APPEAL, ARGO, CLOSED, _SR

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: 5:09–cv–00081–R
# *Internal Use Only*

Morris v. Workman

Assigned to: Honorable David L. Russell

Case in other court:  Tenth Circuit, 09–06248

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 01/20/2009

Date Terminated: 10/08/2009

Jury Demand: None

Nature of Suit: 530 Habeas Corpus (General)

Jurisdiction: Federal Question

**Petitioner**

**Howard P Morris, III**                    represented by   **Bill Zuhdi**
                                                             Bill Zuhdi Attorney at Law PC
                                                             P O Box 1077
                                                             Oklahoma City , OK 73101
                                                             405–232–1400
                                                             Fax: 405–755–9686
                                                             Email: zlawoffice@aol.com
                                                             *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Warden Randall G Workman**                represented by   **Jared A Looper**
                                                             Attorney General's Ofc–OKC
                                                             313 NE 21st St
                                                             Oklahoma City , OK 73105
                                                             405–521–3921
                                                             Fax: 405–522–4534
                                                             Email: fhc.docket@oag.state.ok.us
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/20/2009 | 1 | 5 | PETITION for Writ of Habeas Corpus, filed by Howard P Morris, III.(db, ) (Entered: 01/20/2009) |
| 01/20/2009 | 2 | | PREVIOUS Cases (db, ) (Entered: 01/20/2009) |
| 01/20/2009 | 3 | | ENTER ORDER REFERRING CASE to Magistrate Judge Doyle W. Argo.. By Direction of Honorable David L. Russell on 1/20/08. (db, ) (Entered: 01/20/2009) |
| 01/20/2009 | 4 | | FIRST MOTION for Extension of Time *to file memorandum and brief in support* by Howard P Morris, III. Motions referred to Doyle W. Argo. (Zuhdi, Bill) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/20/2009) |
| 01/20/2009 | 5 | | Receipt for Money Received from Howard P Morris, III in the amount of $5.00, receipt number 131873 regarding 1 Petition for Writ of Habeas Corpus (db, ) (Entered: 01/20/2009) |
| 01/21/2009 | 6 | | ORDER the Court GRANTS Petitioner Howard P. Morris's Motion for Extension of Time to File Memorandum and Brief in Support of Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. sec 2254. Petitioner shall file his supporting memorandum to his sec 2254 Petition on or before Thursday, February 19, 2009. granting 4 Motion for Extension of Time to File. Signed by Magistrate Judge Doyle W. Argo on 1/21/09. (sr, ) (Entered: 01/21/2009) |
| 01/21/2009 | 7 | | ORDER for Response by Oklahoma Attorney General to petition for Writ of HC re 1 Petition for Writ of Habeas Corpus filed by Howard P Morris, III. Signed by Magistrate Judge Doyle W. Argo on 1/21/09. (sr, ) (Entered: 01/21/2009) |
| 01/26/2009 | 8 | | ENTRY of Appearance by Jared A Looper on behalf of Randall G Workman (Looper, Jared) (Entered: 01/26/2009) |
| 02/19/2009 | 9 | | MOTION for Extension of Time *to file memorandum and brief in support of petition for writ of habeas corpus* by Howard P Morris, III. Motions referred to Doyle W. Argo. (Zuhdi, Bill) (Entered: 02/19/2009) |
| 02/19/2009 | 10 | | ORDER granting 9 Motion for Extension of Time to File Memorandum and Brief in Support to Petitioner's Petition for Writ of Habeas Corpus. Petitioner shall file his supporting memorandum on or before 3/21/2009. Signed by Magistrate Judge Doyle W. Argo on 2/19/2009. (bc, ) (Entered: 02/19/2009) |
| 03/23/2009 | 11 | 23 | BRIEF IN SUPPORT re 1 Petition for Writ of Habeas Corpus by Howard P Morris, III. (Zuhdi, Bill) (Entered: 03/23/2009) |
| 04/13/2009 | 12 | 49 | RESPONSE to 1 Petition for Writ of Habeas Corpus by Randall G Workman. (Attachments: # 1 Exhibit 1 – Brief of Appellant, # 2 Exhibit 2 – Brief of Appellee, # 3 Exhibit 3 – Opinion, # 4 Exhibit 4 – JT relevant pages, Vol. II, # 5 Exhibit 5 – JT relevant pages, Vol. III, # 6 Exhibit 6 – Preliminary Hrg relevant pages, # 7 Exhibit 7 – Brown v. Gibson, unpublished opinion, # 8 Exhibit 8 – Delgado v. Barreras, unpublished opinion, # 9 Exhibit 9 – Battle v. Sirmons, unpublished opinion)(Looper, Jared) (Entered: 04/13/2009) |
| 04/13/2009 | 13 | | NOTICE of Conventional Filing by Jared A Looper on behalf of Randall G Workman (Looper, Jared) (Entered: 04/13/2009) |
| 04/13/2009 | 14 | 271 | STATE COURT RECORDS RECEIVED – CONVENTIONAL FILING by Randall G Workman. (kw, ) (Entered: 04/14/2009) |

| 07/27/2009 | 15 | 272 | REPORT AND RECOMMENDATION it is recommended that the petition for a writ of habeas corpus be denied. Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court on or before August 17, 2009; This Report and Recommendation disposes of all the issues referred to the undersigned Magistrate Judge in the captioned matter. re 1 Petition for Writ of Habeas Corpus filed by Howard P Morris, III Objections to RRdue by 8/17/2009. Signed by Magistrate Judge Doyle W. Argo on 7/27/09. (sr, ) (Entered: 07/27/2009) |
| --- | --- | --- | --- |
| 07/27/2009 | | | Magistrate Judge Doyle W. Argo no longer assigned to case. (sr, ) (Entered: 07/27/2009) |
| 08/17/2009 | 16 | | MOTION for Extension of Time *to file objection to Report and Recommendation* by Howard P Morris, III. (Zuhdi, Bill) (Entered: 08/17/2009) |
| 08/18/2009 | 17 | | ORDER granting 16 Motion for Extension of Time to File objections to R &R until 9/16/09. Signed by Honorable David L. Russell on 8/18/09. (ns, ) (Entered: 08/18/2009) |
| 08/18/2009 | 18 | | ORDER ADOPTING REPORT AND RECOMMENDATION. Signed by Honorable David L. Russell on 8/18/09. (ns, ) (Entered: 08/18/2009) |
| 08/18/2009 | 19 | | JUDGMENT. Signed by Honorable David L. Russell on 8/18/09. (ns, ) (Entered: 08/18/2009) |
| 08/18/2009 | 20 | | ORDER vacating Order 18 and Judgment 19 due to being entered in error. Signed by Honorable David L. Russell on 8/18/09. (ns, ) (Entered: 08/18/2009) |
| 09/16/2009 | 21 | 306 | OBJECTION TO REPORT AND RECOMMENDATION 15 filed by Howard P Morris, III. (Zuhdi, Bill) (Entered: 09/16/2009) |
| 10/08/2009 | 22 | 315 | ORDER ADOPTING REPORT AND RECOMMENDATION. Signed by Honorable David L. Russell on 10/8/09. (ns, ) (Entered: 10/08/2009) |
| 10/08/2009 | 23 | 324 | JUDGMENT. Signed by Honorable David L. Russell on 10/8/09. (ns, ) (Entered: 10/08/2009) |
| 11/06/2009 | 24 | 325 | NOTICE OF APPEAL as to 23 Judgment by Howard P Morris, III. (Zuhdi, Bill) (Entered: 11/06/2009) |
| 11/09/2009 | 25 | | PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 24 Notice of Appeal (kw, ) (Entered: 11/09/2009) |
| 11/09/2009 | 26 | | CORRECTED PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 24 Notice of Appeal (kw, ) (Entered: 11/09/2009) |

| 11/09/2009 | 27 | | Tenth Circuit USCA Case Number 09–6248 for 24 Notice of Appeal filed by Howard P Morris, III. (kw, ) (Entered: 11/09/2009) |
| 11/19/2009 | 28 | | USCA Appeal Fee received in the amount of $ 455, receipt number 5736, re 24 Notice of Appeal filed by Howard P Morris, III (kw, ) (Entered: 11/20/2009) |
| 12/08/2009 | 29 | | TRANSCRIPT LETTER advising no transcripts are necessary re 24 Notice of Appeal filed by Howard P Morris, III. The record is ready for appeal purposes. (kw, ) (Entered: 12/08/2009) |
| 04/08/2010 | 30 | | DESIGNATION of Record on Appeal by Howard P Morris, III re 24 Notice of Appeal (Zuhdi, Bill) (Entered: 04/08/2010) |
| 04/09/2010 | 31 | | LETTER – Record Sent Electronically to USCA re 24 Notice of Appeal. 1 Volume. (kw, ) (Entered: 04/09/2010) |

Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 5

Name:                          Howard P. Morris, III
Prisoner's No.:                # 538096
Place of Confinement:          Oklahoma State Penitentiary
                               P.O. Box 97
                               McAlester, OK 74502


## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HOWARD MORRIS, III** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** |
| | ) | |
| **RANDY WORKMAN,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **THE ATTORNEY GENERAL OF** | ) | |
| **THE STATE OF OKLAHOMA.** | ) | |

## PETITION

1.   **Name and location of court which entered the judgment of conviction under attack:**

     District Court of Oklahoma County, State of Oklahoma

2.   **Date of Judgment of conviction:** Petitioner was sentenced on April 17, 2006.

3.   **Length of Sentence:** Life without parole.

4.   **Nature of offenses involved**:  On the 10th day of September, 2004, an Information was filed

     in Case No.: CF-2004-1212 in the District Court of Oklahoma County, Oklahoma, which

     charged Mr. Morris and Timothy Kendell Johnson ("Johnson"), Jeremy Dion Nicholson

     ("Nicholson") and Mr. Morris with Count 1, Murder in the First Degree of the victim,

     Rodney Lamont Perry,  in violation of OKLA. STAT. tit, 21 § 701.7.

5.   **What was the plea:**  Not guilty

-1-

6.    **If Petitioner pleaded not guilty, what kind of trial was had.**   Jury trial.

7.    **Testify at Trial:**   Yes.

8.    **Appeal from judgment on conviction**: Yes.

9.    **Information on Direct Appeal**:

    a.    Name of Court:        Oklahoma Court of Criminal Appeals

    b.    Result: The Judgment and Sentence of the district court was affirmed.

    c.    Date of result and citation, if known: October 24, 2007.  The summary opinion was

       not published.

    d.    Petitioner raised seven propositions of error in his direct appeal:

       **PROPOSITION ONE**
       **THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN**
       **OVERRULING MR. MORRIS' MOTION FOR MISTRIAL**
       **VIOLATING HIS SIXTH, EIGHTH, AND**
       **FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL**
       **OF HIS CONVICTION AND SENTENCE**

       **PROPOSITION TWO**
       **MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT**
       **AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS**

       **PROPOSITION THREE**
       **HEARSAY STATEMENTS INTRODUCED INTO MR. MORRIS' TRIAL**
       **WERE IMPROPER AND DENIED HIM**
       **HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH**
       **AMENDMENTS OF THE UNITED STATES CONSTITUTION**
       **AND ARTICLE 2, SECTION 20 OF THE OKLAHOMA CONSTITUTION**

       **PROPOSITION FOUR**
       **MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL**
       **COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH**
       **AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

       **PROPOSITION FIVE**
       **PROSECUTOR MISCONDUCT DENIED**
       **MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION**

-2-

**OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**
**OF THE UNITED STATES CONSTITUTION**

**PROPOSITION SIX**
**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT**
**TO SUPPORT MR. MORRIS' CONVICTION FOR FIRST DEGREE**
**MURDER**
**AND WAS INSUFFICIENT TO SUSTAIN HIS CONVICTION AND**
**THEREFORE, HIS CONVICTION**
**VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH**
**AMENDMENT OF THE U.S. CONSTITUTION AND**
**ARTICLE 2, SECTION 7 OF THE OKLAHOMA CONSTITUTION**

**PROPOSITION SEVEN**
**THE TRIAL ERRORS COMPLAINED OF HEREIN**
**CUMULATIVELY DENIED MR. MORRIS' RIGHT**
**TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA**
**CONSTITUTION AND THEREFORE, HIS CONVICTION**
**AND SENTENCE MUST BE REVERSED**

e.     No further review of the decision on appeal by a higher state court was sought.

f.     No petition for certiorari in the United States Supreme Court was filed.

10.    Other than a direct appeal from the judgment of conviction and sentence, no other petition,

application, or motions with respect to this judgment in any court, state or federal, have been

previously filed.

11.    Not applicable

12.    State concisely every ground in which Petitioner claims to be held unlawfully.  Summarize
briefly the facts supporting each ground.  If necessary, attach pages stating additional grounds
and facts supporting same.

-3-

**Ground One:**
## THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING MR. MORRIS' MOTION FOR MISTRIAL VIOLATING HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL OF HIS CONVICTION AND SENTENCE

**Supporting Facts**:

Mr. Morris submits the trial court erred in denying Mr. Morris's motion for a mistrial after the judge met privately with jurors. The meeting occurred after the jury sent a communication to the judge that they were concerned Mr. Morris had taken notes while their personal and family information was disclosed during voir dire. During the second day of trial, the jury made it clear that they had severe concerns regarding Mr. Morris. After a break in the trial, the court informed trial counsel and Mr. Morris that the bailiff had made her aware, "that the jurors had expressed to her a concern that your client was taking notes during jury selection and because this is gang stuff, they don't know what that means and they're concerned about their personal security." (Vol. 2, Tr. 153). The judge then explained that she went into the jury room during the break and told the jurors that she generally doesn't talk to the jury during trial and that she had to be very limited in what she said. The judge continued that she told the jurors that in her history with the court, she was unaware of there ever being a time when jurors had been threatened or intimidated, and that she was confident that Mr. Morris' taking notes was so that he could communicate with trial counsel. According to the judge, she also told the jurors that Mr. Morris would not be taking anything from the courtroom (Vol. 2, Tr. 153). The trial continued.

The following morning, trial counsel informed the court that the previous day he had been caught flatfooted and that he was disturbed the jury had the concern and the contact with the court because it indicated to trial counsel that the jury had collectively or individually talked about Mr.

-4-

Morris (Vol. 3, Tr. 9). Trial counsel set forth that the jury had violated its oath and that the concern expressed by the jury about Mr. Morris, that he would know where they live or that was of consequence, showed him he was facing an unlevel playing field (Vol. 3, Tr. 10, 11). Trial counsel asked for a mistrial (Vol. 3, Tr. 11). At trial counsel's request for individual voir dire, the jurors were individually voir questioned (Vol. 3, Tr. 12, 13).

Juror Lee stated that several jurors brought up their concerns. Juror Lee had no concerns (Vol. 3, Tr. 21). Juror Lee stated they (jurors) were talking how Mr. Morris was writing down notes and that he probably would take that out of the room, and that he could probably give it to somebody else and they could track the jurors down. Juror Lee agreed that some of the jurors were expressing fear (Vol. 3, Tr. 22).

Juror Carrender stated concerns about safety were brought up, that some of the jurors were concerned because they had to say where their spouses worked, where they worked, their spouse's name, and things like that. Juror Carrender some were kind of fearful and were just worried for their families, and were curious as to what kind of information could be taken from the courtroom (Vol. 3, Tr. 24, 25, 26).

Juror Townsend stated that a couple of jurors were concerned Mr. Morris may have written down information names, places were they worked and such information (Vol. 3, Tr. 28).

Juror Alexander stated he thought one person was a little concerned over information he had given (Vol. 3, Tr. 30).

Juror Ryan was concerned that Mr. Morris was taking notes when Ryan was answering questions about his wife's name and where she worked, and kids and all those things. Juror Ryan also said it was becoming evident that there are people that could be possibly involved with gangs in this

-5-

whole scenario.  Witness Demetria's boyfriend was wearing all red, a Blood's color.  And that if the person is innocent or guilty or there would be a side that decided, they would want to retaliate (Vol. 3, Tr. 33, 34).  In addition to juror Ryan and the blond juror, there were three other jurors that were concerned (Vol. 3, Tr. 37).

Juror Gilbert stated that it just came up that Mr. Morris could have remembered something (Vol. 3, Tr. 41).

Juror Berry stated he thought one juror was concerned.  Juror Berry stated that he did not think it was just Mr. Morris, but that there were so many people in and out of the courtroom he worried that they and their families were safe in general (Vol. 3, Tr. 42, 43, 44).

Juror Cotey stated she thought the concern was the fear of reprisals since there was mention of gangs, Crips and Bloods (Vol. 3, Tr. 46).

 Juror Demers stated that Mr. Morris was the only person that wasn't a professional or working in the courtroom at the time.  Juror Demers said Mr. Morris taking information was a concern and she agreed that was discussed in the jury room among several jurors (Vol. 3, Tr. 47, 50).

Juror Myers stated that "...but I'm worried if we don't convict the guy. We're going to turn him loose in the community." (Vol. 3, Tr. 54).

Juror Peters did not hear any concerns from the other jurors (Vol. 3, Tr. 59).

Juror Marquez agreed that it was brought up that Mr. Morris may have information and give it to somebody (Vol. 3, Tr. 62).

Juror Cornish (alternate and ultimately jury member replacing juror Berry) agreed jurors were concerned that Mr. Morris could give information to other people.  The concern was alleviated because nothing would be leaving the courtroom (Vol. 3, Tr. 66, 169).

-6-

Juror Leavitt (alternate) agreed there was fear about Mr. Morris having information from jury selection and maybe giving that information to somebody (Vol. 3, Tr. 69, 70).

All of the jurors told the court they could be fair and impartial and that they had not decided the case yet and had not discussed the case (Vol. 3, Tr. 21-69). Some jurors exhibited concerns and fears about the gangs and retribution from Mr. Morris or others in the courtroom. Juror Myers was worried that if they didn't convict Mr. Morris, then they were going to turn him loose in the community (Vol. 3, Tr. 54). Trial counsel re-urged the motion for mistrial. The court did not declare a mistrial (Vol. 3, Tr. 70, 71, 72, 73). It is Mr. Morris's position that the trial court erred in not granting the motion for mistrial and the Court of Criminal Appeals erred in finding the trial court judge did not abuse her discretin in denying the motion for new trial.

## Ground Two:

## MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS

**Supporting Facts:**

Mr. Morris was denied his constitutional and statutory rights to be present at all critical stages of trial when the judge met privately with the jury to discuss their security concerns. During the second day of trial the jury made it clear that they had severe concerns regarding Mr. Morris. After a break during the second day of trial, the court informed trial counsel and apparently Mr. Morris that the bailiff had made her aware, "that the jurors had expressed to her a concern that your client was taking notes during jury selection and because this is gang stuff, they don't know what that means and they're concerned about their personal security." (Vol. 2, Tr. 153). The judge then explained that she went into the jury room during the break and told the jurors that she generally doesn't talk to the jury during trial and that she had to be very limited in what she said. The judge continued that she

-7-

told the jurors that in her history with the court she was unaware of there ever being a time when jurors had been threatened or intimidated, and that she was confident that Mr. Morris' taking notes was so that he could communicate with trial counsel. The judge also told the jurors that Mr. Morris would not be taking anything from the courtroom (Vol. 2, Tr. 153). The trial continued and the following morning trial counsel asked for a mistrial (Vol. 3, Tr. 11). Trial counsel re-urged the motion for mistrial. The court did not declare a mistrial (Vol. 3, Tr. 70, 71, 72, 73). Trial counsel's motion for mistrial was on other grounds as set forth in Ground One. Mr. Morris submits the Court of Criminal Appeals erred in finding under the circumstances of his case, no violation of Morris's statutory right to be present at trial occurred.

### Ground Three:

### MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

**Supporting Facts:**

Trial counsel was ineffective in failing to move for a new trial on the basis of the alleged jury misconduct discussed in Grounds One and Two. Further, trial counsel was deficient in his performance for failing to object to the prosecutor's improper comments discussed in Ground Four. The Court of Criminal Appeals erred in finding Mr. Morris cannot meet the burden of showing deficient performance and prejudice.

-8-

**Ground Four:**

**PROSECUTOR MISCONDUCT DENIED
MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION
OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION**

**Supporting Facts:**

Morris was denied due process by the prosecutor making improper remarks during closing argument. It is Mr. Morris's assertion that repeatedly during closing argument, the prosecutor shifted the burden of proof to Mr. Morris and such conduct was so egregious that reversible error is warranted. The prosecutor stated:

(By the prosecutor):   This Defendant couldn't even give you a reason that these people would all get together and do this. *You've heard no evidence that would indicate to you these people are not telling you what they saw.*

(Vol. 3, Tr. 108, lines 8-11)

(By the prosecutor):   There is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but to tell you the truth.

(Vol. 3, Tr. 146, lines 5-7).

These two comments by the prosecutor were unobjected to by trial counsel. However, Mr. Morris submits they were so egregious in nature that plain error occurred and reversal is warranted despite trial counsel's failure to object.

And then, regarding another instance where the prosecutor impermissibly shifted the burden of proof which was objected to by trial counsel, the prosecutor stated:

(By the prosecutor):   Second, the Defense never shows any reason to question eyewitness credibility. Mr. Box never establishes a conspiracy among those individuals

-9-

to lie. *He has the right to present evidence of that and he didn't.* What can

they gain by doing so? And, secondly, wouldn't you expect a more complete

thorough and unquestionable story if they did indeed conspire to lie.

Trial counsel:    Objection, Your Honor. May I approach?

The Court:    You may.

Trial counsel:    Your Honor, I take issue with this part of the closing argument. The Defendant has

no obligation to recall any testimony. The burden is strictly on the State of Oklahoma

and any comment that the Defense is lacking in putting on particular evidence I

believe is improper.

(Vol. 3, Tr. 156, lines 24, 25 and Tr. 157, lines 1-13)

The judge then told trial counsel, "I don't believe that what he said shifts the burden. He just

said that you never established that." (Vol. 3, Tr. 157).

Mr. Morris was unduly prejudiced due to the prosecutor's misconduct. The evidence of guilt

was not overwhelming in his case (*See Ground Five*) and Mr. Morris submits the prosecutor's

comments were likely to have affected the verdict and sentence. The Court of Criminal Appeals erred

in finding the prosecutor comments did not merit reversal.

-10-

_____Ground Five:

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
TO SUPPORT MR. MORRIS' CONVICTION FOR FIRST DEGREE MURDER
AND WAS INSUFFICIENT TO SUSTAIN HIS CONVICTION AND
THEREFORE, HIS CONVICTION
VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH
AMENDMENT OF THE U.S. CONSTITUTION AND
ARTICLE 2, SECTION 7 OF THE OKLAHOMA CONSTITUTION**

**Supporting Facts:**

**State witnesses**

Demetria Tinner ("Tinner") testified that on the evening of February 20th, 2004, at 10:30 or 11:00, she was heading over to Rockwell Villa Apartments. Christa Anderson was with her in Tinner's car, a white Ford Focus. They were going to the apartments to visit Anderson's friend Kesha (Vo. 2, Tr. 35, 36, 40). Both Tinner and Anderson had previously lived in the Rockwell Villa Apartments. When they had lived at the apartments Rodney Perry lived "across the way" from them the entire time (Vol. 2, Tr. 37).

When Tinner came off of Rockwell to Rockwell Villa she saw a group of guys standing outside and arguing in the parking area. Tinner testified she saw five guys. Four men were arguing with one man. Tinner's front tires were over a speed bump and she came to a stop. They let the car windows down and watched. The four men started stomping all over the one man's body and were beatong him up really bad, jumping on his chest and stuff (Vol. 2, Tr. 40, 41, 42). All four men were participating in the beating. The man that was beaten was standing up at first but one of the guys hit him and he fell back on the ground. They started jumping and stomping him (Vol. 2, Tr. 43). Tinner testified the four men were saying something about Crip stuff and Rodney saying he didn't do anything. Rodney then started gurgling real bad. Rodney was shaking real bad and Tinner could tell

-11-

he was not breathing.  Tinner called 911 on her way back.  She had turned around in a little circle and came back by the men.  As she came into the apartment complex the beating was on her side of the car and on the way back the beating was on the passenger side of the car.  About ten people came out.  One of the four men took off through the crowd.  The other three men got into a car and left behind her on Rockwell (Vol. 2, Tr. 44, 45, 46, 47, 54).  Tinner identified Mr. Morris as being out there that night (Vol. 2, Tr. 48, 49).  Tinner did not identify Mr. Morris when she was initially interviewed by the police and did not tell them she knew him.  Tinner told the prosecutor right before the last trial.  Tinner stated she did not remember how Mr. Morris was dressed (Vol. 2, Tr. 49, 50).  Tinner testified that Mr. Morris came to the car and guessed that when he noticed it wasn't Eenie in the car he went through the crowd (Vol. 2, Tr. 51).  Tinner stated she knew Mr. Morris as NC (Vol. 2, Tr. 52).  Tinner agreed that Mr. Morris was one of the four men that was beating and stomping Rodney Perry (Vol. 2, Tr. 54, 61).

On cross examination, Tinner admitted that in July 2004 at a preliminary hearing she testified that she answered no to the question of whether she recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62).

Christa Anderson ("Anderson") testified that on February 20, 2004, between 10:30 and 11, she and Tinner were driving to the Rockwell Villa Apartments.  Anderson was in the passenger seat of Tinner's white Ford Focus.  They were going to visit Anderson's friend Tasha.  Anderson knew Rodney Perry.  She had lived in the apartments from 2001 to 2002.  As Anderson and Tinner were entering the apartments they went over a speed bump, and heard someone say "What did I do?  I didn't do anything."  That is when Anderson saw the fight start (Vol. 2, Tr. 65, 66, 67, 68).  After the individual made the statements he started getting beaten up by four gentleman.  The individual

-12-

was being punched very violently (Vol. 2, Tr. 68, 69).  Once the men were against the mailboxes the

victim was lifeless and kind of slid down the car.  The victim was laying on the ground where the men

proceeded to stomp on him and kick.  Rodney was the individual that was beat up.  Anderson could

hear what sounded like a wet snore, like a gurgling sound (Vol. 2, Tr. 70, 71).

Oklahoma police officer Taylor Shaw ("Shaw") testified that on February 20th, 2004, at 11:48

p.m., he received a call on an assault at an apartment location located at 933 North Rockwell.  When

officer Shaw arrived he found a gentleman that looked like he was sitting or leaning against a car.

Officer Shaw got out of his car and asked the man if he was okay.  Officer Shaw did not get a

response.  Officer Shaw checked for a pulse and didn't find one, and then told EMSA to step it up

(Vol. 2, Tr. 75, 76, 77).

Oklahoma police officer Matthew Reed ("Reed") stated on February 20th, 2004 at

approximately 11:49 p.m. he was dispatched to Rockwell Villa Apartments.  When officer Reed

arrived he observed the deceased Mr. Perry laying against a Dodge Neon (Vol. 2, Tr. 78, 79).  Officer

Reed could see blood on Mr. Perry's face (Vol. 2, Tr. 79, 80, 81).

Oklahoma police officer David Feskanich ("Feskanich") testified he was one of the crime

scene investigators assigned to the homicide of Rodney Perry.  Officer Feskanich arrived on the scene

at 12:35 on the 21st (Vol. 2, Tr. 83).  Officer Feskanich described his role, sketches of the scene, what

he found at the scene and items he had collected (Vol. 2, Tr. 85-95).  Officer Feskanich testified that

one of the detectives brought to his attention that a Mitsubishi Galant vehicle may have also been

involved. Officer Feskanich also collected a wool or knit beanie cap (Vol. 2, Tr. 96, 97).  Officer

Feskanich  testified about photographs taken of the deceased Mr. Perry which showed blood coming

-13-

from the nose, mouth, and facial area as well as other photographs of the deceased's injuries (Vol. 2, Tr. 99, 100, 101).

Chai Choi ("Choi"), forensic pathologist working with the office of Chief Medical Examiner for the State of Oklahoma, performed an autopsy on Rodney Perry on February 21st, 2004 (Vol. 2, Tr. 103, 104, 105). Dr. Choi described the injuries she found to Mr. Perry's body (Vol. 2, Tr. 105, 108, 109, 110, 111, 112, 113, 114). Based on Dr. Choi's examination, her determination of the cause of death was head injury. Dr Choi classified the death as a homicide, one person harm to another person that resulted in death (Vol. 2, Tr. 113).

Kyle Laws ("Laws"), a resident of Rockwell Villa Apartments, on February 20th, 2004, at approximately 11 or 11;30 P.M., saw a fight broke out between Rodney Perry and four other individual. Laws was upstairs in his apartment when the fight first broke out (Vol. 2, Tr. 117, 118, 127). Laws went downstairs with six or seven friends to where th fight was and the four men walked by him bragging that they had knocked some guy out and he was over there asleep. Laws testified one of the four men had two sets of teardrops tattoo under each eye. After initially testifying he could not remember any of the clothing these individuals were wearing, Laws testified that he vaguely remembered a North Carolina logo (Vol. 2, Tr. 119, 120, 121, 122, 128). Laws went over and looked at Rodney Perry. Mr. Perry looked like he was laid out on the ground asleep. His body was laying next to the vehicle on the concrete. Rodney Perry was trying to gasp for air. The guy with the teardrops came over and grabbed Rodney Perry by his shirt , picked him up and said something to him, slammed his head on the concrete pretty hard, then kicked him twice in the head. The guy then picked Rodney Perry back up by his shirt, leaned him against the car and then walked away to another group of people (Vol. 2, Tr. 122, 123). The cops pulled up and the guy with the teardrops

-14-

followed Laws and the group of his family up to their apartment. The guy with the teardrops and those with him tried to use the phone but they were not allowed in. Kurt gave them a cell phone from the house to use (Vol. 2, Tr. 124, 125).

Kurt Brazille ("Brazille"), on February 20, 2004, between 10:30 and midnight, was at his girlfriend's house at Rockwell Villa Apartments (Vol. 2, Tr. 130). Either Brazille's niece or daughter came over and said there was a fight by the mailboxes. Brazille dropped everything he had in his hand and took off running outside (Vol. 2, Tr. 134, 156). Brazille was met by his nephew Dewan Debose and three other guys. Brazille identified Mr. Morris as one of the three other guys. He stated Mr. Morris had on a baseball cap and a jacket with Tar Heel colors (Vol. 2, Tr. 137, 139). In past court testimony Brazille had testified the individual that he identified at trial as Mr. Morris had a jacket on that said "Thug Life." (Vol. 2, Tr. 155, 156). Brazille saw that one of the guys had teardrop tattoos under each eye. A third guy had a black hoodie (Vol. 2, Tr. 138, 140). Brazille testified that Mr. Morris kept biting his bottom lip and was saying he would get a fair fight with anyone that wanted one (Vol. 2, Tr. 140, 141, 142, 143). The three men went back around the side of the grey car where Rodney Perry was laying. Brazille stated he could hear stomping and skin slapping. They then came back over to where Brazille was standing outside the apartment building. That is when they got in their car. Brazille stated that Mr. Morris got in the passenger side but in the back seat (Vol. 2, Tr. 147, 148, 157).

There was Brazille's stepson and close to nine of his skateboard friends out there that night, and there could have been over 20 people (Vol. 2, Tr. 163). The Oklahoma City and Bethany police came to the apartments. About four minutes later Brazille saw Mr. Morris and the teardrop guy in Tracy's house. Brazille stated that Mr. Morris and the teardrop guy told him they wanted to use the

-15-

phone.  Brazille did not want them to use the house phone so he gave them his stepson's cell phone (Vol. 2, Tr. 149, 150, 161).  Brazille testified he handed the phone to Howard and that Howard spoke on the phone.  Brazille stated that Howard told whoever he was talking to on the phone to meet him at Abadan's, a small convenience store on Northwest 10th.  Brazille stated that Howard told him thank you and then proceeded to go out the back way down the back stairway (Vol. 2, Tr. 150, 15, 161).

Brazille testified that before that night he had never seen Mr. Morris, the teardrop guy or the guy in the black hoodie.  Brazille knew Howard's name from having been in court and hearing lawyers say Howard Morris (Vol. 2, Tr. 152).  Brazille was in contact with the three men approximately 10 minutes or less (Vol. 2, Tr. 163).

**Defense witness**

Howard Morris ("Mr. Morris") took the stand in his own defense.  He had lived in an apartment at Southwest 74th and May since January 2004.  On September 2, 2004 Mr. Morris was arrested at his home when he got off work.  Mr. Morris denied being near the location of the homicide on February 20, 2004.  Mr. Morris denied being involved in the homicide that he was charged with and Mr. Morris denied having any information about the homicide (Vol. 3, Tr. 75, 76, 77, 78, 80).

On cross-examination, Mr. Morris denied ever meeting Tinner, denied knowing Debose, denied knowing or ever meeting Brazille, and denied knowing Rodney Perry.  Mr. Morris stated he did not know what happened to Mr. Perry and that he was not there at the homicide of Mr. Perry (Vol. 3, Tr. 82, 83).  Mr. Morris had one item of Tar Heel clothing, as well as other teams.  Mr.

-16-

Morris testified he wasn't wearing Tar Heel clothing on February 20th, 2004, he was at home in bed (Vol. 3, Tr. 84). Mr. Morris testified he has never been convicted of a felony (Vol. 3, Tr. 90).

**Ground Six:**

**THE TRIAL ERRORS COMPLAINED OF HEREIN
CUMULATIVELY DENIED MR. MORRIS' RIGHT
TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA
CONSTITUTION AND THEREFORE, HIS CONVICTION
AND SENTENCE MUST BE REVERSED**

**Supporting Facts:**

The errors that occurred during the trial individually and collectively adversely affected Petitioner's conviction and sentence as set forth herein.   The numerous irregularities during the course of Petitioner's trial prejudiced his rights and denied him a fair trial.

13.    There are no other grounds not previously presented.

14.    Petitioner has no petition or appeal now pending in any court, either state or federal, as to the judgment under attack.

15.    Attorney information:

At preliminary hearing/arraignment and plea/trial/sentencing:

Chris Box
2208 S.W. 59th Street
Oklahoma City, OK 73119

Direct appeal:

Bill Zuhdi
P.O. Box 1077
Oklahoma City, OK 73101

16.    Petitioner was sentenced to count one of the indictment.

-17-

17.    Petitioner does not have a future sentence to serve after completion of the sentence imposed

by the judgment under attack.

WHEREFORE, Petitioner Howard Morris, III prays the Court grant Petitioner relief to which

he may be entitled in this proceeding.

Respectfully submitted,

s/Bill Zuhdi
Bill Zuhdi, OBA #10013
Bill Zuhdi Attorney at Law, P.C.
P.O. Box 1077
Oklahoma City, OK 73101
(405)232-1400 (office)
(405)755-9686 (facsimile)
Zlawoffice@aol.com (e-mail)
ATTORNEY FOR PETITIONER

-18-

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HOWARD MORRIS, III | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV -09-81-R |
| | ) | |
| RANDY WORKMAN, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| THE ATTORNEY GENERAL OF | ) | |
| THE STATE OF OKLAHOMA. | ) | |

## MEMORANDUM IN SUPPORT OF PETITION
## FOR WRIT OF HABEAS CORPUS

Respectfully submitted,

s/Bill Zuhdi
Bill Zuhdi, OBA #10013
Bill Zuhdi Attorney at Law, P.C.
P.O. Box 1077
Oklahoma City, OK 73101
(405)232-1400 (office)
(405)755-9686 (facsimile)
Zlawoffice@aol.com (e-mail)
ATTORNEY FOR PETITIONER

-1-

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TABLE OF CASE AUTHORITIES, STATUTES, CITATIONS AND RULES  . . . . . . 3

GROUNDS ONE AND TWO COMBINED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN
OVERRULING MR. MORRIS'S MOTION FOR MISTRIAL
VIOLATING HIS SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL
OF HIS CONVICTION AND SENTENCE AND
MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT
AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS**

GROUND THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
**MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL
COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

GROUND FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
**PROSECUTOR MISCONDUCT DENIED
MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION
OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION**

GROUND FIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
TO SUSTAIN MR. MORRIS' CONVICTION FOR FIRST DEGREE MURDER
AND THEREFORE HIS CONVICTION
VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH
AMENDMENT OF THE U.S. CONSTITUTION**

GROUND SIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
**THE TRIAL ERRORS COMPLAINED OF HEREIN
CUMULATIVELY DENIED MR. MORRIS'S RIGHT
TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA
CONSTITUTION AND THEREFORE, HIS CONVICTION
AND SENTENCE MUST BE REVERSED**

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF CASE AUTHORITIES, STATUTES, CITATIONS AND RULES

## CASE AUTHORITIES

*Boltz v. Mullin*, 415 F.3d 1215, 1230 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Donnelly v. CeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872,
    40 L.Ed. 2d 431 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Early v. Packer*, 537 U.S. 3, 7-8 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hoxsie v. Kerby,* 108 F.3d 1239, 1245 (10th Cir.1997), *cert. denied,* 522 U.S. 844,
    118 S.Ct. 126, 139 L.Ed.2d 77 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) . . . . . . . . . . . . . . . . 7

*Jackson v. Virginia*, 443 U.S. 307, 319,  99 S.Ct. 2781, 2787,
    61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,23,24

*Morris v. Taylor*, 529 U.S. 362, 402-03 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6

*Remmer v. United States*, 347 U.S. 227, 229 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) . . . . . . . 7

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct 2052, 2065,
    80 L.Ed 2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,14,15

*United States v. Day*, 830 F.2d 1099, 1106 (10th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Bradshaw*, 787 F.2d 1385 (10th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Gigax*, 605 F.2d 507, 515 (10th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir.1980) . . . . . . . . . . . . . . . . . . . 8

*United States v. McKneely*, 69 F.3d 1067, 1080 (10th Cir.1995) . . . . . . . . . . . . . . . . . . 36

-3-

*United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.1990) . . . . . . . . . . . . . . . . . . . . 25

*United States v. Washita Construction Co.,* 789 F.2d 809, 821 (10th Cir.1986) . . . . . . . 8

## STATUTORY AUTHORITIES

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, passim

28 U.S.C. § 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, passim

OKLA. STAT. tit, 21 § 1123(A)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## CONSTITUTIONAL AUTHORITIES

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, passim

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, passim

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, passim

U.S. Const. amend. IVX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, passim

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HOWARD MORRIS, III | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. CIV -09-81-R** |
| | ) | |
| RANDY WORKMAN, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| THE ATTORNEY GENERAL OF | ) | |
| THE STATE OF OKLAHOMA. | ) | |

## MEMORANDUM IN SUPPORT OF PETITION
## FOR WRIT OF HABEAS CORPUS

COMES NOW, Petitioner Howard Morris, III ("Mr. Morris" and/or "Petitioner") by and through his attorney Bill Zuhdi, respectfully submits this Memorandum and Brief in Support of his Petition for Writ of Habeas Corpus.

## <u>STANDARD OF REVIEW</u>

Petitioner's habeas action is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pursuant the AEDPA, a petitioner is entitled to relief if his claim has been adjudicated on the merits by the state court and if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § § 2254(d)(1) & 2254(d)(2); *Morris v. Taylor*, 529 U.S.

-5-

362, 402-03 (2000); *see also Early v. Packer*, 537 U.S. 3, 7-8 (2002). Thus, when a state

court applies the correct federal law to deny relief, a federal court will only grant relief if the

state court applied federal law in an objectively unreasonable manner. *Hooper v. Mullin*, 314

F.3d 1162, 1169 (10th Cir. 2002). Furthermore, a federal habeas court must presume state

court factual findings to be correct and require the petitioner to rebut that presumption with

clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Hooper*, 314 F.3d at 1167. Questions

of law are reviewed *de novo* and questions of fact are reviewed for clear error. *Cook v.

McKune*, 323 F.3d 825, 830 (10th Cir. 2003). Grounds One through Six herein were raised

by Mr. Morris in his brief of appellant which was filed in the Oklahoma Court of Criminal

Appeals. The court rendered its decision by opinion which affirmed Petitioner's conviction

on October 24, 2007.

### Grounds One and Two (Combined):

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN
OVERRULING MR. MORRIS'S MOTION FOR MISTRIAL
VIOLATING HIS SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL
OF HIS CONVICTION AND SENTENCE AND
MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT
AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS**
(Raised as Propositions One and Two in Direct Appeal)

### INTRODUCTION

The trial court erred in denying Mr. Morris's motion for a mistrial after the judge met

privately with jurors. Further, the trial court erred in not granting the motion for mistrial.

The OCCA erred in finding the trial court judge did not abuse her discretion in denying the

-6-

motion for new trial.  Further, Mr. Morris was denied his constitutional and statutory rights to be present at all critical stages of trial when the judge met privately with the jury to discuss their security concerns.  The OCCA erred in finding under the circumstances of his case, no violation of Morris's statutory right to be present at trial occurred.

## ARGUMENT AND AUTHORITIES

The trial court's error in not declaring a mistrial violated Mr. Morris's due process rights.  Mr. Morris's rights under the United States Constitution were violated by the trial court's error, which affected the very foundation of the trial, requiring reversal of his judgment and sentence and warranting remand for a new trial.  The OCCA's subsequent finding on Mr. Morris's direct appeal of this issue was erroneous that the judge's ruling on the motion for mistrial was amply supported by the record and the trial court did not abuse its discretion in denying the motion for mistrial (Opinion at pgs. 3, 4).

The "...right to a trial by an impartial jury lies at the heart of due process." *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Due process requires both "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

A trial court's decision as to how to proceed in response to allegations of juror misconduct will not be reversed except for abuse of discretion. *United States v. Bradshaw*, 787 F.2d 1385 (10th Cir.1986); *United States v. Day*, 830 F.2d 1099, 1106 (10th Cir.1987).

"Whether a motion for a mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury." 830 F.2d at 1106 (quoting *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir.1980)). *United States v. Washita Construction Co.,* 789 F.2d 809, 821 (10th Cir.1986) (outcome of trial not affected where juror involved in ex parte communication was dismissed).

In its opinion, the OCCA held that, "Because each juror expressed willingness to fully and fairly listen to all of the evidence, and because each juror denied discussing the case..." the trial court's denial of Petitioner's motion for mistrial was "not clearly against the logic and effect of the facts presented." (Opinion at pg. 4).  Petitioner Morris submits the record demonstrates just the opposite and the OCCA's noting in footnote 1 that a juror had stated "If we don't convict the guy, we're going to turn him loose in the community" evidences this point (Vol. 3, Tr. 54).  Clearly, this admission by Juror Myer indicates that the juror was not and could not be fair and impartial to Mr. Morris, bias against Mr. Morris had been formed in Mr. Myer's mind and Mr. Myer's admission went to the core of the merits of the case, that Mr. Morris needed to be found guilty. Juror Myer had already decided that Mr. Morris needed to be convicted because the jury needed to "convict the guy" or he was going to be "turn[ed] loose in the community." (Vol. 3, Tr. 54).   Though Juror Myer told the court he could be fair and impartial and he had not decided the case yet, Juror Myer's statement belies this position (Vol. 3, Tr. 54).  Accordingly, the trial court's decision to deny Mr. Morris's motion for mistrial was contrary to law and violated his due process rights and the OCCA

-8-

erred in its finding that the trial court judge did not abuse her discretion in denying the motion for mistrial (Opinion at pg. 4).

Moreover, Mr. Morris was denied his right to be present at all critical stages of the trial proceedings (See Proposition Two of Brief of Appellant). The OCCA's finding was erroneous that "Because the record shows that this brief meeting between the judge and jury was on a subject unrelated to the merits of the case, the meeting and resulting communications between the judge and jury did not impact Morris's ability to defend against the charges..." Further, the OCCA erred in finding there was no "constitutional violation." (Opinion at pgs. 5,6). As is set forth above, Juror Myer's admission evidences that the juror was not fair and impartial to Mr. Morris. He clearly had bias against Mr. Morris. Juror Myer's decision that Mr. Morris needed to be convicted because the jury needed to "convict the guy" or he was going to be "turn[ed] loose in the community"[1] went to the core of the merits of the case. In Juror Myer's mind, Mr. Morris needed to be found guilty. Therefore, Mr. Morris should have been present during the communications and the "meeting" between the jurors and the judge. Mr. Morris obviously needed to defend himself against the charges and against Juror Myer's voiced belief that Mr. Morris needed to be convicted of the crime with which he was charged or he would be turned loose on the community. The OCCA's finding was erroneous that under the circumstances of Mr. Morris's case, there was no violation of his statutory right to be present at trial (Opinion at pg. 6). The record shows the

---

[1](Vol. 3, Tr. 54).

exchange between Juror Myer and the judge (as well as the other jurors) involved the merits of the case prior to the jury beginning deliberations and dealt with Mr. Morris's guilt or innocence of the charges and the need to convict him of the charges in order to keep him off the streets.

In a criminal case, any private communication with a juror during trial about the matter pending before the jury is deemed presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954). The burden rests on the government to establish after hearing and notice that such contact was harmless. 347 U.S. at 229. In a hearing with all parties present, the trial court should determine the circumstances, impact on the juror, and whether or not the communication was prejudicial. *United States v. Gigax*, 605 F.2d 507, 515 (10th Cir.1979).

The statements Juror Myer made were related to the merits of the case as is evident by the juror's statement to the Court and other jurors that Mr. Morris needed to be convicted of the crime with which he was charged or he would be turned loose on the community. As was the case in *Remmer,* Juror Myer remained on the jury and was not dismissed. The meeting and resulting communications between the judge and the jury impacted Mr. Morris's ability to defend against the charges. Under the circumstances of his case, a violation of Morris's constitutional rights occurred and accordingly, this writ should issue.

### Ground Three:

## MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### (Raised as Proposition Four in direct appeal)

Petitioner Morris was denied his Sixth Amendment right to effective assistance of counsel. As a result of his counsel's ineffective assistance, he was unduly prejudiced, denied a fair trial and was wrongly convicted, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The OCCA's decision was contrary to Supreme Court law as set forth in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct 2052, 2065, 80 L.Ed 2d 674 (1984). Trial counsel was deficient in his performance and Petitioner Morris was prejudiced as a result. *Id*, 466 U.S. at 687. To show prejudice, Petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Trial counsel was ineffective in failing to move for a new trial on the basis of the alleged jury misconduct discussed in Grounds One and Two. Mr. Morris submits the record amply supports juror misconduct occurred during his trial, he was unduly prejudiced as a result and his conviction should be overturned on this basis as is argued in Grounds One/Two herein. However, if this Court determines the record was not amply supported or that the trial court should have reexamined the issues of fact and law regarding the misconduct of the jury, then Mr. Morris submits that trial counsel was ineffective in not moving for a new trial

-11-

on this basis.  Had trial counsel moved for a new trial, the trial court could have reexamined the issues of fact and taken more time to properly examine Juror Myers and the other jurors about what Mr. Morris submits was their fixed beliefs (prior to deliberation) of his guilt of the crime charged.  Trial counsel's failure in not filing a motion for a new trial, prevented the trial court from reexamining the issues of fact and law regarding the misconduct of the jury as set forth in Grounds One and Two herein.  Further, Petitioner was denied an avenue he submits may have led to a new trial without having to seek relief by appeal.

Further, trial counsel was deficient in his performance for failing to object to the prosecutor's improper comments discussed in Ground Four herein.  The OCCA erred in finding no merit in Mr. Morris's claims of prosecutorial misconduct.   As is set forth in Ground Four, Petitioner has asserted that he was unduly prejudiced due to the prosecutor's misconduct because the evidence of guilt was not overwhelming in his case and the prosecutor's comments were likely to have affected the verdict and sentence.  The OCCA was incorrect in its finding that Petitioner was not denied effective assistance of counsel and Petitioner submits the facts support this assertion.  See Ground Four of the Petition for Writ of Habeas Corpus and the recitation of the prosecutor's comments set forth therein at pgs. 9 and 10 of the writ.   See also Mr. Morris's arguments in Ground Four herein related to undue prejudiced suffered by Mr. Morris because of trial counsel's failure to object to the improper comments.

-12-

But for trial counsel's error in failing to object to the prosecutor's comments,[2] Mr.
Morris would not have been found guilty.   Please see the prosecutor comments which Mr.
Morris objected to on direct appeal and in his petition for writ of habeas corpus which are
recited in Ground Four, pgs. 9, 10 of Petitioner's writ and recited once again in Ground Four
of this Memorandum.

In closing, the prosecutor told the jury that there was no evidence presented that
Demetria Tinner took the stand and didn't do anything but tell the truth.   But a review of
Tinner's testimony reveals this was not the case.   Tinner admitted on cross-examination that
in preliminary hearing, she had testified she answered "no" to the question of whether she
recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62).   However, when the prosecutor
told the jury that Tinner had told the truth, Mr. Morris was then forced to prove she wasn't
being truthful.

The OCCA erred in finding no merit in Mr. Morris's prosecutorial misconduct
assertions because when Mr. Morris testified at trial he denied beating the victim, denied
knowing witnesses Brazille, Tinner, and Debose, and he had testified their testimony was a
result of mistaken identity (Opinion at pg. 13).   Mr. Morris submits the OCCA's finding was
contrary to U.S. Supreme Court law and contrary to his due process rights under the United
States Constitution.   The burden was on the state to prove every element of murder in the
first degree beyond a reasonable doubt.   Mr. Morris's testimony of mistaken identity was not

---

[2]

Trial counsel did not object to two of the comments (Vol. 3, Tr. 108, 146) and objected to a third
remark but it was overruled by the trial court judge (Vol. 3, Tr. 157).

-13-

a permissible reason under the law to shift the burden of proof to him. The prosecutor's comments complained of herein shifted the burden of proof and caused Mr. Morris's trial to be so fundamentally unfair, he was denied his due process rights. *Donnell v. CeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed. 2d 431 (1974). Additionally, the OCCA's finding was based upon an erroneous statement of the facts of the case by the OCCA stating that Kurt Brazille testified that he saw Mr. Morris beating the victim Rodney Perry (Opinion at pg. 13). At trial, Kurt Brazille had testified that the three men went back around the side of the grey car where Rodney Perry was laying and he could hear stomping and skin slapping (Vol. 2, Tr. 134, 137, 147, 148, 157). Due to the prosecutor's comments where he shifted the burden of proof, Mr. Morris was in the position that he had to prove that the witnesses were not being truthful. Mr. Morris believed the witness testimony was a result of mistaken identity, not that they were lying. The prosecutor – through the unobjected to comments – placed the burden of proving that the witnesses were lying upon Mr. Morris, which was not related or relevant to his mistaken identity assertion. Trial counsel's failure to object to these comments and his failure to protect Mr. Morris's due process rights was ineffective and but for the ineffective conduct, the jury would not have been tainted against him, would not have had the burden of proof misstated, Mr. Morris would not have had his due process rights violated and he would not have been found guilty.

Applying the clearly established principles in *Strickland*, the OCCA's determination on this issue was contrary to and an unreasonable application of Supreme Court law. Further, Petitioner has aptly demonstrated his counsel was ineffective based on the standards set forth

-14-

in *Strickland*.  He has shown there was a reasonable probability that but for his trial counsel's unprofessional errors, the result of his trial proceedings would have been different.  Petitioner has shown both deficient performance and prejudice and therefore, he should prevail on his claim of ineffective assistance of counsel.  Petitioner's constitutional right to effective assistance of counsel under the Sixth Amendment to the United States Constitution were violated.  Habeas relief should be granted as to ineffective assistance of trial counsel.

### Ground Four:

### PROSECUTOR MISCONDUCT DENIED
### MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION
### OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
### OF THE UNITED STATES CONSTITUTION
### (Raised as Ground Five in Direct Appeal)

### INTRODUCTION

Mr. Morris was denied due process of law when the prosecutor improperly shifted the burden of proof to him.  The shifting of the burden of proof to Mr. Morris by the prosecutor was contrary to United States Supreme Court law.  The OCCA's decision was contrary to Supreme Court law when the OCCA found that the prosecutor's comments were fair comments on the issue raised by Mr. Morris when he testified (Opinion at pg. 14).

### ARGUMENT AND AUTHORITIES

The prosecutor wrongly shifted the burden of proof to Mr. Morris by the prosecutor's repeated comments in closing arguments.  The prosecutor's remarks, set forth below, were so fundamentally unfair that Mr. Morris was denied due process.

-15-

(By the prosecutor): This Defendant couldn't even give you a reason that these

people would all get together and do this. *You've heard no*

*evidence that would indicate to you these people are not telling*

*you what they saw.*

(Vol. 3, Tr. 108, lines 8-11)

(By the prosecutor): There is no evidence presented in this case whatsoever that Demetria

Tinner took the stand to do anything but to tell you the truth.

(Vol. 3, Tr. 146, lines 5-7).

These two comments by the prosecutor were unobjected to by trial counsel. However,

Mr. Morris submits they were so egregious in nature that plain error occurred and reversal

is warranted despite trial counsel's failure to object.

And then, regarding another instance where the prosecutor impermissibly shifted the

burden of proof which was objected to by trial counsel, the prosecutor stated:

(By the prosecutor): Second, the Defense never shows any reason to question eyewitness

credibility.  Mr. Box never establishes a conspiracy among those

individuals to lie. *He has the right to present evidence of that and he*

*didn't.* What can they gain by doing so?  And, secondly, wouldn't you

expect a more complete thorough and unquestionable story if they did

indeed conspire to lie.

Trial counsel:        Objection, Your Honor.  May I approach?

The Court:           You may.

-16-

Trial counsel:         Your Honor, I take issue with this part of the closing argument. The
                       Defendant has no obligation to recall any testimony. The burden is
                       strictly on the State of Oklahoma and any comment that the Defense is
                       lacking in putting on particular evidence I believe is improper.

(Vol. 3, Tr. 156, lines 24, 25 and Tr. 157, lines 1-13)

The judge then told trial counsel, "I don't believe that what he said shifts the burden.
He just said that you never established that." (Vol. 3, Tr. 157).

The prosecutor told the jury that there was no evidence presented that Demetria Tinner
took the stand and didn't do anything but tell the truth. A review of Tinner's testimony
reveals that this was not the case. Tinner admitted on cross-examination that in the
preliminary hearing she had testified that she answered "no" to the question of whether she
recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62). However, with the prosecutor
telling the jury that Tinner told the truth, Mr. Morris was then forced to prove that she wasn't
being truthful. The OCCA found no merit in the prosecutorial misconduct assertions because
when Mr. Morris testified at trial he denied beating the victim, denied knowing witnesses
Brazille, Tinner, and Debose, and that their testimony was a result of mistaken identity
(Opinion at pg. 113). Mr. Morris submits the OCCA's finding was contrary to U.S. Supreme
Court law and contrary to his due process rights under the United States Constitution because
the burden was on the state to prove every element of murder in the first degree beyond a
reasonable doubt. Mr. Morris's testimony of mistaken identity was not a permissible reason
under the law to shift the burden of proof to him. The prosecutor's comments complained

-17-

of herein shifting the burden of proof cause Mr. Morris's trial to be so fundamentally unfair that it denied him of his due process rights. *Donnelly*, *supra*. Additionally, the OCCA's finding was based upon an erroneous statement of the facts of the case by the OCCA stating that Kurt Brazille testified that he saw Mr. Morris beating the victim Rodney Perry (Opinion at pg. 13). At trial, Kurt Brazille had testified that the three men went back around the side of the grey car where Rodney Perry was laying and he could hear stomping and skin slapping (Vol. 2, Tr. 134, 137, 147, 148, 157). Due to the prosecutor's comments shifting the burden, Mr. Morris was now in the position that he had to prove that the witnesses were not being truthful. Mr. Morris believed the witness testimony was a result of mistaken identity, not that they were lying. The prosecutor through his comments had placed the burden of proving that the witnesses were lying, which was not related or relevant to his mistaken identity assertion.

Morris was denied due process by the prosecutor making improper remarks during closing argument, in violation of his due process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. It is Mr. Morris's assertion that repeatedly during closing argument, the prosecutor shifted the burden of proof to Mr. Morris and such conduct was so egregious that reversible error is warranted.

Mr. Morris was unduly prejudiced due to the prosecutor's misconduct. The evidence of guilt was not overwhelming in his case (*See Ground Five*) and Mr. Morris submits the prosecutor's comments were likely to have affected the verdict and sentence. Additional prejudice suffered by Mr. Morris due to the improper comments is set forth in Ground Three herein and incorporated within this Ground. The Court of Criminal Appeals erred in finding

-18-

the prosecutor comments did not merit reversal and therefore, this writ of habeas corpus

should be granted.

**_____Ground Five:**

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
TO SUSTAIN MR. MORRIS' CONVICTION FOR FIRST DEGREE MURDER
AND THEREFORE HIS CONVICTION
VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH
AMENDMENT OF THE U.S. CONSTITUTION
(Raised as Ground Five in the Direct Appeal)**

**INTRODUCTION**

The conviction of Mr. Morris for murder in the first degree was wrongly upheld by

the OCCA, sharply contrary to clearly established United States Supreme Court law.  COCA

found that the jury's verdict alone verified that the verdict was proper.  If a jury verdict

indeed validated all the encompassed law and facts, then there would be no need for review

since all verdicts under the OCCA's reasoning would be proper.

**ARGUMENT AND AUTHORITIES**

The decision by the OCCA was an unreasonable application of *Jackson v. Virginia*,

443 U.S. 307, 319,  99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) and therefore, the decision

by the OCCA was contrary to Supreme Court law as set forth in *Jackson* on the issue of

sufficiency of the evidence. Holdings by the OCCA are reviewed either under 28 U.S.C. §

2254(d)(1) or are reviewed to determine whether the OCCA made an unreasonable

determination in light of the evidence presented in the state court proceeding or whether the

-19-

OCCA's holding was an unreasonable application of clearly established law. *Boltz v. Mullin*, 415 F.3d 1215, 1230 (10th Cir. 2005) (noting that the Tenth Circuit has not decided whether a sufficiency of the evidence claim presents a mixed question of law reviewed under § 2254(d)(1) or a question of fact reviewed under § 2254(d)(2)).

Under Oklahoma law and in light of this standard, Petitioner submits a reasonable fact-finder could not conclude he was guilty of murder in the first degree in violation of OKLA. STAT. tit, 21 § 1123(A)(1).        Every fact necessary to constitute the crimes were not proved beyond a reasonable doubt.  Petitioner submits that the jury's factual findings should be disturbed because the jury's verdict was not within the bounds of reason.  Petitioner submits that no rational trier of fact could find him guilty beyond a reasonable doubt of the crime in which he was convicted.

According to the OCCA's finding, since the jury found the eyewitness testimony credible, then that choice must be honored as it supports the verdict (Opinion at pg. 15).  The OCCA addressed the issue of the witnesses credibility but did not address the issue that the third element of murder in the first degree was not met except in the context of witness credibility.

Witnesses placed Mr. Morris at or near the scene – but Mr. Morris asserts that is all the witnesses did at trial.  Only one witness identified Mr. Morris as one of the individuals beating the victim.  Witness Tinner agreed that Mr. Morris was one of the four men that was beating  Rodney Perry (Vol. 2, Tr. 54, 61).  Tinner did have credibility issues when she admitted on cross-examination that in the preliminary hearing she had testified that she

-20-

answered no to the question of whether she recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62). The OCCA decided that the jury resolved this question of credibility by their verdict, and that was in their finding Mr. Morris guilty (Opinion at pg. 15).

However, Mr. Morris asserts that the OCCA did not address to a constitutionally sufficient level as to how the lack of all other evidence tended to support the jury verdict. The OCCA set forth the challenges to the third element to find murder in the first degree, that the death was caused by Mr. Morris, but gave no explanation how the lack of physical or forensic evidence linking Mr. Morris to the murder supported the jury verdict (Opinion at pg. 14-15). At trial, during her live testimony, only Tinner placed Mr. Morris actually participating along with three others in the assault upon the victim. There were no other witnesses at trial that had Mr. Morris participating in the beating and ultimate murder[3]. The credibility issue concerned whether Tinner was being truthful because at preliminary hearing she testified under oath that she did not recognize anybody at the scene. The OCCA resolved this question by virtue of the jury's verdict.

Remaining, Mr. Morris submits, is that being present along with three other individuals does not equate with finding him guilty beyond a reasonable doubt of murdering Rodney Perry. Notwithstanding the resolution of the credibility of Tinner by the jury and then by the OCCA, the constitutionally insufficiency of the evidence to support the jury

---

[3]

Witness Debose, not subject to cross-examination at trial because he was not present, had his preliminary hearing testimony read into evidence, wherein Mr. Morris was identified as one of the attackers (Vol. 2, Tr. 117; P.H. Tr. 50, 59, 62).

verdict is lacking.  Tinner did not testify that she saw Mr. Morris beat Rodney Perry until

death.  Tinner only agreed that Mr. Morris was one of the four men that was beating and

stomping Rodney Perry.  The evidence was insufficient that it was Mr. Morris that beat

Rodney Perry to death, or that Mr. Morris's participation in the beating, if believed, caused

Mr. Perry's death.

Mr. Morris testified at trial and denied he had been present, denied being involved in

the homicide, and denied ever meeting Tinner or knowing witnesses Debose, Brazille, or the

victim Rodney Perry (Vol. 3, Tr. 75, 76, 77, 78, 80, 82, 83).  Mr. Morris submits that even

assuming for constitutional analysis purposes that he was present as portrayed by witness

Tinner, and then by witness Brazille, it is just as plausible that Mr. Morris ceased beating

Rodney Perry well before life threatening injuries occurred.  Another witness that did not see

Mr. Morris beat Rodney Perry did testify about Mr. Morris at the scene.  Witness Brazille,

who had run up to the mailboxes where he had been told there was a fight, testified that the

three men went back around the side of the grey car where Rodney King was laying and he

could hear stomping and skin slapping (Vol. 2, Tr. 134, 137, 147, 148, 157).  Brazille did not

testify that Mr. Morris beat Rodney Perry or in any way struck or killed him.  Brazille placed

Mr. Morris present and walking around the side of the car with the others when he heard

stomping and skin slapping where Rodney Perry was laying.

Therefore, resolving witness credibility issues in favor of the state, accepting all

reasonable inferences and credibility choices that tend to support the jury's verdict, does not

circumvent the lack of evidence to connect Mr. Morris with committing the acts that caused

-22-

Rodney Perry's death.   There was not proof beyond a reasonable doubt of every fact necessary to establish that Mr. Morris caused the death of Rodney Perry.   Mr. Morris's conviction under the facts of the instant case violated the due process guarantees by the Fourteenth Amendment and was contrary to clearly established United States Supreme Court law.  The OCCA made an unreasonable determination in light of the evidence presented in the state court proceeding and the OCCA's holding was an unreasonable application of clearly established law.

The United States Supreme Court precedent provides that when reviewing a sufficiency of the evidence claim in a habeas corpus action "the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson, supra*.  The OCCA adjudicated this claim on the merits, therefore, review of Petitioner's claim is subject to deference as defined by the AEDPA, 28 U.S.C. § 2254(d).

Based on the above and foregoing, Petitioner submits he has sufficiently established herein the factual findings of the OCCA should not be presumed correct.   After an independent review of the evidence, viewed in the light most favorable to the prosecution, Petitioner submits this Court will find that a rational fact finder could not have found the essential elements of the crime charged against Mr. Morris beyond a reasonable doubt. Therefore, the OCCA's determination regarding the sufficiency of the evidence was contrary

-23-

to or an unreasonable application of *Jackson*, or was an unreasonable determination of the facts in light of the evidence presented and the court's findings violated Petitioner's rights to due process under the law. *See also* U.S. Const. amends. V and IVX. Therefore, this Petition should be granted.

**Ground Six:**

**THE TRIAL ERRORS COMPLAINED OF HEREIN
CUMULATIVELY DENIED MR. MORRIS'S RIGHT
TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA
CONSTITUTION AND THEREFORE, HIS CONVICTION
AND SENTENCE MUST BE REVERSED**
**(Raised as Ground Seven in Direct Appeal)**

**INTRODUCTION**

The accumulation of the trial errors in this case set forth herein entitles Petitioner to habeas relief. Oklahoma and federal law provide that a person accused of a crime is entitled to a fair and impartial trial. The OCCA's findings on this issue were contrary to or an unreasonable application of federal law because the errors which occurred at Petitioner's trial set forth herein cumulatively denied him a fair trial. Therefore, Petitioner's conviction and sentence must be reversed.

**ARGUMENT AND AUTHORITIES**

Petitioner has demonstrated herein actual, prejudicial errors which when taken in a cumulative fashion, warrants reversal or modification of his convictions. The OCCA's

-24-

determination of this issue was not reasonable. "Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors. *Hoxsie v. Kerby,* 108 F.3d 1239, 1245 (10th Cir.1997), *cert. denied,* 522 U.S. 844, 118 S.Ct. 126, 139 L.Ed.2d 77 (1997). This Court should determine if the combined errors were harmless by determining whether Petitioner's substantial rights were affected. *United States v. McKneely*, 69 F.3d 1067, 1080 (10th Cir.1995). However, in *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.1990) (en banc), the Tenth Circuit noted that "[t]he only possible exception (to the above rule), is the holistic analysis conducted to determine whether the entire trial was so fundamentally unfair that defendant's due process rights were violated." Id. at 1471 n. 8. Demonstrated herein and within Petitioner's Petition for Writ if Habeas Corpus, Petitioner has shown actual prejudicial errors. Therefore, there was cumulative error and the OCCA's determination of this issue was not reasonable and was contrary to federal law. Consequently, the cumulative prejudice from the errors raised herein entitles Petitioner to habeas relief.

## <u>CONCLUSION</u>

Petitioner is entitled to habeas corpus relief because the claims contained herein have been adjudicated on the merits by the state court and the state court's decision was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination

-25-

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § §

2254(d)(1) & 2254 (d)(2).

WHEREFORE, Petitioner Howard Morris, III prays the Court grant Petitioner relief

to which he may be entitled in this proceeding.

Respectfully submitted,


s/Bill Zuhdi_____

Bill Zuhdi, OBA #10013

Bill Zuhdi Attorney at Law, P.C.

P.O. Box 1077

Oklahoma City, OK 73101

(405)232-1400 (office)

(405)755-9686 (facsimile)

Zlawoffice@aol.com (e-mail)

ATTORNEY FOR PETITIONER

-26-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HOWARD P. MORRIS, III, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | No. CIV-09-81-R |
| | ) | |
| RANDY WORKMAN, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW Respondent, Randy Workman, by and through W.A. Drew Edmondson, Attorney General of the State of Oklahoma, in response to the Petition for Writ of Habeas Corpus, and shows this Court as follows:

1.  Petitioner, Howard P. Morris, III, an Oklahoma Department of Corrections inmate in the custody of the Oklahoma State Penitentiary, McAlester, Oklahoma, has filed with this Court a petition seeking federal habeas corpus relief.

2.  Petitioner is currently incarcerated pursuant to a judgment and sentence entered April 17, 2006, in the District Court of Oklahoma County, State of Oklahoma, Case No. CF-

---

[1]The Petition for Writ of Habeas Corpus names the Attorney General of the State of Oklahoma as one of the Respondents. Under federal law, the proper respondent in a federal habeas corpus action is "the person having custody of the person detained." 28 U.S.C. § 2243. Here, Respondent Randy Workman, not the Attorney General of the State of Oklahoma, has custody of the Petitioner. Furthermore, in his Petition for Writ of Habeas Corpus, the Petitioner does not challenge a sentence to be served in the future. Accordingly, the Attorney General of the State of Oklahoma should be dismissed as a respondent. *See* Rule 2(b), Rules Governing Section 2254 Cases in the United States District Courts (the attorney general of the state holding the petitioner is only a proper respondent where the petitioner attacks a sentence to be served in the future).

04-1212, wherein Petitioner was found guilty by a jury of First Degree Murder in violation of Okla. Stat. tit. 21, § 701.7 (2001). Petitioner was sentenced to life imprisonment without the possibility of parole.

3. Petitioner appealed his conviction to the Oklahoma Court of Criminal Appeals (OCCA) which affirmed his convictions in an opinion issued on October 24, 2007. Copies of Petitioner's direct appeal brief, the State's direct appeal brief, and the OCCA opinion are attached hereto as Exhibits 1, 2, and 3, respectively.

4. Petitioner has sought no post-conviction relief in the Oklahoma state courts.

5. Full transcripts of the preliminary hearing held on March 25, 2005 and Volumes II and III of the jury trial proceedings held on April 3 - 5, 2006 are being conventionally filed with this Court. Volume I of the jury trial proceedings, consisting solely of *voir dire*, is available to the Court upon request. Relevant portions of Volumes II and III of the jury trial proceedings are attached to this Response and shall be designated as Exhibits 4 and 5, respectively. Relevant portions of the preliminary hearing transcript are attached to this Response and shall be designated as Exhibit 6. The Petitioner's sentencing hearing held on April 17, 2006 does not appear to have been transcribed.

6. Petitioner has timely filed his petition for habeas corpus relief pursuant to 28 U.S.C. § 2244(d).

7. Petitioner has exhausted his state court remedies for purposes of federal habeas corpus review, and none of his claims are procedurally barred.

2

8.  An evidentiary hearing is not required as the claims presented for review neither rely on a new rule of constitutional law nor on a factual predicate that could not have been discovered through the exercise of due diligence.  Therefore, this Court can properly and sufficiently review Petitioner's claims based solely on the evidence presented in the record.

## ARGUMENT AND AUTHORITY

The Petitioner presents this Court with six grounds upon which he claims entitlement to federal habeas corpus relief.  First, the Petitioner claims that the trial court should have granted his motion for mistrial after some members of the jury expressed concerns about the fact that the Petitioner was writing while members of the jury were divulging personal information during *voir dire*.  Second, the Petitioner claims he was deprived of his right to be present at all critical stages of trial after the trial court briefly met privately with the jury to address their concerns.  Third, the Petitioner claims that he suffered ineffective assistance of trial counsel based upon his trial counsel's failure to move for a new trial based upon the incidents discussed in the Petitioner's first and second grounds for relief.  The Petitioner further claims that his trial counsel was ineffective for failing to object to alleged prosecutorial misconduct.  Fourth, the Petitioner claims that the prosecutor committed prosecutorial misconduct by attempting to shift the burden of proof to the Petitioner when the prosecutor stated during closing argument that the jury had not seen any evidence that the State's witnesses did not tell the truth.  Fifth, the Petitioner claims that the evidence was insufficient to sustain his conviction.  Finally, the Petitioner claims that cumulative error

3

deprived him of a fair trial. Respondent will set forth each of the grounds below and demonstrate that none of them merits habeas corpus relief.

## PROPOSITION I

### THE OCCA'S DECISION TO UPHOLD THE TRIAL COURT'S DENIAL OF THE PETITIONER'S MOTION FOR A MISTRIAL WAS NEITHER CONTRARY TO NOR BASED UPON AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW.

In his first ground for relief, the Petitioner claims that the trial court erred when it overruled his motion for a mistrial following the individual *voir dire* of the jury. The OCCA's decision to reject this claim was neither contrary to nor based upon an unreasonable application of clearly established federal law, nor was the OCCA's decision based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, the Petitioner is not entitled to relief on this claim.

Under 28 U.S.C. § 2254(d), a writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in a state court proceeding unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). The only "clearly established federal law" a federal habeas court may consider are the decisions–not dicta–of the Supreme Court of the United States.

4

Parker v. Scott, 394 F.3d 1302, 1308 (10th Cir. 2005). A state court decision is not "contrary

to" clearly established federal law unless it "applies a rule that contradicts the governing law

set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is

materially indistinguishable from a decision of [the] Court but reaches a different result."

Brown v. Payton, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *see also*

Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). A state

court decision is not an "unreasonable application" of clearly established federal law unless

the decision "identifies the correct legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of the petitioner's case." Wiggins v. Smith,

539 U.S. 510, 520, 123 S.Ct. 2527, 2534-2535, 156 L.Ed.2d 471 (2003). The fact that the

state court decision was incorrect or erroneous does not justify a finding of an unreasonable

application of clearly established federal law unless the state court decision is "objectively

unreasonable." Id. at 520-521. It is not necessary that the state court cite Supreme Court

precedent in order to pass federal habeas corpus muster; in fact, it is not even necessary that

the state court be *aware* of controlling Supreme Court precedent, so long as the state court

decision does not contradict a controlling Supreme Court decision. Early v. Packer, 537 U.S.

3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). Finally, in conducting federal habeas corpus

review of state court proceedings, the state court's factual findings are presumed to be correct

unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C.

2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-925 (10th Cir. 2004)(holding that the Tenth

5

Circuit "presume[s] the factual findings of the state court are correct unless petitioner can rebut this presumption by clear and convincing evidence").

In this case, it should first be noted that, in deciding that the trial court did not abuse its discretion when it overruled the Petitioner's motion for mistrial, the OCCA made a number of factual findings. In its Opinion affirming the Petitioner's conviction, the OCCA noted that the Petitioner claimed "that the trial court erroneously denied his motion for a mistrial after the judge met privately with jurors." Exhibit 3 at 3. The OCCA then explained its factual findings regarding what occurred in that private meeting:

> The meeting occurred in response to a communication the judge received from the jury concerning Morris's note taking while their personal and family information was being disclosed in open court during voir dire. Upon receiving the communication from the jury, the judge met with the jurors and advised them that in her experience she was unaware of any instance where jurors had been threatened or intimidated and that she was confident that Morris was merely writing notes to his attorney. After being advised of the meeting between the judge and jury, defense counsel moved for a mistrial and requested individual questioning of all the jurors. Morris contends here, as he did below, that the jurors' concern over the security of their personal information shows that they had already discussed the facts of the case among themselves.
>
> . . .
>
> [T]he record shows that under questioning by the judge and defense counsel, the jurors unanimously agreed that none of them discussed any aspect of the case among themselves. Jurors did state, however, that some of their number voiced concern about disclosing personal and family member information in open court where the defendant seemed to be writing it down and where there were many people coming and going

6

throughout the courtroom.  Some jurors stated that it appeared to them at the time that the case might be gang-related, based on the appearance of some of the persons present in the courtroom, and that this caused them some degree of apprehension when their personal information was being discussed so openly.  All the jurors denied any specific fear of Morris, however, and all the jurors expressed to the judge that they could remain fair and impartial.

Exhibit 3 at 3-4 (footnote omitted).

Under federal law, the factual findings of the state court must be presumed correct unless the petitioner demonstrates by clear and convincing evidence that the findings were erroneous.  Valdez v. Ward, 219 F.3d 1222, 1231 (10th Cir. 2000); 28 U.S.C. § 2254(e). Here, the Petitioner has not alleged the OCCA's factual findings were incorrect. Accordingly, the OCCA's factual findings must be presumed correct for purposes of federal habeas review.

The Petitioner insists, as he insisted before the OCCA, that the jury was hopelessly biased against him, in spite of the fact that "[a]ll of the jurors denied any specific fear of Morris . . . and all the jurors expressed to the judge that they could remain fair and impartial." Exhibit 3 at 3-4 (footnote omitted).[2]  The Petitioner insists that the trial court's denial of his motion for a mistrial and the OCCA's subsequent decision to uphold the trial court's decision

---

[2]The Petitioner's claim before the OCCA included the argument that the jurors had committed misconduct by discussing the merits of the case prior to deliberation, as well as the argument that the jury was biased against him because of their alleged fear.  Exhibit 1 at 15, 18-19.  Before this Court, however, the Petitioner focuses exclusively on the claim that the jury was biased against him.

7

warrants federal habeas corpus relief.   Under both federal law and Oklahoma law, the
decision of whether to grant a motion for mistrial is within the discretion of the trial court.
U.S. v. Massey, 48 F.3d 1560, 1569 (10th Cir. 1995); Jackson v. State, 146 P.3d 1149, 1156
(Okla. Crim. App. 2006).   Furthermore, while the ability of an appellate court to overturn
discretionary rulings on direct review is severely constrained, a federal habeas court's ability
to overturn such decisions on federal habeas review is "even more attenuated."   Miller v.
Mullin, 354 F.3d 1288, 1296 (10th Cir. 2004).   Finally, a trial court's decision to hold a
hearing prior to deciding whether to grant a mistrial motion provides some evidence that the
trial court "acted responsibly and deliberately" in coming to its decision on the motion for
a mistrial.   Arizona v. Washington, 434 U.S. 497, 516, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

Under the Sixth Amendment, all criminal defendants are entitled to trial by an
impartial jury.   U.S. Const. amend. VI.   The constitutional standard of fairness requires that
the defendant have a panel of impartial and indifferent jurors.   Murphy v. Florida, 421 U.S.
794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).   However, the mere existence of any
preconceived notion of the guilt or innocence of the defendant in the mind of a given juror
is insufficient to rebut the juror's presumption of impartiality; to hold otherwise would set
up "an impossible standard."   Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d
751 (1961).

In this case, the Petitioner claims that his right to an impartial jury was violated
because a few jurors expressed some concern about the Petitioner writing while the jurors

8

were disclosing personal information during *voir dire*. The Petitioner specifically focuses his ire on a few statements by Juror Myers.[3] At the individual *voir dire* of the jury that the Petitioner's trial counsel demanded, Juror Myers admitted his concern that "[i]f we don't convict this guy, we're going to turn him loose and he's got my address. Or if we do convict him, he's going to give it to his buddy and the buddy is going to come and get me." Exhibit 5 at 54. Juror Myers also stated: "Seems like this is a gang-related case. Nobody has said that [in court]. It hasn't come up in the court but I'm worried if we don't convict the guy, we're going to turn him loose in the community." Exhibit 5 at 54.

The Petitioner completely ignores the context within which these statements took place. First, the statements were made immediately after Juror Myers indicated that his wife had previously served on a jury and that the defendant in that case seemed to write down the personal information of the jurors during *voir dire*, including "where they lived." Exhibit 5 at 53. Juror Myers stated that his wife "thought that was a little odd that [defendants] know all about us but we don't know anything about them." Exhibit 5 at 53. Upon questioning by the trial court, Juror Myers revealed that the incident with his wife had taken place approximately fifteen years prior to the Petitioner's trial and that, to Juror Myers' knowledge, no threats were made or carried out against any jurors. Exhibit 5 at 53-54. Juror Myers summed up the situation as "just a goosey feeling that [his] wife had." Exhibit 5 at 54. Juror Myers' discussion of his concerns about the Petitioner writing during *voir dire* took place just

---

[3]The Petition incorrectly identifies the juror in question as "Juror Myer."

9

after the discussion of his wife's experience. Exhibit 5 at 54. Thus, Juror Myers' discussion of his concerns was almost certainly colored by his wife's experience of fifteen years earlier. Further, when he was asked whether he was the juror who initially brought up the issue of juror safety, Juror Myers stated: "I don't think so. I agreed with it when I heard it but I didn't bring it up." Exhibit 5 at 52.

Even more importantly, when asked whether he had formed an opinion as to the Petitioner's guilt, Juror Myers stated: "No. He's still innocent. I haven't heard the whole deal." Exhibit 5 at 52-53. When the trial court asked Juror Myers if he could be fair and impartial, Juror Myers answered that he could, and that he would ignore any issues that were not in evidence. Exhibit 5 at 54-55. Under questioning by the Petitioner's trial counsel, Juror Myers stated that neither he nor any other jurors had expressed any specific fear of the Petitioner; rather, the concern "was just kind of a general – a general, how come he's writing notes." Exhibit 5 at 55-56. At the conclusion of the discussion with Juror Myers, the trial court noted:

> "I've got to tell you guys that I think what we're seeing here is pretty normal, healthy reactions of jurors that we don't normally get to see. We're not usually informed about their concerns and I think what I'm seeing is very typical of every jury, so far."

Exhibit 5 at 56-57.

Taken as a whole, Juror Myers' statements reveal that he remained a fair and impartial juror. While he admitted to some concern over the Petitioner's act of writing notes while the

jurors revealed personal information during *voir dire* (a concern which was undoubtedly colored by his wife's experiences from fifteen years earlier), Juror Myers insisted that he would base his decision solely on the evidence and would remain fair and impartial. Exhibit 5 at 51-57. Further, even if Juror Myers had harbored some notion of the Petitioner's guilt, this fact alone would not rebut the presumption that Juror Myers was fair and impartial. Irvin, 366 U.S. at 722 (the mere existence of any preconceived notion of the guilt or innocence of the defendant in the mind of a given juror is insufficient to rebut the juror's presumption of impartiality; to hold otherwise would set up "an impossible standard."). The trial judge assuaged Juror Myers' safety concerns by assuring Juror Myers (just as the trial judge assured each of the jurors) that the Petitioner was not writing down personal information about the jurors during *voir dire*, but had merely been communicating with his counsel. Exhibit 5 at 52. Finally, the trial judge, who was in a far better position than any reviewing court to examine Juror Myers' demeanor, concluded immediately after Juror Myers' individual *voir dire* that all of the jurors' attitudes, including that of Juror Myers, were "pretty normal" and "healthy," as well as being "very typical of every jury . . ." Exhibit 5 at 56-57. Plainly, there simply was no manifest necessity for the trial court to declare a mistrial.

In fact, a thorough review of the precedent of the Tenth Circuit and sister circuits reveals that complaints similar to that of the Petitioner are rarely raised at all, and when they are raised, they are rejected. For example, in U.S. v. Thomas, 632 F.2d 837, 838 (10th Cir.

1980), the defendants were convicted in federal court of conspiracy to distribute heroin.  On

appeal before the Tenth Circuit, the defendants complained of an incident which took place

on the third day of trial in which the U.S. marshal was asked by a juror his opinion as to "any

potential likelihood that they, the jurors, had anything to fear from the defendants."  Thomas,

632 F.2d at 841.  The marshal replied that he was sure that the jurors had nothing to fear, and

that "if any anger were to be expressed, it would probably be directed toward someone giving

testimony rather than any member of the jury."  Id.  When the conversation came to light, the

defendants moved for mistrial, and the trial court overruled the motion, finding that the

conversation "did not pose a realistic risk of prejudice so as to justify a mistrial."  Id.  The

Tenth Circuit affirmed the trial court's decision.  Id. at 843-844.

Similarly, in Kinnamon v. Scott, 40 F.3d 731 (5th Cir. 1994), a juror in the Petitioner's

state murder case approached the bench after the court was adjourned for lunch.  Kinnamon,

40 F.3d at 733.  The juror "expressed concern on her own behalf and other jurors that

defendant [Kinnamon] had access to the long-form juror information sheets."  Id.  As it

happened, the jurors' fear that Kinnamon was looking at their personal information was

misplaced: the jurors' personal information which had been gathered during *voir dire* was

written on legal-size papers, and when the jurors saw Kinnamon looking at legal-size papers,

they feared–wrongly–that he was reviewing the jurors' personal information.  Id.  On appeal,

the Fifth Circuit affirmed the district court's denial of habeas relief, explaining:

> That members of a jury in a capital murder case do not
> want the defendant examining information concerning their

12

> home addresses, phone numbers, etc. raises no concern of
> constitutional magnitude. As we understand it, Kinnamon's
> contention is bottomed on the assertion that this expression of
> concern signals some mid-trial determination by the jury of guilt
> or perhaps its caution about the defendant. We are unpersuaded.
> At that juncture, Kinnamon was accused by the state of a violent
> capital crime. Such a concern by a juror is consistent with an
> open mind regarding guilt.  <u>Id</u>.

In this case, as in <u>Kinnamon</u>, the jurors mistakenly believed that the defendant was trying to gather their personal information for possible later use.  As in <u>Kinnamon</u>, the jurors' concern centered on their disclosure of personal information during *voir dire*.  In <u>Kinnamon</u> and in this case,  the jurors expressed their concern to court personnel.  Thus, this Court should find, as the Fifth Circuit did in <u>Kinnamon</u>, that the fact that "members of a jury . . . do not want the defendant examining" their personal information "raises no concern of constitutional magnitude." <u>Id</u>.  The Petitioner has failed to show that the OCCA's decision was contrary to or based upon an unreasonable application of clearly established federal law, and has failed to show that the OCCA's determination of the facts was unreasonable.  28 U.S.C. § 2254(d)(1)-(2).  The Petitioner is not entitled to federal habeas corpus relief.

# PROPOSITION II

## THE PETITIONER WAS NOT DEPRIVED OF HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS.

Next, the Petitioner claims that the trial court's decision to speak with the jury about their concern in his absence deprived him of his right to be present at all critical stages of his trial proceedings.[4]  The decision of the OCCA to reject this claim on direct appeal was neither contrary to nor based upon an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).

Under 28 U.S.C. § 2254(d), a writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in a state court proceeding unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[4]The Petitioner's claim is based upon the following incident: during one of the court recesses, the trial judge "went into the jury room" to address the jurors collectively after "the bailiff made [the trial judge] aware that the jurors had expressed . . . a concern that [the Petitioner] was taking notes during jury selection," and because the case involved "gang stuff," some members of the jury were "concerned about their personal security."  Exhibit 4 at 152-153.  The trial judge told the jury that she did not generally talk to the jurors during trial and had to be very limited in what she told the jury, but that in her entire judicial career with the court, she was unaware of any incidents of threats against jurors or attempts to intimidate jurors.  Exhibit 4 at 153.  The trial judge further assured the jury that the Petitioner was not writing notes during *voir dire*, but was simply communicating with his trial counsel. Exhibit 4 at 153.

14

28 U.S.C. § 2254(d)(1)-(2).  A state court decision is not "contrary to" clearly established federal law unless it "applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the] Court but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *see also* Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).  A state court decision is not an "unreasonable application" of clearly established federal law unless the decision "identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the petitioner's case."  Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-2535, 156 L.Ed.2d 471 (2003).  The fact that the state court decision was incorrect or erroneous does not justify a finding of an unreasonable application of clearly established federal law unless the state court decision is "objectively unreasonable."  Id. at 520-521.  Finally, in conducting federal habeas corpus review of state court proceedings, the state court's factual findings are presumed to be correct unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. 2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-925 (10th Cir. 2004)(holding that the Tenth Circuit "presume[s] the factual findings of the state court are correct unless petitioner can rebut this presumption by clear and convincing evidence").

Under clearly established federal law, a criminal defendant has the right to be present during all critical stages of his criminal proceedings. Snyder v. Massachusetts, 291 U.S. 97,

15

105-106, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds*, <u>Malloy v. Hogan</u>,

378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed. 653 (1964); *see also* <u>Bland v. Sirmons</u>, 459 F.3d 999,

1020-1021 (10th Cir. 2006).  This right is rooted in the Confrontation Clause of the Sixth

Amendment and the Due Process clause of the Fourteenth Amendment.  <u>Brown v. Gibson</u>,

7 Fed.Appx. 894, 909 (10th Cir. 2001 (unpublished),[5] *citing* <u>Illinois v. Allen</u>, 397 U.S. 337,

338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).  The right to be present at all critical stages is not

absolute, however.  A criminal defendant may waive his right to be present, or he may lose

the right to be present through his own misconduct.  <u>Brown</u>, 7 Fed.Appx. at 909, *citing*

<u>Snyder</u>, 291 U.S. at 106.  Moreover, the right to be present extends only to those critical

stages of criminal proceedings where the criminal defendant's presence would have a

"reasonably substantial" relation to "the fulness of his opportunity to defend against the

[criminal] charge." <u>Bland</u>, 459 F.3d at 1020, *quoting* <u>Snyder</u>, 291 U.S. at 105-106.  Thus,

"the constitutional right to be present exists to the extent that a fair and just hearing would

be thwarted by [the defendant's] absence, and to that extent only." <u>Bland</u>, 459 F.3d at 1020-

1021, *quoting* <u>Snyder</u>, 291 U.S. at 107-108 (internal quotation marks omitted).  The

defendant has no right to be present where his "presence would be useless, or the benefit but

a shadow." <u>Bland</u>, 459 F.3d at 1021, *quoting* <u>Snyder</u>, 291 U.S. at 106-107.

---

[5]This is an unpublished opinion and is cited only for its persuasive value pursuant to 10th Cir. R. 32.1.  A copy of the opinion is attached to this Response as Exhibit 7  for the Court's convenience.

Here, the Petitioner claims that he was deprived of his right to be present at all critical stages of trial proceedings when the trial judge met privately with jurors after one of the jurors expressed concern that the Petitioner was writing notes during *voir dire*. On direct appeal, the OCCA rejected the Petitioner's claim, explaining:

> A defendant's constitutional and statutory rights to be present at trial are rooted in the Sixth Amendment's right to confront witnesses and the Fifth Amendment's due process right to present a defense. . . . [H]owever, a defendant's right to be present has limits. Specifically, a defendant must be allowed to be present only when his presence is reasonably related to his opportunity to defend. Because the record shows that this brief meeting between the judge and jury was on a subject unrelated to the merits of the case, the meeting and resulting communications between the judge and jury did not impact Morris's ability to defend against the charges; nor did it impinge in any way on his ability to confront witnesses. There is no constitutional violation.

Exhibit 3 at 5-6 (citations omitted).

Plainly, the OCCA's decision was neither contrary to nor based upon an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). On the contrary, the OCCA correctly noted that the Petitioner's right to be present was rooted in his Sixth Amendment confrontation rights, and since the trial judge's brief meeting with jurors had nothing whatsoever to do with the merits of the case, the Petitioner's right to be present was not implicated.

The Tenth Circuit has rejected claims for federal habeas corpus relief based upon similar *ex parte* communications between judge and jury which do not have anything to do

17

with the actual merits of the case.  For example, in <u>Bland</u>, the trial court met privately with jurors for the purpose of addressing some of the jurors' concerns about serving on the jury. <u>Bland</u>, 459 F.3d at 1020.  One juror was excused because he was going through a divorce, and another was excused because of illness.  <u>Id</u>.  The trial court also conducted limited *voir dire* upon the request of defense counsel, who told the judge that some of the jurors could have been exposed to pre-trial publicity concerning the case.  <u>Id</u>.  Following the <u>Snyder</u> rule that a defendant's right to be present only attaches to proceedings where his ability to defend against the charges are implicated, the Tenth Circuit rejected the Petitioner's claim for federal habeas corpus relief.  <u>Id</u>. at 1020-1021.

In this case, as in <u>Bland</u>, the trial court met privately with jurors to address some of their concerns.  While it is true that the concerns of the jurors in this case involved their safety rather than their personal convenience, the fact remains that, as in <u>Bland</u>, the substance of the meeting had nothing whatsoever to do with the merits of the case against the Petitioner.  The trial court did not discuss any of the specific testimony or other evidence against the Petitioner; rather, the trial court merely addressed the jurors' concerns over their own personal safety.  If anything, the Petitioner's presence would have been counterproductive to the legitimate purpose of the meeting: if the Petitioner had been present, the jurors would almost certainly have been far less forthright in their discussions of their concerns.  Plainly, the Petitioner's presence at such a meeting would have been "useless" at best, and no benefit would have accrued had he been present.  <u>Bland</u>, 459 F.3d at 1021,

18

*quoting* <u>Snyder</u>, 291 U.S. at 106-107 (the defendant has no right to be present where his "presence would be useless, or the benefit but a shadow"). Accordingly, the Petitioner's constitutional right to be present during all critical stages of his criminal proceedings did not attach to the meeting with the jury to discuss their concerns. <u>Bland</u>, 459 F.3d at 1020, *quoting* <u>Snyder</u>, 291 U.S. at 105-106 (constitutional right to be present does not attach unless defendant's presence would have a reasonably substantial relation to his opportunity to defend).

Contrary to the Petitioner's claims, his right to be present at all critical stages of his criminal proceedings did not attach to the trial court's brief private meeting with the jury. <u>Bland</u>, 459 F.3d at 1020. The decision of the OCCA to affirm the Petitioner's conviction was neither contrary to, nor based upon an unreasonable application of, clearly established federal law, nor was the decision based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)-(2). The Petitioner's request for habeas corpus relief should be denied.

## <u>PROPOSITION III</u>

**THE DECISION OF THE OCCA THAT THE PETITIONER WAS NOT DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WAS NEITHER CONTRARY TO NOR BASED UPON AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW.**

In his next ground for relief, the Petitioner claims that he was deprived of the effective assistance of trial counsel. Specifically, the Petitioner contends that his trial counsel rendered ineffective assistance when he failed to move for a new trial following the trial court's

19

meeting with the jury to address juror concerns for personal safety. The Petitioner further claims that his trial counsel delivered ineffective assistance when he failed to object to the alleged prosecutorial misconduct during closing statements.[6] The decision of the OCCA to reject the Petitioner's ineffective assistance of counsel claims was neither contrary to, nor based upon an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Accordingly, the Petitioner is not entitled to federal habeas relief on this claim.

Under 28 U.S.C. § 2254(d), a writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in a state court proceeding unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). A state court decision is not "contrary to" clearly established federal law unless it "applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); see also Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). A state court

---

[6]The prosecutorial misconduct which the Petitioner claims his trial counsel should have objected to is addressed substantively in Proposition IV below.

20

decision is not an "unreasonable application" of clearly established federal law unless the

decision "identifies the correct legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of the petitioner's case." Wiggins v. Smith,

539 U.S. 510, 520, 123 S.Ct. 2527, 2534-2535, 156 L.Ed.2d 471 (2003).  The fact that the

state court decision was incorrect or erroneous does not justify a finding of an unreasonable

application of clearly established federal law unless the state court decision is "objectively

unreasonable." Id. at 520-521.  Finally, in conducting federal habeas corpus review of state

court proceedings, the state court's factual findings are presumed to be correct unless the

petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. 2254(e)(1);

Smith v. Mullin, 379 F.3d 919, 924-925 (10th Cir. 2004)(holding that the Tenth Circuit

"presume[s] the factual findings of the state court are correct unless petitioner can rebut this

presumption by clear and convincing evidence").

In addressing the Petitioner's ineffective assistance of counsel claims on direct appeal,

the OCCA noted that the claims tied in closely with the Petitioner's substantive claims

regarding the trial court's meeting with jurors to address their safety concerns and the

prosecutor's allegedly improper statements during closing argument. Rejecting the

Petitioner's ineffective assistance of counsel claims, the OCCA held:

> Morris claims next that he received constitutionally
> ineffective assistance of counsel.  He claims first that trial
> counsel was ineffective for not objecting to the alleged hearsay

21

evidence discussed above.[7]  Morris also contends counsel was ineffective for failing to move for a new trial on the basis of the alleged jury misconduct discussed above.  Lastly, Morris claims that counsel was ineffective for failing to object to the allegedly improper closing comments made by the prosecutor, also discussed above.

To prevail on his ineffective assistance claims, Morris must demonstrate that counsel acted in a professionally unreasonable manner by failing to object to the evidence or the prosecutor's comments, or that he acted unprofessionally by failing to move for a new trial.  In addition, Morris must also demonstrate there is a reasonable possibility that a different outcome would have resulted if counsel had objected or moved for a new trial.  As we have found no merit to Morris's substantive claims on each of these issues, it is clear that any objections or motions for new trial raised on these grounds would have been properly overruled and the ultimate outcome unchanged.  Trial counsel therefore was not ineffective.

Exhibit 3 at 15-16 (citations omitted).

The decision of the OCCA to reject the Petitioner's ineffective assistance of counsel claims was neither contrary to, nor based upon an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  Under clearly established federal law, a defendant will not prevail on an ineffective assistance of counsel claim without showing (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

---

[7]On direct appeal, in addition to the claims he now presents to this Court, the Petitioner argued that the admission of hearsay testimony deprived him of a fair trial.  Exhibit 1 at 22-26.  Just as the Petitioner omitted the hearsay claim in his Petition for Writ of Habeas Corpus, he likewise does not argue before this Court that it was ineffective assistance of counsel to fail to object to the alleged hearsay.

With respect to the first prong of the <u>Strickland</u> test, attorney performance is measured against the background of reasonableness under prevailing professional norms. <u>Strickland</u>, 466 U.S. at 688. The purpose of the right to counsel is not to improve the quality of criminal defense representation, but merely to ensure that defendants receive a fair trial. <u>Id.</u> at 689. Courts must be "highly deferential" in reviewing the performance of a defendant's counsel. <u>Id</u>. Every effort must be made to eliminate hindsight bias on the part of the Court, and the Court must analyze counsel's conduct from the perspective of counsel at the time of the representation. <u>Id</u>. The Court must "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." <u>Id</u>. The Court must impose, and the defendant must overcome, a presumption that counsel's action or inaction constituted sound trial strategy under the circumstances. <u>Id</u>.

Even if a defendant is able to show deficient performance, the defendant will not be entitled to relief unless the defendant can show that the deficiency was prejudicial to the defense. <u>Id.</u> at 687. In order to establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694.

Here, the Petitioner's ineffective assistance of counsel claims plainly fail the prejudice prong of the <u>Strickland</u> test. First, the Petitioner has failed to show that the result of his proceeding would have differed if his trial counsel had entered a motion for a new trial following the trial court's meeting with the jury. On the contrary, as the trial court's reaction

23

to the Petitioner's motion for mistrial made clear, the trial court found nothing improper in briefly addressing the concerns of a handful of jurors for their safety. Thus, just as the trial court denied the Petitioner's motion for a mistrial, the trial court would have denied a motion for a new trial had the Petitioner's trial counsel made such a motion. Further, as the OCCA's opinion makes clear, the OCCA would clearly have upheld the trial court's decision to reject a motion for a new trial, as the OCCA plainly expressed that the trial court's meeting with the jurors was not improper. Exhibit 3 at 3-6. Finally, as established in Propositions I and II above, the jurors' concerns regarding the Petitioner's note-taking, and the vetting of those concerns with the trial court in the Petitioner's absence, raised no questions of constitutional magnitude. Thus, even if trial counsel had filed a motion for a new trial, it would not have made any difference in the outcome of the proceedings. *See* Strickland, 466 U.S. at 694.

Likewise, the Petitioner's ineffective assistance of counsel claim relating to trial counsel's failure to object to the alleged prosecutorial misconduct occurring during closing statements fails the second prong of the Strickland test. If trial counsel had objected to the prosecutor's comments, the result would have been that the underlying claim, *i.e.*, the claim of prosecutorial misconduct stemming from the comments, would have been subjected to a more rigorous analysis on appellate review before the OCCA and in habeas review. *See* DeRosa v. State, 89 P.3d 1124, 1147 (Okla. Crim. App. 2004) (failure to object to prosecutorial comments waives all but plain error); Trice v. Ward, 196 F.3d 1151,1167 (10th Cir. 1999) (fact that petitioner does not object to prosecutorial misconduct, while not

24

dispositive, is relevant to a determination of whether the prosecutor's comment deprived the petitioner of a fundamentally fair trial). However, as will be demonstrated in Proposition IV below, even under the more stringent standard of review that would apply had the Petitioner's trial counsel filed a contemporaneous objection to the prosecutor's comments, the comments at issue (*i.e.*, statements during closing argument to the effect that the Petitioner failed to explain why three independent eyewitnesses would each identify him as one of the people who murdered the victim if the Petitioner was in fact innocent) were plainly not so egregious so as to deprive the Petitioner of a fundamentally fair trial. *See* Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Mayes v. Gibson, 210 F.3d 1284, 1293 (10th Cir. 2000). Therefore, even if the Petitioner's trial counsel had entered an objection to the prosecutor's comments during closing argument, the result of the proceeding would not have differed. *See* Strickland, 466 U.S. at 694.

The Petitioner's ineffective assistance of counsel claims fail the second prong of the Strickland test. The OCCA's decision to reject the Petitioner's ineffective assistance of counsel claims was neither contrary to, nor based upon an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). The Petitioner is not entitled to relief on this claim.

25

## PROPOSITION IV

## THE PETITIONER WAS NOT DEPRIVED OF A FUNDAMENTALLY FAIR TRIAL BY PROSECUTORIAL MISCONDUCT.

The Petitioner next claims, as he did before the OCCA, that he was denied a fair trial by prosecutorial misconduct.  The decision of the Oklahoma Court of Criminal Appeals to deny this claim was neither contrary to, nor based on an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).  The Petitioner is accordingly not entitled to relief on this claim.

In this case, the Petitioner claims that the prosecutor improperly shifted the burden of proof to the Petitioner by stating during closing argument that the Petitioner had failed to explain why three separate witnesses each identified the Petitioner as one of the individuals who beat the victim, Rodney Perry, to death.[8]  On direct appeal, the Oklahoma Court of Criminal Appeals rejected the Petitioner's claim:

> Morris claims that three specific comments made by the prosecutor during closing improperly shifted the burden of proof to him.  Morris identifies the following remarks as impermissible burden-shifting comments:

---

[8]The Petitioner's trial counsel objected to only one of these comments at trial.  Exhibit 5 at 108, 146, 156-157.  The fact that the Petitioner did not object to two of the comments, while not dispositive, is relevant to this Court's determination of whether the prosecutor's comment deprived the Petitioner of a fundamentally fair trial.  Trice v. Ward, 196 F.3d 1151,1167 (10th Cir. 1999).  However, the allegedly improper comments in this case were clearly nothing more than fair comments on the evidence presented to the jury, and were therefore not improper even under the more stringent standard that would apply if the Petitioner had filed a contemporaneous objection to them.

26

(1) "you've heard no evidence that would indicate to you these people are not telling you what they saw" (Tr. Vol. 3, 108);[9]

(2) "[t]here is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but tell you the truth" (Tr. Vol. 3, 146);[10] and

(3) "[h]e [Morris] has the right to present evidence of that and he didn't" (Tr. Vol. 3, 157).[11]

Morris did not object to the first two comments. Therefore, their use is reviewed for plain error. Morris objected to the third remark, but the objection was overruled by the trial court judge. We review a trial court's overruling of a defendant's objection to a prosecutor's comments during closing argument for an abuse of discretion. Regardless of which standard is applied, however, we find no merit in any of these claims of prosecutorial misconduct.

The burden of proof is on the State to prove every element of the crime charged beyond a reasonable doubt. The State may not attempt to shift the burden of proof to the defendant during closing argument.

In this instance, Kurt Brazille and Demetria Tinner both testified that they saw Morris beating the victim Rodney Perry. Dewan Debose's preliminary hearing testimony, which was read into the record because of his unavailability for trial, indicated that he also saw Morris beating the victim. When Morris testified at trial, he claimed he was at home asleep when the beating occurred and denied knowing the victim, Kurt Brazile, Demetria Tinner, and Dewan Debose. When asked why these three individuals would lie and say that they saw him beating the

---

[9]Exhibit 5 at 108.

[10]Exhibit 5 at 146.

[11]Exhibit 5 at 157.

27

victim, Morris asserted that their testimony was the result of mistaken identity. When the prosecutor told the jury in closing that "you've heard no evidence that would indicate to you these people are not telling you what they saw"; "[t]here is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but tell you the truth"; and that Morris "ha[d] the right to present evidence of that and he didn't," the prosecutor was doing nothing more than commenting on the state of the evidence supporting Morris's asserted defense of mistaken identity. This was fair comment on the evidence on an issue raised by Morris when he testified. The prosecutor's statements were not improper.

Exhibit 3 at 12-14 (citations omitted).

The holding of the Oklahoma Court of Criminal Appeals was plainly neither contrary to nor based upon an unreasonable application of clearly established federal law. Under clearly established federal law, claims of prosecutorial misconduct will result in habeas corpus relief only where "the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Mayes v. Gibson, 210 F.3d 1284, 1293 (10th Cir. 2000). The fact that the prosecutor's remarks are undesirable or even universally condemned, without more, will not warrant relief. Darden, 477 U.S. at 181. Inquiry into the fundamental fairness of a trial can only be made after examination of the entire proceedings. Trice, 196 F.3d at 1167.

Further, under the precedent of the Tenth Circuit, the mere fact that the prosecutor points out the petitioner's failure to substantiate claims made in his own defense does not necessarily result in a fundamentally unfair trial. For example, in Delgado v. Barreras, No.

28

97-2007, 132 F.3d 42, 1-2 (Table), 1997 WL 785525 (10th Cir. 1997)(unpublished)[12], the

Tenth Circuit held that the petitioner was not deprived of a fundamentally fair trial for rape

when the prosecutor, responding to the petitioner's claim that the victim's story was

improbable and inconsistent, pointed out that the petitioner could not show any

inconsistencies in the victim's account of the rape and never even cross-examined the victim

about the rape.  Delgado, 132 F.3d 42 at 1-2.  The Tenth Circuit explained that relief was not

appropriate because the prosecutor's comments "were not a direct statement on the

presumption of innocence."  Id. at 2.  The Tenth Circuit further held that the prosecutor made

the statement as a rebuttal to the defense attorney's closing statement.  Id.

  Similarly, in this case the prosecutor was not making any comment on the presumption

of innocence when the prosecutor pointed out that the Petitioner had failed to explain why

the three independent eyewitnesses would have reason to implicate the Petitioner as one of

the killers of Rodney Perry if the Petitioner was in fact innocent.  Rather, as in Delgado, the

prosecutor was merely responding to defense counsel's attempt to sow seeds of doubt in the

minds of the jurors.   The prosecutor's statements to the effect that the Petitioner failed to

explain why three eyewitnesses would incorrectly identify him as one of the killers if he was

in fact innocent did not constitute improper burden shifting, and plainly were not so

egregious so as to deprive the Petitioner of a fundamentally fair trial.  Mayes v. Gibson, 210

---

[12]This is an unpublished opinion and is cited only for its persuasive value pursuant to
10th Cir. R. 32.1.  A copy of the opinion is attached to this Response as Exhibit 8  for the
Court's convenience.

F.3d at 1293.  The decision of the OCCA to reject the Petitioner's claim of prosecutorial

misconduct was neither contrary to, nor based upon an unreasonable application of, clearly

established federal law.  28 U.S.C. § 2254(d)(1).  The Petitioner is not entitled to federal

habeas relief on this claim.

**PROPOSITION V**

**THE DECISION OF THE OCCA THAT THE EVIDENCE
WAS SUFFICIENT TO SUSTAIN THE PETITIONER'S
CONVICTION WAS NEITHER CONTRARY TO, NOR
BASED UPON AN UNREASONABLE APPLICATION OF,
CLEARLY ESTABLISHED FEDERAL LAW.**

The Petitioner next claims that the evidence was insufficient as a matter of law to

sustain his conviction.  Specifically, the Petitioner attacks the fact that his conviction rested

largely upon eyewitness testimony, and claims that only one witness, Demetria Tinner,

actually saw him beating  Rodney Perry and that Ms. Tinner had serious credibility issues.[13]

On direct appeal, the OCCA rejected this claim, explaining:

---

[13]The Petitioner also insists that he is entitled to relief based upon the alleged lack of
detail in the OCCA's opinion.  The Petitioner attacks the OCCA Opinion by asserting that
the OCCA "found that the jury's verdict alone verified that the verdict was proper," and
complains that "the OCCA did not address to a constitutionally sufficient level as to how the
lack of all other evidence tended to support the jury verdict."  Petitioner's Brief at 19, 21.
However, under federal law, federal habeas courts "owe deference to the state court's *result*,
even if its reasoning is not expressly stated." Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir.
1999) (emphasis in original).  A federal habeas court "cannot grant relief unless the state
court's result is legally or factually unreasonable." Aycox, 196 F.3d at 1178.  Therefore,
even if the OCCA's Opinion were as woefully deficient as the Petitioner claims, the
Petitioner would not be entitled to habeas relief unless the OCCA's affirmance of the
Petitioner's conviction were shown to be "legally or factually unreasonable." Id.

30

This Court reviews a challenge to the sufficiency of the evidence in the light most favorable to the State and will not disturb the verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Under this standard, we accept all reasons, inferences, and credibility choices that tend to support the verdict.

Three witnesses identified Morris as one of [Rodney] Perry's attackers and described the severity of the savage beating. Even without any physical of forensic evidence of Morris's participation, this eyewitness testimony was sufficient evidence from which the jury reasonably could conclude that Morris caused Perry's death. Furthermore, the question of whether the witnesses' testimony was worthy of belief is not relevant here. The witnesses were tested under cross-examination at trial. Any question as to their credibility was resolved by the jury. By rendering a verdict of guilty, the jury obviously found the eyewitness testimony credible, and we must honor that choice as it supports the verdict.

Exhibit 3 at 14-15 (citations omitted).

The decision of the OCCA to reject the Petitioner's claim was plainly neither contrary to, nor based upon an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Under clearly established federal law, the correct standard for evaluating sufficiency of the evidence claims is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); <u>Battle v. Sirmons</u>, 304 Fed.Appx. 688, 691 (10th Cir. 2008)

31

(unpublished).[14]  If the facts in the record support conflicting inferences, the reviewing court

must presume that the trier of fact resolved them in favor of the prosecution.  Jackson, 443

U.S. at 326.

In U.S. v. West, 828 F.2d 1468 (10th Cir. 1987), the defendant argued on direct appeal

that the evidence was insufficient to sustain his conviction.  West, 828 F.2d at 1469.  At trial,

three witnesses testified that they saw the defendant strike the victim in the head with a long

stick.  Id.  In spite of the lack of forensic evidence tying the defendant to the crime, the Tenth

Circuit found that, taking the evidence in the light most favorable to the prosecution, the

defendant's conviction was sustainable based upon the testimony of the three eyewitnesses

and the testimony of a medical expert who testified that the blow to the head caused the

victim's death.  Id.

Here, as in West, taking the evidence in the light most favorable to the prosecution,

it is plainly clear that a reasonable jury could have found the Petitioner guilty.   Three

witnesses independently identified the Petitioner as one of the men who attacked Rodney

Perry.  Demetria Tinner testified that she saw four men, one of whom was the Petitioner,

beating Rodney Perry.  Exhibit 4 at 42-49.  Ms. Tinner testified that she recognized the

Petitioner because he was the boyfriend of one of her friends.  Exhibit 4 at 49.[15]  Dewan

---

[14]This is an unpublished opinion and is cited only for its persuasive value pursuant to
10th Cir. R. 32.1.  A copy of the opinion is attached to this Response as Exhibit 9  for the
Court's convenience.

[15]Ms. Tinner got a particularly good look at the Petitioner: just after the beating,
apparently mistaking Ms. Tinner for his girlfriend, the Petitioner began to walk toward Ms.

Debose, a second eyewitness, also identified the Petitioner as one of the men who beat Rodney Perry to death. Exhibit 6 at 45-51.[16] Finally, a third witness, Kurt Brazille, identified the Petitioner as a member of the group of men who beat Rodney Perry. Exhibit 4 at 130-148. According to Mr. Brazille, after the Petitioner and several other men went back to "finish [Mr. Perry] off," Mr. Brazille heard "stomping and skin slapping" coming from the location where Perry was lying on the ground. Exhibit 4 at 146-147.

Three separate witnesses identified the Petitioner as being one of the men who beat Rodney Perry to death. Accordingly, the Petitioner's conviction was supported by the evidence. Taking the evidence in the light most favorable to the State, it is clear that a reasonable jury could have found the Petitioner guilty. Jackson, 443 U.S. at 319. The decision of the OCCA to reject the Petitioner's sufficiency of the evidence claim was plainly neither contrary to, nor based upon an unreasonable application of, clearly established federal law, and was not based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1)-(2). The Petitioner is not entitled to federal habeas corpus relief.

_____

Tinner as she sat in her car, made eye contact with Ms. Tinner, and walked away. Exhibit 4 at 51.

[16]Because he was unavailable for trial, Mr. Debose's preliminary hearing testimony was read into evidence at trial. Exhibit 4 at 116-117.

33

## PROPOSITION VI

**THE PETITIONER HAS FAILED TO DEMONSTRATE ANY ERROR; THEREFORE, THERE IS NO ACCUMULATION OF ERROR. ACCORDINGLY, CUMULATIVE ERROR DID NOT DEPRIVE THE PETITIONER OF A FUNDAMENTALLY FAIR TRIAL.**

In his final ground for relief, the Petitioner claims that cumulative error deprived him of a fair trial. Exhibit 1 at 21-26. The decision of the Oklahoma Court of Criminal Appeals to deny this claim was neither contrary to, nor based on an unreasonable application of, clearly established federal law, and the decision was not based upon an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The Petitioner is accordingly not entitled to relief on this claim.

Upon reviewing the Petitioner's cumulative error claim on direct appeal, the OCCA held:

> This Court has repeatedly held that a cumulative error argument has no merit when we do not sustain any of the other errors raised. Because we have examined each of Morris's allegations in detail and found no error, relief is not warranted on this claim.

Exhibit 3 at 17 (citations omitted).

The decision of the OCCA to reject the Petitioner's cumulative error argument was neither contrary to nor based upon an unreasonable application of federal law, and was not based upon an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Under federal law, cumulative error arguments operate by aggregating

34

all errors found to be harmless and analyzing to determine whether the cumulative effect of the harmless errors is such that, collectively, they can no longer be considered harmless. Young v. Sirmons, 551 F.3d 942, 972 (10th Cir. 2008), *quoting* Brown v. Sirmons, 515 F.3d 1072, 1097 (10th Cir. 2008). However, within the context of federal habeas corpus review, cumulative error analysis applies only to *constitutional* errors. Young, 551 F.3d at 972, *quoting* Jackson v. Johnson, 194 F.3d 641, 655 n. 59 (5th Cir. 1999). In other words, "[t]he cumulative error doctrine provides relief only when the *constitutional errors* committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." Id. (emphasis present in Young). In this case, as demonstrated in Propositions I-V above, the Petitioner has failed to show any error at all, much less any constitutional errors. Hence, the Petitioner's cumulative error argument must fail, as there is nothing to accumulate.

Furthermore, the OCCA found no harmless error in its review of the Petitioner's claims. Exhibit 3. Therefore, even if cumulative error analysis of state law errors is subject to federal habeas review in order to ensure the state law errors found harmless by the state court did not cumulatively deprive the petitioner of a fundamentally fair trial, the Petitioner in this case is nevertheless not entitled to relief, because there is nothing to accumulate. *See* Darks v. Mullin, 327 F.3d 1001, 1016-1019 (10th Cir. 2003) (holding that a state cumulative error analysis is subject to federal habeas review to ensure a fundamentally fair proceeding,

but recognizing that cumulative error analysis is predicated in all cases upon the finding of harmless error).

As demonstrated in Propositions I-V above, the Petitioner has failed to show any error at all, much less any constitutional error.  Further, the Petitioner has failed to show that cumulative error deprived him of a fundamentally fair proceeding.  In short, the Petitioner's cumulative error argument must fail, because there is nothing to accumulate.  The Petitioner is not entitled to federal habeas corpus relief.

## CONCLUSION

The Petitioner's contentions have been answered by both argument and citations of authority.  As demonstrated above, the Petitioner has failed to show that he is entitled to habeas corpus relief on any of his claims.  Therefore, Respondent respectfully requests that this Court deny the Petitioner's claims and requested relief, and dismiss his Petition for Writ of Habeas Corpus.

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ JARED A. LOOPER**
**JARED A. LOOPER, OBA # 21529**
**ASSISTANT ATTORNEY GENERAL**
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (FAX)
Service email: fhc.docket@oag.state.ok
**ATTORNEYS FOR RESPONDENT**

36

## CERTIFICATE OF SERVICE

X      I hereby certify that on April 13, 2009, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmitted a Notice of Electronic Filing to the following ECF registrant:

Bill Zuhdi
Bill Zuhdi Attorney at Law, P.C.
P.O. box 1077
Oklahoma City, OK 73101
Zlawoffice@aol.com

                              s/ JARED A. LOOPER

37

**CASE NO. F-06-428**

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

NOV 1 7 2006

MICHAEL S. RICHIE
CLERK

# IN THE COURT OF CRIMINAL APPEALS
## STATE OF OKLAHOMA

**District Court of Oklahoma County**
**Case No.: CF-04-1212**

RECEIVED

Attorney General

## HOWARD MORRIS, III

### APPELLANT

-vs-

## THE STATE OF OKLAHOMA,

### APPELLEE.

## ORIGINAL BRIEF FOR AND ON BEHALF OF

## HOWARD MORRIS, III

### APPELLANT

**Bill Zuhdi, OBA #10013**
**Bill Zuhdi Attorney at Law, P.C.**
**P. O. Box 1077**
**Oklahoma City, OK  73101**
**(405) 232-1400**

**ATTORNEY FOR APPELLANT**

BRIEF DUE
1-16-07

November 17, 2006

EXHIBIT
1

tabbies

## TABLE OF CONTENTS AND INDEX

TABLE OF CONTENTS AND INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CASE AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATUTORY AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6

CONSTITUTIONAL AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OTHER AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PROPOSITION ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN
OVERRULING MR. MORRIS' MOTION FOR MISTRIAL
VIOLATING HIS SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL
OF HIS CONVICTION AND SENTENCE

PROPOSITION TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT
AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS

PROPOSITION THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
HEARSAY STATEMENTS INTRODUCED INTO MR. MORRIS' TRIAL
WERE IMPROPER AND DENIED HIM
HIS RIGHTS UNDER THE   SIXTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION
AND ARTICLE 2, SECTION 20 OF THE OKLAHOMA CONSTITUTION

PROPOSITION FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL
COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

PROPOSITION FIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
PROSECUTOR MISCONDUCT DENIED
MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION
OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION

**PROPOSITION SIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
TO SUPPORT MR. MORRIS' CONVICTION FOR FIRST DEGREE MURDER
AND WAS INSUFFICIENT TO SUSTAIN HIS CONVICTION AND
THEREFORE, HIS CONVICTION
VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH
AMENDMENT OF THE U.S. CONSTITUTION AND
ARTICLE 2, SECTION 7 OF THE OKLAHOMA CONSTITUTION**

**PROPOSITION SEVEN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
**THE TRIAL ERRORS COMPLAINED OF HEREIN
CUMULATIVELY DENIED MR. MORRIS' RIGHT
TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA
CONSTITUTION AND THEREFORE, HIS CONVICTION
AND SENTENCE MUST BE REVERSED**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITY

**AUTHORITY**                                                    **PAGE NUMBER**

Bland v. State, 2000 OK CR 11, ¶ 91, 4 P.3d 702, 726 . . . . . . . . . . . . . . . . . . . . . . . 34

Cargle v. State, 1995 OK CR 77, ¶ 56, 909 P.2d 806 . . . . . . . . . . . . . . . . . . . . . . . . 27

Carol v. State, 1988 OK CR 114, 756 P.2d 614, 618 . . . . . . . . . . . . . . . . . . . 27

Cooper v. State, 1991 OK CR 26, 806 P.2d 1136 . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) . . . . . . . . . . 25

Davis v. State, 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246 . . . . . . . . . . . . . . . . . . . . . . . 28

DeRosa v. State, 2004 OK CR 19, ¶ 53, n. 102, 89 P.3d 1124, 1145, n. 102 . . . . . . . . . . . . . . 29

Dodd v. State, 2004 OK CR 31, ¶ 20, 100 P.3d 1017 . . . . . . . . . . . . . . . . . . . . 21

Donnell v. CeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed. 2d 431 (1974) . . 33

Douglas v. State, 1997 OK CR 79, 951 P.2d 651, *cert. denied*, 525 U.S. 884,

        119 S.Ct. 195, 142 L.Ed.2d 159 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Easlick v. State, 2004 OK CR 21, § 5, 90 P.3d 556, 557 . . . . . . . . . . . . . . . . . . . . . . 31

Frederick v. State, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 947 . . . . . . . . . . . . . . . . . . . 32

Fritz v. State, 730 P.2d 530, 534 (Okl.Cr. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hawkins v. State, 1986 OK CR 58, ¶ 5, 717 P.2d 1156 . . . . . . . . . . . . . . . . . . . . . . 18

In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) . . . . . . . . . . . . . . . . 34

In re Bishop, 443 P.2d 768, 773 (Okl.Cr. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) . . . . . . . . . . . . . . . . . 19

Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) . . . . . . . . 27

Johnson v. State, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44-45 . . . . . . . . . . . . . . . . . . . . 40

McCarty v. State, 1988 OK CR 271, 765 P.2d 1215 . . . . . . . . . . . . . . . . . . . . . . . 41

Mitchell v. State, 2006 OK CR 20, ¶ 107, 136 P.3d 671 . . . . . . . . . . . . . . . . . . . . 26

Penninger v. State, 1991 OK CR 60, 811 P.2d 609, 613 . . . . . . . . . . . . . . . . . . . . . 26

Primeaux v. State, 2004 OK CR 16, 88 P.3d 893 . . . . . . . . . . . . . . . . . . . . . . . . . 26

Romano v. State, 1993 OK CR 8, ¶41, 847 P.2d 368, 380 . . . . . . . . . . . . . . . . . . . 34

Romano v. State, 1995 OK CR 74, 909 P.2d 92, 116, *cert denied*, 519 U.S. 855,

    117 S.Ct. 151, 136 L.Ed.2d 96 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Ryder v. State, 2004 OK CR 2, ¶ 29 , 83 P.3d 856 . . . . . . . . . . . . . . . . . . . . . . . 21

Skelly  v. State, 1994 OK CR 55, P.2d 401, 407 . . . . . . . . . . . . . . . . . . . . . . . . . 21

Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) . . . . . . . . . . . 19

Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04 . . . . . . . . . . . . . . . . . . . . 21

Strickland v. Washington, 466 U.S. 668, 677-78, 104 S.Ct. 2052, 2059,

    80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Thornburg v. State, 1999 OK CR 32, ¶ 25, 985 P.2d 1234 . . . . . . . . . . . . . . . . . . . 28

Torres v. State, 1998 OK CR 40, ¶ 38, 962 P.2d 3, 16, *cert. denied*, 525 U.S. 1082,

    119 S.Ct. 826, 142 L.Ed. 2d 683 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 28

Tucker v. State, 1984 OK CR 36, 675 P.2d 459 . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S. v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981) . . . . . . . . . . 29

U.S. v. Young, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985) . . . . . . . . . . . . 34

U.S. v. Lovett, 964 F.2d 1029 (10th Cir. 1993), *cert. den.* 113 S.Ct. 169 . . . . . . . . . . . . . . . 33

United States v. Rivera, 900 F.2d 1462, 1469-1470 (10th Cir. 1990) . . . . . . . . . . . . . . . . . 33

United States v. Gagnon, 470 U.S. 522, 526, 105 S.CT. 1482, 1484,

    84 L.Ed.2d 486 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Walker v. State, 1987 OK CR @ 183, 738 P.2d 181 . . . . . . . . . . . . . . . . . . . . . . 21

Warner v. State, 2001 OK CR 11, 29 P.3d 569 . . . . . . . . . . . . . . . . . . . . . . . . 19

Washington v. State, 729 P.2d 509, 510 (Okl. Cr. 1986) . . . . . . . . . . . . . . . . . . . 19

Young v. State, 1998 OK CR 62, ¶ 9, 992 P.2d 332 . . . . . . . . . . . . . . . . . . . . . . 18

## **CONSTITUTION**

Okla. Const., art. 2, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Okla. Const. art. 2, § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Okla. Const. art. 2 § 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. IVX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

OKLA. STAT, tit 12 § 2802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT, tit 12 § 2804.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT, tit 12 § 2803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT tit 12 § 651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT, tit 22 § 583 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

OKLA. STAT, tit 12 § 576 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

OKLA. STAT, tit 12 § 581 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

OKLA. STAT. tit, 21 § 701.7(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

OKLA. STAT, tit 12 § 2801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT. tit, 20 § 3001.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OKLA. STAT, tit 12 § 2804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## OTHER AUTHORITIES

OUJI-CR 4-61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

HOWARD MORRIS,                          )
                                        )
            Appellant,                  )
                                        )        Case No.    F-06-428
                                        )
v.                                      )
                                        )
THE STATE OF OKLAHOMA                   )
                                        )
            Appellee.                   )

## BRIEF OF APPELLANT

Appellant, Howard Morris ("Mr. Morris") was the Defendant in the district court and will be referred to by name or as Appellant. The Appellee will be referred to as the State or as the prosecution. The numbers in the parenthesis refer to page citations in the original record (O.R.), the trial transcript (Tr.) the preliminary hearing transcript (P.H. Tr.), motions hearing (M.Tr. ) and the transcript of the sentencing hearing (S.Tr.). Appellant's trial counsel will be referred to as trial counsel.

## STATEMENT OF THE CASE

On the 10th day of September, 2004, an Information was filed in Case No.: CF-2004-1212 in the District Court of Oklahoma County, Oklahoma, which charged Mr. Morris and Timothy Kendell Johnson ("Johnson"), Jeremy Dion Nicholson ("Nicholson") and Mr. Morris with Count 1, Murder in the First Degree of the victim, Rodney Lamont Perry,  in violation of OKLA. STAT. tit, 21 § 701.7 (O.R. 29).

A Motions Hearing was held on the 23rd day of September, 2005.

Preliminary Hearing was held on the 25th day of March, 2005, before the Honorable D. Fred Doak. At the conclusion of the hearing, the court found there was probable cause to believe the crime of murder in the first degree and bound over Mr. Morris (P.H. Tr. 65; O.R. 61).

-7-

Mr. Morris filed Defendant's Proposed Jury Instructions on October 6, 2005 (O.R. 96-99).

Pro se, Mr. Morris filed a Motion to Dismiss Charges on October 25, 2005 (O.R. 103).

On April 3, 2006, the State filed State's Motion to declare Witness Dewon Debose Unavailable and Read the Transcript of Preliminary Hearing Testimony (O.R. 160).

On April 4, 2006, Codefendant Nicholson filed Notice by Jeremy Dion Nicholson of Invocation of his Constitutional Privilege Against Self-Incrimination (O.R. 165).

Trial by jury occurred on the 3rd, 4th and 5th of April, 2006, and at the conclusion of the trial, the jury found Mr. Morris guilty of the crime of murder in the first degree and fixed his punishment at life without the possibility of parole (O.R. 175; Vol. 3, Tr. 170).

Mr. Morris was sentenced on the 17th day of April, 2006, in accordance with the jury's verdict and assessment of sentence (O.R. 227; Vol. 3, Tr. 173).

## STATEMENT OF THE FACTS

**State witnesses**

Demetria Tinner ("Tinner") testified that on the evening of February 20th, 2004, at 10:30 or 11:00, she was heading over to Rockwell Villa Apartments. Christa Anderson was with her in Tinner's car, a white Ford Focus. They were going to the apartments to visit Anderson's friend Kesha (Vo. 2, Tr. 35, 36, 40). Both Tinner and Anderson had previously lived in the Rockwell Villa Apartments. When they had lived at the apartments Rodney Perry lived "across the way" from them the entire time (Vol. 2, Tr. 37).

When Tinner came off of Rockwell to Rockwell Villa she saw a group of guys standing outside and arguing in the parking area. Tinner testified she saw five guys. Four men were arguing with one man. Tinner's front tires were over a speed bump and she came to a stop. They let the car

-8-

windows down and watched. The four men started stomping all over the one man's body and were beatong him up really bad, jumping on his chest and stuff (Vol. 2, Tr. 40, 41, 42). All four men were participating in the beating. The man that was beaten was standing up at first but one of the guys hit him and he fell back on the ground. They started jumping and stomping him (Vol. 2, Tr. 43). Tinner testified the four men were saying something about Crip stuff and Rodney saying he didn't do anything. Rodney then started gurgling real bad. Rodney was shaking real bad and Tinner could tell he was not breathing. Tinner called 911 on her way back. She had turned around in a little circle and came back by the men. As she came into the apartment complex the beating was on her side of the car and on the way back the beating was on the passenger side of the car. About ten people came out. One of the four men took off through the crowd. The other three men got into a car and left behind her on Rockwell (Vol. 2, Tr. 44, 45, 46, 47, 54). Tinner identified Mr. Morris as being out there that night (Vol. 2, Tr. 48, 49). Tinner did not identify Mr. Morris when she was initially interviewed by the police and did not tell them she knew him. Tinner told the prosecutor right before the last trial. Tinner stated she did not remember how Mr. Morris was dressed (Vol. 2, Tr. 49, 50). Tinner testified that Mr. Morris came to the car and guessed that when he noticed it wasn't Eenie in the car he went through the crowd (Vol. 2, Tr. 51). Tinner stated she knew Mr. Morris as NC (Vol. 2, Tr. 52). Tinner agreed that Mr. Morris was one of the four men that was beating and stomping Rodney Perry (Vol. 2, Tr. 54, 61).

On cross examination, Tinner admitted that in July 2004 at a preliminary hearing she testified that she answered no to the question of whether she recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62).

-9-

Christa Anderson ("Anderson") testified that on February 20, 2004, between 10:30 and 11, she and Tinner were driving to the Rockwell Villa Apartments. Anderson was in the passenger seat of Tinner's white Ford Focus. They were going to visit Anderson's friend Tasha. Anderson knew Rodney Perry. She had lived in the apartments from 2001 to 2002. As Anderson and Tinner were entering the apartments they went over a speed bump, and heard someone say "What did I do? I didn't do anything." That is when Anderson saw the fight start (Vol. 2, Tr. 65, 66, 67, 68). After the individual made the statements he started getting beaten up by four gentleman. The individual was being punched very violently (Vol. 2, Tr. 68, 69). Once the men were against the mailboxes the victim was lifeless and kind of slid down the car. The victim was laying on the ground where the men proceeded to stomp on him and kick. Rodney was the individual that was beat up. Anderson could hear what sounded like a wet snore, like a gurgling sound (Vol. 2, Tr. 70, 71).

Oklahoma police officer Taylor Shaw ("Shaw") testified that on February 20th, 2004, at 11:48 p.m., he received a call on an assault at an apartment location located at 933 North Rockwell. When officer Shaw arrived he found a gentleman that looked like he was sitting or leaning against a car. Officer Shaw got out of his car and asked the man if he was okay. Officer Shaw did not get a response. Officer Shaw checked for a pulse and didn't find one, and then told EMSA to step it up (Vol. 2, Tr. 75, 76, 77).

Oklahoma police officer Matthew Reed ("Reed") stated on February 20th, 2004 at approximately 11:49 p.m. he was dispatched to Rockwell Villa Apartments. When officer Reed arrived he observed the deceased Mr. Perry laying against a Dodge Neon (Vol. 2, Tr. 78, 79). Officer Reed could see blood on Mr. Perry's face (Vol. 2, Tr. 79, 80, 81).

-10-

Oklahoma police officer David Feskanich ("Feskanich") testified he was one of the crime scene investigators assigned to the homicide of Rodney Perry. Officer Feskanich arrived on the scene at 12:35 on the 21st (Vol. 2, Tr. 83). Officer Feskanich described his role, sketches of the scene, what he found at the scene and items he had collected (Vol. 2, Tr. 85-95). Officer Feskanich testified that one of the detectives brought to his attention that a Mitsubishi Galant vehicle may have also been involved. Officer Feskanich also collected a wool or knit beanie cap (Vol. 2, Tr. 96, 97). Officer Feskanich testified about photographs taken of the deceased Mr. Perry which showed blood coming from the nose, mouth, and facial area as well as other photographs of the deceased's injuries (Vol. 2, Tr. 99, 100, 101).

Chai Choi ("Choi"), forensic pathologist working with the office of Chief Medical Examiner for the State of Oklahoma, performed an autopsy on Rodney Perry on February 21st, 2004 (Vol. 2, Tr. 103, 104, 105). Dr. Choi described the injuries she found to Mr. Perry's body (Vol. 2, Tr. 105, 108, 109, 110, 111, 112, 113, 114). Based on Dr. Choi's examination, her determination of the cause of death was head injury. Dr Choi classified the death as a homicide, one person harm to another person that resulted in death (Vol. 2, Tr. 113).

Kyle Laws ("Laws"), a resident of Rockwell Villa Apartments, on February 20th, 2004, at approximately 11 or 11;30 P.M., saw a fight broke out between Rodney Perry and four other individual. Laws was upstairs in his apartment when the fight first broke out (Vol. 2, Tr. 117, 118, 127). Laws went downstairs with six or seven friends to where th fight was and the four men walked by him bragging that they had knocked some guy out and he was over there asleep. Laws testified one of the four men had two sets of teardrops tattoo under each eye. After initially testifying he could not remember any of the clothing these individuals were wearing, Laws testified that he

-11-

vaguely remembered a North Carolina logo (Vol. 2, Tr. 119, 120, 121, 122, 128). Laws went over and looked at Rodney Perry. Mr. Perry looked like he was laid out on the ground asleep. His body was laying next to the vehicle on the concrete. Rodney Perry was trying to gasp for air. The guy with the teardrops came over and grabbed Rodney Perry by his shirt , picked him up and said something to him, slammed his head on the concrete pretty hard, then kicked him twice in the head. The guy then picked Rodney Perry back up by his shirt, leaned him against the car and then walked away to another group of people (Vol. 2, Tr. 122, 123). The cops pulled up and the guy with the teardrops followed Laws and the group of his family up to their apartment. The guy with the teardrops and those with him tried to use the phone but they were not allowed in. Kurt gave them a cell phone from the house to use (Vol. 2, Tr. 124, 125).

Kurt Brazille ("Brazille"), on February 20, 2004, between 10:30 and midnight, was at his girlfriend's house at Rockwell Villa Apartments (Vol. 2, Tr. 130). Either Brazille's niece or daughter came over and said there was a fight by the mailboxes. Brazille dropped everything he had in his hand and took off running outside (Vol. 2, Tr. 134, 156). Brazille was met by his nephew Dewan Debose and three other guys. Brazille identified Mr. Morris as one of the three other guys. He stated Mr. Morris had on a baseball cap and a jacket with Tar Heel colors (Vol. 2, Tr. 137, 139). In past court testimony Brazille had testified the individual that he identified at trial as Mr. Morris had a jacket on that said "Thug Life." (Vol. 2, Tr. 155, 156). Brazille saw that one of the guys had teardrop tattoos under each eye. A third guy had a black hoodie (Vol. 2, Tr. 138, 140). Brazille testified that Mr. Morris kept biting his bottom lip and was saying he would get a fair fight with anyone that wanted one (Vol. 2, Tr. 140, 141, 142, 143). The three men went back around the side of the grey car where Rodney Perry was laying. Brazille stated he could hear stomping and skin

-12-

slapping. They then came back over to where Brazille was standing outside the apartment building. That is when they got in their car. Brazille stated that Mr. Morris got in the passenger side but in the back seat (Vol. 2, Tr. 147, 148, 157).

There was Brazille's stepson and close to nine of his skateboard friends out there that night, and there could have been over 20 people (Vol. 2, Tr. 163). The Oklahoma City and Bethany police came to the apartments. About four minutes later Brazille saw Mr. Morris and the teardrop guy in Tracy's house. Brazille stated that Mr. Morris and the teardrop guy told him they wanted to use the phone. Brazille did not want them to use the house phone so he gave them his stepson's cell phone (Vol. 2, Tr. 149, 150, 161). Brazille testified he handed the phone to Howard and that Howard spoke on the phone. Brazille stated that Howard told whoever he was talking to on the phone to meet him at Abadan's, a small convenience store on Northwest 10th. Brazille stated that Howard told him thank you and then proceeded to go out the back way down the back stairway (Vol. 2, Tr. 150, 15, 161).

Brazille testified that before that night he had never seen Mr. Morris, the teardrop guy or the guy in the black hoodie. Brazille knew Howard's name from having been in court and hearing lawyers say Howard Morris (Vol. 2, Tr. 152). Brazille was in contact with the three men approximately 10 minutes or less (Vol. 2, Tr. 163).

**Defense witness**

Howard Morris ("Mr. Morris") took the stand in his own defense. He had lived in an apartment at Southwest 74th and May since January 2004. On September 2, 2004 Mr. Morris was arrested at his home when he got off work. Mr. Morris denied being near the location of the homicide on February 20, 2004. Mr. Morris denied being involved in the homicide that he was

-13-

charged with and Mr. Morris denied having any information about the homicide (Vol. 3, Tr. 75, 76,

77, 78, 80).

On cross-examination, Mr. Morris denied ever meeting Tinner, denied knowing Debose,

denied knowing or ever meeting Brazille, and denied knowing Rodney Perry. Mr. Morris stated he

did not know what happened to Mr. Perry and that he was not there at the homicide of Mr. Perry

(Vol. 3, Tr. 82, 83). Mr. Morris had one item of Tar Heel clothing, as well as other teams. Mr.

Morris testified he wasn't wearing Tar Heel clothing on February 20th, 2004, he was at home in bed

(Vol. 3, Tr. 84).

Mr. Morris testified he has never been convicted of a felony (Vol. 3, Tr. 90).

Other facts may be included in as warranted in Mr. Morris' propositions of error.

## PROPOSITION ONE

### THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING MR. MORRIS' MOTION FOR MISTRIAL VIOLATING HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS, WARRANTING REVERSAL OF HIS CONVICTION AND SENTENCE

### INTRODUCTION

Juror bias and prejudice against Mr. Morris denied him a fair and impartial jury. Therefore,

Mr. Morris did not have a trial by an impartial jury, thereby violating his rights under the Sixth

Amendment. Mr. Morris's conviction should be reversed and his sentence remanded and vacated.

### ARGUMENT AND AUTHORITIES

During the second day of trial, the jury made it clear that they had severe concerns regarding

Mr. Morris. After a break in the trial, the court informed trial counsel and Mr. Morris that the bailiff

had made her aware, "that the jurors had expressed to her a concern that your client was taking notes

-14-

during jury selection and because this is gang stuff, they don't know what that means and they're concerned about their personal security." (Vol. 2, Tr. 153). The judge then explained that she went into the jury room during the break and told the jurors that she generally doesn't talk to the jury during trial and that she had to be very limited in what she said. The judge continued that she told the jurors that in her history with the court, she was unaware of there ever being a time when jurors had been threatened or intimidated, and that she was confident that Mr. Morris' taking notes was so that he could communicate with trial counsel. According to the judge, she also told the jurors that Mr. Morris would not be taking anything from the courtroom (Vol. 2, Tr. 153). The trial continued.

The following morning, trial counsel informed the court that the previous day he had been caught flatfooted and that he was disturbed the jury had the concern and the contact with the court because it indicated to trial counsel that the jury had collectively or individually talked about Mr. Morris (Vol. 3, Tr. 9). Trial counsel set forth that the jury had violated its oath and that the concern expressed by the jury about Mr. Morris, that he would know where they live or that was of consequence, showed him he was facing an unlevel playing field (Vol. 3, Tr. 10, 11). Trial counsel asked for a mistrial (Vol. 3, Tr. 11). At trial counsel's request for individual voir dire, the juror's were individually voir questioned (Vol. 3, Tr. 12, 13).

Juror Lee stated that several jurors brought up their concerns. Juror Lee had no concerns (Vol. 3, Tr. 21). Juror Lee stated they (jurors) were talking how Mr. Morris was writing down notes and that he probably would take that out of the room, and that he could probably give it to somebody else and they could track the jurors down. Juror Lee agreed that some of the jurors were expressing fear (Vol. 3, Tr. 22).

-15-

Juror Carrender stated concerns about safety were brought up, that some of the jurors were concerned because they had to say where their spouses worked, where they worked, their spouse's name, and things like that. Juror Carrender some were kind of fearful and were just worried for their families, and were curious as to what kind of information could be taken from the courtroom (Vol. 3, Tr. 24, 25, 26).

Juror Townsend stated that a couple of jurors were concerned Mr. Morris may have written down information names, places were they worked and such information (Vol. 3, Tr. 28).

Juror Alexander stated he thought one person was a little concerned over information he had given (Vol. 3, Tr. 30).

Juror Ryan was concerned that Mr. Morris was taking notes when Ryan was answering questions about his wife's name and where she worked, and kids and all those things. Juror Ryan also said it was becoming evident that there are people that could be possibly involved with gangs in this whole scenario. Witness Demetria's boyfriend was wearing all red, a Blood's color. And that if the person is innocent or guilty or there would be a side that decided, they would want to retaliate (Vol. 3, Tr. 33, 34). In addition to juror Ryan and the blond juror, there were three other jurors that were concerned (Vol. 3, Tr. 37).

Juror Gilbert stated that it just came up that Mr. Morris could have remembered something (Vol. 3, Tr. 41).

Juror Berry stated he thought one juror was concerned. Juror Berry stated that he did not think it was just Mr. Morris, but that there were so many people in and out of the courtroom he worried that they and their families were safe in general (Vol. 3, Tr. 42, 43, 44).

-16-

Juror Cotey stated she thought the concern was the fear of reprisals since there was mention of gangs, Crips and Bloods (Vol. 3, Tr. 46).

Juror Demers stated that Mr. Morris was the only person that wasn't a professional or working in the courtroom at the time. Juror Demers said Mr. Morris taking information was a concern and she agreed that was discussed in the jury room among several jurors (Vol. 3, Tr. 47, 50).

Juror Myers stated that "...but I'm worried if we don't convict the guy. We're going to turn him loose in the community." (Vol. 3, Tr. 54).

Juror Peters did not hear any concerns from the other jurors (Vol. 3, Tr. 59).

Juror Marquez agreed that it was brought up that Mr. Morris may have information and give it to somebody (Vol. 3, Tr. 62).

Juror Cornish (alternate and ultimately jury member replacing juror Berry) agreed jurors were concerned that Mr. Morris could give information to other people. The concern was alleviated because nothing would be leaving the courtroom (Vol. 3, Tr. 66, 169).

Juror Leavitt (alternate) agreed there was fear about Mr. Morris having information from jury selection and maybe giving that information to somebody (Vol. 3, Tr. 69, 70).

All of the jurors told the court they could be fair and impartial and that they had not decided the case yet and had not discussed the case (Vol. 3, Tr. 21-69). Mr. Morris submits that the jurors' assertions that they could be fair did not ring true in light of their concerns about Mr. Morris and their safety and family's safety and what he might do with the information he gathered during jury selection. Some jurors exhibited concerns and fears about the gangs and retribution from Mr. Morris or others in the courtroom. Juror Myers was worried that if they didn't convict Mr. Morris, then they were going to turn him loose in the community (Vol. 3, Tr. 54). Obviously, juror Myer was biased

-17-

and prejudiced against Mr. Morris. "Actual bias is present when a juror's views prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." Young v. State, 1998 OK CR 62, ¶ 9, 992 P.2d 332. "The rule in Oklahoma is that all doubts regarding juror impartiality must be resolved in favor of the accused." Hawkins v. State, 1986 OK CR 58, ¶ 5, 717 P.2d 1156. As set forth above, the juror concerns, discussions the jurors had in the jury room, and their fears, as told to the court, were not the statements of fair and impartial jurors, notwithstanding their statements to the contrary.

Trial counsel re-urged the motion for mistrial. The court did not declare a mistrial (Vol. 3, Tr. 70, 71, 72, 73). The trial court erred in not granting the motion for mistrial.

The jurors discussed facts of the case prior to deliberations and thereby violated their oaths as jurors. The jury was sworn to give a true verdict according to the law and evidence. OKLA. STAT, tit 12 § 576. The jury verdict was not according to the law because they discussed the case prior to verdict. Many jurors not only expressed their concerns to other jurors about Mr. Morris taking notes during jury selection and obtaining information to give to others, but they admitted that some of them discussed the gang aspects of the facts, Bloods, and the concerns for safety of themselves and their families (Vol. 3, Tr. 33, 34, 37, 46). The prosecutor cross-examined Mr. Morris asking him if he had reason to believe the homicide of Rodney Perry was gang-related (Vol. 3, Tr. 83). The prosecutor in closing arguments hit on these gang concerns of the jury again by arguing:

> Now, I know that there are concerns about Crips and Bloods. If he's a Crip, if he's a blood, if he's a Crip, if he's a blood, what difference does that make? Does that lessen the value of Rodney Perry's life? Does that mitigate his responsibility?

-18-

If this is a Blood killing a Crip or a Crip killing a Blood, what difference does that make? Is there some special rule out there that gang members can kill each other? (Vol. 3, Tr. 102).

Clearly gangs, Bloods and Crips, figured heavily in this trial and the jury violated their oath by discussing the gang aspects of the trial before deliberations and also in violation of the court's admonishments not to discuss the case among themselves or form or express an opinion on the case until it is submitted to them for their decision (Vol. 2, Tr. 9, 10, 98, 152). The jurors also violated their duty not to converse on any subject of the trial and to not form or express an opinion until the case is finally submitted to them pursuant OKLA. STAT, tit 12 § 581.

The "...right to a trial by an impartial jury lies at the heart of due process." Warner v. State, 2001 OK CR 11, 29 P.3d 569, *citing* Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). And "Due process requires both "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Warner, *citing* Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

The trial court's error in not declaring a mistrial violated Mr. Morris' due process rights. Mr. Morris' rights under the United States Constitution were violated by the trial court's error, which affected the very foundation of the trial, requiring reversal of his judgment and sentence and warranting remand for a new trial.

-19-

## PROPOSITION TWO

## MR. MORRIS WAS DENIED HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS

### INTRODUCTION

The trial judge met with the jury during trial outside the presence of Mr. Morris or his trial counsel. The meeting between the judge and the jury was unknown to Mr. Morris or trial counsel until after the meeting was concluded and the judge informed counsel of what had transpired. Mr. Morris' right to be present at all critical stages of the trial proceedings was violated.

### ARGUMENT AND AUTHORITIES

During the second day of trial the jury made it clear that they had severe concerns regarding Mr. Morris. After a break during the second day of trial, the court informed trial counsel and apparently Mr. Morris that the bailiff had made her aware, "that the jurors had expressed to her a concern that your client was taking notes during jury selection and because this is gang stuff, they don't know what that means and they're concerned about their personal security." (Vol. 2, Tr. 153). The judge then explained that she went into the jury room during the break and told the jurors that she generally doesn't talk to the jury during trial and that she had to be very limited in what she said. The judge continued that she told the jurors that in her history with the court she was unaware of there ever being a time when jurors had been threatened or intimidated, and that she was confident that Mr. Morris' taking notes was so that he could communicate with trial counsel. The judge also told the jurors that Mr. Morris would not be taking anything from the courtroom (Vol. 2, Tr. 153). The trial continued and the following morning trial counsel asked for a mistrial (Vol. 3, Tr. 11). Trial counsel re-urged the motion for mistrial. The court did not declare a mistrial (Vol. 3, Tr. 70,

-20-

71, 72, 73). Trial counsel's motion for mistrial was on other grounds as set forth in Proposition One. However, the conviction should be reversed because Mr. Morris was denied his Constitutional right to be present at all critical stages of the trial proceedings.

Mr. Morris' right to due process under the Fifth Amendment was violated since his absence impaired his ability to defend himself, as well as his Sixth Amendment right to confrontation, when the judge met with the jury unknown to him or his counsel and discussed with the jury their concerns about Mr. Morris. *See* United States v. Gagnon, 470 U.S. 522, 526, 105 S.CT. 1482, 1484, 84 L.Ed.2d 486 (1985). Also, no one should communicate with the jury regarding the merits of the case prior to submission of the case to the jury. Ryder v. State, 2004 OK CR 2, ¶ 29 , 83 P.3d 856. The right of a defendant to be present is rooted in the Sixth Amendment right to be confronted with the witnesses against him. Dodd v. State, 2004 OK CR 31, ¶ 20, 100 P.3d 1017.

Mr. Morris' right to be present at trial for a felony was protected by statute. OKLA. STAT, tit 22 § 583. The jury and the judge discussed specific concerns and fears that some jurors had specifically about Mr. Morris and his ability to find them or their family members after the trial. Mr. Morris' presence was essential to a fair and just determination of the matters discussed with the jury since Mr. Morris could have, through counsel or personally, submitted that his note taking during jury selection was not a listing of juror personal information on family for later retribution. Mr. Morris did not waive his right to be present before the jury.

Mr. Morris was denied his rights under the United States Constitution and Oklahoma law as set forth preceding to be present before the jury. Mr. Morris was denied a fair trial due to the trial judge's action and his conviction should be reversed.

-21-

## PROPOSITION THREE

### HEARSAY STATEMENTS INTRODUCED INTO MR. MORRIS' TRIAL WERE IMPROPER AND DENIED HIM HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 2, SECTION 20 OF THE OKLAHOMA CONSTITUTION

### INTRODUCTION

Improper hearsay was presented to the jury through state witnesses. The improper hearsay was devastating to Mr. Morris and adversely affected his due process rights under the constitution, denying him a fair trial. Trial counsel failed to object to the improper hearsay statements. Notwithstanding, Mr. Morris was denied his right to a fair trial and his conviction and sentence should be reversed.

### ARGUMENT AND AUTHORITIES

State witness Brazille testimony's contained improper hearsay that caused Mr. Morris to be convicted. The complained of testimony:

A..     They was asking – my nephew kept saying that, "They messed Rodney up. Do you want to go see him?" I was like, "No, I don't care." You know, I didn't know it was Rodney Perry at that time. He just kept a stating that, "They messed Rodney up. Do you want to go see him?"...

(Vol. 2, Tr. 144).

Mr. Morris could not confront the person that allegedly made the above statement to Brazille. And, to compound the undue prejudice to Mr. Morris, Brazille's nephew denied talking to Brazille. Dewan is Brazille's nephew (Vol. 2, Tr. 141). Brazille testified his nephew made the above statements (Vol. 2, Tr. 144). Dewan, however, denied that he had a conversation with his uncle

-22-

Brazille (Court's Exhibit No. 1, Tr. 49; Vol. 2, Tr. 117). Mr. Morris was denied his constitutional right to confront Brazille's nephew Dewan Debose.

The above hearsay by witness Brazille was particularly damaging because it went to the material facts of the case and unduly prejudiced the jury. Mr. Morris, along with the "teardrop" guy and the guy wearing the hoodie was obviously one of the "they" that "messed Rodney up." Brazille identified Mr. Morris as "the guy with the hat," and Mr. Morris as the guy in a Tar Heels' colored jacket with a baseball hat that kept biting the bottom of his lip and was walking with his nephew (Vol. 2, Tr. 140, 142). The witness had already identified Mr. Morris as being one of the men that Brazille's nephew, Dewan, was talking about (Vol. 2, Tr. 141, 142, 143, 144). All of theses improper hearsay statements were actually denied ever being made by the alleged declarant but Mr. Morris could not confront the alleged declarant, thereby denying him a fair trial.

This hearsay testimony directly placed Mr. Morris as one of the men that "messed Rodney up". Mr. Morris could not confront the hearsay evidence of Mr. Brazille's nephew's statements that came in through Mr. Brazille. The denial of Mr. Morris' right to confrontation violated his rights under the Sixth Amendment.

During the trial, state witness Tinner testified that:

They were saying something about Crip stuff and Rodney was like he didn't do anything and they was just doing cussing and stuff like that.

(Vol. 2, Tr. 44)

The hearsay from whoever was standing by the victim that, "They were saying something about Crip stuff" unduly prejudiced Mr. Morris because it improperly introduced evidence of gang activity and gang violence. Also, this improper hearsay was unduly prejudicial to Mr. Morris

-23-

because it created sympathy for the victim since the victim allegedly said, "he didn't do anything."
The witness Tinner never identified who was allegedly making these statements. The evidence at
trial was that there were ultimately as many as 20 people around Mr. Perry. Tinner stated that she
was talking about "four men" that were saying "crip stuff" but that one of them took off through the
crowd because people had started coming out (Vol. 2, Tr. 44, 45). Tinner testified as many as ten
people had come out (Vol. 2, tr. 46). Tinner identified Mr. Morris as one of the men she saw out
there that night but there was no testimony that Mr. Morris made the above statements. Mr. Morris
submits that the hearsay statements could have been made by any number of individuals that were
at the scene the night Mr. Perry was killed. Dewan Debose, who stated he witnessed the beating of
Mr. Perry and his death, testified that besides the three individuals and Mr. Perry there were, "At least
five or maybe more" people "at the location when the fight was occurring in the parking lot." There
were at least eight or nine people at the location (Court's Exhibit No. 1, Tr. 46, 49, 55, 56; Vol. 2,
Tr. 117).

Then during Brazille's direct testimony, the following exchanges occurred which resulted
in the introduction of improper hearsay into the trial. Trial counsel, as more fully discussed herein
in Proposition Three, failed to object to the hearsay even though the prosecutor's questions were
obviously designed to elicit improper hearsay:

(By the prosecutor):    What about either the teardrop guy or the man in the black hoodie, were they
                        saying anything?

A.    The guy with the black hoodie was mostly like stating that he didn't care who know him,
      what kind of car he drove and that he stated that he drive the maroon car or purple car and
      he lived out on 122nd or Hefner and May or something like that, he stated.

-24-

(Vol. 2, Tr. 143)

This improper hearsay unduly prejudiced Mr. Morris since it introduced to the jury the codefendants and Mr. Morris didn't care who knew they killed Mr. Perry, and/or they were arrogant and/or cavalier in their criminal activity. This hearsay, coupled with the hearsay "something about Crip stuff," and that "they was just doing cussing" collectively painted Mr. Morris and whoever was with him as violent, cussing gang members. Mr. Morris had no opportunity to cross-examine regarding the hearsay nor confront the individuals that were saying "Crip stuff" and cussing.

All of the statements set forth above were obvious hearsay statements. OKLA. STAT, tit 12 § 2801. Hearsay is not admissible except as otherwise provided by an act of the Legislature. OKLA. STAT, tit 12 § 2802. Mr. Morris asserts that there are no hearsay exceptions applicable to the statements set forth above. *See* OKLA. STAT, tit 12 §§ 2803, 2804, 2804.1.

The Sixth Amendment of the United States Constitution provides one of our countries most fundamental rights and a cornerstone of the safeguards placed by the founders for an accused, the right "...to be confronted with the witnesses against him;" U.S. Const. amend. VI.; Okla. Const., art. 2, §20. The United States Supreme Court held in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that the state's use of the petitioner's wife's statement made during police interrogation violated the Confrontation Clause because, where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. In Crawford, the Court examined the Clause's historical background and found the Clause's primary objective is testimonial hearsay, which includes squarely within the class interrogation by police officers, and that the defendant had a prior opportunity for cross-examination. *Id.* Mr. Morris did

-25-

not have an opportunity to cross-examine Debose about the new statements attributed to him by Brazille during the trial, thereby denying him the right to confrontation.

Under Oklahoma law, hearsay evidence is not admissible except as otherwise provided by an act of Legislature. OKLA. STAT, tit 12 § 2802. Under the analysis provided in <u>Primeaux v. State</u>, 2004 OK CR 16, 88 P.3d 893, the hearsay statements were clearly offered to prove the truth of the matter asserted. <u>Id</u>. at ¶ 37. As set forth in <u>Primeaux</u>, *supra.*,"... if the purpose of offering the statement is to establish any assertion made by the challenged evidence, it is hearsay." *Id.* at ¶ 38.

The hearsay statements admitted during Mr. Morris' trial denied him due process of law and denied him a fair trial. Since the hearsay statements went directly to the guilt or innocence of the charged offense, who killed Mr. Perry, the statements cannot be said to have not contributed to the conviction. The errors in the repeated admissions of the hearsay statements were of constitutional magnitude and were not harmless beyond a reasonable doubt. *See* <u>Chapman</u>, *supra.* Consequently, these errors dictate that Mr. Morris' conviction be reversed.

## PROPOSITION FOUR

### MR. MORRIS RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### INTRODUCTION

Mr. Morris received ineffective assistance of counsel when his trial counsel failed to object to improper hearsay statements and when his trial counsel failed to object to prosecutorial misconduct. As a result of his trial counsel's errors, Mr. Morris was wrongly convicted. Mr. Morris was denied his rights to due process, right to counsel and equal protection pursuant the Fifth, Sixth,

-26-

Eighth, and Fourteenth Amendments. Accordingly, Mr. Morris' conviction should be reversed and remanded.

## ARGUMENT AND AUTHORITIES

### Failure to object to Improper Hearsay Evidence

Trial counsel was ineffective in his representation of Mr. Morris when he failed to object to the blatant hearsay that occurred during his trial (Vol. 2, Tr. 44, 143, 144). The exact undue prejudice to Ms. Morris is expostulated in Proposition Three and is incorporated herein. As a result of trial counsel's failure to object to the improper hearsay testimony, Mr. Morris was unduly prejudiced and was denied effective assistance of counsel under the Sixth Amendment and was denied due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

### Failure to apply for a new trial

Trial counsel was ineffective in failing to seek a new trial based on misconduct of the jury. OKLA. STAT tit 12 § 651. By not applying for a new trial, the trial court did not reexamine the issues of fact and law regarding misconduct of the jury as set forth in Proposition One. Mr. Morris was denied an avenue that he submits may have lead to a new trial without having to seek relief by appeal.

### Failure to Object to Prosecutorial Misconduct

Further, trial counsel was deficient in his performance for failing to object to the prosecutor's improper comments discussed in Proposition Five (which argument and authorities are incorporated herein). *See* <u>Cargle v. State</u>, 1995 OK CR 77, ¶ 56, 909 P.2d 806. Mr. Morris was unduly prejudiced (also as set forth in Proposition Five by his trial counsel's failure to object to the

-27-

prosecutor's comments and therefore, reversal of Mr. Morris' conviction on this basis is warranted.

To prove a claim of ineffectiveness, the appellant must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced his defense, depriving him of a fair trial with a reliable result. Davis v. State, 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246. To show prejudice, the appellant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., citing Strickland v. Washington, 466 U.S. 668, 677-78, 104 S.Ct. 2052, 2059, 80 L.Ed.2d 674 (1984). As repeatedly provided in case law, in order to successfully prove Mr. Morris received ineffective assistance of his trial counsel, Mr. Morris must show: "(1) that exiguous counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance." Thornburg v. State, 1999 OK CR 32, ¶ 25, 985 P.2d 1234; Strickland, supra.; See also Douglas v. State, 1997 OK CR 79, 951 P.2d 651, cert. denied, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998).

The prosecutor misconduct and the improper and blatant hearsay testimony that was allowed into the trial without objection by trial counsel as well as trial counsel's failure to ask that the jury to be admonished for the errors, and his failure to move for mistrial during Mr. Morris' trial cannot be deemed to have been a harmless error. These errors contributed to Mr. Morris' verdicts of guilt. Mr. Morris has shown that, but for trial counsel's errors, the outcome of the proceeding would have been different.

In order for constitutional error to be deemed harmless, the court must find beyond a reasonable doubt that it did not contribute to the verdict. Chapman, supra. Reversal of Mr. Morris' conviction for the errors discussed herein is in order because the State cannot show the errors were harmless beyond a reasonable doubt. Simpson, supra, at ¶ 34, citing Chapman, supra.

-28-

Under the Sixth and Fourteenth Amendments to the United States Constitution, Mr. Morris is entitled to equal protection regarding the competent and effective assistance of counsel. When an actual ineffectiveness of trial counsel claim is made, this court must judge the reasonableness of trial counsel's conduct on the facts presented and viewed as of the time of counsel's conduct. And the convicted defendant must identify the acts or omissions trial counsel committed that are alleged not to have been the result of reasonable professional judgment. *See* Strickland, *supra.*

Given the totality of the circumstances in the instant case, trial counsel's failures were clearly ineffective. And, as required under the law, Mr. Morris has set forth herein and has identified the acts and omissions his trial counsel committed that were not the result of professional judgment. Unfairness does not result unless the ineffectiveness of counsel deprived the defendant of a substantial or procedural right to which he is entitled by law. Id. at 844. U.S. v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered suspect." Nix v. Whiteside, 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986). "If a trial counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." U.S. v. Cronic, 466 U.S. 648, 80 L.Ed.2d 657, 104 S.Ct. 2039 (1984).

When trial counsel failed to object to the improper, rampant and unduly prejudicial hearsay statements and failed to object to the prosecutorial misconduct in closing argument, the adversarial balance between Mr. Morris' defense and the state's case was upset to the degree that Mr. Morris' trial was rendered unjust. Reversal is therefore warranted because Mr. Morris' Sixth Amendment

-29-

rights were violated. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." Strickland, 466 U.S. at 691, 692.

A reading of the trial transcripts proves that Mr. Morris had no reliance on the outcome of the proceeding. Therefore, Mr. Morris has sufficiently proven from the record that his attorney was ineffective in that his performance was deficient and his performance resulted in prejudice which materially affected the outcome of his trial and reversal of his conviction is required.

## PROPOSITION FIVE

### PROSECUTOR MISCONDUCT DENIED
### MR. MORRIS' RIGHT TO A FAIR TRIAL IN VIOLATION
### OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
### OF THE UNITED STATES CONSTITUTION

### INTRODUCTION

The prosecutor made unduly prejudicial and improper remarks to the jury during Mr. Morris' trial which irreversibly tainted the jury against him and rendered the proceedings unfair and unjust. Mr. Morris was denied a fair trial because of the prosecutor's improper remarks, was unduly prejudiced and was wrongly convicted, in violation of the Sixth, Eighth, and Fourteenth Amendments. Accordingly, Mr. Morris' conviction and sentence must be reversed and remanded.

### ARGUMENT AND AUTHORITIES

Repeatedly during closing argument, the prosecutor shifted the burden of proof to Mr. Morris and such conduct was so egregious that reversible error is warranted. The prosecutor stated:

-30-

(By the prosecutor):    This Defendant couldn't even give you a reason that these people would all get together and do this. *You've heard no evidence that would indicate to you these people are not telling you what they saw.*

(Vol. 3, Tr. 108, lines 8-11)

(By the prosecutor):    There is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but to tell you the truth.

(Vol. 3, Tr. 146, lines 5-7).

These two comments by the prosecutor were unobjected to by trial counsel. However, Mr. Morris submits they were so egregious in nature that plain error occurred and reversal is warranted despite trial counsel's failure to object.

And then, regarding another instance where the prosecutor impermissibly shifted the burden of proof which was objected to by trial counsel, the prosecutor stated:

(By the prosecutor):    Second, the Defense never shows any reason to question eyewitness credibility. Mr. Box never establishes a conspiracy among those individuals to lie. *He has the right to present evidence of that and he didn't.* What can they gain by doing so? And, secondly, wouldn't you expect a more complete thorough and unquestionable story if they did indeed conspire to lie.

Trial counsel:    Objection, Your Honor. May I approach?

The Court:    You may.

Trial counsel:    Your Honor, I take issue with this part of the closing argument. The Defendant has no obligation to recall any testimony. The burden is strictly

-31-

on the State of Oklahoma and any comment that the Defense is lacking in putting on particular evidence I believe is improper.

(Vol. 3, Tr. 156, lines 24, 25 and Tr. 157, lines 1-13)

The judge then told trial counsel, "I don't believe that what he said shifts the burden. He just said that you never established that." (Vol. 3, Tr. 157).

The judge's ruling, Mr. Morris submits, was in error. The prosecutor had indeed shifted the burden of proof when he said, "He has the right to present evidence of that and he didn't." The prosecutor created a conspiracy defense for Mr. Morris in his argument to the jury, then ridiculed Mr. Morris for not presenting evidence of the conspiracy among the witnesses to lie. But Mr. Morris never presented this defense or theory, yet according to the prosecutor's argument to the jury Mr. Morris was to supply such evidence and did not. In trial counsel's closing, he argued the contradictions in the eyewitnesses testimony, inconsistencies, that one eyewitness had recently come up with identification of Mr. Morris, and that eyewitness identifications are to be scrutinized with extreme care (Vol. 3, Tr. 127, 128, 129, 130, 131, 132, 134, 135, 136, 140). Mr. Morris testified that the identification of him was "Mistaken identity, ladies and gentlemen." (Vol. 3, Tr. 83). Mr. Morris nor his trial counsel ever stated that there was a conspiracy among the witnesses to lie. Mr. Morris' defense was mistaken identity. The conspiracy to lie among witnesses was a defense raised and placed on Mr. Morris by the prosecutor. Clearly the prosecutor impermissibly shifted the burden of proof to Mr. Morris.

Obviously, as set forth above in the three separate instances, the prosecutor shifted the burden of proof away from the state and placed it squarely upon Mr. Morris' shoulders. Mr. Morris is not obligated under the law to present any evidence. Mr. Morris' due process rights under the Fifth

-32-

Amendment were violated when the prosecutor, as described above, repeatedly shifted the burden of proof to Mr. Morris. Due process of law requires that the state prove each element of the charged crime beyond a reasonable doubt. Mr. Morris is not compelled to present evidence in his behalf and to require him to do so violates the United States Constitution. It is solely the State's duty to present evidence that establishes guilt beyond a reasonable doubt of each element of the offense.

Mr. Morris was unduly prejudiced due to the prosecutor's misconduct. The evidence of guilt was not overwhelming in his case (*See Proposition Six*) and the prosecutor's comments were likely to have affected the verdict and sentence. There was no objection by trial counsel to two of the comments and on the third instance, the objection was not sustained and there was no admonishment by the trial court. The comments were not reasonable inferences based on the evidence and relief is required because the grossly improper and unwarranted argument adversely affected Mr. Morris' rights to a fair trial.

Grave doubt exists that the comments made by the prosecutor had a substantial influence on the finding of Mr. Morris' guilt by the jury. Therefore, reversal of Mr. Morris' sentence is required, notwithstanding trial counsel's failure to object to the above listed comment (See Proposition ____ herein).

The Supreme Court has held that the standard for establishing the appropriateness of a prosecutor's comment during trial is whether the prosecutor's remarks caused the defendant's trial to be so fundamentally unfair as to deny him due process. Donnell v. CeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed. 2d 431 (1974).

This Honorable Court has held that "in order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the

-33-

defendant". Romano v. State, 1993 OK CR 8, ¶41, 847 P.2d 368, 380; and "a criminal conviction is not to be overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." U.S. v. Young, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985). "Appellant must show not only that error occurred but that the resulting prejudice from the error was such that reversal is warranted." Bland v. State, 2000 OK CR 11, ¶ 91, 4 P.3d 702, 726.

The complained of misconduct of the prosecutor was clearly improper, unduly prejudicial, and resulted in a denial of a fair trial to Mr. Morris in violation of Mr. Morris' rights under the Sixth Amendment. Viewing the above set forth instances in context, it is obvious they affected the overall fairness of Mr. Morris' trial.

Errors that go to the foundation of the case or which take from the defendant an essential right are fundamental. Tucker v. State, 1984 OK CR 36, 675 P.2d 459. Mr. Morris submits that the above cited comments by the prosecutor constitute fundamental error and plain error is not waived by defense attorney's failure to object or address the issue at trial. Cooper v. State, 1991 OK CR 26, 806 P.2d 1136. "The standard for constitutional violations is well-known: reversal is in order unless the State can show the error was harmless beyond a reasonable doubt. Chapman; Fritz v. State, 730 P.2d 530, 534 (Okl.Cr. 1986); In re Bishop, 443 P.2d 768, 773 (Okl.Cr. 1968)." Simpson, supra. In order to constitute plain error warranting reversal, the comment must have resulted in prejudice. Carol v. State, 1988 OK CR 114, 756 P.2d 614, 618. Mr. Morris must specifically show conduct or comment that is not only improper but prejudicial to the outcome of the jury's verdict. Driskell, supra. "Plain error, which allows review on appeal in first instance, will

-34-

be reviewed by appellate court in same manner as error which was preserved by timely objection during trial." Simpson, *supra*; Romano v. State, 1995 OK CR 74, 909 P.2d 92, 116, *cert denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

The above cited prosecutorial misconduct conclusively proves that fundamental error and undue prejudice to Mr. Morris occurred and reversal is warranted. 20 O.S. 2001 § 3001.1; Frederick v. State, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 947.

The prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. DeRosa v. State, 2004 OK CR 19, ¶ 53, n. 102, 89 P.3d 1124, 1145, n. 102. The error was not harmless. *See* Chapman, *supra*. Mr. Morris submits the prosecutor's misconduct contributed to his verdict of guilt. Mr. Morris' rights to a fair and impartial jury were stripped from him by the prosecutor's unduly prejudicial remarks that went to the foundation of the case. Mr. Morris was unduly prejudiced by the prosecutor's statements, the jury was impermissibly tainted as a result and accordingly, Mr. Morris' conviction and sentence must be reversed.

## PROPOSITION SIX

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT MR. MORRIS' CONVICTION FOR FIRST DEGREE MURDER AND WAS INSUFFICIENT TO SUSTAIN HIS CONVICTION AND THEREFORE, HIS CONVICTION VIOLATED THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 2, SECTION 7 OF THE OKLAHOMA CONSTITUTION**

## INTRODUCTION

The evidence completely failed to prove beyond a reasonable doubt that Mr. Morris murdered Mr. Perry or that he was guilty of murder in the first degree.

-35-

## ARGUMENT AND AUTHORITIES

The evidence at trial to connect Mr. Morris to the murder of Mr. Perry consisted of eye witness testimony of Tinner, Debose (by way of transcript testimony), Brazille, and vaguely, Laws.

Tinner identified Mr. Morris as being out there the night Rodney Perry was beaten and killed (Vol. 2, Tr. 43, 44, 45, 46, 47, 48, 49). Tinner did not identify Mr. Morris when she was initially interviewed by the police and did not tell them she knew him. Tinner told the prosecutor right before the last trial. Tinner stated she did not remember how Mr. Morris was dressed (Vol. 2, Tr. 49, 50). Tinner testified that Mr. Morris came to the car and guessed that when he noticed it wasn't Eenie in the car he went through the crowd (Vol. 2, Tr. 51). Tinner stated she knew Mr. Morris as NC (Vol. 2, Tr. 52). Tinner agreed that Mr. Morris was one of the four men that was beating and stomping Rodney Perry (Vol. 2, Tr. 54, 61).

On cross examination, Tinner admitted that in July 2004 at a preliminary hearing she testified that she answered no to the question of whether she recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62).

Laws testified, after initially testifying he could not remember any of the clothing these individuals were wearing, he testified that he vaguely remembered a North Carolina logo (Vol. 2, Tr. 119, 120, 121, 122, 128).

Braille testified that he was met by his nephew Dewan Debose and three other guys when he was running to the mailboxes where he was told there was a fight. Brazille identified Mr. Morris as one of the three other guys. He stated Mr. Morris had on a baseball cap and a jacket with Tar Heel colors (Vol. 2, Tr. 134, 137, 139). In past court testimony Brazille had testified the individual that he identified at trial as Mr. Morris had a jacket on that said "Thug Life." (Vol. 2, Tr. 155, 156).

-36-

Brazille saw that one of the guys had teardrop tattoos under each eye. A third guy had a black hoodie (Vol. 2, Tr. 138, 140). Brazille testified that Mr. Morris kept biting his bottom lip and was saying he would get a fair fight with anyone that wanted one (Vol. 2, Tr. 140, 141, 142, 143). The three men went back around the side of the grey car where Rodney Perry was laying. Brazille stated he could hear stomping and skin slapping. They then came back over to where Brazille was standing outside the apartment building. That is when they got in their car. Brazille stated that Mr. Morris got in the passenger side but in the back seat (Vol. 2, Tr. 147, 148, 157).

The Oklahoma City and Bethany police came to the apartments. About four minutes later Brazille saw Mr. Morris and the teardrop guy in Tracy's house. Brazille stated that Mr. Morris and the teardrop guy told him they wanted to use the phone. Brazille did not want them to use the house phone so he gave them his stepson's cell phone (Vol. 2, Tr. 149, 150, 161). Brazille testified he handed the phone to Howard and that Howard spoke on the phone. Brazille stated that Howard told whoever he was talking to on the phone to meet him at Abadan's, a small convenience store on Northwest 10th. Brazille stated that Howard told him thank you and then proceeded to go out the back way down the back stairway (Vol. 2, Tr. 150, 15, 161).

Brazille testified that before that night he had never seen Mr. Morris, the teardrop guy or the guy in the black hoodie. Brazille knew Howard's name from having been in court and hearing lawyers say Howard Morris (Vol. 2, Tr. 152). Brazille was in contact with the three men approximately 10 minutes or less (Vol. 2, Tr. 163).

A stipulation was entered into and read to the jury which stated that no latent prints lifted from any items of evidence processed by the Oklahoma City Police Department Technical Investigation Unit matched the Defendant Howard Purifor Morris, III (Vol. 2, Tr. 103).

-37-

There was no physical or forensic evidence to connect Mr. Morris with Rodney Perry's death. The eyewitness testimony was contradictory, not worthy of belief and insufficient. Eyewitness identifications are to be scrutinized with extreme care. OUJI-CR 9-19. The accuracy of a witnesses prior description of an assailant was set forth in Mathieus v. State, 1989 OK CR 47, ¶ 7, 778 P.2d 491. Tinner identified Mr. Morris as being at the scene of the beating but she admitted that in July 2004 at a preliminary hearing she had testified that she answered "no" to the question of whether she recognized anybody at the scene (Vol. 2, Tr. 55, 56, 61, 62). Two years later at trial in April 2006 Tinner identifies Mr. Morris. Clearly Tinner's prior description verses her identification at trial establishes her testimony as contradictory and unworthy of belief. Laws "vaguely"remembered a North Carolina logo (Vol. 2, Tr. 122). Vague remembrance cannot meet the beyond a reasonable doubt standard. Brazille testified that before that night he had never seen Mr. Morris, the teardrop guy or the guy in the black hoodie. Brazille knew Howard's name from having been in court and hearing lawyers say Howard Morris (Vol. 2, Tr. 152). Brazille was in contact with the three men approximately 10 minutes or less (Vol. 2, Tr. 163). In past court testimony Brazille had testified the individual that he identified at trial as Mr. Morris had a jacket on that said "Thug Life." (Vol. 2, Tr. 155, 156). At trial Brazille testified Mr. Morris had on a baseball cap and a jacket with Tar Heel colors (Vol. 2, Tr. 134,137, 139). Brazille claimed his nephew Debose told him they messed Rodney up (Vol. 2, Tr. 144). Dewan, Debose, however, denied that he had a conversation with his uncle Brazille (Court's Exhibit No. 1, Tr. 49; P.H. Tr. 49; Vol. 2, Tr. 117). Brazille's testimony was contradictory and unworthy of belief. Dewan Debose testimony was introduced by way of preliminary hearing transcript. Debose, not subject to cross-examination at trial, testified at preliminary hearing that the beating of Rodney Perry took "maybe even longer" than two and a half

-38-

hours (P.H. Tr. 61). Obviously the incident according to all the other witnesses took mere minutes, certainly not hours. Debose's testimony is contradictory and unworthy of belief. The evidence was clearly insufficient to sustain the conviction of Mr. Morris.

The requirements of the Due Process Clause of the Fourteenth Amendment and Article 2, Section 7 of the Oklahoma Constitution is that a criminal defendant only be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979), citing In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970);[1] Easlick v. State, 2004 OK CR 21, § 5, 90 P.3d 556, 557; Okla. Const. Art. II, §§ 7, 9. Due process requires the court determine, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; Johnson v. State, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44-45.

Mr. Morris submits the evidence at trial did not meet the elements of the offenses in which he was charged and convicted.

First Degree Murder is defined in Title 21 O.S. Supp.1989, § 701.7(A):

A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

---

[1] The due process guaranteed by the 14th Amendment is that there should be no criminal conviction except upon sufficient proof "defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Jackson v. Virginia at 2787.

The elements for murder in the first degree are set forth in OUJI-CR 4-61:

First, the death of a human;

Second, the death was unlawful;

Third, the death was caused by the defendant;

Fourth, the death was caused with malice aforethought.

OUJI CR 4-61

A review of the evidence that the state used to connect Mr. Morris to the crimes reveals the evidence was insufficient. A review of the sufficiency of the evidence is viewed in the light most favorable to the State and this Court will ask whether a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Black v. State, 2001 OK CR 5, ¶ 33, 72 OBJ 865; Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04. "This Court will not disturb a jury verdict where there is sufficient evidence to support it, as it is the jury's exclusive province to weigh the evidence and determine the facts." Black, at ¶ 33, citing Torres v. State, 1998 OK CR 40, ¶ 38, 962 P.2d 3, 16, cert. denied, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed. 2d 683 (1999). On appeal, the reviewing court must accept all reasonable inferences and credibility choices that tend to support the trier of fact's verdict. See Washington v. State, 729 P.2d 509, 510 (Okl. Cr. 1986).

It is incumbent upon the reviewing court to independently review the record evidence under Jackson, infra, to wit:

Winship[2]...requires more than...a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the fact finder will rationally apply that standard to the facts in evidence...Yet a properly instructed jury

---

[2]Winship, supra.

may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt...Under <u>Winship</u>, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot...stand." <u>Jackson v. Virginia</u>, 443 U.S. at 317-318, 99 S.Ct at 2788, 61 L.Ed.2d at 572-573 (footnote omitted).

The Oklahoma Court of Criminal Appeals review of facts and determination of conflicts in testimony are subject to the standard set forth in <u>Jackson</u> for sufficiency of the evidence[3]. Though the evidence presented at trial in the case herein may have raised a suspicion of guilt, mere suspicion is not sufficient and does not rise to the level required of beyond a reasonable doubt. <u>U.S. v. Lovett</u>, 964 F.2d 1029 (10th Cir. 1993), *cert. den.* 113 S.Ct. 169.  It is well established in Oklahoma that mere presence at or acquiescence in a crime without participation does not equal a crime.  <u>Walker v. State</u>, 1987 OK CR @ 183, 738 P.2d 181.

The evidence presented at trial was insufficient to sustain Morris' conviction. Since Morris was wrongly convicted, his rights to due process under the law were violated. U.S. Const. amends. VI, XIV; Okla. Const. art. 2 §§ 7, 20.  There was not competent evidence to support the jury's findings and it cannot be concluded that "any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." <u>Spuehler</u>, 709 P.2d 203-04. This court must reverse and remand Mr. Morris' conviction.

---

[3]E.g. <u>Hill v. State</u>, 638 P.2d 1128, 1130 (Okl. Cr. 1981); <u>Garrett v. State</u>, 586 P.2d 754, 756 (Okl. Cr. 1978); <u>Enoch v. State</u>, 495 P.2d 411, 412-143 (Okl. Cr. 1972).

-41-

## PROPOSITION SEVEN

### THE TRIAL ERRORS COMPLAINED OF HEREIN CUMULATIVELY DENIED MR. MORRIS' RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES AND OKLAHOMA CONSTITUTION AND THEREFORE, HIS CONVICTION AND SENTENCE MUST BE REVERSED

### INTRODUCTION

Oklahoma and federal law provide that a person accused of a crime is entitled to a fair and impartial trial. The errors that occurred at Mr. Morris' trial cumulatively denied him fair trial. Accordingly, Mr. Morris' conviction and sentence must be reversed.

### ARGUMENT AND AUTHORITIES

A review of the entire trial record reveals that there were numerous irregularities and errors that unduly prejudiced Mr. Morris' rights. "This Court has repeatedly recognized that when there are multiple errors or irregularities during a trial, reversal will be required if the "cumulative effect" was to deny the defendant a fair trial." Mitchell v. State, 2006 OK CR 20, ¶ 107, 136 P.3d 671. This court has also said that when a cumulation of the irregularities and/or errors have denied the accused a fair trial, the case will be reversed, even though one of the errors standing alone would not justify reversal. See Skelly v. State, 1994 OK CR 55, P.2d 401, 407; Penninger v. State, 1991 OK CR 60, 811 P.2d 609, 613; see also U.S. Const. Amend XIV; United States v. Rivera, 900 F.2d 1462, 1469-1470 (10th Cir. 1990); Okla. Const. Art. II, § 7; McCarty v. State, 1988 OK CR 271, 765 P.2d 1215. Reversal is required if the cumulative effect of all the errors was to deny the defendant a fair trial. Id.

An analysis of cumulative error is done by aggregating all the errors that individually have been found to be harmless to determine whether their cumulative effect on the outcome of the trial

-42-

is such that collectively they can no longer be determined to be harmless. Rivera, *supra*, 900 F.2d at 1470. Moreover, if any of the cumulative errors are constitutional in nature, the State is required to prove beyond a reasonable doubt that the errors complained of did not contribute to the verdict rendered. Chapman, *supra*; Rivera, 900 F.2d at 1470 n. 6.

The trial errors complained of herein necessitate that Mr. Morris' conviction be reversed for a new trial or his sentence be vacated for resentencing and/or modification. Consequently, Mr. Morris should be granted a new trial or sentence modifications.

## CONCLUSION

Based upon the above and foregoing, and all premises considered, Mr. Morris submits that the above-delineated errors occurred during the trial. Mr. Morris submits that his conviction should be reversed and remanded with instructions to dismiss or his conviction should be reversed and remanded for a new trial, and the sentence he received should be reversed, vacated and/or modified.

Respectfully submitted,

BILL ZUHDI, OBA # 10013
P. O. Box 1077
Oklahoma City, OK 73101
(405) 232-1400
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Brief of Appellant was caused to be served on the Attorney General this 16th day of November, 2006, by hand delivery. The Appellant was caused to be served at the last known address, via United States Postal Service, postage prepaid.

BILL ZUHDI

-43-

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

JAN 16 2007

No. F-2006-428

MICHAEL S. RICHIE
CLERK

---

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

---

### HOWARD PURIFOR MORRIS III,

**Appellant,**

-vs-

### THE STATE OF OKLAHOMA,

**Appellee.**

---

## BRIEF OF APPELLEE
## FROM OKLAHOMA COUNTY DISTRICT COURT
## CASE NO. CF-2004-1212
### Before the Honorable Twyla Mason Gray, District Judge

---

### W.A. DREW EDMONDSON
### ATTORNEY GENERAL OF OKLAHOMA

### THOMAS LEE TUCKER, OBA # 20874
### ASSISTANT ATTORNEY GENERAL

### 313 NE 21st Street
### Oklahoma City, Oklahoma 73105
### (405) 521-3921
### (405) 522-4534 (FAX)

### ATTORNEYS FOR APPELLEE

---

**JANUARY 16, 2007**



# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROPOSITION I

    THERE WAS NO ERROR IN DENYING THE
    DEFENDANT'S MOTION FOR MISTRIAL. . . . . . . . . . . . . . . 6

PROPOSITION II

    THE DEFENDANT WAS NOT DENIED HIS RIGHT TO
    BE PRESENT AT ALL CRITICAL STAGES OF THE
    TRIAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . 10

PROPOSITION III

    THERE WERE NO IMPROPER HEARSAY
    STATEMENTS INTRODUCED AT THE DEFENDANT'S
    TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PROPOSITION IV

    THE DEFENDANT DID NOT RECEIVE INEFFECTIVE
    ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . 19

PROPOSITION V

    THERE WAS NO PROSECUTORIAL MISCONDUCT
    COMMITTED AT TRIAL. . . . . . . . . . . . . . . . . . . . . . . 22

PROPOSITION VI

    THE EVIDENCE PRESENTED AT TRIAL WAS
    SUFFICIENT TO SUPPORT THE DEFENDANT'S
    CONVICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

## PROPOSITION VII

THERE WAS NO ERROR THEREFORE THERE CAN BE
NO CUMULATIVE EFFECT OF ALLEGED ERRORS TO
WARRANT A REVERSAL. . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF MAILING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ii

# TABLE OF AUTHORITIES

## CASES CITED

**Adair v. State,**
    1911 OK CR 296, 118 P. 416 ................................................... 24

**Brewer v. State,**
    2006 OK CR 16, 133 P.2d 892 ................................................ 22

**Browning v. State,**
    2006 OK CR 8, 134 P.3d 816 ................................................. 23

**Dodd v. State,**
    2004 OK CR 31, 100 P.3d 1017 ............................................. 11

**Easlick v. State,**
    2004 OK CR 21, 90 P.3d 556 ................................................. 26

**Hampton v. State,**
    1998 OK CR 131, 757 P.2d 1343 ...................................... 24, 25

**Idaho v. Wright,**
    497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990) .............. 15

**Jackson v. State,**
    2006 OK CR 45, 146 P.3d 1149 ............................................... 6

**Jones v. State,**
    2006 OK CR 5, 128 P.3d 521 ........................................... 10, 11

**Jordan v. State,**
    1988 OK CR 115 756 P.2d 8 ................................................. 24

**Lockett v. State,**
    2002 OK CR 30, 53 P.3d 418 ................................................ 11

**Lott v. State,**
    2004 OK CR 27, 98 P.3d 318 ............................................ 6, 10

**Matthews v. State,**
    2002 OK CR 16, 45 P.3d 907 ........................................... 26, 27

iii

__Mitchell v. State__,
      2005 OK CR 15, 120 P.3d 1196 ................................................ 26

__Myers v. State__,
      2006 OK CR 12, 133 P.3d 312 ................................................. 30

__Patton v. State__,
      1998 OK CR 66, 973 P.2d 270 ........................................... 8, 9, 10

__Pennington v. State__,
      1995 OK CR 79, 913 P.2d 1356 .............................................. 28

__Perry v. State__,
      1995 OK CR 20, 893 P.2d 521 ............................................. 11, 12

__Pickens v. State__,
      2001 OK CR 3, 19 P.3d 866 ................................................... 26

__Powell v. State__,
      2000 OK CR 5, 995 P.2d 510 ................................................. 15

__Raymond v. State__,
      1986 OK CR 51, 717 P.2d 1147 ........................................... 22, 25

__Rojem v. State__,
      2006 OK CR 7, 130 P.3d 287 .............................................. 8, 10

__Simpson v. State__,
      1994 OK CR 40, 876 P.2d 690 ............................................ 22, 25

__Spuehler v. State__,
      1985 OK CR 132, 709 P.2d 202 .............................................. 26

__State v. Love__,
      1998 OK CR 32, 960 P.2d 368 ............................................ 23, 25

__Strickland v. Washington__,
      466 U.S. 668, 104 S. Ct. 2052 (1984) ..................................... 20

__Thomas v. State__,
      1987 OK CR 113, 741 P.2d 482 ........................................... 13, 19

iv

**Ullery v. State,**
        1999 OK CR 36, 988 P.2d 332 ................................................ 27

**Washington v. State,**
        1999 OK CR 22, 989 P.2d 960 ........................................ 21, 22

**Welch v. State,**
        1988 OK CR 54, 968 P.2d 1231 ............................................ 15

**White v. State,**
        1995 OK CR 15, 900 P.2d 982 ............................................ 27

**Woodruff v. State,**
        1993 OK CR 7, 846 P.2d 1124 ............................................ 21

## STATUTES CITED

12 O.S. 2001, § 576 ................................................................ 9

12 O.S. 2001, § 581 ................................................................ 9

12 O.S. 2001, § 651 ............................................................ 21

12 O.S. Supp. 2002, § 2801 ............................................ 14, 17

12 O.S. Supp. 2002, § 2802 ............................................ 14

12 O.S. Supp. 2002, § 2803 ............................................ 14, 15

21 O.S. 2001, § 701.7 ............................................................ 1

22 O.S. 2001, § 583 ............................................................ 10

22 O.S. 2001, § 836 ............................................................ 24

22 O.S. 2001, § 853 ........................................................ 9, 12

22 O.S. 2001, § 854 ........................................................ 9, 12

22 O.S. 2001, § 952 ............................................................ 21

v

# IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

HOWARD PURIFOR MORRIS III,       )
                                  )
      Appellant,               )
                                  )
                  )    Case No.   F-2006-428
v.                                )
                                  )
STATE OF OKLAHOMA,               )
                                  )
      Appellee.                )

## BRIEF OF APPELLEE

## STATEMENT OF THE CASE

Howard Purifor Morris III, hereinafter referred to as the defendant, was tried by jury for the crime of Murder in the First Degree in Case No. CF-2004-1212 in the District Court of Oklahoma County before the Honorable Twyla Mason Gray, District Judge. The defendant was represented by counsel. The jury found the defendant guilty of Murder in the First Degree in violation of 21 O.S. 2001, § 701.7 and set punishment at life imprisonment without the possibility of parole. The trial court imposed judgment and sentence in accordance with the jury's verdict. From this judgment and sentence the defendant has perfected his appeal to this Court.

## STATEMENT OF FACTS

On February 20, 2004, Demetria Tinner and Christa Anderson were riding together in Ms. Tinner's car, a white Ford Focus, to go see a mutual friend who lived at the Rockwell Villa Apartments on North West 10th and Rockwell. (Tr. Vol. II, 36, 65) Ms. Tinner and Ms. Anderson arrived at the apartment complex around

10:30p.m. or 11:00p.m. (Tr. Vol. II, 40, 65)  Upon arrival, the ladies noticed a

group of men arguing, more specifically there were four men arguing with one

other man. (Tr. Vol. II, 40-41) Ms. Tinner pulled her car even with the men and

rolled down her car window. (Tr. Vol. II, 42) Ms. Anderson heard the lone man say

"What did I do?  I didn't do anything." (Tr. Vol. II, 66)  The four men then

proceeded to violently punch the lone man; at first the man was standing, but

after a barrage of punches from the four other men, he fell to the ground. (Tr. Vol.

II, 43, 69) Once the man was on the ground, the four assailants began to stomp

on the man's neck and body, jump on his chest, and kick the man all over. (Tr.

Vol. II, 42-43, 69-70)

Ms. Tinner pulled her car forward to turn around and leave; having

previously lived at the Rockwell Villa Apartments, she was aware that there was

only one entrance and exit. (Tr. Vol. II, 37, 44)  After she got her car turned

around, Ms. Tinner had to drive back by the altercation. (Tr. Vol. II, 44) When the

ladies drove back by, the assailants had temporarily stopped the beating due to

a group of residents and other people that had started to gather around the

commotion. (Tr. Vol. II, 46) As they drove by the beaten man, they heard gurgling

sounds coming from him and realized that they recognized him as Rodney Lamont

Perry, (hereinafter referred to as the victim) and immediately called 911. (Tr. Vol.

II, 44, 71)

2

Ms. Tinner recognized the defendant as one of the assailants, she drove the same type of car (white Ford Focus) as the defendant's girlfriend. (Tr. Vol. II, 49-51) Ms. Tinner watched the defendant come towards her after the altercation and look in the car, once the defendant made eye contact with Ms. Tinner and realized she wasn't his girlfriend, he stopped his approach. (Tr. Vol. II, 51)  At the defendant's trial, Ms. Tinner admitted that she didn't tell the police she knew the defendant and even admitted that she testified at a co-defendant's preliminary hearing that she didn't know any of the assailants. (Tr. Vol. II, 50, 56) Ms. Tinner explained that she was friends with the defendant's girlfriend and didn't want to tell anyone, but she finally decided to testify because she felt bad. (Tr. Vol. II, 50)

Dewan Debose was determined to be an unavailable witness for the prosecution.  Mr. Debose's testimony from the defendant's preliminary hearing was read to the jury during the defendant's trial. (Tr. Vol. II, 117; Court's Exhibit 1) Mr. Debose was at the Rockwell Villa Apartments on the night of February 20, 2004. (Tr. PH. 45) Mr. Debose was standing in front of his cousin's apartment when he noticed an altercation between four men and the victim. (Tr. PH. 46, 48) After a verbal confrontation the assailants surrounded the victim and began to beat him up; Mr. Debose witnessed the assailants knock the victim down and begin to stomp on him. (Tr. PH. 48)

3

Kurt Brazille, Dewan Debose's uncle, was visiting his girlfriend at the Rockwell Villa Apartments on the night of February 20, 2004. (Tr. Vol. II, 130-132) Mr. Debose had previously left the apartment Mr. Brazille was visiting to go use a phone when either Mr. Brazille's daughter or his niece came into the apartments claiming there was a fight happening over by the mailboxes. (Tr. Vol. II, 134) Mr. Brazille dropped everything and ran down to see what was going on, fearing it was Mr. Debose who was involved in the fight. (Tr. Vol. II, 134-135) As Mr. Brazille ran out to the common area of the complex, he noticed Mr. Debose talking with three other men, one of which he identified in court as the defendant. (Tr. Vol. II, 136) Mr. Debose asked Mr. Brazille several times, "They messed Rodney up, do you want to go see him?" Mr. Brazille did not go because he didn't want to "look at anybody hurt." (Tr. Vol. II, 144)

At this time there were several other people gathering in the common area; the defendant started taking a defensive posture, biting his bottom lip and repeating over and over that "he'll give a fair fight to anybody who wants one." (Tr. Vol. II, 42) The three assailants then went back over to the victim, Mr. Brazille heard stomping and slapping sounds. (Tr. Vol. II, 147) The three then got into a Mitsubishi Gallant and attempted to leave the complex. (Tr. Vol. II, 148) The police were coming into the apartment through the only entrance and exit at the time so the Gallant was not able to leave. (Tr. Vol. II, 149)

4

Kyle Laws, the son of Mr. Brazille's girlfriend also went out to see what all the commotion was about. (Tr. Vol. II, 122)  As he witnessed the victim lying on the ground gasping for air, one of the men (not the defendant) came back over to the victim, said something to him, kicked him and then leaned him up against a car. (Tr. Vol. II, 123)

After the police arrived, Mr. Brazille was attempting to get his family back into the apartment when the defendant and another of the assailants attempted to enter. (Tr. Vol. II, 125, 149)  Mr. Brazille told the defendant and the other that they could not come into the apartment, the defendant asked to use the phone, Mr. Brazille let the defendant use a cell phone outside of the apartment. (Tr. Vol. II, 125, 150-151; Tr. PH. 50, 62)

Officer Taylor Shaw of the Oklahoma City Police Department was the first law enforcement officer to arrive at the scene. (Tr. Vol. II, 74-75)  Upon his arrival, Officer Shaw found a man sitting/leaning against a car. (Tr. Vol. II, 75)  Officer Shaw asked the victim if he was alright, there was no response, so Officer Shaw checked the victim for a pulse, he found none so he immediately radioed EMSA to "step it up." (T. Vol. II, 76)  The victim was determined to be dead at the scene by fire/EMSA personnel. (Tr. Vol. II, 79-80)

Doctor Chai Choi, a forensic pathologist for the Chief Medical Examiner performed the autopsy on the victim. (Tr. Vol. II, 103, 105)  Doctor Choi

determined the cause of death to be a severe head injury and ruled the death a homicide. (Tr. Vol. II, 111, 113)  Additional facts may be presented as the relate to the defendant's propositions of error.

## PROPOSITION I

## THERE WAS NO ERROR IN DENYING THE DEFENDANT'S MOTION FOR MISTRIAL.

The defendant's first proposition of error claims the trial court erroneously denied his motion for mistrial.  The defendant's motion for mistrial alleged that there was juror bias and prejudice that prevented the defendant from receiving a fair trial.  Specifically, the jurors had violated their oath by talking about the defendant, their concerns for their safety, and discussing the facts of the case prior to deliberations.  However, because the defendant presented no evidence that the jurors had actually discussed the facts and circumstances of the case, and because an individual *voir dire* revealed that no juror harbored any bias or prejudice and could still be fair and impartial, the defendant's first proposition of error is without merit and must be denied by this Court.

"This Court reviews a trial court's ruling on a motion for mistrial for an abuse of discretion." Jackson v. State, 2006 OK CR 45, ¶ 11, 146 P.3d 1149, 1156. "An abuse of discretion has been defined as a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application." Lott v. State, 2004 OK CR 27, ¶ 96, 98

6

P.3d 318, 344. The trial court's denial of the defendant's motion for mistrial was clearly *not* against the logic and effect of the facts presented and therefore the defendant's first proposition of error is without authority and must be denied by this Court.

The defendant first claims that the jury violated it's oath by talking about the defendant and expressing concerns for their safety. A few of the jurors were concerned that the defendant was taking notes during *voir dire* while they were giving personal information. Those jurors, prior to the completion of the evidence, erroneously thought the defendant's case involved "gangs" (specifically, Cripps and Bloods) and expressed concern for a retaliation against their families from either side depending upon the verdict. The defendant believes that this concern biased the jurors against the defendant.

The concerned jurors contacted the bailiff with their concern, who, informed the trial judge. The trial judge spoke with the jurors collectively and informed them that she was "unaware of there ever being a time when jurors have been threatened or intimidated, and that [she] was confident that the [defendant's note taking] was so that he could communicate with [his attorney]." (Tr. Vol. II, 153)

The day after this incident, the defendant urged a motion for mistrial, claiming that the jurors concerns were overwhelming evidence that they had discussed the case and had formed an actual bias against the defendant. The

7

trial court then held an individual *voir dire* of each of the jurors and the two alternates to determine if, in fact, the case had been discussed or a bias formed. This Court has held that an "actual bias is present when a juror's views prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." Rojem v. State, 2006 OK CR 7, ¶ 32, 130 P.3d 287, 295. During the *voir dire* each juror and alternate informed the parties and the trial court that the facts of the case had not been discussed, no one still harbored any concern for themselves or their families safety and each juror was still fair and impartial to both sides. (Tr. Vol. III, Juror Lee - 20; Juror Carrender - 24; Juror Townsend - 27; Juror Alexander - 30-31; Juror Ryan - 35-36; Juror Gilbert - 39-40; Juror Berry - 42-43; Juror Cotey - 45; Juror Demers - 48; Juror Myers - 52-53; Juror Peters - 58; Juror Marquez - 62-63; Alternate Cornish - 64-65; Alternate Leavitt - 68)

Similar to the present case is Patton v. State, 1998 OK CR 66, 973 P.2d 270. The defendant in Patton complained that a potential juror was not excused for cause after he expressed a concern for the safety of his family because he had given his address in open court. This Court found no error in the trial court's refusal to excuse the potential juror for cause reasoning that, when the potential juror's "*voir dire* is read in its entirety, it is clear that, notwithstanding his concerns for his family's safety, he was able to fully and fairly listen to all of the

8

evidence and consider all punishments, thereby fulfilling his duty as a juror."

Patton v. State, 1998 OK CR 66, ¶ 24, 973 P.2d 270, 283.

The same holds true in the present case. Although a few of the jurors expressed a concern for their familie's safety, that concern was alleviated by the trial judge and an individual *voir dire* revealed that each juror was able to fully and fairly listen to all of the evidence and consider all punishments, thereby fulfilling his duty as a juror.

Next the defendant claims that the jury violated it's oath by discussing the facts of the case before it submission in violation of 22 O.S. 2001, § 853 and 22 O.S. 2001, § 854.[1] However, the defendant never cites to any passage in the transcripts that support this allegation. In fact, the opposite is true. As shown above, each juror and alternate, on individual *voir dire* explained to the parties and the trial court that the facts of the case had not been discussed.

Because each juror openly expressed that they were able to fully and fairly listen to all of the evidence, and that none of the jurors harbored views, bias or prejudices that would prevent or substantially impair the performance of their duties as a juror in accordance with their instruction and their oath, the trial court's denial of the defendant's motion for mistrial was ***not*** clearly against the

---

[1]The defendant cites these statutes as 12 O.S. 2001, § 576 and 12 O.S. 2001, § 581 in the Oklahoma Civil Procedure Code. The statutes will be cited by the State in their nomenclature and form as found the Oklahoma Criminal Procedure Code for consistency and clarity.

9

logic and effect of the facts presented. <u>Patton v. State</u>, 1998 OK CR 66, ¶ 24, 973 P.2d 270, 283; <u>Rojem v. State</u>, 2006 OK CR 7, ¶ 32, 130 P.3d 287, 295; <u>Lott v. State</u>, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344. Therefore, the defendant's first proposition of error is without merit or authority and must be denied by this Court.

**PROPOSITION II**

**THE DEFENDANT WAS NOT DENIED HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF THE TRIAL PROCEEDINGS.**

The defendant's second proposition of error claims that he was denied his statutory right to be present during all critical stages of his trial. Specifically, the defendant claims that when the trial judge spoke with the jury in the jury room, this was a "critical stage" in the defendant's trial and he was denied his Constitutional right to be present. Because the judge's talk with the jury was administrative at best, the defendant was not entitled to be present and his second proposition of error must be denied by this Court.

A defendant's right to be present at the trial is protected by statute. 22 O.S. 2001, § 583. The right to be present that the defendant claims was violated, "is rooted primarily in a defendant's Sixth Amendment right to confront the witnesses against him. A defendant's Fifth Amendment due process right is violated only if the defendant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself." <u>Jones v. State</u>, 2006 OK CR 5, ¶ 68, 128

10

P.3d 521, 543. (*Internal citations omitted.*) "This right to be present has limitations, however." <u>Dodd v. State</u>, 2004 OK CR 31, ¶ 20, 100 P.3d 1017, 1027.

> A defendant must be allowed to be present where his presence "bears, or may be fairly assumed to bear, a relation, reasonably substantial, to his opportunity to defend." <u>Lockett v. State</u>, 2002 OK CR 30, ¶ 9, 53 P.3d 418, 423, *quoting* <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). In <u>Lockett</u>, this Court said "it did not intend to hold in any way that 'the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow.'" <u>Id</u>. (*quoting* <u>Snyder</u>, 291 U.S. at 106-107, 54 S.Ct at 332).

<u>Jones v. State</u>, 2006 OK CR 5, ¶ 70, 128 P.3d 521, 544.

Clearly the trial judge's talk with the jury did not deny the defendant an opportunity to confront witnesses against him. Further, his presence in the jury room during the talk did not bear, or may be fairly assumed to bear, a relation, reasonably substantial, to his opportunity to defend.

In <u>Perry v. State</u>, 1995 OK CR 20, 893 P.2d 521, the defendant complained that the trial judge had a communication with the jury outside of his or his counsel's presence. Specifically in <u>Perry</u>, the trial judge informed the jury that he would like them to check out of their motel prior to the commencement of sentencing, and the trial judge then spoke briefly to the jury about a man the jury had seen around the motel which concerned them. This Court first noted that:

> no one should "communicate with the jury regarding the merits of the case prior to submission of the case to the

11

jury. However, *this Court has also made clear that not every communication between the court and jury outside the presence of counsel is prohibited*. For example, communications with the jury regarding simple housekeeping matters do not give rise to a violation of the statutory right to be present. Rather, prejudice arises when the trial court communicates with the jury outside the parameters of the statute.

Perry v. State, 1995 OK CR 20, ¶ 26, 893 P.2d 521, 528. (*Emphasis added*) This

Court went on to hold that:

With respect to the conversation regarding the man at the motel, this discussion was very short and did not concern the merits of the case. The trial court simply advised the jurors that the court was taking care of the problem. Moreover, the trial court determined that none of the jurors had spoken to the man, and there has been no showing that any of the jurors were influenced or biased due to the presence of the man. This brief conversation did not have a reasonably substantial relation to Perry's ability to defend against the charges.

Perry v. State, 1995 OK CR 20, ¶ 29, 893 P.2d 521, 529.

The applicable statutes in the instant case are 22 O.S. 2001, §§ 853, 854. The statutes state in relevant part that the jury, prior to the final submission of the case to them for deliberation, must not discuss, between themselves or with others, the facts or circumstances surrounding the case. In the instant case, the trial judge merely discussed the defendant's right to take notes during *voir dire* and alleviated any concerns they might have for their safety. (Tr. Vol. II, 153) Therefore, the defendant was not denied any right to be present during all critical

12

stages as the judge and jury were in no way discussing the facts, circumstances or merits of the defendant's case. (Tr. Vol. III, 20, 24, 27, 30, 35, 40, 42, 45, 52, 63, 64, 68. (Jurors individual *voir dire* that the case was not discussed.))

Because the trial judge's communication with the jury did not deny the defendant his right to confront the witnesses against him, and because the defendant's absence from the conversation between the judge and jury **did not** impair the defendant's ability to defend himself, the defendant's second proposition is without merit or authority and must be denied by this Court.

### PROPOSITION III

### THERE WERE NO IMPROPER HEARSAY STATEMENTS INTRODUCED AT THE DEFENDANT'S TRIAL.

The defendant's third proposition of error claims that three separate improper hearsay statements were introduced at trial. However, because the statements either fall within an exception to the hearsay rule or were not actually hearsay, the defendant third proposition of error is without merit and must be denied by this Court.

It should first be noted that in the event this Court finds one or all of the statements to be improperly admitted hearsay, a failure of defendant to object at trial or request admonition from court in regard to alleged hearsay testimony precludes appellate review. <u>Thomas v. State</u>, 1987 OK CR 113, ¶ 16, 741 P.2d 482, 487.

13

The first of the statements the defendant complains about came from Mr. Brazille who testified that his nephew, Mr. Debose, said to him, "they messed Rodney up." (Tr. Vol. II, 144) The defendant complains that this is hearsay because of the implication of other testimony that put the defendant as one of the "they" that "messed up" the victim. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." 12 O.S. Supp. 2002, § 2801(A)(3). The State does not allege that this statement was not offered to prove the truth of the matter asserted, mainly that "they" had "messed up" the defendant. However, this statement clearly falls within an exception to the hearsay rule.

Title 12 O.S. Supp. 2002, § 2802 states that, "[h]earsay is not admissible except as otherwise provided by an act of the Legislature. The Oklahoma Legislature has specifically made an exception for Mr. Debose's type of statement from the hearsay rule as a "present sense impression." Title 12 O.S. Supp. 2002, § 2803 specifically enumerates twenty three exceptions to the hearsay rule. It is within the first exception that Mr. Brazille's quote of Mr. Debose falls. "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." 12 O.S. Supp. 2002, § 2803(1). The theory of this exception is well established that a substantial

14

contemporaneity of the event and the statement negate the likelihood of deliberate and conscious misrepresentation.

The defendant does not allege that Mr. Debose did not witness the senseless, tragic and violent beating of the victim, which is the predicate event for his statement. Mr. Debose's statement was clearly explaining the event that he had just witnessed. And finally, the statement was made immediately after Mr. Debose witnessed the event. Clearly Mr. Debose's statement falls within the "present sense impression" exception to the hearsay rule as allowed by 12 O.S. Supp. 2002, § 2803(1). Further, because Mr. Debose's statement falls under a well established exception to the hearsay rule, there was no violation of the defendant's right of confrontation. Idaho v. Wright, 497 U.S. 805, 814-815, 110 S.Ct. 3139, 3146-3147, 111 L.Ed.2d 638 (1990); Powell v. State, 2000 OK CR 5, ¶ 76, 995 P.2d 510, 529; Welch v. State, 1988 OK CR 54, ¶ 8, 968 P.2d 1231, 1240.

The defendant complains that Mr. Debose testified that he did not have a conversation with Mr. Brazille. During Mr. Debose's testimony at the defendant's preliminary hearing, Mr. Bebose testified:

Q.    You say all your family. Do you know Kurt Brazille?

A.    That's my Uncle.

Q.    All right. Did he come down?

A.    Yes, sir.

15

Q.    All right.  And did you have a conversation with Mr. Brazille?

A.    No.

(Tr. PH. 49)  The defendant submits that this question and answer establish as fact that Mr. Debose did not say "they messed Rodney up."  The importance of this question and answer is lost on the State.  Although the prosecution asked if Mr. Debose had a "conversation" with Mr. Brazille, the prosecution did not elicit any testimony concerning whether or not Mr. Debose had simply made any statements to Mr. Brazille.  A conversation, no matter how brief, dictates that there be an exchange of statements and/or ideas.  Mr. Brazille testified that Mr. Debose repeatedly asked him if he wanted to go see the victim's body.  Mr. Brazille answered in the negative every time. (Tr. Vol. II, 144)  With all the commotion, people gathering and shock of having just seen a man get the life beat out of him in an unfair fight, it is understandable why Mr. Debose claimed he did not have a "conversation" with Mr. Brazille.

The second statement the defendant claims was admitted as improper hearsay came from the testimony of Ms. Tinner.  The defendant complains that Ms. Tinner testified that "they were saying something about Crip stuff and Rodney was like he didn't do anything and they was just doing cussing and stuff like that." (Tr. Vol. II, 44)  This statement simply is not hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence **to prove the truth of the**

16

***matter asserted*.**" 12 O.S. Supp. 2002, § 2801(A)(3). (*Emphasis added*) The defendant complains that this statement attempts to introduce evidence of gang violence. No where in the prosecution's case did they ever claim this murder was gang related. The only mention of gangs by the prosecution came in the closing arguments.

> Now, I know that there are concerns about Crips and Bloods. If he's a Crip, if he's a Blood, if he's a Crip, if he's a Blood, what difference does that make? Does that lessen the value of Rodney Perry's life? Does that mitigate his responsibility?
> If this is a Blood killing a Crip or a Crip killing a Blood, what difference does that make? Is there some special rule out there that gang members can kill each other? No. This is the law. And it talks about the death of a human and that's what you are here to decide.
> You haven't heard... outside of the 911 tape, you have not heard anything about gang membership. And I know from the conversations that you had with Judge Gray back in the chambers some of you have concerns about that. How is that supposed to impact your verdict?
> ...
> You can't beat people to death in a parking lot no matter how much money you have or how much money you don't have or where you live or what the color of your skin is or what color clothes you have on, or how offended you might be because somebody has got red clothes on. It doesn't matter. None of that matters.

(Tr. Vol. III, 102-103) Clearly the prosecutions case did not depend on whether the victim's death was gang related or not. Therefore, Ms. Tinner's remark that "they said some Crip stuff" was not offered to prove the "Crip stuff." The same

17

holds true for the "cussing." Ms. Tinner's statement was not offered to prove the truth of the "cussing." Ms. Tinner's statement was not hearsay.

The third statement the defendant claims was improper hearsay came once again from Mr. Brazille who stated that one of the assailants (not the defendant) was saying to the crowd that "he didn't care who know him, what kind of car he drove and that he stated that he drive the maroon car or purple car and he lived on 122nd or Hefner and May or something like that, he stated." (Tr. Vol. II, 143) The defendant complains that this statement was offered to prove the truth that the assailant didn't care who knew his identification, vehicle or where he lived to show a cavalier attitude towards his criminal activity. However, this statement was offered to prove the assailant's relation to the 1999 Mitsubishi Galant, as indicated by the very next question by the prosecution:

Q.    And you kind of indicated during your testimony, was the man in the black hoodie pointing to a particular car that night?

A.    Yeah, he was pointing to the car he was driving.

Q.    Okay. Let me show you what we have previously introduced as State's Exhibit Number 34 and ask if that is the car that the man in the black hoodie was pointing at?

A.    Yes. Ma'am.

(Tr. Vol. II, 143) The statement made by the assailant was not offered to prove the assailant's cavalier attitude towards criminal activity, and is therefore **not** a hearsay statement regarding that specific issue.

18

Because the statements complained of by the defendant were either not hearsay or were allowed in under an exception to the hearsay rule, the defendant's third proposition is without merit or authority and must be denied by this Court. Or, in the alternative, even if this Court finds that one or more of the statements were improperly admitted hearsay, the statements were not objected to at trial and are therefore, precluded from appellate review. The defendant's third proposition of error must be denied by this Court. <u>Thomas v. State</u>, 1987 OK CR 113, ¶ 16, 741 P.2d 482, 487.

## <u>PROPOSITION IV</u>

### THE DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL.

The defendant's fourth proposition of error claims that the defendant received ineffective assistance of counsel. The defendant alleges three instances in which the defendant's trial counsel was ineffective; (1) trial counsel failed to object to alleged hearsay statements, (See, Proposition 3) (2) trial counsel failed to apply for a new trial after alleged juror misconduct, (See, Proposition 1) and (3) trial counsel failed to object to prosecutorial misconduct. (See, Proposition 5) Because the substantive claims underlying the ineffective assistance claim have no merit, the defendant's fourth proposition of error is without merit and must be denied by this Court.

19

In <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 690, 104 S.Ct. 2052, 2064, 2066 (1984), the U.S. Supreme Court held that in order for a defendant to prevail on a claim of ineffective assistance of counsel, the defendant must identify "acts or omissions [which] show that counsel's representation fell below an objective standard of reasonableness." Even if errors are identified, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694, 104 S.Ct. at 2068. Furthermore, "the reviewing court must apply 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Id.</u> at 689, 104 S.Ct. at 2065. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing of one." <u>Id.</u> at 697, 104 S.Ct. at 2069.

In the instant case, as explained in propositions I, III and V, the defendant's underlying substantive claims lack merit. There was no juror misconduct to prejudice the defendant, the alleged hearsay statements were either not actually hearsay or allowed in under a proper exception, and the alleged prosecutorial

20

misconduct was not an attempt to shift the burden of proof on to the defendant to prove his innocence. This Court has held that where a defendant's substantive claim has no merit, the defendant cannot meet his burden of showing deficient performance and prejudice on the part of his counsel. <u>Washington v. State</u>, 1999 OK CR 22, ¶57, 989 P.2d 960, 977.

The defendant complains that his trial counsel was deficient and he was prejudiced because counsel did not apply for a new trial. The defendant incorrectly cites the Oklahoma Civil Procedure Code, 12 O.S. 2001, § 651(2) as the appropriate ground for requesting a new trial. However, the defendant in this case is a criminal defendant so a motion for new trial is governed by the Oklahoma Criminal Procedure Code, 22 O.S. 2001, § 952. The appropriate provision in § 952 allows a motion for new trial to be predicated upon a finding that the jury was guilty of any misconduct. However, "[i]n order to establish juror misconduct, a defendant must show actual prejudice from any alleged jury misconduct and defense counsel's mere speculation and surmise is insufficient upon which to cause reversal." <u>Woodruff v. State</u>, 1993 OK CR 7, ¶ 13, 846 P.2d 1124, 1132. The defendant refers to proposition I to support his claim that his trial counsel was insufficient for failing to apply for new trial. However, as shown in proposition one, the defendant failed to show he was prejudiced.

21

Because the defendant's underlying claims, admittance of hearsay, failure to apply for a new trial, and prosecutorial misconduct are completely without merit, the defendant's fourth proposition of error is without merit and must be denied by this Court. Washington v. State, 1999 OK CR 22, ¶57, 989 P.2d 960, 977.

## PROPOSITION V

### THERE WAS NO PROSECUTORIAL MISCONDUCT COMMITTED AT TRIAL.

The defendant's fifth proposition of error is that improper remarks by the prosecution during closing arguments denied him due process of law. Specifically, the defendant claims the prosecutor attempted to shift the burden of proof on to the defendant. Of the three remarks complained about by the defendant, only one was objected to at trial. When a defendant does not object to the alleged misconduct in closing argument, in the absence of fundamental error, the right to raise the issue on appeal is waived. Raymond v. State, 1986 OK CR 51, ¶ 8, 717 P.2d 1147, 1150. "Fundamental error, now properly known as plain error, has been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." Simpson v. State, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698. Furthermore, "[a]llegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such as to deprive the defendant of a fair trial." Brewer v. State, 2006 OK CR

22

16, ¶ 13, 133 P.2d 892, 895. The record shows no fundamental error and no cumulative effect of prosecutorial misconduct and therefore the defendant's fifth proposition is without merit and should be denied by this Court.

The defendant claims the prosecutor made three comments on the defendant's lack of evidence that improperly shifted the burden of proof to the defendant. During the prosecutor's closing argument, the prosecutor commented; "you've heard no evidence that would indicate to you these people are not telling you what they saw." (Tr. Vol. III, 108) "There is no evidence presented in this case whatsoever that Demetrial Tinner took the stand to do anything but tell you the truth." (Tr. Vol. III, 146) And finally, "He has the right to present evidence of that and he didn't." (Tr. Vol. III, 157)

Only the final comment, "He has the right to present evidence of that and he didn't." was objected to. The trial court overruled the objection finding that the prosecutor was not attempting to shift the burden but merely "said that you never established that." (Tr. Vol. III, 157) This Court reviews a trial court's overruling of a defendant's objection for an abuse of discretion. Browning v. State, 2006 OK CR 8, ¶ 40, 134 P.3d 816, 840. "An abuse of discretion has been defined as a conclusion or judgment that is clearly against the logic and effect of the facts presented." State v. Love, 1998 OK CR 32, ¶ 2, 960 P.2d 368, 369.

23

The burden of proof is on the prosecution to prove every element of the crime charged beyond a reasonable doubt. 22 O.S. 2001, § 836; <u>Adair v. State</u>, 1911 OK CR 296, 118 P. 416. The prosecution may not attempt to shift the burden of proof from the State to the defendant during his closing argument. <u>Jordan v. State</u>, 1988 OK CR 115 ¶ 5, 756 P.2d 8. However, in order for the remark to be improper, it must place the burden of proof on the defendant to prove his innocence. "Before a purported comment at trial on the defendant's failure to deny his guilt will constitute reversible error, the comment must directly and unequivocally call attention to that fact." <u>Hampton v. State</u>, 1998 OK CR 131, ¶ 12, 757 P.2d 1343, 1346.

The comment made in this case does not place the burden of proof on the defendant to prove his innocence nor claim that the defendant failed to prove his innocence. This remark is hardly improper, the defendant claimed this was a case of mistaken identity, the prosecutor's remark was simply a proper comment on the defendant's failure to present evidence that questions the eyewitness credibility or reliability.

Because the trial court's overruling of the defendant's objection was not against the logic and effect of the facts presented, the trial court did not abuse it's discretion and the defendant's claim of prosecutorial misconduct as to this

24

comment must be denied by this Court. State v. Love, 1998 OK CR 32, ¶ 2, 960 P.2d 368, 369.

The two other remarks complained of by the defendant, "you've heard no evidence that would indicate to you these people are not telling you what they saw" and "There is no evidence presented in this case whatsoever that Demetrial Tinner took the stand to do anything but tell you the truth," were not objected to at trial. In order to warrant relief, the other two remarks must go to the foundation of the case, or take from the defendant a right essential to his defense. Raymond v. State, 1986 OK CR 51, ¶ 8, 717 P.2d 1147, 1150; Simpson v. State, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698. Again, the defendant's theory was that of mistaken identity. The comments complained of merely point out the defendant's failure to present evidence that questions the eyewitness credibility or reliability. "Before a purported comment at trial on the defendant's failure to deny his guilt will constitute reversible error, the comment must directly and unequivocally call attention to that fact." Hampton v. State, 1998 OK CR 131, ¶ 12, 757 P.2d 1343, 1346.

Moreover, the prosecutor is allowed to comment on the defendant's failure to call witnesses to contradict the State's evidence, further, the prosecutor's comment on the defendant's access to evidence and witnesses is permissible, and under the facts presented here, it cannot be said that the prosecution shifted the

burden of proof onto the defendant nor that any plain error occurred. <u>Pickens v.</u> <u>State</u>, 2001 OK CR 3, ¶ 39, 19 P.3d 866, 879-880.

Because the record shows that the prosecution did not attempt to shift the burden of proof on to the defendant to prove his innocence, there was no abuse of discretion, no fundamental error and no cumulative effect of prosecutorial misconduct, the defendant's fifth proposition is without merit and must be denied by this Court.

## PROPOSITION VI

### THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO SUPPORT THE DEFENDANT'S CONVICTION.

The defendant's sixth proposition of error claims that he was denied due process of law because he was convicted on evidence that was insufficient to satisfy the State's burden of proving guilt beyond a reasonable doubt. This Court has held that the test to be applied in determining the sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. <u>Mitchell v. State</u>, 2005 OK CR 15, ¶ 51, 120 P.3d 1196, 1209; <u>Easlick v. State</u>, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559; <u>Spuehler v. State</u>, 1985 OK CR 132, ¶ 7, 709 P.2d 202,203.

Furthermore, this Court will interpret the record by "crediting all inferences that could have been drawn in the State's favor." <u>Matthews v. State</u>, 2002 OK CR

26

16, ¶ 35, 45 P.3d 907, 919-920. And it is the jury's responsibility to assess the credibility of witnesses and weigh the evidence. Id. See also White v. State, 1995 OK CR 15, ¶ 5, 900 P.2d 982, 986. Further, even when conflicts in the testimony are present, deference should be given to the jury's conclusions. Ullery v. State, 1999 OK CR 36, ¶ 32, 988 P.2d 332, 347.

The elements for Murder in the First Degree are:

| First, | the death of a human; |
|---|---|
| Second, | the death was unlawful; |
| Third, | the death was caused by the defendant; |
| Fourth, | the death was caused with malice aforethought. |

Instruction No. 4-61, OUJI-CR(2d) (O.R. 192). The defendant was found guilty of these elements by a rational trier of fact beyond a reasonable doubt and therefore the jury's verdict should not be disturbed. The defendant makes no argument that the evidence was insufficient to prove the first, second or fourth elements of the crime. The defendant's main argument is that the State failed to prove the third element, that the victim's death was caused by the defendant.

The defendant was identified by three State's witnesses as one of the victim's attackers. First, was Ms. Tinner who testified that she knew the defendant as the boyfriend of one of her friends. (Tr. Vol. II, 49) Ms. Tinner also testified that she knew the defendant was one of the attackers because after she witnessed the murder, he walked up to her car, made eye contact and then

rejoined the others. (Tr. Vol. II, 51) Mr. Debose's testimony, at the preliminary hearing then read into the evidence at trial as Court's Exhibit 1, was that he witnessed the attack and identified the defendant as one of the attackers who beat the victim to death and then tried to enter his uncle's apartment to use the phone. (Tr. PH. 50, 59, 62; Tr. Vol. II, 117) Finally, Mr. Brazille identified the defendant as one of the attackers as identified by his nephew Mr. Debose. (Tr. Vol. II, 144) Mr. Brazille also testified that after the police showed up, the defendant tried to enter his apartment, when Mr. Brazille refused, the defendant then asked to use the phone. (Tr. Vol. II, 149-151)

To determine the reliability of an eyewitness' in-court identification, this Court utilizes a test which includes consideration of all the surrounding circumstances plus the following:

1) prior opportunity of the witness to observe the defendant during the alleged criminal act;

2) degree of attention of the witness;

3) accuracy of the witness' prior identification;

4) the witness' level of certainty; and,

5) the time between the crime and the confrontation.

Pennington v. State, 1995 OK CR 79, ¶ 33, 913 P.2d 1356, 1365-1366.

Ms. Tinner and Mr. Debose had an excellent opportunity to observe the defendant during the beating death of the victim. Ms. Tinner watched from her car and the defendant approached her afterwards while Mr. Debose watched from

28

his aunt's porch and was approached by the group when it was finished. Although Mr. Brazille was not present during the initial beating, he was there and had close visual contact with the defendant just prior to when the assailants went back to finish the victim off. There cannot be a doubt as to the three witnesses' degree of attention as this was a major event going on in the parking lot where nothing else was happening. Both Mr. Debose and Mr. Brazille previously identified the defendant at his preliminary hearing and Ms. Tinner identified the defendant at a prior trial for one of the co-defendant's. Not one of the three witness ever faltered on their level of certainty as to the defendant's involvement and it cannot be said that the identification of the defendant was far to attenuated from the time of the crime.

When crediting all inferences that could have been drawn in the State's favor and viewing the evidence in the light most favorable to the State, it is clear that any rational trier of fact could have found the essential elements of the crime charged, specifically that the victim was murdered by the defendant, beyond a reasonable doubt. Because the prosecution presented evidence sufficient to support the defendant's conviction, his sixth proposition of error must be denied by this Court.

# PROPOSITION VII

## THERE WAS NO ERROR THEREFORE THERE CAN BE NO CUMULATIVE EFFECT OF ALLEGED ERRORS TO WARRANT A REVERSAL.

The defendant's seventh and final proposition of error is that the cumulative effect of all the errors deprived the defendant of a fair trial. "This Court has consistently held that where there is no individual error, there can be no error by accumulation." Myers v. State, 2006 OK CR 12, ¶ 103, 133 P.3d 312, 336. The defendant has not shown that there was any error committed at his trial. There was no error in overruling the defendant's motion for mistrial, the defendant was not denied a right to be present at all critical stages of the trial, there were no improper hearsay statements introduced at trial, the defendant's trial counsel was not ineffective, there was no prosecutorial misconduct committed at trial and the evidence presented was sufficient to support the defendant's conviction. Because there was no error committed at trial, there can be no accumulation of error to warrant reversal.

However, if this Court does find that error was committed at trial the cumulative effect of any error does not reach the level needed to warrant reversal. Even looking at these allegations in a cumulative fashion, this Court cannot find that they rise to the level of plain error and therefore are not reversible.

Because there was no error committed at trial, or because any alleged error committed at trial does not rise to the level of plain error, the defendant's seventh proposition of error is without merit and should be denied by this Court.

## CONCLUSION

The defendant's contentions have been answered by both argument and citations of authority.  The State contends that no error occurred which would require reversal or modification and therefore, respectfully requests that the Judgement and Sentence be affirmed.

Respectfully submitted,

**W.A. DREW EDMONDSON
ATTORNEY GENERAL**

**THOMAS LEE TUCKER, OBA # 20874
ASSISTANT ATTORNEY GENERAL**

313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (FAX)

**ATTORNEYS FOR APPELLEE**

31

## CERTIFICATE OF MAILING

On this 16th day of January, 2007, a true and correct copy of the foregoing was mailed to:

Bill Zuhdi
PO Box 1077
Oklahoma City, OK 73101

Thomas Lee Tucker

32

# IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

HOWARD MORRIS, III,  )
  )
     Appellant,  )
  )
v.  )
  )
THE STATE OF OKLAHOMA,  )
  )
     Appellee.  )

RECEIVED

NOT FOR PUBLICATION  OCT 24 2007

No. F-2006-428  ATTORNEY GENERAL

**FILED**
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

OCT 24 2007

MICHAEL S. RICHIE
CLERK

## OPINION

**A. JOHNSON, J.:**

    Appellant Howard Morris, III, was tried by jury and convicted of Murder in the First Degree in violation of 21 O.S. § 701.7, in the District Court of Oklahoma County, Case No. CF-2004-1212. The jury fixed punishment at life imprisonment without the possibility of parole and the Honorable Twyla Mason Gray, who presided at trial, sentenced him accordingly. From this judgment and sentence Morris appeals raising the following issues:

1.     Whether the trial court erred by denying his motion for mistrial.

2.     Whether he was denied the right to be present at all critical stages of trial proceedings when the judge met with jurors over their concerns for the security of their personal information that was being disclosed in open court.

3.     Whether certain statements introduced as evidence were improper hearsay.

4.     Whether certain statements made by the prosecutor during closing argument were improper.

5.     Whether the evidence was sufficient to support the conviction for first-degree murder.



EXHIBIT
3

6.  Whether trial counsel was constitutionally ineffective for failing to: (a) object to hearsay testimony; (b) seek a new trial; (c) object to certain statements made by the prosecutor during closing argument.

7.  Whether an accumulation of errors denied Morris a fair trial.

We find reversal is not required and affirm the Judgment and Sentence of the trial court.

## FACTS

At approximately 11:00 p.m., February 20, 2004, Rodney Perry, was beaten to death in the parking lot of the Rockwell Villa Apartments in Oklahoma City. Witnesses in a small crowd of onlookers saw three or four men punching Perry. Perry was quickly knocked to the ground, and once on the ground, his attackers stomped and kicked his head, neck, and body.

One witness driving through the parking lot at the time heard Perry telling his attackers he "didn't do anything" (Tr. Vol. 2, 44). She then said he began "gurgling real bad . . . kicking and shaking in his own blood" (Tr. Vol. 2, 44-45). The witness knew Morris as the boyfriend of one of her girlfriends and identified Morris as one of the attackers. Two other witnesses identified Morris as one of the attackers.

Morris testified at trial. He denied being present at the beating and claimed to have been at home asleep at the time of the incident. He denied knowing the victim and denied knowing the three witnesses who identified him. On cross-examination, Morris asserted that all three identifications were the result of mistaken identity.

# I.
## Mistrial Motion

Morris claims initially that the trial court erroneously denied his motion for a mistrial after the judge met privately with jurors. The meeting occurred in response to a communication the judge received from the jury concerning Morris's note taking while their personal and family information was being disclosed in open court during voir dire. Upon receiving the communication from the jury, the judge met with the jurors and advised them that in her experience she was unaware of any instance where jurors had been threatened or intimidated and that she was confident that Morris was merely writing notes to his attorney. After being advised of the meeting between the judge and jury, defense counsel moved for a mistrial and requested individual questioning of all the jurors. Morris contends here, as he did below, that the jurors' concern over the security of their personal information shows that they had already discussed the facts of the case among themselves.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Jackson v. State*, 2006 OK CR 45, ¶ 11, 146 P.3d 1149, 1156. An abuse of discretion is a "clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application." *Lott v. State*, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344. Here, the judge's decision is amply supported by the record and it is Morris's position that is clearly against the logic and facts because his premise that the jury prematurely discussed the facts of the case is contradicted by the record.

Case 5:09-cv-81     Document 12-4     Filed 04/13/2009     Page 4 of 18

Specifically, the record shows that under questioning by the judge and defense counsel, the jurors unanimously agreed that none of them discussed any aspect of the case among themselves. Jurors did state, however, that some of their number voiced concern about disclosing personal and family member information in open court where the defendant seemed to be writing it down and where there were many people coming and going throughout the courtroom. Some jurors stated that it appeared to them at the time that the case might be gang-related, based on the appearance of some of the persons present in the courtroom, and that this caused them some degree of apprehension when their personal information was being discussed so openly.[1] All the jurors denied any specific fear of Morris, however, and all the jurors expressed to the judge that they could remain fair and impartial.

Because each juror expressed willingness to fully and fairly listen to all of the evidence, and because each juror denied discussing the case, the trial court's denial of Morris's motion for mistrial was not clearly against the logic and effect of the facts presented. The trial court judge did not abuse her discretion in denying the motion for mistrial.

---

[1] One juror stated, for example, that it appeared to him the case was going to be gang related and explained:

> [I]f we don't convict the guy, we're going to turn him loose in the community. And I know that I'm only supposed to be concerned about the evidence and I'm thinking about what I was. And I know that I'm supposed to only think about the stuff that's presented in the case in the courtroom, evidence.

(Tr. Vol. 3, 54). Upon further discussion with the judge, the juror acknowledged that he understood that his decisions had to be based solely on the evidence presented in the courtroom and assured the judge that he could be fair and impartial and make his decisions accordingly.

## II.
## Presence at Trial

Morris contends that he was denied his constitutional and statutory rights to be present at all critical stages of trial when the judge met privately with the jury to discuss their security concerns. According to Morris, his constitutional and statutory rights were impaired by his absence because if he had been present, he could have told the jury personally, or through counsel, that his note taking during the jury selection process was not a listing of juror personal or family information for later retribution.

A defendant's constitutional and statutory rights to be present at trial are rooted in the Sixth Amendment's right to confront witnesses and the Fifth Amendment's due process right to present a defense. *Jones v. State*, 2006 OK CR 5, ¶ 68, 128 P.3d 521, 543.[2] As we noted in *Dodd v. State*, 2004 OK CR 31, ¶ 20, 100 P.3d 1017, 1027-28, however, a defendant's right to be present has limits. Specifically, a defendant must be allowed to be present only when his presence is reasonably related to his opportunity to defend. *Id.* Because the record shows that this brief meeting between the judge and jury was on a subject unrelated to the merits of the case, the meeting and resulting

---

[2] A defendant's statutory right to be present at trial is codified at 22 O.S.2001, § 583, which provides:

> If the indictment or information is for a felony, the defendant must be personally present at the trial, but if for a misdemeanor not punishable by imprisonment, the trial may be had in the absence of the defendant; if, however, his presence is necessary for the purpose of identification, the court may, upon application of the district attorney, by an order or warrant, require the personal attendance of the defendant at the trial.

communications between the judge and jury did not impact Morris's ability to defend against the charges; nor did it impinge in any way on his ability to confront witnesses. There is no constitutional violation.

With regard to Morris's statutory right to be present at trial, we likewise find no violation. This Court has held that 22 O.S. § 583 "has never been interpreted to require a defendant's presence during all communications with jurors." *Lockett v. State*, 2002 OK CR 30, ¶ 10, 53 P.3d 418, 423. Rather, we have held that statutory provisions governing a defendant's presence at trial and a trial court's communications with jurors only require that: (1) a trial court should not communicate with the jury outside the presence of counsel and defendant during deliberations; and (2) the trial court should not permit communication with the jury regarding the merits of the case prior to the jury beginning their deliberations. *Bland v. State*, 2000 OK CR 11, ¶ 20, 4 P.3d 702, 712.

Here, the record shows that the communication between the judge and jury occurred well before the jurors began deliberating. The record also shows that the exchange did not involve the merits. Moreover, the trial court judge told the jurors precisely what Morris claims he would have told them in person had he been present (i.e., that his note taking during voir dire did not include their personal or family information and was not being done for any purpose of retribution). Under these circumstances, we find no violation of Morris's statutory right to be present at trial.

6

## III.
## Hearsay

Morris claims three hearsay statements were improperly introduced as evidence at trial.

Morris complains first about the testimony of Kurt Brazille. Brazille testified that he was near the crowd that witnessed the beating and that his nephew Dewan Debose approached him from the crowd saying that "they messed Rodney up" (Tr. Vol. 2, 144). Morris contends that this statement is improper hearsay because when connected with other testimony, it implies that he (Morris) was one of the "they" that "messed up" the victim. The State agrees that the statement is hearsay, but argues that it was properly admissible under the "present sense impression" exception to the hearsay rule at 12 O.S. Supp. 2002, § 2803(1).

Morris did not object to the statement at trial. The introduction of the statement is therefore reviewed only for plain error. *Lott v. State*, 2004 OK CR 27, ¶ 101, 98 P.3d 318, 345. Under plain error review, an appellant must first establish the existence of some error. *Hogan v. State*, 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923. Morris's claim fails at this threshold question.

The present sense impression is a hearsay statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." 12 O.S. Supp. 2003, § 2803(1). "The foundational requirements for a present sense impression include: a startling event; a statement explaining the event or condition; made while the

declarant is perceiving the event or immediately after the event." *Hancock v. State*, 2007 OK CR 9, ¶ 84, 155 P.3d 796, 816.

Kurt Brazille testified that he was standing near the crowd that witnessed Rodney Perry's beating. According to Brazille, his nephew Dewan Debose approached him immediately after the beating, and stated repeatedly that "they messed him up," referring to the victim Rodney Perry (Tr. Vol. 2 144-45). A vicious beating is certainly a startling event, and as Brazille's testimony makes clear, Debose's statement was made nearly contemporaneously with Debose having witnessed the beating. This statement meets the requirements necessary for admission as a present sense impression describing an event. It was not improper hearsay. There is no plain error.

Morris also claims that another portion of Brazille's testimony consisted of improper hearsay. Specifically, Morris complains about the following exchange between Brazille and the prosecutor:

> Q.    What about either the teardrop guy or the man in the black hoodie, were they saying anything?
>
> A.    The guy with the black hoodie was mostly like stating that he didn't care who know him, what kind of car he drove, and that he stated that he drive the maroon car or purple car and he lived out on 122nd or Hefner and May or something like that, he stated.

(Tr. Vol. 2, 143). According to Morris, this statement was improper hearsay because it was offered to prove the truth that the assailant who made the statement had a cavalier attitude toward his criminal conduct through his brazen declaration that he did not care who knew his identity, vehicle, or where he lived. The full context of Brazille's testimony shows, however, the statement

8

Case 5:09-cv-81    Document 12-4    Filed 04/13/2009    Page 9 of 18

was offered to prove the assailant's connection to a 1999 Mitsubishi Galant, a

vehicle with a nexus to the crime.   Brazille's full testimony consisted of the

following:

> Q.   What about either the teardrop guy or the man in the black hoodie, were they saying anything?
>
> A.   The guy with the black hoodie was mostly like stating that he didn't care who know him, what kind of car he drove, and that he stated that he drive the maroon car or purple car and he lived out on 122nd or Hefner and May or something like that, he stated.
>
> Q.   And you kind of indicated during your testimony, was the man in the black hoodie pointing to a particular car that night?
>
> A.   Yeah, he was pointing at the car he was driving.
>
> Q.   Okay. Let me show you what we have previously introduced as State's Exhibit Number 34 and ask if that is the car that the man in the black hoodie was pointing at?
>
> A.   Yes, ma'am.
>
> Q.   And if you would, when – at the time that the man in the black hoodie is pointing at this car, are you standing in close proximity to the car?
>
> A.   I was standing in front of the car about where the police officer is standing.

(Tr. Vol. 2, 143).

Taken as a whole, Brazille's testimony shows that the statement made

by the assailant in the black hoodie was not offered to prove that the assailant

possessed a cavalier attitude toward criminal activity.   It is therefore not

hearsay on that issue.   See 12 O.S.2003, § 2801(3)(defining hearsay as "a

9

statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted). Introduction of this statement as evidence was not error.

Morris also complains about the testimony of Demetria Tinner as she described what she heard during Rodney Perry's beating. Specifically, Morris complains about the following statement made by Tinner:

> They were saying something about Crip stuff and Rodney was like he didn't do anything and they was just doing cussing and stuff like that.

(Tr. Vol. 2, 44).

Morris's argument on this point consists of a lengthy complaint that Tinner never identified him as the person making the Crip-related statement and that because of the size of the crowd present at the beating scene the statement could have come from any one of the ten or so onlookers. Morris contends further that he was prejudiced by the statement because it improperly introduced evidence of gang activity and created sympathy for the victim. With regard to the crux of his claim, however, Morris merely asserts, without elaboration or any attempt at developed argumentation, that Tinner's mention of the Crips gang was improper hearsay evidence. Morris did not object to this testimony at trial so, again, the claim is reviewed only for plain error.

Tinner's full testimony on this point consisted of the following:

Q.  Let me ask you – I forgot one thing. You've told us what you saw. What could you hear whenever you rolled your window down initially?

A.   They were saying something about Crip stuff and Rodney was like he didn't do anything and they was just doing cussing and stuff like that.

Q.   Okay. Now, when you say "they were saying Crip stuff," are you talking about the four men or are you talking –

A.   The four men.

Q.   And what could you hear? You ultimately came to find that you knew the man that was beaten, is that right?

A.   Right.

Q.   And who was that?

A.   Rodney.

Q.   What could you hear – and is that Rodney Perry?

A.   Yes.

Q.   What could you hear Rodney Perry saying?

A.   He said he didn't do anything. And that was it. And then he started gurgling real, real bad.

Q.   And you could hear the gurgling when you were still here initially or was that on your way back?

A.   On my way back. That's why I called 911.

(Tr. Vol. 2, 44).

Taken in its full context, this testimony shows that Tinner's recounting of what she heard was intended to show only that Rodney Perry pleaded with his attackers, whoever they were, and that the sounds he made during the beating suggested a degree of suffering sufficient to induce her call 911 for assistance. Obviously, then, the information in this statement was not introduced to prove the truth of the matter asserted (i.e., that someone in the crowd or one of the

11

attackers was a member of the Crips gang).  *See* 12 O.S.2001, § 2801(3).

Therefore, the statement was not hearsay, and its introduction was not error.

## IV.
## Prosecutorial Misconduct

Morris claims that he was denied due process by the prosecutor making improper remarks during closing argument.  Morris claims that three specific comments made by the prosecutor during closing improperly shifted the burden of proof to him.  Morris identifies the following remarks as impermissible burden-shifting comments:

(1)  "you've heard no evidence that would indicate to you these people are not telling you what they saw" (Tr. Vol. 3, 108);

(2)  "[t]here is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but tell you the truth" (Tr. Vol. 3, 146); and

(3)  "[h]e [Morris] has the right to present evidence of that and he didn't" (Tr. Vol. 3, 157).

Morris did not object to the first two comments.  Therefore, their use is reviewed for plain error.  Morris objected to the third remark, but the objection was overruled by the trial court judge.  We review a trial court's overruling of a defendant's objection to a prosecutor's comments during closing argument for an abuse of discretion.  *Browning v. State*, 2006 OK CR 8, ¶ 40, 134 P.3d 816, 840.  Regardless of which standard is applied, however, we find no merit in any of these claims of prosecutorial misconduct.

12

The burden of proof is on the State to prove every element of the crime charged beyond a reasonable doubt. 22 O.S.2001, § 836; *Mullaney v. Wilbur*, 421 U.S. 684, 703-04, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975). The State may not attempt to shift the burden of proof to the defendant during closing argument. *Jordan v. State*, 1988 OK CR 115, ¶ 5, 756 P.2d 8, 9. *See also Mullaney*, 421 U.S. at 703-04, 95 S.Ct. at 1892 (holding State must prove every element of offense beyond reasonable doubt and scheme that shifts burden of proof to defendant violates due process).

In this instance, Kurt Brazille and Demetria Tinner both testified that they saw Morris beating the victim Rodney Perry. Dewan Debose's preliminary hearing testimony, which was read into the record because of his unavailability for trial, indicated that he also saw Morris beating the victim. When Morris testified at trial, he claimed he was at home asleep when the beating occurred and denied knowing the victim, Kurt Brazille, Demetria Tinner, and Dewan Debose. When asked why these three individuals would lie and say that they saw him beating the victim, Morris asserted that their testimony was the result of mistaken identity. When the prosecutor told the jury in closing that "you've heard no evidence that would indicate to you these people are not telling you what they saw"; "[t]here is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but tell you the truth"; and that Morris "ha[d] the right to present evidence of that and he didn't," the prosecutor was doing nothing more than commenting on the state of the evidence supporting Morris's asserted defense of mistaken identity. This was

fair comment on the evidence on an issue raised by Morris when he testified. The prosecutor's statements were not improper. *Cf. Darks v. State*, 1980 OK CR 15, ¶ 54, 954 P.2d 152, 166 (finding no impermissible burden shifting in comment by prosecutor that "he who asserts must prove" by holding that defendant who presents alibi defense must show state of facts creating reasonable doubt of his presence at time and place crimes were committed).

## V.
## Sufficiency of Evidence

Morris claims that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The elements of Murder in the First degree are:

First,      the death of a human;

Second,     the death was unlawful;

Third,      the death was caused by the defendant;

Fourth,     the death was caused with malice aforethought.

Instruction No. 4-61; OUJI-CR(2d)(O.R. 192); 21 O.S.2001, § 701.7. Morris challenges the third element (i.e., that he caused Perry's death) by claiming that there was no physical or forensic evidence linking him to the murder and that testimony of the three witnesses identifying him as one of Perry's assailants was contradictory and therefore not worthy of belief.

This Court reviews a challenge to the sufficiency of the evidence in the light most favorable to the State and will not disturb the verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Head v. State*, 2006 OK CR 44, ¶ 6, 146 P.3d 1141, 1144. Under this standard, we must accept all reasons, inferences, and

credibility choices that tend to support the verdict. *Warner v. State*, 2006 OK CR 40, ¶ 35, 144 P.3d 838, 863.

Three witnesses identified Morris as one of Perry's attackers and described the severity of the savage beating. Even without any physical or forensic evidence of Morris's participation, this eyewitness testimony was sufficient evidence from which the jury reasonably could conclude that Morris caused Perry's death. Furthermore, the question of whether the witnesses' testimony was worthy of belief is not relevant here. The witnesses were tested under cross-examination at trial. Any question as to their credibility was resolved by the jury. By rendering a verdict of guilty, the jury obviously found the eyewitness testimony credible, and we must honor that choice as it supports the verdict. *See e.g., Warner v. State*, 2006 OK CR 40, ¶ 35, 144 P.3d 838, 863.

## VI.
## Ineffective Assistance of Counsel

Morris claims next that he received constitutionally ineffective assistance of counsel. He claims first that trial counsel was ineffective for not objecting to the alleged hearsay evidence discussed above. Morris also contends counsel was ineffective for failing to move for a new trial on the basis of the alleged jury misconduct discussed above. Lastly, Morris claims that counsel was ineffective for failing to object to the allegedly improper closing comments made by the prosecutor, also discussed above.

To prevail on his ineffective assistance claims, Morris must demonstrate that counsel acted in a professionally unreasonable manner by failing to object

15

to the evidence or the prosecutor's comments, or that he acted unprofessionally by failing to move for a new trial. *Strickland v. Washington*, 466 U.S. 668, 687-89, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). In addition, Morris must also demonstrate there is a reasonable possibility that a different outcome would have resulted if counsel had objected or moved for a new trial. *Id.* As we have found no merit to Morris's substantive claims on each of these issues, it is clear that any objections or motions for new trial raised on these grounds would have been properly overruled and the ultimate outcome unchanged. Trial counsel therefore was not ineffective. *See e.g., Pavatt v. State*, 2007 OK CR 19, ¶ 66, 159 P.3d 272, 292 ("As we have found that the prosecutor's comments were not improper, any defense objection to them would have been properly overruled and the ultimate outcome unchanged. Defense counsel was not ineffective for failing to object to comments which were not objectionable"); *Short v. State*, 1999 OK CR 15, ¶ 85, 980 P.2d 1081, 1106-07 (holding that in situations where objections to evidence that might have been raised would have been properly overruled and those that might have been sustained would have amounted to at most harmless error had the ruling been incorrect, counsel cannot be found ineffective for failing to object to evidence); *Washington v. State*, 1999 OK CR 22, ¶ 57, 989 P.2d 960, 977 (holding that where appellant's substantive claim lacks merit, he cannot meet burden of showing deficient performance and prejudice).

16

## VII.
## Cumulative Error

Lastly, Morris contends that the cumulative effect of errors in his case requires reversal of his conviction or modification of his sentence. This Court has repeatedly held that a cumulative error argument has no merit when we do not sustain any of the other errors raised. *Lott v. State*, 2004 OK CR 27, ¶ 166, 98 P.3d 318, 357. Because we have examined each of Morris's allegations in detail and found no error, relief is not warranted on this claim.

### DECISION

The Judgment and Sentence of the district court is **AFFIRMED**. Under Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE TWYLA MASON GRAY, DISTRICT JUDGE

| **APPEARANCES AT TRIAL** | **APPEARANCES AT APPEAL** |
|---|---|
| CHRIS BOX<br>2208 S.W. 59TH STREET<br>OKLAHOMA CITY, OK 73119<br>ATTORNEY FOR DEFENDANT | BILL ZUHDI<br>P. O. BOX 1077<br>OKLAHOMA CITY, OK 73101<br>ATTORNEY FOR APPELLANT |
| PATTYE HIGH<br>GRAHAM GUHL<br>ASSISTANT DISTRICT ATTORNEYS<br>COUNTY OFFICE BUILDING, STE 505<br>320 ROBERT S. KERR<br>OKLAHOMA CITY, OK 73102<br>ATTORNEYS FOR STATE | W. A. DREW EDMONDSON<br>OKLAHOMA ATTORNEY GENERAL<br>THOMAS LEE TUCKER<br>ASSISTANT ATTORNEY GENERAL<br>313 N.E. 21ST STREET<br>OKLAHOMA CITY, OK 73105<br>ATTORNEYS FOR APPELLEE |

17

**OPINION BY: A. JOHNSON, J.**
LUMPKIN, P.J.: Concur
C. JOHNSON, V.P.J.: Concur
CHAPEL, J.: Concur
LEWIS, J.: Concur

RA

1                IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

2                     STATE OF OKLAHOMA

APR 2 8 2006

3

PATRICIA PRESLEY, COURT CLERK

4    THE STATE OF OKLAHOMA,        )    By_____
                                   )            Deputy
5              Plaintiff,          )
                                   )    F-2006-428
6    VS.                           )    CASE NO. CF-04-1212
                                   )
7    HOWARD PURIFOR MORRIS, III,   )
                                   )    COPY
8              Defendant.          )

9

10                    * * * * * * * *

11

12              TRANSCRIPT OF PROCEEDINGS,

13                     JURY TRIAL,

14              HAD ON APRIL 4, 2006,

15        BEFORE THE HONORABLE TWYLA MASON GRAY,

16                  DISTRICT JUDGE.

17

18                 * * * * * * * * *

19

20                  **VOLUME 2 OF 3**

21                                        RECEIVED
                                          JUL 27 2006
22   REPORTED BY:                         Attorney General

23   THERESA L. REEL, RPR

24   321 PARK AVENUE, SUITE 201

25   OKLAHOMA CITY, OK  73102

EXHIBIT
4

```
 1    A.    Yes.

 2    Q.    Did there come a time when you stopped?

 3    A.    Yes.

 4    Q.    About where did you stop?

 5    A.    Right over that first speed bump.

 6    Q.    And so this yellow line that we can see in the

 7    photograph, that's a speed bump?

 8    A.    Yes.

 9    Q.    Did you go over the speed bump?

10    A.    My front tires was over it and my back one was behind

11    it.

12    Q.    And what did you do when you stopped?

13    A.    We let the window down and we watched.

14    Q.    What could you see?

15    A.    They were arguing and basically just started stomping

16    all over his body and beating him up really bad and jumping

17    all on his chest and stuff.

18    Q.    Now, the man that was being beaten, at that time did

19    you recognize him?

20    A.    No, I did not.

21    Q.    And you indicated that there were four men doing the

22    beating?

23    A.    Yes.

24    Q.    Were there any of the four men that were not

25    participating in the kicking and the stomping?
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   A.   No.  They all was doing it.

2   Q.   When you first noticed this going on, was the man who

3   was ultimately beaten, was he standing up or was he on the

4   ground already?

5   A.   He was standing up at first.

6   Q.   Did there come a time when he was on the ground?

7   A.   Yes.

8   Q.   How did he come to be on the ground?

9   A.   One of the guys hit him and he fell back.

10  Q.   And fell back flat onto the ground?

11  A.   Yes.

12  Q.   And what happened after the man was on the ground?

13  A.   They started jumping, stomping on him.

14  Q.   And I'm not sure the jury can see because of that, but

15  you were showing with your feet, they were stomping him?

16  A.   Yes.

17  Q.   Where on the man's body were they stomping him?

18  A.   All through the neck, everywhere, all the way down.

19  Q.   And were all four of the men participating in the

20  stomping?

21  A.   Yes.

22  Q.   So what happens next?

23  A.   After we seen that?

24  Q.   Yes.

25  A.   Oh, after that we drove around and came back and looked

1    and noticed it was Rodney and called 911.

2    Q.    Let me ask you -- I forgot one thing.  You've told us

3    what you saw.  What could you hear whenever you rolled your

4    window down initially?

5    A.    They were saying something about Crip stuff and Rodney

6    was like he didn't do anything and they was just doing

7    cussing and stuff like that.

8    Q.    Okay.  Now, when you say "they were saying Crip stuff,"

9    are you talking about the four men or are you talking --

10   A.    The four men.

11   Q.    And what could you hear?  You ultimately came to find

12   that you knew the man that was beaten, is that right?

13   A.    Right.

14   Q.    And who was that?

15   A.    Rodney.

16   Q.    What could you hear -- and is that Rodney Perry?

17   A.    Yes.

18   Q.    What could you hear Rodney Perry saying?

19   A.    He said he didn't do anything.  And that was it.  And

20   then he started gurgling real, real bad.

21   Q.    And could you hear the gurgling when you were still

22   here initially or was that on your way back?

23   A.    On my way back.  That's why I called 911.

24   Q.    And so if I'm correct, did you go down and turn around

25   in this little circle?

1    A.    I sure did.

2    Q.    And came back?

3    A.    Yes.

4    Q.    Now, as you came in to the apartment complex, was the

5    beating happening on your side of the car?

6    A.    Yes, it was.

7    Q.    And when you came back, it would have been on the

8    passenger side of the car?

9    A.    Right.

10   Q.    What did you see when you got back to the same spot

11   after you had turned around?

12   A.    Rodney was laying on the ground and kind of kicking and

13   shaking and gurgling in his own blood so we decided to go

14   ahead and call the police.

15   Q.    What of the four men?  Where were they?

16   A.    One of them was still standing right there but then I

17   seen like one go through the -- took off and went through

18   the crowd, because people had started coming out by then,

19   and then the other ones got in the car.

20   Q.    Now, you say people had begun to come out.  How many

21   people would you estimate were outside in this area at that

22   time?

23   A.    I can't -- I don't remember.

24   Q.    Okay.  Did it seem like a great number or a few?  A

25   couple?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1    A.    Maybe ten.   Maybe.

 2    Q.    All right.

 3          And so you indicated one of the men took off through

 4    the crowd?

 5    A.    Yes.

 6    Q.    And then the other ones went and got in a car?

 7    A.    Yes.

 8    Q.    Where was the car?

 9    A.    Right by the -- well, let me show you.   Right through

10    there.

11    Q.    Okay.   And obviously this photograph is taken during

12    the day, and this was at night, right?

13    A.    Right.

14    Q.    And so not necessarily that these are the same cars,

15    but there were cars parked there that night also?

16    A.    Yes.

17    Q.    And did you see three men get in that car?

18    A.    I did.

19    Q.    And what happened next?

20    A.    The one went through the crowd, they got in.   I started

21    calling 911, pulled off.   They got behind me but they went

22    around me and went out and went back on Rockwell.

23    Q.    Okay.   So when you came and you stopped at the speed

24    bump on your way out, did you look at who you knew then to

25    be Rodney Perry?
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   A.   Yeah, we stopped right there and I called 911 from

2   looking at him right there and then when we got them on the

3   line, I drove out.

4   Q.   Describe for the jury Mr. Perry's condition at the time

5   you stopped.

6   A.   He was gurgling and just shaking real bad and I could

7   tell he wasn't breathing.  And I asked Christa should we get

8   out and help him but she was like, "No," because they were

9   still kind of right there at the time.

10      She was like, "We don't know what they'll do to us, so

11  we just decided to call 911.  He was pretty bad."

12  Q.   Could you see -- I understand he was not breathing like

13  you would expect him to breathe.  Could you see any obvious

14  sign of injury on his face or anywhere on his body?

15  A.   I seen a lot of blood around him.

16  Q.   Okay.  All right.  And you have previously told us that

17  State's Exhibit Number 3 is a photograph of the apartment

18  complex that night.

19  A.   Yes.

20  Q.   Now, this person that we can see lying there, do you

21  recognize that person?

22  A.   Yes, I do.

23  Q.   And who is that?

24  A.   Rodney.

25  Q.   Now, at the time that you pulled up and stopped that

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    night, is that the exact position that Mr. Perry's body was

2    in?

3    A.    Excuse me?

4    Q.    When you turned around and came back --

5    A.    Oh, yes, yes.

6    Q.    -- and you stopped --

7          And this is the speed bump, is that right?

8    A.    Uh-huh.

9    Q.    Is this where Mr. Perry's body was?

10   A.    Yes, it was.

11   Q.    And, now, you've told us that you called 911, is that

12   correct?

13   A.    Yes.

14   Q.    Before we get to that, I want to ask you about the four

15   men.

16         I may have spelled that wrong and I'll get a pen that

17   has more ink.

18         I want you to think back in your mind to the four men

19   and I want you to pick one of them -- well, let me ask you

20   first, of the four men that you saw, did you recognize any

21   of them out there that night?

22   A.    Yeah, kind of.  Not at first.

23   Q.    Not at first?

24   A.    Uh-huh.

25   Q.    As you sit here in this courtroom today, do you see any

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   of the men that were out there that night?

2   A.    Yes.

3   Q.    And can you tell me where he is sitting and what he is

4   wearing?

5   A.    He's sitting right there.  He has on a yellow shirt and

6   black pants.

7            MS. HIGH:  Your Honor, I'd ask the record to

8   reflect identification of the Defendant, Howard Morris.

9            THE COURT:  The record will so reflect.

10  Q.    (BY MS. HIGH)  Prior to that night, did you know this

11  Defendant?

12  A.    Not really but kind of.

13  Q.    Explain.

14  A.    He was just one of my friend's boyfriends.

15  Q.    And who was your friend?

16  A.    Do I have to say her name?

17  Q.    Yes.

18  A.    I don't know her last name, but her name Eenie.

19  Q.    Eenie?

20  A.    Uh-huh.

21  Q.    Okay.  And how long had you -- had you seen him

22  occasionally prior to that night?

23  A.    Yes.

24  Q.    About how many times would you estimate you had seen

25  Howard Morris prior to that night?

1    A.    Just a couple.

2    Q.    Now, when you were initially interviewed by the police,

3    did you tell them that you knew Howard Morris or identify

4    him in any way?

5    A.    No, I didn't.

6    Q.    Why?

7    A.    Because I didn't -- I didn't want -- I didn't want to.

8    Q.    When was the first time -- or who was the first person

9    that you ever told, I know that one?

10   A.    You.

11   Q.    And how long ago was that?

12   A.    Right before the last trial.

13   Q.    Why did you change your mind and tell what you knew?

14   A.    I don't know.  I just -- I don't know.  I felt bad, I

15   guess.

16   Q.    Okay.  How was Howard Morris dressed that night?  We

17   will make him the first individual.  How was he dressed?

18   A.    I really don't remember.

19   Q.    Do you remember anything about his clothing?

20   A.    No, not really.  I can't now.

21   Q.    When you observed the four men, did you have an

22   opportunity to look at Howard Morris, to look at his face?

23   A.    When they were stomping on Rodney?

24   Q.    At any point.

25   A.    Oh, yeah.

1   Q.   What happened?

2   A.   Well, me and Eenie had the same car that day.  I

3   mean -- well, she has a white Ford Focus also, she did, so

4   after they were stomping him or whatever he kind of like

5   came to the car, because -- I'm just assuming, I don't know,

6   but maybe he thought I was her.  So he stopped and I got --

7   that's how I seen that it was him.

8   Q.   You say he came to the car.  Did he walk all the way up

9   to your car?

10  A.   Not all the way because I guess when he noticed it

11  wasn't her, I'm guessing he noticed it wasn't her, he went

12  through the crowd.

13  Q.   Okay.  So if I'm understanding you correctly, did

14  Howard Morris turn and look at you?

15  A.   Yes.

16  Q.   Did you make eye contact with him?

17  A.   Yes.

18  Q.   And at the time that you made eye contact, is that the

19  point when he turned and walked away?

20          MR. BOX:  Objection, leading, Your Honor.

21          THE COURT:  Sustained.

22  Q.   (BY MS. HIGH)  At what point did Howard Morris turn and

23  walk away?

24  A.   It wasn't -- when he looked, I'm guessing when he

25  noticed it wasn't her and he just walked -- he just ran, ran

1          THE COURT:  Thank you.

2          MS. HIGH:  I have marked this as Court's Exhibit

3  Number 1.  I have made a couple of redactions in terms of

4  objections that were sustained.  I've shown those or

5  discussed those with Mr. Box and he was in agreement that we

6  do it that way.

7          MR. BOX:  Absolutely, Judge.

8          THE COURT:  Absolutely.  Before you leave, I'm

9  going to mark for the record your stipulation as Court's 2.

10  And receive Court's 1, this redacted version of the

11  transcript.

12          MR. BOX:  Yes, Judge.

13          MS. HIGH:  It begins with the Court getting him to

14  say his name.  Would you been kind enough to do that part?

15          THE COURT:  Sure, I'll be happy to.

16     (Thereupon, the following was had in open court.)

17          THE COURT:  Ladies and gentlemen of the jury, I

18  need to kind of explain to you what's going to go on next.

19  I think they mentioned -- the attorneys mentioned in opening

20  that one of the witnesses is unavailable but he has had an

21  opportunity to testify before under oath and so the law

22  allows us to read that to you.

23          And I don't think there will be any confusion in

24  your mind that the people that are reading it are all

25  different.  Ms. High will be reading the questions as the

1    Prosecutor.  I will be reading the part on behalf of the

2    Court.  And Mr. Guhl will be reading on behalf of the

3    witness, Dewan Debose.  None of us were present at the time

4    that this testimony was given.

5         (Thereupon, Court's Exhibit 1, the transcript testimony

6         of Dewan Debose was read for the jury.)

7              THE COURT:  Is the State prepared to call your

8    next witness?

9              MR. GUHL:  We are, Judge.  The State calls Kyle

10   Laws.

11                        **KYLE LAWS,**

12   having been first duly sworn, testified as follows:

13                    **DIRECT EXAMINATION**

14   **BY MR. GUHL:**

15   Q.    Sir, please introduce yourself to the jury.

16   A.    My name is Kyle Laws.

17   Q.    And, sir, how old are you?

18   A.    Eighteen.

19   Q.    And, sir, if I can refer you back to February 20th of

20   2004.  Where were you living?

21   A.    In Rockwell Villa Apartments.

22   Q.    And, sir, how long had you been living there?

23   A.    About a year.

24   Q.    Sir, within the apartments, where specifically did you

25   live?  In other words, near the entrance to the apartments

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    THE COURT:  Redirect.

2    MR. GUHL:  No, Your Honor.

3    THE COURT:  Thank you, sir.  You may be excused.

4    The State's next witness, please.

5    MS. HIGH:  Kurt Brazille.

6                    **KURT BRAZILLE,**

7    having been first duly sworn, testified as follows:

8                    **DIRECT EXAMINATION**

9    **BY MS. HIGH:**

10    Q.    Sir, would you introduce yourself to the jury, please.

11    A.    Hi.  My name is Kurt Brazille.

12    Q.    And, Mr. Brazille, how old are you?

13    A.    Thirty-nine.

14    Q.    I want to direct your attention back to February the

15    20th of 2004.  Do you recall that date?

16    A.    Yes.

17    Q.    I want to talk about the late evening hours, 10:30,

18    11:00, between 10:30 and midnight that night, where were

19    you?

20    A.    Over to my girlfriend's house.

21    Q.    And who was your girlfriend?

22    A.    Tracy Laws.

23    Q.    And where is her house?

24    A.    Rockwell Villa Apartments.

25    Q.    And --

1       MS. HIGH:  May I approach the witness, Judge?

2       THE COURT:  You may.

3   Q.   (BY MS. HIGH)  Mr. Brazille, I want to hand you what I

4   have previously introduced as State's Exhibit Number 1 and

5   it's been identified as an aerial photograph of Rockwell

6   Villa Apartments.  Do you recognize it that way also?

7   A.   Yes, ma'am.

8   Q.   And in this photograph are you able to show us where

9   Tracy Laws' apartment is?

10  A.   Yes.

11  Q.   And if you would do that, please?

12  A.   In the back of the apartments.

13  Q.   Okay.  And, so, it's in the last apartment building?

14  A.   Yes.

15  Q.   Now, had you been over at Ms. Laws' apartment all day?

16  A.   Yes.

17  Q.   And that evening, 10:30, 11:00 at night, who else is in

18  the apartment besides yourself?

19  A.   Me and my stepson, Kyle, and his skating friends and I

20  think my two cousins and one of their friends.

21  Q.   Now, when you say your stepson, Kyle, is that Kyle

22  Laws?

23  A.   Yes, ma'am.

24  Q.   Is that the young man that you saw leaving as you were

25  coming in here today?

1   A.   Yes.

2   Q.   And was Tracy Laws there?

3   A.   Yes, she was asleep.

4   Q.   Now, do you know a person by the name of Dewan Debose?

5   A.   Yes, ma'am.

6   Q.   How do you know him?

7   A.   That's my nephew.

8   Q.   Was Dewan Debose there in the apartment that night?

9   A.   Well, he showed up.

10  Q.   Okay.  At what point did Dewan Debose show up?

11  A.   Oh, I'd say anywhere from like 11:30 to -- could have

12  been 11:25 at that time, somewhere.

13  Q.   So prior to him -- so prior to Dewan Debose showing up,

14  it was you, if I understood you correctly, Tracy Laws was

15  asleep?

16  A.   Yes.

17  Q.   Kyle Laws and he had some friends?

18  A.   Yes, ma'am.

19  Q.   Now, these friends and Kyle Laws, did they share a

20  common interest in some sport?

21  A.   Yes, they were skateboarding friends.

22  Q.   And then did you say you had a cousin over there also?

23  A.   Yes, ma'am.

24  Q.   Who was your cousin?

25  A.   I think it was Andre.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    Q.    And anybody else that you can recall?

2    A.    Yeah, and they had one of their friends with them named

3    One Fifth, I believe.

4    Q.    One Fifth?

5    A.    Yes.

6    Q.    Is that a nickname?

7    A.    Yes.  I don't know his real name.

8    Q.    All right.  Now, you said that at some point Dewan

9    Debose showed up.

10    A.    Yes.

11    Q.    How long was Dewan Debose in the apartment before he

12    left again?

13    A.    Approximately about 10, 15 minutes.

14    Q.    Why did he leave?

15    A.    He wanted to use the phone and I wouldn't let him.

16    Q.    You wouldn't let him use the phone in the apartment?

17    A.    No, I was just being hard.

18    Q.    Where did you send him to use the phone?

19    A.    He went out to the pay phone outside.

20    Q.    And is the pay phone located there in the apartment

21    complex?

22    A.    Yes, ma'am.

23    Q.    And about where in the apartment complex?

24    A.    At the entrance.  Almost at the entrance, it's right by

25    the office.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    Q.    And this is State's Exhibit Number 15.    Is that the

2    office that you are referring to?

3    A.    Yes, ma'am.

4    Q.    Now, are you able to see in this photograph where the

5    phone is or is it out of the picture?

6    A.    Well, it's just about out of the picture.    It's right

7    behind that Suburban, that white Suburban.

8    Q.    Oh, right behind the white Suburban over here?

9    A.    Yes, ma'am.

10   Q.    Okay.    All right.    And, so how long was Dewan gone from

11   the apartment before something else happened?

12   A.    No more than -- I'd say three to four minutes.

13   Q.    What happened?

14   A.    As far as my niece or my daughter, one of the two came

15   over and said it was a fight up by the mailboxes.

16   Q.    Now, the mailboxes there in the apartment, are there

17   any other mailboxes besides these that we can see in State's

18   Exhibit Number 15?

19   A.    No, those are the only ones.

20   Q.    And when your niece or your daughter, whoever it was,

21   came and said that there was a fight by the mailboxes, what

22   did you do?

23   A.    I dropped everything that I had in my hand and took off

24   running outside.

25   Q.    Why?

1    A.    Because I sent my nephew outside.

2    Q.    And so where did you go?

3    A.    Ran up towards the mailboxes where they said the fight

4    was.

5    Q.    I need to stop making this trek.

6          And this is State's Exhibit Number 8.  And, again, it's

7    been identified as an aerial photograph of the apartment

8    complex.  The apartment that you were coming out of, is it

9    one of these back here?

10   A.    Yes, ma'am.

11   Q.    Is it in the far building?

12   A.    Yes, the far building.

13   Q.    Now, we can kind of see there's some dark areas.  Are

14   those breezeways where you can go into the apartment

15   building?

16   A.    Yes.

17   Q.    And do you recall, did you come out of the first

18   breezeway or the second?

19   A.    It's just one breezeway there.

20   Q.    One breezeway.

21         And when you came out of the apartment complex, did you

22   come across the street?

23   A.    Yeah, we just come down the stairway and just started

24   running straight across here.

25   Q.    Headed for these mailboxes?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    A.    Yes, ma'am.

2    Q.    How far did you get?

3    A.    We got to this breezeway here before we had met my

4    nephew and the guys he was walking with.

5    Q.    Okay.  So you didn't make it all the way to the

6    mailbox?

7    A.    No, ma'am.

8    Q.    About this first breezeway in this first building?

9    A.    Yes, ma'am.

10    Q.    Now, you say that you were met by your nephew.  Is that

11    Dewan Debose?

12    A.    Yes.

13    Q.    And who else was with him?

14    A.    Three other guys.

15    Q.    I want to ask you to look all around the courtroom here

16    today and tell me if you see any of the three other guys

17    that was walking with Dewan Debose that night.

18    A.    Well, it's the same guy that's sitting with the yellow

19    shirt on.

20    Q.    Okay.

21            MS. HIGH:  Ask the record to reflect

22    identification of the Defendant?

23            THE COURT:  The record will so reflect.

24    Q.    (BY MS. HIGH)  Now, how was Howard Morris dressed that

25    night?

1    A.    He had a baseball cap on that nicked him right across

2    his eyebrows and I believe he had on a jacket with -- I

3    believe Tar Heel colors.

4    Q.    And sorry, while you're doing that, I'm going to write.

5         Do you recall anything about the baseball hat other

6    than the fact that it was set down low on his head?

7    A.    It's been a long time.

8    Q.    Okay.  And then you said a jacket?

9    A.    Yes, ma'am.

10   Q.    And Tar Heels' colors?

11   A.    Yes, baby blue and I believe it could have been black

12   or white.

13   Q.    Do you recall anything else about how Howard Morris was

14   dressed that night?

15   A.    Just with the faded-out jeans that he had on.

16   Q.    Now, you've said that there were two other individuals

17   walking with Dewan Debose and this Defendant, is that

18   correct?

19   A.    Yes, ma'am.

20   Q.    And have you testified previously against both of those

21   individuals?

22   A.    Yes, ma'am.

23   Q.    As between -- well, tell me what you remember about a

24   different individual.  Was there anything distinctive about

25   any of their faces?

1    A.    The only -- the teardrop guy.

2    Q.    Why do you call him the teardrop guy?

3    A.    That's the only way I can notice who he was, by the

4    teardrops on his eyes.

5    Q.    Did he have teardrops -- where on his face were the

6    teardrops?

7    A.    Up under each eye.

8    Q.    Each eye?

9    A.    Yeah.

10   Q.    Now, you sort of indicated.  Did they come from the

11   outside?

12   A.    Yeah, just like you're crying.

13   Q.    Now, real teardrops or --

14   A.    No, they are a tattoo.

15   Q.    Do you remember anything else about the way the

16   teardrop guy was dressed?

17   A.    Other than he had a curl and he had on, I think, some

18   blue jeans that was also faded, too.

19   Q.    Did you say he had a curl?

20   A.    Yeah, I believe it was a short curl.  Just like you can

21   get a wave on your hair or something like that.

22   Q.    So you're talking about the manner in which he wore his

23   hair?

24   A.    Yeah.

25   Q.    Okay.  Do you recall anything about Howard Morris' hair

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    that night, this Defendant?

2    A.    Well, I couldn't see his hair.  He had a baseball cap

3    on.

4    Q.    Did he happen to have glasses on that night?

5    A.    No.

6    Q.    And, so, he had a short curl and then had faded blue

7    jeans?

8    A.    Yes.

9    Q.    Do you recall a jacket or anything up at the top of the

10   teardrop guy?

11   A.    I believe he also had -- excuse me, a jacket on, too,

12   with the Tar Heel colors that could have had the "Thug Life"

13   name on it.

14   Q.    Tar Heels' colors?

15   A.    Yes, ma'am.

16   Q.    And, again, is that the baby blue with maybe some black

17   and white?

18   A.    Yes.

19   Q.    And then there was something else that you said, maybe.

20   "Thug Life"?

21   A.    Yes.  I think that was on the jacket.

22   Q.    Do you recall seeing "Thug Life" on a jacket on one of

23   them that night?

24   A.    I believe so.  It's one.  I just can't recall because

25   it's been so long.

1    Q.    What are you able to remember about the third man that

2    was walking with your nephew?

3    A.    He was just the way he just kept biting his bottom lip

4    and acting to where he would say he would get a fair fight

5    with anyone that wanted one.

6    Q.    And I'm not sure my question was clear.  You've

7    described for us a guy in a Tar Heels' colored jacket with a

8    baseball hat.  You've described the teardrop guy.

9         The third guy, what was he wearing?

10    A.    The third guy had the black hoodie.

11    Q.    Now, when you used the term "hoodie," what does that

12    mean to you?

13    A.    Well, it's like a sweat jacket with a hood on it.

14    Q.    And it was black?

15    A.    Yes.

16    Q.    Did he have anything on his head?

17    A.    He had a hood, yeah.

18    Q.    He had the hood up?

19    A.    Yes.

20    Q.    And any writing, any insignia, or anything on that

21    black hoodie?

22    A.    No, not that I remember.

23    Q.    Do you recall what kind of pants or what he had on down

24    at the bottom?

25    A.    I believe it was dark black pants or something like

1    that, I believe.

2    Q.    Okay.  Now, when you first -- you're coming towards the

3    front of the apartment complex.  Your nephew and these three

4    men including the Defendant are coming towards you.  When

5    you get close enough to hear each other, what is going on

6    with the three men?

7    A.    And my nephew?

8    Q.    Yes.

9    A.    Well, he started stating to them that I was his uncle

10   and everybody else that was running with me was his family

11   and he just didn't want, I guess, the guys to get all jumpy

12   to where they thought that we was coming to jump on them or

13   something like that.

14   Q.    When you say he was stating that, are you talking about

15   Dewan?

16   A.    Yes, ma'am, my nephew, Dewan.

17   Q.    All right.  Did you say anything to your nephew or the

18   three men?

19   A.    At that particular time, no, I was just worried about

20   was he all right.  He was just letting them know that the

21   reason why they was probably running this way because they

22   thought I was in trouble.

23   Q.    And, so, what happens next?

24   A.    Then they all was just proceeded to come and the guy

25   with the hat just kept -- had his lip bit, just saying that

1    he'll get a fair fight with anybody that wants one.

2    Q.    Now, when you say "the guy with the hat," are you

3    referring to this man right here, Howard Morris?

4    A.    Yes, ma'am.

5    Q.    And you say he was biting his lip?

6    A.    Yes.

7    Q.    Can you show me and the jury what you mean?

8    A.    He was doing this motion, (Indicating).

9    Q.    And what was he saying?

10   A.    He would get a fair fight with anyone.

11   Q.    And what did you take that to mean?

12   A.    He'll fight.

13   Q.    And is that something that this Defendant said one time

14   or did he say it more than one time?

15   A.    No, he said it more than once.

16   Q.    How would you describe the way that this Defendant was

17   acting that night?  Was he calm?  Was he relaxed?  How would

18   you describe his manner?

19   A.    Well, he was mostly like I guess you can be like on

20   your defense when you know you done done something and

21   you're not knowing if somebody else is involved with that

22   person you done something to, so you're going to stay on

23   your defense.

24   Q.    And so he -- this Defendant said more than one time,

25   "I'll get a fair fight with anyone"?

1    A.    Yes.

2    Q.    What about either the teardrop guy or the man in the

3    black hoodie, were they saying anything?

4    A.    The guy with the black hoodie was mostly like stating

5    that he didn't care who know him, what kind of car he drove,

6    and that he stated that he drive the maroon car or purple

7    car and he lived out on 122nd or Hefner and May or something

8    like that, he stated.

9    Q.    And you kind of indicated during your testimony, was

10   the man in the black hoodie pointing to a particular car

11   that night?

12   A.    Yeah, he was pointing the car he was driving.

13   Q.    Okay.  Let me show you what we have previously

14   introduced as State's Exhibit Number 34 and ask if that is

15   the car that the man in the black hoodie was pointing at?

16   A.    Yes, ma'am.

17   Q.    And if you would, when -- at the time that the man in

18   the black hoodie is pointing at this car, are you standing

19   in close proximity to the car?

20   A.    I was standing in front of the car about where the

21   police officer is standing.

22   Q.    Okay.  So this is about where you were?

23   A.    Yes, ma'am.

24   Q.    And was the man in the black hoodie closer to the car

25   or was he more on this side?

1   A.   He was mostly on the left-hand side, yes.

2   Q.   Over here?

3   A.   Yes, back to where you was.

4   Q.   Over here?

5   A.   Yes, ma'am.

6   Q.   I'll just let you do it.

7   A.   He was mostly like on this side over here.

8   Q.   And, so, when the man in the black hoodie is saying, "I

9   don't care who knows what I drive," and tells where he

10   lives, what about the teardrop guy?  Is he doing anything?

11   Saying anything?

12   A.   I believe him and my nephew and the other kids and the

13   other people was just talking at that time.

14   Q.   So what happens next?

15   A.   They was asking -- my nephew kept saying that, "They

16   messed Rodney up.  Do you want to go see him?"  I was like,

17   "No, I don't care."  You know, I didn't know it was Rodney

18   Perry at that time.  He just kept a stating that, "They

19   messed Rodney up.  Do you want to go see him?"  I was like,

20   "No, I don't want to go see him because I'll check his

21   pockets and take his shoes," you know.

22   Q.   Why were you saying that?

23   A.   Not to mean it, just to be joking.  Because I didn't

24   want to go over there and look at anybody hurt.

25   Q.   So at that time, were you aware -- did you know who the

1    victim was?

2    A.    No, ma'am.

3    Q.    Did you later come to find out who the victim was?

4    A.    Oh, yes.

5    Q.    And did you know Rodney Perry?

6    A.    Yes, I've been knowing Rodney for a while.

7    Q.    And how did you first come to know or make Rodney

8    Perry's acquaintance?

9    A.    Well, he used to date my niece.

10   Q.    Okay.  All right.

11       So when Dewan Debose was saying, "They messed Rodney

12   up," at that time you didn't associate Rodney with Rodney

13   Perry?

14   A.    No, ma'am.

15   Q.    Was Rodney Perry living in Rockwell Villa Apartments on

16   February the 20th, 2004?

17   A.    No.

18   Q.    Okay.  And had it been some time since he had been

19   staying there or living there?

20   A.    Yes, it's been like a couple months prior.

21   Q.    Okay.  And, so, what happens next?  Your nephew is

22   telling you that they've messed Rodney up.  What happens

23   next?

24   A.    I was just basically just telling them -- the guys

25   after they was saying that and there was some more people

1   was standing there, like I say, talking to the teardrop guy

2   and I was mainly talking to my cousin, Andre, and One Fifth.

3   And somehow they all just like disappeared and went back

4   around the car.

5   Q.   Was there anything said about what they were going back

6   around the car for?

7   A.   I believe it was stated that some blood was on his

8   shoes.

9   Q.   On whose shoes?

10   A.   Teardrop dude's shoes.

11   Q.   And when it was stated or noticed that there was blood

12   on the teardrop guy's shoes, what was his reaction to blood

13   being on his shoes?

14   A.   I guess he wanted to go back and finish him off.

15   Q.   Did the teardrop guy go by himself?

16   A.   No, they all three left out of my vicinity.

17   Q.   Now, when you say that they went back around there to

18   where he was, where did they go?

19   A.   They went back to where Rodney was laying at.

20   Q.   Were you able to see where Rodney was laying at?

21   A.   I don't want to see those pictures.

22   Q.   Okay.  All right.  This photograph is just an aerial

23   photograph, and I'm sorry.  I didn't intend for you to see

24   those.

25        Are you okay?

1   A.    Yeah.

2   Q.    When we look at State's Exhibit Number 8, you've

3   indicated that you were standing about in this area talking;

4   that's where you met up with your nephew and the three men.

5   Does that look about right to you, right outside that

6   breezeway?

7   A.    Yes.

8   Q.    Where did they go when they went back around, as you

9   said, to finish him off?

10  A.    They went back around to where the car was parked, the

11  gray car where Rodney was laid up against.

12          THE COURT:  Would you care for some water,

13  Mr. Brazille?

14          THE WITNESS:  Please.  Thank you.

15  Q.    (BY MS. HIGH)  After the three men went back around the

16  side of the gray car where Rodney was laying, could you see

17  what was going on?

18  A.    No, I didn't see.

19  Q.    Could you hear?

20  A.    Yes.

21  Q.    Could you hear?

22  A.    I could hear like you're stomping and skin slapping.

23  Q.    And so what happened next?

24  A.    They all proceeded to come back over.

25  Q.    Back over to where you were standing outside of that

1    apartment building?

2    A.    Yes.

3    Q.    And what happened then?

4    A.    Well, that's when -- I was just telling them to just go

5    ahead and leave.  I mean, "you did enough damage to whoever

6    you done it to," still not knowing it was Rodney.

7    Q.    And was there any response or anything said back to you

8    by any of the three men?

9    A.    There could have been.  It's been a while, ma'am.

10   Q.    Okay.  And so what do you recall happening next?

11   A.    We all proceeded -- that's when they was getting in the

12   car.

13   Q.    All three getting in the car?

14   A.    Yes.

15   Q.    Okay --

16   A.    The --

17   Q.    I'm sorry.

18   A.    The guy that had the black hoodie on was the first one

19   that seated in the car.

20   Q.    Where in the car did he get?

21   A.    In the driver's seat.

22   Q.    And do you recall where this Defendant, Howard Morris,

23   got in the car?

24   A.    He got in on the passenger side but in the back seat.

25   Q.    And so where did the teardrop guy get?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    stairway.  I didn't go follow them or anything.

2    Q.    Going down those back stairway -- going down that back

3    stairwell, would that take you to that foot path that you

4    can take out the back way of the apartment complex?

5    A.    Yes.

6    Q.    Now, had you ever seen any of those three men, either

7    the teardrop guy, this Defendant or the guy in the black

8    hoodie, had you ever seen them before that night?

9    A.    No, ma'am.

10   Q.    And so when you use the name Howard, do you just know

11   that from having been in court and hearing lawyers say

12   Howard Morris?

13   A.    Yes.

14           MS. HIGH:  May I have just a moment, Judge?

15           THE COURT:  You may.

16           MS. HIGH:  Pass the witness.

17           THE COURT:  I think that I need to recess to work

18   on my other docket for a few minutes so I think I'm going to

19   go ahead and give you all a break.  I'll ask you to be back

20   in the courtroom at 3:45.  Ladies and gentlemen of the jury,

21   you are admonished.  Thank you.  Court's in recess.

22        (Thereupon, a recess was had, after which, with all

23        parties present, the following was had in open court

24        out of the hearing of the jury.)

25           THE COURT:  During the very brief break the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    bailiff made me aware that the jurors had expressed to her a

2    concern that your client was taking notes during jury

3    selection and because this is gang stuff, they don't know

4    what that means and they're concerned about their personal

5    security.

6          I went into the jury room during this break and

7    said to them that I don't generally talk to the jurors

8    during trial and that I had to be very limited in what I

9    said but that in my history with the court, I am unaware of

10   there ever being a time when jurors have been threatened or

11   intimidated, and that I was confident that Mr. Morris'

12   taking notes was so that he could communicate with you.

13         MR. BOX:  Absolutely.

14         THE COURT:  And would not be taking anything from

15   the courtroom.

16         MR. BOX:  No.

17         THE COURT:  And so I wanted to put on the record

18   their concern, also how I had handled it.  If you have

19   objections or something that you wish that I would do in

20   addition to that, I will be happy to address that.

21         MR. BOX:  At this point I don't have any.

22   Obviously the notes at the table weren't even to do with

23   even the individual particulars of the prospective jurors,

24   it was numbers only and he was just circling numbers that he

25   didn't like or liked.  So that's all that it was.

1              IN THE DISTRICT COURT OF OKLAHOMA COUNTY

2                      STATE OF OKLAHOMA,

3

4  THE STATE OF OKLAHOMA,          )

5             Plaintiff,           )

6  VS.                             )   CASE NO. CF-04-1212

7  HOWARD PURIFOR MORRIS, III,     )

8             Defendant.           )

9

10                  * * * * * * * *

11

12              TRANSCRIPT OF PROCEEDINGS,

13                    JURY TRIAL,

14              HAD ON APRIL 5, 2006,

15  AND FORMAL SENTENCING HAD ON APRIL 14, 2006,

16        BEFORE THE HONORABLE TWYLA MASON GRAY,

17                  DISTRICT JUDGE.

18

19                  * * * * * * * * *

20                  **VOLUME 3 OF 3**

21

22  REPORTED BY:

23  THERESA L. REEL, RPR

24  321 PARK AVENUE, SUITE 201

25  OKLAHOMA CITY, OK  73102

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

APR 2 8 2006

PAT...............  CLERK
By_____
Deputy

F-2006-428

COPY

RECEIVED
JUL 27 2006
Attorney General

EXHIBIT
5

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANS...

1    be -- there was a sincere feeling of apprehension or fear --

2    I'm not putting words in your mouth -- because of this?  I

3    mean you had some concern?

4              JUROR DEMERS:  Yeah.  I think just in general.  I

5    don't think it had anything to do with even with -- with

6    what the case was about, just at that time we didn't know --

7    at the time that he was taking notes we didn't know

8    anything.  So...

9              MR. BOX:  Also, and I'm just curious, it kind of

10   struck a nerve, but you were asked by the Judge, "Well, do

11   you have any thoughts about this case," and you said you had

12   some thoughts.

13             THE COURT:  No, what I said was, had she formed an

14   opinion as to the Defendant's guilt or innocence and she

15   said she had some thoughts, which I certainly think is a

16   normal thing.

17             MR. BOX:  Sure.  I'm not putting words in your

18   mouth.  Yeah, sure.  I have no further questions.

19             THE COURT:  Thank you so much.  We'll see you in a

20   minute.

21             JUROR DEMERS:  All right.

22             (Juror Demers exited.  Juror Myers entered.)

23             THE COURT:  Good morning, sir.  Have a seat.

24   You're not in trouble.  Nobody is in trouble.  Let me just

25   say that.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    JUROR MYERS:  Nobody ever comes back from these

2    deals.

3    THE COURT:  Mr. Myers, we're just putting people

4    in a different room.  There's no ultimate danger here.

5    Mr. Myers, yesterday afternoon someone stressed a

6    concern to the bailiff and then I came in and visited with

7    you all.  You remember that?

8    JUROR MYERS:  Yeah.

9    THE COURT:  Sir, were you guys discussing the case

10    itself in the jury room?

11    JUROR MYERS:  No.

12    THE COURT:  Were you one of the people that

13    expressed some concern about security or some apprehension

14    about anything?

15    JUROR MYERS:  I don't think so.  I agreed with it

16    when I heard it but I didn't bring it up.

17    THE COURT:  Okay.  I think I stated clearly

18    yesterday, but let me state again, most of the time when a

19    Defendant is writing things in the courtroom they're

20    communicating with their lawyer and these -- they don't have

21    the opportunity to take all these notes and stuff out of the

22    courtroom.

23    JUROR MYERS:  Good.

24    THE COURT:  Mr. Myers, at this point in the trial

25    have you formed an opinion as to whether or not the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   Defendant is guilty or not guilty?

2          JUROR MYERS:  No.  He's still innocent.  I haven't

3   heard the whole deal.

4          THE COURT:  All right.  Can you be a fair and

5   impartial juror in this case?

6          JUROR MYERS:  I think so.

7          THE COURT:  Do you have any concern at all that we

8   need to visit with you about?

9          JUROR MYERS:  I haven't talked to anybody about

10  this but I'm concerned.  Number one, I want to tell you that

11  my wife was a juror about 15 years ago and I think it was

12  under the different rules that you were talking about that

13  the Defendant was there and the individual jurors were asked

14  questions about where they lived and the juror -- the

15  Defendant was writing all this stuff down.

16         THE COURT:  Okay.

17         JUROR MYERS:  And it was like they were writing it

18  all down.  That's what the Defendant was writing down.  And

19  my wife thought that was a little odd that they know all

20  about us but we don't know anything about them.

21         THE COURT:  Mr. Box, when I went back into the

22  jury room yesterday I told them that once upon a time was a

23  rule that jurors --

24         JUROR MYERS:  Yeah, that was 15 years.

25         THE COURT:  -- that jurors gave their addresses

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    but that that was no longer the rule and partially because

2    it made people uncomfortable and we don't want them to be

3    uncomfortable about this.  As far as you know --

4        JUROR MYERS:  One other concern.

5        THE COURT:  As far as you know, did anything

6    happen has a result of that information being given to that

7    individual in the courtroom 15 years ago?

8        JUROR MYERS:  No.  No, it was just a goosey

9    feeling that my wife had.

10       THE COURT:  Okay.  I just wanted to clarify.

11       JUROR MYERS:  If we don't convict this guy, we're

12   going to turn him loose and he's got my address.  Or if we

13   do convict him, he's going to give it to his buddy and the

14   buddy is going to come and get me.

15       THE COURT:  The second concern that you had?

16       JUROR MYERS:  Seems like this is a gang-related

17   case.  Nobody has said that.  It hasn't come up in the court

18   but I'm worried if we don't convict the guy, we're going to

19   turn him loose in the community.

20       And I know that I'm only supposed to be concerned

21   about the evidence and I'm thinking about what I was.  And I

22   know that I'm supposed to only think about the stuff that's

23   presented in the case in the courtroom, evidence.

24       THE COURT:  You're right.  You are.  And here is

25   kind of what I would tell you.  At the conclusion of this

1   case, undoubtedly you're going to have questions and we'll

2   do our best to answer them but all of the what ifs are not

3   addressed in the law that I give you.

4           JUROR MYERS:  I'm supposed to ignore all that

5   stuff.

6           THE COURT:  That's right.  Can you do that?

7           JUROR MYERS:  Yeah.  I won't like it but that's

8   what my job is.

9           THE COURT:  Okay.  Do you have any doubt in your

10  mind that you can be fair and impartial in this case?

11          JUROR MYERS:  No.  That's what I'm going to do.

12          THE COURT:  Okay.  Great.

13          MR. BOX:  I have a couple of questions.  It's

14  obviously became quite apparent that there was some

15  discussion yesterday afternoon in the jury room about some

16  sort of, for lack of a better word, apprehension that my

17  client was taking notes at the table during voir dire, is

18  that correct?

19          JUROR MYERS:  Yes.

20          MR. BOX:  And you said that you might have joined

21  in, you didn't initiate that conversation, you may have

22  joined in to the conversation, is that correct?

23          JUROR MYERS:  One guy said he was going to go

24  talk.  I said, "Yeah, go find out about that."

25          MR. BOX:  Was there some serious concern or fear

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   raised by members of the jury that they had fear for my

2   client?

3          JUROR MYERS:  No, I think it was just kind of a

4   general -- a general, how come he's writing notes.

5          MR. BOX:  Was there a fear that will he would do

6   something or somebody he knew would do something, or if you

7   know?

8          JUROR MYERS:  We didn't know.  It wasn't a big

9   deal.  It was a concern that was expressed by the fella with

10  the shaved head and the beard and I don't know his name and

11  I was sitting next to him.  And I said, "Yeah, go find out

12  about that.  We need to find out."

13         THE COURT:  You understand the admonishment that I

14  give you guys every time you leave the courtroom?

15         JUROR MYERS:  You bet.

16         THE COURT:  You understand the reason for it?

17         JUROR MYERS:  You bet.

18         THE COURT:  Do you have any questions for us?

19         JUROR MYERS:  No.

20         THE COURT:  All right.  Thank you very much for

21  your time, sir.  We're going to see you in a minute.  Okay.

22      (Juror Myers exited.)

23         THE COURT:  I've got to tell you guys that I think

24  what we're seeing here is pretty normal, healthy reactions

25  of jurors that we don't normally get to see.  We're not

1   usually informed about their concerns and I think what I'm

2   seeing is very typical of every jury, so far.

3            MR. BOX:  I am a little concerned about one

4   statement he just made that he kind of indicated that part

5   of his brain, for lack of a better word, was influenced by

6   this gang testimony.

7            THE COURT:  Well, he also said he was going to

8   absolutely set it aside and I think that that conscious

9   decision may be better than what sometimes happens.

10        (Juror Peters entered.)

11            THE COURT:  Good morning.  Have a seat,

12   Mr. Peters, you're not in trouble.  Nobody is in trouble so

13   I know this looks like you're being called to the

14   principal's office.

15            JUROR PETERS:  I'm not worried.

16            THE COURT:  Because we just needed to talk to

17   everybody individually and I thought this was better than in

18   the courtroom.

19            JUROR PETERS:  Okay.

20            THE COURT:  Mr. Peters, yesterday afternoon, I

21   think some people had some concerns and they talked to the

22   bailiff and I came in the jury room and visited with you.

23   Do you remember that?

24            JUROR PETERS:  Yes.

25            THE COURT:  Were you one of the people that had a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    of the side of the car and then moved by EMSA to this

2    position.

3           Now, do you think those witnesses are so

4    sophisticated that they could get together and make that up

5    to where it just happens to fit?  Is that what you think

6    this is?  A conspiracy between Demetria Tinner, Kyle Laws,

7    Kurt Brazille, is that what this is?

8           This Defendant couldn't even give you a reason

9    that these people would all get together and do this.

10   You've heard no evidence that would indicate to you these

11   people are not telling you what they saw.

12          Instruction number 3 talks to you -- because you

13   know the evidence is the testimony, the stipulations, and

14   the exhibits.  Well, instruction number 3 tells you -- sort

15   of breaks it down into two further categories, direct and

16   circumstantial evidence.

17          Direct evidence is what you have in this case.

18   You have eyewitness identifications.  You know that.

19   Circumstantially you can take -- and it says circumstantial

20   evidence is the proof of facts or circumstances which gives

21   rise to a reasonable inference of other connected facts that

22   tend to show the guilt or innocence of a Defendant.

23          Well, circumstantial evidence is that example that

24   we talked about in voir dire.  Pan of brownies on the table,

25   come home, it's gone, dog has got chocolate all over its

1    friend in an apartment complex and you drive up on this

2    horrific scene.

3              Who would want to be involved in this?  Who would

4    want to take that stand and point the finger at Howard

5    Morris unless it were true?  There is no evidence presented

6    in this case whatsoever that Demetria Tinner took the stand

7    to do anything but to tell the truth.  No conspiracy shown,

8    no bias.  What can she gain by taking the stand and pointing

9    the finger at Howard Morris?  Nothing.

10             Next, Mr. Box says, "Well, you all need to make a

11   big deal about the point that these witnesses say that four

12   people were involved."  Well, the fact of the matter is, it

13   doesn't matter if these witnesses said there were four

14   people involved or five people or three or six.

15             You know, those people, maybe they're out there.

16   And if they are, maybe one day we'll find them, but what's

17   relevant here is whether Howard Purifor Morris committed

18   these crimes and that's what these witnesses have told you

19   he did.  It doesn't matter that these individuals say there

20   were three or four.  What matters is they said that all of

21   these black males were participating.

22             Next, he says that there are inconsistencies involving

23   Demetria Tinner's testimony about these individuals leaving

24   the scene in a car.  Well, you know, we're going to admit

25   that I think Demetria Tinner was mistaken on that point.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    How do we know that happened?  Well, imagine the

2   brutality that Kurt Brazille had to experience in his mind

3   when he heard -- he didn't see, he heard this beating take

4   place.  Imagine hearing a beating of this magnitude taking

5   place, the slapping of the skin.

6        And then the third prong of this triangle is Dewan

7   Debose who witnessed beating one and beating two.  He

8   witnessed the initial beating and he witnessed the second

9   incident where Howard Purifor Morris and others returned to

10   the body.

11        These individuals did not see Howard Morris stick

12   his head in the door, because I'm telling you if someone

13   stuck their head in the door right now, it would be pretty

14   hard to identify them.  They observed a course of conduct.

15   They observed beating one and beating two.  That's why they

16   are credible.  That's why they are credible.

17        And so reasons to find Howard Purifor Morris

18   guilty of Murder in the First Degree:  First, the

19   eyewitnesses identify Howard Morris as the killer of the

20   initial beating and the follow-up beating; and we talked

21   about this, Demetria Tinner, the initial beating; Kurt

22   Brazille the follow-up beating; Dewan Debose, both.  That's

23   what lends them so much credibility.

24        Second, the Defense never shows any reason to

25   question eyewitness credibility.  Mr. Box never establishes

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   a conspiracy among these individuals to lie.  He has the

2   right to present evidence of that and he didn't.  What can

3   they gain by doing so?  And, secondly, wouldn't you expect a

4   more complete thorough and unquestionable story if they did

5   indeed conspire to lie?

6           MR. BOX:  Objection, Your Honor.  May I approach?

7           THE COURT:  You may.

8       (Thereupon, the following was had at the bench.)

9           MR. BOX:  Your Honor, I take issue with this part

10  of the closing argument.  The Defendant has no obligation to

11  recall any testimony.  The burden is strictly on the State

12  of Oklahoma and any comment that the Defense is lacking in

13  putting on particular evidence I believe is improper.

14          MS. HIGH:  Judge --

15          THE COURT:  I don't believe that what he said

16  shifts the burden.  He just said that you never established

17  that.

18      (Thereupon, the following was had in open court.)

19          MR. GUHL:  Mr. Box has shown know evidence of bias

20  in this case.  Mr. Box has a right to examine these

21  witnesses and say, "Well, why would you be biased against my

22  client or why would you be biased toward Rodney Perry?"

23  Well, ultimately these individuals didn't even know it was

24  Rodney Perry lying on the ground at first.  Why would they

25  be biased?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1

IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

2                    STATE OF OKLAHOMA

APR 2 1 2005

3    THE STATE OF OKLAHOMA,           )
                                      )    PATRICIA PRESLEY, COURT CLERK
4              Plaintiff,             )    By_____
                                      )         Deputy
5    vs.                              )    Case No. CF-2004-1212
                                      )
6    HOWARD PURIFOR MORRIS, III,      )    F-2006-428
                                      )
7              Defendant.             )

                    * * * * *

8

9         TRANSCRIPT OF PRELIMINARY HEARING PROCEEDINGS

10          HAD ON THE 25TH DAY OF MARCH, 2005

11          BEFORE THE HONORABLE D. FRED DOAK

12                   SPECIAL JUDGE

                    * * * * *

13

14              A P P E A R A N C E S

15   For the State:        Christy Miller
                           Assistant District Attorney
16                         Patrick Crawley
                           Assistant District Attorney
17                         County Office Building
                           Oklahoma City, Oklahoma

18

19   For the Defendant:    Chris Box
                           Attorney at Law
20                         2208 Southwest 59th Street
                           Oklahoma City, Oklahoma

21

22                         RECEIVED

23                         JUL 27 2006

                           Attorney General

24   Reported By:
     Kim Fowler, C.S.R.

25                              COPY

1    Mr. Crawley.

2    Whereupon,

3                    DEWAN SALVADORE DEBOSE,

4    was called as a witness on behalf of the State of Oklahoma

5    and, having been first duly sworn, was examined and testified

6    as follows

7             THE COURT:  Would you please tell me your full name?

8             THE WITNESS:  Dewan Salvadore DeBose.

9             THE COURT:  Would you say your middle name again?

10            THE WITNESS:  Salvadore.

11            THE COURT:  Salvadore?  Thank you, sir.

12            Mr. Crawley, you may inquire.

13                    DIRECT EXAMINATION

14   BY MR. CRAWLEY:

15   Q    Mr. DeBose, draw your attention back to the 20th day of

16   February of 2004.  Were you -- did you have occasion to be at

17   the Rockwell Villa Apartments on that day?

18   A    Yes, sir.

19   Q    And do you know where those -- where are those apartments

20   located?

21   A    Tenth and Rockwell.

22   Q    Is that Oklahoma County?

23   A    Yes, sir.

24   Q    And drawing your attention to at or around 11 o'clock in

25   the evening on the 20th of February, did something unusual

1    occur?

2    A    Yes, sir.

3    Q    And what was that?

4    A    The death of Rodney Perry.  The death of Rodney Perry.

5    Q    All right.  And did you witness the death of Rodney

6    Perry?

7    A    Yes, I did.

8    Q    All right.  Would you tell us what you -- well, first

9    let's begin here.  What were you doing at the Rockwell Villa

10   Apartments?

11   A    I was standing in front of my cousin's apartment.

12   Q    And who is your cousin?

13   A    Paula.

14   Q    All right.  And what happened -- and where was Rodney

15   Perry killed?

16   A    He was killed in Rockwell Villa.

17   Q    I know --

18   A    Where?

19   Q    Yes, sir.  Where in the apartment complex?

20   A    In the middle, like at the beginning of the front, by a

21   car.

22   Q    All right.  In the parking lot?

23   A    Yes, sir.

24   Q    All right.  And are there mailboxes?

25   A    Yes.

1    Q    Where are the mailboxes located from where you saw him

2    get killed?

3    A    Like in front of -- in front of Rodney.

4    Q    Excuse me?

5    A    In front of Rodney.

6    Q    Okay.  In front of where Rodney was at?

7    A    Well, not in front of him, but on the side, but they was

8    like off -- off the parking lot on the sidewalk.

9    Q    All right.  Well, why don't you just tell us exactly what

10   you saw and start at the beginning.

11   A    I was standing in front of my cousin's apartment, and I

12   seen three men standing across the street in front of a car,

13   and they was talking or whatever.  And Rodney walked out of

14   the breezeway and said something to one of the dudes, and they

15   just start arguing or whatever, you know what I'm saying.  And

16   Rodney backed up, and the dude said something, and Rodney

17   pushed him, and Rodney got to backing up, saying, you all

18   leave me alone, you all leave me alone, you know what I'm

19   saying.  The three men jumped him on the other side of the

20   car.

21   Q    All right.  Now, you were referring to them as dudes and

22   this sort of thing.  Are you talking about three men that you

23   saw?

24   A    Yes, three men.

25   Q    And they had they had some kind of confrontation with

1    Rodney?

2    A    One of them did.

3    Q    And you knew Rodney Perry?

4    A    Yes, sir, that was like --

5    Q    How long have you known him?

6    A    For since I was like ten years old.

7    Q    Okay.  All right.  After the confrontation, you say

8    Rodney pushed one of the men?

9    A    Yes.

10   Q    And then he backed up and said, you all leave me alone?

11   A    Yes.

12   Q    Then what happened?

13   A    And he was trying to get away, and one of the dudes swung

14   at him and hit him, and he was fighting them back.  And then

15   after a while they start jumping him.  Two went behind --

16   behind the cars and one went onto the sidewalk, and they

17   trapped him on the side of the car and started beating him up

18   and stomping him.

19   Q    When you say beating him up and then stomping him, was he

20   standing on his feet when the fight began?

21   A    When the fight began, yes, but when they got on the other

22   side of the car, he wasn't.

23   Q    All right.  Did he get knocked down?

24   A    Yes.

25   Q    All right.  Then what happened?

1    A    They started kicking him and bamming (phonetic) his head
2    into the car.
3    Q    All right.  Then what happened?
4    A    They killed him.
5    Q    All right.  After you saw them kicking and stomping on
6    him, did you have any conversation or contact with the three
7    men at all?
8    A    No.  They just ran up and said, yeah, we got him, we got
9    him, and all of my family started running down because they
10   thought it was happening to me.
11   Q    You say all your family.  Do you know Kurt Brazille?
12   A    That's my uncle.
13   Q    All right.  Did he come down?
14   A    Yes, sir.
15   Q    All right.  And did you have a conversation with Mr.
16   Brazille?
17   A    No.
18   Q    Okay.  When your family came down, what happened?  What
19   did the three men do?
20   A    They was just talking about how he's over there knocked
21   out and how they -- how they did him or whatever, and that's
22   it.
23   Q    All right.
24   A    And they -- after that we walked up to my uncle's house,
25   and the police was on their way, and one of the men ran, and

1    two of the men came up to my uncle's house.

2    Q    All right.  The three men that you saw kill Rodney Perry,

3    have you -- well, let me back up and say this.  Back in July

4    of last year, did you testify at a preliminary hearing on that

5    day?

6    A    On what day?

7    Q    Well, in July -- July 27th?

8    A    Yes.

9    Q    Okay.  And you recall testifying on that day?

10    A    Yes.

11    Q    And were two of the men that were -- of the three in

12    court that day?

13    A    Yes.

14    Q    And you identified them as two of the individuals in the

15    fight?

16    A    Yes.

17    Q    The third individual that was in the fight that wasn't in

18    court on that day, is he in court today?

19    A    Yes.

20    Q    Do you see -- would you point him out, describe where

21    he's sitting, how he's dressed for the record, please?

22    A    He's sitting over there (indicating) behind the man in

23    the blue jacket in orange with glasses on.  He's a black male.

24        MR. CRAWLEY:  Your Honor, if the record would

25    reflect identification of the Defendant?

1          THE COURT:  So noted.

2     Q    (By Mr. Crawley)  After you observed the three men to

3     beat and stomp Rodney Perry, what, if anything, did they do

4     immediately after that?

5     A    Can you rephrase that question?

6     Q    Well, did they immediately go run -- jump in a car and

7     leave, or what did they do?

8     A    No.  They sat there and talked for a minute, and then --

9     and then they left, and then one of them went and jumped the

10    fence, and then the other two went up to my uncle's house, was

11    trying to use the phone, and my uncle let them use the phone.

12    Q    Now, the beating and stomping that you observed, did that

13    all occur in one continuous incident?

14    A    Yes.  Like one beating?

15    Q    Was there a time that they stopped, walked away, and then

16    went back?

17          MR. BOX:  Objection, leading, Your Honor.

18          THE COURT:  Sustained.

19          MR. CRAWLEY:  All right.  Let me rephrase it.

20    Q    (By Mr. Crawley)  Was the beating that you saw, when they

21    were beating and stomping on him, was that in one continuous

22    beating and stomping?

23    A    Yes, it was.  They went -- they went and beat him, and

24    then they left, and then they, you know what I'm saying, went

25    back and beat him again and then left again.

Westlaw.

7 Fed.Appx. 894

Page 1

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
David Jay BROWN, Petitioner-Appellant,
v.
Gary GIBSON, Warden, Oklahoma State Penitentiary, Respondent-Appellee.
No. 99-6419.

April 12, 2001.

Following affirmance of conviction and death sentence for first-degree murder, 871 P.2d 56, state prisoner petitioned for habeas corpus. The district court denied relief, and petitioner appealed. The Court of Appeals, Brorby, Circuit Judge, held that: (1) ineffective assistance of trial counsel was not shown; (2) state procedural bar was not adequate as to one claim; (3) ineffective assistance of appellate counsel was not established, to excuse procedural defaults; (4) argument asserting legal, not factual, innocence did not overcome procedural default; (5) prosecutor's comment on mitigating evidence did not warrant relief; (6) petitioner knowingly, voluntarily and intelligently waived the right to be present at the penalty phase of trial; (7) evidence did not require a second-degree murder instruction; and (8) determination of state appellate court that sufficient evidence existed to support the continuing threat aggravator was reasonable.

Affirmed.

West Headnotes

**[1] Habeas Corpus 197 ⟨key⟩841**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(D) Review
            197III(D)2 Scope and Standards of Review
                197k841 k. In General. Most Cited Court of Appeals may affirm the denial of habeas relief on whichever prong of the *Strickland* test of ineffective assistance of counsel is easier to resolve. U.S.C.A. Const.Amend. 6.

**[2] Habeas Corpus 197 ⟨key⟩486(4)**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k482 Counsel
                197k486 Adequacy and Effectiveness of Counsel
                    197k486(4) k. Evidence; Procurement, Presentation, and Objection. Most Cited Cases Determination of the Oklahoma Court of Criminal Appeals that trial counsel did not provide ineffective assistance at murder trial, by failing to obtain and use available evidence proving petitioner was afraid of victim and acted in self-defense, was a reasonable application of *Strickland,* and thus did not warrant federal habeas relief, where petitioner presented no evidence that he informed counsel of a prior gunshot wound he allegedly suffered at victim's behest, even if he did inform counsel, he did not overcome the presumption that counsel's performance was strategic, and in light of the total evidence presented at trial, there was no reasonable probability the result at trial would have been different if counsel had presented this evidence. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d)(1).

**[3] Criminal Law 110 ⟨key⟩1892**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT
7

7 Fed.Appx. 894
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1892 k. Preparation for Death Penalty Matters. Most Cited Cases
(Formerly 110k641.13(6))
In a capital case, an attorney's duty to investigate all possible lines of defense is strictly observed. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞1890**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1890 k. In General. Most Cited Cases
(Formerly 110k641.13(1))
Defendant could not show prejudice, and therefore counsel was not ineffective in failing to take actions which lacked merit. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1961**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1958 Death Penalty
110k1961 k. Presentation of Evidence in Sentencing Phase. Most Cited Cases
(Formerly 110k641.13(7))
Because defendant had notice at the preliminary hearing, he failed to show prejudice from failure of counsel to object to inclusion of certain first stage evidence into the second stage of capital murder trial. U.S.C.A. Const.Amend. 6.

**[6] Habeas Corpus 197 ☞486(5)**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General

197k482 Counsel
197k486 Adequacy and Effectiveness of Counsel
197k486(5) k. Post-Trial Proceedings; Sentencing, Appeal, Etc. Most Cited Cases
Determination of the Oklahoma Court of Criminal Appeals that counsel was not ineffective in failing to investigate additional mitigating evidence in capital murder trial, because petitioner did not show prejudice, was a reasonable application of *Strickland*, and thus did not warrant federal habeas relief, where strong evidence supported the conviction and continuing threat aggravator, and though additional childhood evidence was admissible mitigating evidence, petitioner presented no evidence indicating his childhood had an effect on his ability to conform his conduct to noncriminal behavior. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d)(1).

**[7] Habeas Corpus 197 ☞403**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
197k403 k. Invalidity of State Procedural Requirement; Inconsistent Application. Most Cited Cases
State procedural bar, that petitioner waived his claim that trial counsel should have investigated and presented evidence of petitioner's psychological problems in capital murder trial because petitioner obtained, or could have obtained, this information earlier, was not adequate to preclude consideration of the merits of this claim in federal habeas proceeding, where the Oklahoma Court of Criminal Appeals applied the same procedural bar inconsistently in the same case when it found procedural bar with respect to the mental health evidence but not with respect to the other mitigating evidence.

**[8] Habeas Corpus 197 ☞403**

197 Habeas Corpus

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 4 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 3 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 241

Page 3

7 Fed.Appx. 894
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

1971 In General
    197I(D) Federal Court Review of Petitions by State Prisoners
        197I(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
            197k403 k. Invalidity of State Procedural Requirement; Inconsistent Application. Most Cited Cases
To be adequate to bar consideration of issue in federal habeas proceeding, state courts must apply a state procedural bar consistently.

**[9] Criminal Law 110 ☞1931**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1931    k.    Experts;    Opinion Testimony. Most Cited Cases
        (Formerly 110k641.13(6))

**Criminal Law 110 ☞1960**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1960 k. Adequacy of Investigation of Mitigating Circumstances. Most Cited Cases
        (Formerly 110k641.13(7))
Trial counsel's failure to seek a mental health expert in capital murder trial did not result in prejudice, so as to constitute ineffective assistance, as conclusions of psychologist who evaluated defendant in prison, speculating that he had a brain dysfunction secondary to chronic alcohol and drug abuse, were not compelling, and due to the callous nature of the crime and the abundant evidence supporting the guilty verdict and the continuing threat aggravator, no reasonable probability existed the outcome at either stage of trial would have been

different if psychological evidence had been presented. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ☞1967**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1966 Appeal
                    110k1967 k. In General. Most Cited Cases
        (Formerly 110k641.13(7))
Ineffective assistance of appellate counsel claims are    governed    by    *Strickland.*    U.S.C.A. Const.Amend. 6.

**[11] Criminal Law 110 ☞1969**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1966 Appeal
                    110k1969 k. Raising Issues on Appeal; Briefs. Most Cited Cases
        (Formerly 110k641.13(7))
Appellate counsel's performance may be deficient and prejudicial only if counsel failed to argue a "dead-bang winner." U.S.C.A. Const.Amend. 6.

**[12] Criminal Law 110 ☞1969**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1966 Appeal
                    110k1969 k. Raising Issues on Appeal; Briefs. Most Cited Cases
        (Formerly 110k641.13(7))
None of habeas petitioner's claims, based on failure of trial counsel to object to hearsay, failure to impeach witnesses with inconsistent statements, and failure to object to prosecutor's demonstration, was a "dead-bang winner," in light of the strong evid-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                    Page 4

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

ence against petitioner, so that failure to raise claims on direct appeal was not ineffective assistance of appellate counsel. U.S.C.A. Const.Amend. 6.

**[13] Habeas Corpus 197 ☞816**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
     197III(D) Review
      197III(D)1 In General
       197k816 k. Presentation and Reservation in Lower Habeas Court of Grounds of Review. Most Cited Cases
Court of Appeals would not consider evidence not presented to the district court with respect to any claims raised on appeal from denial of habeas corpus.

**[14] Habeas Corpus 197 ☞401**

197 Habeas Corpus
   197I In General
     197I(D) Federal Court Review of Petitions by State Prisoners
      197I(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
       197k401 k. In General. Most Cited
To prove a fundamental miscarriage of justice, as a basis for overcoming a procedural default, a habeas petitioner must make a threshold showing of actual innocence.

**[15] Habeas Corpus 197 ☞401**

197 Habeas Corpus
   197I In General
     197I(D) Federal Court Review of Petitions by State Prisoners
      197I(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
       197k401 k. In General. Most Cited
Habeas petitioner's argument asserting legal, not factual, innocence, to effect that he acted in self de-

fense, could not show a fundamental miscarriage of justice, based on actual innocence, so as to overcome procedural default.

**[16] Habeas Corpus 197 ☞480**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
     197II(B) Particular Defects and Authority for Detention in General
      197k480 k. Discovery and Disclosure. Most Cited Cases
There was no likelihood the result at murder trial would have been different if state investigative report, stating that witness reported a threat by defendant against the victim and others, had been disclosed or if counsel had used it, assuming counsel had the report, and thus habeas relief was not warranted, where witness denied making the statement, in any event, it was doubtful the jury gave much credence to her testimony, and even without her testimony, much evidence shows petitioner made threats against victim.

**[17] Habeas Corpus 197 ☞508**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
     197II(B) Particular Defects and Authority for Detention in General
      197k503 Judgment, Sentence, or Order
       197k508 k. Death Sentence. Most Cited Cases
State appellate court's finding of no fundamental error with respect to admission of evidence, at penalty stage of capital murder trial, of defendant's killing of a puppy was reasonable, so that federal habeas relief was not warranted, though the jury probably considered this evidence when considering the continuing threat aggravator, as much other evidence also supported the aggravator. 28 U.S.C.A. § 2254(d).

**[18] Habeas Corpus 197 ☞497**

197 Habeas Corpus

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5

7 Fed.Appx. 894
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

1971I Grounds for Relief; Illegality of Restraint
    1971I(B) Particular Defects and Authority for Detention in General
        197k497 k. Prosecutorial and Police Misconduct; Argument. Most Cited Cases
State appellate court's finding of no reversible error in prosecutor's asking defendant if he had called murder victim's wife and inquired if she wanted to have oral sex with him, in light of the overwhelming evidence against him, was reasonable, and did not warrant federal habeas relief, particularly where the trial court sustained the objection to this question. 28 U.S.C.A. § 2254(d).

**[19] Habeas Corpus 197 ☞490(6)**

197 Habeas Corpus
    1971I Grounds for Relief; Illegality of Restraint
        1971I(B) Particular Defects and Authority for Detention in General
            197k489 Evidence
                197k490 Admissibility
                    197k490(6)  k.  Other  Offenses.
Most Cited Cases
State appellate court's findings of no fundamental error with respect to prosecutor's asking witness if she had seen petitioner's former wife after he had abused her, and that there was no admission of evidence of a bad act with respect to incident in which petitioner drove a bulldozer on the property of the victim, his former father-in-law, because the trial court sustained an objection before witness answered the question, were reasonable, and did not warrant federal habeas relief. 28 U.S.C.A. § 2254(d).

**[20] Habeas Corpus 197 ☞495**

197 Habeas Corpus
    1971I Grounds for Relief; Illegality of Restraint
        1971I(B) Particular Defects and Authority for Detention in General
            197k495 k. Witnesses; Examination. Most Cited Cases
State appellate court's conclusion that erroneous admission of inadmissible hearsay to impeach a wit-

ness, to effect that witness had reported another person told her petitioner had threatened to kill murder victim, did not require reversal because witness denied making the statement and there was other evidence of petitioner's threats was reasonable, and did not warrant habeas relief. 28 U.S.C.A. § 2254(d).

**[21] Habeas Corpus 197 ☞508**

197 Habeas Corpus
    1971I Grounds for Relief; Illegality of Restraint
        1971I(B) Particular Defects and Authority for Detention in General
            197k503 Judgment, Sentence, or Order
                197k508  k.  Death  Sentence.  Most Cited Cases
Determinations of state appellate court that there was no evidence that petitioner intended to call his mother as a second-stage witness in murder trial and that any error in the prosecutor's eliciting fact that the mother's current address was a prison was harmless were reasonable, and did not warrant habeas relief, where petitioner failed to show how this questioning precluded him from presenting mitigating evidence, and none of his second-stage witnesses had criminal records, so that it was not likely the prosecutor tried to portray him as coming from a family of criminals. 28 U.S.C.A. § 2254(d).

**[22] Habeas Corpus 197 ☞508**

197 Habeas Corpus
    1971I Grounds for Relief; Illegality of Restraint
        1971I(B) Particular Defects and Authority for Detention in General
            197k503 Judgment, Sentence, or Order
                197k508  k.  Death  Sentence.  Most Cited Cases
State appellate court's determination that prosecutor's statement, that witnesses who had testified for defendant at penalty stage of capital murder trial "of course, for the most part were family witnesses. And you observed their demeanor on the stand," was more a comment on the sufficiency of the evidence than a comment the people who produced that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 7 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 6 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 244

7 Fed.Appx. 894                                                    Page 6
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

evidence were lying was reasonable, and thus did not warrant habeas relief. 28 U.S.C.A. § 2254(d).

**[23] Sentencing and Punishment 350H ⟜ 1780(2)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
     350HVIII(G) Proceedings
      350HVIII(G)3 Hearing
       350Hk1780 Conduct of Hearing
        350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases
The prosecutor is entitled to comment on the weight to be afforded mitigating evidence, in sentencing phase of capital trial.

**[24] Habeas Corpus 197 ⟜508**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
     197II(B) Particular Defects and Authority for Detention in General
      197k503 Judgment, Sentence, or Order
       197k508 k. Death Sentence. Most Cited Cases
Although state prosecutor may have improperly injected his personal opinion, at penalty stage of capital murder trial, by stating there was insufficient mitigating evidence to outweigh the aggravating circumstances, his doing so did not result in fundamental error, warranting habeas relief.

**[25] Criminal Law 110 ⟜957(1)**

110 Criminal Law
   110XXI Motions for New Trial
     110k948 Application for New Trial
      110k957 Statements, Affidavits, and Testimony of Jurors
       110k957(1) k. In General. Most Cited Cases
A single juror may not impeach a jury's verdict.

**[26] Habeas Corpus 197 ⟜496**

197 Habeas Corpus

   197II Grounds for Relief; Illegality of Restraint
     197II(B) Particular Defects and Authority for Detention in General
      197k496 k. Jury. Most Cited Cases
Assuming that Court of Appeals, on a habeas appeal, could consider black juror's affidavit that he violated his oath in capital murder case in order to get along in the community and to appease the white jurors, even though he believed this was a case of self-defense, the affidavit did not warrant habeas relief, as it made nonspecific allegations and juror did not indicate why he did not bring evidence of alleged racial pressures to the trial court's attention before the jury reached its verdicts. 12 Okl.St.Ann. § 2606(B).

**[27] Constitutional Law 92 ⟜4614**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
       92k4613 Presence and Appearance of Defendant and Counsel
        92k4614 k. In General. Most Cited Cases
   (Formerly 92k268(6))

**Constitutional Law 92 ⟜4745**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(H) Criminal Law
      92XXVII(H)6 Judgment and Sentence
       92k4741 Capital Punishment; Death Penalty
        92k4745 k. Proceedings. Most Cited Cases
   (Formerly 92k268(6))

**Criminal Law 110 ⟜662.70**

110 Criminal Law
   110XX Trial
     110XX(C) Reception of Evidence
      110k662 Right of Accused to Confront

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                                      Page 7
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

Witnesses
      110k662.70 k. Proceedings in Absence of Accused. Most Cited Cases
A defendant has a right, under the confrontation and due process clauses, to be present at all stages of a criminal trial, including capital sentencing, but a defendant may waive his right to be present, or he may lose that right through misconduct. U.S.C.A. Const.Amends. 6, 14.

**[28] Criminal Law 110 ⇐══1144.11**

110 Criminal Law
    110XXIV Review
        110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record
                110k1144.11 k. Presence of Accused. Most Cited Cases
The Court of Appeals indulges every reasonable presumption against the loss of the constitutional right to be present at trial. U.S.C.A. Const.Amends. 6, 14.

**[29] Sentencing and Punishment 350H ⇐══345**

350H Sentencing and Punishment
    350HII Sentencing Proceedings in General
        350HII(G) Hearing
            350Hk340 Presence of Defendant
                350Hk345 k. Voluntary Absence and Waiver. Most Cited Cases
State trial record showed that defendant knowingly, voluntarily and intelligently waived the right to be present at the penalty phase of capital murder trial, where his decision was unequivocal and clear, and both the trial judge and counsel called to defendant's attention the possible disadvantages of not being present, yet he persisted in choosing to absent himself, and indicated he would disrupt proceedings if he was required to stay, and after-the-fact assessment by doctor who examined defendant seven years after trial, that defendant was not capable of making a knowing and intelligent waiver due to his responses to extreme emotional stressors, did not undermine that determination. U.S.C.A.

Const.Amends. 6, 14.

**[30] Habeas Corpus 197 ⇐══453**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(A) Ground and Nature of Restraint
            197k450 Federal Review of State or Territorial Cases
                197k453 k. Questions of Local Law. Most Cited Cases
A petitioner is not entitled to habeas relief on ground that state appellate court erroneously interpreted and applied state law, unless he can also show the state law violation resulted in a fundamentally unfair trial.

**[31] Habeas Corpus 197 ⇐══481**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k481 k. Conduct of Trial, in General. Most Cited Cases
Even if there was a violation of Oklahoma statutes providing a defendant must be present at trial or when the verdict is received, there was no fundamental unfairness, warranting federal habeas relief, where petitioner voluntarily, knowingly and intelligently waived his right to be present. 22 Okl.St.Ann. §§ 583, 912.

**[32] Criminal Law 110 ⇐══1960**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1960 k. Adequacy of Investigation of Mitigating Circumstances. Most Cited Cases
    (Formerly 110k641.13(7))

**Criminal Law 110 ⇐══1963**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                          Page 8
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

110 Criminal Law
  110XXXI Counsel
    110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
        110k1958 Death Penalty
          110k1963 k. Other Particular Issues
in Death Penalty Cases. Most Cited Cases
   (Formerly 110k641.13(7))
Defendant could not show ineffective assistance of
counsel for failing to request a competency hearing
or a continuance when defendant sought to be ab-
sent from penalty phase of capital murder trial,
where defendant waived his presence and rejected
counsel's advice to remain in the courtroom, and
pointed to no evidence he was incompetent at the
time he waived his rights. U.S.C.A. Const.Amend. 6.

**[33] Sentencing and Punishment 350H ⊂═⊃345**

350H Sentencing and Punishment
  350HII Sentencing Proceedings in General
    350HII(G) Hearing
      350Hk340 Presence of Defendant
        350Hk345 k. Voluntary Absence and
Waiver. Most Cited Cases
The mere fact that defendant chose not to be
present at the penalty phase of his capital murder
trial did not constitute incompetence, and therefore
did not undermine the voluntariness determination.

**[34] Constitutional Law 92 ⊂═⊃4637**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4635 Instructions
          92k4637 k. Particular Issues and
Applications. Most Cited Cases
   (Formerly 92k268(11))
Due process requires that a trial court give a lesser-
included-offense instruction when the evidence
supports such an instruction. U.S.C.A.
Const.Amend. 14.

**[35] Homicide 203 ⊂═⊃1456**

203 Homicide
  203XII Instructions
    203XII(C) Necessity of Instruction on Other
Grade, Degree, or Classification of Offense
      203k1456 k. Degree or Classification of
Homicide. Most Cited Cases
   (Formerly 203k308(5))
If the jury had believed capital murder defendant's
self-defense theory, it would have found him not
guilty of first-degree murder, and after the jury re-
jected self-defense, there was no evidence left to
support a finding defendant acted with a depraved
mind without malice aforethought, or that his ac-
tions were imminently dangerous, yet without any
design to effect death, so as to require a second-de-
gree murder instruction under Oklahoma law. 21
Okl.St.Ann. § 701.8(1).

**[36] Habeas Corpus 197 ⊂═⊃486(5)**

197 Habeas Corpus
  197II Grounds for Relief; Illegality of Restraint
    197II(B) Particular Defects and Authority for
Detention in General
      197k482 Counsel
        197k486 Adequacy and Effectiveness
of Counsel
          197k486(5) k. Post-Trial Proceed-
ings; Sentencing, Appeal, Etc. Most Cited Cases
Determination of state appellate court that appellate
counsel was not ineffective for failing to argue inef-
fective assistance of trial counsel, based on a de-
termination that trial counsel was not ineffective,
was a reasonable application of *Strickland,* and did
not warrant habeas relief. 28 U.S.C.A. § 2254(d)(1).

**[37] Habeas Corpus 197 ⊂═⊃508**

197 Habeas Corpus
  197II Grounds for Relief; Illegality of Restraint
    197II(B) Particular Defects and Authority for
Detention in General
      197k503 Judgment, Sentence, or Order

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                           Page 9
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

197k508 k. Death Sentence. Most Cited Cases

Determination of state appellate court that sufficient evidence existed in capital murder case to support a finding of the continuing threat aggravator was reasonable and did not warrant habeas relief, considering, inter alia, incident in which petitioner fired a gun in a beauty shop, his threats and his grudge against victim and his daughter, and evidence that petitioner's attitude caused him to blame others for any major problems in his life. 28 U.S.C.A. § 2254(d)(1, 2)

**[38] Sentencing and Punishment 350H ⮞ 1789(8)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
            350Hk1789 Review of Proceedings to Impose Death Sentence
               350Hk1789(8) k. Verdict and Findings. Most Cited Cases

The question on review as to sufficiency of the evidence to support a death penalty aggravator is whether a reasonable factfinder, who views the evidence in the light most favorable to the prosecution, would have found this aggravator beyond a reasonable doubt.

**[39] Habeas Corpus 197 ⮞ 508**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
         197k503 Judgment, Sentence, or Order
            197k508 k. Death Sentence. Most Cited Cases

Determination of state appellate court that there was no need for instruction on mitigators that (1) petitioner had no significant past criminal history; (2) murder occurred while petitioner was under extreme mental or emotional disturbance; (3) the vic-

tim participated in the homicidal conduct; and (4) the homicide occurred under circumstances which petitioner believed provided a moral justification or extenuation of his conduct was reasonable, and did not warrant habeas relief, especially since the jury instructions, considered as a whole, did not preclude the jury from considering any mitigating evidence. 28 U.S.C.A. § 2254(d).

**\*898** Before BRORBY, EBEL, and BRISCOE, Circuit Judges.

ORDER AND JUDGMENT [FN*]

> FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

BRORBY, Circuit Judge.

**\*\*1** David Jay Brown was convicted of the first degree murder of his former father-**\*899** in-law, Eldon McGuire. The jury found the one aggravator offered, that he would be a continuing threat to society, and recommended a death sentence. The Oklahoma Court of Criminal Appeals affirmed the conviction and death sentence, *Brown v. State,* 871 P.2d 56 (Okla.Crim.App.), *cert. denied,* 513 U.S. 1003, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994), and denied post-conviction relief, *Brown v. State,* 933 P.2d 316 (Okla.Crim.App.1997). Thereafter, Mr. Brown sought federal habeas corpus relief. The district court, in a very thorough and careful opinion, denied relief. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c), we affirm.

FACTS

In the afternoon of February 20, 1988, Mr.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...   4/6/2009

Page 11 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 10 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 248

7 Fed.Appx. 894

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
(Not Selected for publication in the Federal Reporter)
(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))

Page 10

McGuire was discovered dead by his daughter Lee Ann McGuire and his mother Lillie McGuire. The two had gone to check on him when he could not be reached by telephone. The prior evening, he had telephoned his wife Laverne McGuire, who was in the hospital, to tell her that he would visit her the next morning, but he had failed to do so. At the time he was found, there was unwrapped meat and cheese on the kitchen table, suggesting he was preparing to eat before he was murdered.

Mr. Brown and Lee Ann had had a stormy six-month marriage and eight-year relationship. Mr. McGuire had never approved of Mr. Brown. And Mr. Brown did not like and was afraid of Mr. McGuire. Once the two had had a physical confrontation.

Sometime after the marriage had ended, Mr. Brown went to the beauty shop where Lee Ann worked, taking a rifle with him. He argued with her, told the people in the shop not to touch the telephone or he would blow them away, and shot at a vacant chair. Most people in the shop retreated to the back room. Mr. Brown was arrested and charged with sixteen criminal counts, including twelve counts of kidnaping. He thought the charges were manufactured by Mr. McGuire, who was a retired fire department captain and who Mr. Brown believed had influence with law enforcement. When the charges were not dismissed and Mr. Brown believed he could receive a greater than 150 year sentence, he fled from the area.

A little over a year later, he returned. He called Lee Ann. When she refused to have the charges dismissed, he became angry. She testified that he told her if they did not do something about the charges, they would all be sorry. Also, he described to her both her and her parents' actions on a particular night, indicating he had been watching them. He left an obscene message in the woodpile at her house. Approximately one month prior to the murder, Mr. Brown called the McGuire house. Laverne testified she picked up the telephone and heard Mr. Brown tell Mr. McGuire "you all's time" is up

and they would pay for what they had done to him.

At approximately the same time, Mr. Brown told a friend he blamed Mr. McGuire for his problems. When the friend asked what he could do to help, Mr. Brown told him to beat up Mr. McGuire. Another ex-wife of Mr. Brown, Connie Brown, testified Mr. Brown said he would like to beat up Mr. McGuire. Jerry Clark, with whom Mr. Brown became acquainted after absconding, testified Mr. Brown said he would like to get drunk and get even with Mr. McGuire because he had cost him everything and he did not care if the whole *900 bunch was dead. Mr. Clark also testified Mr. Brown told him after the murder that he had gotten even with Mr. McGuire and had left him on the floor.

**2 At trial, Mr. Brown testified he went to the McGuire house to convince Mr. McGuire to drop the charges. According to Mr. Brown, Mr. McGuire invited him in; hit him from behind, knocking him down; kicked toward his a bedroom door and told him he would kill him. As Mr. Brown ran to leave the house, Mr. McGuire fired a shot. Mr. Brown then pulled a semiautomatic gun from his back pocket and fired eighteen shots in self-de- fense.

Mr. McGuire sustained two bullet wounds to his head. One came from a gun fired at close range, and the other was a hard contact wound. He also suffered other gunshot wounds, including a wound to his left hand, rendering him incapable of using it.

## STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this appeal. *See Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under AEDPA, the applicable standard of review depends upon whether the state courts addressed the merits of a particular claim for relief. If the state courts decided the merits of a claim, Mr. Brown will not be entitled to habeas relief unless the decision "was contrary to,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 12 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 11 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 249

Page 11

7 Fed.Appx. 894
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

or involved an unreasonable application of, clearly established" Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). We presume the state court's factual findings are correct, unless rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). If the state courts did not decide a claim on its merits, we review the district court's legal conclusions *de novo* and its factual findings, if any, for clear error. *Hale v. Gibson,* 227 F.3d 1298, 1309 (10th Cir.2000).

### DISCUSSION

1. Ineffective Assistance of Trial Counsel

[1] Mr. Brown argues several ineffective assistance of trial counsel claims. To obtain habeas relief, he must establish both that his attorney's representation was deficient, measured against an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This court may affirm the denial of habeas relief on whichever prong is easier to resolve. *See id.* at 697.

[2] a. *Failure to investigate and present evidence in support of self defense and of victim's animosity toward Mr. Brown.* Mr. Brown argues counsel failed to obtain and use available evidence proving he was afraid of Mr. McGuire and acted in self-defense. This additional evidence includes: (1) affidavits and medical records showing that he was hospitalized in September of 1983 for a gunshot wound allegedly inflicted at Mr. McGuire's behest and (2) that Mr. McGuire had tried to hire others, including Randy Stephens, to kill Mr. Brown.

On direct appeal, the Oklahoma Court of Criminal Appeals refused to consider, as not properly before it, the affidavits of (1) James Bunch, indicating Mr. McGuire had offered him $1500 in 1986 or 1987 to kill Mr. Brown; (2) James Pool, indicating Mr. McGuire had threatened to kill Mr. Brown; (3) Howard Hawthorn, indicating in 1983 he heard Mr. McGuire claim he would get Mr. Brown; (4) Donna Taylor and Linda *901 Barker, indicating Lee Ann said that if Mr. Brown had treated her decently her father would not have had to shoot him; and (5) Barbara Mask, Mr. Brown's mother, indicating Lee Ann had speculated that Mr. McGuire had had Mr. Brown shot. *Brown,* 871 P.2d at 75. Also, the court refused to consider the medical records. *Id.* Even if the evidence was admissible, the court determined it could be considered only to show Mr. McGuire's character, that he and Mr. Brown did not get along and that friction still existed, a matter testified to by several witnesses, including Mr. Brown. *Id.* at 75-76. Because this evidence was cumulative, the court determined it would not have changed the outcome at trial and, therefore, Mr. Brown could not show prejudice. *Id.* Further, the court did not fault trial counsel for failing to discover this evidence because nothing indicated Mr. Brown told his attorney about the shooting. *Id.* Even if counsel knew, the court held that failure to present the evidence was trial strategy, because the existing friction combined with the earlier shooting showed Mr. Brown had a strong motive for revenge. *Id.*

**3 [3] We conclude the Oklahoma Court of Criminal Appeals' determination is a reasonable application of *Strickland. See* 28 U.S.C. § 2254(d)(1). In a capital case, an attorney's duty to investigate all possible lines of defense is strictly observed. *See, e.g., Boyd v. Ward,* 179 F.3d 904, 915 (10th Cir.1999), *cert. denied,* 528 U.S. 1167, 120 S.Ct. 1188, 145 L.Ed.2d 1093 (2000). Counsel's investigations, however, are usually based on information provided by the defendant. *Strickland,* 466 U.S. at 691. Mr. Brown presented no evidence that he informed counsel of the 1983 gunshot wound, its possible origin, or Mr. McGuire's efforts to solicit someone to shoot him. Even if he did inform counsel, Mr. Brown has not overcome the presumption that counsel's performance was not constitutionally

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                    Page 12
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
(Not Selected for publication in the Federal Reporter)
(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))

defective and was instead strategic. *See id.* at 689; *Wallace v. Ward,* 191 F.3d 1235, 1247 (10th Cir.1999), *cert. denied,* 530 U.S. 1216, 120 S.Ct. 2222, 147 L.Ed.2d 253 (2000). Also, in light of the total evidence presented at trial, there is no reasonable probability the result at trial would have been different if counsel had presented this evidence. *See Boyd,* 179 F.3d at 914, 915.

b. *Failure to object to prosecutorial misconduct.* To support this argument, Mr. Brown relies on his arguments *infra* in ground 3. The Oklahoma Court of Criminal Appeals concluded Mr. Brown could not show prejudice under *Strickland. See Brown,* 871 P.2d at 75. Based on the merits discussion below, we conclude this determination is reasonable. *See*28 U.S.C. § 2254(d)(1).

[4] c. *Failure to request second-degree-murder instruction, object to other crimes evidence and prevent Mr. Brown's absence from second stage.* Mr. Brown relies on his arguments *infra* in grounds 6, 3(a) and 5 to support these claims. The Oklahoma appellate court addressed and rejected the underlying merits claims on direct appeal. *Brown,* 871 P.2d at 66-67, 69-72. Based on the merits discussions below, we conclude that Mr. Brown cannot show prejudice and therefore counsel was not ineffective.

[5] d. *Failure to object to inclusion of first-stage evidence into second stage.* Mr. Brown argues his counsel should have objected to inclusion of the first stage evidence into the second stage, because the Bill of Particulars did not list Mike Bradford, who testified at the first stage, as a second stage witness and mentioned only the beauty shop shooting and Mr. Brown's flight thereafter, whereas the incorporated first-stage evidence also included telephone threats, a puppy killing and Mr. Brown's alcohol abuse. On direct appeal, the Oklahoma appellate court determined *902 an extensive preliminary hearing afforded Mr. Brown notice of this evidence. *Brown,* 871 P.2d at 72.

The Due Process Clause mandates that a defendant receive adequate notice that he could receive

the death penalty. *See Lankford v. Idaho,* 500 U.S. 110, 127, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991). Similarly, a defendant must have a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence. *See Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

**4 *Duvall v. Reynolds,* 139 F.3d 768, 797 (10th Cir.1998). Because Mr. Brown had notice at the preliminary hearing, this was not a "trial by ambush." *Id.* at 797-98 (quotation omitted). Mr. Brown, therefore, has failed to show prejudice.

e. *Failure to investigate, prepare and present mitigation evidence.*

i. *Family and background evidence.* Mr. Brown argues counsel did not interview his family before presenting mitigating evidence and did not prepare for the second stage until immediately after the first stage, when he then asked four people to testify and to answer questions as best they could. Mr. Brown maintains counsel should have interviewed his half-sister to learn his mother was an alcoholic and a prostitute; he suffered severe emotional trauma due to the "horrid circumstances" of his childhood; he was harassed, emotionally harmed and got in fights because his mother spent time with black men; he tried to protect his siblings when his mother's husbands became violent; he tried to protect his mother when men abused her; he was the saddest of the children because his half-siblings had fathers who loved them; and he was the only person who took care of his half-sister after she attempted suicide. Mr. Brown also believes that, if trial counsel had interviewed his mother, she would have revealed that the family was poor and Mr. Brown had an "abusive dreadful life." Other evidence Mr. Brown believes counsel should have presented included that he was left alone frequently, was abused, was an unhappy child who had to look after his younger half-siblings, helped pay for his half-sister's funeral and was a hard worker. On post-conviction review, the Oklahoma Court of Criminal Appeals determ-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                                         Page 13
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

ined Mr. Brown did not prove ineffective assistance of counsel. *Brown,* 933 P.2d at 321-22.

[6] Addressing only whether Mr. Brown has shown prejudice, *see Strickland,* 466 U.S. at 697, we keep in mind the strength of the State's case and the aggravating factor the jury found, along with all the mitigating evidence that might have been presented. *Walker v. Gibson,* 228 F.3d 1217, 1234 (10th Cir.2000). Here, strong evidence supported the conviction and continuing threat aggravator. Counsel did present mitigating evidence that Mr. Brown had an unsupervised upbringing, family members would stay in contact with him, he loved his children, he was a good father, he was kicked and bounced around his whole life and he had no guidance. Although the childhood evidence Mr. Brown now points to was admissible mitigating evidence, he presents no evidence indicating his childhood had an effect on his ability to conform his conduct to noncriminal behavior. *See Stafford v. Saffle,* 34 F.3d 1557, 1565 (10th Cir.1994). His troubled childhood does not outweigh the substantial evidence supporting his conviction and the continuing threat aggravator. *See Foster v. Ward,* 182 F.3d 1177, 1189 (10th Cir.1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1438, 146 L.Ed.2d 326 (2000). Given the strength of the State's case, the aggravating factor found by the jury and the nature of the crime, the later-identified mitigating evidence would not have created a reasonable probability the *903 jury would not have sentenced Mr. Brown to death. *See Strickland,* 466 U.S. at 695; *Clayton v. Gibson,* 199 F.3d 1162, 1179 (10th Cir.1999), *cert. denied,* 531 U.S. 838, 121 S.Ct. 100, 148 L.Ed.2d 59 (2000). Thus, the Oklahoma Court of Criminal Appeals' determination that Mr. Brown's counsel was not ineffective is a reasonable application of *Strickland. See* 28 U.S.C. § 2254(d)(1).

**5 ii. *Mental health evidence.* Mr. Brown also argues counsel should have investigated and presented evidence of his psychological problems. Dr. Watson, a psychologist who evaluated Mr. Brown while he was in prison, speculated Mr. Brown had a brain dysfunction secondary to chronic alcohol and drug abuse for seventeen years and a mild degree of neuropsychological dysfunction. Mr. Brown believes Dr. Watson's report, along with the trial court's finding that he was under the influence of extreme mental or emotional disturbance when he committed the crime, shows counsel should have been aware of the need to investigate. Further, Mr. Brown believes, in light of the finding of the continuing threat aggravator, counsel should have obtained evidence that he would do well in a structured setting. Dr. Watson did indicate Mr. Brown would make a good adjustment in prison.

On post-conviction review, the Oklahoma Court of Criminal Appeals decided Mr. Brown waived this claim, because he obtained, or could have obtained, this information earlier. *Brown,* 933 P.2d at 322. The federal district court concluded the state's procedural bar was not adequate after finding the Oklahoma appellate court did not consistently waive claims asserting this type of evidence in post-conviction proceedings.

[7][8] We agree, but for different reasons, that the state procedural bar is not adequate. To be adequate, state courts must apply a state procedural bar consistently. *Romano v. Gibson,* 239 F.3d 1156, 1170 (10th Cir.2001) (citing *Lambrix v. Singletary,* 520 U.S. 518, 522-23, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)). Here, the Oklahoma Court of Criminal Appeals applied the same procedural bar inconsistently in the same case when it found procedural bar with respect to the mental health evidence but not with respect to the other mitigating evidence. In light of the inconsistency, this procedural bar will not preclude our consideration of the merits of this claim. *Cf. id.*(reaching merits when state court did not apply procedural bar consistently in cases of codefendants charged with same offenses and tried together).

[9] In addressing the merits, the federal district court determined counsel's failure to seek a mental

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                    Page 14

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

health expert did not result in prejudice. Reviewing *de novo, Hale,* 227 F.3d at 1309, we agree. Dr. Watson's conclusions are not compelling. Due to the callous nature of the crime and the abundant evidence supporting the guilty verdict and the continuing threat aggravator, no reasonable probability exists the outcome at either stage of trial would have been different if psychological evidence had been presented. *See Strickland,* 466 U.S. at 695. Further, we conclude counsel's representation was not deficient, because nothing in the record, apart from the trial judge's comment in his report, would have led a reasonable attorney to believe Mr. Brown's mental condition was a potentially mitigating factor. *See Mayes v. Gibson,* 210 F.3d 1284, 1289 n. 3 (10th Cir.), *cert. denied,* 531 U.S. 1020, 121 S.Ct. 586, 148 L.Ed.2d 501 (2000).

**\*\*6** f. *Failure to object to hearsay, impeach Laverne, impeach Mr. Clark and object to prosecutor's demonstration.* On post-conviction review, the Oklahoma appellate**\*904** court found Mr. Brown waived these claims because he could have raised them on direct appeal. *Brown,* 933 P.2d at 320. The federal district court, however, reached the merits of these claims to determine if ineffective assistance of appellate counsel provided cause for the procedural default. *See Coleman v. Thompson,* 501 U.S. 722, 749-50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (holding federal courts do not consider claims defaulted in state court on independent or adequate procedural grounds without showing of cause and prejudice or fundamental miscarriage of justice). On appeal to this court, however, Mr. Brown does not specifically argue ineffective assistance of appellate counsel as cause excusing his procedural default. Nonetheless, because he makes a general ineffective assistance of appellate counsel argument, *see* ground 7 *infra,* we will consider these claims on their merits to determine if appellate counsel was ineffective.

[10][11][12] Ineffective assistance of appellate counsel claims are also governed by *Strickland. Smith v. Massey,* 235 F.3d 1259, 1274 (10th

Cir.2000). Appellate counsel's performance may be deficient and prejudicial only if counsel failed to argue a "dead-bang winner." *Moore v. Gibson,* 195 F.3d 1152, 1180 (10th Cir.1999), *cert. denied,* 530 U.S. 1208, 120 S.Ct. 2206, 147 L.Ed.2d 239 (2000). Because none of Mr. Brown's claims is a "dead-bang winner," we conclude these claims are defaulted.

i. *Failure to object to hearsay.* Mr. Brown argues counsel should have objected to the prosecutor's (1) questioning Inez Baker about her statement that Ms. Mask told her Mr. Brown was going to kill five people, even though Ms. Baker denied making that statement; (2) arguing six times that Ms. Baker had testified Mr. Brown said he was going to kill five people; and (3) stating Ms. Brown had testified that she had told Oklahoma State Bureau of Investigation (OSBI) agents Mr. Brown told her he would like to get even with his ex-in-laws and kill Mr. McGuire when she denied making that statement. The federal district court concluded counsel's failure to object did not result in prejudice under *Strickland.* Reviewing *de novo, Hale,* 227 F.3d at 1309, we agree. In light of the strong evidence against Mr. Brown, the result of the trial would not have been different if counsel had objected.

ii. *Failure to impeach Laverne.* Mr. Brown argues counsel should have shown Laverne gave a statement inconsistent with her testimony concerning the scope of Mr. Brown's alleged threats.[FN1] The federal district court determined that strong evidence, apart from Laverne's testimony, indicated Mr. Brown posed a continuing threat to society. Thus, the court concluded Mr. Brown could not show prejudice. Reviewing *de novo, id.,* we agree. The result at trial would not have been different if counsel had attempted to impeach Laverne. Her statements consistently showed Mr. Brown had made a threat. Substantial other evidence also showed Mr. Brown had made threats.

> FN1. Mr. Brown also argues counsel failed to object to testimony of Laverne and Lee Ann concerning the date Mr. Brown made

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...    4/6/2009

Page 16 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 15 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 253

7 Fed.Appx. 894                                                                    Page 15
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

the threatening calls as inconsistent with their statements. We do not consider these arguments raised for the first time on appeal. *See Jones v. Gibson,* 206 F.3d 946, 958 (10th Cir.), *cert. denied,* 531 U.S. 998, 121 S.Ct. 496, 148 L.Ed.2d 467 (2000).

**\*\*7** iii. *Failure to impeach Mr. Clark.* At trial, Mr. Clark testified that Mr. Brown said he would like to kill the victim. Mr. Brown argues counsel failed to point out this testimony was inconsistent with Mr. Clark's statement and preliminary hearing **\*905** testimony that he did not remember if Mr. Brown specifically mentioned he wanted to kill the victim. Reviewing *de novo, id.,* we conclude the federal district court correctly found no prejudice because Mr. Clark consistently stated Mr. Brown expressed a desire to get even with Mr. McGuire. Also, abundant other evidence existed of Mr. Brown's threats against the McGuires.

iv. *Failure to object to prosecutor's demonstration.* Mr. Brown argues the prosecutor's demonstration, used to prove Mr. Brown shot Mr. McGuire execution-style, was unsupported by the evidence, inflammatory, and prejudicial. The federal district court determined the evidence established Mr. Brown held the gun to the top of Mr. McGuire's head and fired two shots and Mr. McGuire was found in a fetal position, suggesting he was on his knees when the shots were fired. Upon *de novo* review, *id.,* we agree with the district court's analysis of the evidence and finding of no prejudice to establish ineffective assistance of appellate counsel.

[13] g. *New claims.* Mr. Brown raises several claims of ineffective assistance of counsel for the first time on appeal.[FN2] We will not consider these claims. *See Jones,* 206 F.3d at 958. Furthermore, in part, Mr. Brown attempts to support these claims with evidence not presented to the district court.[FN3] We will not consider this evidence with respect to any claims raised in this appeal. *See Kennedy,* 225 F.3d at 1191 (recognizing this court does not consider evidence not before district court).

FN2. Specifically, he argues counsel failed to (1) challenge the State's time line; (2) show the inconsistency of eye-witness identifications; (3) use prior inconsistencies of Lee Ann and Laverne; (4) challenge the State's theory that Mr. Brown checked out of his motel prior to the murder; (5) use Ms. Baker's prior statements to challenge her credibility; (6) disclose the crime scene was contaminated; (7) investigate and present evidence of the victim's prior violent intentions toward Mr. Brown; and (8) seek funding for a forensic reconstruction expert. Alternatively, he argues if the State concealed this information, there is either a *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim or prosecutorial misconduct.

FN3. On appeal to this court, Mr. Brown submits for the first time a crime scene reconstruction. He believes that because this reconstruction was not available to him at the time he filed his federal habeas petition, this court should remand to the district court for an evidentiary hearing. We decline to do so. *See United States v. Kennedy,* 225 F.3d 1187, 1191-93 (10th Cir.2000) (declining, under circumstances of that case, to remand), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1406, 149 L.Ed.2d 348 (2001). This evidence does not overcome the significant other evidence establishing Mr. Brown's guilt.

2. State's Improper Withholding of Reports

a. *Reports of Ms. Baker's Statements.* Mr. Brown argues the State did not provide him an OSBI report summarizing statements of Ms. Baker that damaged him.[FN4] In the report, Ms. Baker stated Ms. Mask told her that Mr. Brown had threatened to kill five people, including Mr. McGuire. Also, Ms. Baker reported that the day before the interview she, Ms. Mask and Ms. Brown ran Lee Ann off the road. At

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 17 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 16 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 254

7 Fed.Appx. 894    Page 16
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
(Not Selected for publication in the Federal Reporter)
(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))

the bottom of the report, the investigator noted that Lee Ann denied being run off the road. Alternatively, Mr. Brown argues that if counsel had this report, counsel was ineffective for not using it for impeachment.

> FN4. Mr. Brown also argues he should have been given a report reflecting Ms. Baker's attempt to involve herself in another capital case. The federal district court properly declined to address this claim as irrelevant.

Mr. Brown first presented this argument in state post-conviction proceedings. The Oklahoma Court of Criminal Appeals *906 deemed the claim waived. *Brown*, 933 P.2d at 324. Additionally, it found Mr. Brown failed to show the information was not received by trial counsel before trial. *Id.* With respect to Mr. Brown's alternative assertion, that trial counsel was ineffective for failing to use the report, the court determined Mr. Brown failed to provide argument or authority to support the claim and thus it too was waived. *See id.* at 325. The federal district court agreed no evidence showed the State wrongfully withheld the report. The court held this claim was procedurally defaulted because Mr. Brown could not show that if Ms. Baker had been cross examined with this report, the result of his trial would have been different. The court did not address Mr. Brown's argument that a fundamental miscarriage of justice would result if this claim is not considered on its merits.

**8 [14][15] On appeal, Mr. Brown continues to argue this claim must be considered to avoid a fundamental miscarriage of justice. To prove a fundamental miscarriage of justice, he must make a threshold showing of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Mr. Brown, however, does not argue he is innocent of killing Mr. McGuire. Rather, he claims he acted in self defense. Thus, Mr. Brown argues legal, not factual, innocence. *See Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir.2000). Accordingly, we conclude he cannot

show a fundamental miscarriage of justice.

[16] Even if this claim is not procedurally barred, it does not warrant habeas corpus relief. There is no likelihood the result at trial would have been different if the report had been disclosed or if counsel had used it, assuming counsel had the report. Ms. Baker denied making the statement. In any event, it is doubtful the jury gave much credence to her testimony. Even without her testimony, however, much evidence shows Mr. Brown made threats against Mr. McGuire.

b. *Reports of Others' Statements.* Mr. Brown also argues the State failed to disclose the OSBI reports of Laverne, Lillie, and Lee Ann McGuire and Connie Brown. Because he did not make this claim in state court, the federal district court held it was procedurally barred. We agree.

### 3. Prosecutorial Misconduct

a. *Introduction of "other crimes" evidence.*

[17] i. *Puppy killing.* Lee Ann testified that Mr. Brown had thrown her puppy against a wall and then shot and killed it after he learned it had gone to the bathroom on the floor. Mr. Brown argues this improper evidence was crucial to the jury's finding that he would be a continuing threat to society. Because Mr. Brown failed to object to Lee Ann's testimony, the Oklahoma appellate court reviewed only for fundamental error, finding none. *Brown*, 871 P.2d at 67. This determination is reasonable. *See* 28 U.S.C. § 2254(d). While the jury probably considered this evidence when considering the continuing threat aggravator, much other evidence also supported it.

[18] ii. *Oral sex.* Mr. Brown argues the prosecutor sought to degrade and intimidate him and prejudice the jury by asking him if he had called Laverne and inquired if she wanted to have oral sex with him. The Oklahoma Court of Criminal Appeals found no reversible error in light of the overwhelming evidence against Mr. Brown. *Brown*, 871 P.2d at 67.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                            Page 17
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

Considering all of the evidence, this determination is reasonable. *See* 28 U.S.C. § 2254(d). Additionally, because the trial court sustained the objection to this question,*907 the trial court admitted no evidence of a bad act.

[19] iii. *Abuse of Lee Ann and bulldozer incident.* Mr. Brown argues the prosecutor improperly asked Laverne if she had seen Lee Ann after Mr. Brown had abused her and asked Lee Ann about his driving a bulldozer on the McGuire property. The Oklahoma Court of Criminal Appeals found no fundamental error with respect to the abuse question and no admission of evidence of a bad act with respect to the bulldozer incident because the trial court sustained an objection before Lee Ann answered the question. *Brown,* 871 P.2d at 66-67. These determinations are reasonable. *See* 28 U.S.C. § 2254(d).

**\*\*9** b. *Interjection of unproven theories.* Mr. Brown argues the prosecutor improperly advanced lay-in-wait and bullet-in-the-head theories.FN5 The Oklahoma Court of Criminal Appeals found sufficient evidence to support the theories. *Brown,* 871 P.2d at 68. This determination is reasonable. *See* 28 U.S.C. § 2254(d).

> FN5. Mr. Brown further argues, for the first time, that the prosecutor failed to disclose that Lillie moved bullet casings. Relying on his new-on-appeal reconstruction report, he also contends (1) Mr. McGuire tried to kill him; (2) the angles of fire, shell casing locations and wound locations show Mr. McGuire fired first; (3) there was no series of bullet holes supporting the State's evidence; (4) he panicked while firing and did not commit premeditated murder; (5) the wound to Mr. McGuire's hand showing gun powder residue was one of the last to occur; (6) blood on the rifle indicated it was in Mr. McGuire's possession when the wound occurred, allegedly, at the end of the shootout; (7) Mr. McGuire was in shooting posture when he received the wounds with no residue; and

(8) when the casings are in their proper place, they show Mr. McGuire was not shot in the southernmost part of the hallway. Mr. Brown also suggests counsel was ineffective for failing to present this evidence to the jury. We will not consider these new arguments. *See Jones,* 206 F.3d at 958.

[20] c. *Use of Ms. Baker's inadmissible hearsay to impeach another witness.* Mr. Brown argues the prosecutor used inadmissible hearsay to impeach another witness when he impeached Ms. Baker with the statement she made to the OSBI. In that statement she reported Ms. Mask told her Mr. Brown had threatened to kill five people, including Mr. McGuire.FN6 The Oklahoma Court of Criminal Appeals recognized Ms. Baker's comments were erroneous, yet decided they did not require reversal because Ms. Baker denied making them, Mr. Brown told Mr. Clark he did not care if the whole family were dead, Laverne heard his threats to Mr. McGuire and Mr. Brown told Lee Ann they would be sorry for what they had done to him. *Brown,* 871 P.2d at 67. We conclude the state appellate court's determination is reasonable. *See* 28 U.S.C. § 2254(d).

> FN6. Mr. Brown also argues, for the first time, that the prosecutor deliberately sought to deceive the court and jury by using false statements in violation of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We do not consider this new claim. *See Jones,* 206 F.3d at 958.

[21] d. *Attack on Ms. Mask's character.* The prosecutor elicited the fact that Ms. Mask's current address was a prison and asked her why she was in prison. Mr. Brown argues the prosecutor attempted to discredit her as a mitigation witness and to portray him as coming from a family of criminals. The Oklahoma Court of Criminal Appeals found no evidence Mr. Brown intended to call Ms. Mask as a second-stage witness and nothing showed he came

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                Page 18

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

from a family of criminals. *Brown,* 871 P.2d at 67. Further, it concluded any error was harmless. *Id.* These determinations are reasonable. *See* 28 U.S.C. § 2254(d). Mr. Brown fails to show how this questioning precluded him from presenting *908 mitigating evidence. None of his second-stage witnesses had criminal records. Thus, it is not likely the prosecutor tried to portray him as coming from a family of criminals.

[22] e. *Denigrating mitigating evidence.* During second-stage closing argument, the prosecutor stated:

Now, the witnesses have testified, of course, for the most part were family witnesses. And you observed their demeanor on the stand and I don't think, ladies and gentlemen, that you can conclude from what they said that there is sufficient mitigating evidence that should outweigh the aggravating circumstances which we've shown....

Tr. at 963. Mr. Brown argues this remark attacked his mitigation evidence as presented by family members, who were lying; expressed the prosecutor's personal opinion on the weight of the evidence; and attempted to get the jury to ignore the mitigating evidence.

[23][24] The Oklahoma Court of Criminal Appeals believed the statement "was more a comment on the sufficiency of the evidence than a comment the people who produced that evidence were lying." *Brown,* 871 P.2d at 68. This determination is reasonable. *See* 28 U.S.C. § 2254(d). The prosecutor is entitled to comment on the weight to be afforded mitigating evidence. *Fox v. Ward,* 200 F.3d 1286, 1299-1300 (10th Cir.), *cert. denied,* 531 U.S. 938, 121 S.Ct. 329, 148 L.Ed.2d 264 (2000). Also, as the district court correctly determined, the statement does not tell the jurors to disregard the mitigating evidence and does not suggest the family witnesses lied. Although the prosecutor may have improperly injected his personal opinion, his doing so did not result in fundamental error. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40

L.Ed.2d 431 (1974).

4. Racial Prejudice Influenced Juror Jenkins

**10 Mr. Brown argues Juror Jenkins violated his oath due to racial influences. In an affidavit, Juror Jenkins, the only black juror, stated he violated his oath in order to get along in the community and to appease the white jurors, even though he believed this was a case of self defense and Mr. Brown did not deserve a first degree murder conviction or the death penalty.

According to the State, the Oklahoma Court of Criminal Appeals and the federal district court, Mr. Brown first raised this claim on appeal from the denial of state post-conviction relief. The Oklahoma Court of Criminal Appeals therefore deemed it waived. *See Brown,* 933 P.2d at 325. Mr. Brown, however, did raise this claim on page forty-nine of his state post-conviction application brief. We therefore review *de novo* the district court's alternate determination that this claim would fail on its merits.[FN7] *See Hale,* 227 F.3d at 1309.

> FN7. Because this claim can be easily decided on its merits, we do not consider whether it is otherwise procedurally barred. *See Romero v. Furlong,* 215 F.3d 1107, 1111 (10th Cir.), *cert. denied,* 531 U.S. 982, 121 S.Ct. 434, 148 L.Ed.2d 441 (2000).

[25][26] It is settled that a single juror may not impeach a jury's verdict. *See Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *McDonald v. Pless,* 238 U.S. 264, 268-69, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). Assuming without deciding that we may consider Juror Jenkins' affidavit, *see Walker,* 228 F.3d at 1233 & n. 8,[FN8] we conclude the affidavit *909 does not compel reversal. It makes nonspecific allegations. Also, Juror Jenkins does not indicate why he did not bring evidence of alleged racial pressures to the trial court's attention before the jury reached its ver-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 20 of 23

Case 5:09-cv-81    Document 12-8    Filed 04/13/2009    Page 19 of 22
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 257

7 Fed.Appx. 894                                                      Page 19

7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

dicts. We refuse to allow this allegation, raised long after the verdicts, to disrupt the finality of the trial. *Tanner,* 483 U.S. at 120; *see also Walker,* 228 F.3d at 1233 (holding jury's verdict, not individual juror's expressions after trial, carries legal weight).

> FN8. Okla.Stat.tit. 12, § 2606(B) prohibits consideration of juror statements regarding matters affecting jury deliberations. *See also* Fed.R.Evid. 606(b).

**5. Mr. Brown's Second Stage Absence**

Mr. Brown argues he did not knowingly, voluntarily and intelligently absent himself from the second-stage proceedings because he was under extreme mental and emotional disturbance. On direct appeal, the Oklahoma Court of Criminal Appeals held "an adequate waiver took place," because the trial court advised Mr. Brown he had the right to remain in the courtroom and he clearly and voluntarily expressed his desire to absent himself. *Brown,* 871 P.2d at 71. The court found nothing in the record indicating Mr. Brown was incompetent to waive his right to be present merely because he did not follow his attorney's advice. *Id.* at 72.

[27] The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment establish a defendant's right to be present at all stages of a criminal trial, *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *see also United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam), including capital sentencing, *see Gardner,* 430 U.S. at 358 (recognizing capital sentencing is critical stage of criminal proceeding). A defendant, however, may waive his right to be present, or he could lose that right through misconduct. *Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934);[FN9] *see Clark v. Stinson,* 214 F.3d 315, 323 (2d Cir.2000), *cert. denied,* 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001); *Amaya Ruiz v. Stewart,* 121 F.3d 486, 496 (9th Cir.1997); *see also Crosby v. United

States,* 506 U.S. 255, 261, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993) (declining to decide whether defendant could waive presence); *Drope v. Missouri,* 420 U.S. 162, 182, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (declining to consider whether "it was constitutionally impermissible to conduct the remainder" of capital trial due to defendant's "enforced absence from a self-inflicted wound"). *But see Hall v. Wainwright,* 733 F.2d 766, 775 (11th Cir.1984) (holding capital defendant may not waive presence at critical stage of trial).

> FN9. *Snyder* was overruled in part on other grounds. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**11 [28][29] A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Although this court indulges every reasonable presumption against the loss of the constitutional right to be present, *Allen,* 397 U.S. at 343, the trial record shows that Mr. Brown did knowingly, voluntarily and intelligently waive that right. *See Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *see also Amaya-Ruiz,* 121 F.3d at 496 (holding petitioner's waiver of presence at second stage, because he did not want to be shackled, to be knowing, intelligent and voluntary, where trial court warned petitioner of danger of absence and counsel advised against absence). His decision was unequivocal and clear. Both the trial judge and counsel called to Mr. Brown's attention the possible disadvantages of not *910 being present, yet he persisted in choosing to absent himself. Indeed, he indicated he would disrupt proceedings if he were required to stay. We conclude Mr. Brown understood the possible consequences of his absence and made a proper waiver.

The post-conviction affidavit of Dr. Watson, who examined Mr. Brown seven years after trial, however, did indicate Mr. Brown was not capable of making a knowing and intelligent waiver of his right to be present, due to his responses to extreme

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                           Page 20
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

emotional stressors. Dr. Watson believed Mr. Brown was unable to follow counsel's advice because Mr. Brown was under extreme pressure. This after-the-fact assessment does not undermine a determination that Mr. Brown's waiver was knowing, intelligent and voluntary.[FN10]

> FN10. Because Mr. Brown knowingly, voluntarily and intelligently waived his right to be present, we do not address his claim of structural error. *Cf. Larson v. Tansy,* 911 F.2d 392, 396 (10th Cir.1990) (applying harmless error analysis to defendant's absence from return of jury verdict).

[30][31] In addition to the allegations of a constitutional violation, Mr. Brown also refers, without more, to state statutes providing a defendant must be present at trial or when the verdict is received. *See* Okla.Stat.tit. 22, §§ 583, 912. If Mr. Brown is arguing the state appellate court erroneously interpreted and applied state law, he is not entitled to habeas relief, *see Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), unless he can also show the state law violation resulted in a fundamentally unfair trial. *See Boyd,* 179 F.3d at 916. Here, there was no fundamental unfairness because Mr. Brown voluntarily, knowingly and intelligently waived his right to be present.

[32][33] Mr. Brown argues his attorney was constitutionally ineffective for failing to request a competency hearing or a continuance. Although the federal district court determined Mr. Brown had failed to exhaust this argument, he did argue in state court that his attorney should have requested a competency evaluation. Mr. Brown, however, cannot show ineffective assistance of counsel because he waived his presence and rejected counsel's advice to remain in the courtroom and because he points to no evidence he was incompetent at the time he waived his rights. The mere fact he chose not to be present does not constitute incompetence, and therefore does not undermine the voluntariness determina- tion.

### 6. Failure to Instruct on Second-Degree Murder

**\*\*12** Mr. Brown argues the trial court should have instructed *sua sponte* on second-degree murder. On direct criminal appeal, the Oklahoma Court of Criminal Appeals concluded, without explanation, the evidence did not warrant a second-degree murder instruction. *See Brown,* 871 P.2d at 66. Based on our independent review of the record, we conclude this determination is reasonable.[FN11] *See Walker,* 228 F.3d at 1241 (giving deference to state court's result even when its reasoning is not expressly stated).

> FN11. This court has not decided if sufficiency of the evidence to support a lesser included offense instruction is a factual or a legal question. *See Walker,* 228 F.3d at 1237 n. 13. Under the circumstances of this case, we need not decide this question.

[34][35] Due process requires that a trial court give a lesser-included-offense instruction when the evidence supports such an instruction. *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Under Oklahoma law, second-degree murder includes death perpetrated by an act imminently dangerous to the victim and evincing a depraved mind, but **\*911** without a premeditated design to effect death. Okla.Stat.tit. 21, § 701.8(1). We agree with the federal district court that if the jury had believed Mr. Brown's self-defense theory, it would have found him not guilty of first-degree murder. After the jury rejected self defense, there was no evidence left to support a finding Mr. Brown acted with a depraved mind without malice aforethought. We also agree with the district court that Mr. Brown failed to show how his actions were imminently dangerous, yet without any design to effect death.

### 7. Ineffective Assistance of Appellate Counsel

[36] Mr. Brown argues appellate counsel was ineffective for failing to argue ineffective assistance of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894                                                                                    Page 21
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

trial counsel. The Oklahoma appellate court rejected this claim, after determining trial counsel was not ineffective. *Brown,* 933 P.2d at 323. This determination is a reasonable application of *Strickland. See* 28 U.S.C. § 2254(d)(1). Furthermore, as raised before this court, this argument is conclusory. *See Walker,* 228 F.3d at 1239-40 (refusing to consider conclusory and unsupported issues).

8. Sufficiency of Evidence to Support Continuing Threat Aggravator

[37] Mr. Brown argues the only admissible evidence at the second stage, that concerning the beauty shop incident and his flight thereafter, was insufficient to support the continuing threat aggravator. He believes the beauty shop incident fails to show a continuing threat because he was intoxicated and two women in the shop attempted to calm him and therefore were not threatened by him. He also asserts mere flight from the beauty shop does not support the aggravator.

Viewing the evidence in the light most favorable to the State, the Oklahoma appellate court determined sufficient evidence existed to support a finding of this aggravator. *Brown,* 871 P.2d at 76-77. In doing so, the court noted the beauty shop incident, Mr. Brown's threats and his grudge against Mr. McGuire and Lee Ann. *Id.* The court also determined the evidence established Mr. Brown's attitude caused him to blame others for any major problems in his life. *Id.* at 77.

**13 [38] Under the rational factfinder standard set forth in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the question presented is whether a reasonable factfinder, who views the evidence in the light most favorable to the prosecution, would have found this aggravator beyond a reasonable doubt, *Romano,* 239 F.3d at 1177. This circuit has not resolved whether sufficiency of the evidence is a factual or legal question. *Hale,* 227 F.3d at 1335 n. 17. In either event, Mr. Brown's claim lacks merit and, therefore, the Ok-

lahoma appellate court's determination is not unreasonable under 28 U.S.C. § 2254(d)(1) or (2). Contrary to his argument, the jury was not limited to considering only the beauty shop incident or his flight.

9. Failure to List All Mitigating Evidence

[39] Mr. Brown argues the jury did not receive particularized guidance because the instructions did not list four mitigators later set forth in the trial court's report: (1) he had no significant past criminal history; (2) the murder occurred while he was under extreme mental or emotional disturbance; (3) the victim participated in the homicidal conduct; and (4) the homicide occurred under circumstances which Mr. Brown believed provided a moral justification or extenuation of his conduct. The Oklahoma appellate court initially noted the trial court had instructed the jury to determine what mitigating evidence was present. *912 Brown,* 871 P.2d at 74. The appellate court then held there was no need for instruction on the other four: (1) in light of the kidnaping episode, the jury would not have believed Mr. Brown had no significant past criminal history; (2) if he had committed the murder under extreme emotional disturbance, the jury would have selected manslaughter; (3) the jury considered the victim's participation when it rejected the self-defense theory; and (4) instruction on moral justification would have led the jury to believe Mr. Brown could justify killing anyone. *Id.* We conclude these determinations are reasonable. *See* 28 U.S.C. § 2254(d). Moreover, the jury instructions, considered as a whole, did not preclude the jury from considering any mitigating evidence. *See Bryson v. Ward,* 187 F.3d 1193, 1209-10 (10th Cir.1999) (citing Supreme Court cases), *cert. denied,* 529 U.S. 1058, 120 S.Ct. 1566, 146 L.Ed.2d 469 (2000).

10. Cumulative Error

The federal district court rejected Mr. Brown's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 894 Page 22
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)))**

claim that the cumulative impact of the trial errors denied him a fair trial. We agree.

## 11. Evidentiary Hearing

Mr. Brown argues the federal district court should have granted an evidentiary hearing. Mr. Brown's request for an evidentiary hearing satisfies neither AEDP1A standards, *see* 28 U.S.C. § 2254(e)(2), nor pre-AEDP1A standards, *see Walker,* 228 F.3d at 1231. We therefore conclude the district court properly denied an evidentiary hearing.

## 12. Certificate Of Appealability Denied

Mr. Brown lists seven issues, for which this court denied a certificate of appealability (COA), that he wishes to pursue and preserve for appeal. We reaffirm the denial of COA on each of these issues. This court has repeatedly rejected Mr. Brown's arguments that (1) Oklahoma applies and reviews the continuing threat aggravator in an unconstitutionally vague and overbroad manner, *see, e.g., Moore,* 195 F.3d at 1177-78; (2) the trial court improperly failed to instruct the jury it had the option to return a life sentence, *see, e.g., Walker,* 228 F.3d at 1244 n. 16; (3) the trial court improperly failed to instruct the jury on the presumption of life, *see, e.g., Smallwood v. Gibson,* 191 F.3d 1257, 1271-72 (10th Cir.1999), *cert. denied,* 531 U.S. 833, 121 S.Ct. 88, 148 L.Ed.2d 49 (2000); (4) the mitigation instructions allowed the jury to disregard mitigation evidence, *see, e.g., Boyd,* 179 F.3d at 923-24; and (5) the anti-sympathy instruction given at both stages denied Mr. Brown his right to have the jury fully and fairly consider the mitigation evidence, *see, e.g., Smallwood,* 191 F.3d at 1272-73. Further, Mr. Brown makes only conclusory assertions that (6) Junior Turner was not qualified as an expert or knowledgeable lay witness and (7) the jury was selected under a scheme excluding certain classes of citizens from the pool. *See Walker,* 228 F.3d at 1239-40 (refusing to consider unsupported issues).

## CONCLUSION

**\*\*14** We have reviewed the record in this case and considered all of Mr. Brown's arguments on appeal, including those not specifically addressed, and are not persuaded constitutional error infected his trial. We therefore AFFIRM the district court's denial of habeas corpus relief.

C.A.10 (Okla.),2001.
Brown v. Gibson
7 Fed.Appx. 894, 2001 WL 363522 (C.A.10 (Okla.)), 2001 DJCAR 1912

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Westlaw.**

132 F.3d 42                                                                    Page 1
132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.)))**

**H**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA 10 Rule 32.1 be-
fore citing.)

United States Court of Appeals, Tenth Circuit.
Arturo B. DELGADO, Petitioner-Appellant,
v.
Lawrence BARRERAS, Warden, Penitentiary of
New Mexico, Respondent-Appellee.
**No. 97-2007.**

Dec. 22, 1997.

Before KELLY, McKAY, and BRISCOE, Circuit
Judges.

ORDER AND JUDGMENT [FN*]

> FN* This order and judgment is not bind-
> ing precedent, except under the doctrines
> of law of the case, res judicata, and collat-
> eral estoppel. The court generally disfavors
> the citation of orders and judgments; nev-
> ertheless, an order and judgment may be
> cited under the terms and conditions of
> 10th Cir. R. 36.3.

BRISCOE, Circuit Judge.

**\*1** After examining the briefs and appellate record,
this panel has determined unanimously that oral ar-
gument would not materially assist the determina-
tion of this appeal. *See* Fed. R.App. P. 34(a); 10th
Cir. R. 34.1.9. The case is therefore ordered sub-
mitted without oral argument.

Defendant Arturo Delgado appeals from the district
court's denial of his petition for habeas corpus relief
pursuant to 28 U.S.C. § 2254.[FN1] Delgado was ori-

ginally indicted on charges of kidnaping, criminal
sexual penetration, and aggravated battery. A New
Mexico state court dismissed the kidnaping charge
because of insufficient evidence at his first trial.
The jury hung, and the court declared a mistrial. At
his second trial, Delgado was convicted of the re-
maining counts and was sentenced to concurrent
terms of nine years and one year, with three years
suspended. On appeal, the New Mexico Court of
Appeals dismissed the battery charge because it
found that the battery charge merged with the rape
charge, and it affirmed the conviction and sentence
for criminal sexual penetration.

> FN1. Because the petition was filed before
> the effective date of the Antiterrorism and
> Effective Death Penalty Act of 1996, no
> certificate of appealability is necessary.
> *See United States v. Kunzman,* 125 F.3d
> 1363, 1364 n. 2 (10th Cir.1997). We,
> therefore, construe Delgado's notice of ap-
> peal as requesting a certificate of probable
> cause. *See* Fed. R.App. P. 22(b) (prior to
> amendment by AEDPA).

Delgado filed a petition for a writ of habeas corpus
in federal district court, challenging his conviction
on grounds of double jeopardy, insufficient evid-
ence, prosecutorial misconduct resulting in viola-
tion of his constitutional rights, and ineffective as-
sistance of counsel. The district court adopted the
findings and recommendations of the magistrate
judge and dismissed the habeas petition. We review
the district court's dismissal of Delgado's petition
for writ of habeas corpus de novo, *see Sinclair v.
Henman,* 986 F.2d 407, 408 (10th Cir.1993), and
we affirm.

*Double Jeopardy*

Delgado's first argument for habeas relief is that his
constitutional right to be free from double jeopardy
was violated when the state retried him for the same

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



EXHIBIT
**8**

Page 3 of 5

Case 5:09-cv-81   Document 12-9   Filed 04/13/2009   Page 2 of 4
Appellate Case: 09-6248   Document: 01018399442   Date Filed: 04/09/2010   Page: 262

132 F.3d 42
132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.)))**

Page 2

offenses before he received appellate review on his claim of insufficient evidence at his first trial. As Delgado concedes, this claim lacks merit under *Richardson v. United States,* 468 U.S. 317, 325-26 (1984). In that case, the Court held that declaration of a mistrial because the jury was unable to reach a verdict is not an event that terminates jeopardy. *See id.* at 326. Delgado's second trial was, therefore, a continuation of the original jeopardy. "Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." *Id.*

### *Prosecutor Misconduct*

Next, Delgado argues that improper remarks in the prosecutor's rebuttal closing statement violated his constitutional rights and made his trial fundamentally unfair. Specifically, Delgado argues that the prosecutor's comments on defense counsel's failure to question the victim, Shirley Zahoney, about the rape in her video-taped deposition violated his constitutional right to a presumption of innocence by impermissibly shifting the burden of proof. He also asserts that his trial was fundamentally unfair because of the prosecutor's representation that defense counsel had referred to defendant as a "stalker and a thug," the prosecutor's representation that defense counsel referred to Zahoney as "an old drunk," and the prosecutor's improper attempt to appeal to racial prejudice by characterizing defendant's testimony so as to insinuate that he was prejudiced against Native Americans and the homeless.

**\*2** "While, ordinarily, claims of prosecutorial misconduct ... are reviewed on habeas [to determine whether the misconduct made the trial fundamentally unfair], when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." *Mahorney v. Wallman,* 917 F.2d 469, 472 (10th Cir.1990). In support of his argument that the prosecutor's remarks impermissibly shifted the burden

of proof and denied him his constitutional entitlement to a presumption of innocence, Delgado cites our decision in *Mahorney.* That case is distinguishable, and it does not support Delgado's argument that the prosecutor's remarks deprived him of a specific constitutional right. Here, the prosecutor's rebuttal remarks were aimed at countering Delgado's closing statement, in which his attorney emphasized the inconsistencies and improbabilities in Zahoney's video-taped testimony. In response, the prosecutor sought to emphasize that, regardless of any inconsistencies or improbability of Zahoney's testimony about details, the defense could point to no inconsistency in her account of the actual rape. To that end, the prosecutor pointed out that defense counsel did not even question Zahoney about the rape.

In contrast, the prosecutor in *Mahorney* actually told the jury that the presumption of innocence no longer existed, that it had been removed by the evidence, and that the defendant now stood before them guilty. 917 F.2d at 471. Defense counsel objected, and the judge overruled the objection. *Id.* In light of that scenario, we held that the defense was prejudiced by the direct statement about the presumption of innocence and that the judge's overruling of the objection amplified the prejudice. *Id.* at 473-74. We do not find *Mahorney* persuasive because, in this case, the prosecutor's remarks were not a direct statement on the presumption of innocence. In addition, the remarks were in direct response to defense counsel's comments in his closing statement regarding the inconsistencies in Zahoney's testimony. *See United States v. Haar,* 931 F.2d 1368, 1377 (10th Cir.1991) (holding no impropriety in prosecutor's remarks that were invited by comments of defense counsel). Further, the defense made no objection to the remarks, *see Mason v. United States,* 719 F.2d 1485, 1489 (10th Cir.1983) (stating no objection indicates lack of serious problem), and there was no amplification of any prejudice caused by the judge overruling an objection.

We review the three other remarks to which Del-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...   4/6/2009

Page 4 of 5

Case 5:09-cv-81   Document 12-9   Filed 04/13/2009   Page 3 of 4
Appellate Case: 09-6248   Document: 01018399442   Date Filed: 04/09/2010   Page: 263

132 F.3d 42
132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.)))**

gado objects to determine "whether the challenged statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Brecheen v. Reynolds,* 41 F.3d 1343, 1355 (10th Cir.1994) (quoting *Donnelly v. De-Christoforo,* 416 U.S. 637, 643 (1974)). After careful consideration of the pertinent surrounding circumstances of the trial, *see id.,* we conclude that the prosecutor's comments did not "so prejudice[ ] the jury against [Delgado] as to deny him the fundamental fairness to which he is entitled under the Constitution." *Id.* at 1356. The comments were appropriately responsive to defense counsel's closing statement, and the reference to Zahoney's class and race did not improperly appeal to the jury's bias or prejudice.

### Sufficiency of the Evidence

*3 Delgado's third argument is that the prosecution produced insufficient evidence at his second trial to support a conviction for criminal sexual penetration. He maintains that the trial court erred in admitting the video-taped deposition of Zahoney and that without her testimony, there was insufficient evidence to convict. The district court found that, with or without Zahoney's video-taped testimony, there was sufficient evidence upon which a jury could have found, beyond a reasonable doubt, that Delgado committed the offense. We agree. In reviewing the sufficiency of the evidence, we do not reweigh conflicting evidence or pass on the credibility of witnesses; we will "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Messer v. Roberts,* 74 F.3d 1009, 1013 (10th Cir.1996) (quotation omitted).

"[W]e will not question the evidentiary ... rulings of the state court unless [Delgado] can show that, because of the court's actions, his trial, as a whole, was rendered fundamentally unfair." *Maes v. Thomas,* 46 F.3d 979, 987 (10th Cir.)*cert. denied,* 514 U.S. 1115 (1995) (quotation omitted). The prosecution satisfied its burden of showing that Zahoney was unavailable, defense counsel was af-

forded a chance to cross-examine Zahoney at the taped deposition, and her testimony was not inherently improbable. Our review of the record shows that admission of Zahoney's video-taped deposition did not make the trial fundamentally unfair.

In any event, like the district court, we also conclude that even without the video of Zahoney's testimony, there was sufficient evidence from which the jury could have found Delgado guilty beyond a reasonable doubt. Denise Sponsel testified that, as she was walking up to her friend Barbara Beck's apartment, she heard a woman crying for help. When she went to the apartment from which she heard the pleas, she saw Delgado on the couch, positioned on top of Zahoney and in between her legs. Zahoney was trying to push him off. Delgado had no clothes on, and Zahoney was not clothed below the waist. When Sponsel came in, Delgado's arm was raised, as if ready to strike Zahoney, and Zahoney's face was bloodied. Zahoney was shaking and crying, and, after Sponsel and Beck took her back to Beck's apartment, Zahoney said that "[Delgado] hurt me down there," pointing to her vaginal area. Trial Transcript, July 28, 1993, at 20.

Beck testified that she heard a woman crying for help as she ascended the steps to her apartment. She followed Sponsel into Delgado's apartment and saw Zahoney, who was crying, visibly shaking, and naked from the waist down, and Delgado, who was on the couch laughing. She testified that Zahoney's face was freshly bloodied, and that Zahoney pointed to her vagina and cried: "He hurt me.... He hurt me down there." *Id.* at 63.

### Ineffective Assistance of Counsel

Finally, Delgado argues that his Sixth Amendment right was violated because he received ineffective assistance of counsel. Delgado maintains that his attorney's failure to object to prosecutorial remarks at trial and his failure to perfect an appeal until a year after Delgado's conviction constituted ineffective assistance. To maintain a claim for ineffective

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

132 F.3d 42

132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.))

**(Table, Text in WESTLAW), Unpublished Disposition**

**(Cite as: 132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.)))**

assistance of counsel, Delgado must show that his attorney's performance was deficient in that it fell below an objective standard of reasonableness, and that the deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). We have already held that the prosecutor's remarks were not improper. Therefore, Delgado's attorney was not deficient in failing to object. Further, Delgado's conviction was affirmed on appeal, and he can show no prejudice resulting from his attorney's delay in perfecting his appeal.

*4 The application for a certificate of probable cause is GRANTED. The judgment of the district court is AFFIRMED.

C.A.10 (N.M.),1997.

Delgado v. Barreras

132 F.3d 42, 1997 WL 785525 (C.A.10 (N.M.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

304 Fed.Appx. 688                                                                Page 1
304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Dovell B. BATTLE, Petitioner-Appellant,
v.
Marty SIRMONS, Respondent-Appellee.
No. 08-5114.

Dec. 22, 2008.

**Background:** Defendant convicted of second degree burglary and obstruction of a police officer petitioned for a writ of habeas corpus. The United States District Court for the Northern District of Oklahoma, 2008 WL 2889751, denied relief, and defendant sought a certificate of appealability (COA).

**Holdings:** The Court of Appeals, Timothy M. Tymkovich, Circuit Judge, held that:
(1) trial court's refusal to order a redaction of defendant's prior sentence information in copies of prior judgments and sentences provided to the jury did not render his trial fundamentally unfair;
(2) evidence supported burglary conviction; and
(3) defendant was not denied effective assistance of counsel.

Petition denied.

West Headnotes

**[1] Criminal Law 110 ⟶374**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k374 k. Proof and Effect of Other Offenses. Most Cited Cases
Trial court's refusal to order a redaction of defendant's prior sentence information in copies of prior judgments and sentences provided to the jury did not render his trial fundamentally unfair, so as to violate the Sixth Amendment; defendant was sentenced below the maximum sentence allowed under state law, even with all of the un-redacted sentencing information before the jury. U.S.C.A. Const.Amend. 6.

**[2] Burglary 67 ⟶41(1)**

67 Burglary
    67II Prosecution
        67k40 Weight and Sufficiency of Evidence
            67k41 In General
                67k41(1) k. In General. Most Cited Cases
Evidence supported burglary conviction under Oklahoma law; two police officers arrived at the building in question after an alarm was tripped, late at night, and found a padlocked gate surrounding the outside of the building open, and the padlock cut, then observed defendant and a cohort exiting the building from underneath a partially opened garage door, and apprehended defendant as he fled the scene, and the owner of the building testified that some computers and other valuable equipment had been moved from their normal location to a location near the partially opened door.

**[3] Criminal Law 110 ⟶1932**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1932 k. Declarations, Confessions, and Admissions. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT
9
tabbies

Page 2

304 Fed.Appx. 688
304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))**

Defendant was not prejudiced by trial counsel's failure to accept the trial court's offer to hold a post-trial hearing to determine the voluntariness of defendant's confession, thus precluding a finding of ineffective assistance of counsel; defendant made no showing that his statement was involuntary, and the record pointed quite to the contrary. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞1936**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1936 k. Defendant as Witness. Most Cited Cases
Burglary defendant was not prejudiced by trial counsel's refusal to allow defendant to testify in his own defense, thus precluding a finding of ineffective assistance of counsel; state produced strong evidence of defendant's guilt at trial, including the testimony of two police officers and a business owner, and the record did not suggest that the result would have been different had defendant testified. U.S.C.A. Const.Amend. 6.

*689 Dovell B. Battle, Hominy, OK, pro se.

Keeley Lane Harris, Attorney General for the State of Oklahoma, Oklahoma City, OK, for Respondent-Appellee.

Before LUCERO, TYMKOVICH, and HOLMES, Circuit Judges.[FN*]

> FN* After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R.App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

**ORDER DENYING CERTIFICATE OF APPEALABILITY[FN**]**

> FN** This order is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

TIMOTHY M. TYMKOVICH, Circuit Judge.

**1 Dovell B. Battle was convicted of second degree burglary and obstruction of a police officer, and is serving a 30-year sentence in Oklahoma prison. Proceeding pro se,[FN1] Battle seeks a certificate of appealability (COA) to challenge the district court's denial of habeas corpus relief under 28 U.S.C. § 2254. Battle seeks relief on three grounds: (1) un-redacted sentencing information from prior convictions was submitted to the jury, (2) sufficiency of the evidence, and (3) ineffective assistance of counsel.

> FN1. Because Battle proceeds pro se, we review his pleadings and filings liberally. *See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

We conclude Battle is not entitled to relief on any claim and therefore DENY his COA request.

**690 I. Background**

In 2003 two police officers were dispatched to a commercial building in Tulsa, Oklahoma to respond to a tripped alarm in the building. When the officers arrived, they noticed a cut padlock near a rear entry gate, which was open, and a partially open garage door on the rear of the building. The officers then witnessed Battle and another person leaving the building through the partially open garage door. Battle fled, and the officers stopped him after a short chase.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 4 of 7

Case 5:09-cv-81    Document 12-10    Filed 04/13/2009    Page 3 of 6
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 267

304 Fed.Appx. 688    Page 3
304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))

Battle was charged under Oklahoma law with second degree burglary after having been convicted of two prior felonies, and obstructing an officer. After a jury trial, he was convicted on both counts and sentenced to concurrent terms of 30 years imprisonment. Battle unsuccessfully appealed his sentence to the Oklahoma Court of Criminal Appeals (OCCA).

Battle now seeks federal habeas review of his conviction under 28 U.S.C. § 2254.

## II. Discussion

To obtain a COA, Battle must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). This standard is satisfied by demonstrating that "reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal quotation marks omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El,* 537 U.S. at 338, 123 S.Ct. 1029.

### A. Un-redacted prior sentence information

[1] Battle first claims the trial court wrongly refused to order a redaction of his prior sentence information in copies of prior judgments and sentences provided to the jury. The OCCA rejected the claim on direct appeal. The OCCA's analysis was based entirely on state law regarding the requirements for proving former convictions and what information may be considered by a jury. On habeas review, we have no authority to review a state court interpretation or application of its own law. *Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of fed-

eral habeas court[s] to reexamine state-court determinations on state-law questions.").

**2 In light of this obstacle, Battle attempts to recast his claim based on federal due process principles. He also claims that the un-redacted documents could have tainted the jury, thereby violating his Sixth Amendment right to a fair trial by an impartial jury. State evidentiary rulings may be subject to habeas review if the rulings "rendered the trial so fundamentally unfair that a denial of constitutional fairness results." *Duckett v. Mullin,* 306 F.3d 982, 999 (10th Cir.2002). "In engaging in this fundamental fairness analysis, we reiterate that we must examine the proceedings as a whole." *Parker v. Scott,* 394 F.3d 1302, 1317 (10th Cir.2005) (citation omitted). For several reasons, Battle's claim does not rise to the level of rendering his trial fundamentally unfair.

First, Battle did not raise his claim as a federal constitutional claim before the OCCA. Thus, any federal due process claims related to Battle's claim are unexhausted. But even though Battle failed to exhaust, the district court declined to have *691 him return to state court, because the claims lacked merit. *See* R., Doc. 17 at 6 (relying on § 2254(b)(2) for authority to deny a habeas claim on the merits "notwithstanding the failure of the applicant to exhaust" the claim). We agree.

After reviewing the record, we find the failure to redact sentencing information from the list of prior convictions placed before the jury to fall short of implicating fundamental trial fairness. Battle was sentenced below the maximum sentence allowed under state law, even with all of the un-redacted sentencing information before the jury. In essence, Battle argues that the prior sentence information was prejudicial because the jury could have inferred Battle was released on parole before serving the full length of his sentences, and thus, jurists could have speculated that he should be given a longer sentence because he might be released early on parole. This argument requires extensive speculation-which we decline to do-and ignores the wealth of facts

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5 of 7

Case 5:09-cv-81    Document 12-10    Filed 04/13/2009    Page 4 of 7
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 268

304 Fed.Appx. 688
304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))**

from trial, which as a whole supported the jury's ultimate decision at sentencing. We have found much more inflammatory material placed before the juries not to have rendered trials fundamentally unfair. *See Wilson v. Sirmons*, 536 F.3d 1064, 1113 (10th Cir.2008) (collecting cases). And, in any event, the jury did not give Battle the maximum sentence allowed, supporting the OCCA's conclusion that the information before the jury was harmless beyond a reasonable doubt.

Accordingly, we deny Battle a COA on his first claim.

**B. Sufficiency of the evidence**

[2] Battle also challenges the sufficiency of the evidence for his burglary conviction. "Sufficiency of the evidence is a mixed question of law and fact." *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir.2006). It requires that we ask whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). If facts in the record support conflicting inferences, we must presume "that the trier of fact resolved any such conflicts in favor of the prosecution." *Id.* at 326, 99 S.Ct. 2781.

**\*3** Battle's numerous arguments about the insufficiency of the evidence leave much to be desired. The arguments merely assert Battle's version of events, and his unsurprising skepticism toward the state's evidence. For example, he argues "no physical evidence supported any evidence that the appellant had entered inside of the alleged building." Aplt. Br. at 10. But two officers testified they saw Battle leaving the building.

Battle also makes much of the lack of additional evidence of his guilt, such as the "absence of [him] being in possession of any tools or property" or any "fingerprints on any items inside or outside of the overhead door," a lack of videotape, and the lack of "DNA, or proof beyond a reasonable doubt." Aplt. Br. at 14. But the lack of some evidence says nothing about the evidence actually presented. Battle also makes an "adamant assertion that [he] never entered the alleged building, with all due respect, challenges any rational trier of fact to prove otherwise." Aplt. Br. at 15. But this was Battle's defense at trial, and the jury found otherwise.

When Battle presented his sufficiency of the evidence challenge before the OCCA, it was rejected. In applying 28 U.S.C. § 2254(d), we focus on whether the state court's result contravenes or unreasonably applies clearly established federal law, not on the extent of the reasoning followed by \*692 the state court in reaching its decision. *See Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir.1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated.... [W]e cannot grant relief unless the state court's result is legally or factually unreasonable.").

Here, while the OCCA's summary opinion offers sparse analysis of Battle's sufficiency challenge, the district court's review of the evidence presented at trial illustrates the strength of the state's case. Two police officers arrived at the building in question after an alarm was tripped, late at night. The officers found the padlocked gate surrounding the outside of the building open, and the padlock cut. The officers observed Battle and a cohort exiting the building from underneath a partially opened garage door. The officers then apprehended Battle as he fled the scene. The owner of the building testified that some computers and other valuable equipment had been moved from their normal location to a location near the partially opened door. This evidence, and any reasonable inference drawn from it, was sufficient for a juror to find Battle had burglarized the building, and specifically that he had broke and entered, and had an intent to steal. We agree with the district court, the evidence was sufficient to support Battle's conviction for second degree burglary under Oklahoma law.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 6 of 7

Case 5:09-cv-81    Document 12-10    Filed 04/13/2009    Page 5 of 7
Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 269

304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))**

We decline to grant Battle a COA on his second claim.

### C. Ineffective assistance of counsel

Lastly, Battle claims his trial counsel was ineffective for two reasons: (1) failure to accept the trial court's offer to hold a hearing under *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to determine the voluntariness of his confession; and (2) failure to allow him to testify in his own defense. Both claims were rejected by the OCCA. Thus, Battle must show that the OCCA's adjudication of his claim was an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Battle must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defendant so that, but for counsel's errors, there was a reasonable probability the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**\*\*4** We address Battle's two arguments in turn.

*Failure to request a voluntariness hearing*

[3] Battle claims his counsel was ineffective for failing to agree to holding a specific evidentiary hearing after trial related to his statement he now characterizes as a "confession." When a defendant challenges the voluntariness of a confession, the Supreme Court has determined the voluntariness issue should be decided by a separate hearing, instead of being determined by the jury charged with determining guilt. *See Jackson,* 378 U.S. at 376, 84 S.Ct. 1774. These are commonly known as *Jackson v. Denno* hearings. *See generally* 2A Charles Alan Wright, Federal Practice and Procedure: Criminal § 414, at 117-22 (3d ed.2000).

The "confession" statement in question came from the owner of the burgled business, who testified that he heard the apprehended Battle say to him, "I

know it doesn't mean anything, but I'm sorry." R., Doc. 17 at 11. Battle's counsel objected at trial to the admission of the statement, but was overruled. At sentencing, the trial court recognized that the defendant had no opportunity to challenge the voluntariness of the statement outside the \*693 jury's presence. The judge explained how the lack of any custodial interrogation during the time of the alleged statement, as well as the apparent voluntariness of the statement, both accounted for the failure to conduct a hearing. However, the trial judge ultimately offered to have a *Jackson v. Denno* hearing, "postmortem." R., Doc. 10, Ex. 8 at 3. Battle's counsel declined the trial judge's offer to hold a *Jackson v. Denno* hearing, "I don't think it would be appropriate for me to suggest that we have a Jackson/Denno hearing now, and so I would object to a[ ] postmortem Jackson/Denno hearing." *Id.* at 5. The trial court subsequently ruled on all Battle's post-trial motions and sentenced him. Battle now claims his counsel's failure to request a post-trial *Jackson v. Denno* hearing was ineffective assistance of counsel.

The OCCA rejected Battle's ineffective assistance of counsel claim largely because he did not show prejudice. If the OCCA properly decided Battle failed to establish prejudice, it is unnecessary for us to evaluate the first prong of the *Strickland* test. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.").

We agree with the OCCA. Battle has not shown prejudice. He makes no showing on appeal that his statement was involuntary, and the record points quite to the contrary. Absent any evidence of an involuntary custodial interrogation, we decline to grant Battle a COA for ineffective assistance of counsel.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

304 Fed.Appx. 688

304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.)))**

*Failure to allow Battle to testify*

**\*\*5** [4] Finally, Battle claims his counsel refused to allow him to testify in his own defense. Due process of law protects the right to testify on one's own behalf at a criminal trial. *Rock v. Arkansas,* 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 **(1987)**. "The decision whether to testify lies squarely with the defendant; it is not counsel's decision." *Cannon v. Mullin,* 383 F.3d 1152, 1171 (10th Cir.**2004**). If Battle were prevented from testifying in his own defense by counsel, he would satisfy the *Strickland* deficient performance prong. But he must also show prejudice to satisfy *Strickland.*

The OCCA found that Battle had not established prejudice. The state produced strong evidence of Battle's guilt at trial, including the testimony of two police officers and the business owner. Upon a review of the record, we see no suggestion the result of Battle's trial would have been different had he testified. To counter the overwhelming weight of the evidence presented against him, Battle argues that his testimony would have explained away all of the state's evidence. Even if we entertain Battle's arguments presented in brief, which reflect the 20/20 wisdom of hindsight, we cannot find prejudice.

While we make all presumptions in favor of Battle, the arguments remain unavailing. For example, to counter the two police officers who testified to have actually seen Battle exit the burglarized building (around midnight, with a gate opened and padlock cut), Battle asserts,

> [The Officer] testified that he observed two (2) individuals exiting the building from "beneath" the west overhead door-a door (by his own testimony) only raised a mere THREE (3) to FOUR (4) feet above the ground. The district [court judge] erroneously did not take into consideration that the Appellant\*694 is 6' [foot 1" inch] in height and weighed approximately 230 pounds at the time of this alleged offense. Even in his best physical condition, the Appellant could not have

run, walk[ed] or even crawl[ed] underneath a three to four foot raised door. Not by any stretch of the imagination.

Aplt. Br. at 26. But it is not hard to imagine a jury, hearing the officer's testimony, would conclude that Battle could have easily exited from under a four foot opening in a door.

We have carefully reviewed all of Battle's arguments for how his testimony might have persuaded the jury of his innocence, and we agree with the OCCA: Battle was not prejudiced by his failure to testify in his own defense. Thus, he has not shown the OCCA's determination was an unreasonable application of Supreme Court precedent. Accordingly, we do not grant a COA on this issue.

### III. Conclusion

For the reasons set forth above, we DENY Battle's petition.

C.A.10 (Okla.),2008.
Battle v. Sirmons
304 Fed.Appx. 688, 2008 WL 5328447 (C.A.10 (Okla.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**FILED**

**APR 13 2009**

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____ DEPUTY

| | | |
|---|---|---|
| HOWARD P. MORRIS, III, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | No. CIV-09-81-R |
| | ) | |
| RANDY WORKMAN, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## STATE COURT RECORD

Respondent, by and through the Attorney General for the State of Oklahoma, W.A.

Drew Edmondson, hereby conventionally submits the relevant state court records and

transcripts, in Oklahoma County Case No. CF-2004-1212, which include the following:

> Transcript of Preliminary Hearing, March 25, 2005
> Transcript of Jury Trial, April 4, 2006, Vol. 2 of 3
> Transcript of Jury Trial, April 5, 2006, Vol. 3 of 3

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

_____
**JARED A. LOOPER, OBA #21529**
**ASSISTANT ATTORNEY GENERAL**
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921; FAX (405) 522-4534
**ATTORNEYS FOR RESPONDENT**

1     IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

2                     STATE OF OKLAHOMA

APR 2 1 2005

3   THE STATE OF OKLAHOMA,           )
                                     )   PATRICIA PRESLEY, COURT CLERK
4              Plaintiff,            )   By_____
                                     )            Deputy
5   vs.                             )   Case No. CF-2004-1212
                                     )
6   HOWARD PURIFOR MORRIS, III,      )   F-2006-428
                                     )
7              Defendant.           )

8                     *  *  *  *  *

9     TRANSCRIPT OF PRELIMINARY HEARING PROCEEDINGS

10         HAD ON THE 25TH DAY OF MARCH, 2005

11           BEFORE THE HONORABLE D. FRED DOAK

12                     SPECIAL JUDGE

13                    *  *  *  *  *

14           A P P E A R A N C E S

15   For the State:          Christy Miller
                             Assistant District Attorney
16                           Patrick Crawley
                             Assistant District Attorney
17                           County Office Building
                             Oklahoma City, Oklahoma
18

19   For the Defendant:      Chris Box
                             Attorney at Law
20                           2208 Southwest 59th Street
                             Oklahoma City, Oklahoma
21

22

23

24   Reported By:
     Kim Fowler, C.S.R.
25

1              I    N    D    E    X

2  WITNESSES ON BEHALF OF THE STATE:                    PAGE

3      KURT JACINTO BRAZILLE
           Direct Examination, by Ms. Miller ----------- 5
4          Cross-Examination, by Mr. Box --------------- 27

5      DEWAN SALVADORE DEBOSE
           Direct Examination, by Mr. Crawley ---------- 45
6          Cross-Examination, by Mr. Box --------------- 53

7  EXHIBITS:

8      STATE'S EXHIBIT 1
           Offered ------------------------------------- 64
9          Admitted ------------------------------------ 65
           Withdrawn ----------------------------------- 67

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (With the Defendant present with counsel, counsel for the

2    State present, the following proceedings were had in open

3    court:)

4            THE COURT:  State of Oklahoma versus Howard Purifor

5    Morris, III, case number CF-2004-1212.  Counsel will please

6    announce your appearances.

7            MS. MILLER:  Christy Miller and Pat Crawley for the

8    State.

9            MR. BOX:  Chris Box on behalf of the Defendant,

10   Howard Morris, Your Honor.

11           THE COURT:  Mr. Box, are you aware of any law

12   enforcement report to which you're entitled under LaFortune

13   versus District Court that you have not timely received?

14           MR. BOX:  No, Your Honor.  I have been provided

15   every copy of the DA's file.

16           THE COURT:  All right, sir.  Do you waive formal

17   reading of the Information?

18           MR. BOX:  Yes, Your Honor, I do.

19           THE COURT:  Any announcements from the Defendant

20   before we begin receiving evidence?

21           MR. BOX:  No, Your Honor.

22           THE COURT:  If there is nothing further, then, Ms.

23   Miller, you may call your first witness.

24           MS. MILLER:  Thank you.  The State calls Kurt

25   Brazille.

4

1        THE COURT:  Mr. Box, if you wish, you may have your

2   client at counsel table with you so you'll have his

3   assistance.

4        MR. BOX:  Or can he be excused to there?  Judge, I

5   would just rather keep him over there.

6        THE COURT:  All right.

7     (A brief pause was had in the proceedings.)

8        THE COURT:  Step around here in front of me, if you

9   would, please, sir, and raise your right hand.

10   Whereupon,

11             KURT JACINTO BRAZILLE,

12   was called as a witness on behalf of the State of Oklahoma

13   and, having been first duly sworn, was examined and testified

14   as follows:

15        THE COURT:  Have a seat right over there, please.

16   And if you will arrange yourself comfortably so you can face

17   the podium, that's where the attorneys will be standing, and

18   try to put the microphone right directly between you and Ms.

19   Miller.

20        Please tell me your full name and then spell your

21   last name for me.

22        THE WITNESS:  My name is Kurt Jacinto Brazille,

23   B-R-A-Z-I-L-L-E.

24        THE COURT:  Thank you.  Ms. Miller, you may -- would

25   you spell your middle name for me?

1          THE WITNESS:  J-A-C-I-N-T-O.

2          THE COURT:  Thank you, sir.

3          Ms. Miller, you may inquire.

4          MS. MILLER:  Thank you, Judge.

5                    <u>DIRECT EXAMINATION</u>

6     BY MS. MILLER:

7     Q    Good morning, Mr. Brazille.

8     A    Good morning.

9     Q    Mr. Brazille, I want to take you back to February 20th of

10    2004, okay?

11    A    Okay.

12    Q    At that time were you staying at the Rockwell Villa

13    Apartments?

14    A    Yes, ma'am.

15    Q    And can you tell us where those apartments are located?

16    A    They're located on Northwest Tenth and Rockwell.

17    Q    Do you know if that's in Oklahoma City?

18    A    Yes.

19    Q    Do you know whether or not it's in Oklahoma County?

20    A    Now, not to my knowledge -- I believe it's Oklahoma

21    County, I believe.

22    Q    Okay.  Mr. Brazille, I want to talk to you about that

23    day.  Were you living at an apartment by yourself, or were you

24    staying with someone else?

25    A    I wasn't living by myself.  I had a girlfriend that lived

1    there that I was basically staying pretty close to like four

2    to five days there.

3    Q    And what was your girlfriend's name?

4    A    Tracy.

5    Q    So you were staying at your girlfriend -- is that Tracy

6    Laws?

7    A    Yes, ma'am.

8    Q    So you were staying at Miss Laws' apartment; is that

9    right?

10   A    Yes.

11   Q    Okay.  And you have a nephew by the name of Dewan DeBose;

12   is that correct?

13   A    Yes, ma'am.

14   Q    On February 20th of 2004, Mr. Brazille, did something

15   happen at the Rockwell Villa Apartments that made you go

16   outside and see some things?

17   A    Yeah.  To begin, my nephew and about two more of my

18   cousins came over with -- also my stepson and his skateboard

19   friends was there too.

20        THE COURT:  Mr. Brazille, let me ask you if you

21   could move the microphone maybe just a little further away

22   from you.  Okay.  Thank you, sir.

23        I apologize for interrupting.  Please continue.

24        THE WITNESS:  And Dewan had asked me to use the

25   phone, and I was being not in a good mood because all the kids

1   was in the house, and it was pretty close to midnight or

2   11:30, somewhere in that time.

3   Q      (By Ms. Miller)   So when you say Dewan, are you talking

4   about Dewan DeBose?

5   A      Yes, ma'am.

6   Q      Okay.  And that's your nephew?

7   A      That's my nephew.

8   Q      Okay.  And he had asked you to use the phone; is that

9   right?

10  A      Yes.

11  Q      And if I understand you correctly, it was late at night

12  and you decided you weren't going to let him use the phone?

13  A      Yeah.

14  Q      Was he young at the time?

15  A      I believe he was 17.

16  Q      Okay.  So what did you tell -- did you tell him to do

17  anything since you said you can't use my phone?

18  A      I said, no, you can't use my phone, go use the pay phone.

19  Q      Okay.  And what happened after that?

20  A      He left the apartment and pretty close to -- pretty close

21  to about five to seven minutes later my niece came up the

22  stairs and said, there's a fight at the -- up by the

23  mailboxes.

24  Q      Okay.  So about five to seven minutes after Dewan left to

25  use the pay phone; is that right?

8

1    A    Yes.

2    Q    Okay.  And had he come back to your home, or was he still

3    out?

4    A    He was still out.

5    Q    Okay.  And your niece came over.  Can you tell us what

6    her name is?

7    A    Her name is Paula.  I believe it was my niece and my

8    daughter.

9    Q    Is that Paula Turner?

10   A    Yes, ma'am.

11   Q    And your daughter as well?

12   A    Yes.  I believe it was both of them at the same time.

13   Q    Okay.  And they came in -- so that I understand you

14   correctly, they came in and said something -- some kind of

15   fight's going on out by the mailboxes?

16   A    Yes, ma'am.

17   Q    The apartment that you were staying in, was it located

18   close to the mailboxes or far away?

19   A    It was at the back of the apartment complex.

20   Q    The apartment you were staying in?

21   A    Yes.

22   Q    Okay.  And where were the mailboxes located?

23   A    They was at the front of the --

24   Q    At the front?

25   A    Yes, up by the office.

1    Q    When you -- so after your niece and your daughter told

2    you about a fight that was going on, did you go outside?

3    A    Yeah.  I immediately ran outside, me and my stepson and

4    his skateboarding friends.

5    Q    And where did you go?

6    A    We ran straight up to the mailbox area where we seen four

7    people coming back.  Three of them was people I didn't know,

8    but the fourth one was my nephew.

9    Q    Okay.  So when you went out of your apartment, did you

10   make it all the way to the mailbox area before you saw these

11   people?

12   A    No.  We didn't get to make it all the way exact (sic) to

13   the mailbox.  We made it to the breezeway before the mailbox.

14   Q    Okay.  And then you said that four people came up.  One

15   of those four people was your nephew Dewan; is that right?

16   A    Yes, ma'am.

17   Q    And do you know who the other three people were?

18   A    I never seen them a day in my life.

19   Q    Okay.  What happened as you saw these four people coming

20   toward you?

21   A    I was running and everybody was running to where the

22   commotion was that came out of my house (sic), and my nephew

23   and I believe it was the taller guy with the teardrops on his

24   eye was walking back, and the other two gentlemen was

25   following behind him, and they was real like angry.  And my

1    nephew said, it's all right, uncle, it's not me, it's fine.

2    And the guy -- the guy with the baseball cap had his fist

3    balled and had his bottom lip sucked in to where he was saying

4    that he would take a fair fight with anybody, and I was just

5    going to see where my nephew was.  I didn't know that -- what

6    happened at that time.

7    Q     Would it be fair to say that you were concerned whether

8    or not your nephew was involved in the --

9    A     I was most definitely concerned --

10   Q     -- commotion?

11   A     -- yes, ma'am.

12   Q     Okay.  Now, you told me that there were four people

13   coming toward you, one was your nephew Dewan?

14   A     Uh-huh.

15   Q     And can you tell me -- describe the other three people

16   one at a time for me.

17   A     The tall gentleman that had the two teardrops on his eye

18   had -- I would say he was pretty close to like six-two,

19   six-three area, somewhere in there.

20   Q     Okay.  Do you recall what he was wearing or anything

21   about his appearance other than the teardrop tattoos?

22   A     He had on -- either he had on some blue jeans with a

23   light skin -- light sky blue shirt.

24   Q     Okay.

25   A     And the driver of the vehicle was wearing a black hoodie

1   with some black pants on.  I didn't know what type of shoes

2   neither one of those had and --

3   Q    Okay.  So the tall guy with the two teardrops had on blue

4   jeans and a light blue shirt?

5   A    To my knowledge, yes.

6   Q    Was that a T-shirt or was it a sweatshirt or a jacket,

7   could you tell?

8   A    It could have been a jacket because it was pretty chilly

9   out.

10  Q    Okay.  And then you said that there was a driver, and you

11  described him wearing a black hoodie with black pants?

12  A    Yes, ma'am.

13  Q    And there was a third person in that group.  Tell me what

14  that person looked like.

15  A    Well, he had a baseball cap on that came down to his

16  eyebrows (indicating) to where you couldn't see his eyes.  All

17  you can see is from here down (indicating).

18  Q    Okay.

19  A    And he had a -- he had a jacket on.  I believe it was

20  almost like a North Carolina jacket, but it had "Thug Life" on

21  the back of it.

22  Q    Okay.

23  A    And I also do believe he did have blue jeans on too.

24  Q    Okay.  Now, you said something a minute ago about the guy

25  with the baseball cap had his lip sucked in or taken in.  What

1  do you mean by that?

2  A    I mean to where he was -- whoever was running up to all

3  four of them at the same time, he was ready to -- to carry on

4  defending whatever he was defending at that time.  I guess he

5  was wanting to fight.

6  Q    Okay.  Now -- and just so I understand you correctly,

7  which of these people had their fists balled up and looked

8  like he was ready to fight?

9  A    The guy with the baseball cap.

10  Q    Okay.  Is the guy with the baseball cap also the one who

11  made the statement about he would catch a fight with anyone

12  or --

13  A    Yeah.  He said he will take a fair fight with anybody.

14  And my nephew kept stating to the tall dude with the teardrops

15  that, this is my uncle.  And he was like, I don't care, I'll

16  just get a fair fight with anybody, and just had his lip still

17  sucked in.

18  Q    Okay.  Did it appear to you based on what you saw, did

19  it -- did you think that these three men thought that you were

20  coming to fight with them?  Is that the impression you got?

21  A    Yeah, I got that impression, but --

22  Q    But you weren't?

23  A    No.  I wasn't coming to fight.  I was just basically

24  looking for my nephew.

25  Q    Okay.  After your nephew and these other three men came

1  walking toward you at the apartment complex, what happened
2  after that?
3  A    My nephew kept saying to me, mumbling to where I guess
4  the others couldn't hear him, saying, man, they messed Rodney
5  up, they messed Rodney up.  And it wasn't -- it didn't dawn on
6  me what Rodney he was talking about.
7  Q    Now, did your nephew appear to be upset or scared at this
8  time that he was saying these things?
9  A    He looked more scared to me.
10 Q    And did you know a person in your apartment complex by
11 the name of Rodney?
12 A    Yeah.  I knew Rodney for a while.
13 Q    And is that person Rodney Perry?
14 A    Yes, ma'am.
15 Q    Can you tell us how long you had known Rodney Perry?
16 A    Anywhere from like nine to ten years.
17 Q    How had you known him?
18 A    He used to date my niece.
19 Q    So you had known him for a really long time?
20 A    Yeah.
21 Q    And when your nephew said they had messed Rodney up, you
22 didn't know they were talking about Rodney Perry at the time?
23 A    No, I didn't.
24 Q    When your nephew made that statement to you, they messed
25 Rodney up, could you tell who he was talking about?

14

1    A    No, no, not at the time.  He couldn't -- he couldn't just

2    say it was Rodney, the Rodney I know.  I guess he just kept

3    saying, they messed Rodney up, they messed him up bad.

4    Q    And what happened after Dewan made those statements to

5    you?

6    A    We was still standing there, and the guys is like, yeah,

7    he's over there laying down beside the car.  Do you want to go

8    see him?  I was like, no, you wouldn't want me to go over

9    there and see him, you know, I'll look at his shoes and see

10   what size he wear.  I'm going to be straight honest with you.

11   That's what I said.

12   Q    Okay.  And why did you say that?

13   A    Just -- just to -- just to try to make the guys go ahead

14   and leave is what I told them, just go ahead and leave.  And

15   they was wanting to go back and do some more.  I was like, no,

16   man, he's already down, I guess, just go ahead and leave.  You

17   done proved your point to him.

18   Q    Okay.  And at this time did you know that they were

19   talking about Rodney Perry?

20   A    No, ma'am.

21   Q    So the three guys that are in this group, the baseball

22   cap, the teardrop tattoos, and the guy with the black hoodie,

23   they told you, he's laying over there, go over and look at him

24   if you want?

25   A    Yeah.

1    Q    Did they all three make statements about Rodney being

2    down, or was it one person or two people?

3    A    The guy with the teardrops and the gentleman with the

4    baseball cap is the only one that stayed close to me, and the

5    dude with the teardrop is the one that said that we can go and

6    look at him.  I didn't want to go look.  And I said -- when I

7    said something about the tennis shoes, this is what made the

8    guy with the teardrops look down at his shoes, and I guess he

9    noticed that he had blood on his shoes.  So they went back

10   around the vehicle and proceeded to finish Rodney off.

11   Q    Okay.  So while you're standing there talking with these

12   three men and your nephew, the guy with the teardrop tattoos

13   looks down and you can see that there's blood on his shoes,

14   and you think he realized he had drops on his shoes?

15              MR. BOX:  Objection, Your Honor, calls for

16   speculation.

17              THE COURT:  Sustained.

18              MR. BOX:  Also asked and answered.

19   Q    (By Ms. Miller)  You saw something on his shoes, right?

20   A    I didn't look at his shoes.

21   Q    Okay.  Then I misunderstood you.

22   A    When I told him that --

23              MR. BOX:  Objection, not responsive to the question

24   asked.

25              THE COURT:  Sustained.

1    Q      (By Ms. Miller)  Can you tell us what happened about the

2    time that the guy with the teardrops said, you can go over and

3    look at him if you want, and you made the comment about shoes,

4    what happened after that?

5    A      He looked down at his shoes and said, oh, sh (phonetic),

6    I got blood on my shoes, and then he proceeded to go back with

7    my -- with my stepson and his eight friends that's -- was all

8    skateboarders, and they went back around, and all you can hear

9    was the sound of blows coming from the other side of the

10    vehicle.

11    Q      Okay.  The guy with the teardrops went back over to where

12    this person was laying on the ground; is that right?

13    A      Yes, and the guy with the hat.

14    Q      So the guy with the baseball cap, he went back over there

15    as well?

16    A      Yeah.

17    Q      How about the guy in the black hoodie, did he go back

18    over there?

19    A      They all three proceeded to go back.

20    Q      Okay.  I just wanted to make sure I had it clear on who

21    went back.  All three of the men that you've described to us

22    went back over to where this person was laying on the ground;

23    is that right?

24    A      Yes.

25    Q      Now, you said something about your stepson and his

17

```
 1   friends went as well.  Where did they go?
 2   A    They stood in front of the vehicle, exactly by like the
 3   mailboxes where the car was parked.
 4   Q    Okay.
 5   A    And like I said, you can just -- you can hear it.  You
 6   can hear it, the --
 7   Q    Okay.  Your stepson and his eight friends, did they go
 8   down and participate in anything --
 9   A    No.
10   Q    -- that happened to the man on the ground?
11   A    No.
12   Q    Okay.  So the only person that you saw touching the man
13   on the ground was the three men you've described?
14        MR. BOX:  Objection, Your Honor, leading.
15        THE COURT:  Overruled.
16   Q    (By Ms. Miller)  Go ahead and answer that, Mr. Brazille.
17   A    I didn't look to see who was hitting who.  I just didn't
18   want to see it at all.
19   Q    Okay.  Well, tell me what you could see from where you
20   were standing after the three men left you and went back to
21   where the man was on the ground.  What could you see?
22   A    You could see the movement over there by the vehicle
23   where Rodney there -- where they said that he was laying.
24   Q    Okay.  And what kind of movements could you see?
25   A    Oh, stomping and --
```

1    Q    Stomping?

2    A    -- pulling him up, kicking him, all kinds of stuff.

3    Q    And were all three of the men participating in the

4    stomping and hitting, or was it just one or two?

5    A    I believe it was -- I think it was two.

6    Q    And which two do you remember seeing doing it when they

7    went back over to where Rodney was laying?

8    A    The guy with the baseball cap and the dude with the

9    teardrops.

10   Q    And do you know about how long they stayed over there

11   hitting on Rodney again?

12   A    It couldn't be no more than two to three minutes.

13   Q    And what did you do -- were you just standing in the

14   parking lot when this was going on?

15   A    No.  I was standing on the sidewalk --

16   Q    On the sidewalk.

17   A    -- where it's in the breezeway before the mailboxes.

18   Q    Could you hear any statements being made by the person

19   being hit?  Were they saying anything?

20   A    I didn't -- I couldn't -- not -- no, I didn't hear.

21   Q    After the three men quit stomping and hitting on Rodney

22   that was on the ground, what did they do?

23        MR. BOX:  Objection, Your Honor.  I don't believe

24   the testimony was all three men were stomping and hitting.  I

25   believe he said that he saw two people hitting.

1          THE COURT:  I believe that's correct, Ms. Miller.

2          MS. MILLER:  I'm sorry.  That's correct.

3    Q    (By Ms. Miller)  I didn't mean to misstate what you said,

4    Mr. Brazille.  The three men went over to where the man was

5    laying on the ground and you saw two of them hitting him; is

6    that right?

7    A    Yes, to my knowledge.  All three of them could have been

8    doing it but once --

9    Q    Okay.  But you only saw two?

10   A    Yes, ma'am.  But the sound of -- the sound of that, I

11   just -- I just turned my head because I didn't -- I just

12   couldn't believe it.

13   Q    Okay.  When the hitting stopped, what did the three men

14   that you've described to us do?

15   A    They proceeded to come back around the car.  And I told

16   them, man, you guys just might as well just go ahead and

17   leave, man, just go ahead and leave.  And the driver of the

18   vehicle was saying, this -- I drive this purple car, I live

19   out on 122nd and -- I believe it was May or Penn, somewhere in

20   that area, and --

21   Q    Okay.  And did he say anything else after that?

22   A    No.  They proceeded to get in the car to drive off.

23   Q    Okay.  Now, you named a person that you called the

24   driver.  What did the driver have on?

25   A    He had on black with the black hoodie and --

1    Q    The guy wearing the black hoodie got into the driver's

2    seat of the car?

3    A    Yes, ma'am.

4    Q    Of that purple car?

5    A    Yes.

6    Q    And then did the other two people get in the car as well?

7    A    Yes, ma'am.

8    Q    And then what happened after they got in the car?

9    A    They proceeded to back up, but Bethany Police Department

10   and Oklahoma City Police Department was coming right off of

11   Rockwell to where they was going to have to leave the

12   apartments.  So it's just one way in, and when they were

13   backing in, Oklahoma City police was coming.  They -- I guess

14   they stopped and came back in.  We proceeded to walk on down

15   to the house after we noticed they was going to drive off.

16   Q    Okay.  So you saw the three men get into this purple car

17   and you thought they were leaving, so you started to walk back

18   to your apartment?

19   A    Yes.  And by that time the police and the -- I guess --

20   AMCARE, I guess, was coming.  And we went on down to the

21   apartment and then, like I said, you can see the polices (sic)

22   is lined up on the front -- on Rockwell to where, I guess,

23   nobody can come in and nobody can leave.

24   Q    Okay.

25   A    And I went on into the house, and my nephew and my

1   stepson and his friends were still standing on the porch

2   talking about how bad it looked.

3   Q    Okay.

4   A    And then that's when Dewan had really told me, it's

5   Rodney, it's Rodney.  I was like, Rodney who?  The one that go

6   with Dewan?  I was like, no.  He was like, yeah.  And I would

7   say within like two minutes later all the two -- the two

8   gentlemen come from under the breezeway.  The guy with the

9   teardrop stated that the dude was driving the vehicle must

10  have jumped over the fence and ran, because we -- all we heard

11  was dogs barking in the neighborhood there.

12  Q    Let me stop you for just a second before we get too far.

13  You said the people that were in the purple car left.  Did you

14  see them pull back into the apartment complex or come back in?

15  A    No.  I didn't see them pull back in.  I thought they had

16  left.

17  Q    Okay.  You thought they left, and the next thing you know

18  the guy with the teardrops, you see him again.

19  A    He's right there, yeah.

20  Q    Okay.

21  A    It was like --

22  Q    So the guy with the teardrops comes to your door; is that

23  right?

24  A    They were standing downstairs at the bottom of the

25  breezeway, and then they came up to -- wanted to use the

1    phone.

2    Q    And was the man with the teardrops alone, or did he have

3    someone else with him?

4    A    No.  He had the guy with the baseball cap with him.

5    Q    And the guy with the black hoodie is the one who you

6    think ran off?

7    A    Yes, ma'am.

8    Q    Because he wasn't there at your apartment that evening?

9    A    No.

10   Q    And what happened when the man with the teardrops and the

11   man in the baseball cap came to your apartment?  Or came --

12   I'm sorry, came to your breezeway.

13   A    They proceeded -- because the door was open, they

14   proceeded to act like they was going to come on in.  And I

15   told them, no, you can't come in here because my girlfriend

16   will be highly upset at me.  So -- and they just said, we need

17   to use the phone.  And my stepson -- well, he's not my

18   stepson, but a kid that we was taking care of was also staying

19   there with us, so I didn't give them the house phone, but I

20   gave him his cell phone to use.

21   Q    And what is his name, the person whose cell phone you

22   allowed them to use?

23   A    His name is Shannon.

24   Q    Shannon?

25   A    Yes.

```
 1   Q    What's his last name?

 2   A    Forest.

 3   Q    Could you spell that?

 4   A    No, I can't really.

 5   Q    Okay.  Forest?

 6   A    Yes, I believe.

 7   Q    Like a forest of --

 8   A    Forest Gump, yeah.

 9   Q    Okay.  I was going to say trees, but that makes it even

10   easier.  So you gave them Shannon Forest's cell phone?

11   A    Uh-huh.

12   Q    And did they use that cell phone?

13   A    Yes.

14   Q    Which person used the cell phone?

15   A    The guy with the baseball cap.

16   Q    Baseball cap.  Could you hear any part of his

17   conversation?

18   A    He just said, man, meet me at Abadan's.

19   Q    Did you know what Abadan's was?

20   A    Yes, I knew what Abadan's --

21   Q    What is that?

22   A    It's a little convenience store that sells hot food and

23   all kinds of stuff.

24   Q    Is it close to the Rockwell Villa Apartments?

25   A    Yes.
```

1    Q    Do you know about where it's at?

2    A    It's on Tenth and -- I don't know the name of the street,

3    but it's right next to the Riverton Apartments.

4    Q    It's in the Tenth and Rockwell area?

5    A    Yes, ma'am.

6    Q    So the person with the baseball cap said, meet me at

7    Abadan's?

8    A    Yes.

9    Q    Could you hear anything else that was said?

10   A    No.  He just told him to meet me there, and whoever it

11   was must have said okay.

12   Q    Okay.  What happened after that?

13   A    He hung up the phone and gave it back to me, and he

14   looked up at me and said, thank you, man, thank you a lot.

15   Q    What happened after he thanked you for letting him use

16   the phone?

17   A    They went down the back stairway of the apartments.

18   Q    Did they both leave together --

19   A    Yes.

20   Q    -- the person with the teardrops and the baseball cap?

21   A    Yes.

22   Q    Did you see the people anymore after that day --

23   A    No.

24   Q    -- at the apartment complex?

25   A    No.

1  Q    Did you ever go down and -- after your nephew Dewan told

2  you that it was the Rodney that you knew who was down there,

3  did you ever go down and look at Rodney?

4  A    No.  No.

5  Q    When you were down in the parking lot on the sidewalk

6  earlier, could you see any part of Rodney's body by the car?

7  A    No.  The only time I seen his body is when the police

8  came and got me and brought me down to the station.

9  Q    Okay.  And when you went -- on the way to talk to the

10 police, did you see Rodney Perry's body in the parking lot?

11 A    Yeah.  He was laying -- yeah.

12 Q    Were you able to tell that it was the Rodney that you

13 knew?

14 A    I wasn't that close.

15 Q    You didn't go up and look at anything or anything?

16 A    No.

17 Q    Mr. Brazille, I'm going to ask you to look around the

18 courtroom today and tell me if you see any of the people

19 involved in this incident with Rodney Perry on February 20th

20 in the courtroom today.

21 A    It's the gentleman with the glasses on.

22 Q    Okay.  I'm going to have to get you to -- I know this is

23 hard for you, Mr. Brazille, but there are several people in

24 the courtroom with glasses on, okay?  Can you tell me, the

25 people who were involved in this, were they white men or black

1   men?

2   A    He was black.

3   Q    Okay.  And can you tell me what color of clothing the

4   person you see here today is wearing?

5   A    Orange.

6   Q    And can you tell me where that person is located?

7   A    He's sitting behind the -- the attorney here (indicating)

8   with the yellow book.

9        MS. MILLER:  Would the record reflect identification

10  of the Defendant Morris?

11       THE COURT:  So noted.

12  Q    (By Ms. Miller)  And, Mr. Brazille, I'm going to ask you,

13  the person you've identified here today, what was this person

14  wearing at the Rockwell Villa Apartments on February 20th?

15  A    He had the baseball cap and the jacket that was stating

16  "Thug Life" on it.

17  Q    So he was the one in the baseball cap who placed the

18  phone call?

19  A    Yes.

20       MS. MILLER:  Thank you, Mr. Brazille.  I have no

21  other questions for you, but Mr. Box is going to ask you some,

22  okay?

23       THE WITNESS:  (Nods head up and down.)

24       THE COURT:  Cross-examine.

25                    CROSS-EXAMINATION

BY MR. BOX:

Q     Mr. Brazille, this was -- this happened -- this incident happened on February 20th, 2004; is that correct?

A     Yes.

Q     And about what time of the day or the night did this incident occur?

A     Anywhere from 11:30 to 12.

Q     So it was late -- late night; is that correct?

A     Yes.

Q     Now, how long had you been at that apartment complex that particular day?

A     Been there for all day.

Q     And you mentioned on direct examination that there were several people there at the apartment complex with you that night; is that correct?

A     Yes, sir.

Q     Now, who exactly was with you that night at the apartment complex?

A     My stepson.

Q     And who is that?

A     His name is Cal.

Q     Cal what?

A     Laws.

Q     And who else?

A     And his friends, pretty close to eight of them.

1    Q    And do you know any of their names?

2    A    Oh, it's been so long.  They don't come around no more

3    since this incident happened.

4    Q    Well, and you stated about his age.  What age were these

5    eight young individuals?

6    A    From the ages of 15 to 16.

7    Q    And do you know if any of these individuals -- do you

8    know personally if any of these individuals stayed around at

9    the apartment complex that night to be interviewed by the

10   police?

11   A    No.

12   Q    They didn't?

13   A    No.

14   Q    Did you give the police department information indicating

15   that there were other people there with you that night that

16   saw this incident?

17   A    Yes.

18   Q    And did you tell them about these eight other people?

19   A    Yes, I believe I did, sir.

20   Q    Did you furnish the police department with any names of

21   those people?

22   A    I just gave out my stepson and my daughter's name.

23   Q    Obviously your son would know these eight people?

24   A    Yes, but he's a terrified guy.  He's out in the streets

25   all the time.

1  Q  He's out in the streets all the time?

2  A  Yeah.  He's -- he's a pool -- he shoot pools (sic) a lot.

3  Q  At any rate, you indicated that -- was it your nephew

4  that had gone outside that night and heard a commotion?  Who

5  was it that went out and left the apartment?

6  A  It was Dewan, my nephew.

7  Q  And did he just leave -- to your knowledge, did he just

8  leave or did he hear something outside?

9  A  No.  He left because he wanted to use the phone, and I

10  didn't want him to use my phone.

11  Q  Is there a phone outside in the apartment complex?

12  A  Yes.  Up by the office there's a pay phone.

13  Q  And you're back in the back; is that right?

14  A  Yes, sir.

15  Q  And he left, and how long was he gone?

16  A  Oh, it wasn't more than three, four minutes.

17  Q  And then what happened?

18  A  My niece and my daughter come running up the stairs

19  saying there's a fight.

20  Q  Now, who is your niece?

21  A  Paula Turner.

22  Q  And who's your daughter?

23  A  Denise.

24  Q  And at that time, I guess, is when you said you left the

25  apartment and went from the back of the apartment up toward

1    the front of the apartment; is that correct?

2    A    Yes.

3    Q    And were the eight guys that were there with your

4    stepson, did they run up with you?

5    A    Yes.  Everybody was running because we just didn't know

6    what was happening.

7    Q    So you were going to check the well-being of your nephew?

8    A    That's all I was doing.

9    Q    And you went from the back of the apartment to the front

10   of the complex -- the front of the apartment, and what did you

11   see first?

12   A    I seen the -- my nephew and the three guys coming from

13   around there.  The -- up by the mailbox where the vehicle was

14   where Rodney was laying.

15   Q    The vehicle, was it parked in a parking space?

16   A    Yes.

17   Q    And were there other vehicles parked around it?

18   A    To the right side of it, yeah.

19   Q    And how far -- they were approaching you.  How far did

20   they get from the vehicle when they came in contact with you?

21   A    From the vehicle to the breezeway, I would say no more

22   than like ten -- ten -- ten to 15 yards.

23   Q    Okay.  And then that's when they came in contact with

24   your nephew and these three individuals; is that correct?

25   A    Excuse me?

1   Q    That's where they came in contact with you in the

2   breezeway?

3   A    Yes.  That's where we all basically met when I was

4   running up there with my stepson and his friends.

5   Q    And that's where you had this conversation that you

6   discussed on direct examination about looking at their shoes

7   and making some --

8   A    No, I never looked at anyone's shoes.

9   Q    Well, you made some comment about a shoe, didn't you?

10  A    Yes.

11  Q    Is that where that occurred?

12  A    Yes, sir.

13  Q    And how long did that conversation occur there in the

14  breezeway?

15  A    It didn't last long.

16  Q    Okay.  You didn't know at that time if anybody had been

17  injured; is that correct?

18  A    No, I didn't.

19  Q    You didn't see a body behind the car?

20  A    No.  I couldn't see anything.  I wasn't -- I wasn't

21  near -- I wasn't near where they came from.

22  Q    What type of lighting was there in that breezeway?

23  A    Oh, they have all kinds -- they have the breezeway lights

24  and also have porch lights on in each -- on each apartment

25  there.

1  Q    What kind of lighting was in the apartment -- the parking

2  lot that night?

3  A    It's a big streetlight there.

4  Q    How close to the car --

5  A    It's right behind the mailbox, so the big streetlight

6  will light up everything right there.

7  Q    At any rate, there were some conversations had in the

8  breezeway.  Then after those conversations ended, these three

9  individuals went back back by the car; is that correct?

10 A    Yes.

11 Q    And how long did they stay by the car at that time?

12 A    It didn't last no more than three minutes to two (sic).

13 Q    And were you still at the breezeway area when this

14 occurred?

15 A    Yes.  I didn't move.

16 Q    Now, I believe if I understand your testimony correctly,

17 the eight people that were your son's friends, they actually

18 went up by the car when this occurred?

19 A    Uh-huh.

20 Q    So they were in a better position to see what was

21 happening than you?

22 A    Yes, sir.

23 Q    And then after two or three minutes, then the three

24 people proceeded to leave the apartment complex or attempt to

25 leave the apartment complex by a car; is that correct?

33

1   A    Yes, sir.

2   Q    Where was this maroon car parked at?

3   A    It was parked basically in the breezeway where I was.

4   Q    So how far was it away from the car where this incident

5   occurred?

6   A    About pretty close to 15 to ten yards.

7   Q    Okay.  Now, what -- if you recall, what did the eight

8   people, the juveniles, what did they do when these three

9   people were trying to leave the apartment complex?

10  A    We all went back down to the house.

11  Q    So nobody went back by the car where this -- where Rodney

12  was?

13  A    Just with the guys when they went back.

14  Q    But I mean as far -- when they were leaving, you didn't

15  run over to check the well-being of Rodney?

16  A    No.

17  Q    And nobody did?

18  A    No.

19  Q    Okay.

20  A    I just didn't want to see anything that would happen on

21  the other side of that vehicle.

22  Q    Okay.  At any rate, then, if I understand your testimony

23  correctly, these individuals, it was apparent to you they were

24  going to leave the apartment complex by car?

25  A    Yes.

1   Q    And then you could see -- when you went back to your

2   apartment, you could see that there had been police vehicles

3   arrive at the complex?

4   A    Yes.  When we was walking down, you could see the polices

5   just rushing in.

6   Q    By sirens or just by lights or both?

7   A    Lights and sirens.

8   Q    Okay.  And is your apartment complex on the first

9   story -- is it a two-story apartment complex?

10  A    Yes.

11  Q    Is it on the first floor or the second floor?

12  A    The second.

13  Q    And you got back to your apartment complex -- or to your

14  apartment?

15  A    Uh-huh.

16  Q    And then how long after you got back to the apartment did

17  these two individuals that you described on direct come to the

18  apartment?

19  A    It could have been within like as soon as we made it down

20  there and I went on upstairs and stepped back out on the

21  breezeway, they was downstairs on the breezeway.

22  Q    And then they made eye contact with you?

23  A    They came upstairs to use my phone.

24  Q    And the police were already there; is that correct?

25  A    The police was already on the scene.

35

1   Q    And you said that one individual in the ball cap
2   requested to use the phone; is that correct?
3   A    He didn't request.  His friend asked could -- we just
4   want to use the phone.
5   Q    And he's the one that used the phone?
6   A    Yes, sir, the guy with the baseball cap.
7   Q    Did you give that phone to the police?
8   A    Yes, I did.
9   Q    That night?
10  A    Yes.
11  Q    Now, let's talk about the descriptions of the
12  individuals.  You said one individual had teardrops; is that
13  correct?
14  A    Yes.
15  Q    Tattoos?
16  A    Yes.
17  Q    How tall was he?
18  A    Pretty close to six-two, six-three.
19  Q    And his build, how much do you believe he weighed?
20  A    Pretty close to 190 to 210, somewhere in the area.
21  Q    And how old did he appear to be?
22  A    At that time I really didn't know, but he looked young to
23  me.
24  Q    And what's young?
25  A    Twenty-four, 25.

1    Q    Now, the individual that you described to have the

2    baseball cap, how tall was he?

3    A    Anywhere from like five-seven to five, I think, eight.

4    Q    And how much did he weigh?

5    A    I really couldn't say.  Pretty close to 160 to 172

6    pounds.

7    Q    Okay.  And that's the description you gave to the police

8    that night?

9    A    To my recollection, I think so, sir.

10   Q    Was he light-skinned, dark-skinned?

11   A    He's light-skinned.

12   Q    Light-skinned?

13   A    Yeah.  Brown-skinned.

14   Q    And if I understand correctly, you had never seen these

15   individuals before in your life prior to that night; is that

16   correct?

17   A    Yes, sir.

18   Q    Now, that night, later that night you were called down to

19   go to the police department and you have gave a statement; is

20   that correct?

21   A    Uh-huh.

22   Q    How many other statements --

23        THE COURT:  Was that a yes?

24        THE WITNESS:  Yes, sir.

25   Q    (By Mr. Box)  And how many other times were you called to

37

1    the police department or contacted by the police department to

2    talk to them about this case?

3    A    Prior to that night, just -- I think it's been just -- to

4    go back to the police department, I took my stepson back

5    there.

6    Q    Okay.  Now, were you ever asked to make an identification

7    through a photo lineup?

8              MS. MILLER:  Objection --

9              THE WITNESS:  Yes.

10             MS. MILLER:  It's irrelevant at this point since the

11   Defendant has been identified in court.

12             THE COURT:  Overruled.

13   Q    (By Mr. Box)  Were you?

14   A    Was I?

15   Q    Were you ever asked to make identification pursuant to a

16   photo lineup?

17   A    Yes.

18   Q    And when was that, if you recall?

19   A    It's been pretty close to two to -- to two and a half

20   months.  It's been a while.

21   Q    Two and a half months from the incident, or how long

22   after the incident is what I'm asking?

23   A    Approximately two months or a month after.  It's been a

24   long time, sir.

25   Q    All right.  Maybe you didn't understand my question.

1    This incident occurred in February?

2    A    Uh-huh.

3    Q    How soon after that were you asked to look at a photo

4    lineup and try to make an identification?

5    A    Approximately a week or two after.

6    Q    Were you able to make identification?

7    A    On the first two, yeah, I believe.

8    Q    On the individual with the ball cap were you able to?

9    A    No.  I just -- I just -- I just made that -- I just

10   picked him out of the lineup pretty close to two and -- to two

11   and a half months ago.

12   Q    From today?

13   A    Yeah.  To my knowledge, yes.  It's been a long time.  And

14   it seemed like every time it was time to go to court it was

15   put off, so --

16   Q    And I'm not belaboring the point then.  If I understand

17   correctly, you've said you made identification of two people

18   soon after the incident on a photo lineup; is that correct?

19   A    Yes.

20   Q    And those people were not the person in the ball cap?

21   A    No.

22   Q    And then you later identified a person in the ball cap a

23   couple three months from today's date?

24   A    You're confusing me, sir.  I'm under medication.  Maybe I

25   need to let you know that.  I've been having nothing but

1    stress and more problems.  I can't even look at TV, sir,

2    without --

3    Q    So you're on medication?

4    A    Without getting nervous of the people that I see on TV

5    that look like the people that knows me on the streets.  My

6    life has been a wreck.

7    Q    Are you on medication today?

8    A    I haven't took my pills today, but I have prior took

9    pills.  I got it from my doctor.

10   Q    And I'm not being critical.  You just indicated that this

11   bothers you and --

12   A    Yes, it does.

13   Q    And as a result you've had to take --

14   A    Because I don't have a reason --

15        THE COURT:  Sir, take a deep breath.  Now, what I

16   need you to do, please, is listen to the attorney's question,

17   and then just answer the question he asks you.  And that will

18   help me a little bit if you'll do that.  Will you give that a

19   try for me?  I know you're nervous and upset, but just try to

20   listen to what he asks you and then answer that, okay?

21        THE WITNESS:  Okay.

22        THE COURT:  All right, sir.  Thank you.

23   Q    (By Mr. Box)  And I just need to ask you, you said

24   something about medication and this bothered you, and that's

25   understandable.  But you said that you were kind of confused.

1    Now, you indicated that you hadn't taken medication today; is

2    that correct?

3    A    No.  I haven't took a pill today.

4    Q    What kind of pills are you taking?

5    A    I don't know the name of them.  My doctor -- I can't read

6    and write.  My doctor prescribed them for me for stress.

7    Q    Anxiety?

8    A    Yeah.

9    Q    Well, the fact that you haven't taken them today, does

10   that affect your ability to remember what --

11   A    No, it don't affect my ability, sir.  I'm just nervous.

12   Q    Okay.

13   A    I'm nervous.  I have more than over half of the people in

14   that vicinity of that area know me --

15         THE COURT:  Okay.  Mr. Morris, I need you, please,

16   just to wait till the question --

17         THE WITNESS:  I'm Mr. Brazille.

18         THE COURT:  Brazille.  I'm sorry.  Could you wait

19   just a moment and let the attorney ask a question and please

20   just respond to his question?  That's all we need from you

21   today, okay?

22   Q    (By Mr. Cox)  The only question I asked you is, you said

23   that it does not affect your ability to remember; is that

24   correct?  The fact that you haven't taken medication today?

25   A    No.

1    Q    Now, in that particular -- you've identified a person in

2    court today with glasses on.  That night did that person have

3    glasses on --

4    A    No.

5    Q    -- that had the baseball cap?

6    A    Yes.  No, he did not have glasses on.

7    Q    And you said that the baseball cap covered part of his

8    face; is that correct?

9    A    It came down to his eyebrows.

10   Q    So the baseball cap was level with his eyebrows; is that

11   correct?

12   A    Yes.

13   Q    The person with the baseball cap on, what was he wearing

14   that night, you said?

15   A    He had the blue almost like North Carolina colors with

16   the symbol on the back of his jacket Thug Life and I believe

17   blue jeans.

18   Q    And you never heard a name given that night for him; is

19   that correct?

20   A    No.

21   Q    Now, for the one guy that night you had heard a name of

22   Jeremy; is that correct?

23   A    No.

24   Q    Okay.

25   A    Jeremy is one of my stepson's friends.

42

1   Q    Okay.  Now, to your knowledge, was that purple car, was
2   it left in the apartment complex that night?
3   A    Yeah.  It was left because they abandoned it when the
4   police came --
5   Q    Sure.
6   A    -- but the police took it with them.
7   Q    Okay.
8        Now, what statements -- if I understand correctly, what
9   statements, if any, did you hear the person in the baseball
10  cap say that night?
11  A    He'll get a -- he'll do a fair fight with anybody.
12  Q    Is that the only statements that was made by the person
13  in the baseball cap?
14  A    Yes.
15  Q    Did you see any blood on the person with the baseball
16  cap?
17  A    I was just looking at him straight in his face because he
18  was more anxious to swing, so I didn't take my eye off of him.
19  Q    At you?
20  A    It seemed like at anyone that was coming with me to try
21  to see what was going on.  I believe that he thought that we
22  was coming to help Rodney out.
23  Q    You were pretty excited and --
24  A    Excited.
25  Q    Were you -- I mean, you were pretty adren -- you had an

43

1    adrenaline rush during that time, didn't you?  Were you

2    scared?

3    A    I was more scared of what happened to my nephew until I

4    seen him.  So all of that adrenaline, it died when I seen my

5    nephew standing and him talking to me.

6    Q    So in summation, that particular night this person in the

7    baseball cap, you had never seen before besides that night?

8    A    Uh-huh.

9    Q    Is that correct?

10   A    Yes.

11   Q    And the total time that you saw the three people that

12   night were five or six minutes; would that be a fair

13   statement?

14   A    Pretty close to -- to five to ten minutes, because the

15   prior time that I stood there and talked to them, and then

16   they came down to my house, if you want to put all that time

17   together, yes --

18   Q    Yeah, that's what I want --

19   A    -- we can do that.

20   Q    -- five to ten minutes?

21   A    Yes.  We can go there.

22          MR. BOX:  If I can have one second, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. BOX:  Your Honor, I have no further questions of

25   this witness.

1      THE COURT:  Redirect?

2      MS. MILLER:  No, sir.

3      THE COURT:  Thank you, sir.  You may step down.

4      May Mr. Brazille be excused?

5      MS. MILLER:  Yes.

6      THE COURT:  You're free to go, sir.  Thank you for

7  coming.

8      Call your next witness.

9      MR. CRAWLEY:  The State would call Dewan DeBose.

10      (The following proceedings were had at the bench:)

11      MR. CRAWLEY:  The deputy has said it's up to you.

12  We're going to ask that the cuffs be taken off of him because

13  we don't want him to hint that he's in custody because of the

14  danger that's --

15      THE COURT:  Security is up to the sheriff.  It's at

16  his discretion.

17      MR. CRAWLEY:  Right.

18      THE COURT:  I'm okay with whatever he wants to do.

19  I'm not going to tell him how to do his job.

20      MR. CRAWLEY:  Okay.  That's all I needed.  Thank

21  you.

22      (The following proceedings were had in open court:)

23      MR. CRAWLEY:  He'll need to stand up here.

24      THE COURT:  That's okay.  Just let him sit.  And if

25  you would swing the microphone around in front of him, please,

1   Mr. Crawley.

2   Whereupon,

3                    DEWAN SALVADORE DEBOSE,

4   was called as a witness on behalf of the State of Oklahoma

5   and, having been first duly sworn, was examined and testified

6   as follows

7            THE COURT:  Would you please tell me your full name?

8            THE WITNESS:  Dewan Salvadore DeBose.

9            THE COURT:  Would you say your middle name again?

10           THE WITNESS:  Salvadore.

11           THE COURT:  Salvadore?  Thank you, sir.

12           Mr. Crawley, you may inquire.

13                    DIRECT EXAMINATION

14  BY MR. CRAWLEY:

15  Q    Mr. DeBose, draw your attention back to the 20th day of

16  February of 2004.  Were you -- did you have occasion to be at

17  the Rockwell Villa Apartments on that day?

18  A    Yes, sir.

19  Q    And do you know where those -- where are those apartments

20  located?

21  A    Tenth and Rockwell.

22  Q    Is that Oklahoma County?

23  A    Yes, sir.

24  Q    And drawing your attention to at or around 11 o'clock in

25  the evening on the 20th of February, did something unusual

1   occur?

2   A    Yes, sir.

3   Q    And what was that?

4   A    The death of Rodney Perry.  The death of Rodney Perry.

5   Q    All right.  And did you witness the death of Rodney

6   Perry?

7   A    Yes, I did.

8   Q    All right.  Would you tell us what you -- well, first

9   let's begin here.  What were you doing at the Rockwell Villa

10  Apartments?

11  A    I was standing in front of my cousin's apartment.

12  Q    And who is your cousin?

13  A    Paula.

14  Q    All right.  And what happened -- and where was Rodney

15  Perry killed?

16  A    He was killed in Rockwell Villa.

17  Q    I know --

18  A    Where?

19  Q    Yes, sir.  Where in the apartment complex?

20  A    In the middle, like at the beginning of the front, by a

21  car.

22  Q    All right.  In the parking lot?

23  A    Yes, sir.

24  Q    All right.  And are there mailboxes?

25  A    Yes.

1    Q    Where are the mailboxes located from where you saw him

2    get killed?

3    A    Like in front of -- in front of Rodney.

4    Q    Excuse me?

5    A    In front of Rodney.

6    Q    Okay.  In front of where Rodney was at?

7    A    Well, not in front of him, but on the side, but they was

8    like off -- off the parking lot on the sidewalk.

9    Q    All right.  Well, why don't you just tell us exactly what

10   you saw and start at the beginning.

11   A    I was standing in front of my cousin's apartment, and I

12   seen three men standing across the street in front of a car,

13   and they was talking or whatever.  And Rodney walked out of

14   the breezeway and said something to one of the dudes, and they

15   just start arguing or whatever, you know what I'm saying.  And

16   Rodney backed up, and the dude said something, and Rodney

17   pushed him, and Rodney got to backing up, saying, you all

18   leave me alone, you all leave me alone, you know what I'm

19   saying.  The three men jumped him on the other side of the

20   car.

21   Q    All right.  Now, you were referring to them as dudes and

22   this sort of thing.  Are you talking about three men that you

23   saw?

24   A    Yes, three men.

25   Q    And they had they had some kind of confrontation with

1    Rodney?

2    A    One of them did.

3    Q    And you knew Rodney Perry?

4    A    Yes, sir, that was like --

5    Q    How long have you known him?

6    A    For since I was like ten years old.

7    Q    Okay.  All right.  After the confrontation, you say

8    Rodney pushed one of the men?

9    A    Yes.

10    Q    And then he backed up and said, you all leave me alone?

11    A    Yes.

12    Q    Then what happened?

13    A    And he was trying to get away, and one of the dudes swung

14    at him and hit him, and he was fighting them back.  And then

15    after a while they start jumping him.  Two went behind --

16    behind the cars and one went onto the sidewalk, and they

17    trapped him on the side of the car and started beating him up

18    and stomping him.

19    Q    When you say beating him up and then stomping him, was he

20    standing on his feet when the fight began?

21    A    When the fight began, yes, but when they got on the other

22    side of the car, he wasn't.

23    Q    All right.  Did he get knocked down?

24    A    Yes.

25    Q    All right.  Then what happened?

1    A    They started kicking him and bamming (phonetic) his head

2    into the car.

3    Q    All right.   Then what happened?

4    A    They killed him.

5    Q    All right.   After you saw them kicking and stomping on

6    him, did you have any conversation or contact with the three

7    men at all?

8    A    No.   They just ran up and said, yeah, we got him, we got

9    him, and all of my family started running down because they

10    thought it was happening to me.

11    Q    You say all your family.   Do you know Kurt Brazille?

12    A    That's my uncle.

13    Q    All right.   Did he come down?

14    A    Yes, sir.

15    Q    All right.   And did you have a conversation with Mr.

16    Brazille?

17    A    No.

18    Q    Okay.   When your family came down, what happened?   What

19    did the three men do?

20    A    They was just talking about how he's over there knocked

21    out and how they -- how they did him or whatever, and that's

22    it.

23    Q    All right.

24    A    And they -- after that we walked up to my uncle's house,

25    and the police was on their way, and one of the men ran, and

1  two of the men came up to my uncle's house.

2  Q     All right.  The three men that you saw kill Rodney Perry,

3  have you -- well, let me back up and say this.  Back in July

4  of last year, did you testify at a preliminary hearing on that

5  day?

6  A     On what day?

7  Q     Well, in July -- July 27th?

8  A     Yes.

9  Q     Okay.  And you recall testifying on that day?

10 A     Yes.

11 Q     And were two of the men that were -- of the three in

12 court that day?

13 A     Yes.

14 Q     And you identified them as two of the individuals in the

15 fight?

16 A     Yes.

17 Q     The third individual that was in the fight that wasn't in

18 court on that day, is he in court today?

19 A     Yes.

20 Q     Do you see -- would you point him out, describe where

21 he's sitting, how he's dressed for the record, please?

22 A     He's sitting over there (indicating) behind the man in

23 the blue jacket in orange with glasses on.  He's a black male.

24         MR. CRAWLEY:  Your Honor, if the record would

25 reflect identification of the Defendant?

1        THE COURT:  So noted.

2   Q    (By Mr. Crawley)  After you observed the three men to

3   beat and stomp Rodney Perry, what, if anything, did they do

4   immediately after that?

5   A    Can you rephrase that question?

6   Q    Well, did they immediately go run -- jump in a car and

7   leave, or what did they do?

8   A    No.  They sat there and talked for a minute, and then --

9   and then they left, and then one of them went and jumped the

10  fence, and then the other two went up to my uncle's house, was

11  trying to use the phone, and my uncle let them use the phone.

12  Q    Now, the beating and stomping that you observed, did that

13  all occur in one continuous incident?

14  A    Yes.  Like one beating?

15  Q    Was there a time that they stopped, walked away, and then

16  went back?

17        MR. BOX:  Objection, leading, Your Honor.

18        THE COURT:  Sustained.

19        MR. CRAWLEY:  All right.  Let me rephrase it.

20  Q    (By Mr. Crawley)  Was the beating that you saw, when they

21  were beating and stomping on him, was that in one continuous

22  beating and stomping?

23  A    Yes, it was.  They went -- they went and beat him, and

24  then they left, and then they, you know what I'm saying, went

25  back and beat him again and then left again.

1    Q    All right.  Well, that's what I was getting to.  There

2    was a time where they stopped and they -- what did they --

3    where did they go before they went back?

4    A    When they first beat him, they -- that's when that my

5    family started coming down, and I had walked across the

6    street, and they was talking how they had did him or whatever.

7    And then they went back around and started beating him up

8    again and said that -- that's when they said that he was

9    knocked out and he was snoring.

10   Q    Okay.  After the first beating and when they had walked

11   over to you and you said they were saying how they did him,

12   what are you talking about?

13   A    Like what do you mean, like --

14   Q    What were the three men saying?

15   A    They said that they had beat him up and he was snoring,

16   and that's what he get (sic).

17   Q    All right.  During that period of time when they're

18   making these statements after they walked away, did Rodney

19   Perry get up or do anything?

20   A    No, he didn't.

21           MR. CRAWLEY:  Could I have a moment, Your Honor?

22           THE COURT:  Yes, sir.

23           MR. CRAWLEY:  Pass the witness, Your Honor.

24           THE COURT:  Mr. Box, if I could have just one second

25   before you start?  I need to check with my bailiff on

53

1    something.

2          MR. BOX:  Sure.

3       (A brief pause was had in the proceedings.)

4          THE COURT:  Thank you, Mr. Box.  You may

5    cross-examine.

6          MR. BOX:  Thank you.

7                 CROSS-EXAMINATION

8    BY MR. BOX:

9    Q    Mr. DeBose, you were at the apartment complex in the

10   early morning hours of February 20th; is that correct?

11   A    Yes.

12   Q    And you happened to be there because you said you -- were

13   you staying with Paula, or were you just at Paula's apartment

14   that night?

15   A    I was at her apartments.

16   Q    And how long had you been there that night?

17   A    I really don't know.

18   Q    Well, was it hours before this incident or was it

19   minutes?

20   A    It was hours.

21   Q    And who was there at the apartment with you?

22   A    Paula was inside her apartment.  I was standing outside.

23   Q    Who else was there?

24   A    No one.

25   Q    Was Kurt there?

54

1    A    He was in the house.

2    Q    He was in the apartment?

3    A    Yes, he was.

4    Q    In Paula's apartment?

5    A    No.

6    Q    In whose apartment?

7    A    He was in his house.

8    Q    Okay.  So at your place it was you and Paula and who

9    else?

10    A    No.

11    Q    Excuse me.  I'm sorry.  I'm not trying to confuse you.

12    Who was at the place you were at?

13    A    Paula was at her house and me and her son.

14    Q    And who's her son?

15    A    Dontay (phonetic).

16    Q    Dontay?  And when did it occur to you or when did it

17    happen that you became aware that there was an incident

18    occurring in the parking lot?

19    A    When I seen three men fighting one man.

20    Q    So you had left the apartment?  Could you see this from

21    where -- the apartment where you were staying at?

22    A    I was in front of her apartment, and I seen it from right

23    there.

24    Q    Okay.  So her apartment is toward the front of the

25    apartment complex?

1   A    No, it's not.

2   Q    How far away were you when you saw the incident in the

3   apartment complex then?

4   A    I don't know.  I really don't know the distance, but I

5   was standing, you know what I'm saying, where I can see.

6   Q    Well, was it -- I'm just asking for a guess if you can.

7   Was it 50 yards away?  Less than 50 yards?

8   A    It was 50 yards or more.

9   Q    Okay.  It was dark out?

10  A    Yes.

11  Q    And once you saw something happening at the apartment

12  parking lot, then you went over there; is that correct?

13  A    Yes.

14  Q    And who went over there with you?

15  A    My Uncle Kurt and them by -- at this time had came

16  downstairs.

17  Q    So you went over there with Kurt; is that correct?

18  A    Yes.

19  Q    Who else was there with Kurt?

20  A    His family that was in his house.

21  Q    Okay.  How many people would you estimate were at the

22  location when the fight was occurring in the parking lot --

23  besides the three individuals and Rodney?

24  A    At least five or maybe more.

25  Q    Was there some skaters?  Was there some young

1  individuals?

2  A    Yes, there was some skaters.

3  Q    How many of the skaters were there?

4  A    It was four of those.  It was four skaters.

5  Q    All right.  We have four skaters.  Then who else?

6  A    Me and my uncle.

7  Q    And Kurt.  Who else besides the four skaters, Kurt, and

8  you?  Besides the three people and Rodney, who else was there?

9  A    And like three more people because they came -- my

10 uncle's family, they was with him when they came -- when he

11 came down.

12 Q    Okay.  So there was three other people that were with

13 your uncle; is that correct?

14 A    Yes.

15 Q    So if my math is right, there was at least about eight or

16 nine people at the location?

17 A    Yes.

18 Q    And what color of car was it that was located next to the

19 incident of the fight?

20 A    I can't really remember.  It was like a dark-colored car.

21 Q    Now, did you get in a position to where you could

22 actually see the fight occurring as you came to the car?

23 A    Yes.

24 Q    How close did you get to the fight?

25 A    From me to the dude back there (indicating).

```
 1   Q    This gentleman here (indicating)?
 2   A    Yes.
 3             MR. BOX:  I'm asking the Court, would the Court
 4   reflect that's approximately 30 feet?
 5   Q    (By Mr. Box)  Would it be about 30 feet away?  I'm just
 6   asking you.  You tell me.
 7   A    I really don't know how many feet that is from here to
 8   there, but that's about where I was.
 9   Q    So you were pretty close?
10   A    Yes, to see that they was beating on Rodney.
11   Q    And who was directly next to you?
12   A    No one.
13   Q    Were you the closest one to the three people and Rodney
14   when it was occurring?
15   A    Yes.  And there was just a lot of movement.  They was
16   moving back.
17   Q    Did you have a clear, unobstructed view to see Rodney?
18   Could you see Rodney?
19   A    I seen Rodney, and I also seen them three --
20   Q    Let's describe the three people that you're talking
21   about.  Tell me the description of one of them first.
22   A    The description?
23   Q    Uh-huh.
24   A    One was --
25   Q    How tall they were, what they were wearing.
```

58

1    A    One was short.

2    Q    Okay.  You say "short."  How tall was the person that was

3    short?

4    A    Five-nine, five-eight, one of those.

5    Q    How much did he weigh?

6    A    170, 175.

7    Q    What was he wearing?

8    A    I really don't remember.  That's been -- I really

9    don't --

10   Q    The second individual, describe him.

11   A    Six-something.  I really can't -- I really don't know how

12   tall he is.  He's six-something.

13   Q    And how much did he weigh?

14   A    I'm saying 195, 2 (sic).

15   Q    Was there anything unique about his clothing or

16   appearance besides over six foot and 190 to 200 pounds?

17   A    He just had on a Thug Life jacket.

18   Q    So he had a thug -- a jacket that said Thug Life?

19   A    Yes.

20   Q    And he was over six foot tall; is that correct?

21   A    Yes.

22   Q    And then the third individual, what -- describe him for

23   me.

24   A    He was dark-skinned, and he was standing about five-ten

25   or 11.

1    Q    How much did he weigh?

2    A    About 190, 195.

3    Q    And what was he wearing?

4    A    Dark colors.  That's all I remember.  Dark colors.

5    Q    Now, the individual you've identified in court today,

6    which individual was he?  What was he wearing and how big was

7    he?

8    A    He had -- he was the short one that was five --

9    five-nine, five-eight.

10    Q    Okay.  He was the one that you don't remember what he was

11    wearing; is that correct?

12    A    All I remember is he had on a baby blue hat.

13    Q    Okay.  And then the one that was around six foot or

14    bigger had a jacket on and it said "Thug Life."  Is that

15    correct?

16    A    Yes.

17    Q    What color was that jacket?

18    A    It was green.

19    Q    And then the third individual, you don't remember what he

20    was wearing; is that correct?

21    A    Yes.

22    Q    Now, had you ever seen these individuals before?

23    A    One of them.

24    Q    And who was that?

25    A    The one with the Thug Life jacket.

60

1   Q      Okay.  And do you know that person's name?

2   A      I think Nichols or something.

3   Q      And how often had you seen that person?

4   A      Like a few times.

5   Q      But the other two individuals you had never seen before;

6   is that correct?

7   A      No.

8   Q      And how long would you estimate that you had an

9   opportunity to come in contact with these three individuals

10  that night?  How many minutes was the whole episode?

11  A      Two -- two to three hours.

12  Q      Two to three hours?

13  A      Well, two -- two hours, but two and a half hours.

14  Q      So you were in contact with these three individuals for

15  two hours that night?

16  A      No, I wasn't in contact with them.

17  Q      Okay.  Maybe you misunderstood my question.  My question

18  is, you said that you knew one of these people, Nichols, or

19  something like that, you had seen him several times before; is

20  that correct?

21  A      Yes.  Yes.

22  Q      The other two individuals, one of them being that you

23  identified in court today, you said you had never seen before;

24  is that correct?

25  A      Never.

1    Q    Now, that night how long were you in contact with those

2    other two individuals?  How long did you see them that night?

3    A    I seen them for two and a half hours, ever since it

4    started.

5    Q    So this whole incident took two and a half hours?

6    A    Maybe even longer.  They was there.  They beat up Rodney.

7    One of them ran.  The other two came up the stairs, were

8    sitting at my uncle's house.  They used the phone, and then

9    they left.

10   Q    So the total from the time that you saw them at the fight

11   to the time they left your uncle's house was two hours?

12   A    I mean, they was -- they was standing there for a minute

13   before Rodney had walked up, so, yes.  They were standing

14   there for a minute.

15   Q    Okay.  So they're standing there for a minute.  Then

16   there was a fight; is that correct?

17   A    Yes.

18   Q    And then soon -- sometime after that they showed up at

19   your uncle's apartment?

20   A    Yes.

21   Q    Is that correct?

22   A    Yes.

23   Q    Were you there when they showed up at the uncle's

24   apartment?

25   A    Yes.  We was standing outside.

1    Q    And from the time that you saw in the breezeway the

2    confrontation with Rodney to the time that they used the

3    phone, that whole episode took a couple of hours.  Is that

4    what you're telling me?

5    A    Yes.

6    Q    Did any of them use the phone at the apartment?

7    A    Yes.

8    Q    And who was that?

9    A    That was him.

10    Q    The person you identified today?

11    A    Yes.

12    Q    And whose phone did that person use?

13    A    He used my uncle's son-in-law.

14    Q    Now, the police arrived at the location, did they not?

15    A    Yes.

16    Q    And when was the first opportunity you had a chance to

17    talk to the police about this?

18    A    The next day.

19    Q    The next day?

20         Did you ever have an opportunity to identify a person in

21    a photo lineup?

22    A    Yes.

23    Q    And did you ever identify the person that you've

24    identified today in court in a photo lineup?

25    A    Yes.

1    Q    And how long after this incident did that occur?

2    A    I don't know actually.

3    Q    Well, was it a week after, two weeks after, or was it

4    months?

5    A    I mean, I think I identified him once, but they didn't --

6    they didn't catch him, but it was months after.

7    Q    Months after before you made identification of a photo

8    lineup of the individual --

9    A    The final --

10    Q    -- is that correct?

11    A    -- identification.  When they finally caught him.

12    Q    Well, my question is -- maybe you misunderstood.

13    A    No, I know the question.

14    Q    Okay.  The question was that you identified the

15    individual that you've mentioned today in a photo lineup

16    before; is that correct?

17    A    Yes.

18    Q    And how long after this incident did you make that

19    identification in a photo lineup?

20    A    Some months after or maybe even the first time.  It

21    was -- I've seen a lot of pictures.

22    Q    So you really don't remember?

23    A    No, I don't.

24    Q    Had you used any alcohol or drugs that night?

25    A    No.

1    Q    And as far as these skater people we've talked about, do

2    you know their names?

3    A    No.

4    Q    Had you seen them after this?

5    A    Yes.

6    Q    And do they still live around there?

7    A    No.

8    Q    Do you know where they live?

9    A    No.

10          MR. BOX:  Your Honor, I have no further questions.

11          THE COURT:  Redirect?

12          MR. CRAWLEY:  No questions, Your Honor.

13          THE COURT:  All right, sir.  Thank you.  You may

14    step down.

15          May this witness be excused?

16          MS. MILLER:  Yes, sir.

17          THE COURT:  You are free to go, sir.  Thank you for

18    coming.

19          Call your next witness.

20          MS. MILLER:  Your Honor, the State has no further

21    witnesses to present.  I would move to admit State's Exhibit

22    1, which is a certified copy of the medical examiner's report,

23    reflecting that Dr. Chai Choi performed an autopsy on Rodney

24    Perry on 2-21-04; that the cause of death was traumatic injury

25    to the head; that the manner of death was a homicide.  And I

1  would move to admit that report at this time.  Mr. Box has had

2  a copy of it.

3          MR. BOX:  That is correct, Your Honor.  For the

4  purpose of preliminary hearing I have no objection.

5          THE COURT:  State's 1 is admitted without objection.

6          MS. MILLER:  With that exhibit admitted, the State

7  rests.

8          MR. BOX:  Your Honor, at this time we have no

9  evidence to present, and we would enter a general demurrer to

10 the evidence that's been presented before the Court this

11 morning.

12         THE COURT:  Do you care to argue your demurrer, Mr.

13 Box, or do you stand on your demurrer?

14         MR. BOX:  No.  I will just stand on the demurrer.

15         THE COURT:  All right.  Defendant's demurrer is

16 overruled.  I find from the evidence there is probable cause

17 to believe that the crime of murder in the first degree was

18 committed in Oklahoma County.

19         I further find probable cause to believe that that

20 crime was committed by the Defendant, Howard Purifor Morris,

21 III.

22         Mr. Morris, would you stand up, please, sir?  He can

23 just stand right there.  Sir, is your true name Howard Purifor

24 Morris, III?

25         MR. MORRIS:  Yes, sir.

1          THE COURT:  Mr. Morris, how old are you?

2          MR. MORRIS:  Twenty-eight.

3          THE COURT:  What is your date of birth?

4          THE WITNESS:  12-25-76.

5          THE COURT:  Mr. Morris, probable cause having been

6  found, you are hereby bound over to the District Court to

7  answer the charge of murder in the first degree.  To that

8  charge, sir, how do you plead, guilty or not guilty?

9          MR. MORRIS:  Not guilty.

10          THE COURT:  Mr. Box, do you waive formal reading of

11  the Information?

12          MR. BOX:  Yes, Your Honor.  We would ask the Court

13  to set the pretrial date.

14          THE COURT:  Ms. Miller, has the State filed a bill

15  in this case?

16          MS. MILLER:  No, sir.

17          THE COURT:  Do you intend to do that?

18          MS. MILLER:  No, sir.

19          THE COURT:  All right.  Pretrial conference will be

20  April 6, 2005, at 9 o'clock AM before Judge Twyla Mason Gray.

21  Until that date Defendant is remanded to the custody of the

22  sheriff of Oklahoma County.  Bail is denied.

23          Anything further from the State?

24          MS. MILLER:  Yes, Your Honor.  Move to admit State's

25  Exhibit Number 1.

1        THE COURT:  It's already been admitted.

2        MS. MILLER:  I'm sorry.  Move to withdraw.

3        THE COURT:  Any objection?

4        MR. BOX:  No, Your Honor.

5        THE COURT:  State's 1 is returned to the assistant

6  district attorney.

7        Anything from the Defendant?

8        MR. BOX:  No, Your Honor.

9        THE COURT:  We are adjourned.

10     (Conclusion of preliminary hearing proceedings had on the

11  25th day of March, 2005.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 IN THE DISTRICT COURT OF OKLAHOMA COUNTY

2                         STATE OF OKLAHOMA

3    THE STATE OF OKLAHOMA,        )
                                   )
4              Plaintiff,          )
                                   )
5    vs.                           )        Case No. CF-2004-1212
                                   )
6    HOWARD PURIFOR MORRIS, III,   )
                                   )
7              Defendant.          )

8                         *  *  *  *  *

9                      C E R T I F I C A T E

10             I, Kim Fowler, C.S.R. and Official Court Reporter

11   for Oklahoma County, do hereby certify that the foregoing

12   transcript in the above-styled cause contains all the evidence

13   requested to be transcribed by me, and that said transcript is

14   a true, correct, and complete transcript of my shorthand notes

15   of the preliminary hearing proceedings had in said cause.

16             Dated this _2kt_ day of _April_____, 20_05_.

17

18

19                        _____

20                        Kim Fowler, C.S.R., Official
                          Court Reporter for and within
21                        the State of Oklahoma

22                        Kim Fowler
                          Oklahoma Certified Shorthand Reporter
23                        Certificate No. 0168
                          Exp. Date: December 31, 2006

24

25

1     IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

2     STATE OF OKLAHOMA

3     APR 2 8 2006

PATRICIA PRESLEY, COURT CLERK

4  THE STATE OF OKLAHOMA,    )
By_____
Deputy

5     Plaintiff,    )

F-2006-428

6  VS.    )  CASE NO. CF-04-1212

7  HOWARD PURIFOR MORRIS, III,    )

8     Defendant.    )  COPY

9

10     * * * * * * * *

11

12     TRANSCRIPT OF PROCEEDINGS,

MICHAEL C. RICHIE
CLERK

13     JURY TRIAL,

14     HAD ON APRIL 4, 2006,

15     BEFORE THE HONORABLE TWYLA MASON GRAY,

16     DISTRICT JUDGE.

17

18     * * * * * * * *

19

20     **VOLUME 2 OF 3**

RECEIVED
JUL 27 2006
Attorney General

21

22  REPORTED BY:

23  THERESA L. REEL, RPR

24  321 PARK AVENUE, SUITE 201

25  OKLAHOMA CITY, OK  73102

2

1                    **A P P E A R A N C E S**

2


3    <u>ON BEHALF OF THE STATE:</u>

4    Ms. Pattye High
     Mr. Graham Guhl
5    Assistant District Attorneys
     District Attorney's Office
6    Oklahoma County Office Building
     320 Robert S. Kerr, Suite 505
7    Oklahoma City, OK  73102

8


9    ON BEHALF OF THE DEFENDANT,
     <u>HOWARD PURIFOR MORRIS, III:</u>
10
     Mr. Chris Box
11   Attorney at Law
     2208 S.W. 59th Street
12   Oklahoma City, OK  73119
     (405) 682-5544
13

14   ON BEHALF OF THE DEFENDANT,
15   <u>JEREMY DION NICHOLSON:</u>

16   Mr. Danny G. Lohmann
     Ms. Lisbeth McCarty
17   Appellate Defense Counsel
     P.O. Box 926
18   1070 Griffin Drive
     Norman, OK  73070-0926
19

20   Mr. Jason Spanich
     Attorney at Law
21   228 Robert S. Kerr, Suite 100
     Oklahoma City, OK  73102

22

23

24

25

1 **TABLE OF CONTENTS**

2

3 VOLUME 2 OF 3

4 APRIL 4, 2006

5                                                                    PAGE

6 JURORS SWORN ------------------------------------  6

7 IN CAMERA RECORD WITH DEFENDANT JEREMY ----------  13
      NICHOLSON
8 STATE'S OPENING STATEMENT BY MR. GUHL -----------  19

9 DEFENDANT'S OPENING STATEMENT BY MR. BOX --------  27

10 **DEMETRIA TINNER TESTIFIED:**

11       Direct Examination ------------------------  35
      By Ms. High
12       Cross-Examination  ------------------------  55
      By Mr. Box
13       Redirect Examination ----------------------  60
      By Ms. High
14       Recross-Examination -----------------------  61
      By Mr. Box
15       Redirect Examination ----------------------  63
      By Ms. High
16

17 **CHRISTA ANDERSON TESTIFIED:**

18       Direct Examination ------------------------  64
      By Mr. Guhl
19       Cross-Examination  ------------------------  73
      By Mr. Box
20

21 **TAYLOR SHAW TESTIFIED:**

22       Direct Examination ------------------------  74
      By Ms. High
23

24 **MATTHEW REED TESTIFIED:**

25       Direct Examination ------------------------  78
      By Mr. Guhl

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  **DAVID FESKANICH TESTIFIED:**

2      Direct Examination ------------------------  81
       By Ms. High

3

4  **STIPULATION** ----------------------------------  102

5  **CHAI CHOI TESTIFIED:**

6      Direct Examination ------------------------  103
       By Mr. Guhl

7

8  **DEWAN DEBOSE TESTIFIED:**

       By Transcript Testimony --------------------  117

9

10  **KYLE LAWS TESTIFIED:**

11      Direct Examination ------------------------  117
        By Mr. Guhl

12      Cross-Examination ------------------------  127
        By Mr. Box

13

14  **KURT BRAZILLE TESTIFIED:**

15      Direct Examination ------------------------  130
        By Ms. High

16      Cross-Examination ------------------------  155
        By Mr. Box

17      Redirect Examination ----------------------  165
        By Ms. High

18

19  JURY EXCUSED FOR EVENING RECESS -----------------  166

20  IN CAMERA RECORD WITH DEFENDANT JEREMY ----------  166
        NICHOLSON

21  CERTIFICATE OF THE COURT REPORTER ---------------  174

22

23

24

25

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

**TABLE OF CONTENTS - EXHIBITS**

**EXHIBITS OFFERED BY THE STATE**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | AERIAL PHOTO | 38 | 38 |
| 2 | AERIAL PHOTO | 38 | 38 |
| 3 | PHOTO | 38 | 38 |
| 4 | PHOTO | 38 | 38 |
| 5 | CRIME SCENE DIAGRAM | 86 | 86 |
| 6-10 | AERIAL PHOTOS OF SCENE | 84 | 84 |
| 11-15 | PHOTOS | 88 | 88 |
| 16-19 | PHOTOS | 93 | 93 |
| 20-29 | PHOTOS | 98 | 98 |
| 30-35 | PHOTOS | 96 | 96 |
| 38, 39 | MEDICAL EXAMINER'S DIAGRAMS | 106 | 107 |
| 42 | 911 TAPE | 55 | 55 |

**COURT'S EXHIBITS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | TRANSCRIPT TESTIMONY OF DEWAN DEBOSE | 117 | |
| 2 | STIPULATION | 102 | |

6

1    (Thereupon, on April 4, 2006, with all counsel present

2        and the jury seated in the box, the following was had

3        in open court.)

4        THE COURT:  Good morning.  Ladies and gentlemen,

5    the first thing that we're going to do is swear you in as

6    the jurors to try this case.  If the alternates will remain

7    seated, please, and if the rest of you will please rise and

8    raise your right hands to be sworn.

9    (Jurors sworn.)

10       THE COURT:  Thank you.  Please be seated.  I'm

11   going to ask the bailiff to hand out these buttons to you.

12   It's a very solemn proceeding we call buttonizing.  They're

13   not souvenirs.  They're not even attractive enough to be

14   wanted as souvenirs, I don't think, but we ask you to wear

15   them along with your jury badges.  It just helps put people

16   on notice that you're actually serving as a juror and it

17   might help us prevent a conversation that shouldn't take

18   place in front of jurors, something like that.

19       Ladies and gentlemen of the jury, you have been

20   selected and sworn as the jury to try the case of the State

21   of Oklahoma against Howard Purifor Morris, III.  Let me now

22   explain your duties as jurors.

23       The Defendant is charged with the crime of Murder

24   in the First Degree and he is charged because the State has

25   filed a legal document called the Information.  The

1    Information in this case is the formal method of accusing

2    the Defendant of a crime.  The Information is not evidence

3    and the law is that you should not allow yourselves to be

4    influenced against the Defendant just because the

5    Information has been filed.

6        The Defendant has pled not guilty.  A plea of not

7    guilty puts in issue each element of the crime with which

8    the Defendant is charged.  A plea of not guilty requires the

9    State to prove each element of the crime beyond a reasonable

10   doubt.  The Defendant is presumed innocent of the crime and

11   that presumption continues unless after consideration of all

12   the evidence you are convinced of his guilt beyond a

13   reasonable doubt.

14       The State has the burden of presenting the

15   evidence that establishes guilt beyond a reasonable doubt.

16   The Defendant must be found not guilty unless the State

17   produces evidence which convinces you beyond a reasonable

18   doubt of each element of the crime charged.

19       Evidence is the testimony received from witnesses

20   under oath; agreements as to facts made between the

21   attorneys, and we call those stipulations; and exhibits

22   admitted into evidence during the trial.

23       I told you before that my court reporter takes

24   down everything that is said in the courtroom but her notes

25   or transcripts are not available to you so you must listen

1    carefully to the testimony given.  However, any exhibits

2    that are admitted into evidence will be available and will

3    go back with you into the jury deliberation room at the

4    conclusion of the trial.

5         It is your responsibility as jurors to determine

6    the facts from the evidence, to follow the law as stated in

7    the instructions that I will give you, and to reach a

8    verdict of not guilty or guilty based upon the evidence and

9    if you should find the Defendant guilty, to determine

10   punishment.

11        You are the sole judges of the credibility of each

12   witness and you determine the weight to be given the

13   testimony of the witness.  In order to make this

14   determination, you may properly consider the overall

15   reaction of the witness while testifying, his or her

16   frankness or lack of frankness, his or her interest and

17   bias, if any, the means and opportunity the witness had to

18   know the facts about which they testify, and the

19   reasonableness or unreasonableness of his testimony in light

20   of all of the evidence in the case.

21        You are not required to believe the testimony of

22   any witness simply because they are under oath.  You may

23   believe or disbelieve all or part of the testimony of any

24   witness.  It is your duty to determine what testimony is

25   worthy of belief and what testimony is not worthy of belief.

1      It is my responsibility to ensure the evidence is

2  presented according to the law, to instruct you as to the

3  law, and to rule on objections raised by the attorneys.  No

4  statement or ruling by me is intended to indicate any

5  opinion concerning the facts or the evidence.

6      It is the responsibility of the attorneys to

7  present evidence, to examine and cross-examine witnesses,

8  and to argue the evidence.  No statement or question or

9  argument of the attorneys is evidence.  In fact, if an

10 attorney makes a statement that differs from your own memory

11 of the evidence that's presented, you should rely on your

12 own recollection.

13      All of the evidence presented in this courtroom is

14 governed by rules of law and from time to time during the

15 trial it may be the duty of the attorneys to object to

16 certain evidence and then it's my job to rule on these

17 objections.

18      When an objection is made, you should not

19 speculate on the reason why it was made.  When an objection

20 is approved or sustained by me, you should not speculate on

21 what might have occurred or what might have been said had

22 the objection not been sustained.

23      Throughout the trial you should remain alert and

24 attentive.  Do not form or express an opinion on the case

25 until it is submitted to you for your decision.  Do not

1    discuss this case among yourselves until that time.

2          During all recesses and adjournments while the

3    case is in progress, you must not discuss this case or

4    anything about this case or what happens in this courtroom

5    with anyone and do not allow anyone to discuss it with you.

6          Do not talk to witnesses, your family, friends,

7    courthouse employees, or anyone else.  If anyone should

8    attempt to discuss this case with you, you need to report

9    the incident to my bailiff or my clerk immediately.

10          Sometimes jurors set out to solve a crime and I

11    would tell you that is not your job.  Your only job is to

12    determine the facts of this case from the evidence produced

13    in court.  Do not visit the scene of the crime.  This case

14    must be decided solely upon the evidence presented to you in

15    this courtroom, free from any outside influence.

16          Sometimes jurors ask me about taking notes and I

17    don't allow this and particularly in a case like this that's

18    really going to be concluded pretty quickly.  I don't allow

19    note taking for several reasons.

20          Taking notes is a skill and if it's something that

21    you do every day in the course of your work or if you're a

22    student, that skill improves and you get pretty good at

23    that, but if it's been a while since you take notes

24    regularly, those skills atrophy.  Have you ever been writing

25    something down and you hear something and you look up and

1    you have to say, "Can you repeat that?"  Well, I can't do

2    that for you during trial.

3            I've also had the experience where I start to

4    write something down and I don't get the thought completed

5    on paper and then when I go back, because it's not a

6    completed thought, it kind of contradicts with the way I

7    remember it.  So I think the best way to handle this is to

8    tell you up front that you're going to have to rely on your

9    collective recollection, your collective memory of the

10   testimony.  But I am going to give you what I call an

11   abstract that gives you a list of the witnesses so that it's

12   a starting point for your deliberations.  Okay?

13           At any point during the trial, if you're having

14   trouble hearing or seeing, please wave your hand to get my

15   attention so we can resolve that problem.  Don't be shy.

16   Don't hesitate.  Okay?

17           At this point in the trial, the attorney for the

18   State reads the Information, the plea of the Defendant, and

19   gives an opening statement.  And then Defense Counsel may

20   give their opening statement or they can elect to reserve

21   that until the conclusion of the State's evidence.  Opening

22   statements are not evidence but serve as guides so that you

23   may better understand and evaluate the evidence when it is

24   presented.

25           Following opening statements, witnesses will be

1    called to testify.  Witnesses are sworn and then examined

2    and cross-examined by the attorneys.  Exhibits may also be

3    introduced.  In fact, I know they'll be introduced.

4         After the evidence is completed, then I will

5    instruct you on the law that applies in this case and the

6    attorneys are then permitted closing arguments.  Closing

7    arguments aren't evidence either but are permitted for the

8    purposes of persuasion only.  When closing arguments are

9    completed, then the case will be submitted to you and you

10   will then retire to consider your verdict.

11        I would mention to you that once you enter upon

12   your deliberations you will be sequestered.  That doesn't

13   mean that you pack a bag like on television.  It simply

14   means that you're going to all be together in the jury room

15   until a verdict is reached.  There's no smoke breaks,

16   there's no dinner breaks, there's no walk around the block.

17   So what I will need you to do, and I'll keep you posted, for

18   instance, if we think that you'll go out tomorrow or we'll

19   go out Thursday morning, I need you to make your coworkers

20   or your family aware that during that period of time you're

21   going to be incommunicado.  And you need to bring with you

22   anything that you might need.

23        We've never lost a single juror for lack of

24   hydration or nourishment.  In fact, we feed you pretty good.

25   But I have had people who I've made this announcement

13

1    several times, talked to the jury, I think you're going to

2    go out late today, 30 minutes after I sent them out a juror

3    buzzed and said, "I'm insulin-dependant and I've got to go

4    home." And we wound up having to send a sheriff's deputy

5    with keys to her house because I could not let her leave.

6         So do yourself a favor and think ahead a little

7    bit and if there's any special accommodation I need to make

8    for you, I am happy to do that. I'll assist you in any way

9    that I can. Okay?

10        We have a couple of preliminary matters that we

11   need to take care of so I'm going to send you guys back into

12   the jury deliberation room and I will send for you as soon

13   as I can. All right? Thank you.

14        Ladies and gentlemen, you are admonished. You all

15   know what that means. And if you'll go into the jury

16   deliberation room, please.

17        (Thereupon the following was had outside the presence

18        and hearing of the jury.)

19        THE COURT: Mr. Nicholson, if you'll just have a

20   seat over here in front of the jury box. Jeremy Nicholson,

21   who is in custody is in the courtroom, along with appellate

22   counsel, is it Lisbeth --

23        MS. MCCARTY: It's Lisbeth McCarty.

24        THE COURT: And Danny Lohmann, who are appellate

25   counsel in response to notice that the State intended to

1    call Mr. Nicholson.  You've been afforded a few minutes to

2    meet Mr. Nicholson, is that correct?

3            MS. MCCARTY:  Yes, thank you.

4            THE COURT:  You filed this morning a notice of him

5    invoking his fifth amendment right.  We've talked about this

6    a little bit before we went on the record this morning and I

7    have looked at the cases that you have cited and we have

8    agreed that we're not aware of any Oklahoma law that's

9    directly on point.  Most of these cases deal with situations

10   where a defendant has been convicted but has not previously

11   testified.  Some of them deal with situations in which the

12   defendant willingly testified against a co-defendant at a

13   preliminary hearing but never knowingly and voluntarily

14   waived his fifth amendment right in his own case.

15           So, the State has provided me a case, a

16   10th Circuit Opinion, **Harvey v. Shillinger**,

17   S-H-I-L-L-I-N-G-E-R.  It's a 1996 case out of Wyoming.  In

18   that case a co-defendant knowingly and voluntarily waived

19   his fifth amendment rights at allocution and then later was

20   called as a witness to testify against a co-defendant.  The

21   10th Circuit held that the issue was before he had knowingly

22   and voluntarily waived his fifth amendment privilege and

23   they found that he had under the particulars of that case.

24   And I believe that the facts in this case are more similar

25   to this than of the other cases that you were able to find

1  in very short notice and I appreciate the fact that you have
2  not had the luxury of this.

3          Furthermore, the transcripts in Mr. Nicholson's
4  case have not yet been filed, so you haven't even seen his
5  testimony, but there's no question that Mr. Nicholson
6  understood his rights, he was advised by his trial counsel
7  of the pros and the cons of that and Mr. Nicholson made the
8  decision that it was in his best interest to present his
9  side of the story to the jury and he did that.

10          Furthermore, Mr. Nicholson, the rule is that even
11  if your case is reversed and at this point, trust me, your
12  appellate lawyers will find something that they think merits
13  some discussion, but I know of no genuine error or
14  reversible error.  I can't say that about every trial but I
15  know of no problems in the Nicholson case.  If, for some
16  reason, the Court of Criminal Appeals were to reverse your
17  case, your testimony is admissible against you, even if that
18  conviction is set aside and you go to trial again and you
19  decide not to testify, the State can use your prior
20  testimony against you.  Therefore, I don't believe that
21  there is any, I don't believe that there's prejudice to this
22  Defendant by him being required to testify against
23  Mr. Morris.

24          MR. LOHMANN:  Like I say, Your Honor, we did
25  advise him of the ramifications of testifying and not

1    testifying and so the ultimate decision I guess is his.

2            THE COURT:  Well, Mr. Nicholson, what do you have

3    to say?

4            DEFENDANT NICHOLSON:  I plead the fifth, ma'am.

5            THE COURT:  Well, since I have made a ruling that

6    you are not entitled to the privilege of that fifth

7    amendment, you are compelled to testify today.  Do you

8    understand?

9            DEFENDANT NICHOLSON:  Well, my attorney said and

10   Jason said I didn't have to do that either, though.

11           THE COURT:  Yes, sir, you do have to do that or

12   you'll be held in contempt by this Court.

13           DEFENDANT NICHOLSON:  I guess I've got to be held

14   in contempt.

15           THE COURT:  Okay.  So that's what you choose to do

16   is to violate the order of the Court?

17           DEFENDANT NICHOLSON:  I mean, I wasn't supposed to

18   get on the stand.  I was just supposed to tell my side of it

19   but I wasn't supposed to tell, I wasn't advised none of

20   that.

21           THE COURT:  You wasn't advised none of that what?

22           DEFENDANT NICHOLSON:  I wasn't advised to get on

23   that stand.  I wasn't supposed to get on that stand.

24           THE COURT:  Sir, when you testified in your case

25   you testified about what other people did and you gave up

```
 1   your right to the protection of the fifth amendment and you
 2   did that knowingly and voluntarily.  We fully explored what
 3   all of your rights were and gave you the option and you
 4   wanted to tell the jury your story which included what other
 5   people did.  And, so, you are not entitled to the protection
 6   of the fifth amendment and I intend for you to testify or to
 7   be held in contempt.  Do you understand that?
 8              DEFENDANT NICHOLSON:  Ma'am?
 9              THE COURT:  Do you understand, Mr. Nicholson?
10              DEFENDANT NICHOLSON:  Yes, ma'am.
11              THE COURT:  And, you know, if you want to think
12   about it, you can, but those are your choices.  Do you
13   understand?
14              DEFENDANT NICHOLSON:  Yes, ma'am.
15              THE COURT:  Do you want time to think about it?
16              DEFENDANT NICHOLSON:  Huh-uh.  No, ma'am.
17              THE COURT:  Okay.  So, what is your answer,
18   Mr. Nicholson?
19              DEFENDANT NICHOLSON:  I've just got to be held in
20   contempt.
21              THE COURT:  Okay.  You are under direct contempt
22   of this Court.  It will be purged by your testimony.  If you
23   fail to testify when called, then I will sentence you in
24   accordance with the law.  You're excused.
25              Mr. Nicholson is to be held upstairs as a
```

1   potential witness.  He has the ability to purge the
2   contempt.  He will be sentenced to the maximum on direct
3   contempt if he refuses to testify.  Thank you.  You may be
4   excused.

5       (Thereupon, Mr. Nicholson was excused and the following
6           was had.)

7       THE COURT:  Ms. High, let me return this to you.
8   And it's my understanding you've already announced to this
9   jury that Mr. Morris is going to testify?

10      MR. BOX:  Absolutely, Your Honor.

11      THE COURT:  And so I guess we'll cross other
12  bridges when we get to them.  Are you all prepared for
13  opening?

14      MR. GUHL:  Yes, ma'am.

15      MR. BOX:  Judge, might I inquire, I don't know if
16  this is premature or not.  I had advised the Court that I
17  would object, you advised tentatively in just a pretrial
18  ruling that you were inclined to possibly admit the
19  transcript of Mr. Nicholson and obviously that was based on
20  several things and then one thing has come to light now
21  based on his testimony in open court, it is quite apparent
22  that he is going to elect not to testify so therefore, under
23  the statute, he would be deemed to be unavailable, however
24  under the evidence code as I cited, 2804 B(1).

25      THE COURT:  I'm not going to do this right now.

19

1   The State's already said that they're not going to do that

2   in opening and I will consider that at the appropriate time.

3   I will listen to all of the law and I'm going to follow it.

4          MR. BOX:  Sure.

5          THE COURT:  Okay.  Just as I've followed it so

6   far.  Let me take a brief recess just for about five

7   minutes.

8       (Thereupon, a recess was had, after which, with all

9       parties present, the following was had in open court.)

10         THE COURT:  On opening for the State of Oklahoma.

11         MR. GUHL:  Thank you, Judge.

12         May it please the Court, counsel, ladies and

13  gentlemen of the jury.  My name is Graham Guhl.  I'm an

14  Assistant District Attorney here in Oklahoma County and at

15  this point in time during opening statements it's my

16  obligation to first read the Information in this case

17  word-for-word and then to deliver an opening statement.

18         The Information in this case is the formal

19  charging document filed by our office when we charge someone

20  with a crime.  It's my job at this point this time to read

21  that Information word for word.

22         "Criminal felony, 2004, 1212, Information.  In the

23  District Court in and for Oklahoma County, State of

24  Oklahoma, State of Oklahoma, Plaintiff, versus Howard

25  Purifor Morris, III, Defendant.

1          "In the name and by the authority of the State of

2     Oklahoma, comes now C. Wesley Lane, II, the duly elected,

3     qualified, and acting District Attorney in and for Oklahoma

4     County, District Number 7, State of Oklahoma and on his

5     official oath informs the District Court that:

6          "Count one.  On or about the 20th day of February,

7     2004, A.D., the crime of Murder in the First Degree was

8     feloniously committed in Oklahoma County, Oklahoma, by

9     Timothy Kendell Johnson, Jeremy Dion Nicholson, and Howard

10    Purifor Morris, who acting jointly, willfully, unlawfully,

11    and with malice aforethought, killed Rodney Lamont Perry, by

12    stomping and beating Rodney Lamont Perry, inflicting mortal

13    wounds which caused his death on the 20th day of February,

14    2004, contrary to the provisions of Section 701-7 of Title

15    21 of the Oklahoma statutes, and against the peace and

16    dignity of the State of Oklahoma.

17         "Signed C. Wesley Lane, II, District Attorney,

18    District Number 7, Oklahoma County, Oklahoma."

19         In this case, the Defendant, Howard Purifor

20    Morris, III, has pled not guilty to the crime he's charged

21    with.  Therefore, as in every criminal case, it becomes the

22    State's burden to prove his guilt beyond a reasonable doubt.

23    Ladies and gentlemen, that is a burden we gladly accept.

24         Ladies and gentlemen, today I want to tell you the

25    story of this senseless and ferocious murder of Rodney

21

1   Lamont Perry.  Rodney was a 32-year-old African-American man

2   who was struck down by three men; Timothy Kendell Johnson,

3   Jeremy Nicholson, and this man, Howard Purifor Morris, III.

4           Mr. Morris is here today because on the night of

5   February 24th -- on the night of February 20th, 2004, he

6   made several terrible choices.

7           Choice number one, Mr. Morris and two other men

8   chose to attack Rodney in the parking lot of the Rockwell

9   Villa Apartments at 933 North Rockwell.  Rodney was unarmed,

10  outnumbered, and ambushed.

11          Choice number two, Mr. Morris and the two other

12  men chose to beat, stomp, kick, and pummel Rodney to death.

13          Choice number three, Jeremy Nicholson, Kendell

14  Johnson, and Howard Purifor Morris, III, chose to leave

15  Rodney Perry's dying body on the ground on that cold night.

16          Choice number four, Howard Morris and the two

17  others returned to the body of Rodney Perry, lying on the

18  ground, gurgling and snorting, sucking in his last breaths

19  and decided to continue stomping him, to continue slamming

20  his head against the ground and a vehicle, to make sure that

21  he was truly finished off.

22          I want to tell you the story of Rodney's death by

23  taking you back to the scene of the crime.  Imagine with me,

24  if you will, it's February 20th of 2004.  It's a cold

25  February night.  Rodney Perry is in the parking lot of an

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

22

```
 1   apartment complex near Northwest 10th and Rockwell.  He

 2   encounters three men, Jeremy Nicholson, Timothy Kendell

 3   Johnson, and Howard Purifor Morris.

 4        Some type of dispute arises and a fight erupts.

 5   If you can call it a fight.  Because we're talking about one

 6   unarmed man against at least three other men.  But you don't

 7   have to listen -- or take my word for it.  Listen to the

 8   stories of the witnesses that you're going to hear during

 9   the course of this trial.

10        Demetria Tinner is driving a vehicle along with

11   her passenger, Christa Anderson.  Demetria Tinner and

12   Christa Anderson are visiting a friend named Tasha in the

13   apartment complex.  They turn into the apartment complex.

14   There's only one way in and one way out by vehicle.

15        They're turning, they go west, they're about to

16   approach the office and the mailbox area of that apartment

17   complex when suddenly they see this horrendous scene taking

18   place.  They see Rodney Perry struggling for his life

19   against these three men.

20        Demetria Tinner sees one individual wearing dark

21   clothing and in black do rag.  One individual wearing blue

22   slick pants.  She sees Rodney Perry in a white outfit with

23   red slick pants.  But what really sticks in her mind is the

24   individual who looks directly at her.  That individual is

25   Howard Purifor Morris.
```

1        Not only does he look directly at her, he also

2  starts walking towards her vehicle.  When he makes eye

3  contact with her, he turns away, but Demetria Tinner didn't

4  just see a pause in the action, she saw the entire beating

5  taking place.

6        She saw Howard Purifor Morris, III, and two other

7  men punching Rodney Perry in the face.  She saw him fall

8  against a mailbox that's near the office at that apartment

9  complex.  She saw his head being slammed into the ground and

10  against a vehicle that was nearby, a Dodge Neon.  She saw

11  the men stomping him on his chest, his neck, and his head.

12  Obviously frightened, as anyone would be who sees this

13  occurrence, she kept driving.

14        Now, Christa Anderson, who you will also hear

15  from, was the passenger in that vehicle.  She also got a

16  look at this entire scene taking place and she saw what

17  Demetria Tinner saw just from a different perspective, from

18  the passenger seat of that vehicle.

19        She saw three black males -- at least three black

20  males, pummelling Rodney Perry.  Pummelling him to the

21  ground.  She saw individuals wearing dark clothing, blue-ish

22  clothing.  Scared, too, both individuals continued driving.

23  And then they turned around going back east towards the exit

24  of this apartment complex.

25        Now, when they turned back east they took another

24

1    look from another perspective at what was going on.  They

2    saw Rodney Perry's body.  They saw him gurgling and snorting

3    and inspired Demetria Tinner to immediately call 911 and

4    report the words that they had heard from Rodney Perry.

5          "What did I do?  I don't know what I did."  His

6    final words.

7          Ultimately, the worst choice that Howard Purifor

8    Morris and others made that night was to commit this crime

9    in front of numerous eyewitnesses.  And Demetria Tinner and

10   Christa Anderson were not the only eyewitnesses to the

11   crime.

12         A man named Dewan Debose whose words you will hear

13   saw the crime take place, possibly from one of the best

14   vantage points.  He describes the three individuals.  One

15   wearing baby blue colors, one wearing a jacket with the

16   words "Thug Life" on it, one wearing dark clothing with a

17   hoodie.

18         He saw the pummelling take place.  He saw the

19   entire beat down take place.  Like I said, we're not talking

20   about a fight, we're talking about a murder.  Three, at

21   least, on one.

22         One of those individuals who he saw stomping,

23   beating, kicking Rodney Perry into the mailboxes at the

24   office complex is Howard Purifor Morris.

25         Now, you might say, "Well, who else was there?"

25

1    Kurt Brazille, a man who was staying in an apartment west of

2    where this was all happening, was playing video games with

3    some friends when he heard that a fight had broke out.

4         It was approximately 11:30 that night and he

5    rushes down because he figures that someone he knows, Dewan

6    Debose, may be hurt or may be there.  He wants to know

7    what's happening.

8         And so when he gets down there, he, too,

9    encounters three individuals, three black males who are

10   walking towards the area from which he came.  He describes

11   them as one individual with teardrop tatoos on his eyes and

12   a "Thug Life" written on his jacket.  One individual wearing

13   a baby blue hat with the letters NC on it and baby blue

14   colors.  And one individual wearing a black hoodie.

15        He sees that these individuals are getting into a

16   purple vehicle and trying to leave the scene of the crime

17   and that is suddenly when police pull up.  They get out of

18   the vehicle, they continue walking towards him, and they ask

19   to use his telephone.

20        The individuals who asked to use his telephone are

21   Jeremy Nicholson, the individual with the teardrop tatoos

22   and the "Thug Life" jacket, and Howard Purifor Morris.

23        Now, Kurt Brazille sees these two individuals

24   asking to use his phone and he says, "Well, you can't use my

25   phone but you can use my stepson's phone to make a phone

1    call," presumably to call for help, and for someone to come

2    pick them up from the scene of the crime.

3            Kurt Brazille sees Howard Purifor Morris using his

4    phone and calling someone for several minutes.  And that's

5    not the end of the story.  There's also a witness, Kyle

6    Laws, who has seen this incident take place from nearly the

7    same vantage point of Kurt Brazille.

8            He sees these individuals walking towards the home

9    or their apartment from which Kurt Brazille and he emerged.

10    He sees these three black males walking towards his

11    apartment, one wearing a "Thug Life" jacket, one dressed in

12    blue colors.

13            Now, I told you that one of the worst choices that

14    Howard Purifor Morris made is to not just beat down Rodney,

15    but to return to his body and stomp him, kick him, destroy

16    him to make sure that he was dead.  This action was observed

17    by Kurt Brazille and by Kyle Laws.  These individuals, after

18    making a phone call, left the scene of the crime, as anyone

19    would.

20            A police investigation ensued.  The evidence was

21    collected and you're going to get to see that evidence.

22    You're going to get to hear testimonial evidence and see

23    physical evidence.  The physical evidence that was gathered

24    at the scene.  We're going to take you back to the crime

25    scene not just through our words, but also through pictures.

1   And I'm going to tell you right up front that some of the

2   individuals who testify may testify to certain details which

3   may conflict with one another.

4            In other words, we're going to bring in a number

5   of individuals who are going to be describing the same

6   hallway but may have slightly different perspectives or

7   versions of what that hallway looked like or what this crime

8   scene looked like.

9            But please listen to their testimony and I assure

10  you that not only will these individuals describe the same

11  clothing at the same scene, that at least three of them will

12  identify Howard Purifor Morris as one of the killers.

13           After the presentation of the evidence, just as

14  Howard Purifor Morris on that night made the choice with two

15  other men to attack Rodney Perry, a defenseless man, to beat

16  him to death, to leave him on the cold pavement bleeding to

17  death, I'm going to ask you to make the choice to find him

18  guilty of Murder in the First Degree because that's what the

19  evidence will show that he is guilty of.  Thank you.

20           THE COURT:  Thank you.

21           Mr. Box.

22           MR. BOX:  Yes, Your Honor.

23           May it please the Court, opposing counsel, members

24  of the jury.  As I introduced myself, my name is Chris Box.

25  I represent the accused in this case, Howard Morris.

28

1          Now, the State of Oklahoma has just given their

2     opening statement and, as the Court has instructed you, what

3     Mr. Guhl just said in court is not evidence.  It is his

4     summary or summarizing the evidence as he anticipates as it

5     develops.

6          What I say to you now is not evidence either, but

7     what I tell you in my opening statement is what I anticipate

8     the evidence will show you.  Not going over to the extremes,

9     this happened and this happened, I'm going to go specific

10    what I anticipate certain witnesses will tell you.

11          I anticipate that you're going to hear from a

12    Ms. Tinner, you're going to hear from her probably early on,

13    one of the first witnesses.  And the State has eluded to

14    that witness.  And I anticipate that you will hear that she

15    has previously testified under oath in this courthouse

16    before.

17          I anticipate through my cross-examination when I

18    get up and get to talk to her and get to ask her questions,

19    and maybe through the direct examination, you're going to

20    hear certain segments of her testimony.

21          Specifically, I anticipate the evidence is going

22    to show to you that Ms. Tinner has testified in open court

23    under oath in this courthouse before and she has been asked

24    if she recognized anybody at the scene, and that her answer

25    was, no, except for the victim, Rodney.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

29

1          I anticipate that some two years later that she

2     may come into the courtroom today and through examination

3     she will say, "No, I recognized Howard Morris," that, "I

4     knew Howard Morris."  But yet under oath, I anticipate the

5     evidence will show that she has previously under oath said

6     she did not recognize anybody.

7          I anticipate also that through cross-examination

8     and through direct examination of Ms. Tinner that she's

9     going to say that there was four people involved in the

10    fight with the victim.

11         I anticipate further that her evidence will say

12    that she will say that she saw four people, that one

13    individual, I anticipate her testimony will show had blue

14    jeans and a t-shirt on, he was approximately 5 foot 9, he

15    was thin and dark-colored skin.

16         I anticipate further that her testimony will show

17    through cross-examination that she will identify a second

18    person as light-skinned, that she said he had a powdered

19    blue shirt on and jeans.

20         Third, I anticipate her testimony will show that a

21    third individual had a green jacket on with blue jeans.

22         And that the fourth suspect at the scene,

23    according to her, was about 5 foot 6, had a do rag on and a

24    t-shirt.  I anticipate that that will be her testimony or

25    previous testimony under oath.

1        I further anticipate the evidence will show

2   through her that she will say that she did not see anybody

3   witnessing the fight as it occurred, that she only saw

4   people come out after the fight had occurred.

5        I anticipate the evidence, according to her, will

6   say that this fight took three to four minutes and that she

7   followed the car through the parking lot as it left.

8        Now, second of all, I anticipate that some of the

9   evidence that you're going to hear in this case will not be

10  contested by the Defense.  You will not hear us

11  cross-examine the medical examiner.

12        In fact, we would stipulate to the medical

13  examiner's testimony, that she will say that Rodney, the

14  victim in this case, died as a result of a homicide and of a

15  beating.  That is not the issue for our case.

16        I anticipate also that when some of the witnesses

17  are called as far as the technical investigators, the police

18  officer that examined the scene, that you will not hear any

19  cross-examination from the Defense because that is not at

20  issue.

21        Now let's talk about what other anticipated

22  evidence I anticipate you will hear.  I anticipate that, as

23  you've heard, that a Dewan Debose will testify and he will

24  testify as has been indicated by transcript, that there will

25  actually be somebody on that witness stand reading that

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    transcript of Mr. Debose' previous testimony in this

2    courthouse under oath, that he's been determined to be

3    unavailable for court today and therefore that testimony

4    will come in through the testimony.

5         What will Mr. Debose testimony, I anticpate, show

6    you?  I anticipate his testimony will say there's three

7    people fighting, not four.  And I anticipate that his

8    testimony is going to say that the tall individual that was

9    involved in the fight had a sweatshirt on that said "Thug

10   Life."

11        He will also say that there was a person that he

12   identified under oath at a previous hearing that he

13   identified as my client that had a baby blue hat on.  And he

14   will say that the whole incident took two to two and a half

15   hours, I anticipate his testimony.

16        He will say further, I anticipate the testimony,

17   that the individuals didn't leave in a car and that two of

18   the individuals ran to his uncle's apartment and that the

19   individual that he identified as my client actually picked

20   up the phone, used the phone, and called a number for a

21   ride.  I anticipate that's what his testimony will be.

22        Third of all, I anticipate that you're going to

23   hear from the third person that allegedly identifies my

24   client.  It will be a Mr. Kurt Brazille.  And I anticipate

25   the evidence by Mr. Brazille will be that -- and, oh, by the

1   way, back to Mr. Debose, unlike Ms. Tinner who says that

2   there was no other individuals seeing the fight, Mr. Debose

3   is going to say that he witnessed the fight, he saw three

4   people stomping and kicking, that there had already been a

5   fight but they went back over and so-called finished him

6   off.

7        Then I anticipate you're going to hear from an

8   individual named Kurt Brazille.  And I anticipate through

9   cross-examination and direct examination that he's going to

10  tell you that there was three individuals, not four

11  individuals involved in the fight.

12       He's going to say that my client that he

13  identifies was the one wearing the "Thug Life" sweatshirt,

14  contradictory to Mr. Debose's testimony.

15       He's going to say that three men stomped the

16  individual and then he's going to further state that the

17  person that had the "Thug Life" sweatshirt, that he

18  identifies as my client, and the blue hat went to his

19  apartment, used his phone, and called the number to get a

20  ride.

21       I anticipate further that the testimony is going

22  to show that there is no physical evidence through

23  fingerprints or anything to link my client to the scene of

24  the crime.  I anticipate the evidence will show no

25  fingerprints, not on a phone, not on a car, not on anything,

1    to establish that my client was present at the scene.

2           Further I anticipate the evidence, my client will

3    testify, and I anticipate that you will hear from my client

4    that he was born on Christmas day in 1976.  He was born

5    to -- his mother and father.  His father is a retired police

6    officer, now a minister.  His mother is a day care provider.

7    He has two sisters and a brother.

8           I anticipate his testimony will say that he

9    attended school at Midwest City Elementary and that he

10   graduated from Chickasha.

11          MR. GUHL:  Judge, may we approach?

12          THE COURT:  You may.

13     (Thereupon, the following was had at the bench.)

14          MR. GUHL:  Judge, we'd object on the basis of

15   relevance to the cause at hand.  Even if Mr. Morris could

16   get up and testify to this, I don't know how it would be

17   relevant to this trial.

18          MR. BOX:  It goes to credibility, Your Honor.  It

19   is relevant.

20          THE COURT:  Sustained.

21     (Thereupon, the following was had in open court.)

22          MR. BOX:  Well, you're going to hear about his

23   life.  And then you're specifically going to hear that in

24   the year 2004 that he was employed at Midwest City, worked

25   for Midwest City, the City of Midwest City; that he lived on

34

1   the south side of Oklahoma City in an apartment and lived

2   there for about a year.

3        And you're going to hear from the testimony that

4   this incident occurred in February of 2004.  And you're

5   going to hear that he was arrested in September of 2004, at

6   his residence where he had resided for the last year after

7   he had got off of work from Midwest City where he had worked

8   for a year.

9        You're further and finally going to hear from my

10  client that he was not involved in this case, that he was

11  not present at this location, and that he did not

12  participate in the homicide of the victim.

13        After you hear all the evidence, we are convinced

14  that you are going to find that there is reasonable doubt in

15  this case and the State will not prove their case beyond a

16  reasonable doubt.  Thank you.

17        THE COURT:  Thank you, Mr. Box.

18        Is the State prepared to open your case in chief?

19        MS. HIGH:  Yes.

20        THE COURT:  Thank you.  I'm going to invoke the

21  rule and if you'll look around the courtroom.

22        Please call your first witness.

23        MS. HIGH:  The State calls Demetria Tinner.

24    (Witness sworn.)

25        THE COURT:  Counsel, will you approach, please?

```
 1           (Thereupon, the following was had at the bench.)

 2               THE COURT:  I'm thinking that there's transcripts

 3   that are going to be used here.

 4               MR. BOX:  Yes, Your Honor.  July 27th of 2004.

 5               THE COURT:  They're not in the court file.

 6               Well, if you have it, maybe I can have somebody

 7   make a copy.

 8               MR. BOX:  Yes, Judge.

 9               THE COURT:  I think you can probably proceed.

10                        DEMETRIA TINNER,

11   having been first duly sworn, testified as follows:

12                        DIRECT EXAMINATION

13   BY MS. HIGH:

14   Q.   Ma'am, would you introduce yourself to the Court and to

15   the jury, please.

16   A.   I'm Demetria Tinner.

17   Q.   And, Ms. Tinner, how old are you?

18   A.   Twenty-six.

19   Q.   I want to direct your attention back to February the

20   20th of 2004.  Do you recall that date?

21   A.   Yes, ma'am.

22   Q.   And that night in the evening, 10:30, 11:00, or so,

23   where were you?

24   A.   Heading over to Rockwell Villa Apartments.

25   Q.   Now, were you going by yourself or with someone else?
```

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

36

```
 1   A.   With somebody else.

 2   Q.   Who were you with?

 3   A.   Christa Anderson.

 4   Q.   And were you in a car?  On foot?  How were you going

 5   over to the Rockwell Villa Apartments?

 6   A.   In a car.

 7   Q.   And was it your car or Christa's car?

 8   A.   Mine.

 9   Q.   And what kind of car was it?

10   A.   A white Ford Focus.

11   Q.   I'm sorry, a white Ford Focus?

12   A.   Yes.

13   Q.   And were you the driver or the passenger?

14   A.   The driver.

15   Q.   And was Ms. Anderson in the front passenger seat or in

16   the back seat?

17   A.   In the front seat.

18   Q.   And for what reason were you going over to the Rockwell

19   Villa Apartments?

20   A.   To visit a friend.

21   Q.   And who was your friend?

22   A.   Her friend is Kesha, I think is her name.

23   Q.   Now, had you lived or been to the Rockwell Villa

24   Apartments before?

25   A.   Yes.
```

```
 1    Q.   Had you lived there or had you just been there?

 2    A.   Lived there also.

 3    Q.   And how long had it been since you had lived in the

 4    Rockwell Villa?

 5    A.   Since that night.

 6    Q.   Before that night, yes, ma'am.

 7    A.   Maybe -- I don't know, a year, six months, something

 8    like that.

 9    Q.   All right.  And Ms. Anderson, had she lived in that

10    apartment complex before or was she just visiting?

11    A.   She had lived there also.

12    Q.   Now, did you know a man by the name of Rodney Perry?

13    A.   Yes.

14    Q.   And how did you know Mr. Perry?

15    A.   Because when we used to live there; he lived across the

16    way from us.

17    Q.   So when you say "across the way," are you talking about

18    he lived in a different apartment in Rockwell Villa?

19    A.   Yes.

20    Q.   And for how long -- how much time would you say that

21    you had known Rodney Perry?

22    A.   The whole time I was over there.

23    Q.   And how long was that?

24    A.   A year or so.

25              MS. HIGH:  May I approach the witness, Judge?
```

```
 1              THE COURT:  You may.
 2   Q.   (BY MS. HIGH)  Ms. Anderson, I'm going to hand you what
 3   I have previously marked --
 4   A.   Ms. Tinner.
 5   Q.   I'm so sorry, Ms. Tinner, previously marked as State's
 6   Exhibits 1, 2, 3, and 4, and I just want you to tell me if
 7   you recognize what's in those photographs?
 8   A.   The first one is a picture of the complex at Rockwell
 9   Villa.
10   Q.   And the second one?
11   A.   The same, the apartment complex, Rockwell Villa.
12   Q.   And the third one?
13   A.   Rockwell Villa the night of the -- the night that
14   Rodney was killed.
15   Q.   And the fourth one?
16   A.   Rodney.
17              MS. HIGH:  Your Honor, at this time I would move
18   for admission of exhibits 1, 2, 3, and 4.
19              MR. BOX:  No objection, Your Honor.
20              THE COURT:  Without objection, State's 1, 2, 3,
21   and 4 are admitted.
22   Q.   (BY MS. HIGH)  Now, Ms. Tinner, when you've been here
23   before we've had big machines that allowed us to show this.
24   We don't have that today.  And so I want to hold up State's
25   Exhibit Number 1.
```

39

```
 1        And if I understood you correctly, you said that this
 2   is a photograph of Rockwell Villa Apartments?
 3   A.   Correct.
 4   Q.   Taken from the air?
 5   A.   Yes.  It looks like so.
 6   Q.   All right.  Now, using this photograph, where is the
 7   apartment complex?
 8   A.   Right here.
 9   Q.   Is it all of these buildings?
10   A.   Yes, the whole strip right there.
11   Q.   Now, this street that is right here, what is that
12   street?
13   A.   Rockwell.
14   Q.   And this street over here, what is it?
15   A.   Tenth.
16   Q.   Now, from the time that you lived in the apartment
17   complex, is there any other way to drive a car in and out
18   other than this one --
19   A.   No, it's one way in and one way out.
20   Q.   Now, from living there, if you're on foot, can you
21   leave the apartment complex other than out the front way?
22   A.   Yes.
23   Q.   How can can you leave?
24   A.   You can go back here.  It's like a little field through
25   here and you can go through there.
```

40

1    Q.    So on foot you can travel this way to 10th Street?

2    A.    Uh-huh, yes.

3    Q.    Yes.  Okay.

4          And this is State's Exhibit Number 2, which you've told

5    us is a photograph of the apartment complex?

6    A.    Yes.

7    Q.    Again, taken from the air?

8    A.    Yes.

9    Q.    Now, and just so that we can orient ourselves and the

10   jury, is this the way that you go in to the apartment

11   complex?

12   A.    Yes.

13   Q.    So you've already told us this street up here would be

14   Rockwell?

15   A.    Yes.

16   Q.    And is this the way that you came in to the apartments

17   that night with Ms. Anderson in your car?

18   A.    Yes.

19   Q.    Now, do you recall what time it was when you came in or

20   when you got to Rockwell Villa that night?

21   A.    I really don't.

22   Q.    Was it dark outside?

23   A.    It was dark.  I think it was like 10:30 or 11.

24   Q.    And when you came in this way off of Rockwell, did

25   there come a time when you noticed something unusual or out

41

```
 1   of the ordinary going on in the parking area?

 2   A.    Yes.

 3   Q.    Tell the jury what you saw.

 4   A.    I saw a group of guys standing outside arguing.

 5   Q.    Now, using this photograph, if you can, about where in

 6   this roadway were you when you saw this?

 7   A.    I really can't see.

 8   Q.    Go ahead.

 9   A.    Right here.  Like right there.

10   Q.    Okay.  So you're showing not terribly far into the

11   apartment complex when you noticed it?

12   A.    Right.

13   Q.    When you say you saw a group of guys arguing, how many

14   guys did you see?

15   A.    Five.

16   Q.    And was it three guys arguing with two guys?  How many

17   appeared to be arguing with how many?

18   A.    Four was arguing with one.

19   Q.    And did you have your windows down?

20   A.    Not at first.

21   Q.    Okay.

22   A.    But when I approached it a little bit more we rolled

23   them down.

24   Q.    Okay.  And so when you first saw that, did you continue

25   to travel in to the apartment complex?
```

```
1   A.    Yes.

2   Q.    Did there come a time when you stopped?

3   A.    Yes.

4   Q.    About where did you stop?

5   A.    Right over that first speed bump.

6   Q.    And so this yellow line that we can see in the

7   photograph, that's a speed bump?

8   A.    Yes.

9   Q.    Did you go over the speed bump?

10  A.    My front tires was over it and my back one was behind

11  it.

12  Q.    And what did you do when you stopped?

13  A.    We let the window down and we watched.

14  Q.    What could you see?

15  A.    They were arguing and basically just started stomping

16  all over his body and beating him up really bad and jumping

17  all on his chest and stuff.

18  Q.    Now, the man that was being beaten, at that time did

19  you recognize him?

20  A.    No, I did not.

21  Q.    And you indicated that there were four men doing the

22  beating?

23  A.    Yes.

24  Q.    Were there any of the four men that were not

25  participating in the kicking and the stomping?
```

 1  A.    No.   They all was doing it.

 2  Q.    When you first noticed this going on, was the man who

 3  was ultimately beaten, was he standing up or was he on the

 4  ground already?

 5  A.    He was standing up at first.

 6  Q.    Did there come a time when he was on the ground?

 7  A.    Yes.

 8  Q.    How did he come to be on the ground?

 9  A.    One of the guys hit him and he fell back.

10  Q.    And fell back flat onto the ground?

11  A.    Yes.

12  Q.    And what happened after the man was on the ground?

13  A.    They started jumping, stomping on him.

14  Q.    And I'm not sure the jury can see because of that, but

15  you were showing with your feet, they were stomping him?

16  A.    Yes.

17  Q.    Where on the man's body were they stomping him?

18  A.    All through the neck, everywhere, all the way down.

19  Q.    And were all four of the men participating in the

20  stomping?

21  A.    Yes.

22  Q.    So what happens next?

23  A.    After we seen that?

24  Q.    Yes.

25  A.    Oh, after that we drove around and came back and looked

44

```
 1   and noticed it was Rodney and called 911.

 2   Q.   Let me ask you -- I forgot one thing.  You've told us

 3   what you saw.  What could you hear whenever you rolled your

 4   window down initially?

 5   A.   They were saying something about Crip stuff and Rodney

 6   was like he didn't do anything and they was just doing

 7   cussing and stuff like that.

 8   Q.   Okay.  Now, when you say "they were saying Crip stuff,"

 9   are you talking about the four men or are you talking --

10   A.   The four men.

11   Q.   And what could you hear?  You ultimately came to find

12   that you knew the man that was beaten, is that right?

13   A.   Right.

14   Q.   And who was that?

15   A.   Rodney.

16   Q.   What could you hear -- and is that Rodney Perry?

17   A.   Yes.

18   Q.   What could you hear Rodney Perry saying?

19   A.   He said he didn't do anything.  And that was it.  And

20   then he started gurgling real, real bad.

21   Q.   And could you hear the gurgling when you were still

22   here initially or was that on your way back?

23   A.   On my way back.  That's why I called 911.

24   Q.   And so if I'm correct, did you go down and turn around

25   in this little circle?
```

1   A.    I sure did.

2   Q.    And came back?

3   A.    Yes.

4   Q.    Now, as you came in to the apartment complex, was the

5   beating happening on your side of the car?

6   A.    Yes, it was.

7   Q.    And when you came back, it would have been on the

8   passenger side of the car?

9   A.    Right.

10  Q.    What did you see when you got back to the same spot

11  after you had turned around?

12  A.    Rodney was laying on the ground and kind of kicking and

13  shaking and gurgling in his own blood so we decided to go

14  ahead and call the police.

15  Q.    What of the four men?  Where were they?

16  A.    One of them was still standing right there but then I

17  seen like one go through the -- took off and went through

18  the crowd, because people had started coming out by then,

19  and then the other ones got in the car.

20  Q.    Now, you say people had begun to come out.  How many

21  people would you estimate were outside in this area at that

22  time?

23  A.    I can't -- I don't remember.

24  Q.    Okay.  Did it seem like a great number or a few?  A

25  couple?

```
 1   A.    Maybe ten.  Maybe.

 2   Q.    All right.

 3         And so you indicated one of the men took off through

 4   the crowd?

 5   A.    Yes.

 6   Q.    And then the other ones went and got in a car?

 7   A.    Yes.

 8   Q.    Where was the car?

 9   A.    Right by the -- well, let me show you.  Right through

10   there.

11   Q.    Okay.  And obviously this photograph is taken during

12   the day, and this was at night, right?

13   A.    Right.

14   Q.    And so not necessarily that these are the same cars,

15   but there were cars parked there that night also?

16   A.    Yes.

17   Q.    And did you see three men get in that car?

18   A.    I did.

19   Q.    And what happened next?

20   A.    The one went through the crowd, they got in.  I started

21   calling 911, pulled off.  They got behind me but they went

22   around me and went out and went back on Rockwell.

23   Q.    Okay.  So when you came and you stopped at the speed

24   bump on your way out, did you look at who you knew then to

25   be Rodney Perry?
```

1  A.    Yeah, we stopped right there and I called 911 from

2  looking at him right there and then when we got them on the

3  line, I drove out.

4  Q.    Describe for the jury Mr. Perry's condition at the time

5  you stopped.

6  A.    He was gurgling and just shaking real bad and I could

7  tell he wasn't breathing.  And I asked Christa should we get

8  out and help him but she was like, "No," because they were

9  still kind of right there at the time.

10      She was like, "We don't know what they'll do to us, so

11  we just decided to call 911.  He was pretty bad."

12  Q.    Could you see -- I understand he was not breathing like

13  you would expect him to breathe.  Could you see any obvious

14  sign of injury on his face or anywhere on his body?

15  A.    I seen a lot of blood around him.

16  Q.    Okay.  All right.  And you have previously told us that

17  State's Exhibit Number 3 is a photograph of the apartment

18  complex that night.

19  A.    Yes.

20  Q.    Now, this person that we can see lying there, do you

21  recognize that person?

22  A.    Yes, I do.

23  Q.    And who is that?

24  A.    Rodney.

25  Q.    Now, at the time that you pulled up and stopped that

48

```
 1    night, is that the exact position that Mr. Perry's body was

 2    in?

 3    A.    Excuse me?

 4    Q.    When you turned around and came back --

 5    A.    Oh, yes, yes.

 6    Q.    -- and you stopped --

 7          And this is the speed bump, is that right?

 8    A.    Uh-huh.

 9    Q.    Is this where Mr. Perry's body was?

10    A.    Yes, it was.

11    Q.    And, now, you've told us that you called 911, is that

12    correct?

13    A.    Yes.

14    Q.    Before we get to that, I want to ask you about the four

15    men.

16          I may have spelled that wrong and I'll get a pen that

17    has more ink.

18          I want you to think back in your mind to the four men

19    and I want you to pick one of them -- well, let me ask you

20    first, of the four men that you saw, did you recognize any

21    of them out there that night?

22    A.    Yeah, kind of.  Not at first.

23    Q.    Not at first?

24    A.    Uh-huh.

25    Q.    As you sit here in this courtroom today, do you see any
```

1    of the men that were out there that night?

2    A.    Yes.

3    Q.    And can you tell me where he is sitting and what he is

4    wearing?

5    A.    He's sitting right there.  He has on a yellow shirt and

6    black pants.

7         MS. HIGH:  Your Honor, I'd ask the record to

8    reflect identification of the Defendant, Howard Morris.

9         THE COURT:  The record will so reflect.

10   Q.    (BY MS. HIGH)  Prior to that night, did you know this

11   Defendant?

12   A.    Not really but kind of.

13   Q.    Explain.

14   A.    He was just one of my friend's boyfriends.

15   Q.    And who was your friend?

16   A.    Do I have to say her name?

17   Q.    Yes.

18   A.    I don't know her last name, but her name Eenie.

19   Q.    Eenie?

20   A.    Uh-huh.

21   Q.    Okay.  And how long had you -- had you seen him

22   occasionally prior to that night?

23   A.    Yes.

24   Q.    About how many times would you estimate you had seen

25   Howard Morris prior to that night?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    A.    Just a couple.

2    Q.    Now, when you were initially interviewed by the police,

3    did you tell them that you knew Howard Morris or identify

4    him in any way?

5    A.    No, I didn't.

6    Q.    Why?

7    A.    Because I didn't -- I didn't want -- I didn't want to.

8    Q.    When was the first time -- or who was the first person

9    that you ever told, I know that one?

10    A.    You.

11    Q.    And how long ago was that?

12    A.    Right before the last trial.

13    Q.    Why did you change your mind and tell what you knew?

14    A.    I don't know.  I just -- I don't know.  I felt bad, I

15    guess.

16    Q.    Okay.  How was Howard Morris dressed that night?  We

17    will make him the first individual.  How was he dressed?

18    A.    I really don't remember.

19    Q.    Do you remember anything about his clothing?

20    A.    No, not really.  I can't now.

21    Q.    When you observed the four men, did you have an

22    opportunity to look at Howard Morris, to look at his face?

23    A.    When they were stomping on Rodney?

24    Q.    At any point.

25    A.    Oh, yeah.

```
 1    Q.    What happened?

 2    A.    Well, me and Eenie had the same car that day.  I

 3    mean -- well, she has a white Ford Focus also, she did, so

 4    after they were stomping him or whatever he kind of like

 5    came to the car, because -- I'm just assuming, I don't know,

 6    but maybe he thought I was her.  So he stopped and I got --

 7    that's how I seen that it was him.

 8    Q.    You say he came to the car.  Did he walk all the way up

 9    to your car?

10    A.    Not all the way because I guess when he noticed it

11    wasn't her, I'm guessing he noticed it wasn't her, he went

12    through the crowd.

13    Q.    Okay.  So if I'm understanding you correctly, did

14    Howard Morris turn and look at you?

15    A.    Yes.

16    Q.    Did you make eye contact with him?

17    A.    Yes.

18    Q.    And at the time that you made eye contact, is that the

19    point when he turned and walked away?

20          MR. BOX:  Objection, leading, Your Honor.

21          THE COURT:  Sustained.

22    Q.    (BY MS. HIGH)  At what point did Howard Morris turn and

23    walk away?

24    A.    It wasn't -- when he looked, I'm guessing when he

25    noticed it wasn't her and he just walked -- he just ran, ran
```

```
 1   off.

 2   Q.   Okay.  All right.  And so did you know Howard Morris by

 3   any name other than Howard Morris?

 4   A.   Yeah, because I didn't even know his last name was

 5   Morris.

 6   Q.   What name did you know him by?

 7   A.   NC.

 8   Q.   NC?

 9   A.   Uh-huh.

10   Q.   Like the two letters, NC?

11   A.   Uh-huh.

12   Q.   Had you ever heard him called anything besides NC?

13   A.   No.

14   Q.   And, so, can you tell me anything about the next one of

15   the next people?

16   A.   I noticed he had on a white t-shirt.

17   Q.   A white t-shirt?

18   A.   Yes.

19   Q.   Let me ask you, you've told us they were all men.

20   A.   Yes.

21   Q.   Do you recall the race of the men?

22   A.   They were all black.

23   Q.   Okay.  Do you recall anything else about the man in the

24   black -- in the t-shirt?

25   A.   He was light-skinned, I believe.
```

53

```
 1   Q.   Anything else?

 2   A.   Huh-uh.

 3   Q.   And the next one?

 4   A.   I really can't remember now.  I'm sorry.

 5   Q.   That's fine.

 6        Do you recall as to height, were any of the men

 7   significantly taller than the others?

 8   A.   One was real, real short.

 9   Q.   One was short?

10   A.   Yes.

11   Q.   Okay.  Was it either the one in the white t-shirt or

12   Howard Morris or was it --

13   A.   It was another one.

14   Q.   Okay.  Do you recall anything about the shorter man's

15   clothing?

16   A.   Not really.  I really can't.

17   Q.   Now, you have testified previously in these matters,

18   have you not?

19   A.   Yes.

20   Q.   Do you know how many times you've testified?

21   A.   Oh, Lord, like three.

22   Q.   And have you testified twice with a jury in that box?

23   A.   I believe so, yes.

24   Q.   Now, when you came in and testified each of those

25   times, did you see men that you recognized as being the men
```

54

1    out there?

2    A.    I thought that some -- well, not that shorter one.

3    I've never seen him.

4    Q.    Not the shorter one, but either the second one or the

5    fourth one, did you see them in this courtroom on previous

6    occasions?

7    A.    Yes.

8    Q.    And so this is definitely -- Howard Morris is separate

9    and distinct from these three men?

10    A.    Yes.

11    Q.    Is there any doubt in your mind that it was Howard

12    Morris, was one of the four men that was beating and

13    stomping Rodney Perry that night?

14           MR. BOX:   Objection, asked and answered, Your

15    Honor.

16           THE COURT:   Overruled.

17    Q.    (BY MS. HIGH)   You may answer.

18    A.    No, that's him.

19    Q.    And you've told us that you called 911.

20    A.    Yes.

21    Q.    I want to hand you what I have previously marked as

22    State's Exhibit Number 42 and ask if you've heard the

23    contents of this tape before?

24    A.    Yes.

25    Q.    And does it contain in entirety the 911 call that you

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1   made reference to Rodney Perry being beaten in the parking

 2   lot?

 3   A.   Yes.

 4          MS. HIGH:  State would move for admission of

 5   Exhibit Number 42.

 6          MR. BOX:  We have no objection, Your Honor.

 7          THE COURT:  State's Exhibit 42 then is admitted

 8   without objection.

 9          MS. HIGH:  Offer it for playing to the jury.

10          (Thereupon, State's Exhibit 42 was played.)

11   Q.   (BY MS. HIGH)  Ms. Tinner, why were you leaving?

12   A.   I wasn't going to stay there with that going on.

13   Q.   I'm sorry?

14   A.   I wasn't going to stay there with that going on.

15          MS. HIGH:  Pass the witness.

16                    CROSS-EXAMINATION

17   BY MR. BOX:

18   Q.   Now, Ms. Tinner --

19   A.   Tinner.

20   Q.   Tinner, excuse me.  Ms. Tinner, as previously has been

21   admitted, you have testified several times in this

22   courthouse under oath, is that correct?

23   A.   Yes.

24   Q.   And do you recall testifying back in July of 2004, at a

25   preliminary hearing on the fifth floor of this courthouse?
```

1    A.    Yes.

2    Q.    And do you recall that you were asked then if you

3    recognized under oath --

4    A.    Yes.

5    Q.    -- if you recognized anybody at the scene?

6    A.    Yes.

7    Q.    And your answer was no, is that correct?

8    A.    Yes.

9    Q.    And if I understand your testimony correctly, the first

10   time that you told anybody after being interviewed by the

11   police department several times, after testifying under oath

12   in this courthouse several times, the first time you told

13   anybody that you knew my client was approximately a couple

14   months ago?

15   A.    Uh-huh.

16   Q.    Is that correct?

17   A.    Uh-huh.

18   Q.    Now, if I also understand correctly, in that 911 tape,

19   you said there was four or five individuals.  Is that

20   correct?

21   A.    Yes.

22   Q.    And you also said in the 911 tape that you didn't know

23   what they were wearing, it was white or blue or something

24   like that, is that correct?

25   A.    No, I didn't say that.

57

```
 1   Q.   Well, you said now under oath that there was four

 2   people beating the victim, is that correct?

 3   A.   Yup.

 4   Q.   Okay.  And you also, you said that after they beat the

 5   victim, three of them left in a vehicle and pulled out onto

 6   Rockwell, is that correct?

 7   A.   Yes.

 8   Q.   Did you follow them?

 9   A.   No.

10   Q.   And then you said one of them ran through the crowd.

11   A.   Yes.

12   Q.   Now, the individual you identified today in court, was

13   he the one that ran through the crowd or was he an

14   individual that got in the car?

15   A.   He ran through the crowd.

16   Q.   Did any of them have any facial hair?

17   A.   I'm pretty sure, but I can't remember right now.

18   Q.   Did one of them have a do rag on?

19   A.   Yes.

20   Q.   And was it Mr. Morris that had a do rag?

21   A.   I can't remember right now.

22   Q.   Now, also, isn't it correct that when the fight was

23   going on, nobody -- you didn't see anybody else out in the

24   apartment complex witnessing the fight?

25   A.   No, there was no one else out.
```

1   Q.   And that when you saw the crowd come out, the fight was

2   over, is that correct?

3   A.   Yes.

4   Q.   And, in fact, the people were leaving when the crowd

5   came out, is that correct?

6   A.   What people were leaving?

7   Q.   The people that did this.

8   A.   Well, no, they wasn't leaving.

9   Q.   Just hanging out?

10   A.   You tell me.

11   Q.   I wasn't there.

12      At any rate, when you drove into the apartment complex,

13   you were the driver, is that correct?

14   A.   Yes.

15   Q.   And so you were the closest to the altercation?

16   A.   Yes.

17   Q.   But the altercation was only a verbal altercation then

18   when you drove by?

19   A.   I didn't drive by.  It was verbal, yes, for a minute.

20   Q.   And then you turned around, didn't you?

21   A.   No, not until after it was over.

22   Q.   Okay.

23   A.   Uh-huh.

24   Q.   Approximately how long did this altercation take?

25   A.   I don't remember.

59

```
 1   Q.   Well, was it less than 10 minutes?

 2   A.   Might have been.

 3   Q.   You just don't know?

 4   A.   No.

 5   Q.   Was it more than 10 minutes?

 6   A.   I just said I don't know.  I wasn't counting the

 7   minutes sitting there looking at my watch.

 8   Q.   My question was:  Was it more or less than 10 minutes,

 9   your answer was you don't know?

10   A.   I don't know.

11   Q.   Which direction did the car leave on Rockwell?

12   A.   They went out and turned left.

13   Q.   So they went northbound?

14   A.   Yes.

15   Q.   Were they leaving at a high rate of speed?

16   A.   Yes.

17   Q.   Approximately what time was this?

18   A.   Eleven.

19   Q.   It was a February night.  Was it cold out?

20   A.   No.

21   Q.   It obviously was dark out?

22   A.   Right.

23            MR. BOX:  Your Honor, if I could just have a

24   minute?

25            THE COURT:  You may.
```

60

```
 1        (Brief pause in proceedings.)

 2            MR. BOX:  Your Honor, I have no further questions

 3   of this witness.

 4            THE COURT:  On redirect.

 5            MS. HIGH:  Yes.

 6                    REDIRECT EXAMINATION

 7   BY MS. HIGH:

 8   Q.   Ms. Tinner, is this the first time that you've been in

 9   the courtroom and asked under oath if you see a person that

10   you know as Howard Morris?  Have you ever been in a

11   courtroom with him before?

12   A.   With him?

13   Q.   Yes.

14   A.   No.

15   Q.   So you've never had the opportunity with him sitting

16   here, you've never been asked the question if you recognized

17   Howard Morris with him sitting in the courtroom, is that

18   right?

19   A.   Right.

20   Q.   So those previous times that you've testified, it's

21   never been in a hearing involving Howard Morris?

22   A.   No, it has not.

23            MS. HIGH:  That's all I have.

24            THE COURT:  Thank you.

25            Recross.
```

```
 1              MR. BOX:  Yes.

 2                     RECROSS-EXAMINATION

 3   BY MR. BOX:

 4   Q.    But you have been asked under oath, subject to perjury,

 5   you were asked did you recognize any of the individuals

 6   involved in the fight, have you not before?

 7   A.    Excuse me, one more time?

 8   Q.    Have you not been asked under oath in previous hearings

 9   did you recognize any of the individuals involved in the

10   fight?  You've been asked that before, have you not?

11   A.    Not him.

12   Q.    Were you not asked at the preliminary hearing,

13   July 27th?

14   A.    Well, I seen him.  He did it.

15   Q.    Page 38.

16   A.    Sorry.

17   Q.    The question, "All right.  Do you recognize any of the

18   individuals?"

19         Your answer was, "No."

20         Do you recall that?

21   A.    Uh-huh.

22   Q.    Did you say that?

23   A.    Yes.

24   Q.    And the next question was, "Did any of the five

25   individuals that you saw --"
```

```
 1          "Yeah, Rodney."

 2          "You recognized Rodney.  Which one was he?"

 3          "He was the one being stomped."

 4          Do you recall that?

 5   A.    Uh-huh.

 6   Q.    Is that yes or no?

 7   A.    Yes.

 8   Q.    So you have been asked under oath if you recognized

 9   anybody, if you know anybody that was involved in this case,

10   is that correct?

11   A.    Yes.

12   Q.    And you told them, "No"?

13   A.    Yes.

14          MR. BOX:  No further questions.

15          THE WITNESS:  That don't mean he didn't do it.

16          MR. BOX:  Yes, Your Honor.  Your Honor, I would --

17          THE COURT:  Excuse me.

18          MR. BOX:  I would object, Your Honor.

19          THE COURT:  Ms. Tinner, if you will only answer

20   the questions that are asked, please.

21          THE WITNESS:  Okay.

22          THE COURT:  Redirect.

23          MS. HIGH:  Yes.

24

25
```

1  **REDIRECT EXAMINATION**

2  **BY MS. HIGH:**

3  Q.   Ms. Tinner, in that same preliminary hearing?

4  A.   Yes.

5  Q.   Did you identify two other men sitting in the courtroom

6  that day?

7  A.   Yes.

8          MR. BOX:   Objection, Your Honor, outside the scope

9  of redirect.

10          THE COURT:   Overruled.

11  Q.   (BY MS. HIGH)   Did you identify two other men as being

12  individuals, two of the four that you saw that night?

13  A.   Yes.

14  Q.   And that was right after you were asked did you

15  recognize any of them?

16  A.   Right.

17  Q.   But when asked if you saw any of the individuals in the

18  courtroom, you picked out two of them?

19  A.   Yes, I did.

20  Q.   And this is the first opportunity that you had to pick

21  out Howard Morris?

22  A.   Yes, it is.

23          MS. HIGH:   That's all I have.

24          THE COURT:   Thank you.

25          Is there further, Mr. Box?

```
 1          MR. BOX:  Nothing, Your Honor.

 2          THE COURT:  Thank you.  You may be excused.

 3          Would counsel approach for one moment, please?

 4          (Thereupon, an off-the-record discussion was had at the

 5          bench, after which, the following was had in open

 6          court.)

 7          THE COURT:  I think I'm going to give the jury

 8      about a 15-minute break.  So I'm going to admonish you for

 9      the record and ask you to be back in the courtroom -- let's

10      say at 10 minutes after 11.

11          We generally take a morning break about 10:30, but

12      we got cattywampus with other matters this morning.  So you

13      are admonished and thank you very much.  I'll see you back

14      here at 10 minutes after 11.  Thank you.

15          (Thereupon, a recess was had, after which, with all

16          parties present, the following was had in open court.)

17          THE COURT:  Please be seated.  The State's next

18      witness, please.

19          MR. GUHL:  The State calls Christa Anderson.

20                         CHRISTA ANDERSON,

21      having been first duly sworn, testified as follows:

22                        DIRECT EXAMINATION

23      BY MR. GUHL:

24      Q.  Ma'am, please introduce yourself to the jury.

25      A.  My name is Christa Anderson.
```

65

1    Q.    Ms. Anderson, how old are you?

2    A.    I'm 25.

3    Q.    Ma'am, if I can refer you back to February 20th of

4    2004, somewhere between 10:30 and 11, can you tell this jury

5    where you were?

6    A.    Riding with a friend of mine entering -- we were going

7    to the Rockwell Villa Apartments.

8    Q.    Ma'am, what was your friend's name?

9    A.    Demetria Tinner.

10   Q.    And what kind of vehicle were you riding in?

11   A.    In a white Ford Focus.

12   Q.    Where were you inside the vehicle?

13   A.    I was in the passenger seat.

14   Q.    And what was your intention in going to the Rockwell

15   Villa Apartments?

16   A.    I had a friend that lived there.  We were going to

17   visit her.

18   Q.    And what was your friend's name?

19   A.    Her name is Tasha.

20   Q.    Have you ever lived at the Rockwell Villa Apartments?

21   A.    Yes, sir, I did.

22   Q.    And when did you live there?

23   A.    I lived there for a year from 2001 to early 2002, I

24   believe.

25   Q.    Did you know a person at that apartment complex named

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   Rodney Perry?

2   A.   Yes, sir.

3   Q.   Ma'am, the night of February 20th, 2004, did you

4   eventually meet up with your friend in the apartment

5   complex?

6   A.   No, sir.

7   Q.   Okay.  And, ma'am, why was that?

8   A.   Because we witnessed a fight.

9   Q.   Can you describe where you were when you witnessed the

10  fight?

11  A.   Yes.  We were entering the apartments and initially

12  when you first go in there's a speed bump so we went over

13  that, and then we come to another speed bump.  And my

14  attention is directed because I hear some, you know, talking

15  and I heard somebody say something to the effects of, "What

16  did I do?  I didn't do anything."  So my attention was then

17  drawn towards the left and that's when I saw the fight

18  start.

19          MR. GUHL:  Your Honor, may I approach the witness?

20          THE COURT:  You may.

21  Q.   (BY MR. GUHL)  Ma'am, I'm showing you what's been

22  previously admitted as State's Exhibit 2.  Do you recognize

23  this photograph?

24  A.   Yes, sir.

25  Q.   Ma'am, what do you recognize this photograph as?

| | |
|---|---|
| 1 | A.    Rockwell Villa Apartments. |
| 2 | Q.    Can you please point out exactly where you were when |
| 3 | you first saw the fight? |
| 4 | A.    Let me -- we were right here. |
| 5 | Q.    And you're pointing me to the second speed bump, is |
| 6 | that correct? |
| 7 | A.    Yes, sir. |
| 8 | Q.    Is it also near a group of mailboxes? |
| 9 | A.    Yes, sir. |
| 10 | Q.    Ma'am, were you inside the vehicle when you first |
| 11 | witnessed the fight? |
| 12 | A.    Yes, sir. |
| 13 | Q.    And can you describe where the fight was with respect |
| 14 | to your position? |
| 15 | A.    Okay.  We're here in the car and, as you can see from |
| 16 | the photographs, we were there at the speed bump.  And the |
| 17 | mailboxes, I don't know, are approximately 15, 20 steps |
| 18 | away. |
| 19 | Q.    So from your position, the fight was to your left? |
| 20 | A.    Correct. |
| 21 | Q.    Now, were the windows of the car rolled down? |
| 22 | A.    About halfway, yeah. |
| 23 | Q.    And you heard certain statements being made, is that |
| 24 | correct? |
| 25 | A.    Yes, sir. |

```
 1   Q.   And those statements included, "What did I do?"

 2   A.   Yes.

 3   Q.   Were there additional statements being made by the

 4   person who was making the statement, "What did I do?"

 5   A.   Just, "I didn't do anything, "what did I do?  I didn't

 6   do anything."

 7   Q.   Now, did you recognize the person making these

 8   statements?

 9   A.   Not at that time, no.

10   Q.   Did you have an idea or could you see what color

11   clothing this individual making those statements was

12   wearing?

13   A.   No.  I don't really recall the clothing.  I know people

14   were wearing -- I remember seeing jeans and some sort of

15   jogging pants.

16   Q.   With respect to the person who made those statements

17   you've related to the jury, what was happening to him?

18   A.   I don't know what happened until then but after I heard

19   those statements, I looked over and he started getting

20   beaten up by four gentlemen.

21   Q.   Now, where were you when you saw him starting to be

22   beaten up by four gentlemen?

23   A.   Still in the same position in the car.

24   Q.   The car hadn't moved?

25   A.   No, ma'am -- no, sir.
```

69

```
 1   Q.   Now, can you tell me specifically, when you say "beaten
 2   up," what was happening to the individual being beaten up?
 3   A.   He was being punched very violently.
 4   Q.   How many individuals did you see punching this
 5   individual violently?
 6   A.   Four.
 7   Q.   Were each of these individuals taking part in punching
 8   the individual violently?
 9   A.   Yes, sir.
10   Q.   Was anyone standing around watching?
11   A.   Not to my knowledge, no.
12   Q.   Can you tell the jury how many times you saw these four
13   individuals punching the person who had made those
14   statements?
15   A.   Oh, man.  No.  It was constant.  It was constant.
16   Q.   For how long did this punching continue?
17   A.   I don't know.  It started there by the mailboxes and
18   proceeded to bounce into the mailboxes and then into the
19   parking lot up against a car and --
20   Q.   If I could stop you.  Who bounced into the mailboxes?
21   A.   All of them did.  All of them.  It was kind of like the
22   victim was surrounded and it was just, bam, bam, from the
23   mailboxes to the parking lot.
24   Q.   Was the victim running or being pushed into the
25   mailboxes?
```

70

```
 1   A.   I think he was being beaten.  I mean, he was just being

 2   thrown around.

 3   Q.   Was the victim running or being pushed into the

 4   vehicle?

 5   A.   From -- I say from the force of the hits, yeah.  I

 6   don't know if he was actually running to try to get away

 7   or -- I don't know.

 8   Q.   Apart from punching, did you see any additional violent

 9   activity?

10   A.   Yes, sir.

11   Q.   Can you --

12   A.   Once they were against the mailboxes the victim didn't

13   seem -- I mean, he was lifeless and then he kind of just

14   slid down the car and then he was laying on the ground where

15   these men proceeded to stomp on him, stomp and kick.

16           MR. GUHL:  Your Honor, may I approach the witness?

17           THE COURT:  You may.

18   Q.   (BY MR. GUHL)  Ma'am, I'm showing you what's been

19   previously admitted as State's Exhibit 4.  Do you recognize

20   this photograph?

21   A.   Yes, sir.

22   Q.   And can you describe for the jury what this is a

23   photograph of?

24   A.   That is Rodney.  That's the man who got beat up and

25   that's the car they were against.
```

71

1   Q.   Is his body in a similar position to what you saw it

2   that night?

3   A.   Similar, yes, but that's not how he was when we left.

4   Q.   How was he when you left?

5   A.   The top part of his body was underneath that car.

6   Q.   Can you describe for the jury how long the stomping

7   lasted after -- from when it started after the punching was

8   over to when it ended?

9   A.   It's kind of hard to say.  It was -- everything seemed

10  to be moving really fast.  And to my recollection, we

11  started driving down to turn around to leave before the

12  stomping had stopped.  I don't know, a minute, two, maybe

13  longer.  I really -- I'm not certain.  I wouldn't want to

14  just guess.

15  Q.   After you started to turn around and leave, what did

16  the driver of the vehicle you were in do next?

17  A.   Well, we -- she drove down and then there is a little

18  cul-de-sac area where we turned around and we came back up

19  and stopped.  And I was in line with the victim and I rolled

20  my window all the way down and I could hear him like -- it

21  sounded like a wet snore, like gurgling sounds.

22  Q.   Can you describe what the victim looked like at this

23  point with respect to his face?

24  A.   I couldn't see his face.  It was under the car.

25  Q.   Where were the four individuals at this point in time?

72

```
 1   A.    That I don't know.  My concern was him because that

 2   didn't sound good.  It didn't.  And I knew he was hurt bad.

 3   Q.    Now, before you initially -- before your driver

 4   initially drove off from the first point where the both of

 5   you had stopped, were you able to observe these individuals

 6   in order to tell what race they were?

 7   A.    Yes, sir.

 8   Q.    And what race were they?

 9   A.    Black.

10   Q.    And, ma'am, if I can write your name on the board.

11   Each of these four individuals were black, is that correct?

12   A.    Yes, sir.

13   Q.    Were these individuals male or female?

14   A.    Male.

15   Q.    If you're thinking of these individuals individually,

16   can you describe them?

17   A.    No.  Not individually.  Not at all.

18   Q.    Well, collectively, can you describe these individuals?

19   A.    I know that there were -- one short, seemed to be

20   pretty short, maybe a couple of them were relatively tall.

21   Just -- no, it's kind of hard to focus on something like

22   that when you're witnessing what I did.

23   Q.    Now, when you say that a couple of them were tall, are

24   you speaking of two individuals --

25   A.    Yeah.
```

73

```
 1   Q.    -- or the other three?
 2   A.    Yeah, they seemed a little taller.  And I just -- I
 3   don't know.  I'm sorry.
 4   Q.    Ma'am, do you remember anything about the clothing
 5   these individuals were wearing?
 6   A.    I just really remember like jogging pants and jeans.
 7   Q.    Ma'am, do you remember the color of these jogging
 8   pants?
 9   A.    They seemed dark.  I don't know the color but I know
10   dark.
11   Q.    Do you remember the color of these jeans?
12   A.    No.
13              MR. GUHL:  Your Honor, may I have a moment?
14              THE COURT:  You may.
15              MR. GUHL:  I'll pass this witness.
16              THE COURT:  Mr. Box.
17                      CROSS-EXAMINATION
18   BY MR. BOX:
19   Q.    Ms. Anderson, quite frankly, I just have a couple of
20   questions.  It was chilly out that night, wasn't it?
21   A.    Yes, sir.
22   Q.    And originally and previously you've given a statement
23   that you thought that the victim had black pants on, didn't
24   you?
25   A.    Dark, yeah.
```

```
 1              MR. BOX:  I have no further questions.

 2              THE COURT:  Thank you.

 3              Is there anything further from the State?

 4              MR. GUHL:  No, Your Honor.

 5              THE COURT:  Thank you very much.  You may be

 6    excused.

 7              The State's third witness, please.

 8              MS. HIGH:  We call Officer Taylor Shaw.

 9                        TAYLOR SHAW,

10    having been first duly sworn, testified as follows:

11                      DIRECT EXAMINATION

12    BY MS. HIGH:

13    Q.   Sir, would you introduce yourself to the jury, please.

14    A.   I'm Officer Taylor Shaw.

15    Q.   And by your uniform, I can tell that you are an officer

16    with the Oklahoma City Police Department?

17    A.   Yes, ma'am, I am.

18    Q.   How long have you been an Oklahoma City police officer?

19    A.   Approximately five and a half years.

20    Q.   And what is your current rank and assignment within the

21    police department?

22    A.   I'm a law officer with the Hefner division, second

23    shift.

24    Q.   And what are your responsibilities or duties as a

25    patrol officer?
```

1    A.    Answer calls, write citations.

2    Q.    And you indicated that you work second shift.  That is

3    from what time until what time?

4    A.    4:00 p.m. to 2:00 a.m.

5    Q.    I want to direct your attention back to February the

6    20th of 2004.  Were you on duty as an Oklahoma City officer

7    that night?

8    A.    Yes, I was.

9    Q.    And did you receive a call to go to 933 North Rockwell?

10   A.    Yes, I did.

11   Q.    And what time of day did that call come in?

12   A.    Approximately 2348 hours, 11:48 p.m.

13   Q.    And what was the nature of the call that you were

14   responding to?

15   A.    An assault.

16   Q.    And, so, did you know what was located at 933 North

17   Rockwell?

18   A.    Yes, I did.

19   Q.    What is that?

20   A.    It's an apartment complex.

21   Q.    And did you proceed there?

22   A.    Yes, I did.

23   Q.    And what did you find when you arrived?

24   A.    Upon my first arrival I found a gentleman, looked like

25   as if he was sitting, leaning against a car.

1   Q.   And so what did you do?

2   A.   I got out, asked him if he was okay, didn't get a

3   response, checked for a pulse, didn't find one, and told

4   EMSA to step it up.

5   Q.   And when you approached the person, you indicated

6   leaned up against a car?

7   A.   Uh-huh.

8   Q.   Was he breathing at that time?

9   A.   Without a response, I couldn't tell because he was kind

10   of slumped over a little bit. So that's why I checked for

11   the pulse, because he didn't answer me.

12   Q.   And when you checked for a pulse, did you find any?

13   A.   No.

14           MS. HIGH:  May I approach the witness, Judge?

15           THE COURT:  You may.

16   Q.   (BY MS. HIGH)  Sir, I'm going to hand you what we have

17   previously introduced as State's Exhibits 3 and 4 and ask if

18   you are able to recognize those?

19   A.   Yes, that was the gentleman that was leaning against

20   the car.

21   Q.   Now, you've indicated that when you arrived he was

22   leaned up against the car.

23   A.   Correct.

24   Q.   Using State's Exhibit Number 4, can you indicate how he

25   was leaned up against the car so that the jury can see?

77

```
 1  A.    If you'll -- his back was against here and he was
 2  basically sitting on the ground and his feet were outwards.
 3  From this -- the way he was sitting basically, EMSA just
 4  pulled him out and laid him down.
 5  Q.    And did you observe EMSA to do that?
 6  A.    Yes.
 7  Q.    And so that is how Mr. Perry came to be lying flat on
 8  his back on the ground?
 9  A.    Yes.
10  Q.    And after you had called and requested EMSA to step it
11  up, did you do any further investigation or did you wait for
12  EMSA to arrive?
13  A.    I waited for EMSA to arrive.  I was the only one there
14  at the time.
15  Q.    I'm sorry?
16  A.    I was the only one there at the time.
17  Q.    Did other officers arrive shortly after that?
18  A.    Yes.
19            MS. HIGH:  Pass the witness.
20            THE COURT:  Thank you.
21            MR. BOX:  I have no questions of this witness,
22  Your Honor.
23            THE COURT:  No cross.
24            Thank you, sir.  You may be excused.  The State's
25  next witness, please.
```

```
 1          MR. GUHL:  The State calls Matthew Reed.

 2                    MATTHEW REED,

 3   having been first duly sworn, testified as follows:

 4                  DIRECT EXAMINATION

 5   BY MR. GUHL:

 6   Q.   Sir, please introduce yourself to the jury.

 7   A.   My name is Matthew Shane Reed.  I'm a police officer

 8   for the City of Oklahoma City.

 9   Q.   And, sir, what is your current rank with the Oklahoma

10   City Police Department?

11   A.   I'm a sergeant and I work out of the Hefner division.

12   Q.   Sergeant Reed, can you describe for the jury the

13   training you've received in becoming a police sergeant?

14   A.   We go through the six-month academy and then you go

15   through another three months riding with a senior patrol

16   officer.  And I've been a police officer now for seven and a

17   half years.

18   Q.   Sir, if I could direct you back to February 20th of

19   2004, at approximately 11:49 p.m., were you working in your

20   official capacity as an Oklahoma City police officer?

21   A.   Yes, I was.

22   Q.   And, sir, at that time did you have cause to be

23   dispatched to the Rockwell Villa Apartments?

24   A.   Yes.

25   Q.   Can you describe for the jury where those apartments
```

```
 1    are located?

 2    A.    Yeah, it's at 933 North Rockwell between 10th Street

 3    and Melrose on Rockwell.

 4    Q.    Sir, is that a location in Oklahoma City?

 5    A.    Yes.

 6    Q.    Sir, is that a location in Oklahoma County?

 7    A.    Yes.

 8    Q.    Sir, for what purpose were you dispatched to that

 9    location?

10    A.    I was dispatched there in reference to an assault.

11    Q.    Sir, do you remember who the calling party was?

12    A.    Yeah, it was -- I listed her as Demetria Tinner.

13    Q.    Sir, what other information did you have when you were

14    arriving at the scene?

15    A.    That there was -- all I had when I arrived at the scene

16    was there was a black male that had been beaten and was

17    laying in the parking lot.

18    Q.    Sir, when you arrived at the scene, what did you

19    observe?

20    A.    I observed Mr. Perry to be deceased laying against the

21    car.  His head was partially propped up against a -- I

22    believe it was a Neon, Dodge Neon.  And he was kind of

23    slumped over and I noticed blood about his head.

24    Q.    Sir, how did you know that he was deceased?

25    A.    Because he was not breathing and fire personnel from
```

```
 1    the fire engine were also there and they checked for signs

 2    of life from Mr. Perry and he was deceased.

 3    Q.   Sir, what activity did you see firemen or EMSA

 4    personnel taking with regards to Mr. Perry's body?

 5    A.   They pulled him and laid him on a flat surface, cut his

 6    shirt off of him, and once he was determined he was

 7    deceased, then they left.

 8         MR. GUHL:   Your Honor, may I approach the witness?

 9         THE COURT:   You may.

10    Q.   (BY MR. GUHL)   Sir, I'm showing you what's previously

11    been introduced as State's Exhibit 4.   Do you recognize this

12    image?

13    A.   Yes, I do.

14    Q.   Sir, what is this image?

15    A.   This is the image after they pulled him and laid him on

16    a flat surface and cut his shirt off.   That's Mr. Perry.

17    Q.   Now, using the photo, can you describe the position of

18    Mr. Perry's body when you arrived at the scene?

19    A.   When I arrived he was moved up a little bit further

20    with his head and shoulder area propped on the side of his

21    car and he was kind of slumped forward like I am now.

22    Q.   Sir, did you see any blood on Mr. Perry?

23    A.   Yes, I could see blood on his face.

24    Q.   Could you describe for the jury where the blood was

25    coming from on his face?
```

1    A.    I don't remember if it was his mouth or his head, but

2    he had several different blood spots on his head and mouth

3    area and nose.

4             MR. GUHL:  Your Honor, may I have a moment?

5             THE COURT:  You may.

6             MR. GUHL:  Pass this witness.

7             THE COURT:  Thank you.

8             MR. BOX:  Your Honor, I have no questions of this

9    witness.

10            THE COURT:  Thank you.  Sir, you may step down.

11            THE WITNESS:  Thank you.

12            THE COURT:  The State's next witness, please.

13            MS. HIGH:  The State would call Dan (sic)

14   Feskanich.

15                    **DAVID FESKANICH,**

16   having been first duly sworn, testified as follows:

17                    **DIRECT EXAMINATION**

18   **BY MS. HIGH:**

19   Q.    Sir, would you introduce yourself to the jury, please.

20   A.    I'm Officer David Feskanich with the crime scene unit.

21   Q.    And is that what with the Oklahoma City Police

22   Department?

23   A.    Yes, it is.

24   Q.    And how long have you been an Oklahoma City police

25   officer?

1    A.    Approximately five years.

2    Q.    And prior to being an Oklahoma City police officer, did

3    you have prior law enforcement experience?

4    A.    Yes, I did.  I was a City officer with the City of Elk

5    City for about eight years and then a deputy sheriff with

6    Beckham County for three years.

7    Q.    Now, you indicated at this time you are assigned to the

8    crime scene investigation unit of the police department?

9    A.    Correct.

10   Q.    And what is your responsibilities?  What do you do as a

11   crime scene investigator?

12   A.    Basically what I do is I go to violent scenes, anywhere

13   from rapes, robberies, homicides.  What I do is I go out and

14   I reconstruct the scene, I go out and I collect physical

15   evidence that is left at the scene, I also photograph and

16   sometimes just -- just if there is anything else that needs

17   to be done at the scene itself.

18   Q.    And do you have specialized training or education that

19   prepares you to be a crime scene investigator?

20   A.    Yes, I do.

21   Q.    And what training have you had?

22   A.    The schools that I've been to, I've been to crime scene

23   reconstruction, blood spatter pattern analysis, latent

24   fingerprint and identification, infant homicide

25   investigation.

1      I've gone through initial investigator's training

2   program and basic CLEET as well as the basic academy, with

3   about a total of 1979 total training hours throughout my

4   career.

5   Q.   I want to direct your attention back to February the

6   20th of 2004.  Were you one of the crime scene investigators

7   assigned to the homicide of Rodney Perry at 933 North

8   Rockwell?

9   A.   Yes, I was.

10  Q.   And about what time was it when you arrived?

11  A.   I arrived at the scene at 12:35 hours on the 21st.

12  Q.   So you actually got there the next morning?

13  A.   Yeah, I just -- they dispatched us or notified us a

14  little before midnight and, so, I arrived a little

15  afterwards, yes.

16  Q.   Prior to going to a scene to process it, do you have to

17  collect equipment and sort of get all of your stuff together

18  to enable you to do your job?

19  A.   Pretty much.  Basically, if we know that we're going to

20  need some extra equipment, then we'll load them into our

21  trucks.

22          MS. HIGH:  May I approach the witness, Judge?

23          THE COURT:  You may.

24  Q.   (BY MS. HIGH)  Initially, Sergeant, I want to show you

25  what I have previously marked as State's Exhibits 6, 7, 8,

84

1    9, and 10 and ask if you are able to recognize those?

2    A.    Yes, I do.

3    Q.    And what do you recognize those to be?

4    A.    This is the apartment complex.

5    Q.    And are those photographs taken from the air the next

6    day or at some day after that?

7    A.    Yes, I believe so.

8    Q.    And do they accurately represent and depict the layout

9    of the apartment complex overall as it was on the morning of

10   the 21st when you processed the crime scene?

11   A.    Yes.

12          MS. HIGH:  The State would move for admission of

13   Exhibits 6 through 10.

14          MR. BOX:  No objection.

15          THE COURT:  Without objection, 6, 7, 8, 9, and 10

16   are admitted.

17   Q.    (BY MS. HIGH)  Now, when you were out at the apartment

18   complex that early morning, can you describe the weather, if

19   you recall?

20   A.    I remember it was very cold.

21   Q.    And do you recall if it was wet or dry?

22   A.    I remember it being a little bit wet outside, yeah.

23   Q.    And the fact that it is either cold or that it's a

24   little bit wet, does that in any way affect the way that you

25   process a scene?

85

```
1    A.    No, it doesn't, other than I just put on more clothes.

2    Q.    So when you are assigned to process a scene such as

3    this -- were you aware that it was a homicide at the time

4    that you arrived?

5    A.    Yes.

6    Q.    Do you remember a certain protocol or procedure that

7    you follow in processing the scene?

8    A.    Yes, we do.

9    Q.    What do you do?

10   A.    Normally when we get to the scene we make contact with

11   the investigating officer and/or lieutenant at the scene.

12   We kind of find out the gist of what is going on and what

13   may have happened.  Therefore, if I am the lead

14   investigator, I assign my other investigator to go ahead and

15   start taking photographs throughout the scene.

16        I usually will go in and then start a sketch throughout

17   the scene.  Then we continue to progress on from there.

18   Q.    And did you complete a scene diagram or a scene sketch

19   in this particular case?

20   A.    Yes, I did.

21   Q.    I hand you what I have previously marked as State's

22   Exhibit Number 5 and ask if you are able to identify that?

23   A.    Yes, this is my drawing, no -- yes, I'm sorry, it is my

24   drawing.

25   Q.    All right.  And is it accurate in terms of you were
```

1    drawing this diagram to depict the crime scene that you were

2    investigating on February the 21st of 2004?

3    A.    Yes.

4           MS. HIGH:  State would move for admission of

5    Exhibit Number 5.

6           MR. BOX:  No objection.

7           THE COURT:  State's Exhibit 5 is admitted without

8    objection.

9    Q.    (BY MS. HIGH)  Now, Sergeant, when we look at your

10   scene diagram, obviously it is not the entirety of the

11   apartment complex, is that correct?

12   A.    Correct.

13   Q.    If you look at State's Exhibit Number 6, can you orient

14   the jury in terms of what direction they're looking and then

15   explain to the jury what part of the apartment complex

16   they're seeing in your diagram --

17   A.    Yes.

18   Q.    -- does that make sense?

19          Let me hand you Exhibit Number 6.

20   A.    What we're looking at here is this is the driveway or

21   the entryway.  If you hold this one like this, this is the

22   south curb line, which is this right in here.  And then this

23   is the north curb line, which is right in here.  And then

24   here is the entryway, which is this right up in here.

25   Q.    Okay.  And, so, as part of your responsibility as a

```
 1   crime scene investigator, do you sort of -- I mean, you
 2   start with an entire apartment complex.  Do you then narrow
 3   down to what is to be contained within the crime scene?
 4   A.   Yes, if needed.
 5   Q.   How do you do that?
 6   A.   Usually if the officers who are originally there go out
 7   there and string tape all around it and it's not necessary,
 8   we just go ahead and start shrinking it in.  If there is no
 9   pertinent evidence that is needed to be collected or placed
10   inside the crime scene, then like I said, we just shrink it
11   in.
12   Q.   Now, in State's Exhibits 6, 7, 8, 9, and 10, and some
13   that you haven't seen, other aerial photographs taken during
14   the day, we see automobiles all along in the parking places.
15   A.   Correct.
16   Q.   Now, your diagram, is it accurate in terms of this is
17   how many cars were in these parking places when you
18   processed the scene that early morning?
19   A.   Yes.
20   Q.   And on your diagram we see an automobile with the
21   letter A on it and an automobile with the letter B on it and
22   they appear to be drawn in sort of at an angle?
23   A.   Yes.
24   Q.   Why are they drawn that way?
25   A.   Because that's how they were parked at that time.
```

1  Q.   Okay.  And so it's accurate as to that also?

2  A.   Yes.

3  Q.   Did you take or have taken, at your direction,

4  photographs of the scene in addition to your diagram?

5  A.   Yes.

6  Q.   I have previously marked these as State's Exhibits 11,

7  12, 13, 14, and 15 and would ask if you are able to

8  recognize those?

9  A.   Yes.

10  Q.   And what do you recognize those to be?

11  A.   These are the actual scene.

12  Q.   Taken out there that early morning?

13  A.   Yes, of the apartment complex.

14  Q.   And are they accurate in their representation and

15  depiction of the scene?

16  A.   Yes.

17       MS. HIGH:  State would move for admission of

18  exhibits 11 through 15.

19       MR. BOX:  No objection, Your Honor.

20       THE COURT:  Without objection, State's 11, 12, 13

21  14, and 15 are admitted.

22  Q.   (BY MS. HIGH)  I want to start with State's Exhibit

23  Number 11.  Are you able to see that?

24  A.   Yes.

25  Q.   And if you can, orient the jury in terms of are they

89

1    looking from the front of the apartment complex where you

2    come in off of 10th?  Off of Rockwell?

3    A.    Yes.  Yeah.  You're actually looking west right down

4    the whole line of apartments.

5    Q.    Okay.  So this is as you come in from the front

6    entrance?

7    A.    Yeah.  It's on the north curb line -- or on the south

8    curb line.

9    Q.    Which way is north?

10    A.    It would be this curb line right here.  I would be --

11    or the photographer is standing right there and you're

12    looking this way.

13    A.    Okay.

14    Q.    Now, State's Exhibit Number 12, what is depicted in

15    that photograph?

16    A.    That is the office complex there.

17    Q.    And are you able to see that building somewhat in the

18    aerial photograph?

19    A.    Yes.  This is this building right in here.

20    Q.    Now, using State's Exhibit Number 11, are you looking

21    in the opposite direction from State's Exhibit Number 11, is

22    this taken from towards the back of the apartment complex

23    looking down the same curb line towards the entrance?

24    A.    Yes.

25    Q.    And State's Exhibit Number 13, what is depicted in that

1    photograph?

2    A.    That is a set of mailboxes.

3    Q.    And are we able to see the same set of mailboxes in

4    Exhibit Number 11, being this item right here?

5    A.    Correct.

6    Q.    Okay.  Just so that everyone is clear, this item right

7    here is the mailboxes?

8    A.    Yes.

9    Q.    And State's Exhibit Number 14, where is it taken from

10    and in what direction is it taken?

11    A.    Again, that's just right next to the mailboxes and I

12    believe we're still looking west.

13    Q.    Okay.  So still looking back towards the back of the

14    apartment complex?

15    A.    Yes.

16    Q.    All right.  Now, we are able to see in State's Exhibit

17    Number 11 obviously a body lying here?

18    A.    Correct.

19    Q.    And did you -- is that the position -- well, let me ask

20    you, was Mr. Perry's body still there when you arrived?

21    A.    Yes.

22    Q.    And is that the position that he was in?

23    A.    Yes.

24    Q.    And previously we've had introduced State's Exhibit

25    Number 4.  Do you recognize that?

91

1    A.    Yes.

2    Q.    And is that sort of a more close-in photograph of

3    Mr. Perry?

4    A.    Yes.

5    Q.    Now, as you began to process your scene, do you sort of

6    start from out -- from the outside and work your way in?

7    A.    Most of the time, yes.

8    Q.    And when we talk about working your way in, are you

9    talking about working your way in towards the body?

10   A.    Correct.

11   Q.    Okay.  Now, when we look at your scene diagram, we've

12   already talked about there are two automobiles that are --

13   that have numbers on them.

14   A.    Yes.

15   Q.    But we also see several other -- let me hand you this.

16   There are some things that are numbered.

17   A.    Yes.

18   Q.    Can you show that to the jury and explain to the jury

19   what those things are?

20   A.    The numbers that are near the body and this car over

21   here, what these are, these are evidence items that I had

22   picked up and I just number those down here on the evidence

23   legend from a Bic lighter, coins, copper wire.

24       Over here is like a number four and it's a cotton

25   beanie cap that I had picked up.  And then as far as the

```
 1   vehicles themselves, A is the -- well, what I did is I just
 2   put the tag number; and then same thing with B, which would
 3   be like a '99 Mitsubishi.  And I believe A was a Dodge Neon
 4   that I had -- that was at the scene.
 5   Q.   And in State's Exhibit Number 11, is this the Dodge
 6   Neon that you labeled as A --
 7   A.   Yes.
 8   Q.   -- in your diagram?
 9        So that is the car that Mr. Perry is next to?
10   A.   Correct.
11   Q.   Now, those items that you discussed, the Bic lighter,
12   some change, a piece of copper wiring, at the time that you
13   collect those items, you photograph those items, do you make
14   a determination about whether or not they have any
15   evidentiary value?
16   A.   At that exact time, no.  They were near the body and at
17   the time we didn't know if it was a robbery, that they'd had
18   been pulled out of a pocket or what, so the items were
19   collected.
20   Q.   I hand you what I have previously marked as State's
21   Exhibits 16, 17, 18, and 19 and ask if you are able to
22   recognize those?
23   A.   Yes.
24   Q.   And what do you recognize those to be?
25   A.   The body of the victim as well as the items that were
```

93

1  collected around the victim's body.

2  Q.   Those items that are labeled as 1, 2, and 3 in your

3  diagram?

4  A.   Yes.

5  Q.   And are those photographs accurate in terms of where

6  those items were and where they were found when you

7  collected them?

8  A.   Yes.

9      MS. HIGH:  Move for admission of exhibits 16, 17,

10  18, and 19.

11      MR. BOX:  No objection.

12      THE COURT:  State's 16, 17, 18, and 19 are

13  admitted without objection.

14  Q.   (BY MS. HIGH)  I want to start with State's Exhibit

15  Number 16.  And obviously this is Mr. Perry's body, is this

16  correct?

17  A.   Correct.

18  Q.   And do you take photographs of the items as you find

19  them and then mark them in some way in your photographs?

20  A.   Yes.

21  Q.   So have those markers been put up in State's Exhibit

22  Number 16?

23  A.   I don't believe so.

24  Q.   Now, this is State's Exhibit Number 17.  Do you see the

25  markers that you use in your identification process?

94

1  A.    Yes.

2  Q.    That would be the big 1 and the 3?

3  A.    Correct.

4  Q.    And so using State's Exhibit Number 16, we can see sort

5  of those same items.  Am I correct?

6  A.    Yes.

7  Q.    This is -- what you've marked as number 1 is the Bic

8  lighter and we see that here; and number 3, is it copper

9  wiring?

10  A.    Yes.

11  Q.    And so am I correct that it would be oriented something

12  like that?

13  A.    Yes.

14  Q.    All right.  And then you also marked an Item No. 2.

15  What was your Item No. 2?

16  A.    I believe Item No. 2 was coins.

17  Q.    And so in State's Exhibit Number 19, we see your

18  evidence marker number 2; and then in State's Exhibit

19  Number 18, we see -- are these the coins down here?  Let me

20  hand you Exhibit Number 18 and if you will, show where the

21  coins are?

22  A.    Yes.

23  Q.    Okay.  Now, when you collect those items, what do you

24  do with them?

25  A.    Each item is usually individually collected within a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

95

```
 1   coin envelope or within a paper sack and then it's secured
 2   in my police truck.
 3   Q.    And what do you do with it after you secure it?
 4   A.    After securing it -- after securing it as well as
 5   taking it back to the lab, if there is any other type of
 6   evidentiary value that needs to be pulled off such as a DNA
 7   swab, a fingerprint, or something like that, we process that
 8   back into the lab and then submit it to the proper location,
 9   either being the serology lab or the property room.
10   Q.    But your responsibilities in this particular case
11   beyond collecting it and putting it into the evidence room,
12   did you have any responsibility from processing any of the
13   evidence that was collected?
14   A.    No, I did not.
15   Q.    Now, in your diagram, we can also see what you have
16   marked with a letter number B, and I believe you said that
17   that is a 1999 Mitsubishi Galant?
18   A.    Correct.
19   Q.    And you have a number 4 by that, is that correct?
20   A.    Yes.
21   Q.    I want to hand you another series of exhibits marked
22   Exhibits 30, 31, 32, 33, 34, 35, and ask if you are able to
23   identify those?
24   A.    Yes.
25   Q.    And what do you recognize those to be?
```

```
 1   A.    This being the Galant, Mitsubishi Galant that was also

 2   parked there.

 3   Q.    And are those photographs accurate in that they

 4   represent the Galant and the area surrounding it as you saw

 5   it that morning?

 6   A.    Yes.

 7         MS. HIGH:   State would move for admission of

 8   Exhibits 30 through 35.

 9         MR. BOX:   No objection, Your Honor.

10         THE COURT:   State's Exhibits 30, 31, 32, 33, 34,

11   and 35 are admitted without objection.

12   Q.    (BY MS. HIGH)   And if you will, if you'll just -- I

13   mean, is that the passenger side of the Galant?

14   A.    Yes.

15   Q.    Now, how, Sergeant, did you know to take photographs of

16   this vehicle or how did it become significant in your scene

17   investigation?

18   A.    It was brought to my attention by one of the detectives

19   that this vehicle may have also been involved.

20   Q.    And the detectives, are those the people that interview

21   witnesses and that kind of thing and then pass along to you

22   what they want investigated?

23   A.    Correct.

24   Q.    And so would this be the driver's side of that Galant?

25   A.    Yes.
```

1    Q.    Now, in this photograph which is Exhibit Number 32, we

2    are able to see down here your evidence marker number 4?

3    A.    Yes.

4    Q.    And what is that denoting?

5    A.    That is a -- like a wool beanie cap or a knit beanie

6    cap.

7    Q.    And you collected that?

8    A.    Yes.

9    Q.    And the remainder of exhibits, 33, 34, 35, those are

10   just differing views of the Mitsubishi Galant?

11   A.    Correct.

12   Q.    Did you follow the same protocol that you've described

13   for us in collecting that beanie, the cap, your evidence

14   Item No. 4, and processing it into the evidence room?

15   A.    Yes, I did.

16   Q.    Okay.  All right.  Finally, Sergeant, I want to discuss

17   with you the processing and the photographs that you took of

18   Rodney Perry's body?

19   A.    Okay.

20   Q.    I want to show you what I have marked as Exhibits 20,

21   21, 22, 23, 24, 25, 26, 27, 28, and 29 and ask if you are

22   able to recognize those?

23   A.    Yes.

24   Q.    And what do you recognize those to be?

25   A.    This being the victim's body.

1    Q.    And differing angles and photographs of that?

2    A.    Correct.

3    Q.    Are they accurate in that they represent and depict

4    injuries and things that were present on Mr. Perry's body at

5    the scene?

6    A.    Yes.

7          MS. HIGH:  State would move for admission of

8    Exhibits 20 through 29.

9          MR. BOX:  We have no objection, Your Honor.

10         THE COURT:  State's Exhibits 20, 21, 22, 23, 24,

11   25, 26, 27, 28, and 29 are admitted without objection.

12         And before you continue, Ms. High, I think I'm

13   going to go ahead and break for lunch.

14         MS. HIGH:  Okay.

15         THE COURT:  Ladies and gentlemen of the jury, I'm

16   going to break for lunch and I'm going to ask you to be back

17   in the courtroom at 1:30.  You are admonished.  Thank you

18   very much.  See you back here then.

19       (Thereupon, a recess was had, after which, with all

20       parties present, the following was had in open court.)

21         THE COURT:  I apologize.  I have a number of

22   things going on today, including the fact that I have

23   another regularly scheduled docket at 1:30 today, and I was

24   having to deal with some of that before we came back into

25   trial, so thanks for your patience.

```
 1            Ms. High, you may proceed.
 2   Q.   (BY MS. HIGH)  Sergeant, I think we were just preparing
 3   to talk about the photographs that you took of Rodney
 4   Perry's body?
 5   A.   Correct.
 6   Q.   And these have already been introduced so I want to
 7   start with Exhibit Number 25.  Describe for the jury what
 8   they're seeing here.
 9   A.   Seeing the victim laying on his back as well as blood
10   coming from the nose, mouth, facial area.
11   Q.   Now, when you take these photographs, do you
12   photograph -- did you photograph Rodney Perry as he was
13   there?  You don't change anything?  Alter anything?  Move
14   him initially?  Is that correct?
15   A.   Correct.
16   Q.   But does there come a time when you or, at your
17   direction, someone moves or changes the position of the body
18   in order that you can photograph it from all angles?
19   A.   Yes.  Usually when the field agent medical examiner
20   arrives on scene and they turn the body over, that way we
21   can see the back side or manipulate it to where we can see
22   if there's any other injuries throughout the body.
23   Q.   And this is State's Exhibit Number 26, and can you tell
24   the jury what they're seeing there?
25   A.   What it is is the field agent had already turned the
```

1    body over and is examining the back portion of the head.

2    Q.    Now, were you able to see -- it would appear that the

3    field agent is pressing or pushing on the back of

4    Mr. Perry's head.

5    A.    Correct.

6    Q.    Was there anything unusual or out of the ordinary about

7    the condition of the back of his head?

8    A.    There was a laceration or a cut back there.  Also the

9    tissue had already became very soft.

10   Q.    And this is State's Exhibit Number 27.

11   A.    Again, another cut on the back of the head.

12   Q.    Okay.  And Exhibit Number 28?

13   A.    That's actually the full view of the back of the head

14   itself.

15   Q.    And did you also take photographs of other parts of

16   Mr. Perry's body?

17   A.    Yes, I did.

18   Q.    And Exhibits 20 and 21, can you tell the jury what

19   they're seeing there?

20   A.    That's the left hand of the victim.

21   Q.    Okay?

22   A.    As far as the black marks, those were some type of

23   abrasions that were on the knuckles themselves.

24   Q.    And Exhibit Number 29?

25   A.    That's the victim's back, and the white area back down

1  in here, that's actually transfer from the asphalt on the

2  driveway to his back.

3  Q.   Okay.  And when you say "a transfer," do you mean where

4  his back has come in contact with the asphalt?

5  A.   Yes, where the skin has actually come in contact.

6  Q.   Now, based on your experience, your training, someone

7  just laying down on the asphalt, are they going to have that

8  kind of transfer onto their skin?

9  A.   No.

10  Q.   What is required for that type of transfer to take

11  place?

12  A.   It appears that the victim has been pulled or moved

13  along the concrete, or along the asphalt itself.

14  Q.   All right.  And this area that we can see up here on

15  Mr. Perry's side, do you recall seeing?

16  A.   It looked like some type of bruising was there.

17  Q.   All right.  Now, here in State's Exhibit Number 23, do

18  you recognize that photograph?

19  A.   Yes.

20  Q.   We can see obviously -- here is the car door of the

21  Dodge Neon and there is a dark spot right there by the door.

22  Do you recall what that was?

23  A.   It looked like blood transfer that had come from the

24  back of the head.

25  Q.   So would that be consistent with at some point

1    Mr. Perry's head was more up towards this position up here?

2    A.    Yes.

3    Q.    Because, clearly, if he's down here bleeding, he's not

4    going to bleed in a spot up here, right?

5    A.    Correct.

6    Q.    All right.

7            MS. HIGH:  That's all I have, Judge.  I'd pass the

8    witness.

9            THE COURT:  Thank you.

10           Mr. Box, on cross.

11           MR. BOX:  Your Honor, I have no questions for this

12   witness.

13           THE COURT:  Thank you very much, sir.  You may be

14   excused.

15           Counsel, would you approach, please?

16       (Thereupon, the following was had at the bench.)

17           THE COURT:  Do you want me to read the

18   stipulation?

19           MS. HIGH:  You can read it or I can read it,

20   whatever the Court's process is.

21           MR. BOX:  Judge, I have no preference.

22           THE COURT:  I'll read Court's 2.

23       (Thereupon, the following was had in open court.)

24           THE COURT:  Ladies and gentlemen of the jury, the

25   attorneys have entered into a stipulation.  You may remember

103

```
 1   that in my opening remarks to you I told you that
 2   stipulations are agreements made between the attorneys and
 3   they are also evidence.
 4              "Stipulation.  It is stipulated by the State of
 5   Oklahoma and Defendant Howard Purifor Morris, III, that no
 6   latent prints lifted from any items of evidence processed by
 7   the Oklahoma City Police Department technical investigation
 8   unit matched the Defendant Howard Purifor Morris, III, dated
 9   this 4th day of April, 2006, and signed by Patricia High,
10   Assistant District Attorney, and Chris Box, attorney for the
11   Defendant."
12              Are you prepared to call your next witness,
13   please?
14              MR. GUHL:  We are, Judge.
15              THE COURT:  Please do so.
16              MR. GUHL:  The State calls Dr. Chai Choi.
17                         **CHAI CHOI,**
18   having been first duly sworn, testified as follows:
19                     **DIRECT EXAMINATION**
20   **BY MR. GUHL:**
21   Q.   Ma'am, please introduce yourself to the jury.
22   A.   Yes, sir.  My first name C-H-A-I, Chai, middle initial
23   S, last name C-H-O-I, Choi.
24   Q.   Ma'am, what is your current occupation?
25   A.   I'm a forensic pathologist working with the office of
```

1    Chief Medical Examiner for the State of Oklahoma.

2    Q.   And as a forensic pathologist, do you possess a medical

3    doctorate?

4    A.   Yes.

5    Q.   And could you describe for the jury how you became a

6    medical doctor in terms of both your education and your

7    training and experience?

8    A.   Correct.  First of all, I graduated School of Medicine

9    in Seoul, Korea, and came to the United States and received

10   a residency in anatomical pathology dealing with body tissue

11   examination and two-year residency in clinical pathology

12   dealing with body fluid examination, and then fellowship in

13   forensic pathology dealing with autopsy to determine the

14   manner and cause of death and provided manner of death.

15   Q.   How long have you been a forensic pathologist?

16   A.   Twenty-three years.

17   Q.   And during the course of those 23 years, have you

18   testified in court?

19   A.   Yes, sir.

20   Q.   During the course of those 23 years, can you give us a

21   ball park figure of how many autopsies you've conducted?

22   A.   Over 5,000 cases.

23   Q.   Dr. Choi, on February 21st of 2004, did you have the

24   occasion to perform an autopsy on the human remains of an

25   individual named Rodney Lamont Perry?

1    A.    Yes.   I brought my report on him.

2    Q.    And, ma'am, can you describe for the jury the manner in

3    which you performed this autopsy?

4    A.    When?

5    Q.    The manner in which you performed this autopsy?

6    A.    In which is the jurisdiction and the category of

7    forensic case dealing with violent death.

8    Q.    Ma'am, can you describe a little bit for the jury the

9    procedure you go through in examining a person's human

10   remains?

11   A.    Yes.   That is simply autopsy which is included external

12   body surface and the internal body organ examination through

13   the opening body cavity and examine the individual organs to

14   determine cause of death.

15   Q.    And, ma'am, during the course of the autopsy you

16   performed on Rodney Lamont Perry's body, did you observe

17   evidence of external and internal injuries?

18   A.    Yes.

19   Q.    Did you compose a report based upon your observations?

20   A.    Yes.

21   Q.    And did that report include several diagrams which

22   memorialized your observations during the autopsy?

23   A.    Yes.

24         MR. GUHL:   Your Honor, may I approach the witness?

25         THE COURT:   You may.

106

1    Q.   (BY MR. GUHL)   Dr. Choi, I'm showing you what has been

2    marked for identification purposes at this point in time as

3    State's Exhibit 38 and 39.   Do you recognize State's

4    Exhibit 38?

5    A.   Yes, this is the total body surface diagram and put the

6    nature of the injuries, location.

7    Q.   Did you prepare this diagram based upon your autopsy of

8    Rodney Perry?

9    A.   Yes, during the autopsy, yes.

10   Q.   Ma'am, I'm handing you what's been marked as State's

11   Exhibit 39.   Do you recognize this item?

12   A.   Yes, this is the same thing.

13   Q.   And when you say "the same thing," what do you mean?

14   A.   Which is a sketch the lesions and nature injuries and

15   the body surface.   This Exhibit 39 is mainly on the head,

16   front and back.

17   Q.   Upon looking at these exhibits, State's 38 and 39, do

18   both truly and accurately depict both the diagram you drew

19   and the observations you made during the course of your

20   autopsy of Rodney Perry's body?

21   A.   Yes, sir.

22           MR. GUHL:   Your Honor, we offer State's 38 and 39.

23           MR. BOX:   Your Honor, I have no objection.

24           THE COURT:   State's 38 and 39 are admitted without

25   objection.

1          MR. GUHL:  Your Honor, request permission to

2     publish for the jury?

3          THE COURT:  You may do so.

4          MR. GUHL:  Your Honor, may I also bring Dr. Choi

5     down from the stand so that we can discuss these photos?

6          THE COURT:  You may do that.

7          Dr. Choi, I need you to talk really loud and

8     slowly, if you can.

9          THE WITNESS:  Thank you.  I'll try.

10         THE COURT:  You may step down.

11     (Witness steps down from the stand.)

12  Q.   (BY MR. GUHL)  Dr. Choi, I'm going to act just as the

13  board here to hold these diagrams.  Will you please, using

14  these diagrams, describe the external injuries you observed

15  on Rodney Perry's body starting from the head and moving

16  downward?

17  A.   Yes, first of all, this is State's Exhibit 38 showing

18  the total body surface in front and the right, left, and the

19  total body surface in the back.  And the name of Rodney

20  Perry, the date, which is February 21st, 2004, and the log

21  number.

22     Then I'd like to talk about the injury from front to

23  the back, front top and down order.

24     First of all, your attention to the head here showing a

25  little blown up the detail which is Exhibit 39.  So I will

1 describe here instead of here.

2      And then the chest doesn't have injury but it's just

3 the lower chest just about -- just below the chest on the

4 right side, there is an abrasion -- which is called abraid,

5 abrasion is scratch against rubbing the rough surface.  That

6 is about -- the gray means about the fresh injury.  It's not

7 enough time to bleed.  So that is called abraid.

8      It's not after death, before death.  That is the

9 injury, the right side is which I point using my body.

10      And then the back of the head also I'm going to be

11 presented next diagram.  Other than that is the back has a

12 low back on the left side, which is using this here, little

13 scratch marks could be against some scratching there over

14 bending toward the back.

15      And then here is a black stains on the top of the hands

16 on the left and the right.  So when fall against a touching

17 some black part, the material.

18      And then here a small scratch here which is about 2.4

19 which is one-fifth an inch, small scratch on the top of the

20 third finger.  So that might be against a rough surface like

21 cement and furniture, et cetera.  And then that's all I

22 described here.

23      And then here the head part, which is a front part and

24 back of a head, which upper diagram is this one without the

25 skin, just a bony surface of structure of the face and

1   showing, first of all, here is 1, 2, 3 which is right

2   forehead, 1, 2, and the bridge of nose area scratch.  So

3   when he fall against the cement or rough surface it would do

4   that.

5       Also, tip of nose is a bony, it's a prominent part of

6   the surface that can be scratched there by falling or struck

7   onto that area.

8       And then the lips, the upper, lower lips, the scratches

9   and the bruises, look like a blow into the mouth such as

10  fisting or stomping, that kind of fashion to create such

11  injuries.  That's in the front.

12      And then under the mouth inside the membrane has also

13  bruises and a little scratch against it, because against the

14  hard part which is a bone, so struck onto that created the

15  bruises.  So that upper lip area showing inside the mouth.

16      And then the back of the head with the skin with the

17  hairs, thick hair, and there is the red -- red mean bleeding

18  into the tissue creating color changes red instead of gray.

19  So a little bit more bleeding into that tissue.  So scratch

20  and the tears, split skin.

21      So that is about here, measuring about one, one is

22  about two-fifths an inch size linear tear and the little

23  open up one-sixteenth of an inch.  So that is the nature of

24  injury.  And the underneath again scratch.

25      So what it mean, the purple is -- about red and purple,

110

1    just degree of blood showing over the skin.

2        That is location is about two inch from the left of the

3    posterior midline.  You draw the midline in the back about

4    two inch of the left side, so which is location, and the 4

5    and the one-quarter of inch from top of head.  That's about

6    the location.

7        That is the compared to the external ear canal, that

8    size about two-inch above and two and three-quarter inches

9    behind, which is about the location.  You're looking at the

10   point of the ear where the location of the injury presented

11   in this picture.

12       And then this one inside, which is skin cut and

13   splitted to look inside over the skin, the skull, which is a

14   bony surface.  That skull is covered very thin membrane,

15   what we call galiel membrane.  But between the membrane, the

16   bony surface it bleed into what we call subgaliel

17   hemorrhages, bleeding into.  That kind of thing is showing

18   two.

19       Not only the scalp skin, under the skin has a bruise to

20   this side which is one is -- I think a 6 by 5, close

21   two-inch around, two separate bruises.

22       So what it means, this one is showing, this response

23   for this tear.  And this one doesn't show any skin split,

24   only bruises impact in there.  So look like it two separate

25   impact behind the back of the head on the left side.  That's

1   what I presented in this case.

2            MR. GUHL:  Thank you, Doctor, if you'll return.

3        (Witness retakes the stand.)

4   Q.   (BY MR. GUHL)  Ma'am, what effect -- what effects do

5   the head injuries in this case have upon the rest of the

6   body?

7   A.   Yes, that's external body examination I describe just

8   while ago.  But when it open up the skull, which inside is

9   the content which is the brain including the membrane

10  covering the entire, the brain matter, and there was the

11  injury.  That was the bleeding into the between the thin

12  membrane and the brain surface.  What we call subarachnoid

13  hemorrhages.  There was a multiple responsible for the

14  injury which observed the back of the head.

15  Q.   And in relation to that question, can you describe how

16  these injuries lead to a person dying?

17  A.   Well, that is a signs that the real mechanism of the

18  death in this person with that head injury would have been

19  the brain edema, which means swollen brain.  Brains become

20  swollen suddenly, that compression of the vital center

21  located in the center of the brain which is squeezed down by

22  the swollen brain.

23  Q.   Ma'am, did you -- or, Doctor, did you have an

24  opportunity to conduct a toxicology report upon Rodney

25  Perry's body?

 1  A.    Yes, as a routine procedure.

 2  Q.    And what were the results of that toxicology report?

 3  A.    That was, this case a blood alcohol including vitreous

 4  humor which means his eye fluid that showed that the blood

 5  alcohol level was a .20 percent which is about -- legal DUI

 6  is a .05, it's about four times, close four times.  And

 7  vitreous humor is about a little high, 0.23 but it's about

 8  the same.

 9  Q.    So, ma'am, how would this blood alcohol content affect

10  a person bleeding?

11  A.    Well, main mechanism would be major dilatation which

12  would be blood vessel dilatation, which particular blood

13  vessel dilating expanding.  That is once damaged cut of the

14  vessel could have been bleed more.

15  Q.    So in other words, a person would bleed out more

16  quickly?

17  A.    Quickly or more -- and more.

18  Q.    Doctor, during the course of your autopsy, did you have

19  an opportunity to examine Rodney Perry's hands?

20  A.    Hands?

21  Q.    Yes, ma'am.

22  A.    Well, there was the hands only one scratch.  There's no

23  bruises.

24  Q.    If these jurors were to look at exhibits which have

25  been presented and see black marks on Rodney Perry's hands,

1  how would you describe those marks and from what did they

2  come, based upon your opinion?

3  A.    That I don't know where it come from but I describe it,

4  because I'm body investigation, so that I describe the black

5  stains on top of the hands.  I don't know where it come

6  from.  It's must be at the scene would explain that.

7  Q.    Are the black stains consistent or inconsistent with

8  bruising?

9  A.    That is not bruise.  The stain is just like a stain.

10  You can rub it off.

11  Q.    Is there any kind indication from your examination of

12  Rodney Perry's hands that he had punched or hit anyone?

13  A.    There was no bruises on the hands other than just a

14  minor small scratch.

15  Q.    Doctor, based upon your examination, what was your

16  determination of the cause of death in this case?

17  A.    Head injury.

18  Q.    And, ma'am, based upon your medical opinion, are the

19  injuries Rodney Perry received consistent with him being

20  punched, beaten, and stomped?

21  A.    It could have be.

22  Q.    Ma'am, did you come to a conclusion as to the manner of

23  death in this case?

24  A.    Classified as a homicide, one person harm to person

25  that resulted in death.

114

```
 1              MR. GUHL:  Your Honor, may I have a moment?
 2              THE COURT:  You may.
 3   Q.   (BY MR. GUHL)  Ma'am, did you observe any injuries to
 4   Mr. Perry's ribcage?
 5   A.   Yes.  I described it about the right lower chest which
 6   is the scratches there.  I describe a break.  And near to it
 7   inside was a fracture, one rib.  That is number seven on the
 8   right.
 9   Q.   Ma'am, is it your opinion that this rib fracture was
10   sustained during the fight which caused Mr. Perry's death?
11   A.   I believe it about the same time.
12   Q.   What leads you to that conclusion?
13   A.   The ages about the same from the head injury.
14   Q.   And how do you know that?
15   A.   Well, there was fresh hemorrhages before critical
16   condition.  It was a hit or struck onto here.
17              MR. GUHL:  Pass this witness.
18              THE COURT:  Thank you.
19              MR. BOX:  Your Honor, I have no questions of the
20   doctor.
21              THE COURT:  Thank you very much.  You may be
22   excused.
23              The State's next witness.
24              MS. HIGH:  Judge, at this time we have the
25   transcript of Dewan Debose.
```

1    MR. BOX:  Your Honor, may we approach on it?

2    THE COURT:  You may.

3    (Thereupon, the following was had at the bench.)

4    MR. BOX:  Your Honor, I have no case law on point

5    but I previously had talked to the Court and I object to

6    Mr. Guhl reading the transcript.  I think it gives it unfair

7    value and I would just object to him reading it.  That would

8    be my objection.

9    THE COURT:  Well, let's think about this for a

10    minute.  Mr. Guhl has previously read this testimony.  It

11    has always been read obviously by a member of the District

12    Attorney's Office, but Mr. Guhl is the one who read it.  So

13    your objection is because he's in the courtroom?

14    MR. BOX:  Yes, Judge.

15    THE COURT:  You think it has undue weight?

16    Do you want to respond to that, Ms. High?

17    MS. HIGH:  Judge, this jury does not in any way

18    think that this is Dewan Debose.  They completely understand

19    Mr. Guhl is the Prosecutor.  It's a matter of convenience in

20    that we don't have to tie up somebody else from our staff

21    either preparing to read it or reading it.  I mean, this

22    jury knows he's not the one.

23    THE COURT:  All right, sir.  I will note your

24    objection.

25    MR. BOX:  Yes, Your Honor.

116

1          THE COURT:  Thank you.

2          MS. HIGH:  I have marked this as Court's Exhibit

3    Number 1.  I have made a couple of redactions in terms of

4    objections that were sustained.  I've shown those or

5    discussed those with Mr. Box and he was in agreement that we

6    do it that way.

7          MR. BOX:  Absolutely, Judge.

8          THE COURT:  Absolutely.  Before you leave, I'm

9    going to mark for the record your stipulation as Court's 2.

10   And receive Court's 1, this redacted version of the

11   transcript.

12         MR. BOX:  Yes, Judge.

13         MS. HIGH:  It begins with the Court getting him to

14   say his name.  Would you been kind enough to do that part?

15         THE COURT:  Sure, I'll be happy to.

16       (Thereupon, the following was had in open court.)

17         THE COURT:  Ladies and gentlemen of the jury, I

18   need to kind of explain to you what's going to go on next.

19   I think they mentioned -- the attorneys mentioned in opening

20   that one of the witnesses is unavailable but he has had an

21   opportunity to testify before under oath and so the law

22   allows us to read that to you.

23         And I don't think there will be any confusion in

24   your mind that the people that are reading it are all

25   different.  Ms. High will be reading the questions as the

1    Prosecutor.  I will be reading the part on behalf of the

2    Court.  And Mr. Guhl will be reading on behalf of the

3    witness, Dewan Debose.  None of us were present at the time

4    that this testimony was given.

5         (Thereupon, Court's Exhibit 1, the transcript testimony

6         of Dewan Debose was read for the jury.)

7              THE COURT:  Is the State prepared to call your

8    next witness?

9              MR. GUHL:  We are, Judge.  The State calls Kyle

10   Laws.

11                         **KYLE LAWS,**

12   having been first duly sworn, testified as follows:

13                       **DIRECT EXAMINATION**

14   **BY MR. GUHL:**

15   Q.   Sir, please introduce yourself to the jury.

16   A.   My name is Kyle Laws.

17   Q.   And, sir, how old are you?

18   A.   Eighteen.

19   Q.   And, sir, if I can refer you back to February 20th of

20   2004.  Where were you living?

21   A.   In Rockwell Villa Apartments.

22   Q.   And, sir, how long had you been living there?

23   A.   About a year.

24   Q.   Sir, within the apartments, where specifically did you

25   live?  In other words, near the entrance to the apartments

118

```
 1    or towards the back?

 2    A.    We lived in the back.

 3    Q.    Okay.  Sir, did you have occasion to know a person by

 4    the name of Rodney Perry?

 5    A.    In a way, yes.

 6    Q.    When you say "in a way," what do you mean?

 7    A.    I seen him around the apartments every now and then.

 8    Q.    And, sir, on February 20th of 2004, at approximately 11

 9    to 11:30 p.m., did something unusual occur that caught your

10    attention?

11    A.    A fight broke out.

12    Q.    And when you say that a fight broke out, can you

13    describe how many individuals were involved in this fight?

14    A.    As far as I remember, there was four -- or five

15    including Rodney, but four.

16    Q.    So if we talk about two opposing parties, is it correct

17    to say that there was one on one side and four on the other?

18    A.    Correct.

19    Q.    Okay.  And, sir, from what vantage point at the

20    apartment complex did you witness this occur?

21    A.    Towards the front by the mailboxes.

22    Q.    And, sir, where were you standing when you observed

23    this occur near the mailboxes?

24    A.    Like I was upstairs in my apartment when the first --

25    when the fight first broke out.
```

1  Q.  How did you learn that a fight had broken out?

2  A.  A lady by the name of -- I forgot her name, she came

3  into our apartment and said that somebody was fighting

4  downstairs.

5  Q.  Okay.  Were you related to this lady?

6  A.  Yeah, in a way.

7  Q.  And when you mean "in a way"?

8  A.  Like my mom's boyfriend, was her niece -- his niece.

9  Q.  Okay.  And so did you leave the apartment complex?

10  A.  Yes.

11  Q.  Excuse me, did you leave your specific apartment?

12  A.  Yes.

13  Q.  And where did you go?

14  A.  Down to wherever they were fighting at.

15  Q.  When you saw the fight, can you describe for the jury

16  the specific actions you saw which made you believe that a

17  fight was occurring?

18  A.  As far as I know, the group of guys were walking

19  towards us as we were walking their direction and they were

20  bragging about how they knocked some guy out and he was over

21  there asleep and I went over there to look at what happened

22  and just look at him.

23  Q.  So it's correct to say -- correct me if I'm wrong --

24  you learned about the fight when you came into contact with

25  individuals after it was over?

1   A.   Yes.

2   Q.   Okay.  Now, how many individuals did you come into

3   contact with who were talking about a fight?

4   A.   Four.

5   Q.   Now, where did you meet up with these individuals?

6   A.   In between the mailboxes and my apartment.

7   Q.   Can you describe for the jury, going individually, what

8   these individuals looked like?

9   A.   I mainly only remember one guy.  He had two sets of

10  teardrops under each eye.  He was the main one bragging

11  about how he had put somebody to sleep and knocked them out

12  pretty good.

13  Q.   Now, can you describe what the individual with

14  teardrops was wearing?

15  A.   I sure can't.

16  Q.   Do you remember what race he was?

17  A.   Light-skinned.

18  Q.   Was he an African-American?

19  A.   Yes.

20  Q.   Was he wearing dark clothing or light clothing?

21  A.   I can't remember.

22  Q.   And, sir, if I can write your name up on this board, if

23  you don't mind, as we've been doing with previous witnesses.

24       Now, sir, I'm writing number one by the individual

25  you've described with teardrops under his eyes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1     And, sir, when you say that, do you mean actual

2 teardrops or some sort of --

3 A.    Tattoo.

4 Q.    This individual was a black male?

5 A.    Correct.

6 Q.    How many additional people was he with?

7 A.    Three.

8 Q.    Now, the second person, the person standing next to

9 him, what did he look like?

10 A.    I didn't pay attention to any of them.

11 Q.    Were you able to identify whether or not they were male

12 or female?

13 A.    They are all males.

14 Q.    Were you able to identify the race of each individual?

15 A.    Black.

16 Q.    Were you able to identify and remember any of the

17 clothing these individuals were wearing?

18 A.    No.

19 Q.    Sir, do you remember if any of these individuals were

20 wearing descriptive clothing?

21 A.    Not really, no.

22 Q.    Do you remember if any of these individuals were

23 wearing clothing with any form of insignia or writing on it?

24     MR. BOX:  Objection, asked and answered, Your

25 Honor.

```
 1              THE COURT:  Overruled.  You may answer the
 2    question.
 3              THE WITNESS:  Vaguely, like a North Carolina logo.
 4    Q.   (BY MR. GUHL)  Where was this North Carolina logo
 5    about?
 6    A.   Either on a jacket or a hat.
 7    Q.   Was the individual with the teardrops the one wearing
 8    the North Carolina insignia or logo?
 9    A.   Not that I remember, no.
10    Q.   Now, sir, after you encountered these individuals, did
11    you come into contact with the person they had been
12    fighting?
13    A.   I went over there and looked at him, yes.
14    Q.   And when you say you looked at him, who are you
15    referring to?
16    A.   Rodney.
17    Q.   And what did he look like?
18    A.   Like he was asleep.  He was laid out on the ground
19    asleep.
20    Q.   Now, sir, with respect to where the fight began, where
21    was his body now?
22    A.   In front of the mailboxes on -- like not on the
23    sidewalk, but in the street.
24    Q.   Was it near a vehicle?
25    A.   Close to it, yes.
```

123

1   Q.   With respect to that vehicle, where was Rodney Perry's

2   body positioned?

3   A.   It was laying next to the vehicle on the concrete.

4   Q.   Was there anything unusual about Rodney Perry's nose or

5   face?

6   A.   He was bleeding from like the nose and the chin, mouth

7   area.

8   Q.   Was he making any sounds?

9   A.   Trying to gasp for air.  He was trying to get some

10  breath, I guess.

11  Q.   Now, after you observed Rodney Perry's body bleeding

12  and gasping for breath, did the individuals who -- did you

13  come into contact with the individuals who had passed you on

14  the sidewalk?

15  A.   Yes.

16  Q.   And where did you come into contact with them?

17  A.   Only one of them came who was the guy with the

18  teardrops.  He had came over there and grabbed him by his

19  shirt and picked him up and had said something to him.  And

20  he slammed him back down on the concrete, hit his head on

21  the concrete pretty hard.  And he kicked him twice in the

22  head.

23       He picked him back up by his shirt again and said

24  something else and leaned him against the car.

25  Q.   How would you describe his body when it was leaned

124

1   against the car?

2   A.   Kind of slumped down onto it and barely by his head.

3   Q.   What did the individual with the teardrops do after

4   taking these actions that you've described for the jury?

5   A.   He walked away.

6   Q.   Where did he walk to?

7   A.   To another group of people that were talking.

8   Q.   Now, when you encountered these individuals initially

9   on the sidewalk before you saw the individual with the

10  teardrops walk back to the body, were you alone?

11  A.   No.

12  Q.   Who were you with?

13  A.   I don't remember everybody who was there that night.

14  It was a couple of people.

15  Q.   Were these individuals who had come down from your

16  apartment with you?

17  A.   Yes.

18  Q.   Do you recall any of their names?

19  A.   I know Kurt was there, a couple of his family members

20  and some of my friends but I really -- names...

21  Q.   Were these individuals in a position where they could

22  see the individual with the teardrops return to Rodney

23  Perry's body?

24  A.   Just me and my friends.

25  Q.   Okay.  Now, where did the -- where specifically after

1    the individual with the teardrops returned to the group of

2    people did he go?

3    A.    We started walking away and the cops had pulled up and

4    him and that other guy followed me and the group of my

5    family up to our apartment.

6    Q.    When you say "him," you're referring to the individual

7    with the teardrops?

8    A.    Correct.

9    Q.    And the other individual who followed with you, as

10   well, how would you describe what he looked like?

11   A.    I'm not exactly too sure.  I didn't get a good look at

12   him.

13   Q.    Was he among the individuals you came into contact

14   with?

15   A.    Yes.

16   Q.    On the sidewalk?

17   A.    Yes.

18   Q.    Now, what happened after these two people followed you

19   all back to your apartment?

20   A.    They tried to come in with us to use the phone.

21   Q.    Were they allowed to come in?

22   A.    No.

23   Q.    Were they allowed to use a phone?

24   A.    Yeah, Kurt gave them a cell phone from the house to

25   use.

1    Q.   Did you watch them use the cell phone?

2    A.   No.

3    Q.   Was your last contact with them when they asked to use

4    the cell phone?

5    A.   Actually, mainly by the bottom of the stairs.

6    Q.   Did you at any point in time see these individuals

7    leave the apartment?

8    A.   No, I was in the back playing a game.

9         MR. GUHL:   Your Honor, may I have a moment?

10        THE COURT:   You may.

11    (Brief pause in proceedings.)

12    Q.   (BY MR. GUHL)   Sir, can you describe for the jury the

13    friends you were playing video games with at the apartment?

14    A.   What do you mean describe them?

15    Q.   Well, do you know their names?

16    A.   Yeah, yes, Jeremy Monroe and Marquis Sanders and that's

17    it.

18    Q.   Now, were they skaters?

19    A.   Yes.

20    Q.   Can you describe for the jury the number of people who

21    followed you down from your apartment when they heard that a

22    fight had broken out?

23    A.   Maybe like six or seven.

24    Q.   I believe you mentioned that Kurt Brazille followed you

25    down, is that correct?

1   A.   Yes.

2   Q.   Can you name any other individuals who followed you

3   down?

4   A.   I can't remember who all was there.

5   Q.   Were the skaters among the individuals who followed you

6   down?

7   A.   Yes.

8   Q.   And those individuals had been playing video games with

9   you for some length of time?

10  A.   Yes.

11           MR. GUHL:   Pass this witness.

12           THE COURT:   Thank you.

13           Mr. Box.

14           MR. BOX:   Yes, Your Honor.

15                    **CROSS-EXAMINATION**

16  **BY MR. BOX:**

17  Q.   Mr. Laws, just a few questions.  If I can understand

18  your testimony, on the late hours of February 20th, the

19  early hours of February 21st, 2004, you were living or you

20  were at this apartment complex, is that correct?

21  A.   Correct.

22  Q.   And at some point you became aware that there had been

23  a fight somewhere in the parking lot of the apartment

24  complex, is that correct?

25  A.   Yes.

128

1   Q.   Now, you didn't witness the fight, is that correct?

2   A.   Yes.

3   Q.   And apparently word spread quick and then you -- if I

4   can envision this, you and a group of six or seven friends

5   ran down to the apartment -- to the parking lot and -- to

6   see what happened?

7   A.   Yes.

8   Q.   Or see what was going on, is that correct?

9   A.   Correct.

10   Q.   And if I understand your testimony correctly also, the

11   only person that you can definitely remember for certain is

12   this person that had these tattooed teardrops, is that

13   correct?

14   A.   Correct.

15   Q.   And that was a taller person, is that correct?

16   A.   Yeah.

17   Q.   And you say that there was -- was it four people

18   involved in the fight?

19   A.   Yes.

20   Q.   And Rodney, of course, was the victim?

21   A.   Yes.

22   Q.   And then you never saw the fight?

23   A.   No.

24   Q.   But then you did see the guy with the teardrops go back

25   over to Rodney and kick him and stomp him, is that correct?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   A.   Yes.

2   Q.   Now, was Kurt Brazille, if you recall, was he present

3   when this happened?

4   A.   Not at the scene of the fight, he was distant from it,

5   but, yes.

6   Q.   And then after this last incident occurred, if I

7   understand your testimony correctly, these four individuals

8   that were involved in the fight, they just walk off or they

9   run off, is that correct?

10  A.   Yes.

11  Q.   And the police arrive shortly thereafter?

12  A.   In the process of us running, yes.

13  Q.   And if I also understand your testimony correctly, you

14  are not quite clear as to what anybody else was wearing; is

15  that a fair statement?

16  A.   Yes.

17  Q.   And you're not quite clear as to a description of these

18  other individuals, how tall, how much they weigh, is that

19  correct?

20  A.   Yes.

21  Q.   The only thing that you're quite clear about, of

22  course, is that you witnessed or you saw Rodney Perry's body

23  laying in the parking lot lifeless, is that correct?

24  A.   Yes.

25         MR. BOX:   I have no further questions.

130

```
 1              THE COURT:  Redirect.

 2              MR. GUHL:  No, Your Honor.

 3              THE COURT:  Thank you, sir.  You may be excused.

 4         The State's next witness, please.

 5              MS. HIGH:  Kurt Brazille.
```

                          **KURT BRAZILLE,**

```
 7  having been first duly sworn, testified as follows:
```

                         **DIRECT EXAMINATION**

**BY MS. HIGH:**

```
10  Q.   Sir, would you introduce yourself to the jury, please.

11  A.   Hi.  My name is Kurt Brazille.

12  Q.   And, Mr. Brazille, how old are you?

13  A.   Thirty-nine.

14  Q.   I want to direct your attention back to February the

15  20th of 2004.  Do you recall that date?

16  A.   Yes.

17  Q.   I want to talk about the late evening hours, 10:30,

18  11:00, between 10:30 and midnight that night, where were

19  you?

20  A.   Over to my girlfriend's house.

21  Q.   And who was your girlfriend?

22  A.   Tracy Laws.

23  Q.   And where is her house?

24  A.   Rockwell Villa Apartments.

25  Q.   And --
```

131

| 1 | MS. HIGH: May I approach the witness, Judge? |

1    MS. HIGH: May I approach the witness, Judge?

2    THE COURT: You may.

3    Q. (BY MS. HIGH) Mr. Brazile, I want to hand you what I

4    have previously introduced as State's Exhibit Number 1 and

5    it's been identified as an aerial photograph of Rockwell

6    Villa Apartments. Do you recognize it that way also?

7    A. Yes, ma'am.

8    Q. And in this photograph are you able to show us where

9    Tracy Laws' apartment is?

10   A. Yes.

11   Q. And if you would do that, please?

12   A. In the back of the apartments.

13   Q. Okay. And, so, it's in the last apartment building?

14   A. Yes.

15   Q. Now, had you been over at Ms. Laws' apartment all day?

16   A. Yes.

17   Q. And that evening, 10:30, 11:00 at night, who else is in

18   the apartment besides yourself?

19   A. Me and my stepson, Kyle, and his skating friends and I

20   think my two cousins and one of their friends.

21   Q. Now, when you say your stepson, Kyle, is that Kyle

22   Laws?

23   A. Yes, ma'am.

24   Q. Is that the young man that you saw leaving as you were

25   coming in here today?

132

```
 1   A.   Yes.

 2   Q.   And was Tracy Laws there?

 3   A.   Yes, she was asleep.

 4   Q.   Now, do you know a person by the name of Dewan Debose?

 5   A.   Yes, ma'am.

 6   Q.   How do you know him?

 7   A.   That's my nephew.

 8   Q.   Was Dewan Debose there in the apartment that night?

 9   A.   Well, he showed up.

10   Q.   Okay.  At what point did Dewan Debose show up?

11   A.   Oh, I'd say anywhere from like 11:30 to -- could have

12   been 11:25 at that time, somewhere.

13   Q.   So prior to him -- so prior to Dewan Debose showing up,

14   it was you, if I understood you correctly, Tracy Laws was

15   asleep?

16   A.   Yes.

17   Q.   Kyle Laws and he had some friends?

18   A.   Yes, ma'am.

19   Q.   Now, these friends and Kyle Laws, did they share a

20   common interest in some sport?

21   A.   Yes, they were skateboarding friends.

22   Q.   And then did you say you had a cousin over there also?

23   A.   Yes, ma'am.

24   Q.   Who was your cousin?

25   A.   I think it was Andre.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

133

```
 1    Q.    And anybody else that you can recall?

 2    A.    Yeah, and they had one of their friends with them named

 3    One Fifth, I believe.

 4    Q.    One Fifth?

 5    A.    Yes.

 6    Q.    Is that a nickname?

 7    A.    Yes.   I don't know his real name.

 8    Q.    All right.   Now, you said that at some point Dewan

 9    Debose showed up.

10    A.    Yes.

11    Q.    How long was Dewan Debose in the apartment before he

12    left again?

13    A.    Approximately about 10, 15 minutes.

14    Q.    Why did he leave?

15    A.    He wanted to use the phone and I wouldn't let him.

16    Q.    You wouldn't let him use the phone in the apartment?

17    A.    No, I was just being hard.

18    Q.    Where did you send him to use the phone?

19    A.    He went out to the pay phone outside.

20    Q.    And is the pay phone located there in the apartment

21    complex?

22    A.    Yes, ma'am.

23    Q.    And about where in the apartment complex?

24    A.    At the entrance.   Almost at the entrance, it's right by

25    the office.
```

1    Q.    And this is State's Exhibit Number 15.  Is that the

2    office that you are referring to?

3    A.    Yes, ma'am.

4    Q.    Now, are you able to see in this photograph where the

5    phone is or is it out of the picture?

6    A.    Well, it's just about out of the picture.  It's right

7    behind that Suburban, that white Suburban.

8    Q.    Oh, right behind the white Suburban over here?

9    A.    Yes, ma'am.

10   Q.    Okay.  All right.  And, so how long was Dewan gone from

11   the apartment before something else happened?

12   A.    No more than -- I'd say three to four minutes.

13   Q.    What happened?

14   A.    As far as my niece or my daughter, one of the two came

15   over and said it was a fight up by the mailboxes.

16   Q.    Now, the mailboxes there in the apartment, are there

17   any other mailboxes besides these that we can see in State's

18   Exhibit Number 15?

19   A.    No, those are the only ones.

20   Q.    And when your niece or your daughter, whoever it was,

21   came and said that there was a fight by the mailboxes, what

22   did you do?

23   A.    I dropped everything that I had in my hand and took off

24   running outside.

25   Q.    Why?

1   A.   Because I sent my nephew outside.

2   Q.   And so where did you go?

3   A.   Ran up towards the mailboxes where they said the fight

4   was.

5   Q.   I need to stop making this trek.

6        And this is State's Exhibit Number 8.  And, again, it's

7   been identified as an aerial photograph of the apartment

8   complex.  The apartment that you were coming out of, is it

9   one of these back here?

10  A.   Yes, ma'am.

11  Q.   Is it in the far building?

12  A.   Yes, the far building.

13  Q.   Now, we can kind of see there's some dark areas.  Are

14  those breezeways where you can go into the apartment

15  building?

16  A.   Yes.

17  Q.   And do you recall, did you come out of the first

18  breezeway or the second?

19  A.   It's just one breezeway there.

20  Q.   One breezeway.

21       And when you came out of the apartment complex, did you

22  come across the street?

23  A.   Yeah, we just come down the stairway and just started

24  running straight across here.

25  Q.   Headed for these mailboxes?

1    A.    Yes, ma'am.

2    Q.    How far did you get?

3    A.    We got to this breezeway here before we had met my

4    nephew and the guys he was walking with.

5    Q.    Okay.  So you didn't make it all the way to the

6    mailbox?

7    A.    No, ma'am.

8    Q.    About this first breezeway in this first building?

9    A.    Yes, ma'am.

10   Q.    Now, you say that you were met by your nephew.  Is that

11   Dewan Debose?

12   A.    Yes.

13   Q.    And who else was with him?

14   A.    Three other guys.

15   Q.    I want to ask you to look all around the courtroom here

16   today and tell me if you see any of the three other guys

17   that was walking with Dewan Debose that night.

18   A.    Well, it's the same guy that's sitting with the yellow

19   shirt on.

20   Q.    Okay.

21            MS. HIGH:  Ask the record to reflect

22   identification of the Defendant?

23            THE COURT:  The record will so reflect.

24   Q.    (BY MS. HIGH)  Now, how was Howard Morris dressed that

25   night?

```
 1  A.    He had a baseball cap on that nicked him right across
 2  his eyebrows and I believe he had on a jacket with -- I
 3  believe Tar Heel colors.
 4  Q.    And sorry, while you're doing that, I'm going to write.
 5        Do you recall anything about the baseball hat other
 6  than the fact that it was set down low on his head?
 7  A.    It's been a long time.
 8  Q.    Okay.  And then you said a jacket?
 9  A.    Yes, ma'am.
10  Q.    And Tar Heels' colors?
11  A.    Yes, baby blue and I believe it could have been black
12  or white.
13  Q.    Do you recall anything else about how Howard Morris was
14  dressed that night?
15  A.    Just with the faded-out jeans that he had on.
16  Q.    Now, you've said that there were two other individuals
17  walking with Dewan Debose and this Defendant, is that
18  correct?
19  A.    Yes, ma'am.
20  Q.    And have you testified previously against both of those
21  individuals?
22  A.    Yes, ma'am.
23  Q.    As between -- well, tell me what you remember about a
24  different individual.  Was there anything distinctive about
25  any of their faces?
```

138

1    A.    The only -- the teardrop guy.

2    Q.    Why do you call him the teardrop guy?

3    A.    That's the only way I can notice who he was, by the

4    teardrops on his eyes.

5    Q.    Did he have teardrops -- where on his face were the

6    teardrops?

7    A.    Up under each eye.

8    Q.    Each eye?

9    A.    Yeah.

10   Q.    Now, you sort of indicated.  Did they come from the

11   outside?

12   A.    Yeah, just like you're crying.

13   Q.    Now, real teardrops or --

14   A.    No, they are a tattoo.

15   Q.    Do you remember anything else about the way the

16   teardrop guy was dressed?

17   A.    Other than he had a curl and he had on, I think, some

18   blue jeans that was also faded, too.

19   Q.    Did you say he had a curl?

20   A.    Yeah, I believe it was a short curl.  Just like you can

21   get a wave on your hair or something like that.

22   Q.    So you're talking about the manner in which he wore his

23   hair?

24   A.    Yeah.

25   Q.    Okay.  Do you recall anything about Howard Morris' hair

139

1    that night, this Defendant?

2    A.    Well, I couldn't see his hair.  He had a baseball cap

3    on.

4    Q.    Did he happen to have glasses on that night?

5    A.    No.

6    Q.    And, so, he had a short curl and then had faded blue

7    jeans?

8    A.    Yes.

9    Q.    Do you recall a jacket or anything up at the top of the

10   teardrop guy?

11   A.    I believe he also had -- excuse me, a jacket on, too,

12   with the Tar Heel colors that could have had the "Thug Life"

13   name on it.

14   Q.    Tar Heels' colors?

15   A.    Yes, ma'am.

16   Q.    And, again, is that the baby blue with maybe some black

17   and white?

18   A.    Yes.

19   Q.    And then there was something else that you said, maybe.

20   "Thug Life"?

21   A.    Yes.  I think that was on the jacket.

22   Q.    Do you recall seeing "Thug Life" on a jacket on one of

23   them that night?

24   A.    I believe so.  It's one.  I just can't recall because

25   it's been so long.

1    Q.    What are you able to remember about the third man that

2    was walking with your nephew?

3    A.    He was just the way he just kept biting his bottom lip

4    and acting to where he would say he would get a fair fight

5    with anyone that wanted one.

6    Q.    And I'm not sure my question was clear.  You've

7    described for us a guy in a Tar Heels' colored jacket with a

8    baseball hat.  You've described the teardrop guy.

9        The third guy, what was he wearing?

10   A.    The third guy had the black hoodie.

11   Q.    Now, when you used the term "hoodie," what does that

12   mean to you?

13   A.    Well, it's like a sweat jacket with a hood on it.

14   Q.    And it was black?

15   A.    Yes.

16   Q.    Did he have anything on his head?

17   A.    He had a hood, yeah.

18   Q.    He had the hood up?

19   A.    Yes.

20   Q.    And any writing, any insignia, or anything on that

21   black hoodie?

22   A.    No, not that I remember.

23   Q.    Do you recall what kind of pants or what he had on down

24   at the bottom?

25   A.    I believe it was dark black pants or something like

1   that, I believe.

2   Q.    Okay.  Now, when you first -- you're coming towards the

3   front of the apartment complex.  Your nephew and these three

4   men including the Defendant are coming towards you.  When

5   you get close enough to hear each other, what is going on

6   with the three men?

7   A.    And my nephew?

8   Q.    Yes.

9   A.    Well, he started stating to them that I was his uncle

10  and everybody else that was running with me was his family

11  and he just didn't want, I guess, the guys to get all jumpy

12  to where they thought that we was coming to jump on them or

13  something like that.

14  Q.    When you say he was stating that, are you talking about

15  Dewan?

16  A.    Yes, ma'am, my nephew, Dewan.

17  Q.    All right.  Did you say anything to your nephew or the

18  three men?

19  A.    At that particular time, no, I was just worried about

20  was he all right.  He was just letting them know that the

21  reason why they was probably running this way because they

22  thought I was in trouble.

23  Q.    And, so, what happens next?

24  A.    Then they all was just proceeded to come and the guy

25  with the hat just kept -- had his lip bit, just saying that

1  he'll get a fair fight with anybody that wants one.

2  Q.   Now, when you say "the guy with the hat," are you

3  referring to this man right here, Howard Morris?

4  A.   Yes, ma'am.

5  Q.   And you say he was biting his lip?

6  A.   Yes.

7  Q.   Can you show me and the jury what you mean?

8  A.   He was doing this motion, (Indicating).

9  Q.   And what was he saying?

10 A.   He would get a fair fight with anyone.

11 Q.   And what did you take that to mean?

12 A.   He'll fight.

13 Q.   And is that something that this Defendant said one time

14 or did he say it more than one time?

15 A.   No, he said it more than once.

16 Q.   How would you describe the way that this Defendant was

17 acting that night?  Was he calm?  Was he relaxed?  How would

18 you describe his manner?

19 A.   Well, he was mostly like I guess you can be like on

20 your defense when you know you done done something and

21 you're not knowing if somebody else is involved with that

22 person you done something to, so you're going to stay on

23 your defense.

24 Q.   And so he -- this Defendant said more than one time,

25 "I'll get a fair fight with anyone"?

143

1   A.   Yes.

2   Q.   What about either the teardrop guy or the man in the

3   black hoodie, were they saying anything?

4   A.   The guy with the black hoodie was mostly like stating

5   that he didn't care who know him, what kind of car he drove,

6   and that he stated that he drive the maroon car or purple

7   car and he lived out on 122nd or Hefner and May or something

8   like that, he stated.

9   Q.   And you kind of indicated during your testimony, was

10  the man in the black hoodie pointing to a particular car

11  that night?

12  A.   Yeah, he was pointing the car he was driving.

13  Q.   Okay.  Let me show you what we have previously

14  introduced as State's Exhibit Number 34 and ask if that is

15  the car that the man in the black hoodie was pointing at?

16  A.   Yes, ma'am.

17  Q.   And if you would, when -- at the time that the man in

18  the black hoodie is pointing at this car, are you standing

19  in close proximity to the car?

20  A.   I was standing in front of the car about where the

21  police officer is standing.

22  Q.   Okay.  So this is about where you were?

23  A.   Yes, ma'am.

24  Q.   And was the man in the black hoodie closer to the car

25  or was he more on this side?

```
 1   A.    He was mostly on the left-hand side, yes.

 2   Q.    Over here?

 3   A.    Yes, back to where you was.

 4   Q.    Over here?

 5   A.    Yes, ma'am.

 6   Q.    I'll just let you do it.

 7   A.    He was mostly like on this side over here.

 8   Q.    And, so, when the man in the black hoodie is saying, "I

 9   don't care who knows what I drive," and tells where he

10   lives, what about the teardrop guy?  Is he doing anything?

11   Saying anything?

12   A.    I believe him and my nephew and the other kids and the

13   other people was just talking at that time.

14   Q.    So what happens next?

15   A.    They was asking -- my nephew kept saying that, "They

16   messed Rodney up.  Do you want to go see him?"  I was like,

17   "No, I don't care."  You know, I didn't know it was Rodney

18   Perry at that time.  He just kept a stating that, "They

19   messed Rodney up.  Do you want to go see him?"  I was like,

20   "No, I don't want to go see him because I'll check his

21   pockets and take his shoes," you know.

22   Q.    Why were you saying that?

23   A.    Not to mean it, just to be joking.  Because I didn't

24   want to go over there and look at anybody hurt.

25   Q.    So at that time, were you aware -- did you know who the
```

1    victim was?

2    A.    No, ma'am.

3    Q.    Did you later come to find out who the victim was?

4    A.    Oh, yes.

5    Q.    And did you know Rodney Perry?

6    A.    Yes, I've been knowing Rodney for a while.

7    Q.    And how did you first come to know or make Rodney

8    Perry's acquaintance?

9    A.    Well, he used to date my niece.

10   Q.    Okay.  All right.

11         So when Dewan Debose was saying, "They messed Rodney

12   up," at that time you didn't associate Rodney with Rodney

13   Perry?

14   A.    No, ma'am.

15   Q.    Was Rodney Perry living in Rockwell Villa Apartments on

16   February the 20th, 2004?

17   A.    No.

18   Q.    Okay.  And had it been some time since he had been

19   staying there or living there?

20   A.    Yes, it's been like a couple months prior.

21   Q.    Okay.  And, so, what happens next?  Your nephew is

22   telling you that they've messed Rodney up.  What happens

23   next?

24   A.    I was just basically just telling them -- the guys

25   after they was saying that and there was some more people

146

1   was standing there, like I say, talking to the teardrop guy

2   and I was mainly talking to my cousin, Andre, and One Fifth.

3   And somehow they all just like disappeared and went back

4   around the car.

5   Q.   Was there anything said about what they were going back

6   around the car for?

7   A.   I believe it was stated that some blood was on his

8   shoes.

9   Q.   On whose shoes?

10  A.   Teardrop dude's shoes.

11  Q.   And when it was stated or noticed that there was blood

12  on the teardrop guy's shoes, what was his reaction to blood

13  being on his shoes?

14  A.   I guess he wanted to go back and finish him off.

15  Q.   Did the teardrop guy go by himself?

16  A.   No, they all three left out of my vicinity.

17  Q.   Now, when you say that they went back around there to

18  where he was, where did they go?

19  A.   They went back to where Rodney was laying at.

20  Q.   Were you able to see where Rodney was laying at?

21  A.   I don't want to see those pictures.

22  Q.   Okay.  All right.  This photograph is just an aerial

23  photograph, and I'm sorry.  I didn't intend for you to see

24  those.

25       Are you okay?

1    A.    Yeah.

2    Q.    When we look at State's Exhibit Number 8, you've

3    indicated that you were standing about in this area talking;

4    that's where you met up with your nephew and the three men.

5    Does that look about right to you, right outside that

6    breezeway?

7    A.    Yes.

8    Q.    Where did they go when they went back around, as you

9    said, to finish him off?

10   A.    They went back around to where the car was parked, the

11   gray car where Rodney was laid up against.

12             THE COURT:    Would you care for some water,

13   Mr. Brazille?

14             THE WITNESS:    Please.    Thank you.

15   Q.    (BY MS. HIGH)    After the three men went back around the

16   side of the gray car where Rodney was laying, could you see

17   what was going on?

18   A.    No, I didn't see.

19   Q.    Could you hear?

20   A.    Yes.

21   Q.    Could you hear?

22   A.    I could hear like you're stomping and skin slapping.

23   Q.    And so what happened next?

24   A.    They all proceeded to come back over.

25   Q.    Back over to where you were standing outside of that

148

1  apartment building?

2  A.   Yes.

3  Q.   And what happened then?

4  A.   Well, that's when -- I was just telling them to just go

5  ahead and leave.  I mean, "you did enough damage to whoever

6  you done it to," still not knowing it was Rodney.

7  Q.   And was there any response or anything said back to you

8  by any of the three men?

9  A.   There could have been.  It's been a while, ma'am.

10 Q.   Okay.  And so what do you recall happening next?

11 A.   We all proceeded -- that's when they was getting in the

12 car.

13 Q.   All three getting in the car?

14 A.   Yes.

15 Q.   Okay --

16 A.   The --

17 Q.   I'm sorry.

18 A.   The guy that had the black hoodie on was the first one

19 that seated in the car.

20 Q.   Where in the car did he get?

21 A.   In the driver's seat.

22 Q.   And do you recall where this Defendant, Howard Morris,

23 got in the car?

24 A.   He got in on the passenger side but in the back seat.

25 Q.   And so where did the teardrop guy get?

149

1   A.   The front seat.

2   Q.   And what happened when they got in the car?

3   A.   Well, they -- I guess they proceeded to leave and we

4   proceeded to walk down back towards the house, and you could

5   hear sirens coming from everywhere.  And when we proceeded

6   to look back at the front of the apartments, all the

7   Oklahoma City and Bethany police, everybody was coming.

8   Q.   And did you see the car that the three men had gotten

9   into again?

10  A.   Yeah, later that night.

11  Q.   Did you see any of the three men again?

12  A.   Yes.

13  Q.   How long after they had gotten in the car did you see

14  them again?

15  A.   No more than about four minutes.

16  Q.   Where did you see them?

17  A.   In Tracy's house.

18  Q.   Did you see all three of them?

19  A.   No, just two.

20  Q.   Which two?

21  A.   Howard and the teardrop guy.

22  Q.   So this Defendant and the teardrop guy?

23  A.   Yes, ma'am.

24  Q.   And when you say you saw them in Tracy's apartment, did

25  they come inside the apartment?

150

```
 1   A.   Yes, I left the door open because all the kids was
 2   still standing out on the breezeway, so I left the door open
 3   and walked on down the hallway and I turned around for some
 4   odd reason and that's when I noticed that the Defendant and
 5   the other guy, Howard -- Howard and teardrop guy was coming
 6   into the front door.  And I told them to, "Stop.  You can't
 7   come in here."  And they just stated, "We want to use the
 8   phone."
 9   Q.   And what did you say?
10   A.   I said, "Okay.  You can use it."  But I didn't want
11   them to use the house phone.
12   Q.   So what did you do?
13   A.   I gave them my stepson's cell phone.
14   Q.   And do you recall as between this Defendant and the
15   teardrop guy, who did you hand the phone to?
16   A.   To Howard.
17   Q.   And did one of them speak on the phone?
18   A.   Yes, Howard did.
19   Q.   And were you able to hear any of his conversation?
20   A.   Yeah.  He told whoever he was talking to to meet him at
21   Abadan's.
22   Q.   Abadan's?
23   A.   Yes.
24   Q.   Are you familiar with what Abadan's is?
25   A.   Yeah, it's a little small convenience store.  They sell
```

1    gyros, beer, and everything.

2    Q.    Where is it located?

3    A.    On Northwest 10th.

4    Q.    Is it within walking distance of Rockwell Villa

5    Apartments?

6    A.    Yes, ma'am.

7    Q.    And previously we've heard testimony that if you leave

8    out the back of the apartment complex on foot that there are

9    trails that will take you to 10th Street.

10    A.    Yes, ma'am.

11    Q.    Can you utilize those trails to get to Abadan's?

12    A.    Well, yes, if you come out the back apartments, it will

13    lead you out to 10th Street and then you go straight to

14    Abadan's.

15    Q.    And so how long would you estimate that this Defendant

16    was on the phone?

17    A.    No more than, I'd say, a minute.

18    Q.    And so what happened next?

19    A.    He hung up the phone and looked at me and told me,

20    "Thank you.  Thank you, man."

21    Q.    And then what did he do?

22    A.    They proceeded to go out the back way down the back

23    stairway.

24    Q.    And did you see them leave the apartment complex?

25    A.    Well, I just seen them leave going down the back

152

1    stairway.  I didn't go follow them or anything.

2    Q.   Going down those back stairway -- going down that back

3    stairwell, would that take you to that foot path that you

4    can take out the back way of the apartment complex?

5    A.   Yes.

6    Q.   Now, had you ever seen any of those three men, either

7    the teardrop guy, this Defendant or the guy in the black

8    hoodie, had you ever seen them before that night?

9    A.   No, ma'am.

10   Q.   And so when you use the name Howard, do you just know

11   that from having been in court and hearing lawyers say

12   Howard Morris?

13   A.   Yes.

14           MS. HIGH:  May I have just a moment, Judge?

15           THE COURT:  You may.

16           MS. HIGH:  Pass the witness.

17           THE COURT:  I think that I need to recess to work

18   on my other docket for a few minutes so I think I'm going to

19   go ahead and give you all a break.  I'll ask you to be back

20   in the courtroom at 3:45.  Ladies and gentlemen of the jury,

21   you are admonished.  Thank you.  Court's in recess.

22       (Thereupon, a recess was had, after which, with all

23       parties present, the following was had in open court

24       out of the hearing of the jury.)

25           THE COURT:  During the very brief break the

153

1    bailiff made me aware that the jurors had expressed to her a

2    concern that your client was taking notes during jury

3    selection and because this is gang stuff, they don't know

4    what that means and they're concerned about their personal

5    security.

6          I went into the jury room during this break and

7    said to them that I don't generally talk to the jurors

8    during trial and that I had to be very limited in what I

9    said but that in my history with the court, I am unaware of

10   there ever being a time when jurors have been threatened or

11   intimidated, and that I was confident that Mr. Morris'

12   taking notes was so that he could communicate with you.

13         MR. BOX:  Absolutely.

14         THE COURT:  And would not be taking anything from

15   the courtroom.

16         MR. BOX:  No.

17         THE COURT:  And so I wanted to put on the record

18   their concern, also how I had handled it.  If you have

19   objections or something that you wish that I would do in

20   addition to that, I will be happy to address that.

21         MR. BOX:  At this point I don't have any.

22   Obviously the notes at the table weren't even to do with

23   even the individual particulars of the prospective jurors,

24   it was numbers only and he was just circling numbers that he

25   didn't like or liked.  So that's all that it was.

154

```
 1            THE COURT:  Well, I think that I have adequately
 2   expressed to them that they have no concern and that the
 3   same instruction that we give at the end of the trial which
 4   is at the conclusion of the trial they may discuss or not
 5   discuss with anybody and if anybody persists, that we'll be
 6   happy to handle that for them.  So I just wanted you to know
 7   that.
 8            MR. BOX:  Sure.
 9            THE COURT:  Okay.  Thank you.
10            Would you bring the jury in, please?
11        (Thereupon, the following was had in open court.)
12            THE COURT:  Thank you.  Please be seated.  Ladies
13   and gentlemen, I want to make sure that you understand.
14   It's certainly not attorney's fault this afternoon that I've
15   had to take a break.  While we're in trial life goes on and
16   I still have many other cases to manage.
17            I had a docket set at 1:30 today, most of which
18   was kind of resolved with continuances, but I had several
19   matters that had to be resolved in the courtroom.  And I
20   apologize for taking up your valuable time, but thank you so
21   much for your patience with me today.
22            Mr. Box.
23            MR. BOX:  Yes, Your Honor.
24            THE COURT:  On cross-examination, sir.
25
```

**CROSS-EXAMINATION**

**BY MR. BOX:**

Q.    Mr. Brazille, you've testified several times during the course of the last several months involving this particular case; is that a fair statement?

A.    Yes, sir.

Q.    And on those occasions, of course, you've been under oath like you are today?

A.    Yes.

Q.    And do you recall in the past being asked, you were asked today about a description of the clothing that was being worn by the individual you identified in court, is that correct?

A.    Yes, sir.

Q.    And you said that he had a blue cap on and then you thought he had some sort of shirt, is that correct, or jacket?

A.    A jacket.

Q.    Do you recall in the past under oath and being asked questions about the description of this individual that you said that you believed that he had a jacket on and it had the words "Thug Life" on the back?  Do you recall that?

A.    Yes.

Q.    So in the past you've actually testified that the individual that you have identified today had a jacket on

1    that said "Thug Life." Would that be a fair statement?

2    A.    I believe so, yes, sir.

3    Q.    Now, let's also talk about a couple of other things.

4    You indicated that when you went out to the parking lot of

5    the apartment complex that night -- and it became apparent

6    to you that there had been a fight, is that correct?

7    A.    When I went out there? It was told to me there was a

8    fight. That's why I went out.

9    Q.    That's what I'm saying. You were told that there was a

10   fight in the parking lot, is that correct?

11   A.    Yes.

12   Q.    And then when you went out there you saw three

13   individuals, not four, that you were potentially involved in

14   this fight, is that correct?

15   A.    Well, I didn't know that they were potentially involved

16   at that time.

17   Q.    Well, that's what I'm saying, potentially. Not

18   intentionally, potentially you saw three individuals that

19   you thought might have been involved in this altercation?

20   A.    Well, I didn't know who was involved in what, sir, at

21   the time until my nephew started stating to them who I was

22   so they wouldn't get so jumpy to where they wanted to jump

23   me and my stepson and his friends.

24   Q.    Well, as far as my question is, it became apparent to

25   you at some point that there was possibly three people

157

1  involved in a situation, is that correct?

2  A.    Yes.

3  Q.    And then if I understand your testimony correctly, at

4  some point all three of them went back to the person that

5  was laying on the ground and started kicking him, is that

6  correct?

7  A.    Yes.

8  Q.    Is that correct?

9  A.    Yes.

10  Q.    And you witnessed this?

11  A.    No, I didn't see the actual punches.  I didn't look

12  over at the vehicle where they went.  I was sitting there

13  talking to my cousin and his friend and several more people.

14  Q.    But it wasn't just the person in the teardrops that

15  went over there; is that a fair statement?

16  A.    Yes, sir.

17  Q.    All three of them went?

18  A.    Yes, sir.

19  Q.    And, also, isn't it a fair statement that there was at

20  least eight or nine people that were out there at the

21  location at that time besides the three people and the one

22  person on the ground?

23  A.    Could you repeat that again?

24  Q.    Well, isn't it a fair statement that there was maybe

25  eight or nine people, counting yourself, besides the three

158

1  people and the one person on the ground that were out there

2  during that time period?

3  A.    Yeah.

4  Q.    And then it's also your testimony, is it not, that the

5  three people that you've described to the Court today got

6  into a car, is that correct?

7  A.    Yes, sir.

8  Q.    And that they attempted to leave the parking lot?

9  A.    Yes, sir.

10 Q.    But, in fact, they didn't leave the parking lot, did

11 they?

12 A.    No.

13 Q.    Now, the person you've identified in court today, you

14 said that he had a ball cap down to the eyebrows, is that

15 correct?

16 A.    Yes.

17 Q.    Also you've identified a person that had a hoodie on,

18 is that correct?

19 A.    Yes.

20 Q.    Now, you had a hard time identifying that person

21 because he had the hoodie around his face, didn't he?

22         MS. HIGH:  Judge, I'm going to object in terms of

23 he had a hard time.  He has always identified unequivocally.

24         THE COURT:  Counsel, would you approach, please?

25         (Thereupon, the following was had at the bench.)

```
 1              MR. BOX:  Well then, I'm --

 2              THE COURT:  Now, sir, what basis do you have

 3    for --

 4              MR. BOX:  Well then, I'm going to impeach him on a

 5    prior transcript, Page 69, bottom paragraph.

 6              MS. HIGH:  It's from the other transcript?

 7              MR. BOX:  Uh-huh.

 8              MS. HIGH:  I don't have it with me.

 9              THE COURT:  Certainly.

10              MS. HIGH:  Judge, I don't think that's

11    equivocating.  It says until I see him again.  He said he

12    was equivocal in his identifications.  He's never

13    equivocated in court, never.

14              MR. BOX:  Well then, I'm going to ask him this

15    question if he would --

16              THE COURT:  The reason we come to the bench is so

17    we keep our voices down.

18              MR. BOX:  Well then, I want to ask him with the

19    Court's permission, I want to ask him if he remembers being

20    asking this question and this answer, on Page 69.

21              THE COURT:  Well, I don't think that you can.

22              MR. BOX:  I'm impeaching his credibility, his

23    ability to remember.

24              THE COURT:  I agree with the State's reading of

25    that.  I don't think that he's equivocated, Mr. Box, and I
```

160

1   don't think that his answer as you've shown on that page

2   shows that he's equivocating in his description.

3            MR. BOX:  For the record then, I'll make an offer

4   of proof if I was allowed, I would ask him, do you recall

5   being asked the question.

6            THE COURT:  I'll make your offer of proof simply

7   because you have difficulty with keeping your voice down.

8            MR. BOX:  It's the July 27th transcript, Your

9   Honor.

10           THE COURT:  And it's Page 69 starting at Line 17.

11           "Now, I know there were several children out there

12   with you and your nephew was out there with you.  Tell me,

13   the person in the black hood, what did that person look

14   like?"

15           The answer, "His -- it was dark but the -- he was

16   dark himself and had approximately like a mustache like I

17   did and he had -- the hood had hit him here, (indicating),

18   over his eyebrows so it was very kind of hard to try to

19   describe it until I see him again."

20           Thank you.

21      (Thereupon, the following was had in open court.)

22   Q.   (BY MR. BOX)  Now, Mr. Brazille, also, is it not true

23   that you've testified before that the tall gentleman, you

24   recalled he had blue jeans on and a light blue shirt, is

25   that correct?

161

```
 1   A.   The blue jeans, Tar Heel-colored jacket with the white.

 2   Q.   Now, let's go forward.  You say that the three

 3   individuals you've described tried to leave the parking lot

 4   were unsuccessful and the car was left in the parking lot,

 5   is that correct?

 6   A.   Yes.  They proceeded to leave.

 7   Q.   And then two of them ended up at your apartment a few

 8   minutes later, is that correct?

 9   A.   Yes, sir.

10   Q.   And the individual that you've identified in court

11   today, according to your testimony, he actually held the

12   mobile phone, is that correct?  You gave him a mobile phone?

13   A.   A cell phone.

14   Q.   A cell phone.  Is that correct?

15   A.   Yes.

16   Q.   And was it your cell phone?

17   A.   No, sir.

18   Q.   Whose cell phone was it?

19   A.   My stepson, Lee.

20   Q.   You gave him the cell phone and there was actually a

21   number dialed on that cell phone, is that correct?

22   A.   Yes.

23   Q.   Do you recall what service your nephew had?

24   A.   It wasn't my nephew.  It was Lee, my stepson.

25   Q.   Did you turn that phone over to the police?
```

1  A.    I sure did.

2  Q.    Also, Mr. Brazille, it would a be fair statement to say

3  that while this incident was happening in the parking lot,

4  you never saw a car watching the incident, did you?

5  A.    I was in the house.

6  Q.    When you got out there to the parking lot, you never

7  saw a car that was watching the incident, did you?

8  A.    I wasn't focused on the parking lot.

9  Q.    Well, did the incident occur in the parking lot?

10  A.    To my knowledge, that's where he was laying, in the

11  parking lot, but I never focused my attention to the parking

12  lot.  My attention was fully as the people that was around

13  me, not the parking lot.

14  Q.    And your focus were on the people around you, the

15  people that, for example, had the sweatshirt on, "Thug

16  Life", and the people that had shirts on and jeans on, is

17  that correct?

18  A.    I was focused on my nephew, my cousins, YT, and several

19  more people that was around in that crowd that was talking.

20  Q.    Okay.  And how long would you approximate that you came

21  in contact with these three individuals that evening?

22  A.    How long did it take for me to get out of my apartment

23  to them?

24  Q.    No, how long did you actually come in contact with them

25  that night?

```
 1   A.   How long?  No more than 10 minutes or so.

 2   Q.   Ten minutes or less?

 3   A.   Approximately, yeah.

 4   Q.   And you had never seen these individuals before in your

 5   life?

 6   A.   No, sir.

 7   Q.   Now, besides yourself, besides Mr. Laws that just left

 8   the courtroom -- is that your nephew?

 9   A.   No, that's my stepson.

10   Q.   Stepson, excuse me.

11   A.   He was my stepson at that time.

12   Q.   Okay.  Who else was out there that night?

13   A.   Him and I'd say pretty close to nine of his skating

14   friends, skateboard friends.

15   Q.   And Dewan was there, is that correct?

16   A.   Dewan.

17   Q.   Dewan, excuse me.  And who else?

18   A.   My cousin, Andre, and One Fifth and several more --

19   could have been -- approximately all the people together,

20   could have been over 20 people out there that night.

21   Q.   And would it be fair to say that the -- a lot of those

22   people got closer to the fight than you did?

23   A.   Oh, yeah.  I didn't want to see anything.  I didn't

24   want to see my mom when she died.  I don't want to see

25   nobody get --
```

164

1    Q.    I understand.  I'm just asking you a question.

2         Now, this guy with the black hoodie, where did he go,

3    if you know?

4    A.    What time?

5    Q.    When it was finished.  After -- he got in the car and

6    was the driver, is that correct?

7    A.    Yes.

8    Q.    Did you ever see him after he attempted to drive off?

9    A.    No.

10             MR. BOX:  If I could have just a minute, Your

11   Honor?

12             THE COURT:  You may.

13        (Brief pause in proceedings.)

14   Q.    (BY MR. BOX)  Do you recall any of the names of the

15   skateboard friends?

16   A.    Jeremy, Littlejohn, Bear, Chris, it was also like five

17   new kids that they had probably met that night.  About just

18   those five and then the five new ones that they had with

19   them.

20             MR. BOX:  Your Honor, if I can have just a second?

21             THE COURT:  You may.

22        (Brief pause in proceedings.)

23             MR. BOX:  I have no further questions, Your Honor.

24             THE COURT:  Thank you.

25             Is there redirect?

```
 1              MS. HIGH:  Yes.

 2                    REDIRECT EXAMINATION

 3  BY MS. HIGH:

 4  Q.   Mr. Brazille, as you stood there that night with those

 5  three men in front of you with your nephew Dewan, were you

 6  focused on the clothing that they had on or were you focused

 7  on their faces?

 8  A.   I was looking at their faces.

 9              MS. HIGH:  That's all I have.

10              THE COURT:  Do you have further?

11              MR. BOX:  No further questions.

12              THE COURT:  Thank you very much, sir.  You may be

13  excused.

14              Counsel, would you join me, please?

15       (Thereupon, the following was had at the bench.)

16              THE COURT:  I'm thinking that I will excuse the

17  jury for the day and let us try to deal with Mr. Nicholson.

18  Does that sound okay?

19              MS. HIGH:  Yes, ma'am.

20              MR. BOX:  That's great.

21       (Thereupon, the following was had in open court.)

22              THE COURT:  Ladies and gentlemen of the jury, we

23  have some work to do that does not require your presence so

24  I'm going to go ahead and excuse you for the day and we will

25  be ready for you at 9:00 in the morning.
```

1    Again, you don't have to go back to the jury room

2    today but you will need to go there in the morning to get

3    scanned in.  And you are all admonished and you know what

4    that means.  Thank you very much for your patience with us

5    today and we'll see you tomorrow morning at 9:00.

6    (Thereupon, the jury was excused for the evening recess

7         and the following was had outside the presence and

8         hearing of the jury.)

9    THE COURT:  You may be seated.

10    Mr. Nicholson, as I explained to you earlier

11    today, sir, you do not have a right to invoke your first

12    amendment privileges because you have already testified in

13    your case.  This morning I explained to you that you would

14    be held in contempt until you made a decision to purge that

15    contempt by testifying truthfully.

16    I guess we are to the point in the trial where the

17    State wishes to call Mr. Nicholson and you know, for the

18    record, Ms. High, why don't you tell me exactly what it is

19    that you want to ask Mr. Nicholson.

20    MS. HIGH:  Judge, we would ask Mr. Nicholson if he

21    was at the apartment complex at the Rockwell· Villa apartment

22    complex.  We would ask him if Howard Morris was present at

23    the apartment complex.  We would ask him if Howard Morris

24    went by the nickname or street name of NC.  We would ask him

25    if he observed Rodney Perry in the apartment complex that

167

```
 1   night.  We would ask him if he observed Howard Morris to
 2   strike or get into an altercation of any kind with Rodney
 3   Perry.  We would inquire of Mr. Nicholson about whether or
 4   not he had been at the Lamplighter Club earlier that night
 5   with Howard Morris.  I think that's -- those are the
 6   questions we would ask.
 7             THE COURT:  And those are all matters that you've
 8   testified to during your trial a few weeks ago.  Do you
 9   remember that?  Mr. Nicholson, do you remember your trial?
10             THE DEFENDANT:  Yeah, I remember my trial.
11             THE COURT:  Do you remember talking about you
12   talked about being at the apartment complex?  Do you
13   remember that?
14             THE DEFENDANT:  Ma'am, I plead the fifth on that.
15             THE COURT:  You don't remember talking, testifying
16   in your trial earlier?
17             THE DEFENDANT:  Yeah, I remember all of that,
18   ma'am.
19             THE COURT:  Well, you talked about you being
20   present at the apartment complex.  You talked about this
21   Defendant, Howard Morris, being present.  I believe that you
22   did call him by NC as well as by, well, NC and talked about
23   his clothing.
24             You talked about the victim being at the complex.
25   You offered an explanation of why you all had a physical
```

168

1   altercation with the victim.  It is my recollection and I

2   have not refreshed my memory with your testimony, but it was

3   my recollection that your testimony included the fact that

4   this Defendant was the main person who hit the victim,

5   Rodney Perry.  Am I remembering that wrong?

6         MS. HIGH:  Judge, Mr. Nicholson testified that he

7   initially had a conflict with Rodney Perry and he, too,

8   punched him and then he was done with the fight and at that

9   point he testified that Howard Morris and who he called T

10  Loc, Timothy Johnson, came over and just jumped on him and

11  they are the ones that beat him to death while he stood by

12  and watched.

13        THE COURT:  Right.  Let me ask you something.

14  Ms. High, since the State has already convicted

15  Mr. Nicholson and a jury has already made a decision that he

16  should serve life imprisonment, do you have an election as

17  to whether or not you would want to be able to use his

18  testimony in this trial against him at some further

19  proceeding?

20        MS. HIGH:  We have no need of Mr. Nicholson's

21  testimony from this trial against him in the future.  We

22  have his testimony from his previous trial.

23        THE COURT:  So would you be willing to essentially

24  indemnify him that his testimony in this case would not be

25  proffered by the State in any future legal proceeding?

 1          MS. HIGH:  Yes.  The word indemnify, I don't want
 2   to get into an immunity situation and I think he could come
 3   back and say that we offered him immunity from prosecution
 4   and somehow use that in his appeal.  I will state that we
 5   will not use on the record, that we will not use his
 6   testimony in this trial against him against Howard Morris
 7   against him in future proceedings.

 8          THE COURT:  Well, Mr. Nicholson, you don't have a
 9   right not to testify.  And, so, tomorrow morning at 9:00,
10   we're going to put you on the stand and we're going to swear
11   you in.  And we're not going to go on a big fishing
12   expedition but these matters that the State says that they
13   want to inquire are all things that you gave up in your
14   trial and nothing that you say in this courtroom will be
15   used against you in any future proceeding.  Do you
16   understand?

17          THE DEFENDANT:  Man.  Yeah.

18          THE COURT:  Is there anything further from
19   counsel?

20          MS. MCCARTY:  Your Honor, the only thing I'd like
21   to add and I haven't spoken to my client privately after
22   what just went on here but previous to this he had indicated
23   to me that his intent was to plead the fifth amendment and I
24   need to clarify that by statute I'm only able to represent
25   him on appellate issues so if that's still the case and I

```
 1    haven't spoken to him I would just ask that you would

 2    appoint trial counsel for him at a contempt proceeding.

 3             THE COURT:  Okay.  Well, I don't suspect we're

 4    going to have a problem with contempt in the morning, do

 5    you, Mr. Nicholson?

 6             THE DEFENDANT:  I don't know.  Might.

 7             THE COURT:  Really?

 8             THE DEFENDANT:  Might not say nothing.

 9             THE COURT:  Why is that?

10             THE DEFENDANT:  I already got life.

11             THE COURT:  So, your refusal to testify doesn't

12    have anything to do with the fact that you might incriminate

13    yourself?

14             THE DEFENDANT:  I ain't going to incriminate

15    myself, I just don't want to.

16             THE COURT:  Well, this is not a fifth amendment

17    right, this is just whether or not you're going to follow

18    the orders of the Court and tomorrow morning at 9:00 I

19    suspect you ought to be ready to testify, sir.  Okay?  See

20    you at 9:00 a.m.

21             MR. BOX:  Your Honor, can I go on the record?

22             THE COURT:  Yes, sir.

23             MR. BOX:  I would advise the Court that if in fact

24    he is called to the stand in front of a jury and he either

25    elects to plead the fifth, which the Court says he's not
```

171

1    allowed to.

2            THE COURT:  Well, the fifth amendment doesn't

3    apply in situations where he just doesn't want to, so he

4    would not be allowed to give that answer.

5            MR. BOX:  I understand, but if he gave that answer

6    in front of the jury then I would be forced to move for a

7    mistrial because I think it would be highly prejudicial to

8    my client and if, in fact, he takes the witness stand in the

9    morning and under questions from the Prosecution he elects

10   to say he's not going to answer it, then I'd be forced to do

11   a mistrial and I think it would be proper.  So my inquiry to

12   the Court is that I would ask for an in camera hearing to

13   see what the question is going to be asked and what his

14   answers are going to be because if he answers it the wrong

15   way, then I believe we have a mistrial.

16           THE COURT:  Well, let's see.  I think we've been

17   in in camera right now.

18           MR. BOX:  But he hasn't said what he's going to

19   say.

20           THE COURT:  I've told him that I expect him to

21   answer the questions truthfully.  And since he is not at any

22   jeopardy in regard to further prosecution and this is just a

23   matter of him wanting to torque with all of us, then I think

24   that you ought to be prepared in the morning to answer the

25   questions truthfully.

 1          What, Mr. Nicholson?

 2          DEFENDANT NICHOLSON:  (Inaudible).

 3          THE COURT:  Well, Mr. Nicholson, I guess it's

 4   because we're expecting you to give us an answer.

 5          THE DEFENDANT:  I guess, all right.  What you all

 6   going to do, force me to say something-something?

 7          THE COURT:  You are under an obligation to answer

 8   the questions truthfully just as you took an oath to do in

 9   your own trial.  You've heard there are essentially six

10   questions that the State has to ask you.

11          Do you have any questions, Mr. Nicholson?

12          THE DEFENDANT:  No, ma'am.

13          THE COURT:  Then I'll see you tomorrow morning at

14   nine.

15          MR. LOHMANN:  Can I clarify just one thing?  I

16   might be a little slow.  The pledge of the Prosecution is to

17   not use anything he says tomorrow if he testifies in any

18   proceeding.

19          THE COURT:  Any future legal proceeding against

20   him?

21          MS. HIGH:  Just so that we're clear.  As long as

22   he testifies truthfully consistent with what I'm assuming

23   was his truthful testimony according to him during his

24   trial.  I mean, if he comes up with some third story

25   tomorrow and we decide to pursue perjury against him then I

1   think that's an entirely different matter.

2          MS. MCCARTY:  Your Honor, I just want to reiterate

3   if he comes to court and won't answer anything you have said

4   you will find him in contempt and I feel like he needs trial

5   counsel for that.

6          THE COURT:  Thank you.  I heard you the first

7   time.

8          MS. MCCARTY:  Thank you.

9          THE COURT:  See you at 9:00 in the morning.  Is

10  there anything further that you need to put on the record?

11         MR. BOX:  No, Your Honor.

12         THE COURT:  Anything for the State this afternoon?

13         MS. HIGH:  No, Judge.

14         THE COURT:  Well, this has been so much fun let's

15  get together again tomorrow and do it all over again.

16      (Thereupon, court adjourned for the evening recess.

17      For transcript of proceedings had on April 5, 2006, see

18      Volume 3.)

19

20

21

22

23

24

25

```
 1                IN THE DISTRICT COURT OF OKLAHOMA COUNTY

 2                        STATE OF OKLAHOMA

 3

 4    THE STATE OF OKLAHOMA,          )
                                      )
 5                    Plaintiff,      )
                                      )
 6    VS.                             )   CASE NO. CF-04-1212
                                      )
 7    HOWARD PURIFOR MORRIS, III,     )
                                      )
 8                    Defendant.      )

 9

10              CERTIFICATE OF THE COURT REPORTER

11          I, Theresa L. Reel, Certified Shorthand Reporter

12    and Official Court Reporter for Oklahoma County, do hereby

13    certify that the foregoing transcript in the above-styled

14    case is a true, correct, and complete transcript of my

15    stenographic notes of the hearing in said cause.

16
                        26th
17          Dated this _____ day of _____, 2006.

18

19
                                    Theresa L. Reel
20

21
                            Theresa Reel
22              Oklahoma Certified Shorthand Reporter
                        Certificate No. 0344
23              Exp. Date: December 31, 2006

24

25
```



1        IN THE DISTRICT COURT OF OKLAHOMA COUNTY

FILED IN THE DISTRICT COURT

2              STATE OF OKLAHOMA OKLAHOMA COUNTY, OKLA.

3                                          APR 2 8 2006

4    THE STATE OF OKLAHOMA,          )    PAT _____, COURT CLERK
                                     )    By_____
5              Plaintiff,            )         Deputy
                                     )
6    VS.                             )    CASE NO. CF-04-1212
                                     )
7    HOWARD PURIFOR MORRIS, III,     )
                                     )
8              Defendant.            )

9

10                  * * * * * * * *

11

12              TRANSCRIPT OF PROCEEDINGS,

13                  JURY TRIAL,

14              HAD ON APRIL 5, 2006,

15    AND FORMAL SENTENCING HAD ON APRIL 14, 2006,

16       BEFORE THE HONORABLE TWYLA MASON GRAY,

17                  DISTRICT JUDGE.

18

19                  * * * * * * * *

20                  **VOLUME 3 OF 3**

21

22    REPORTED BY:

23    THERESA L. REEL, RPR

24    321 PARK AVENUE, SUITE 201

25    OKLAHOMA CITY, OK  73102

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

**TABLE OF CONTENTS**

VOLUME 3 OF 3

APRIL 5, 2006

PAGE

IN CAMERA RECORD WITH---------------------------   5
DEFENDANT JEREMY NICHOLSON

IN CAMERA INDIVIDUAL VOIR DIRE-------------------   19

STATE RESTS ------------------------------------   73

DEFENDANT DEMURS -------------------------------   73

**HOWARD MORRIS TESTIFIED:**

    Direct Examination ------------------------   74
    By Mr. Box
    Cross-Examination  -------------------------   77
    By Ms. High
    Redirect Examination ----------------------   90
    By Mr. Box

DEFENSE RESTS ----------------------------------   91

RECORD ON INSTRUCTIONS -------------------------   93

STATE'S FIRST CLOSING ARGUMENT BY MS. HIGH ------   96

DEFENDANT'S CLOSING ARGUMENT BY MR. BOX ---------  125

STATE'S FINAL CLOSING ARGUMENT BY MR. GUHL ------  141

ALTERNATE JUROR SWORN --------------------------  169

VERDICT ----------------------------------------  169

JURY POLLED ------------------------------------  170

COURT ADJOURNED --------------------------------  172

1  APRIL 14, 2006

2  FORMAL SENTENCING -------------------------------  172

3  CERTIFICATE OF THE COURT REPORTER ---------------  175

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS - EXHIBITS

### EXHIBITS OFFERED BY THE STATE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 44 | DEFENDANT'S ID | 80 | 80 |
| 43 | DEFENDANT'S CLOTHING | 86 | 87 |

### COURT'S EXHIBITS

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 3 | TRIAL ABSTRACT | 94 | |
| 4 | NOTE FROM JURY | 166 | |

1        (Thereupon, on April 5, 2006, with all counsel present

2        and the jury seated in the box, the following was had

3        in open court.)

4        THE COURT:   Good morning.   Let me go ahead and

5   begin the record then back in Morris and our appellate

6   counsel have rejoined us today and if you all want to step

7   forward, you've told me that you need to make a record,

8   so...

9        MR. LOHMANN:   Your Honor, we had a chance to read

10  the State's case last night of which we didn't have an

11  opportunity yesterday.

12       THE COURT:   Okay.

13       MR. LOHMANN:   In that case we would like to

14  re-urge that he does have a fifth amendment right but in

15  that case he had testified at a plea hearing --

16       MS. MCCARTY:   Allocution hearing.

17       MR. LOHMANN:   -- which was in his own case, which

18  was similar to our client who has testified previously in

19  this case.   He didn't have the right to not testify in his

20  own case but here we have a co-defendant situation and it's

21  more like the case of **United States v. Albert**, a 1985 case

22  from the 1st Circuit, in which the Court did hold that he

23  could not be forced to testify in a co-defendant's trial,

24  even though he had testified in a previous trial.   And that

25  absent a grant of immunity from the State, any assurance of

1   not being further prosecuted is not worth much, I guess

2   according to that case.

3           So, we would just like to re-urge that this Court

4   allow our client not to testify under his fifth amendment

5   rights.

6           MS. MCCARTY:  And, Your Honor, if I may add,

7   yesterday when we were here at the bench, the Prosecutor did

8   say if he testifies any differently than he did at his trial

9   he's subject to perjury.  That's a new crime with which he

10  has not yet been charged, so, in the **Albert** case they did

11  reference that they could not make him take the stand even

12  though he had testified, I think at some hearing, I'm not

13  sure it was at trial, because they said he could be subject

14  to perjury in that specific case.

15          THE COURT:  Well, I haven't had a chance to read

16  this case and you've handed it to me with a few things

17  highlighted and I appreciate that.

18          MR. LOHMANN:  It was cited in the motion but I

19  know you probably didn't have a chance to look it up.

20          THE COURT:  I did not, sir, but thank you.  You

21  know, I'm still of the opinion that he's waived that.

22  Further, I'm going to tell you that with few exceptions most

23  of the lawyers that I deal with are very honorable and I

24  would not believe that the State of Oklahoma would prosecute

25  Mr. Nicholson, although I think clearly that if he perjures

```
 1    himself he ought to be subject to perjury, although I've
 2    never seen this DA's Office file perjury charges even in
 3    cases where I have begged them to file perjury, so I'm not
 4    really concerned about that.  So, I appreciate the law and I
 5    appreciate your being here this morning.  I believe at this
 6    point I am going to stand on my previous ruling.
 7            MR. LOHMANN:  One other thing, Your Honor.  I'd
 8    just like to reiterate that we've advised the client that
 9    the ramifications of whatever decision he makes, pro or con
10    and you know, we have not advised him to disobey the Court's
11    order.  The decision is up to him.
12            THE COURT:  Okay.  Thank you very much.
13            MR. BOX:  Your Honor, I need to make a record.
14            THE COURT:  Well, come on down.
15            MR. BOX:  Your Honor, for the record, the Court
16    advised us after you took the bench after the afternoon
17    break yesterday afternoon, around the 4:00 hour, that you
18    had been inadvertently contacted by at least one of the
19    jurors or maybe a couple of them.
20            THE COURT:  What I advised you to was that the
21    bailiff had told me that they had expressed to her a
22    concern.
23            MR. BOX:  Excuse me.  I'm not trying to misstate
24    it.
25            THE COURT:  Right.  I'm clarifying for you.
```

1          MR. BOX:  Sure.

2          THE COURT:  And then based on that I went -- we

3    had them in the jury deliberation room because we had been

4    doing some things in the courtroom that they should not be

5    present for.

6          MR. BOX:  All right.  And I'm not misstating, it

7    caught me flatfooted yesterday.  You called us to the bench

8    and advised us that there had been an issue.  After I've had

9    time to think about this, Your Honor, I'm disturbed that the

10   jury would have this concern and that they would have this

11   contact with the Court because, Your Honor, it indicates to

12   me that they have collectively or at least individually

13   talked about my client.

14         And it has not gone to charge, it has not gone to

15   the deciding stage and by the very nature of their concern

16   that they expressed to the Court, they were concerned.  The

17   gist I get and the Court can correct me, but the gist was

18   that they were concerned that my client was taking notes in

19   voir dire and because of the gang-related allegations in

20   this case, they were concerned for their safety or any

21   repercussions that could be made upon them as a result of

22   this case.

23         It is my understanding and I'm going to go to the

24   Court because I'm not going to misstate the Court, and it

25   happened quick yesterday, but the gist of it was, my

```
 1   understanding, the Court had relayed to them that you had
 2   never seen anything like that happen in your experience.
 3   But you can correct me.  I'm not putting words in your
 4   mouth.  I really don't remember.  It was a daze to me.
 5              THE COURT:  I understand.  Why don't you let me
 6   repeat it for you.
 7              MR. BOX:  Sure.
 8              THE COURT:  I told them that in my history with
 9   the court I am unaware of any instance where a juror has
10   been harassed by witnesses or family or friends.
11              MR. BOX:  Okay.
12              THE COURT:  And that I knew that being in a trial
13   was stressful but that we were all in the courtroom all the
14   time and that at the conclusion of the trial we usually have
15   the deputies escort them to their cars, and that I was
16   pretty certain that any note taking that the Defendant was
17   doing during voir dire would have been communication with
18   you and not something that he was trying to memorialize to
19   keep with him.
20              MR. BOX:  Okay.  Well, in light of that, Your
21   Honor, still, I stand by my concerns because I believe that
22   by them talking about my client before they even get the
23   charge to deliberate, that that's a violation of their oath.
24              Number two, by the very nature of the concern they
25   expressed, it shows to me that I'm facing an unlevel playing
```

11

1   field now because they have some sort of either imagined
2   fear or real fear or whatever you want to call it from my
3   client.

4       They're concerned about my client because they
5   were concerned that somehow he would know who they are or
6   where they live or that there was consequences.

7       THE COURT:  What are you asking for?

8       MR. BOX:  I'm asking for a mistrial.  Or -- I'm
9   asking for a mistrial because I believe we have an unlevel
10  playing field now.  I believe they've violated their oath as
11  jurors because they've talked about my client and I'm moving
12  for a mistrial.  I don't think I can get a fair trial -- my
13  client get a fair trial.

14      I'm concerned.  I'm sincerely concerned after
15  thinking about this last night.  I haven't got anybody's
16  counsel.  I just -- it caught me flatfooted yesterday.  We
17  were at the end of the day and then after I thought about it
18  more -- I didn't tell my client about it until this morning,
19  quite frankly, because I didn't want to put fear into him
20  but I thought about this and I just don't think the jury can
21  be fair.

22      They've expressed a concern, a fear for my client,
23  and I don't think that fear can be overcome.  And I believe
24  because of the way they've expressed it, they've talked
25  about my client, obviously.  And they're instructed not to

 1   talk about my client.  They can't talk about my client until

 2   this case is submitted to them.

 3       So they've already got a preconceived idea about

 4   my client even before he takes the witness stand, a

 5   preconceived idea before they even hear all the State's

 6   case.

 7       THE COURT:  Well, you're kind of repeating

 8   yourself now.  So is there anything new that you need to put

 9   into the record?

10       MR. BOX:  Well, besides that, Your Honor, then I

11   would ask for individual voir dire of these jurors about

12   what was talked about, what was discussed, and I move for a

13   mistrial.

14       THE COURT:  Okay.  Do you want to be heard in

15   response to that?

16       MS. HIGH:  Well, yes, Judge.  The mistrial is

17   absolutely not necessary.  There's nothing about the

18   question that they asked that indicates they've discussed

19   the issue in this case, which is whether or not this

20   Defendant committed the crime with which he's charged.

21       I don't think we can infer anything from what

22   they've said other than they had some concerns that he was

23   taking notes.  That in no way indicates that they're

24   deliberating the case.

25       My memory is that this happened well before 4:00

```
 1    yesterday.  I mean, we were finished well -- we finished
 2    early yesterday.  And at the time that the Court brought
 3    this to our attention, you told us exactly what you had
 4    done, nobody raised any objection, nobody asked for a
 5    mistrial, and I can't imagine what happened overnight to
 6    make this different.
 7           But there's nothing about what -- I mean, the jury
 8    didn't communicate with you, they went to your bailiff and
 9    you responded to their concern.  There's nothing
10    inappropriate about that and a mistrial is not necessary.
11                THE COURT:  Okay.
12                MR. BOX:  And then, Your Honor, if I may be heard
13    one more time.  In light of what the State just said, Your
14    Honor, we are assuming or we are reading into what the jury
15    has said and then that would give more light to an
16    individual voir dire to find out individually what they've
17    discussed, what their fears were.
18                THE COURT:  Okay.  Okay.  Okay.
19           The first thing that I'm going to do this morning
20    is try to deal with the issue of Mr. Nicholson and get you
21    guys, at least if you want to sit in the gallery you're free
22    to do that.  You can come back often, as often as you'd
23    like, bring your own cushion, but I want to try to deal with
24    this issue so other lawyers can get on their way and then
25    I'm going to deal with this issue.
```

14

```
1          MR. BOX:  Yes, ma'am.

2          THE COURT:  Good morning, Mr. Nicholson.

3          DEFENDANT NICHOLSON:  Good morning.

4          THE COURT:  Mr. Spanich, do you need a moment with

5     Mr. Nicholson before we begin?

6          MR. SPANICH:  Your Honor, I don't, only because

7     when I filed the Notice Of Intent To Appeal, I was allowed

8     to withdraw, so technically I'm not his lawyer.  So I don't

9     think I really should talk to him unless I've been appointed

10    to be counsel.

11         THE COURT:  Okay.  Well, essentially how this

12    comes down is that when I have ruled that his fifth

13    amendment right does not apply and the State of Oklahoma was

14    on the record yesterday saying that nothing that he

15    testifies to would be used against him in a future

16    proceeding even if his case is reversed and comes back with

17    the exception that we all expect him to testify truthfully

18    and, so, based on that, then appellate counsel believed that

19    it was no longer their issue but perhaps trial counsel's

20    issue.  So, they have very neatly served the ball back to

21    you and if you want to take a moment to visit with

22    Mr. Nicholson, we talked to him yesterday.  He basically

23    advised me that if it wasn't a fifth amendment right that he

24    just didn't know if he was going to cooperate.  He doesn't

25    have anything to lose and I told him that I would hold him
```

1    in contempt and that I expected him to be here this morning

2    and be prepared to testify truthfully.  So, if you want to

3    take a moment with him, I will allow you to do that.

4          Or not.

5          MR. SPANICH:  Not to quibble with the Court, I'm

6    not his lawyer and I mean, Mr. Nicholson and I get along, so

7    it has nothing to do with that, but I'm not his lawyer at

8    this point in time, so I don't think I can advise him of

9    anything.

10          THE COURT:  Okay, well, I'm appointing you as his

11    lawyer.

12          MR. SPANICH:  Okay.  Then I would like to talk to

13    him for a moment.

14          THE COURT:  All right.  Go for it.  Do you guys

15    have anything to share with me this morning, any law or

16    anything?

17          MS. HIGH:  No.  No.

18          THE COURT:  Okay.

19       (Brief pause in proceedings.)

20          THE COURT:  Yes, Mr. Spanich.

21          MR. SPANICH:  On behalf of Mr. Nicholson, I would

22    state to the Court that it is his desire to not testify.

23    Just in this brief moment I've explained to him what I

24    believe would be the pros and cons of that and have advised

25    him that he needs to exercise his choice, that I am not

1   telling him to disobey the Court's order and I specifically

2   told him that and he understands that.  However, he thinks

3   that, well, he didn't say, but I explained to him that the

4   possibility of being charged with perjury versus the

5   possibility of being held in contempt, that it's his desire

6   to remain silent or not testify in this matter.

7           THE COURT:  Mr. Nicholson, stand up, please.  And

8   raise your right hand.

9       (Witness sworn.)

10          THE COURT:  Please be seated.

11          Ms. High, my understanding is is that the first

12  question that you intended to ask Mr. Nicholson was if he

13  was at the apartment complex on the evening of

14  February 20th, 2004, is that correct?

15          MS. HIGH:  Yes.

16          THE COURT:  Mr. Nicholson, were you at the

17  apartment complex on February 20th, 2004?

18          DEFENDANT NICHOLSON:  I plead the fifth, ma'am.

19          THE COURT:  You're not entitled to plead the fifth

20  amendment, sir.  That does not apply to you in this case.

21  Were you at the apartment complex on February the 20th?

22          MR. SPANICH:  Just one second, Your Honor.

23      (Brief pause in proceedings.)

24          THE COURT:  Mr. Nicholson, were you at the

25  apartment complex on February 20, 2004?

```
 1                    MR. NICHOLSON:  I don't want to testify, ma'am.

 2                    THE COURT:  I'm holding you in contempt.

 3                    Mr. Nicholson, was Howard Morris present that

 4     night?

 5                    DEFENDANT NICHOLSON:  I plead the fifth.

 6                    THE COURT:  You're not entitled to the protection

 7     of the fifth amendment, sir.

 8                    DEFENDANT NICHOLSON:  I don't want to testify.

 9                    THE COURT:  I'm holding you in contempt.

10                    When you previously testified that you were with

11     NC and you described the Defendant as NC, is the Defendant

12     the person that you referred to as NC?

13                    DEFENDANT NICHOLSON:  I don't want to testify.

14                    THE COURT:  I'm holding you in contempt.

15                    Sir, you saw the victim at the apartment complex

16     that night, is that correct?

17                    DEFENDANT NICHOLSON:  I don't want to testify.

18                    THE COURT:  I'm holding you in contempt.

19                    Sir, you saw the Defendant in an altercation with

20     the victim, is that correct?

21                    DEFENDANT NICHOLSON:  I don't want to testify.

22                    THE COURT:  I'm holding you in contempt, sir.

23                    And was the Defendant with you when you went to

24     the Lamplighter Club that night?

25                    DEFENDANT NICHOLSON:  I don't want to testify.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

18

1    THE COURT:  I'm holding you in contempt on that.

2    Sir, direct contempt is punishable with up to six

3    months in county jail and I'm holding you in contempt

4    separately on each of those questions.  That's a total of

5    one, two, three years flat in the Oklahoma County Jail.

6    Is there anything from counsel?  Three years flat.

7    MR. SPANICH:  Your Honor, I believe that a direct

8    contempt -- and I haven't looked at the statute so this is

9    just completely off of memory so I may be wrong -- but I

10   believe the hearing on contempt requires or holding him in

11   contempt requires a hearing on that issue.

12   THE COURT:  Well, I'll tell you what.  I believe

13   that his contemptuous behavior in the courtroom is

14   punishable directly and this is not indirect contempt.  I

15   explained to him yesterday his options and how he might

16   purge that.  He was very specific with me yesterday that

17   this just all was a matter of whether he wanted to or not

18   and that he had already gotten life in prison so he had

19   nothing to lose.  He has the ability to purge this with his

20   truthful testimony.  If he does not choose to do that, then

21   as far as I'm concerned, he's going to serve the direct

22   contempt.  So, at any time that Mr. Nicholson wants to purge

23   that while I'm still in trial and it's still relevant I'm

24   happy to hear from him.  Otherwise...

25   MR. SPANICH:  So we need to inform the Court then

19

1    I guess that we'll file a Notice of Intent to Appeal.

2          THE COURT:  Go for it.

3          MR. SPANICH:  Thank you.

4          THE COURT:  Thank you.

5          All right and that does not run at the same time

6    that his other sentence does, so he's going to serve his

7    three years on direct contempt before he gets shipped to

8    DOC.

9          All right.  Counsel, if you will join me in

10   chambers.  First of all, Mr. Box, would you approach,

11   please?

12         MR. BOX:  Yes, Your Honor.

13         THE COURT:  I intend to talk to the jurors

14   individually.  Will you waive your client's presence?

15         MR. BOX:  Yes.

16         THE COURT:  Then I would ask you all to go back

17   into my office and we're going to set up in there.

18      (Thereupon, with all counsel present, the following was

19      had in the Court's chambers.)

20         THE COURT:  I want to talk to Mr. Lee first.

21         THE BAILIFF:  You want to go in numerical order?

22         THE COURT:  I'm going to go in seating order.

23         THE BAILIFF:  That's what I meant.

24         THE COURT:  And for the record we're in chambers,

25   counsel is present.  Mr. Box has waived the presence of his

```
 1    client and we're going to talk to the jurors individually
 2    about their conversation in chambers yesterday and about
 3    whether or not they can be fair and impartial jurors in this
 4    case.
 5         (Juror Lee entered.)
 6         THE COURT:  Good morning, Mr. Lee.  Would you have
 7    a seat?  It may seem a little intimidating to be called in
 8    here and we're all sitting here but I want you to relax
 9    because you're not in trouble or anything.  We just have a
10    couple of questions for you.
11         JUROR LEE:  Okay.
12         THE COURT:  Yesterday afternoon I was -- a message
13    was relayed to me by the bailiff.  I guess some of the
14    jurors had expressed some concerns and then I came in and
15    visited with you guys.  Do you remember that?
16         JUROR LEE:  Yes.
17         THE COURT:  Mr. Lee, did the jurors talk about
18    this case inside the jury room yesterday?
19         JUROR LEE:  No.
20         THE COURT:  Okay.  Do you have concerns about your
21    safety about this case?
22         JUROR LEE:  Not me.
23         THE COURT:  Okay.  Do you think that anything that
24    has gone on would affect your ability to be fair and
25    impartial in this case?
```

1              JUROR LEE:  I can be fair.

2              THE COURT:  Okay.  Do you feel like you have been

3    influenced against the Defendant because of some of the

4    concerns of the jurors?

5              JUROR LEE:  No.

6              THE COURT:  Okay.  Thank you.  Do you have any

7    questions?

8              MR. BOX:  Sure.

9              Mr. Lee, this question came up yesterday

10   afternoon, is that correct?

11             JUROR LEE:  Yes.

12             MR. BOX:  And was it brought by one juror or was

13   it brought collectively by several jurors?

14             JUROR LEE:  I think it was several of them.

15             MR. BOX:  And was it male or female, if you

16   recall?

17             JUROR LEE:  It was a male that went out to the

18   bailiff.

19             MR. BOX:  And was -- were you part of that

20   discussion about the concern?

21             JUROR LEE:  No.  I was just in the room.

22             MR. BOX:  How many people were involved in this

23   discussion about the concern?

24             JUROR LEE:  I'm not sure.

25             MR. BOX:  More than one, obviously?

1          JUROR LEE:  Yes.

2          MR. BOX:  And what was your memory of what was

3    being discussed in your presence about this?

4          JUROR LEE:  They were just talking how he was

5    writing down notes.

6          MR. BOX:  And what was their concern about that?

7          JUROR LEE:  That he would probably take that out

8    of the room.

9          MR. BOX:  And then what else about taking it out

10   of the room?  Why were they concerned?

11         JUROR LEE:  That he could probably give it to

12   somebody else and they could track us down.

13         MR. BOX:  So they were basically expressing some

14   fear?

15         JUROR LEE:  Yes.

16         MR. BOX:  And they were concerned about their

17   safety; would that be a fair statement?

18         JUROR LEE:  Yes.

19         MR. BOX:  And they let this be known among all of

20   you?

21         JUROR LEE:  Yes.

22         MR. BOX:  You just weren't one of the ones that

23   were having this conversation?

24         JUROR LEE:  Right.

25         MR. BOX:  And you weren't one of the ones that

```
 1   asked to relay that to the Judge?

 2            JUROR LEE:  No.

 3            THE COURT:  Okay.  Thank you very much for your

 4   time.  I'm going to be talking to all of the jurors

 5   individually and I'm going to have Tina put you in our

 6   conference room to wait on us until we can get finished.

 7   Thank you very much, Mr. Lee.

 8       (Juror Lee exited chambers.)

 9            THE COURT:  I'm going to ask you to kind of pare

10   down your questions.  I don't think there's any need to

11   repeat all of this stuff.

12            MR. BOX:  Okay.

13            THE COURT:  Let me be clear about this.  I want

14   your client to get a fair trial.

15            MR. BOX:  I understand.

16            THE COURT:  I want to make sure that everybody is

17   treated fairly so that when a verdict is returned we all

18   have confidence in it.

19            MR. BOX:  I understand.

20            THE COURT:  Okay.

21       (Juror Carrender entered.)

22            THE COURT:  Good morning, Ms. Carrender.  Please

23   have a seat.  I'm sure this looks like you're being called

24   to the principal's office and we're all in here but I want

25   you to relax.  Nobody is in trouble or anything.
```

24

1              JUROR CARRENDER:  Okay.

2              THE COURT:  We are creating a record and we want

3     to talk to you a little bit about, I guess, the discussion

4     that went on in the jury room yesterday.  You remember that

5     someone talked to the bailiff and then I came in and visited

6     with you guys for a moment?  Do you remember that?

7              JUROR CARRENDER:  Uh-huh.

8              THE COURT:  Were you one of the people that

9     expressed a concern?

10             JUROR CARRENDER:  No.

11             THE COURT:  Okay.  Do you have any concerns about

12    your safety in regard to this trial?

13             JUROR CARRENDER:  No, not really.

14             THE COURT:  Was this case discussed by the jurors

15    in the jury room yesterday?

16             JUROR CARRENDER:  No.  No.  We were only -- well,

17    not we, because I didn't really say anything.  I was just

18    sitting there.  It was just brought up that I hope no one --

19    I mean, not necessarily any one particular person, just that

20    we were saying a lot of personal things with a lot of people

21    in the room as far as -- I mean, I'm not married or have

22    kids so -- I mean, I didn't really have to give a whole lot

23    of information, but some of the people were concerned

24    because they had to, you know, say where their spouses

25    worked and where they worked and their spouse's name, things

1  like that.

2          It wasn't really any, you know, in particulars,

3  they just were concerned that their information was out

4  there.

5          THE COURT:  So it was a discussion more about the

6  process of the voir dire that went on in this case?

7          JUROR CARRENDER:  Yes.

8          THE COURT:  Ms. Carrender, can you be fair and

9  impartial in this case?

10          JUROR CARRENDER:  Uh-huh.

11          THE COURT:  Do you have further, Mr. Box?

12          MR. BOX:  Just a couple of questions.

13          So how many jurors were talking about this or were

14  concerned about my client writing notes, I think that's what

15  basically the question was?

16          JUROR CARRENDER:  Maybe two or three people.

17          MR. BOX:  And what do you recall they said about

18  that?

19          JUROR CARRENDER:  Just that they had noticed that

20  he was taking notes and they were concerned about maybe that

21  he had written down some information of theirs while we were

22  giving our information.

23          MR. BOX:  So they had expressed some fear that

24  they were kind of fearful about that?

25          JUROR CARRENDER:  Yeah, just worried for their

26

1    families, just kind of curious as to what information would

2    be able to be taken from the courtroom.

3        THE COURT:  And I said yesterday, and let me

4    repeat, you know, most of the time Defendants are writing

5    down communications with their attorneys.  It has nothing to

6    do with the actual information that's being given in the

7    courtroom.

8        And, in fact, I'm even more certain today that the

9    Defendant didn't write anything down to take with him to

10   memorialize an event, you know, that he would use later.

11       So do you have any concerns at all about being

12   fair and impartial in this case?

13       JUROR CARRENDER:  No.

14       THE COURT:  All right.  Thank you very much.

15       (Juror Carrender exited.  Juror Townsend entered.)

16       THE COURT:  Good morning.  Please have a seat.  I

17   know this looks pretty intimidating with us all sitting here

18   waiting for you to walk in.  I don't want you to be nervous

19   about this.  You're not in trouble.  I just need to talk to

20   everybody individually and this seemed like a better way to

21   do this than in the courtroom.

22       You remember, Ms. Townsend, yesterday, you

23   remember that someone came out and talked to the bailiff and

24   then I came into the jury room in response to that?  Do you

25   remember that?

```
 1              JUROR TOWNSEND:  Yes.

 2              THE COURT:  And I want to know, was this case

 3    discussed in the jury room?

 4              JUROR TOWNSEND:  No, huh-uh.  No.

 5              THE COURT:  So people didn't talk about the facts

 6    of the case?

 7              JUROR TOWNSEND:  No, huh-uh, not at all.

 8              THE COURT:  Were you one of the people that had a

 9    concern about the Defendant taking notes during voir dire?

10              JUROR TOWNSEND:  No.  It was brought up but I

11    can't remember who brought it up and it was just one of

12    those -- I noticed that but that was it.

13              THE COURT:  Okay.  You didn't participate in the

14    discussion?

15              JUROR TOWNSEND:  Huh-uh.  No.

16              THE COURT:  Do you have any concerns about that?

17              JUROR TOWNSEND:  No.  No, I don't think so.

18    Huh-uh.

19              THE COURT:  Do you think that you can be fair and

20    impartial in this case?

21              JUROR TOWNSEND:  Yes.

22              THE COURT:  And you understand the admonishment

23    and what that means?

24              JUROR TOWNSEND:  Uh-huh, yes.

25              THE COURT:  Do you have a question, Mr. Box?
```

28

```
 1              MR. BOX:  If I understand correctly then, at least
 2     a couple of jurors expressed some apprehension about my
 3     client taking notes; is that what kind of happened?
 4              JUROR TOWNSEND:  Yes.
 5              MR. BOX:  And they verbalized it with the whole
 6     panel, basically they were saying, "Did you see him taking
 7     notes"?  Tell me what happened.
 8              JUROR TOWNSEND:  That's pretty much what I
 9     remember, just a couple of people saying that they were
10     concerned that he was taking notes during.
11              MR. BOX:  Did they express they had a fear with
12     that, about that apprehension?
13              JUROR TOWNSEND:  Yes.  Just concerned that he may
14     possibly have written down information concerning names
15     or -- not addresses, but places of where they worked and
16     stuff like that.
17              MR. BOX:  And was it -- a concern was, and I'm not
18     putting words in your mouth, you just tell me, was the
19     concern that they thought there might be some retaliation or
20     some harm done to their family?
21              JUROR TOWNSEND:  I don't think any of that was
22     really discussed.  I think it was just the concern that he
23     may have been writing that information down.
24              MR. BOX:  Did they express why they had concern
25     about him in particular because he's the Defendant or
```

```
 1   because of the charge, or was there anything about the

 2   evidence that caused them concern?

 3              JUROR TOWNSEND:  Not that I can recall, huh-uh.

 4              THE COURT:  I expressed yesterday but let me

 5   express again, most of the times Defendants are writing

 6   questions or comments to their attorney.  It's communication

 7   between the two of them.  It's not to memorialize something

 8   to take out of the courtroom.  And do you believe you can be

 9   fair and impartial in this case?

10              JUROR TOWNSEND:  Yes, ma'am.

11              THE COURT:  All right.  Thank you very much.

12   We'll see you in a few minutes.

13              JUROR TOWNSEND:  Okay.

14       (Juror Townsend exited.  Juror Alexander entered.)

15              THE COURT:  Have a seat Ms. Alexander.  I know

16   that this looks a little bit like being called into the

17   principal's office and that's not what's going on here, but

18   I have to talk to all of the jurors individually and this

19   just seemed like a better way to do it it than going into

20   the courtroom.  So you're not in trouble or anything.

21              JUROR ALEXANDER:  Okay.

22              THE COURT:  Do you remember yesterday afternoon,

23   Ms. Alexander, I guess someone had talked to my bailiff and

24   expressed a concern and then I came into the jury room and

25   talked to you all for a minute?  Do you remember that?
```

1        JUROR ALEXANDER:  Yes.

2        THE COURT:  Were you guys talking about this case

3   in the jury room?

4        JUROR ALEXANDER:  No.  I think it was just I

5   remember one person just saying that they were a little bit

6   concerned about if the information that we had given, if

7   somebody had written down that information, if they had, if

8   they were able to access that information after the trial

9   and there was no other conversation about, I mean that was

10  pretty much the only thing I remember being said, was

11  basically that if something were to come about, we gave a

12  lot of personal information and that they were curious how

13  that personal information could be used.

14       THE COURT:  Okay.  Who was the person that had

15  that concern initially, do you remember?

16       JUROR ALEXANDER:  I don't know the gentleman's

17  first name but his last name is Ryan, I believe, or he's the

18  one I remember bringing it up and I believe --

19       THE COURT:  Is he the guy that sits next to you?

20       JUROR ALEXANDER:  -- that's in the chair to the

21  right of me.

22       THE COURT:  Okay.  Ms. Alexander, are you

23  concerned for your safety?

24       JUROR ALEXANDER:  No.

25       THE COURT:  Okay.  Have you formed an opinion as

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1   to whether or not the Defendant is guilty or not guilty?

 2             JUROR ALEXANDER:  No, I have not.  I mean, I

 3   presume he's still innocent because I haven't heard all the

 4   facts of the case.

 5             THE COURT:  Okay.  Is there anything that's

 6   happened that you think would affect your ability to be fair

 7   and impartial in this case?

 8             JUROR ALEXANDER:  No, ma'am.

 9             THE COURT:  All right.  And you can be a fair and

10   impartial juror?

11             JUROR ALEXANDER:  Yes, ma'am.

12             THE COURT:  Okay.  Mr. Box?

13             MR. BOX:  Just a couple of questions.  You said

14   the gentleman to your right was the one that was

15   participating in the conversation.

16             THE COURT:  That's Mr. Ryan.

17             MR. BOX:  Mr. Ryan.  Was there any other

18   individuals joining in on this concern?

19             JUROR ALEXANDER:  I think maybe there would have

20   been, yeah, I'm kind of curious about that, but to be quite

21   honest with you, I'm not certain who said it.

22             MR. BOX:  And was there some statements made that

23   somebody was a little apprehensive or maybe a little fear

24   about possibility of information being given out?

25             JUROR ALEXANDER:  Basically the exact thing that I
```

32

1    said, basically was just if somebody were able to take that

2    information, he was curious how that information could be

3    used or -- I don't necessarily know that he said concerned.

4         MR. BOX:  Okay.

5         JUROR ALEXANDER:  But he was just curious why we

6    gave all that personal information.

7         THE COURT:  I said yesterday and I want to repeat

8    again that most of the time when Defendants write it's

9    because they're communicating with their lawyers.  Okay?

10   And it's not because they're memorializing something that

11   they're going to take out of the courtroom.

12        JUROR ALEXANDER:  I agree.  And I assumed that

13   that was the reason why.

14        THE COURT:  And you understand the admonishment

15   that I give?

16        JUROR ALEXANDER:  Yes.

17        THE COURT:  And you understand the reason I give

18   that is so that people don't discuss the case until they

19   have all the facts, all the evidence, and all the law that

20   applies?

21        JUROR ALEXANDER:  Right.

22        THE COURT:  Okay.  Do you have anything else,

23   Mr. Box?

24        MR. BOX:  No.

25        THE COURT:  Thank you very much.  We'll see you in

1  a minute.

2      (Juror Alexander exited.  Juror Ryan entered.)

3          THE COURT:  Good morning, sir.  Please have a

4  seat.

5          THE BAILIFF:  This is the gentleman that

6  approached me to begin with.

7          THE COURT:  You're not in trouble or anything,

8  nobody is getting demerits in here, but we have a few

9  questions that we need to ask you and we thought it was

10  better to do it in the office rather than in the courtroom.

11          JUROR RYAN:  Sure.

12          THE COURT:  Yesterday afternoon you talked to the

13  bailiff and then I came in and visited with you guys.

14          JUROR RYAN:  Right.

15          THE COURT:  Did you have a concern about the

16  Defendant?

17          JUROR RYAN:  Well, my only concern was -- and, I

18  mean, we're all still under the impression that everybody is

19  innocent until proven guilty, but, you know, when we were

20  going through all of those questions about wife's name and

21  where she works and kids and all of those things, I noticed

22  that the Defendant was -- had a legal pad and was taking

23  notes.  And I'm not trying to say that he is guilty or he

24  isn't, you know, but it was concerning that a person who is

25  accused or thought that there's a First Degree Murder and

34

```
 1   there have been some things that just watching testimony and
 2   everything it's kind of becoming evident that there are
 3   people that possibly could be involved with gangs in the
 4   whole scenario.  You know, I don't know who exactly is.
 5            And then there was a gentleman in the courtroom
 6   yesterday that -- you know, the girl that testified,
 7   Demetria, her boyfriend was wearing all red and that's a
 8   Blood's color and they were out in the hallway after.
 9            And, so, I don't know, I just started having -- I
10   guess my mind started thinking about a lot of things.  Hey,
11   here is all this personal information that just went out and
12   I'm listed in the phone book.  It's not like he can't find
13   me.
14            But my concern was, you know, if the person is
15   innocent or guilty or would there be a side that decided
16   that they wanted to retaliate, you know, either way.
17            THE COURT:  Right.
18            JUROR RYAN:  And you start thinking when I was in
19   my 20s, I would have probably said, "Bring it on," but now
20   that you have two kids you go, "Man, just a little bit of
21   concern."
22            THE COURT:  Well, I think that that shows that
23   you're observant.  I said yesterday -- I would repeat
24   again -- that most of the time when Defendants are taking
25   notes they're only communicating with their lawyers.
```

```
 1              JUROR RYAN:  Right.

 2              THE COURT:  And I guess, Mr. Ryan, I want to make

 3    sure, was this case discussed?  Was the facts of this case

 4    discussed amongst the jurors yesterday?

 5              JUROR RYAN:  No.  We have tried to go out of our

 6    way to not -- you know, somebody will say something about

 7    how you got flustered or you got flustered, an attorney or

 8    something, but then we quickly realize, oh, my gosh, we're

 9    about to get into a conversation.

10              THE COURT:  And it's difficult because the only

11    thing you have in common at this point is the fact that

12    you're sitting in this courtroom and it's a natural thing

13    and I appreciate your being aware and trying to prevent a

14    problem.

15              JUROR RYAN:  Right.

16              THE COURT:  Do you have an opinion at this point

17    as to whether or not the Defendant is guilty or not guilty?

18              JUROR RYAN:  I do not.  I honestly don't.  And

19    that's -- you know, I was thinking about this last night at

20    about 1:00 in the morning -- that's such a huge thing.  A

21    gentleman is up for possibly losing the rest of his life,

22    you know, in prison and, you know, I think everybody comes

23    into some type of trial situation and they think just throw

24    the book at them or let them off but in real life it's not

25    that simple, you know, and I think that's why I'm observing,
```

```
 1    I think that's why I'm observing --

 2            THE COURT:  Yes, we do know.

 3            JUROR RYAN:  -- the people out and the witnesses

 4    and everything and just trying to, you know.  But, no, at

 5    this point I do not have an opinion one way or the other.

 6            THE COURT:  Can you be a fair and impartial juror

 7    in this case?

 8            JUROR RYAN:  Yes, I think I can.  You bet.

 9            THE COURT:  You understand the admonishment it

10    sounds to me.

11            JUROR RYAN:  Yes.

12            THE COURT:  And do you have any questions about

13    that?

14            JUROR RYAN:  No.

15            THE COURT:  Mr. Box?

16            MR. BOX:  Mr. Ryan, I have just a couple of

17    questions and this is just a comfortable setting.

18            JUROR RYAN:  Yes.

19            MR. BOX:  Is it my understanding you were the one

20    that initially brought it up.  I know you were the one that

21    went to the bailiff.  Are you the one that expressed some

22    concern about some observations that you had in the

23    courtroom?

24            JUROR RYAN:  We didn't talk about observations in

25    the courtroom, I was talking with another juror across the
```

```
 1   table and she's a blond girl.  I can't remember what seat
 2   she's sitting in.  But, you know, I said, "I just am a
 3   little concerned all that personal information."  You know,
 4   I said.  And she voiced the same opinion and then there were
 5   a couple of -- three other people that said, "Yeah, it is
 6   kind of concerning what happens on that."
 7            And so there were probably not more than three or
 8   four, but there were three or four.  But at that point I
 9   said, "Well," you know, somebody said, "Well, we can talk to
10   the bailiff if you have any questions."  I said, "Well,
11   maybe we should ask her, maybe it's a concern."  And so I
12   got up and asked her outside.
13            MR. BOX:  Was there any fear described back there?
14   I mean, obviously there is maybe some apprehension.  I'm not
15   putting words in your mouth, but it was a concern big enough
16   that you asked a question, correct?
17            JUROR RYAN:  Correct.
18            MR. BOX:  I'm not putting words in your mouth.
19            JUROR RYAN:  Right.  Right.  Right.
20            MR. BOX:  Was there fear described back there in
21   the jury room?
22            THE COURT:  Well, excuse me.  Because what I've
23   heard you say, Mr. Ryan, is not that it was just about the
24   Defendant, it was about the totality of all of the people in
25   the courtroom and the fact that some of them were dressed in
```

1    a way that might --

2            JUROR RYAN:  Might.

3            THE COURT:  -- might mean that they were gang

4    members.

5            JUROR RYAN:  Right.  My fear is not that the

6    Defendant would retaliate.  You know, it was a total fear of

7    if the Defendant is innocent until proven guilty, then do

8    the people who supposedly were mad at him, you know what I

9    mean --

10            MR. BOX:  Uh-huh.

11            JUROR RYAN:  -- would then be mad.  And it's

12    probably farfetched and it's probably a conspiracy theory

13    small bit, but it's not the Defendant per se, it was the

14    whole situation.

15            THE COURT:  I have to tell you, Mr. Ryan, that at

16    the beginning of the trial I tell you all that if you have a

17    problem or a concern that we're happy to deal with it.  I

18    invite that, right?

19            JUROR RYAN:  Right.

20            THE COURT:  And I appreciate the fact that you

21    told the bailiff so that we could address it.

22            JUROR RYAN:  Sure.

23            THE COURT:  And hopefully make you all more

24    comfortable.  I think that when you're more comfortable

25    you're able to listen better to the evidence.

```
1              JUROR RYAN:  Right.

2              THE COURT:  And to make a decision that's fair and

3    impartial.

4              Do you have anything further, Mr. Box?

5              MR. BOX:  No.

6              THE COURT:  Thank you very much, sir.  We'll see

7    you in a few minutes.

8         (Juror Ryan exited.  Juror Gilbert entered.)

9              THE COURT:  Good morning, sir.  If you'll have a

10   seat.  Nobody is in trouble.  I know this must look pretty

11   intimidating to come in here, Mr. Gilbert.  We're making a

12   report that we thought would be easier to do here than in

13   the courtroom.  Okay?

14             JUROR GILBERT:  Okay.

15             THE COURT:  Yesterday afternoon, I guess Mr. Ryan

16   came out and talked to the bailiff about a concern that was

17   expressed in the jury room and then I came in and visited

18   with you all.  Do you remember that?

19             JUROR GILBERT:  Yes, ma'am.

20             THE COURT:  Were you one of the people that had

21   that concern?

22             JUROR GILBERT:  No.  I have four Catahoolas in my

23   front yard and there ain't no way nobody is coming in.

24             THE COURT:  I like that.

25             JUROR GILBERT:  Best security system there is.
```

```
 1              THE COURT:  I'll bet.  I'll bet.

 2              Do you have any concerns about your security or

 3      safety?

 4              JUROR GILBERT:  No, ma'am.

 5              THE COURT:  Mr. Gilbert, was this case discussed

 6      in the jury room?

 7              JUROR GILBERT:  No.

 8              THE COURT:  All right.  Do you believe that you

 9      can be a fair and impartial juror in this case?

10              JUROR GILBERT:  Yes, ma'am.

11              THE COURT:  All right.  Do you have any concerns

12      about serving as a juror in this case?

13              JUROR GILBERT:  No.

14              THE COURT:  You understand the admonishment that I

15      give about not discussing the case?

16              JUROR GILBERT:  Uh-huh.  We haven't.

17              THE COURT:  All right.  Do you have any questions,

18      Mr. Box?

19              MR. BOX:  Just a couple of questions.  It's

20      become -- we've become aware that of course there was some

21      discussion about note taking by my client at the table.  I

22      guess somebody brought that up.  Is that correct?

23              JUROR GILBERT:  Uh-huh.

24              MR. BOX:  Did anybody express a fear of my client?

25      Did anybody say back there, "Well, gosh, I'm kind of scared
```

1   of Mr. Box's client that he may know where I live," or

2   anything like that?

3            JUROR GILBERT:   No.   Just it come up that could he

4   have possibly remembered or something.   But, I mean, it

5   doesn't bother me.

6            THE COURT:   And you understand that most of the

7   time when Defendants are writing at the table they're

8   communicating with their lawyer?

9            JUROR GILBERT:   Well.   I have no idea.

10           THE COURT:   Okay.

11           MR. BOX:   I understand you have no concern.   It's

12   quite obvious.   Did you hear any concern -- was there any

13   jurors in back in the room that you felt like had some

14   legitimate concern about their welfare?

15           JUROR GILBERT:   No, not really.

16           MR. BOX:   Okay.

17           THE COURT:   Thank you very much.   We're going to

18   have you go back in the conference room.   We're going to see

19   you in a minute.   We're going to visit with the other

20   jurors.   Thank you so much.

21           JUROR GILBERT:   You bet.

22      (Juror Gilmore exited.   Juror Berry entered.)

23           THE COURT:   Good morning, Mr. Berry.   If you'll

24   have a seat.   You're not in trouble.   Nobody is in trouble.

25   I know this looks kind of intimidating but I need to talk to

42

1    each of the jurors individually and we thought this would be

2    easier than going in the courtroom.  Okay?

3                 JUROR BERRY:  Okay.

4                 THE COURT:  Mr. Berry, yesterday afternoon, I

5    guess some concerns were expressed amongst the jurors.

6    Someone approached the bailiff and then I came in and talked

7    to you guys.  Do you remember that?

8                 JUROR BERRY:  Yes, ma'am.

9                 THE COURT:  Mr. Berry, were you guys discussing

10   the case?

11                JUROR BERRY:  No, ma'am.

12                THE COURT:  Okay.  A couple of people, everybody,

13   how did it happen that there was some concern expressed?

14                JUROR BERRY:  I think one person just kind of was

15   concerned about it and they just wanted to ask and see.

16                THE COURT:  Well, I invite questions.  I tell you

17   guys that if you have a problem or a concern, to talk to the

18   bailiff or the clerk because I do want us to take care of

19   you and to make sure that we answer your questions.

20                JUROR BERRY:  Okay.

21                THE COURT:  Mr. Berry, do you have any concern

22   about being a fair and impartial juror in this case?

23                JUROR BERRY:  Not at all.

24                THE COURT:  Do you have any concern for your

25   safety?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

43

```
 1              JUROR BERRY:  Not at all.

 2              THE COURT:  Okay.  Was there anything said

 3    yesterday that you think would interfere with your ability

 4    to be fair and impartial in this case?

 5              JUROR BERRY:  No, ma'am.

 6              THE COURT:  You understand the reason for the

 7    admonishment?

 8              JUROR BERRY:  I do.

 9              THE COURT:  And so far you all have adhered to the

10    admonishment?

11              JUROR BERRY:  Uh-huh, yes, ma'am.

12              THE COURT:  Do you have questions for Mr. Berry?

13              MR. BOX:  Just a couple of questions.

14              Mr. Berry, did you get any indication from any of

15    your fellow jurors that they had a real concern about their

16    safety?

17              JUROR BERRY:  Well, I mean, just the fact that

18    they were concerned, you know, kind of let me know that they

19    may be a little bit worried about this.

20              MR. BOX:  Were they specifically worried about the

21    fact that they saw my client taking notes?

22              JUROR BERRY:  I think it was just that and that we

23    basically put out so much information during the questioning

24    and, you know, they just really wanted to make sure that

25    where they worked and their families and things like that
```

44

 1    were safe.

 2          MR. BOX:  And as far as safe, did they express a

 3    concern that they were in fear of my client?  They thought

 4    my client would do something to them?

 5          JUROR BERRY:  I don't think it was just your

 6    client, I think it was just in general there were so many

 7    people in and out of the courtroom that they just wanted to

 8    make sure that they're just safe in general.

 9          THE COURT:  Okay.  Thank you very much, sir.

10    We're going to ask you to go in the conference room.  I need

11    to talk to the other jurors so we'll see you again in a

12    minute.  Thank you, sir.

13          (Juror Berry exited.  Juror Cotey entered.)

14          THE COURT:  Have a seat.  Mr. Cotey, I know this

15    must look a little intimidating but you're not in trouble

16    and nobody is in trouble and we just needed to visit with

17    everybody individually and thought this would be easier than

18    in the courtroom.  Okay?

19          Do you remember yesterday afternoon somebody came

20    out and visited with the bailiff and then I came in and

21    talked to all of you guys?

22          JUROR COTEY:  Yes.

23          THE COURT:  You remember what I'm talking about?

24    Mr. Cotey, are you one of the folks who expressed any

25    concern about personal safety or security for your family?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1              JUROR COTEY:  No.

 2              THE COURT:  Do you have any concern about that?

 3              JUROR COTEY:  Not really.  It's not a real

 4    concern.  It's just a question that came up and I'm aware of

 5    it.

 6              THE COURT:  Okay.  Well, I invite people to

 7    express their concerns or questions to my clerk or bailiff.

 8    And, so, I want you to feel comfortable in this environment.

 9    I think that you are safe and that your families are safe.

10              Mr. Cotey, you understand the admonishment that I

11    give every time that I send you guys out of the courtroom

12    about not discussing the case?

13              JUROR COTEY:  Yes.

14              THE COURT:  Was the case discussed yesterday?

15              JUROR COTEY:  No.

16              THE COURT:  Okay.  Is there anything that's

17    occurred that you think would affect your ability to be fair

18    and impartial in this case?

19              JUROR COTEY:  No.

20              THE COURT:  Okay.  You can still serve as a juror

21    in this case and be fair and impartial both to the State and

22    to the Defendant?

23              JUROR COTEY:  Yes.

24              THE COURT:  Do you have any questions, Mr. Box?

25              MR. BOX:  Mr. Cotey, I understand then there was
```

1  at least some comments made that there was some concern

2  about my client taking notes at the table, is that correct?

3  I'm not putting words in your mouth.

4          JUROR COTEY:  That was brought up.

5          MR. BOX:  Did any of the jurors -- did you hear --

6  did they express a fear of my client?

7          JUROR COTEY:  I don't think it was so much your

8  client as there was some mention of gangs, Crips and Bloods,

9  you know.  I think that was what the fear was, of reprisals.

10          MR. BOX:  Retaliations?

11          JUROR COTEY:  Yes.

12          MR. BOX:  And was there a fear, and I'm not

13  putting words in your mouth, was it discussed a fear that

14  somehow friends of my client would retaliate or anything

15  like that?

16          JUROR COTEY:  It wasn't said but I think what I

17  took their concern was.

18          THE COURT:  Mr. Cotey, I think I said yesterday,

19  but let me repeat, that most of the time when a Defendant is

20  writing things down they're communicating with their lawyers

21  and I think that's probably the case in this particular

22  instance, as well.

23          Do you have any concerns about serving as a juror

24  in this case?

25          JUROR COTEY:  No.

```
 1              THE COURT:  Thank you very much, sir.  We'll see
 2   you in a few minutes.
 3              (Juror Cotey exited.  Juror Demers entered.)
 4              THE COURT:  Good morning, Ms. Demers.  Have a
 5   seat.  You're not in trouble.  Nobody is in trouble.  We
 6   just need to visit with you a little bit and thought that
 7   this would be better than being in the courtroom.  Okay?
 8              JUROR DEMERS:  All right.
 9              THE COURT:  Yesterday afternoon, I guess someone
10   expressed some concerns and then they talked to the bailiff
11   and then I came into the jury room.  Do you remember that?
12              JUROR DEMERS:  Yup.
13              THE COURT:  Are you one of the people that had a
14   concern about the personal issues and information that was
15   given during voir dire?
16              JUROR DEMERS:  I didn't initiate it but as the
17   conversation started I talked about it with them, yes.
18              THE COURT:  Did you guys discuss any of the facts
19   of this case?
20              JUROR DEMERS:  No, I think we talked about how,
21   you know, they would know where your husband worked or where
22   you worked or questions about why you would want to know how
23   old their kids were.
24              THE COURT:  Okay.  And really I didn't ask the age
25   of your children, I sort of grouped it.
```

48

```
 1            JUROR DEMERS:  And I think they joked about the
 2    small, medium, and large.
 3            THE COURT:  I think I said yesterday, but let me
 4    repeat, that most of the time when a Defendant is taking
 5    notes they're just communicating with their lawyer.
 6            JUROR DEMERS:  Right.
 7            THE COURT:  And do you have any concern?
 8            JUROR DEMERS:  No.  I think that it was comforting
 9    when you said that they probably can't leave with those
10    notes.  And when we all heard things, I probably couldn't
11    tell you where any of the people I'm in the jury room with,
12    I couldn't remember where they worked or anything, so...
13            THE COURT:  Do you have an opinion about whether
14    or not this Defendant is guilty or not guilty?
15            JUROR DEMERS:  Right now?
16            THE COURT:  Yes.
17            JUROR DEMERS:  No, just thoughts.
18            THE COURT:  Okay.  And are you able to be fair and
19    impartial in reaching a verdict both to the State and to the
20    Defendant?
21            JUROR DEMERS:  Yes, I am.
22            THE COURT:  At this point you haven't assumed the
23    Defendant guilty?
24            JUROR DEMERS:  Not at all.
25            THE COURT:  Okay.  Do you have any questions,
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1    Mr. Box?

 2              MR. BOX:  Just a few.  You said that you weren't

 3    the one that initiated the concern that there was -- I guess

 4    somebody brought up the fact that my client was taking notes

 5    at the table, is that correct?

 6              JUROR DEMERS:  Yes.

 7              MR. BOX:  And then there was a concern then talked

 8    about among people and I guess you were one of the people

 9    that did that?  I'm not picking on you.

10              JUROR DEMERS:  Yeah, no.

11              MR. BOX:  I just want to understand what you're

12    saying.

13              JUROR DEMERS:  Definitely.

14              MR. BOX:  And I think you said in answer to the

15    Judge's question they said they would know where you lived

16    or where your husband worked, to that degree?

17              JUROR DEMERS:  Yes.

18              MR. BOX:  Who did you mean by "they"?

19              JUROR DEMERS:  I guess they in my mind would be

20    anyone that he could talk to.

21              MR. BOX:  As far as my client?

22              JUROR DEMERS:  Uh-huh.

23              MR. BOX:  So there was somewhat a fear in your

24    mind, a fear toward my client or who he associates with, is

25    that correct?
```

1          JUROR DEMERS:  Well, not so much your client, just

2     that he was the only person that wasn't a professional or

3     working in the courtroom at that time.  Does that make

4     sense?

5          MR. BOX:  Okay.

6          JUROR DEMERS:  I mean, I would assume you all have

7     rules as to what you can do with that information.  He, to

8     me, seems like the only person aside from any other juror in

9     there who doesn't.

10          MR. BOX:  So what I'm hearing from you is when

11     this information was given, the only person that wasn't an

12     officer of the court or somebody who was an official was my

13     client at the table?

14          JUROR DEMERS:  Sure.  Other than ourselves.

15          MR. BOX:  Sure.  Other than the jurors.  And you

16     had a concern that he would take that information and give

17     it to they or to some people that there could be some

18     consequences?  I'm not putting words in your mouth, but I'm

19     just trying to talk out.

20          JUROR DEMERS:  Yes, that was definitely a thought

21     of the conversation.

22          MR. BOX:  And that was discussed back in the jury

23     room among several jurors, you being one of them?

24          JUROR DEMERS:  Yes.

25          MR. BOX:  And I would assume then that there would

1    be -- there was a sincere feeling of apprehension or fear --

2    I'm not putting words in your mouth -- because of this?  I

3    mean you had some concern?

4            JUROR DEMERS:  Yeah.  I think just in general.  I

5    don't think it had anything to do with even with -- with

6    what the case was about, just at that time we didn't know --

7    at the time that he was taking notes we didn't know

8    anything.  So...

9            MR. BOX:  Also, and I'm just curious, it kind of

10   struck a nerve, but you were asked by the Judge, "Well, do

11   you have any thoughts about this case," and you said you had

12   some thoughts.

13           THE COURT:  No, what I said was, had she formed an

14   opinion as to the Defendant's guilt or innocence and she

15   said she had some thoughts, which I certainly think is a

16   normal thing.

17           MR. BOX:  Sure.  I'm not putting words in your

18   mouth.  Yeah, sure.  I have no further questions.

19           THE COURT:  Thank you so much.  We'll see you in a

20   minute.

21           JUROR DEMERS:  All right.

22           (Juror Demers exited.  Juror Myers entered.)

23           THE COURT:  Good morning, sir.  Have a seat.

24   You're not in trouble.  Nobody is in trouble.  Let me just

25   say that.

```
 1            JUROR MYERS:  Nobody ever comes back from these
 2   deals.
 3            THE COURT:  Mr. Myers, we're just putting people
 4   in a different room.  There's no ultimate danger here.
 5            Mr. Myers, yesterday afternoon someone stressed a
 6   concern to the bailiff and then I came in and visited with
 7   you all.  You remember that?
 8            JUROR MYERS:  Yeah.
 9            THE COURT:  Sir, were you guys discussing the case
10   itself in the jury room?
11            JUROR MYERS:  No.
12            THE COURT:  Were you one of the people that
13   expressed some concern about security or some apprehension
14   about anything?
15            JUROR MYERS:  I don't think so.  I agreed with it
16   when I heard it but I didn't bring it up.
17            THE COURT:  Okay.  I think I stated clearly
18   yesterday, but let me state again, most of the time when a
19   Defendant is writing things in the courtroom they're
20   communicating with their lawyer and these -- they don't have
21   the opportunity to take all these notes and stuff out of the
22   courtroom.
23            JUROR MYERS:  Good.
24            THE COURT:  Mr. Myers, at this point in the trial
25   have you formed an opinion as to whether or not the
```

53

```
 1   Defendant is guilty or not guilty?

 2            JUROR MYERS:  No.  He's still innocent.  I haven't

 3   heard the whole deal.

 4            THE COURT:  All right.  Can you be a fair and

 5   impartial juror in this case?

 6            JUROR MYERS:  I think so.

 7            THE COURT:  Do you have any concern at all that we

 8   need to visit with you about?

 9            JUROR MYERS:  I haven't talked to anybody about

10   this but I'm concerned.  Number one, I want to tell you that

11   my wife was a juror about 15 years ago and I think it was

12   under the different rules that you were talking about that

13   the Defendant was there and the individual jurors were asked

14   questions about where they lived and the juror -- the

15   Defendant was writing all this stuff down.

16            THE COURT:  Okay.

17            JUROR MYERS:  And it was like they were writing it

18   all down.  That's what the Defendant was writing down.  And

19   my wife thought that was a little odd that they know all

20   about us but we don't know anything about them.

21            THE COURT:  Mr. Box, when I went back into the

22   jury room yesterday I told them that once upon a time was a

23   rule that jurors --

24            JUROR MYERS:  Yeah, that was 15 years.

25            THE COURT:  -- that jurors gave their addresses
```

1    but that that was no longer the rule and partially because

2    it made people uncomfortable and we don't want them to be

3    uncomfortable about this.  As far as you know --

4               JUROR MYERS:  One other concern.

5               THE COURT:  As far as you know, did anything

6    happen has a result of that information being given to that

7    individual in the courtroom 15 years ago?

8               JUROR MYERS:  No.  No, it was just a goosey

9    feeling that my wife had.

10              THE COURT:  Okay.  I just wanted to clarify.

11              JUROR MYERS:  If we don't convict this guy, we're

12   going to turn him loose and he's got my address.  Or if we

13   do convict him, he's going to give it to his buddy and the

14   buddy is going to come and get me.

15              THE COURT:  The second concern that you had?

16              JUROR MYERS:  Seems like this is a gang-related

17   case.  Nobody has said that.  It hasn't come up in the court

18   but I'm worried if we don't convict the guy, we're going to

19   turn him loose in the community.

20              And I know that I'm only supposed to be concerned

21   about the evidence and I'm thinking about what I was.  And I

22   know that I'm supposed to only think about the stuff that's

23   presented in the case in the courtroom, evidence.

24              THE COURT:  You're right.  You are.  And here is

25   kind of what I would tell you.  At the conclusion of this

1  case, undoubtedly you're going to have questions and we'll

2  do our best to answer them but all of the what ifs are not

3  addressed in the law that I give you.

4  　　　　　JUROR MYERS:  I'm supposed to ignore all that

5  stuff.

6  　　　　　THE COURT:  That's right.  Can you do that?

7  　　　　　JUROR MYERS:  Yeah.  I won't like it but that's

8  what my job is.

9  　　　　　THE COURT:  Okay.  Do you have any doubt in your

10  mind that you can be fair and impartial in this case?

11  　　　　　JUROR MYERS:  No.  That's what I'm going to do.

12  　　　　　THE COURT:  Okay.  Great.

13  　　　　　MR. BOX:  I have a couple of questions.  It's

14  obviously became quite apparent that there was some

15  discussion yesterday afternoon in the jury room about some

16  sort of, for lack of a better word, apprehension that my

17  client was taking notes at the table during voir dire, is

18  that correct?

19  　　　　　JUROR MYERS:  Yes.

20  　　　　　MR. BOX:  And you said that you might have joined

21  in, you didn't initiate that conversation, you may have

22  joined in to the conversation, is that correct?

23  　　　　　JUROR MYERS:  One guy said he was going to go

24  talk.  I said, "Yeah, go find out about that."

25  　　　　　MR. BOX:  Was there some serious concern or fear

1    raised by members of the jury that they had fear for my

2    client?

3        JUROR MYERS:  No, I think it was just kind of a

4    general -- a general, how come he's writing notes.

5        MR. BOX:  Was there a fear that will he would do

6    something or somebody he knew would do something, or if you

7    know?

8        JUROR MYERS:  We didn't know.  It wasn't a big

9    deal.  It was a concern that was expressed by the fella with

10   the shaved head and the beard and I don't know his name and

11   I was sitting next to him.  And I said, "Yeah, go find out

12   about that.  We need to find out."

13       THE COURT:  You understand the admonishment that I

14   give you guys every time you leave the courtroom?

15       JUROR MYERS:  You bet.

16       THE COURT:  You understand the reason for it?

17       JUROR MYERS:  You bet.

18       THE COURT:  Do you have any questions for us?

19       JUROR MYERS:  No.

20       THE COURT:  All right.  Thank you very much for

21   your time, sir.  We're going to see you in a minute.  Okay.

22       (Juror Myers exited.)

23       THE COURT:  I've got to tell you guys that I think

24   what we're seeing here is pretty normal, healthy reactions

25   of jurors that we don't normally get to see.  We're not

```
 1   usually informed about their concerns and I think what I'm
 2   seeing is very typical of every jury, so far.
 3            MR. BOX:  I am a little concerned about one
 4   statement he just made that he kind of indicated that part
 5   of his brain, for lack of a better word, was influenced by
 6   this gang testimony.
 7            THE COURT:  Well, he also said he was going to
 8   absolutely set it aside and I think that that conscious
 9   decision may be better than what sometimes happens.
10        (Juror Peters entered.)
11            THE COURT:  Good morning.  Have a seat,
12   Mr. Peters, you're not in trouble.  Nobody is in trouble so
13   I know this looks like you're being called to the
14   principal's office.
15            JUROR PETERS:  I'm not worried.
16            THE COURT:  Because we just needed to talk to
17   everybody individually and I thought this was better than in
18   the courtroom.
19            JUROR PETERS:  Okay.
20            THE COURT:  Mr. Peters, yesterday afternoon, I
21   think some people had some concerns and they talked to the
22   bailiff and I came in the jury room and visited with you.
23   Do you remember that?
24            JUROR PETERS:  Yes.
25            THE COURT:  Were you one of the people that had a
```

1    concern?

2            JUROR PETERS:  No, ma'am.

3            THE COURT:  Do you have any concerns about

4    security?

5            JUROR PETERS:  No, ma'am.

6            THE COURT:  Okay.  Mr. Peters, was the case

7    discussed amongst the jurors?

8            JUROR PETERS:  No, ma'am.

9            THE COURT:  All right.  Do you believe that you

10   can be fair and impartial both to the State and to the

11   Defendant in this case?

12           JUROR PETERS:  Yes, ma'am.

13           THE COURT:  At this point in the trial have you

14   formed an opinion as to whether or not the Defendant is

15   guilty or not guilty?

16           JUROR PETERS:  I'm forming an opinion but I

17   haven't formed one yet, no.

18           THE COURT:  Do you have any questions, Mr. Box?

19           MR. BOX:  It's my understanding we've heard from

20   other jurors obviously sometime yesterday afternoon there

21   was some conversation had concerned about my client taking

22   notes at the table, is that correct?

23           JUROR PETERS:  Sir, when I'm in there I'm usually

24   on the phone trying to tell my job what I'm doing.  I don't

25   pay attention.  If there was, there's about five or six

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

59

1    conversations going on at the same time.  Like, so if I'm

2    sitting beside you and she's sitting over there beside her,

3    they're talking and we're talking so it's kind of hard to

4    keep up with everybody.

5            MR. BOX:  So you don't have any independent

6    recollection?

7            JUROR PETERS:  No, sir.

8            THE COURT:  Great.  Thank you so much.  We'll see

9    you in a couple of minutes.

10           JUROR PETERS:  Where do I need to go from here?

11           THE COURT:  Tina is going to show you.  We have a

12   conference room we're showing people to.  Thank you.

13       (Juror Peters exited.  Juror Marquez entered.)

14           THE COURT:  Good morning.  You're not in trouble.

15   Nobody is in trouble.

16           JUROR MARQUEZ:  Well, I hope not.

17           THE COURT:  You're not.  And I know this looks a

18   little intimidating but we just needed to talk to you guys

19   individually.  We thought it would be easier in here than in

20   the courtroom.

21           JUROR MARQUEZ:  Okay.

22           THE COURT:  Do you remember yesterday afternoon

23   when I guess one of the jurors talked to the bailiff and

24   then I came into the jury room and talked to you guys?  Do

25   you remember that?

60

```
 1              JUROR MARQUEZ:  Yes.

 2              THE COURT:  Were you one of the jurors who kind of

 3    expressed a concern about security?

 4              JUROR MARQUEZ:  When you were in there?

 5              THE COURT:  No, before.

 6              JUROR MARQUEZ:  No, before I did, kind of, yeah.

 7              THE COURT:  That's fine.  But you -- but we just

 8    want to visit with you about that.  Do you have an opinion

 9    at this point in the trial whether the Defendant is guilty

10    or not guilty?

11              JUROR MARQUEZ:  No.  Not really.

12              THE COURT:  And I think I said yesterday, but let

13    me clarify, that most of the time when a Defendant is taking

14    notes they're communicating with their lawyer at the table.

15    It's the way that they have to communicate.  So they're not

16    writing something down and they don't take their notes from

17    the courtroom.

18              JUROR MARQUEZ:  Yeah.  I think most of it was from

19    watching TV, honestly, because I see on TV what happens in

20    movies and stuff and we're like, "Well, how do we know that

21    our information is secure," I guess.

22              THE COURT:  Well, and I tell you at the beginning

23    of the trial that if you have a problem or a concern to ask

24    the bailiff or clerk because I want you to feel comfortable,

25    I want to answer your questions.  So I think you guys did
```

61

```
 1    exactly what you should have done.  Okay?

 2              JUROR MARQUEZ:  Okay.

 3              THE COURT:  Mr. Box, I'm going to let you ask a

 4    couple of questions if you have any.

 5              MR. BOX:  It's become quite apparent that at some

 6    point yesterday in the jury room somebody expressed a

 7    concern of the fact that my client was taking notes during

 8    the jury selection process, is that correct?

 9              JUROR MARQUEZ:  Right.

10              MR. BOX:  And I hear from you that you're not the

11    one that brought it up but then you participated in that

12    conversation at some point, is that correct?

13              JUROR MARQUEZ:  Yes.

14              MR. BOX:  Was there a concern or fear expressed

15    from members of the jury, either being you or some other

16    people, that they had a fear for my client?

17              JUROR MARQUEZ:  Not necessarily, no.  I would

18    think it was more of in general saying, you know, if he had

19    our information, what would happen, you know?  Would it

20    be -- could something possibly happen either from him or

21    someone else, you know.

22              MR. BOX:  Some of his friends?

23              JUROR MARQUEZ:  Yeah.  I mean.

24              MR. BOX:  So there was a concern expressed

25    among -- I'm not putting words in your mouth -- a concern
```

62

```
 1   expressed among several jurors that they had a possible fear

 2   that this information could be given either from my client

 3   to some of his friends or somebody that could retaliate?

 4   I'm not putting words in your mouth.

 5        JUROR MARQUEZ:  Kind of, yeah, basically what if

 6   it got into the wrong hands or something, if this was even

 7   information that, you know, we were worried about.  Which we

 8   know now it's not anything that -- you know, he wasn't like

 9   writing our names down and writing down, you know, where we

10   lived or anything.

11        MR. BOX:  But your concern was that my client may

12   have that information and give it to somebody?

13        JUROR MARQUEZ:  That was kind of brought up that,

14   you know, what if.

15        THE COURT:  Can you be fair and impartial in this

16   case?

17        JUROR MARQUEZ:  Yeah.  I think I can.

18        THE COURT:  You can make a decision in this case

19   based only on the evidence?

20        JUROR MARQUEZ:  Yes.

21        THE COURT:  You haven't made a decision yet as to

22   whether or not the Defendant is guilty or not guilty?

23        JUROR MARQUEZ:  Right.

24        THE COURT:  Okay.

25        JUROR MARQUEZ:  And that's another thing, too,
```

1  when we were talking about all of that we were saying when

2  he's found guilty or not guilty, you know.  It was never

3  even brought up of what if he, you know, does this because

4  he's -- it wasn't.

5          THE COURT:  Okay.  And you guys -- were you guys

6  discussing the case?

7          JUROR MARQUEZ:  No.  No.  Because actually when we

8  were talking about that, that was -- it kind of got cut off

9  after that and we kind of just talked about other things.

10  We're not sure if that's part of this that we're not

11  supposed to be talking about and we just said we'd ask the

12  bailiff, you know.

13          THE COURT:  All right.  And you can be -- you can

14  give a fair verdict in this case?

15          JUROR MARQUEZ:  Yes.

16          THE COURT:  Both for the State and for the

17  Defendant?

18          JUROR MARQUEZ:  Yes.

19          THE COURT:  Thank you so much.  We'll see you in a

20  couple of minutes.  Okay.

21          JUROR MARQUEZ:  Okay.

22      (Juror Marquez exited.  Juror Cornish entered.)

23          THE COURT:  Good morning, have a seat,

24  Ms. Cornish.  I want you to know you're not in trouble.

25  Nobody is in trouble.  I know this must feel like you're

64

```
 1    getting called to the principal's office but we just need to
 2    talk to you guys individually and thought this would be
 3    easier than being in the courtroom.  Okay?
 4              JUROR CORNISH:  All right.
 5              THE COURT:  You know, yesterday afternoon when
 6    somebody talked to the bailiff and then I came in the jury
 7    room and talked to you guys for a minute?
 8              JUROR CORNISH:  Yes.
 9              THE COURT:  Were you one of the folks who had a
10    concern about personal security or safety?
11              JUROR CORNISH:  I really hadn't thought about it
12    until somebody brought it up.
13              THE COURT:  Was the case itself being discussed?
14              JUROR CORNISH:  No, no, it wasn't.
15              THE COURT:  You know, I think I explained
16    yesterday, but let me be clear, most of the time when a
17    Defendant is writing in the courtroom they're communicating
18    with their lawyers and they don't have like files and stuff
19    to take out of the courtroom or anything like that.
20              At this point in the case you're an alternate so
21    you haven't yet been sworn in as a juror.  Have you formed
22    any opinion as to whether or not this Defendant is guilty or
23    innocence?
24              JUROR CORNISH:  No, I haven't.
25              THE COURT:  And if you're called to be a juror in
```

65

```
 1   this case, can you give a fair verdict and impartial verdict
 2   both for the State and for the Defendant?
 3              JUROR CORNISH:  I believe I can.
 4              THE COURT:  Do you have any concerns about safety
 5   or personal issues?
 6              JUROR CORNISH:  No, I don't.
 7              THE COURT:  Okay.  Mr. Box?
 8              MR. BOX:  If I understand correctly, and I'm not
 9   going to put words in your mouth, but obviously sometime
10   yesterday afternoon there came up an issue about my client
11   taking notes at the table while the jury was being selected,
12   is that correct?
13              JUROR CORNISH:  Uh-huh.
14              MR. BOX:  And did you join in that conversation at
15   some point once it was started?
16              JUROR CORNISH:  Uh-huh.  Everybody did, I believe.
17              MR. BOX:  There again, I'm not putting words in
18   your mouth, was there a fear expressed by members of the
19   jury about a fear of my client?  Was there -- did you start
20   talking about, "Well, we're afraid of Mr. Box's client"?
21              JUROR CORNISH:  No, I think it's all just kind of
22   good-natured jokingly sort of.
23              MR. BOX:  Well, was there any fear expressed by
24   people; it doesn't have to be you, but did you hear any
25   real?
```

 1          JUROR CORNISH:  No, not fear.

 2          MR. BOX:  What would you say was expressed then?

 3          JUROR CORNISH:  Just concern or -- oh, I hadn't

 4     thought about that.

 5          MR. BOX:  And was the concern that my client may

 6     have jurors' personal information?

 7          JUROR CORNISH:  That was the concern.

 8          MR. BOX:  And was the concern, and there again,

 9     I'm not putting words in your mouth, was the concern further

10     that he could give that information to other people?

11          JUROR CORNISH:  I think that was but then we

12     decided that's probably not even possible because it

13     wouldn't be leaving, as you said, nothing would be leaving

14     the courtroom or -- you know.

15          MR. BOX:  But the concern was that possibly -- I

16     know the Judge talked to you back in chambers, but the fear

17     before the Judge talked to you, the fear was that maybe that

18     information would be given out to the wrong people, is that

19     correct?

20          JUROR CORNISH:  Uh-huh.

21          MR. BOX:  There again, I'm not putting words in

22     your mouth.

23          JUROR CORNISH:  Right.

24          THE COURT:  You understand that the reason that I

25     give the admonishment every time you all leave the

1    courtroom?

2          JUROR CORNISH:  Yes.

3          THE COURT:  Do you have any questions about that?

4          JUROR CORNISH:  No.

5          THE COURT:  Do you have any?

6          JUROR CORNISH:  I'm just not quite sure as an

7    alternate what my role is.  I think neither one of us is.

8    The other alternate and I don't really know.  We've not been

9    sworn in.  That doesn't mean -- I mean.  I'm sure all the

10   rules apply to us as well as the others.

11         THE COURT:  They sure do.  Until the verdict is

12   reached.  There's still some possibility that you could be

13   called upon to serve as a juror.

14         JUROR CORNISH:  Right, and I know not to talk to

15   anybody when I get home and all of that.

16         THE COURT:  Okay.  Thank you very much.  We'll see

17   you in a minute.

18         JUROR CORNISH:  All right.

19      (Juror Cornish exited.)

20         THE COURT:  Hazel Leavitt is next.

21      (Juror Leavitt entered.)

22         THE COURT:  Hi.  Have a seat, Ms. Leavitt.  You're

23   not in trouble.  Nobody is in trouble.  So let me just tell

24   you at the get-go, we needed to talk to each one of you

25   individually and it seemed better to do it in here than in

```
 1   the courtroom.

 2            JUROR LEAVITT:  Okay.

 3            THE COURT:  Do you remember yesterday when

 4   somebody expressed, I guess, some concern, they talked to

 5   the bailiff and then I came into the jury room and visited

 6   with you guys?

 7            JUROR LEAVITT:  Yes.

 8            THE COURT:  Are you one of the folks who had some

 9   concerns about personal information?

10            JUROR LEAVITT:  No, not really.

11            THE COURT:  Was the case discussed?

12            JUROR LEAVITT:  No.

13            THE COURT:  You understand the admonishment that I

14   give and the reason why I would give it?

15            JUROR LEAVITT:  Right.

16            THE COURT:  Do you have any concerns about

17   security or safety issues?

18            JUROR LEAVITT:  I live by myself and I got to

19   thinking about after it was brought up, I thought, yeah, you

20   know, maybe I should be cautious about that sort of thing.

21   But, no, I've decided.

22            THE COURT:  Well, I think I said yesterday, but I

23   would repeat again, that Defendants communicate with their

24   attorneys and so usually that's why we have a pad and pencil

25   there for them and it's not as though they have a file that
```

1    they take out of the courtroom.

2            If you are called upon to serve as a juror, do you

3    have any concern at all that you could be fair and impartial

4    in this case?

5            JUROR LEAVITT:  I can -- yes, I can be fair and

6    impartial.

7            THE COURT:  Have you formed an opinion yet as to

8    whether or not this Defendant is guilty or not guilty?

9            JUROR LEAVITT:  No.

10           THE COURT:  Okay.  Do you have any questions,

11   Mr. Box?

12           MR. BOX:  Just a couple of questions.  It's my

13   understanding that sometime yesterday afternoon there was

14   discussion had, somebody was concerned about the fact that

15   my client had been taking notes at the table during the jury

16   selection; is that fair or is that?

17           JUROR LEAVITT:  Yes.

18           MR. BOX:  And then after that conversation started

19   then different jurors chimed in and said -- well, started

20   talking about it, is that correct?

21           JUROR LEAVITT:  Yes.

22           MR. BOX:  Were you one of the ones that were

23   talking about it?

24           JUROR LEAVITT:  I wasn't the one who brought it

25   up.

```
 1          MR. BOX:  Sure.

 2          JUROR LEAVITT:  But it made me think.  So, yes, I

 3  might have said or questioned it.

 4          MR. BOX:  Was there a fear?

 5          JUROR LEAVITT:  Not on my part.

 6          MR. BOX:  But was there a fear described by some

 7  of the jurors of my client having that information and maybe

 8  giving it to somebody?

 9          JUROR LEAVITT:  Yeah, and that's the only thing

10  that made me think.  But, you know, I thought certainly it

11  wouldn't go that far.

12          MR. BOX:  Couldn't happen.  But there was a fear

13  expressed by certain members of the jury, not you, that they

14  were in fear that this information would be given from my

15  client to somebody else?

16          JUROR LEAVITT:  That was brought up.

17          MR. BOX:  Okay.

18          THE COURT:  Thank you so much.  We're going to see

19  you in a couple of minutes.  And Tina will show you where

20  the conference room is.  Okay?

21      (Juror Leavitt exited.)

22          THE COURT:  Mr. Box.

23          MR. BOX:  Judge, I would still re-urge my Motion

24  for Mistrial.  I know that the Court has honored my request

25  and we've taken individual voir dire.  There was a couple of
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
 1   things that came out during individual voir dire that still
 2   cause me concern.
 3            Mr. Cotey, I believe, said in response to one of
 4   my questions that there was at least some discussion had
 5   back in the jury room yesterday that friends of my client
 6   would retaliate.
 7            And then the alternate juror that just left,
 8   Ms. Leavitt, I believe.
 9            THE COURT:  Leavitt.
10            MR. BOX:  Leavitt, excuse me, had expressed -- not
11   her, but some members of the panel had expressed some fear
12   that my client would give this information to other people.
13   I think that it just doesn't cause a level playing field.
14            I know what the jurors have said back in chambers
15   but I just think there's the appearance of not a level
16   playing field in them even having these conversations, puts
17   some apprehension in my mind that they could honestly be
18   fair and impartial.
19            THE COURT:  Well, apprehension is not the legal
20   standard.
21            MR. BOX:  Sure, I understand.
22            THE COURT:  And the legal standard is manifest
23   necessity.  Every single juror has told me that they have
24   not formed an opinion as to your client's guilt or
25   innocence.  Most of them have expressed that it wasn't
```

1  really so much your client, but the overall circumstances,

2  the people in and out of the courtroom, witnesses and

3  witnesses' boyfriends and, frankly, the kinds of things that

4  we all observe and are aware of and talk about among

5  ourselves.

6       When a juror tells me that they can be fair and

7  impartial and that they have not formed an opinion as to

8  your client's guilt or innocence, I'm under the law to

9  assume their truthfulness.  I've had no other indicia of

10  them being untruthful about that.

11       Not a single juror has revealed to us that there

12  was any discussion of the facts or that there was anything

13  specific, it was more of the unsaid, what happens if this

14  information gets out.

15       I agree with Ms. Demers who said, you know, it's

16  television and it's books and it's other stuff and you

17  think, gosh, and we better find out about this.

18       And I invite the jurors to bring their questions

19  and concerns because I want them to feel comfortable because

20  I believe that people who are comfortable do their best work

21  and can listen and learn to what we have to educate them

22  about.

23       So I understand your concern, I don't believe that

24  it is supported by what we have heard from these individual

25  jurors and the two alternates.  But more than that, I don't

```
 1   believe that there is a legal manifest necessity for me to

 2   declare a mistrial.

 3           Is there anything else that you want to put on the

 4   record, Mr. Box?

 5           MR. BOX:  No, Your Honor.

 6           THE COURT:  Is there anything from the State of

 7   Oklahoma?

 8           MS. HIGH:  No, Judge.

 9           THE COURT:  Okay.  Then let's go out there and

10   see.

11       (Thereupon, with all counsel and the Defendant present,

12       and the jury seated in the box, the following wa had in

13       open court.)

14           THE COURT:  Thank you.  Please be seated.

15           All right.  Ms. High.

16           MS. HIGH:  Judge, at this time the State would

17   have no further witnesses.  The State would rest.

18           THE COURT:  Would counsel approach, please?

19           MR. BOX:  Yes.

20       (Thereupon, the following was had at the bench.)

21           MR. BOX:  In light of the fact that the State has

22   rested, Your Honor, comes now the Defendant and respectfully

23   requests for a directed verdict.  We feel that the State has

24   woefully failed to meet its burden of proof and ask the

25   Court to direct a verdict in our favor.
```

```
 1              THE COURT:  Do you wish to be heard, Ms. High?

 2              MS. HIGH:  No, Judge, we stand on the evidence.

 3              THE COURT:  The demurrer is overruled.

 4              MR. BOX:  Yes, ma'am.

 5         (Thereupon, the following was had in open court.)

 6              THE COURT:  The Defendant's case in chief.

 7              MR. BOX:  Yes, Your Honor.  May we call our first

 8    witness?

 9              THE COURT:  You may.

10              MR. BOX:  We call Howard Morris.

11                        HOWARD MORRIS,

12    having been first duly sworn, testified as follows:

13                        DIRECT EXAMINATION

14    BY MR. BOX:

15    Q.    State your name for the record.

16    A.    Howard Morris.

17    Q.    Mr. Morris, how old are you?

18    A.    Twenty-nine.

19              THE COURT:  You don't need to lean into the

20    microphone every time.  Just relax.  Okay?

21    Q.    (BY MR. BOX)  What's your educational background?

22    A.    Graduated '94 in Chickasha High School.

23    Q.    And are you married?

24    A.    Common law married.

25    Q.    Who's your common law wife?
```

```
 1    A.    Sondra Johnson.

 2    Q.    And how long have you been together with Sondra

 3    Johnson?

 4    A.    Six years.

 5    Q.    And as a result of your relationship with her, do you

 6    have any children?

 7    A.    Yes, I do.

 8          MS. HIGH:   Judge, I'm going to object to the

 9    relevancy.

10          THE COURT:   Sustained.

11    Q.    (BY MR. BOX)  I'm going to direct your attention back

12    to January of 2004.  I'm going to ask you, where were you

13    living at that time?

14    A.    Southwest 74th and May.

15    Q.    And was there an apartment?

16    A.    Yes.

17    Q.    And what number was it?

18    A.    Twenty-eight.

19    Q.    And how long had you been living there at that time, in

20    January 2004?

21    A.    A year.

22    Q.    And I'm going to fast-forward it to September of 2004,

23    where were you living?

24    A.    Same spot.

25    Q.    And where?
```

```
 1    A.    I mean same place.

 2    Q.    And was the lease under your name?

 3    A.    Yes, sir.

 4    Q.    And who was living there with you?

 5    A.    Sondra Johnson.

 6    Q.    And during that time period from January 2004, to

 7    September of 2004, how were you employed?

 8    A.    City of Midwest City.

 9    Q.    And what did you do for them?

10          MS. HIGH:  Objection, Judge, relevancy.

11          THE COURT:  Sustained.

12    Q.    (BY MR. BOX)  At any rate, on September -- what date

13    were you arrested?

14    A.    September the 2nd of '04.

15    Q.    Of 2004?

16    A.    Yes, sir.

17    Q.    And where were you arrested at?

18    A.    At home when I got off of work.

19    Q.    And I'm going to direct your attention back to

20    February 20th of 2004.  You've heard the testimony in the

21    courtroom yesterday.  Were you at or near that location of

22    the homicide that is being -- you're being charged with in

23    court this week?

24    A.    No, sir.

25    Q.    Were you involved in a homicide that you were being
```

```
 1    charged with?

 2    A.   No, sir.

 3    Q.   Do you have any information about the homicide?

 4    A.   No, sir.

 5         MR. BOX:   I have no further questions of this

 6    witness.

 7         THE COURT:   On cross-examination.  Ms. High.

 8                    CROSS-EXAMINATION

 9    BY MS. HIGH:

10    Q.   Mr. Morris, I notice you're wearing glasses here during

11    court this week.  Do you typically wear glasses?

12    A.   Yes, to read.

13    Q.   To read?  You wear them to read?

14    A.   Yes.

15    Q.   Do you -- prior to your incarceration, did you wear

16    contacts or anything else like that?

17    A.   No, I just wear glasses.

18    Q.   But just to read?

19    A.   Yes, ma'am.

20    Q.   So if you're just out and about running errands, doing

21    whatever, you wouldn't have those glasses on?

22    A.   It depends what I'm doing.  If I'm going to pay bills

23    or anything.

24    Q.   What if you were just, say -- I don't know, out in a

25    parking lot visiting with friends, would you have had those
```

1    glasses on?

2    A.    No, ma'am.

3    Q.    On your driver's license, does it say that you have a

4    restriction for glasses?

5    A.    No, ma'am.

6    Q.    Now, you've told us that you lived at Southwest

7    74th and May?

8    A.    Uh-huh.

9    Q.    I'm sorry?

10   A.    Yes, ma'am.

11   Q.    Do you typically do your business, shopping, that kind

12   of thing down on the south side of Oklahoma City?

13   A.    All over Oklahoma City.

14   Q.    Do you have a lot of occasions to be on the north side?

15   A.    No, sir -- no, ma'am.

16   Q.    Have you ever lived on the north side?

17   A.    No, ma'am.

18   Q.    Are you familiar with like the Lyrewood Apartments?

19   A.    No, ma'am.

20   Q.    Have you ever lived in the Lyrewood Apartments?

21   A.    No, ma'am.

22   Q.    Do you know anybody that lives in the Lyrewood

23   Apartments?

24   A.    No, ma'am.

25   Q.    How about an address on North MacArthur?  Have you ever

```
 1   given anybody an address on North MacArthur?

 2   A.    Me?

 3   Q.    Yes.

 4   A.    Yes, ma'am.

 5   Q.    Why would you have given somebody an address on North

 6   MacArthur?

 7   A.    Because that's where I stayed.

 8   Q.    Oh, you stayed?

 9   A.    I stayed there.

10   Q.    When did you stay on North MacArthur?

11   A.    2003.

12   Q.    2003.

13   A.    Yes, ma'am.

14   Q.    So you would have never used that address on North

15   MacArthur prior to 2003?

16   A.    Repeat that again.  I didn't understand, ma'am.

17   Q.    Would you have ever used an address on North MacArthur

18   prior to 2003?

19   A.    Would I use it?

20   Q.    Yes.

21   A.    In 2003?

22   Q.    Yes.

23   A.    Yes.

24   Q.    When did you move to the address on Southwest 74th and

25   May?
```

80

```
 1    A.    January.

 2    Q.    Do you remember when in January?

 3    A.    No, ma'am.

 4    Q.    All right.

 5          MS. HIGH:  May I approach the witness?

 6          THE COURT:  You may.

 7    Q.    (BY MS. HIGH)  Sir, I want to hand you what I have

 8    marked as State's Exhibit Number 44 and ask you if you

 9    recognize this?

10    A.    Yes.

11    Q.    What do you recognize that to be?

12    A.    My address.

13    Q.    Okay.  I understand that the address is on there, but

14    what do you recognize this thing to be?

15    A.    My ID.

16    Q.    And it is yours?

17    A.    Yes, sir -- ma'am.

18          MS. HIGH:  The State would move for admission of

19    Exhibit Number 44.

20          THE COURT:  Is there objection?

21          MR. BOX:  No, Your Honor.

22          THE COURT:  State's Exhibit 44 is admitted without

23    objection.

24    Q.    (BY MS. HIGH)  Mr. Morris, if you would, read to the

25    jury what address that you have on that State ID card?
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    A.    6106 North MacArthur.

2    Q.    And is that in Oklahoma City?

3    A.    Yes.  Warr Acres.

4    Q.    I'm sorry?

5    A.    Warr Acres.

6    Q.    Warr Acres?

7    A.    Yes, ma'am.

8    Q.    Does it say Oklahoma City on the ID, though?

9    A.    Yes, ma'am.

10   Q.    And if you would, when was that ID issued?

11   A.    1-4-2004.

12   Q.    So January the 4th of 2004?

13   A.    Yes, ma'am.

14   Q.    May I see that?  Does it say the 4th?  I don't know if

15   you can see that real well.  You might want to take another

16   look at it?

17   A.    It was 14th.

18   Q.    January 14th, 2004.

19         When was the last time -- let me ask you, and in this

20   state ID photograph, you don't have your glasses on there,

21   do you?

22   A.    No.

23   Q.    When was the last time that you lived or went up to the

24   Lyrewood Apartments?

25   A.    I hadn't ever been there.

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

```
 1    Q.    What's the apartment complex with that address?

 2    A.    Savannah Point.

 3    Q.    Savannah Point.

 4          How far away is that address from Northwest 10th and

 5    Rockwell?

 6    A.    I don't know.

 7    Q.    No idea?

 8    A.    No idea.

 9    Q.    Do you know Demetria Tinner?

10    A.    No, ma'am.

11    Q.    Ever met her before?

12    A.    Never seen her.

13    Q.    Is that the same as you've never met her?

14    A.    Yes, ma'am.

15    Q.    How about Dewan Debose, do you know him?

16    A.    No.

17    Q.    And other than his appearing at court hearings and

18    testifying against you, did you ever know him, see him, meet

19    him before?

20    A.    No, ma'am.

21    Q.    And Kurt Brazille, did you ever know him, see him, meet

22    him other than the times he's appeared in court and

23    testified against you?

24    A.    No, ma'am.

25    Q.    Rodney Perry, did you know him?
```

```
 1   A.   No, ma'am.

 2   Q.   So you certainly cannot give this jury any information

 3   about gang affiliation by anybody, can you?

 4   A.   No, ma'am, I can't.

 5   Q.   And you would have no reason to believe that the

 6   homicide of Rodney Perry was gang-related, would you?

 7   A.   I don't know what happened.  I wasn't there.

 8   Q.   I understand that.  So you would have no information to

 9   provide in that regard?

10   A.   Right.

11   Q.   So can you give this jury one reason why Demetria

12   Tinner would come into this court and point you out and say

13   that you were one of the three men that beat Rodney Perry to

14   death?

15   A.   Can I give the jury -- excuse me again, I'm sorry?

16   Q.   Can you give this jury one reason why Demetria Tinner

17   would pick you out and tell this jury that you were one of

18   the three men that beat Rodney Perry to death?

19   A.   Yes, I can.

20   Q.   You can?  What reason would that be, sir?

21   A.   Mistaken identity, ladies and gentlemen.

22   Q.   Mistaken identity?

23   A.   Yes.

24   Q.   So when she says that she knew you from a friend of

25   hers boyfriend, she's mistaken about that?
```

84

```
 1   A.    Yes, ma'am.

 2   Q.    Did you ever go by the name NC?

 3   A.    No, ma'am.

 4   Q.    Do you have any idea what -- do you know anybody that

 5   goes by that name?

 6   A.    No, ma'am.

 7   Q.    And we heard talk about there being Tar Heels clothing.

 8   Are you a fan of Tar Heels clothing?

 9   A.    I got several clothes like that, and other teams, too.

10   Q.    Okay.  Were you wearing Tar Heel clothing on February

11   the 20th of 2004?

12   A.    I was at home in bed.

13   Q.    You were at home in bed?

14   A.    Uh-huh.

15   Q.    Does that mean, no, you weren't wearing Tar Heels

16   clothing?

17   A.    No, I wasn't.

18   Q.    How frequently, sir, do you wear Tar Heels clothing?

19   A.    Not very often.

20   Q.    Not very often.

21         How many items of Tar Heel clothing would you say you

22   have?

23   A.    One.

24   Q.    One?

25   A.    Uh-huh.
```

85

```
 1   Q.    So just what did it look like?

 2   A.    I have a white t-shirt that my wife had bought me.

 3   I've got other teams, too.  It's just -- really, I just got

 4   other teams that I put on, you know.  It's not no particular

 5   clothes that I actually just put on like that.

 6   Q.    Well, sir, let me hand you what I have marked as

 7   State's Exhibit Number 44 and ask if you're able to --

 8          THE COURT:  I'm sorry.  We have just admitted

 9   State's Exhibit 44.

10          MS. HIGH:  I'm sorry.  This is 43.

11          MR. BOX:  May I approach?

12          THE COURT:  You may.

13      (Thereupon, the following was had at the bench.)

14          MR. BOX:  Your Honor, I would object.  I don't

15   know if there's any relevance to this.  I don't know where

16   she's going on this and she's asking for a t-shirt.  She has

17   told me before that this potentially is the t-shirt he had

18   on when he was arrested but I don't see any relevance in

19   that.

20          MS. HIGH:  Judge, we've heard testimony that one

21   of the three individuals was wearing Tar Heels clothing,

22   light blue clothing.  I think it's up to the jury to

23   determine if it's a coincidence that he's wearing Tar Heels

24   clothing when he's arrested.

25          MR. BOX:  Your Honor, that's seven months after
```

86

1    the alleged offense and, Your Honor, I don't believe that's

2    relevant and I don't believe it has sufficient probative

3    value and I would object.

4            THE COURT:  Overruled.

5        (Thereupon, the following was had in open court.)

6    Q.   (BY MS. HIGH)  Sir, I want to hand you what I have

7    marked as State's Exhibit Number 43 and ask if you recognize

8    this?

9    A.   It's been so long, I mean.  That's the shirt that my

10   wife had bought me but I had worked in that, because I have

11   a uniform and that's just a shirt I have underneath it.

12   Q.   So this is your shirt?

13   A.   I don't know.  I mean, it's been so long.

14   Q.   Do you recall what you were wearing the day you were

15   arrested and -- you remember the day, it was September the

16   23rd, 2004.  Do you remember what you were wearing?

17   A.   My uniform.

18   Q.   And you've told us that this is a shirt that you wear

19   underneath your uniform?

20   A.   Uh-huh.

21   Q.   Is this the shirt that you were wearing that day?

22   A.   That day I got arrested?

23   Q.   Yes.

24   A.   Yes, ma'am.

25           MS. HIGH:  The State would move for admission of

```
 1    Exhibit Number 43.
 2              MR. BOX:  Previously.
 3              THE COURT:  The Defendant stands on a previously
 4    made objection.
 5              MR. BOX:  Yes, Your Honor.
 6              THE COURT:  State's Exhibit 43 is admitted.
 7    Q.   (BY MS. HIGH)  You would agree with me, Mr. Morris,
 8    that this is a North Carolina t-shirt, is that correct?
 9    A.   Uh-huh.
10    Q.   Is that a yes?
11    A.   Yes.
12    Q.   It has to be clear because she takes all this down.
13    Okay?  And you've told us, I believe, this is the only piece
14    of North Carolina clothing that you have?
15    A.   Yes, ma'am.
16    Q.   And North Carolina, their logo is NC, is that correct?
17    A.   Uh-huh.
18    Q.   Is that a yes?
19    A.   That's a yes.  That's on the shirt.
20    Q.   Well, it's your shirt.  Is NC, is this the logo of
21    North Carolina University?
22    A.   Yes.
23    Q.   And have you ever heard that referred to as Tar Heels
24    clothing?
25    A.   Yes.
```

```
 1   Q.    Now, do you know of any other significance for
 2   Tar Heels clothing besides it being worn by Tar Heels' Fans?
 3   A.    No, ma'am.
 4   Q.    And the name NC, does that mean anything at all to you
 5   beyond being a street name?
 6   A.    No.   I don't have any gang affiliation.
 7   Q.    None whatsoever?
 8   A.    No.
 9   Q.    Okay.   Now, I notice when you walked up to the stand
10   you had a bit of a limp.   You do not have a disability, is
11   that correct?
12   A.    No.   I have a leg brace on that I have to have in here.
13   Q.    But that wouldn't -- you didn't have any disability,
14   anything wrong with you on February the 20th, 2004, such
15   that made you walk the way you walked today, that's
16   something here?
17   A.    What do you mean?
18   Q.    Whatever is on your leg wasn't on your leg on February
19   the 20th of 2004, is that correct?
20   A.    Correct.
21   Q.    Now, you told us that Ms. Tinner, this a case of
22   mistaken identity.   Dewan Debose, can you give this jury a
23   reason why he would come into a courtroom on an occasion and
24   pick you out and say that you were one of the three men that
25   participate in the beating death of Rodney Perry?
```

1    A.    Ladies and gentlemen, it's just a misunderstanding.   I

2    guess it's just a mistaken identity.   I'm sorry.

3    Q.    And Kurt Brazille, any reason that you can give this

4    jury for why he would come into this courtroom and pick you

5    out on more than one occasion?

6    A.    Same thing, just a misidentity (sic).

7    Q.    Do you find it odd that three people that don't know

8    you, have never met you, never seen you before, they all

9    mistake you as being one of the three people involved in the

10   beating death of Rodney Perry?   Do you find that odd?

11   A.    Do I find that odd?

12   Q.    Yes.

13   A.    I don't know what people think, you know.   I mean,

14   everybody is up to their own opinion.

15   Q.    Okay.  Do you -- everybody, I'm sorry, did you say

16   subject to their own opinion?

17   A.    They have their own opinion, their own everything.

18   Q.    Do you have -- I mean -- well, strike that.

19        So you don't know of any information that you could

20   provide to this jury about Demetria Tinner and Kurt Brazille

21   having some relationship that would cause them to form a

22   conspiracy against you, right?

23   A.    No, ma'am.

24   Q.    Or Demetria Tinner and Dewan Debose, you don't know of

25   any relationship between them that would cause them to form

```
 1   a conspiracy?

 2   A.   No, ma'am.

 3   Q.   Anything about any of those three individuals that you

 4   could tell this jury here is a reason why, other than

 5   mistaken identity, that they would all three pick you out

 6   and say that you participated in the beating death of Rodney

 7   Perry?

 8   A.   I don't know.

 9   Q.   Mr. Morris, was blue clothing something that you wore

10   frequently?

11   A.   No.

12   Q.   You wouldn't have any affiliation or affinity for blue

13   clothing?

14   A.   No.

15            MS. HIGH:  That's all I have.

16            THE COURT:  Redirect.

17            MR. BOX:  Yes.

18                      REDIRECT EXAMINATION

19   BY MR. BOX:

20   Q.   Mr. Morris, you were asked about athletic t-shirts or

21   shirts you have.  What are some other schools you have?

22   A.   OU, OSU, and Tulsa.

23   Q.   And you've never been convicted of a felony before?

24   A.   No, sir.

25   Q.   And you have three children?
```

```
 1    A.    I've got three children.

 2              MS. HIGH:  Objection, Judge.

 3              THE COURT:  Mr. Box, approach.

 4         (Thereupon, the following was had at the bench.)

 5              THE COURT:  You know better than that.  That

 6    objection has previously been ruled on.  Twenty-five dollars

 7    to the Mental Health Court of Oklahoma County and don't ever

 8    do it in my courtroom again.

 9              MR. BOX:  Okay.

10         (Thereupon, the following was had in open court.)

11              MR. BOX:  I have no further questions for this

12    witness.

13              THE COURT:  Thank you.

14              Is there recross?

15              MS. HIGH:  No, Judge.

16              THE COURT:  You may step down.

17              Is there further, Mr. Box?

18              MR. BOX:  The Defense rests.

19              THE COURT:  Will there be rebuttal?

20              MS. HIGH:  No, Judge.

21              THE COURT:  All right.  Ladies and gentlemen of

22    the jury, it's now time for me to work with the attorneys.

23    I've been working on jury instructions all throughout the

24    trial but we need to sit down and review them together and

25    we'll need to make copies so here's what I'm going to do.
```

92

1   I'm going to ask you to be back in the courtroom at 1:00. I

2   think we can have everything ready for you then.

3         I would ask you to make your phone calls and stuff

4   before you come back into the courtroom so that -- frankly,

5   usually what happens is that when I read the instructions it

6   will probably take 20 minutes or so and then both the State

7   and the Defendant will give closing arguments, and then once

8   you retire to enter upon your deliberations there can't be

9   any rush to judgment.

10        And I'm sure you would agree with me, no one can

11   predict how long that will take. So you just need to be

12   prepared to stay for however long it takes for you all to

13   reach a verdict. Okay?

14        And for those of you who are alternates, if you

15   want to bring books or something to read, I think that might

16   make you more comfortable while the jury is out.

17        So ladies and gentlemen of the jury, once again,

18   you are admonished. You all know what that means and I'll

19   ask you to be back in the courtroom at 1:00. Thank you.

20   The jury is excused.

21      (Thereupon, the jury was excused, at which time, the

22        following was had.)

23       THE COURT: Counsel, would you approach, please?

24       Do you want to excuse your client for the purposes

25   of discussing this?

93

```
 1              MR. BOX:  Yes.

 2              THE COURT:  The Defendant may be excused.

 3              I'm off the record.

 4         (Thereupon, a recess was had, after which, with all

 5         counsel present, the following was had outside the

 6         presence and hearing of the Defendant and the jury.).)

 7              THE COURT:  I'm going back on the record.  I've

 8    given you guys copies of proposed Instructions.  Are there

 9    any instructions requested by the Defendant that have not

10    been included?

11              MR. BOX:  No, Your Honor.

12              THE COURT:  Are there any objections to any of the

13    proposed instructions?

14              MR. BOX:  No, Your Honor.

15              THE COURT:  Have you looked at the verdict form?

16              MR. BOX:  Yes, Your Honor.

17              THE COURT:  Does it appear appropriate?

18              MR. BOX:  Yes, Your Honor.

19              THE COURT:  Are there any requested instructions

20    from the the State of Oklahoma that are not included?

21              MR. BOX:  No, Judge.

22              THE COURT:  Any objections to those proposed?

23              MS. HIGH:  No.

24              THE COURT:  Verdict form appear appropriate?

25              MS. HIGH:  Yes.
```

94

1          THE COURT:  Okay.  I'm going to be preparing the

2    abstract that I promised the jury and I will show it to you

3    all a little bit before 1:00 so we can make copies.  And

4    I'll excuse you until that happy time.  Thank you.

5       (Thereupon, a recess was had, after which, with all

6       parties present, the following was had outside the

7       hearing of the jury.)

8          THE COURT:  I have provided to counsel a copy of

9    the abstract of this case that I had promised the jurors and

10   I've asked them to look through it to make sure that I have

11   described everything in neutral terms and that it appears

12   appropriate.  No one has any objections, am I correct?

13          MS. HIGH:  Not from the State, Judge.

14          MR. BOX:  Not from the Defendant, Your Honor.

15          THE COURT:  And are there any corrections that

16   need to be made of any type?

17          MR. BOX:  No, Your Honor.

18          THE COURT:  I'm marking a copy of this then as

19   Court's 3 for the record.

20          And we had an informal conversation before going

21   on the record about a recent change in the law having to do

22   with instructing the jury about crimes in which a Defendant

23   is ordered to serve 85 percent of their time before they can

24   be considered for parole.

25          We've talked about different approaches to this

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  because then we're in the position of trying to define what

2  life means.  And, frankly, my understanding of the law is

3  that that is to be decided by the executive branch, not by

4  the courts.

5        And at this point, today, the status of the law

6  is, I believe that DOC considers it as 45 years.  So the

7  approach that I think we've agreed upon is not to change the

8  instructions to the jury, but that if the jury asks the

9  question how much time would a Defendant have to serve

10  before being considered for parole, then I would answer that

11  in this particular crime, the law is that a Defendant would

12  have to serve 85 percent of their sentence before

13  consideration for parole.

14        Have I accurately stated the agreement that we

15  made before we went on the record?

16        MS. HIGH:  Yes, Judge.

17        MR. BOX:  Yes, Your Honor.

18        THE COURT:  All right.  Then is there anything

19  else we need to take care of before we bring the jury out

20  this afternoon?

21        MR. BOX:  I don't believe so, Your Honor.

22        MS. HIGH:  No.

23        THE COURT:  All right.  Let's do it.

24        (Thereupon, with all counsel and the Defendant present

25        and the jury seated in the box, the Instructions of the

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

1    Court were read to the jury, after which, the following

2    was had in open court.)

3        THE COURT:  For the State.

4        MS. HIGH:  May it please the Court, counsel, and

5    ladies and gentlemen of the jury.  You will see as you have

6    seen through this entire trial that in closing arguments the

7    State goes first and the State goes last.  I will do what we

8    call first closing argument for the State and Mr. Guhl will

9    do second and Mr. Box will go in the middle, and that's for

10   one reason and one reason only, because the State of

11   Oklahoma has the burden of proof in this case.  It's for no

12   other reason.

13       What I want to do in this first portion of the

14   State's closing argument is to discuss with you the

15   instructions that the Judge just read to you.  Because we've

16   talked a lot about getting a fair trial and everybody is

17   entitled to a fair trial in this courtroom.

18       Well, we only have fair trials where jurors follow

19   the law.  And so you've got to understand what the law

20   expects of you and requires you to do in order to do your

21   job faithfully and conscientiously as you were sworn that

22   you would do.

23       And so the first thing I want to talk about is

24   that the law tells you exactly how to do your job.  If you

25   look at instruction number 20 on the second page, it tells

1  you the first thing that you have to do as a jury when you

2  get in that room.

3          After you have retired to consider your verdict,

4  select one of your number as foreman and enter upon your

5  deliberations.  So the first thing that the 12 of you are

6  going to do is select one of you as a leader.  You select

7  that person however you want, but one of you has to be the

8  foreperson of this jury.  And then you enter upon your

9  deliberations.

10          And what that means is you are finally free to

11  talk about and discuss what you've seen and heard in this

12  courtroom that has been introduced as evidence.  You begin

13  to deliberate this case.

14          Now, instruction number 1 sets out for you -- and

15  additionally instruction number 20 on the first page tells

16  you you have five responsibilities as a jury.  Five.

17          It is your responsibility as jurors to, one,

18  determine the facts from the evidence; two, to follow the

19  rules of law as stated in these instructions; three, to

20  reach a fair and impartial verdict of guilty or not guilty

21  based upon the evidence; and, four, to determine punishment

22  if you should find the Defendant guilty as you have sworn

23  you would do.  And then the fifth one we'll talk about in a

24  minute.

25          But instruction number 1 tells you these

98

 1  instructions contain all the rules of law that are to be

 2  applied by you to this case and all the rules of law by

 3  which you are to weigh the evidence and determine the facts.

 4  You should not consider any matter of fact or of law except

 5  what has been given to you while this court is or has been

 6  in session.

 7       Very, very simple.  If you didn't hear it or see

 8  it within the confines of the four walls of this courtroom,

 9  then it doesn't matter in your deliberations, save one

10  thing, your common sense, and we'll discuss that.

11       But the law also tells you in instruction number 1

12  on the second page what the evidence is.  Because you are to

13  determine the facts at issue.  And I submit to you all you

14  can use to determine what happened is the evidence.

15       Evidence is the testimony received from witnesses

16  under oath, stipulations made by the attorneys, and the

17  exhibits admitted into evidence during the trial.  Nothing

18  else.  We talked about that during voir dire.

19       All the evidence comes from that end of the

20  courtroom.  It doesn't come from back here.  So things you

21  may have seen, you may have thought about that happened back

22  here on the other side of the bar, it can't be considered by

23  you as evidence.

24       And why is that?  Because you see things and you

25  make assumptions and you assume relationships and you just

99

1    might be wrong.

2         So everything that came from this end of the

3    courtroom, that's the evidence.  That's the evidence.  You

4    take that evidence and you apply this law and you determine

5    what is right and just in this case.  That's very simply how

6    you reach the conclusions that you have to make.  Because

7    you have to determine the facts.

8         You listen to everything that you heard and you

9    decide what the facts are.  And I submit to you as you sit

10   there now you well know everything that you heard can't be

11   true.  You know that.  Because you had Demetria Tinner, Kurt

12   Brazille, Dewan Debose, all told you this Defendant is a

13   killer.

14        And then you heard this Defendant say, ladies and

15   gentlemen, it's a case of mistaken identity.  Somebody's not

16   got the facts right.  And that's your job.  You are going to

17   have to decide in this case who is telling you the truth.

18   It's not a difficult case.  This isn't rocket science, this

19   is, who do you believe?

20        Who do you believe?  Do you believe Demetria

21   Tinner?  Do you believe Christa Anderson?  Do you believe

22   Kurt Brazille?  Do you believe Kyle Laws?  Do you believe

23   Dewan Debose?  Or do you believe this is a case of mistaken

24   identity?  It's a simple, simple decision that you have to

25   make.

1    But it becomes complicated when you begin to think

2    about the ramifications of the decision that you're going to

3    make.  But the law tells you, you can use your common sense.

4    And instruction number 20, from all of the facts

5    and circumstances appearing in evidence and coming to your

6    observation during trial, aided by the knowledge which you

7    each possess in common with other persons, you will reach

8    your conclusions.

9    And another instruction, instruction number 2

10   tells you very, very plainly, you may make deductions and

11   reach conclusions which reason and common sense lead you to

12   draw from the facts which you find to have been established

13   by the testimony and the evidence in this case.

14   You have to use your common sense to make these

15   decisions.  And we talked about this in voir dire.  It comes

16   down to, who do you believe?  And how do you decide who's

17   telling you the truth?

18   We talked about the example with children.  You've

19   got a rule in your house, you believe the rule may have been

20   broken.  Someone brings an allegation, the rule has been

21   broken.  How do you decide?  You look at the evidence, you

22   look for the corroboration, and you decide who is telling

23   you the truth.  It's no different.

24   This is no different.  Because this is a court of

25   law and the consequences to Mr. Morris are high -- not as

1    high as they were to Rodney Perry, but they are high -- I

2    submit to you people tend to think, oh, gosh, well, I don't

3    know, I don't know, I don't know.  You do know.

4            As you listen to those witnesses, I submit that

5    when they left the stand you had an impression.  I believed

6    that person.  I didn't believe that person.  This is not

7    rocket science.  This is simple.  It's unfortunate that it

8    involves the death of Rodney Perry, but the decision that

9    you have to make is simple.

10           So the first -- you have to determine the facts

11   and follow the law.  Every one of you told us you would

12   follow the law whether you agreed with it, disagreed with

13   it, thought it was wrong, just didn't like it, whatever it

14   was when Judge Gray gave you the law, you would follow it.

15           And I submit there are probably some things in

16   this law that maybe some of you hadn't considered before,

17   like the aiding and abetting instructions.  That one person

18   can be held criminally responsible for the conduct of

19   another.  But that's the law and you each said that you

20   would follow it.

21           And now is the time when we call upon you to

22   follow through on those oaths that you took, that you would

23   follow the law and you would discharge your duties as jurors

24   faithfully and conscientiously.

25           Because this is an important case.  This is an

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   important case.  A citizen from our community's life has

2   been taken.  Now, you don't know very much about Rodney

3   Perry.  You know virtually nothing about him.  You know that

4   he was at the Rockwell Villa Apartments, you know what

5   clothes he had on because you can see in the photograph the

6   clothing that he had on, and you know how he died.  And you

7   don't know anything else about him.

8          You don't need to know anything else about him

9   because I submit to you being at Rockwell Villa Apartments

10  at 11:30 at night doesn't make your death any less of a

11  crime.

12         Now, I know that there are concerns about Crips

13  and Bloods.  If he's a Crip, if he's a Blood, if he's a

14  Crip, if he's a Blood, what difference does that make?  Does

15  that lessen the value of Rodney Perry's life?  Does that

16  mitigate his responsibility?

17         If this is a Blood killing a Crip or a Crip

18  killing a Blood, what difference does that make?  Is there

19  some special rule out there that gang members can kill each

20  other?  No.  This is the law.  And it talks about the death

21  of a human and that's what you are here to decide.

22         You haven't heard -- outside of that 911 tape, you

23  have not heard anything about gang membership.  And I know

24  from the conversations that you had with Judge Gray back in

25  chambers some of you have concerns about that.  How is that

1    supposed to impact your verdict?

2          Are you going to value Rodney Perry's life less?

3    Are you going to value his life more?  Are you going to

4    apply a different set of rules?  There are no different

5    rules for gang members, for people who are out in the

6    parking lot of Rockwell Villa at 11:30 at night on February

7    the 20th of 2004.  The rules are the same.

8          You can't beat people to death in a parking lot no

9    matter how much money you have or how much money you don't

10   have or where you live or what the color of your skin is or

11   what color clothes you have on, or how offended you might be

12   because somebody has got red clothes on.  It doesn't matter.

13   None of that matters.

14         That is why we are a civilized society.  Because

15   it doesn't matter where people live, where they came from,

16   how many children they have.  It doesn't matter.  Rules are

17   rules.

18         And when Rodney Perry's life was taken, I submit

19   to you as you sit there now, you well know it was a murder.

20   You're not thinking, was this self defense?  Is this somehow

21   justifiable homicide?  You're not thinking that.  You know

22   Rodney Perry was murdered.  And no matter what somebody's

23   life has brought them to, you can't do that.  That's simple.

24         Your fifth responsibility is instruction number 20

25   and I submit to you it's going to be the principle

1  responsibility you're going to have.  It is your

2  responsibility to determine the credibility of each witness

3  and the weight to be given the testimony of each witness.

4       In determining such weight or credibility you may

5  properly consider, one, the interest, if any, which the

6  witness may have in the result of the trial.

7       Well, let's talk about the witnesses.  Demetria

8  Tinner, what interest does she have?

9       Now, these witnesses told you that they knew

10  Rodney Perry from when he lived in Rockwell Villa

11  Apartments.  Every witness told you, except Dewan Debose,

12  that they didn't know it was Rodney Perry until he's dead on

13  the ground.  So what interests do they have?  What benefit

14  are they getting from this?

15       And you can't just think, well, maybe this,

16  because you see "maybe this" is speculating.  And you heard

17  not one word of evidence.  Nothing was brought to you about

18  any interest that these witnesses have in the outcome of

19  this trial.

20       The relation of the witnesses to the party -- to

21  the parties.  Well, they knew him.  They knew him.  Do you

22  think that has made Demetria Tinner identify, because you

23  know, you know from her testimony she's testified before and

24  you know that she's identified people.  Is that old

25  friendship, old acquaintanceship with Rodney Perry going to

105

1   make her pick out these three people whom she had, save

2   Howard Morris, never seen before?

3        The bias or prejudice of the witness.  Now, what

4   bias or prejudice have you seen on the part of any of the

5   State's witnesses?  What bias was shown to you?  What

6   prejudice?

7        Now, I'm not sitting here telling you that I

8   didn't see Demetria Tinner get a little testy.  Sure, she

9   did.  Sure, she did.  For whatever reason.  Whether it be

10  she was embarrassed because she was being called on the

11  carpet for not telling what she knew before, for whatever

12  reason.  But when you listen to her testimony did you think

13  she was making that up?  Do you think she was making that

14  up?

15       Because folks, she calls 911 within seconds to

16  minutes of this.  Has she got an agenda against Howard

17  Morris and the two other individuals?  Why?  What evidence

18  has been brought to you of that?  None.

19       Howard Morris tells you she's not telling you the

20  truth.  He never seen her before, he doesn't know her from

21  Eve.  Why is she going to lie to you about that?  Why?

22       Candor, fairness, intelligence, and demeanor of

23  the witness.  The ability of the witness to remember and

24  relate past occurrences.  Now, how many of these witnesses

25  did you hear had told different stories over time?  None.

1    None.

2         Did you ever hear that somehow they had said it

3    happened some other way than what they told you on the

4    stand?  You absolutely did not.  They have told what they

5    knew to the best of their ability from the beginning, save

6    Demetria Tinner who did not tell us that it was Howard

7    Morris until February of 2004.

8         Everybody else has told the same story over and

9    over and over again and has identified this Defendant at

10   every opportunity over and over and over again.  What more

11   do you expect?

12        The means of observation and the opportunity of

13   knowing the matters about which the witness has testified.

14   You didn't hear anything from any of these witnesses on

15   direct or cross-examination that would lead you to believe

16   they couldn't see what they said they saw.  They were there.

17   They saw what they saw and they told you it happened.

18        Think about the evidence in terms of whether or

19   not they're telling you the truth about what they saw.

20   Because all of these witnesses did not see all of what

21   transpired.  So let's talk about what I submit to you is a

22   compelling piece of evidence about the fact that they're

23   telling you the truth.

24        What did Christa Anderson tell you about the

25   position of the body when they drove off?  She couldn't see

1  his face because he was up under the car.

2          Well, what did Taylor Shaw tell you was the

3  position of Rodney Perry's body when he got on the scene?

4  He was up against the car with his head on the car.

5          Now, clearly, something has happened in there if

6  somebody is telling you -- if both of those people are

7  telling you the truth.  And we know what happened.  We know

8  that after Demetria Tinner and Christa Anderson left, that

9  is when Kurt Brazille and Kyle Laws and Dewan Debose tell

10  you that the three men went back over to Rodney Perry's

11  body.

12          Because where do those witnesses -- where does

13  Dewan Debose -- where do they tell you that the body is?

14  Kyle Laws told you very clearly he's up against the car.  He

15  is up against the car.  And you don't have to take their

16  word for it.  Look at the photographs.  And I realize that

17  you couldn't see the photographs terribly well and

18  fortunately for you, they're going to be in the jury room

19  with you.  And I want you to look at State's Exhibit

20  Number 4.

21          Rodney Perry is laid out on the ground.  Look on

22  the car because there's like dirt on the car and you can see

23  what I submit to you is a slide mark down the car.  And if

24  you look, there is a stain or a dark spot on the car,

25  completely consistent with Mr. Perry having been up against

1   of the side of the car and then moved by EMSA to this

2   position.

3          Now, do you think those witnesses are so

4   sophisticated that they could get together and make that up

5   to where it just happens to fit?  Is that what you think

6   this is?  A conspiracy between Demetria Tinner, Kyle Laws,

7   Kurt Brazille, is that what this is?

8          This Defendant couldn't even give you a reason

9   that these people would all get together and do this.

10  You've heard no evidence that would indicate to you these

11  people are not telling you what they saw.

12         Instruction number 3 talks to you -- because you

13  know the evidence is the testimony, the stipulations, and

14  the exhibits.  Well, instruction number 3 tells you -- sort

15  of breaks it down into two further categories, direct and

16  circumstantial evidence.

17         Direct evidence is what you have in this case.

18  You have eyewitness identifications.  You know that.

19  Circumstantially you can take -- and it says circumstantial

20  evidence is the proof of facts or circumstances which gives

21  rise to a reasonable inference of other connected facts that

22  tend to show the guilt or innocence of a Defendant.

23         Well, circumstantial evidence is that example that

24  we talked about in voir dire.  Pan of brownies on the table,

25  come home, it's gone, dog has got chocolate all over its

1  head.  Circumstantially you know what happened to the

2  brownies.  You don't need an eyewitness to tell you what

3  happened.  Why?  Because you've used your common sense and

4  you've decided what really happened.

5           You can look at Dr. Choi's testimony and her

6  description of the injuries to Rodney Perry.  Think about

7  the description that the witnesses gave you.  Where did they

8  tell you that Rodney Perry was being beaten?  Upper body.

9  Upper body.  Where does he have injury?  On his upper body.

10          He doesn't have injury from the waist down.  He

11  has one mark on his lower back.  Other than that, he has no

12  injury down here.  It is completely consistent with what

13  they are telling you.

14          The law makes no distinction in the weight to be

15  given direct or circumstantial evidence.  Each one of them

16  are equally strong.

17          We talked about in voir dire -- instruction number

18  5.  You know there are three people charged with this

19  murder.  You're here to decide whether or not this Defendant

20  is guilty.  That is your only decision with regard to your

21  service this week.  But the law also tells you that you have

22  to consider the actions of those other people.

23          Instruction number 10 talks to you about aiding

24  and abetting.  All persons concerned in the commission of a

25  crime are regarded by the law as principals and equally

1   guilty thereof.

2          One who directly and actively commits the act or

3   acts constituting the offense knowingly and with criminal

4   intent aids and abets the commission of the offense, whether

5   present or not, advises or encourages the commission of the

6   on offense.  They're all principals, ladies and gentlemen.

7   Because what do Demetria Tinner and Christa Anderson tell

8   you?  They are all kicking, stomping, beating Rodney Perry.

9          And let's talk about for just a moment about the

10  fact that they say there were four.  Now, I believe at one

11  point you heard somebody say maybe five.  Okay.  So you

12  think, Well, God, we're only hearing about three people

13  here.  What about the other two?

14         What about the other two?  What if the other two

15  are never caught?  Does that make him less guilty or is that

16  just an unfortunate fact of life that sometimes people get

17  away with it?

18         So the fact that you hear about more people, do

19  you ever hear less than three?  Does anybody go:  It was

20  just one.  I think it was two.  No, you always hear at least

21  three, with the potential to be four or five.

22         How many ever there were, the witnesses tell you

23  they all actively participated.  There was nobody standing

24  off at the side, nobody going, hey, stop, nobody doing

25  anything other than kicking, stomping, and beating Rodney

1   Perry to death.  And under the law, that makes them all

2   equally guilty.

3          So the fact that we can't bring to you some

4   evidence that tells you that Howard Morris delivered the

5   coup de gras, that last, final blow from which Rodney Perry

6   could no longer survive, that doesn't make him not guilty.

7   He is part of a band of three that beat Rodney Perry to

8   death and he is just as guilty as the other two under the

9   law and that is where you have to follow the law.

10          It's not new, it's not novel.  And if you think

11   about it in other circumstances, you've thought about it

12   before.  Drug store robbery, one person drives the car,

13   other person goes in with the gun and robs the store, comes

14   back out, driver drives and gets away.  Do you think the

15   driver is guilty?  Well, of course, he is.  Because he has

16   actively participated.  He's just as guilty.

17          No different here.  These three men, one of which

18   is Howard Morris, are guilty of the murder of Rodney Perry.

19          There's an instruction number 7 that talks to you

20   about the credibility of the Defendant as a witness and it

21   says, a Defendant who wishes to testify is a competent

22   witness and the Defendant's testimony is to be judged in the

23   same way as that of any other witness.

24          So all of those things that you've thought and

25   that you're going to talk about with regard to the State's

1   witnesses and the things that you're going to look to to

2   say, hmmm, did you see that, did you see that, use that same

3   standard on Howard Morris.

4        Because he doesn't get a step up.  He doesn't get

5   a head start.  He doesn't get anything because he's the

6   Defendant.  Absolutely nothing.  He is to be judged just

7   like every other witness and the State of Oklahoma asks you

8   to do just that.

9        When you consider his demeanor, his candor, his

10  ability to relate past occurrences, ask yourself, what does

11  that tell you?

12       Now, we know that state-issued ID that he got on

13  January the 14th has an address on North MacArthur.  Now, he

14  can't remember when he moved down to the south side but he's

15  telling you he was down on the south side that night.

16       Well, now, if my witnesses couldn't tell you

17  something like that, when they had moved and how they had

18  moved, what would you think?  Well, think that about Howard

19  Morris.

20       Because I submit to you at first he said January

21  the 4th and then I pointed out to him, no, look at that

22  again because it's January the 14th, he can't remember.  But

23  on January the 14th, he was given an address on North

24  MacArthur as being his home address.

25       Here in court he didn't tell you anything about

1  living on the north side.  He didn't tell you anything about

2  any of that.  So judge him just like you do every other

3  witness.

4          The instruction about opinion witnesses, I submit

5  that's primarily Dr. Choi.  She's the expert witness.  She's

6  the pathologist.  And what that tells you is you don't have

7  to believe her if you don't want to believe her.  If you

8  think somehow Rodney Perry died by some means other than

9  being beaten to death, you have the right to do that.  But I

10  submit you've heard no evidence of that.

11          So you don't have to surrender your opinion, but

12  why wouldn't you believe Dr. Choi when she tells you that

13  the manner of death is a homicide and the cause of death is

14  head injury, blunt force trauma to the head?

15          Now, instruction number 9, that's eyewitness

16  identifications.  Because you get special law on this.  Let

17  me ask you this, if I asked you to tell me what color suit

18  Mr. Guhl had on yesterday, how many of you could do that?

19  How about his tie?  What kind of tie did he have on

20  yesterday?  You sat here all day long with us.  He got up

21  here, he's been all over the courtroom.  Can you tell me?

22          How about could you recognize Mr. Guhl if you saw

23  him again?  You could.  Why?  Because you're not focusing on

24  his clothing, you're focusing on his face and on what he's

25  doing, what he's saying.  Because that's primarily what we

114

1   do, we talk.  And that's what you're focused on.

2            You think it's different in other situations?

3   It's not.  It's not any different.  And this is not nearly,

4   I submit, as stressful as what Demetria Tinner and Christa

5   Anderson observed.

6            And they're not hiding anything from you.  When

7   you listen to this 911 tape, ask if Demetria Tinner or

8   Christa Anderson could tell you what those men had on

9   seconds to minutes after it happened.

10       (Thereupon, State's Exhibit 42 was played.)

11            MS. HIGH:  What did she do when he asked for the

12   description?  She turns to her friend Christa and says,

13   "What were they wearing?"  And then she says, "Ah, hell, it

14   was too many of them."

15            Now, do you find that unreasonable that she can't

16   at that moment or at any moment after that go, "Well, all

17   right.  The first one was about 6-foot tall, he had on a

18   jacket and a pair of blue jeans"?

19            I'm always amazed that people don't hang up on the

20   911 people because they're so calm and the people who are

21   calling have just witnessed a horrifying event and they get

22   asked these questions.  And she has no idea.  They all had

23   on light blue and white.  They all had on light blue and

24   white.  But that's after she says, "Ah, hell, there were too

25   many of them."

1    But there's only one of him.  Okay.  So you can't
2  tell me what color suit.  And was it striped or was it
3  solid?  Okay.  So that's yesterday.  How about Monday?
4  Because, see, you've gotten to look at him for two full
5  days.  Tell me what clothing he had on.  If you can't do
6  that after you've sat here.

7    But let me ask you if you can remember what he
8  said in his opening statement.  Do you remember any of what
9  he said in his opening statement?  I submit some of you
10  probably do because you're listening to what he says.

11    Well, Demetria Tinner and Christa Anderson are
12  watching what those people did.  They're not worried about
13  the clothing.  And Christa Anderson said when she
14  testified -- she was being asked about what did the men have
15  on and she said, "It's kind of hard to focus on something
16  like that when you are witnessing what we did."

17    Now, is that unreasonable?  Is that unreasonable?
18  Or do you think that you would have the ability to just
19  rotely be able to tell what all these men had on and which
20  one had it on?

21    Because if you look at the descriptions that we've
22  gotten, they have consistencies among them.  Kurt Brazille,
23  baseball hat.  Dewan Debose said a baseball hat.

24    Kyle Laws, teardrops.  They noticed the teardrops.
25  Where are the teardrops on that person?  On his face.  They

1    notice the teardrops because they're looking at his face.

2         But these are the things you're supposed to

3    consider.  Whether the witness had an opportunity to observe

4    the subject clearly.  They all did.  They all did.  And

5    Demetria Tinner tells you that Howard Morris turned and

6    began to move towards her car, and she believes it is

7    because her car is similar to the girl that she associates

8    with Howard Morris.  There was eye contact made, she assumes

9    he figured out not the girlfriend so he turned back away.

10        Whether the witness is positive in the

11   identification.  Did any of them waver?  Did you ever hear

12   that they have ever wavered?  Ever wavered?  Whether the

13   witness' identification is weakened by a prior failure to

14   identify?  No.

15        And Mr. Box asked questions to Demetria about -- a

16   question being asked of her could you recognize, could you

17   identify any of them, and she said, "No."

18        And in the same prelim she picks out two men.  Now

19   that's not this Defendant's prelim because she wasn't

20   present at this Defendant's preliminary hearing.  Because

21   she was present at this Defendant's preliminary hearing.

22   You know this the first time she has been in court with him.

23        But you know that Kurt Brazille has testified,

24   because he told you, five times.  Did you ever hear anything

25   about a prior failure to identify?  No, you did not.  You

1    did not.

2         How about Dewan Debose?  He had one opportunity.

3    He testified at preliminary hearing.  Did he pick him out?

4    He absolutely did.  So it's not weakened by a prior failure

5    to identify.

6         Whether the witness' testimony remained positive

7    and unqualified after cross-examination.  Not a witness

8    wavered.  Not a one.  Not a one.  Demetria Tinner said,

9    "That don't make him not --" yeah -- "That don't make it not

10   him," because she hadn't told that story before.  It don't

11   make him not him.

12        And whether the witness' prior description of the

13   person or thing was accurate.  And we've talked about that.

14   You've got to use your common sense when you have these

15   expectations of what you expect people to do.

16        Now, you may think, man, you want me to put

17   somebody in prison for the rest of their life based upon

18   these people coming in here and telling me that this man was

19   there?  I don't know if I can do that.  Well, let's look at

20   it from this situation.

21        Some of you have had your home burglarized, some

22   of you haven't.  But I want you to imagine in your mind that

23   you had your home burglarized.  We know how that usually

24   happens.  You come home from work or you come home from

25   whatever and let's say your front door is kicked in.  And

118

1   you call the police and you say, "Hey, somebody has broke

2   into my house and stole my television." The police come

3   out.

4        They come out. You're standing on front porch

5   talking to the police. You have no idea of who has done

6   this. You can't tell them who did it, but your across the

7   street neighbor comes over and goes, "Hey, I saw the man

8   that did that and this is what he looks like." And that

9   person is able to identify your burglar.

10       Now, are you going to expect that person to be

11  believed? That eyewitness identification would be good

12  enough for you, wouldn't it? What's the difference? It

13  comes down to, who do you believe? Who do you believe?

14       Just because this isn't your life doesn't somehow

15  raise the bar to some unattainable standard to where we've

16  got to have videotapes or we've got to have confessions,

17  we've got to have something. We have three eyewitnesses.

18  Three eyewitnesses who all say Howard Morris murdered Rodney

19  Perry. Use your common sense.

20       Kurt Brazille told you -- that was the last thing

21  he said to you, because I asked him, were you looking at

22  their clothing and he said, "No, I was focused on their

23  faces."

24       And think of the description that Kurt Brazille

25  gave you of this Defendant. Because this is the lip biter.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   This is the guy that had his lip in and was saying, "I'll

2   get a fair one with anybody," with the baseball cap on, with

3   the Tar Heels clothing on.

4        Now, maybe you think it's a coincidence that when

5   next law enforcement becomes interested in Howard Morris on

6   September the 2nd of 2004, he's got Tar Heels clothing on.

7   And maybe you think it's a coincidence that Demetria Tinner

8   tells you he goes by the name NC, he's got -- described as

9   having Tar Heels clothing on that night.

10        And Tar Heels clothing, their insignia just

11   happens to be NC. Maybe you think that's a coincidence.  I

12   submit to you it is not.  It is not a coincidence.  If it is

13   a coincidence, then Howard Morris is without a doubt the

14   unluckiest man on the planet because he has had three people

15   who don't know him identify him and he's got the same kind

16   of clothing on when he is arrested.

17        Do you think that that is simply a coincidence or

18   do you think those eyewitnesses are telling you the truth?

19        We talked about voir dire that what you're here to

20   decide is whether or not the State of Oklahoma has proven to

21   you the elements of the crime.  And you know what he's

22   charged with.  The crime that he's charged with is Murder in

23   the First Degree.

24        And there are some instructions that come to you

25   along with the elements of Murder in the First Degree.  And

120

1   the first one is:  No person may be convicted of Murder in
2   the First Degree unless his conduct caused the death of the
3   person allegedly killed.

4            Well, that makes sense.  You're not going to be
5   held responsible if your conduct didn't cause the death.
6   Well, we know in this case beyond all doubt the conduct of
7   the three men out there that night caused Rodney Perry's
8   death.  So this isn't an issue.  The issue is, do you
9   believe he's one of the three men?

10           No person -- this is instruction number 18, no
11  person may be convicted of Murder in the First Degree
12  unless, one, the fact of the death of the person allegedly
13  killed; and, two, the fact that his death was caused by the
14  conduct of another person are established as independent
15  facts and beyond a reasonable doubt.

16           He was killed and he was killed by somebody else.
17  It's not a suicide.  It was not a suicide.  Rodney Perry
18  didn't beat himself to death.  He was killed and he was
19  killed by somebody else.  So that's not an issue in this
20  case.  The issue is, do you believe that Howard Morris is
21  the killer?

22           And that brings us to the elements and instruction
23  number 15 and there are only four.  Death of a human.  We
24  talked about that.  Rodney Perry was as human as anybody
25  else and he is dead today.

1        And, secondly, the death was unlawful.  Was Rodney

2   Perry's death unlawful?  Did you hear any evidence about

3   some excuse, some justification, some reason why Rodney

4   Perry is dead other than he was murdered?  No, you did not.

5        Third, the death was caused by the Defendant.  I'm

6   not going to beat that horse any more.  I submit to you we

7   have proven to you beyond a reasonable doubt through

8   eyewitness testimony this Defendant caused the death of

9   Rodney Perry.  He is guilty as a principal along with the

10  two other men.

11       And, fourth, the death was caused with malice

12  aforethought.  And we talked about that for just a moment in

13  voir dire about you hear premeditation, you hear these terms

14  on TV.  We don't have that in Oklahoma law.

15       What we have is malice aforethought.  And malice

16  aforethought simply means a deliberate intention to take

17  away the life of a human being.  It does not mean hatred,

18  spite, or ill will.

19       The deliberate intent must be formed before the

20  act and must exist at the time the homicidal act is

21  committed.  The intent may have been formed instantly before

22  the commission of the act.

23       Now, how do you know that Howard Morris and two

24  other men acted with malice aforethought?  Well, instruction

25  number 17 tells you you can look at the external

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

122

1    circumstances surrounding the commission of a homicidal act.

2              Well, first of all, I submit, you consider, well,

3    they killed him.  They did kill him.  When you think about

4    what people intend to do, do you intend -- typically the

5    consequences that come, is that what you intended to do?

6    And I submit to you that it does.  If they intended to beat

7    up Rodney Perry, why are three men stomping, kicking, and

8    hitting him after he's on the ground?

9              And consider the extent of the injuries.  I mean,

10   most people are familiar with fights and injuries that come

11   from fights.  Do you see subgaliel hemorrhages?  Do you see

12   subarachnoid hemorrhages?  Do you see brain swelling such

13   that it presses down on the center of your brain and you

14   can't breathe any more and you die?  How about a rib

15   fracture?

16             The force, the ferociousness, the violence of the

17   beating that was delivered to Rodney King -- I'm sorry, to

18   Rodney Perry, clearly indicates to you they intended exactly

19   what they did, which is to take his life.

20             But look at what they did afterwards, because you

21   can look at the external circumstances surrounding it.  Kurt

22   Brazille tells you that when he starts coming in contact

23   with this Defendant, which would have been quickly

24   afterwards, because they're walking back, this Defendant is

25   biting on his lip saying, "I'll get a fair one on with

123

1   anybody.  I'll get a fair one on with anybody."  Not, "Oh,

2   my God, somebody call 911.  This has gotten out of hand.

3   Oh, my word, we've got to get that man some help."  Nothing

4   like that.

5       What does he do after that?  He uses the phone --

6   well, they attempt to get in the car and leave but the

7   police are coming because Demetria Tinner has called 911.

8   And they can't leave.  And, so they get back in the car --

9   or they get out of the car and they go back up to Kurt

10  Brazille and they use the phone.

11      Now, do they use the phone to call 911?  No, oddly

12  enough, they don't.  This Defendant calls someone to come

13  and meet him at Abadan's.  Which Kurt Brazille told you was

14  a convenience store on 10th Street which can conveniently be

15  reached by going out the back footpath from the apartments

16  to 10th Street.

17      So consider those whenever you think, was this

18  just some horrible accident?  He didn't really mean to kill

19  him.  Well, he did kill him.  He did kill him.  He along

20  with Timothy Johnson and Jeremy Nicholson murdered in the

21  first degree with malice aforethought Rodney Lamont Perry.

22  They did exactly what they intended to do.

23      And if you will recall, they were bragging about

24  it afterwards.  Remember Kurt Brazille told you that the men

25  were saying, "You want to go over there and look at him?

1    You want to go over there and look at him?"  And Dewan

2    Debose said the same thing, "Do you want to go over there

3    and look at him?"  They're awfully proud of what they have

4    done because, I submit, they thought based upon where they

5    had chosen to commit this crime, nobody was going to call

6    the police.

7           And Kurt Brazille, ladies and gentlemen, wasn't

8    going to call the police.  He never did, did he?  He never

9    did.  It may be a fact of life in Rockwell Villa Apartments

10   that it's a dangerous place but when Demetria Tinner and

11   Christa Anderson made that decision to call 911, they

12   brought the rest of this community into that.

13          And in this community it is not okay to do what

14   they did, no matter where they chose to do it.  No matter

15   who they chose to do it to, for whatever reason.

16          Did he have the wrong color clothes on?  Don't

17   know.  But if he did have the wrong color clothes on, how

18   senseless is that?  How senseless is it that Rodney Perry

19   was killed because he had red clothes on?  And that's reason

20   enough for this Defendant, Jeremy Nicholson, and Timothy

21   Johnson to beat him to death in the parking lot.

22          The evidence is here.  I submit to you it's proof

23   beyond a reasonable doubt that this Defendant is guilty of

24   Murder in the First Degree and I ask you to so find.

25          THE COURT:  Thank you.

1        Mr. Box.

2        MR. BOX:   Thank you, Your Honor.

3        May it please the Court, opposing counsel.  This

4   is closing argument and as the Assistant District Attorney

5   has said, this is the last opportunity that I will get to

6   talk to you.

7        What the District Attorney just told you or just

8   said is not evidence and what I say is not evidence.  And

9   if, in fact -- I know my opposing counsel well, if they say

10  something that you remember the evidence a little

11  differently, I know they're not intentionally doing

12  anything, like I'm not intentionally misstating the

13  evidence.

14       It's up to you to determine what you heard from

15  that witness stand and what you see as physical evidence in

16  determining your verdict in this case.

17       If you recall, yesterday you took a couple oaths.

18  The first oath you took is when you entered the courtroom,

19  you took an oath to tell the truth, just like the witnesses

20  from this witness stand have taken over the last two days.

21  You took that oath, you told the truth, and you told this

22  Court and counsel certain aspects of your lives that we

23  could determine who could be the most fair and impartial

24  juror to sit on this case.

25       You took a second oath next.  Once you were

1    selected at jurors you took an oath that you would truly try

2    this case that is now before you and in that oath you took

3    an oath that you would follow the law that has been given to

4    you, and the Assistant District Attorney has already told

5    you about some of that law.

6    If you recall also during voir dire examination

7    yesterday, you would like to think that the lawyers involved

8    in this case know a little bit about their case.  You would

9    hope that to be true.

10    If you recall yesterday, the State of Oklahoma,

11    when they were asking questions, used an example of a

12    hallway.  And you recall they said, "Well, if there was

13    three people in the hallway and they were asked to relate

14    events that occurred in that hallway, there might be some

15    differences."

16    I believe that they were tipping their hand then.

17    They knew that they had three potential witnesses that were

18    going to say my client was involved but they also knew there

19    was going to be some problems with those witnesses.

20    If you recall, I asked you a very few questions

21    but I asked several of you specific questions and I asked

22    you could you weigh the evidence, could you determine the

23    credibility of the witnesses, could you weigh their ability

24    to remember past events, could you look at their demeanor in

25    deciding whether or not to believe their testimony.

```
 1          If you look at instruction 20 that the District
 2   Attorney has already read to you, you will find similar
 3   language in that instruction.  It's a coincidence?  No, it's
 4   not a coincidence.  You see the lawyers know about their
 5   case.  They know what you don't know until you hear the
 6   evidence.
 7          And I knew at that time that this case was going
 8   to boil down to some witnesses that take that stand and
 9   they're going to relate past events but there's going to be
10   some big differences in how they saw these past events.
11          I submit to you that at one point the State says,
12   "Well, it's a hallway."  Well, if there was three people in
13   the hallway, my position is they must have been in three
14   different hallways from the evidence that I heard in this
15   case.
16          You look at the law and you look at it in this
17   case.  You look at the testimony of the witnesses.  And
18   let's look at Ms. Tinner's testimony.  What was her
19   demeanor?  You're asked to look at her demeanor.  I believe
20   that she was quite sarcastic, that she got a little snappy.
21          And I will apologize to you if I have done
22   anything to offend you as a panel.  If my actions -- you get
23   in the trenches here and you get emotionally charged and
24   sometimes you say things, you do things.  Don't hold it
25   against my client.
```

128

```
 1              But let's look at her demeanor.  I submit to you
 2     it was sarcastic, it was snippy.  And let's think about her
 3     testimony.  What did she actually say?  Well, right off the
 4     bat to some of my questions, I asked her, "Have you
 5     testified previously under oath in this courthouse and have
 6     you been asked, did you recognize anybody involved in this
 7     case?"
 8              And under oath, like the oath you took to tell the
 9     truth, she said unequivocally, "No, except for Rodney."  You
10     heard that.  You heard that.  You heard that in the
11     testimony yesterday.
12              And you also heard that in my opening statement,
13     if you recall.  You heard when I gave my opening statement,
14     I gave you a synopsis of what I thought the evidence would
15     show, and you can recall if you can -- I talk fast -- but
16     you can recall what I told you I expected the evidence to
17     show.
18              And I told you in opening statement that I
19     expected that she would take the witness stand and she would
20     have to, unless she would deny it again, under oath admit
21     that she had previously said something incorrect.
22              I also told you in opening statement that I
23     anticipated that she would say under oath this time, "Oops.
24     I'm sorry.  I know Mr. Box's client, Howard Morris."  But
25     she just came up with this story in February of this year.
```

129

1  Opposing counsel, I think it was just an error, she said it

2  was 2004, it was 2006.

3          It was two months ago when she came up with the

4  story, "Oops, I know Howard Morris."  But she didn't have

5  any reasonable explanation.  She kind of crawdadded on it.

6  She kind of backed up when I pinned her on it.

7          And even the District Attorney asked her, "Well,

8  why did you just come up with this just now?"  And she was

9  kind of -- her voice -- the tone of her voice changed.  Two

10 years later she comes up with this.

11         You also heard her that she didn't remember the

12 description of the individuals involved in this case.

13 However she says very distinctly that my client's the one

14 that came up to her car and she saw him but she didn't

15 remember his description, she didn't remember what he looked

16 like.

17         She also says there was four people involved.  And

18 one of the most telling things about her testimony -- and

19 this is where it comes in looking in the hallway and the

20 State has already tipped their hand because you have an

21 instruction here about prior inconsistent statements.

22         Look at her testimony.  Is it important?  I

23 believe it's important.  The State of Oklahoma has the

24 burden in this case.  It never shifts to our table.  The

25 burden is beyond a reasonable doubt to your satisfaction.

1    What does she say?

2         She said under oath yesterday that she saw the car

3    leave the apartment complex, went north on Rockwell.  You

4    heard that testimony.  But you didn't hear it from anybody

5    else.  She also said that my client is the one that ran

6    through the crowd of the four people.  You didn't hear that

7    from anybody else.

8         So I ask you, the State of Oklahoma is saying,

9    "Well, disregard some of the inconsistencies, overlook the

10   inconsistencies.  Did you recall what color of tie he had on

11   yesterday?"  Well, he's not on trial.  I'm not on trial.

12   It's not a startling event.

13        But she apparently supposedly witnessed an event,

14   she's coming into the courtroom and coincidentally says,

15   "Well, I knew Mr. Box's client.  I just came up with that

16   two months ago and, by the way, the car left out of the

17   apartment complex."  We know the car never made it out of

18   the apartment complex.  It's in these pictures.  We know

19   it's in the apartment complex.  You see the pictures of it.

20   So her testimony is suspect.

21        And I want to ask you about that.  There's a

22   specific instruction.  You took your oath and you took your

23   oath to follow the law and I know you will because we've

24   talked to you several times, talked to you this morning,

25   we've talked to you during voir dire.  And it says

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

131

1    eyewitness identifications and it's instruction number 9.

2    And let's look at it.

3          It says eyewitness identifications are to be

4    scrutinized with extreme care.  Extreme care.  And it says

5    you should carefully consider the factors.  Pretty strong

6    language, okay?

7          And there's another one, number 5, whether the

8    witness' prior description of the person or thing was

9    accurate.  So you are to look at their prior statements,

10   their prior statements given.  Do they mesh up?  Are they

11   accurate?  In determining whether eyewitness identification

12   is true, is believable beyond a reasonable doubt.

13         Also, coincidentally, and you might think this is

14   just kind of maybe pushing the envelope and stuff, but what

15   did she say with the weather?  Do you recall?  She said it

16   wasn't cold out.  It wasn't cold out.  February 20th.  She

17   didn't have to say that.  Is that really a big material

18   element of the case?  No.  But she's under oath.  She said

19   it wasn't cold out.  What did one of the police officers

20   say?  It was cold.  It was cold.  So it's just points.  It's

21   points.

22         Because they're relying on these witnesses to put

23   my client away for life.  They're relying on these

24   witnesses.  These witnesses that have prior inconsistent

25   parts of their statement.

132

1        She also says, coincidentally, and you can recall
2   according to your memory, but she says there was nobody out
3   there when the beating occurred.  There was nobody out there
4   when the beating occurred.

5        Now, you can remember it differently and please
6   don't hold me to this, but I got the impression that she
7   basically says that the fight goes on, she's -- her and her
8   friend are the only ones out there, they see the fight and
9   then everybody comes down to the parking lot, and then the
10  people leave.  And then they follow behind them and see them
11  leave on Rockwell and see my client leave toward the crowd.

12       Well, we know from the other witnesses that they
13  say they witnessed a beating.  Now, they may not have
14  witnessed the start of the beating, but they actually
15  witnessed a beating.

16       How about Ms. Anderson?  Well, I'm not going to
17  spend a lot of time on Ms. Anderson because Ms. Anderson
18  could not make an identification in court.  She was not even
19  asked.  She cannot identify anybody.  All she can say is I
20  was in Ms. Tinner's car, we went through the parking lot and
21  we saw someone getting beaten to death.

22       We know that.  We stipulate to it.  We know that
23  Mr. Perry is dead and he died as a result of a homicide.
24  That's not the issue.  That is not the issue in this case.
25  I told you in opening statement there were certain aspects

1   of this case that you would not see any questions asked by

2   me, that we would not ask any questions.  There are certain

3   aspects of this case that are not in issue.

4        So I submit to you that you can take her testimony

5   as is but it's not that substantial.  Yes, she was a rider

6   in the car but she doesn't have a lot to add.  She can't

7   make identification.  She doesn't remember the clothing.

8   She just remembers Mr. Perry and where he was lying and that

9   he got beat to death.  And I'm not deemphasizing that.  It's

10  a shame.

11       Also, you heard through the testimony that there

12  was at least eight or nine or more people out there that

13  apparently saw this but you've only heard three come in the

14  courtroom to make an identification.

15       And let's talk about the police' testimony.  You

16  saw that they came in the courtroom.  You're going to get to

17  touch and feel the evidence and take it back with you, the

18  crime scene photographs, you're going to see an aerial,

19  you're going to see it in person, and it's going to

20  establish to your satisfaction that Mr. Perry died in that

21  apartment complex that night.  Back to a point and you're

22  going to hear also, you need to recall, one of the police

23  officers said it was cold out.

24       How about the medical examiner?  We had no issue

25  with the Medical Examiner's Office.  I told you in opening

 1  statement we'd stipulate to it.  Mr. Perry died as a result

 2  of blunt trauma injuries to his head, to his body.  He died

 3  as a violent death, a death as a result of a homicide.

 4          Let's look at Mr. Debose.  Coincidentally he was

 5  unavailable but we heard his testimony through a transcript

 6  and it was read.  Well, what about Mr. Debose testimony?

 7  He's the second so-called witness that identifies my client.

 8          What did he say that was interesting in my

 9  opinion?  He said that the tall man was the one that had the

10  "Thug Life" sweatshirt on.  And he said, if you recall, and

11  I gave him a chance to clarify this, he said that the entire

12  incident took two to two and a half hours.  Two to two and a

13  half hours.

14          He also said there was eight or nine people out

15  there.  And he said, unlike the first witness, Ms. Tinner,

16  that there was only three people involved in the beating.

17  Why do you ask is that important?  The State knew that they

18  had some conflicts.  They knew they had some contradictions.

19  You will have an instruction here about prior inconsistent

20  statements.

21          I anticipate -- they're going to get up, they get

22  up last, they have the burden and that's how it works.  And

23  that's right.  They're going to get up here and say, "So

24  what?"  All three people came in and said that's the man.

25  But it is so what.  It is beyond a reasonable doubt.  It is

135

1  important.

2          We have a man that testifies through transcript

3  that says it lasted two and a half hours.  There was no

4  trick questions.  I gave him every opportunity to clear it

5  up if he made a mistake.  No, it was two, two and a half

6  hours long.

7          How about Mr. Laws?  Well, you heard his

8  testimony.  He said there was four people.  He said he went

9  out there.  He was not asked to make identification because

10 he can't.  He said that only one person, if you recall, went

11 back to -- he only saw one person go back and beat the

12 victim.

13         If you recall his testimony, it was to the degree

14 that -- there was four people involved in it, then when he

15 got out there and other people got out there there was only

16 one person that went back over by the car and so-called

17 finished off Mr. Perry.  He's the only person that said

18 that.

19         Let's look at Mr. Brazille.  You also heard that

20 he's testified several times.  You heard through

21 cross-examination that at least on two occasions he has said

22 that my client had a sweatshirt or jacket on that said "Thug

23 Life," contrary to what Mr. Debose said.  Mr. Debose said

24 that the tall man had "Thug Life", the one that had the

25 teardrops.

136

1          He also says that three people got into the car to

2     leave the apartment complex and he says my client got in the

3     back seat of the car to drive off, contrary to Ms. Tinner

4     who says my client ran through the crowd, contrary to a

5     couple of the other witnesses that don't recall if the car

6     ever left the parking lot -- or they left the parking lot by

7     car.

8          Now, I think it's obvious to me and hopefully is

9     obvious to you that there's some substantial significant

10    problems with the three so-called eyewitnesses in this case.

11    Again, I anticipate the State is going to get up and they're

12    going to say, "Well, everybody sees a thing a little

13    differently."  Everything, well, you'll see it a little

14    differently.  But there's too much discrepancy.  There's too

15    many big things that in my opinion are very relevant in this

16    case, very relevant in this case to not overlook.

17         Another situation, if you believe these witnesses,

18    they say -- except for Ms. Tinner who says she knows my

19    client -- these other people say they've never seen him

20    before but Mr. Debose says he's seen him for two and a half

21    hours, Mr. Brazille says he sees him for three to eight

22    minutes, three to ten minutes, one night, it's dark, it's

23    quick, and then comes back and says, "That's the man"?

24         But I think what is very beneficial to you, and

25    the DA is right, you did not leave your common sense

1   outside.  You collectively brought all your knowledge that

2   you possess together as a group and you will not compromise,

3   I don't believe each individual's decision, because you must

4   be unanimous.  All 12 of you must decide unanimously one way

5   or the other.  But what I think is very important in this

6   case, let's listen to the stipulation that was entered.

7        It is stipulated by the State of Oklahoma and the

8   Defendant, Howard Purifor Morris, III, that no latent prints

9   lifted from any items of evidence processed by the Oklahoma

10  City Police Department technical investigation unit matched

11  the Defendant, Howard Morris.  That no latent prints lifted

12  from any of the items matched my client.

13       What other testimony did you hear from

14  Mr. Brazille?  You heard, if you believe his testimony, that

15  my client went into his apartment, grabbed a cell phone with

16  a cell phone provider or carrier, whoever that may be, and

17  dialed a number and talked to somebody and made arrangements

18  to leave the location.  I think that's important.

19       Now, let's look at my client.  My client

20  testified.  You heard -- he was very brief this morning.  He

21  took the stand.  You heard that he had never been convicted

22  of a felony.  You heard that he has a common law

23  relationship.  You heard that he was employed at the time

24  that he was arrested.  You heard that he had just gotten off

25  work and was at his residence when the police picked him up

138

1   on September 2nd, 2004.

2          You saw an ID that the DA -- and they're going to

3   get up here again in just a minute, you saw an ID and his

4   identification, you can put whatever value you have in it, I

5   don't think he contradicted, that's up to you.

6          But what I heard on the stand was, the District

7   Attorney asked him, "Well, where were you living?  When did

8   you move to this place where you got arrested in?"  He said,

9   "In January, 2004."

10         The DA showed him identification and said, "When

11  was that?"  He said, "January 4th," and then, "Oops, it was

12  January 14th," or whatever the date was on it.  It's still

13  January, okay?  It's still January.  So I don't think

14  there's any significance of that.  You heard that he was at

15  a job at Midwest City, he came home and that he got

16  arrested.

17         The bottom line, the bottom line in this case and

18  I will agree with the DA on this and she said it very --

19  probably better than I can.  We've had some conversations as

20  late as today and there were some issues discussed and there

21  were some issues discussed about gang activity.  Okay?

22         And all of you took an oath, as I told you --

23  you've taken a couple of oaths but particularly the last

24  oath you took -- you said you would follow the law.

25         The District Attorney has pointed out that you

139

1    will not use any chance.  You'll block out -- she said, she

2    even used this, you'll block out what's back here.  Okay?

3    And you've all told us as late as today that you would block

4    out, that you would not consider that.

5         She even said there's been no evidence

6    establishing gang activity.  You did not hear any of that.

7    You didn't hear any evidence that my client is a gang

8    member.  That was not established.  That's not before you.

9    It's not before you.

10        You took an oath and you all said in front of the

11   Judge and in front of counsel that you would truly try this

12   case, that you would apply the facts to the law that the

13   Judge has given you.  Simply put.  And the law is clear.

14   The law says you must find that the State of Oklahoma has

15   proven beyond a reasonable doubt that my client was involved

16   in this case.  I submit to you they haven't.  They have not.

17        I'm going to sit down here in just a few minutes.

18   You'll probably be glad, probably tired, you're going to

19   hear from the Assistant District Attorney then you're going

20   to go back and you're going to get the official copy and

21   you're going to get to touch and feel and look at all this

22   stuff.

23        Read this stipulation real closely.  I think it's

24   important.

25        But I submit to you that if that's the best they

140

1   have, they haven't proven beyond a reasonable doubt.  They

2   have three so-called eyewitnesses, two in living color,

3   there are big holes in their testimony, big holes in their

4   testimony.

5        Eyewitness testimony is to be considered -- as you

6   see the deal -- extreme care.  Carefully considered it.

7   Extreme care.  You must look at it.  There are holes in

8   their case.

9        No, unfortunately, we don't have a video

10  reenactment.  We don't have a video camera of what happened

11  that night.  This is what you have, but you must look at it,

12  you must look at the evidence.  You must weigh it according

13  to the law that's been given to you.  Pay close attention to

14  the stipulation.  I think it's very important.  Very

15  important.

16       I ask you to discharge your duties as jurors as

17  you said you would under your oath, to go back to weigh the

18  evidence as the District Attorney has asked you to do, to

19  look at it closely.  And I believe that when you go back you

20  will find that the State of Oklahoma has not met its burden

21  of proof, that they have not proven beyond a reasonable

22  doubt that my client was involved in this case.  Thank you.

23       THE COURT:  Thank you, sir.

24       The State's second closing.  Mr. Guhl.

25       There's only one thing that I perhaps ought to

141

1  point out.   The stipulation that you are reading from is

2  actually a court's exhibit.   It does not go back with the

3  jury.

4              MR. BOX:   All right.

5              MR. GUHL:   So let me get this straight.   Every one

6  of the State's witnesses is confused, every one of the

7  State's witnesses is lying, every one of the State's

8  witnesses is involved in some vast conspiracy against

9  Mr. Morris.   Well, the truth is is that the one who is

10  confused is Mr. Morris himself.

11              He is confused if he believes that these witnesses

12  are lying and conspiring against him and he's confused if he

13  thinks that you're going to let him pull the wool over your

14  eyes and believe his story which lacks credibility and makes

15  no sense.

16              It's my job at this stage of the trial to provide

17  a rebuttal to what Mr. Box has laid out and then make it as

18  easy as possible for you to interpret the evidence and find

19  Howard Purifor Morris guilty of Murder in the First Degree

20  and that's exactly what I'm going to do.

21              First of all, Mr. Box says that we have the last

22  opportunity as the State to respond.   Well, of course we do.

23  That's the burden.   It's our burden in this case to prove

24  Howard Morris guilty of murder.

25              Secondly, he says -- he talks about what you

1    cannot consider as evidence. Everything that's external to

2    this courtroom. We agree, absolutely, the only evidence you

3    can consider is the evidence that comes from the witness

4    stand, the physical evidence and the stipulations in this

5    case. Whatever other preconceived notions you might have,

6    whatever you might think coming into this courtroom or

7    whatever opinions you have made based upon things that have

8    not come from this courtroom are entirely irrelevant and

9    can't be considered.

10       Next, Mr. Box says that you've all taken an oath

11   to tell the truth, to truly try to find what's right in this

12   case and to follow the law. Of course, you have an

13   obligation to do this, to tell the truth, and to follow the

14   law. There's no dispute about that. But in doing so you

15   have to execute your duty as a jury in following the law by

16   considering the evidence and evaluating the credibility of

17   all of the witnesses based upon the standards set forth by

18   the law.

19       Next, Mr. Box says that in voir dire we gave you

20   all the hallway example because we were tipping our hand

21   that the witnesses in this case may have inconsistent

22   stories. Well, we weren't tipping our hand, we were simply

23   telling you that in being jurors you have to be realistic

24   about the evidence. That goes along with the idea of using

25   your common sense.

1    You have to be realistic about what individuals
2  can recall almost two years after the incident.  You have to
3  be realistic about how people -- different people with
4  different perspectives would describe that hallway out there
5  after having seen it, or describe Howard Purifor Morris and
6  this violent and ferocious murder which they observed.

7    Next, counsel says that there's a big difference
8  between all of the stories coming from this stand.  A big
9  difference?  Really?  Is there that big of a difference when
10 all of these individuals described at least four black
11 males, maybe five, at least three black males, all of whom
12 were participating?  No one is standing around and watching
13 this, but all of whom were participating?

14   Individuals wearing largely the same clothes,
15 jogging pants, jackets with Tar Heel colors, blue, white and
16 black?  Descriptions of one individual wearing a "Thug Life"
17 jacket with teardrops on his eyes?  Are there really huge
18 inconsistencies in the stories of the three eyewitnesses who
19 all put Howard Purifor Morris at that scene?

20   They didn't just see him for a second, he didn't
21 just stick his head in the door.  They observed a course of
22 conduct.  A course of conduct.  A beating, a walking away
23 from the beating, and a return.  They observed a course of
24 conduct in this case.

25   He says that we're showing you three different

1  hallways because the descriptions from the witness stand are
2  so different.  Are they really so different?  Are we really
3  presenting three different descriptions?

4       I don't know what Mr. Box heard but I heard three
5  individuals take the stand and say Howard Purifor Morris was
6  the person stomping and beating and punching Rodney to
7  death.  I heard witnesses take the stand and say that he was
8  the one who walked away and tried to get in a vehicle to
9  leave the scene but the police stopped him.  I heard
10  witnesses from the stand get up there and tell you that he
11  returned to the body.

12       Kurt Brazille told you that he returned to the
13  body and he knew it because he saw the individuals,
14  including Howard Purifor Morris, go back to the body and he
15  heard the stomping sounds and slapping sounds.

16       Are these stories really that inconsistent?

17       Next, Mr. Box attacks Demetria Tinner, the State's
18  first witness, and says, "Well, her demeanor was sarcastic."
19  Well, do you think that if you got on the stand and maybe
20  counsel didn't like your demeanor that you should be
21  disbelieved?  That everything you observed should be thrown
22  in the garbage because maybe counsel didn't like her
23  attitude?  Absolutely not.

24       Certainly you can consider her demeanor but you've
25  got to consider the reasons why maybe she had that demeanor.

1    For instance, maybe she's scared.  Maybe she is scared about

2    being involved.  Maybe she's troubled by being involved.  A

3    lot of people don't want to be involved in jury duty.

4    Imagine having to take the stand and point the finger at a

5    murderer?  Imagine that.

6         Maybe she didn't like being called on the carpet

7    or pressured by Mr. Box.  Simply because she displayed

8    sarcastic behavior, maybe had a little bit of attitude, that

9    doesn't mean that she can't be believed.

10        Next, she said that -- Mr. Box said that in her

11   previous testimony she didn't point the finger at Howard

12   Purifor Morris, but Mr. Box has to admit that this was the

13   very first opportunity Demetria Tinner had to point the

14   finger at Howard Purifor Morris in court.

15        No one is disputing the fact that she wasn't

16   called to Howard Purifor Morris' preliminary hearing.  No

17   one is disputing that.  This was her first opportunity.  She

18   pointed to him and she never equivocated.  She said, It

19   doesn't mean it's not him.  That's him.

20        Next, he says that for the first time in February

21   of '06 she came to the conclusion that Howard Morris was

22   involved.  Well, imagine her position, imagine some of the

23   reasons why she may have just brought that to our attention.

24        Well, I mean, who wouldn't be scared?  You just

25   witnessed a murder.  You're trying to go visit your friend's

146

1    friend in an apartment complex and you drive up on this

2    horrific scene.

3              Who would want to be involved in this?  Who would

4    want to take that stand and point the finger at Howard

5    Morris unless it were true?  There is no evidence presented

6    in this case whatsoever that Demetria Tinner took the stand

7    to do anything but to tell the truth.  No conspiracy shown,

8    no bias.  What can she gain by taking the stand and pointing

9    the finger at Howard Morris?  Nothing.

10             Next, Mr. Box says, "Well, you all need to make a

11   big deal about the point that these witnesses say that four

12   people were involved."  Well, the fact of the matter is, it

13   doesn't matter if these witnesses said there were four

14   people involved or five people or three or six.

15             You know, those people, maybe they're out there.

16   And if they are, maybe one day we'll find them, but what's

17   relevant here is whether Howard Purifor Morris committed

18   these crimes and that's what these witnesses have told you

19   he did.  It doesn't matter that these individuals say there

20   were three or four.  What matters is they said that all of

21   these black males were participating.

22        Next, he says that there are inconsistencies involving

23   Demetria Tinner's testimony about these individuals leaving

24   the scene in a car.  Well, you know, we're going to admit

25   that I think Demetria Tinner was mistaken on that point.

1   Maybe another car left behind her.  It was a crowded parking

2   lot.

3       You saw in the aerial photographs a number of vehicles

4   that could be parked there and you saw in the diagram that

5   Feskanich did the number of vehicles that were there.  I

6   don't know.  But she's mistaken because that's what the

7   other witnesses say happened.  Because Kurt Brazille saw

8   Howard Morris using the phone at his house.

9       The fact that a witness is mistaken about one

10  piece of testimony after observing this horrific crime,

11  after observing this horrific incident take place does not

12  devalue the rest of her testimony.  If you were her,

13  wouldn't you want to be believed even though you may have

14  made a mistake?

15      Next, Mr. Box talks about the issue of eyewitness

16  testimony -- or the testimony of eyewitnesses must be -- an

17  identification based upon that testimony must be evaluated

18  with extreme care.  Well, he hasn't really developed in any

19  way a basis for doubting the credibility of these

20  individuals with regard to their ability to perceive Howard

21  Morris.

22      Did he say that these individuals couldn't see

23  him?  No.  Did he say these individuals were blind or

24  somehow visually impaired?  No.  Did he say it was too dark

25  to see him?  No.  Did he say that they didn't see Howard

148

Purifor Morris for a long enough period of time to identify
him?  No.

So what basis does he have?  Ultimately, these
witnesses observed a course of conduct by Howard Purifor
Morris at that scene.  A course of conduct.

In other words, he didn't just stick his head in
the door, he walked around.  He was observed doing multiple
things.  And we'll get into that later.

Next, Demetria Tinner said that nobody else was
out there.  That's what Mr. Box says that that's a huge
problem with her testimony, that Demetria Tinner said that
nobody else was out there.

Well, she had just driven up on this scene.  You
heard the 911 tape.  You heard the panic in her voice.  Do
you really think she was looking around to take a census
count of how many people were watching this scene?

She testified that all the people she observed
were involved in the murder of Rodney.  She testified to
that.  Are you really going to throw away her testimony
because she didn't count how many other people were gathered
around?

Next, Mr. Box talks about Christa Anderson and he
says, "Well, she didn't ID him."  Well, she did tell you
that there were four black males involved.  You could hear
her on the 911 tape.  They're all wearing blue and white.

149

1    They're all wearing blue and white.

2            So what if Christa Anderson can't walk into this

3    courtroom and identify Howard Morris?  We have the others

4    who had a longer period of time to have contact with him who

5    can identify him.

6            Next, he says that Christa Anderson said that

7    there were eight or nine individuals out there.  Well,

8    listen to the evidence.  Listen to the evidence as it is

9    presented.  What we're concerned about and what is relevant

10   is the conduct, the criminal conduct of Howard Morris.

11           Next, essentially Mr. Box stipulates to the police

12   evidence and he stipulates to the medical examiner evidence.

13   Well, you heard that.  There's no reason to beat that into

14   the ground.  You've heard that.  Let's move on.  He agrees.

15           Next, Mr. Box says that Dewan Debose was

16   conveniently unavailable.  Well, the Judge in this case, as

17   you know, makes the law and she determined that it was

18   lawful for his transcript to be read in court.  It was

19   lawful to do that and that's evidence you can receive.

20   You've got to treat it in exactly the same way as you would

21   treat other evidence presented in court.  There's nothing

22   convenient.  That's a cheap shot.

23           Next, Mr. Box goes into this point over and over

24   again about how Dewan Debose talked about two to two and a

25   half hours, how this incident took two to two and a half

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    hours.  Well, you know what?  Maybe he's mistaken.

2           Have any of you all been in a situation where time

3    has flown by or time just seems to drag on and on?  Have you

4    ever been in that type of situation?  None of these

5    individuals were looking at their clocks or starting a

6    stopwatch.

7           If Mr. Box is going to hang his hat on the

8    testimony of Dewan Debose that seems to conflict with the

9    testimony of these other individuals, that's a pretty thin

10   hook for him to hang his hat on.

11          All the time, individuals, me, you, we don't

12   calculate time correctly.  It doesn't mean that the

13   eyewitness identification these three people made or, in

14   this case, Dewan Debose made is accurate.

15          Next, Mr. Box talks about Kyle Laws.  He says that

16   Kyle Laws said that there were four people that he can't ID

17   and that only one person went back, only Jeremy Nicholson

18   went back.  Well, Kyle Laws identified these four black

19   males and he told you there was an individual with the

20   teardrop tatoos.

21          You know, we can't expect every single person at

22   the scene to ID everyone.  Indeed, if we rolled in every

23   witness here and they had a perfect story, they were not

24   hurt at all by cross-examination, they seemed 100 percent

25   credible with no problems, do you really think you'd believe

1   them?  Is that realistic?  Would you really accept that?

2           Next, Mr. Box talks about Kurt Brazille and he

3   says that he's testified several times that Howard Morris

4   was the one wearing the "Thug Life" jacket.  Well, the fact

5   of the matter is is he didn't testify to that here.  He said

6   that someone was wearing the "Thug Life" jacket.

7           The fact of the matter is is that for five times,

8   Kurt Brazille -- and there's no question about this -- five

9   times Kurt Brazille has pointed the finger and unequivocally

10  identified Howard Morris as the killer.

11          MR. BOX:  Objection, Your Honor.  May I approach

12  the bench?

13          THE COURT:  You may.

14      (Thereupon, the following was had at the bench.)

15          MR. BOX:  Your Honor, that's a misstatement of the

16  evidence.  He's only seen the Defendant at prelim and at

17  trial.  He's not identified him five times and I object.

18          THE COURT:  I would agree.  Every time that Kurt

19  Brazille has been in the courtroom with Howard Morris he has

20  identified him but I believe that would only be two times.

21          MR. BOX:  Yes, Judge.

22          THE COURT:  Would you correct that, please?

23      (Thereupon, the following was had in open court.)

24          MR. GUHL:  Kurt Brazille has identified Howard

25  Purifor Morris two times in court.  He's never been

152

1    unequivocal about that point.  Never.

2          Also, Mr. Box gets into the point that he says

3    that Kurt Brazille never saw his client -- or Kurt Brazille

4    says that his client got into the back seat of a Mitsubishi

5    and there's conflicting evidence about that.

6          But the fact of the matter is that Kurt Brazille,

7    admittedly, he didn't see the initial beating.  He saw the

8    aftermath.  He met these individuals as you'll recall

9    walking down the sidewalk and saw these individuals return

10   to the body.

11         Mr. Box once again reasserts the Dewan Debose

12   argument, about two and a half hours.  He then makes the

13   point about the stipulations to the fingerprints and he says

14   that, ladies and gentlemen, that's a huge hole in the

15   State's case that there is no fingerprints of the Defendant,

16   Howard Purifor Morris anywhere at the scene.

17         Well, the bottom line is that the State has no

18   obligation to present evidence of fingerprints.  The fact of

19   the matter is is that if we came to court with a bunch of

20   fingerprints, there are likely people on this jury who would

21   be saying, "But where are your eyewitnesses?  Who saw this

22   crime take place?"

23         And ultimately isn't that exactly what we ask

24   when, for instance, we are victims of burglary?  If you came

25   home and your door was kicked in and your stuff was gone,

153

1    isn't the first question you would ask is, "Who saw this?

2    Who were the eyewitnesses?  Did any of my neighbors see

3    this?"  So how can we trash eyewitness testimony, how can we

4    say eyewitness testimony is not enough?  You'd want it to be

5    enough in your case.

6         Again, Mr. Box says Kurt Brazille lent the phone,

7    as Kurt Brazille has testified, to Howard Purifor Morris and

8    Howard Purifor Morris made a phone call.  And he leaves it

9    nebulous, like this thing in the air like we should somehow

10   be showing that to you and that should be a big part of this

11   case.

12        Well, you know, the State gets to choose the

13   evidence it presents and the State of course would present

14   the evidence that we think is appropriate.  We're putting on

15   our case.

16        And so Mr. Box can let that just hang here in the

17   air but it's really meaningless because we have eyewitness

18   identification of Howard Purifor Morris as the individual

19   who used that phone, as the individual who left down that

20   footpath towards the store where he called for someone to

21   pick him up.

22        Mr. Box, finally, talks about the Defendant's

23   testimony and he says, "Well, you really shouldn't think

24   anything about the fact that he had a different address."

25   He was living at a different address very shortly after the

1    fact that he had an ID with another address on it.  And so

2    the question it really raises in my mind is, why was he

3    getting an ID with a different address on it when he knew he

4    was moving?  It doesn't make any sense.

5           He says that Howard Morris had a job in Midwest

6    City.  Well, how is that relevant to this case?

7           Ultimately, Mr. Box then says the bottom line in

8    this case is that you've got to listen to the evidence,

9    regardless of the gang activity thing that is hanging in the

10   air, you've got to listen to the evidence in this case.

11          Well that's all we're asking you to do, to listen

12   to the evidence in this case and to set aside everything

13   that has come before this trial.  Listen to the evidence.

14          The testimony of these individuals is equally

15   valuable.  It's equally valuable as the testimony of anyone

16   who would come into this court and testify about this case,

17   regardless of what you may have believed from the things

18   that have been brought to your mind based on your

19   observations.  It's equally valuable.

20          Next, Mr. Box simply says that there are big holes

21   in this case and that eyewitness identification must be

22   examined with great care.  And then he asks you to discharge

23   your duties in this case.  Well, the big hole seemed to be

24   the minor inconsistencies, like the inconsistencies that

25   each one of you might have if you saw the hallway outside

1   for a few seconds and then came in here.  He says that those

2   are the big holes in the case.

3          I'm going to ask you similarly to discharge your

4   duties as jurors in this case by following the law.  And

5   I've responded to what Mr. Box has said.  And I want to give

6   you a short presentation of what I believe to be the primary

7   and most compelling reasons to convict Howard Purifor Morris

8   in this case.

9          First of all, we can see that Howard Purifor

10  Morris is in a triangle of three individuals who positively

11  identify him.  These three individuals observed not Howard

12  Purifor Morris for a glimpse, not for a second, but they

13  observed his course of conduct on the night of

14  February 20th, 2004.

15         You heard from Demetria Tinner who saw the initial

16  beating, the initial beating taking place by that Dodge

17  Neon.  You heard the 911 tape where she said they're all

18  wearing blue and white.

19         You heard from Kurt Brazille who told you that he

20  observed the second beating, that he met with Howard Purifor

21  Morris walking down the sidewalk and that Howard Purifor

22  Morris and the other individuals he saw, the two other black

23  males, one with the teardrops, one with the black hoodie,

24  return to the body as it was gurgling, as it was snoring,

25  and beat him again.

156

 1          How do we know that happened?  Well, imagine the

 2    brutality that Kurt Brazille had to experience in his mind

 3    when he heard -- he didn't see, he heard this beating take

 4    place.  Imagine hearing a beating of this magnitude taking

 5    place, the slapping of the skin.

 6          And then the third prong of this triangle is Dewan

 7    Debose who witnessed beating one and beating two.  He

 8    witnessed the initial beating and he witnessed the second

 9    incident where Howard Purifor Morris and others returned to

10    the body.

11          These individuals did not see Howard Morris stick

12    his head in the door, because I'm telling you if someone

13    stuck their head in the door right now, it would be pretty

14    hard to identify them.  They observed a course of conduct.

15    They observed beating one and beating two.  That's why they

16    are credible.  That's why they are credible.

17          And so reasons to find Howard Purifor Morris

18    guilty of Murder in the First Degree:  First, the

19    eyewitnesses identify Howard Morris as the killer of the

20    initial beating and the follow-up beating; and we talked

21    about this, Demetria Tinner, the initial beating; Kurt

22    Brazille the follow-up beating; Dewan Debose, both.  That's

23    what lends them so much credibility.

24          Second, the Defense never shows any reason to

25    question eyewitness credibility.  Mr. Box never establishes

1   a conspiracy among these individuals to lie.  He has the

2   right to present evidence of that and he didn't.  What can

3   they gain by doing so?  And, secondly, wouldn't you expect a

4   more complete thorough and unquestionable story if they did

5   indeed conspire to lie?

6           MR. BOX:  Objection, Your Honor.  May I approach?

7           THE COURT:  You may.

8       (Thereupon, the following was had at the bench.)

9           MR. BOX:  Your Honor, I take issue with this part

10  of the closing argument.  The Defendant has no obligation to

11  recall any testimony.  The burden is strictly on the State

12  of Oklahoma and any comment that the Defense is lacking in

13  putting on particular evidence I believe is improper.

14          MS. HIGH:  Judge --

15          THE COURT:  I don't believe that what he said

16  shifts the burden.  He just said that you never established

17  that.

18      (Thereupon, the following was had in open court.)

19          MR. GUHL:  Mr. Box has shown know evidence of bias

20  in this case.  Mr. Box has a right to examine these

21  witnesses and say, "Well, why would you be biased against my

22  client or why would you be biased toward Rodney Perry?"

23  Well, ultimately these individuals didn't even know it was

24  Rodney Perry lying on the ground at first.  Why would they

25  be biased?

158

1        Third, the prior inconsistencies are expected of

2   real people testifying about an event that happened two

3   years ago.  Ms. High talked about you identifying my tie and

4   the suit I was wearing yesterday or even Monday.  Real

5   people don't get the story 100 percent straight.  That's an

6   absolute truth.  But I guarantee you that all of you could

7   not only recognize me, but probably give a pretty good

8   description of what I was wearing.

9        Simply because one of you said I was wearing a red

10  tie and one of you said I was -- well, I was wearing a

11  purple tie, that doesn't mean you were untruthful, that

12  doesn't mean you have a bias against the Defendant, that

13  doesn't mean that you were engaged in a conspiracy to lie.

14       Ultimately, Kurt Brazille ID'd twice, once at

15  preliminary hearing and once here.  Demetria Tinner ID'd at

16  her first opportunity to do so.  Her first opportunity to ID

17  Howard Morris was in this jury trial.

18       And, ultimately, Dewan Debose ID'd in his first

19  opportunity to do so.  And as you read in his -- as you

20  heard read, his words, he identified Howard Morris in a

21  photo lineup.

22       The question you would ask if a crime were

23  committed against you, who were the witnesses?  Who saw this

24  took place -- take place?  And now the Defense is saying,

25  "Well, it doesn't matter who saw it take place.  Why would

159

 1  we want to know who saw it take place?"

 2        Next, eyewitness descriptions support one another

 3  and this is essential.  In this case one eyewitness is

 4  enough to convince you and to convict Howard Morris if you

 5  believe that that one eyewitness shows proof beyond a

 6  reasonable doubt that Howard Morris committed this crime.

 7        One is enough.  This isn't a count.  This isn't a

 8  competition of who calls the most witnesses, and we all

 9  agreed on that.

10        Secondly, three eyewitnesses placed Howard Morris

11  killing Rodney at the crime scene.  Three.  Three

12  eyewitnesses put him there.

13        And, third, witnesses placed the same clothing at

14  the scene, perhaps on the wrong person but the face is the

15  key.  Kurt Brazille told that to Ms. High during his

16  examination.  He said that's what he was looking at.

17  Christa Anderson talked about it's kind of hard to get the

18  details of specifically what a person is wearing or their

19  height when you're observing this type of crime take place.

20        Next, eyewitnesses put Howard Morris all over the

21  Rockwell Villa Apartments on the night of the murder.  They

22  put Mr. Morris all over that apartment complex.  This is not

23  a single incident sighting, as I said.  This not a person

24  sticking his head in the door.  Witnesses observed a course

25  of conduct and here are the places, at minimum, they saw

160

1    Howard Morris.  Near the second speed bump where the body

2    was.  On the southwest sidewalk.  Right down here.  Getting

3    into the Mitsubishi, somewhere in this area.  Returning to

4    the body.  At the Laws' apartment using the phone and

5    heading downstairs towards the foot trail.  They put Howard

6    Morris all over, all over this complex.

7         Now, ultimately in this case, the Defendant

8    provides no credible evidence that he wasn't murdering

9    Rodney Perry at the Rockwell Villa Apartments.  Now, it is

10   uncontested that the Defense has no obligation to do

11   anything.  The Defense has no obligation to do anything.

12        Let me say that again.  The Defense doesn't have

13   to call witnesses, the Defense doesn't have to deliver

14   opening or closing statements.  In fact, Mr. Box and

15   Mr. Morris can just sit there and do nothing.  It's our

16   burden.  But the fact of the matter is that they have the

17   power to call witnesses.  They have subpoena power.  They

18   can call witnesses to the stand and if those witnesses won't

19   come, they can ask this Judge to force them to come.

20        But what this doesn't mean, simply because Mr. Box

21   doesn't have to call witnesses or present evidence, it

22   doesn't mean that you can't weigh the evidence.  You can

23   weigh the evidence.

24        Weigh the evidence presented by the State against

25   the evidence presented by the Defendant.  You can weigh that

1    evidence.  Weigh the evidence of the three eyewitnesses who

2    put Howard Morris there against his evidence that he was at

3    home asleep.

4         But, you know, let's really consider the testimony

5    of Howard Morris.  When the critical question was asked why

6    would Demetria Tinner, why would Kurt Brazille, why would

7    Dewan Debose come in here and lie?  Did he give you a

8    credible answer?  Or did he robotically and with a great

9    deal of rehearsal turn to this jury and say, "Ladies and

10   gentlemen, it was mistaken identity"?

11        And he didn't just do it once, he did it three

12   times.  You can remember his words.  You can remember how he

13   turned to the jury and said three times, "Ladies and

14   gentlemen, it was mistaken identity."  How rehearsed does

15   that sound?  What if our witnesses did that?  I submit to

16   you that if our witnesses behaved like that, you would laugh

17   us out of the courtroom.

18        The State of Oklahoma has the burden in this case

19   and that burden is beyond a reasonable doubt, not beyond a

20   shadow of a doubt.  Of course, everyone is going to have

21   thoughts.  Of course, everyone may leave this trial and have

22   some questions, but that doesn't mean that this case hasn't

23   been proven beyond a reasonable doubt.

24        Ask yourself the kind of evidence you would like

25   to hear in your own case.  Eyewitnesses, three eyewitnesses

162

1    who identify Howard Morris as the killer who put him at the

2    first beating and then put him at the second, who put him

3    using a cell phone down the way, who put him getting into a

4    Mitsubishi Galant, who put him going downstairs towards that

5    foot trail?  They put him everywhere.

6            Don't let this Defendant confuse you or try to

7    pull the wool over your eyes and say, "Well, there are no

8    fingerprints, so I'm innocent."

9            There are minor discrepancies about the

10   description of the clothing these people were wearing, like

11   minor discrepancies in the description you might all have of

12   the hallway outside.  Don't let him confuse you because

13   these witnesses testified and they were as solid as a brick

14   wall in their identification of Howard Morris.

15           I want to discuss the issue of punishment in this

16   case.  And the real question is is how should Howard Purifor

17   Morris be punished?  And you all are being put in an

18   incredibly unique position.  It's not every day individuals

19   wake up and are being asked by the State of Oklahoma to put

20   someone away, to put someone in prison.

21           But this case isn't unique because, respectively,

22   you all aren't involved.  It's not unique because of some of

23   the opinions you might have formed about the people who are

24   here testifying or the people who are somewhere involved in

25   this case.  Like the burglary case that happened to some of

1   you all, this is a murder case that has happened to another

2   family, another set of people.

3           This was a senseless and ferocious crime.

4   Senseless in that we have no idea necessarily what it was

5   about but if it was about the fact that Rodney Perry had on

6   red clothing or it was about a minor dispute these

7   individuals had, absolutely senseless.

8           And it's just as senseless as it was ferocious.  I

9   mean, imagine this.  Imagine Rodney Perry being beaten to

10  death.  Imagine his suffering.  Rodney Perry was unarmed,

11  outnumbered, and absolutely ambushed by at least three other

12  men, maybe four, but at least three, including Howard

13  Morris.

14          Howard Morris, according to our witnesses, made

15  some statement that he'll take a fair one with anyone.

16  Well, was this really a fair fight?  At least three on one?

17  Rodney had no chance.  He had absolutely no chance.  His

18  death was guaranteed by this man who acted jointly with

19  others in destroying him.

20          Imagine the horror of his injuries, the horror of

21  a broken rib, the horror of his brain swelling, bleeding,

22  and the subgaliel and subrachnoid hemorrhaging.  Those are

23  separate layers above his brain.

24          The abrasion and the massive head trauma to the

25  back of his head.  Maybe he got it when he struck the

164

1    pavement, maybe he got it when he struck the side of that

2    vehicle.  But imagine these injuries.

3           This is where his life ended.  Imagine the nature

4    of this beating, the nature of the trauma to him, what kind

5    of force it would take to beat someone to death.

6           And what is unquestionably the most horrific act

7    taken by Howard Morris and others is returning to the body

8    and finishing him off.  You heard testimony from Kurt

9    Brazille that Howard Morris returned to Rodney's body and

10   finished him off.  Kurt Brazille, although from his vantage

11   point couldn't see a whole lot, he heard the slapping, the

12   flesh.  He heard this occurring.

13          I asked you at the beginning -- or I told you at

14   the beginning of this trial that in telling the story I

15   wanted to take you back to the scene.  We'll go back there

16   again to imagine what kind of punishment this man deserves.

17          Imagine Rodney being thrown against those

18   mailboxes on this cold winter night.  Imagine the horror he

19   must have sensed when he knew his death was eminent.

20   Imagine his body being thrown against that vehicle.  Imagine

21   his body being stomped into the ground.  Imagine him being

22   left for dead on the pavement.  You saw that scratch on his

23   back.

24          Imagine the feeling he had as he began gurgling

25   and snorting and losing consciousness, his brain swelling so

```
 1   much that he could no longer breathe.  Imagine his heart

 2   stopping.  Imagine his entire body shutting down and then

 3   imagine the horror of these men returning to his body and

 4   destroying him, finishing him off, ending his life for good.

 5   Imagine him lying there and then imagine what type of

 6   sentence Mr. Morris deserves.

 7              Rodney was sentenced to life but the only place

 8   that he's going to spend that life is in the ground.  You'll

 9   see the verdict form and I want you to take a look at it

10   very carefully and I'm going to tell you that there are

11   three choices and I'm going to ask you to consider all of

12   the evidence in this case and make one resounding choice for

13   Rodney.

14              Sentence Howard Purifor Morris by finding him

15   guilty of Murder in the First Degree by fixing his

16   punishment of life without the possibility of parole and

17   checking this box.  Because at the end of this trial after

18   you have returned your verdict, if Judge Gray asked you what

19   your verdict was, I want you to be able to say that Howard

20   Morris is 100 percent absolutely guilty of murdering Rodney

21   in one of the most horrific ways.  And the only just

22   punishment for sentencing someone to life underground is

23   life in prison without the possibility of parole.  Thank

24   you.

25              THE COURT:  Ladies and gentlemen of the jury, how
```

 1    many of you have with you cell phones, pagers, that kind of

 2    thing?  If you'll please take them out and turn them off and

 3    the bailiff is going to take them up from you.

 4         Ladies and gentlemen, how many of you have some

 5    sort of reading material, could be meditation, religious

 6    materials, novels, anything like that, computer, whatever?

 7    Any of you have those sorts of materials with you?  You need

 8    to leave them in the courtroom so if you will take them out

 9    of your bags and if you have them in the jury room, you'll

10    need to give them in the bailiff.

11         Counsel, would you approach, please?

12      (Thereupon, the following was had at the bench.)

13         THE COURT:  Mr. Berry, would you approach, please?

14    I want you to stand in this corner and then I'm going to ask

15    counsel to come around you so they can hear you.  We've got

16    to keep your voice very low.

17         Mr. Berry has indicated to my bailiff that she was

18    taking up his cell phones that he had something that he

19    needed to discuss before he went into the jury

20    deliberations.

21         JUROR BERRY:  I don't know anybody in the

22    courtroom but the last person who came in here today, a

23    gentleman with a jacket, pink shirt, that's a co-worker of

24    mine.

25         THE COURT:  Okay.

```
 1              JUROR BERRY:  So I don't know if he's a family

 2   member of the Defendant and I don't know how that would

 3   affect everything.

 4              THE COURT:  Okay.  Where -- you're a school bus

 5   driver?

 6              JUROR BERRY:  That is right.

 7              THE COURT:  And what does he do?

 8              JUROR BERRY:  He's a driver also.  Matter of fact,

 9   he trained me when I got into that job.

10              THE COURT:  Well, Mr. Berry, does that put some

11   pressure on you about serving as a juror?

12              JUROR BERRY:  It's a little odd but if you don't

13   have a problem with it, I don't.

14              THE COURT:  Well, I'm asking you, do you feel

15   pressured because he's been in the courtroom now?

16              JUROR BERRY:  It's a little different.  It just

17   feels odd to do this for me.

18              THE COURT:  So are you concerned that he might

19   have some questions about what you've done as a juror?  Do

20   you feel like you need to give him an explanation about

21   something?

22              JUROR BERRY:  Not really.

23              THE COURT:  Is he in a position to influence your

24   job evaluations or to create problems for you in your work?

25              JUROR BERRY:  He's really good friends with the
```

168

```
1    supervisor that we have at our job.

2              THE COURT:  Well, you're kind of shaking your

3    head, yes, and I guess that means that he doesn't have a

4    formal supervising position?

5              JUROR BERRY:  That's correct.

6              THE COURT:  But that he could have some influence?

7              JUROR BERRY:  Yeah.

8              THE COURT:  Okay.  So, Mr. Berry, at this point,

9    would you prefer to be relieved of this obligation to

10   deliberate this case?

11             JUROR BERRY:  If it didn't hurt what they have to

12   do at this point, yes.

13             MR. BOX:  May I inquire?

14             THE COURT:  I don't think so.  I think Mr. Berry

15   has been very honest with us and I believe that he has valid

16   concerns.  We have two alternates and it is not going to

17   cause a problem for him to be excused.  And I think what

18   he's done is very conscientiously tell us that if it is not

19   going to create a problem that he doesn't want to have to

20   take this kind of responsibility knowing what he knows now.

21             And if that same person had been in the courtroom

22   on Monday when we were doing jury selection, you would have

23   disclosed to that to us earlier?

24             JUROR BERRY:  Yes, ma'am.

25             THE COURT:  Right.  Okay.  All right.  Thank you,
```

169

```
 1   Mr. Berry.  If you'll be seated, please.
 2            THE COURT:  Mr. Berry, for the reasons that we
 3   have previously put on the record, you are now excused as a
 4   juror.
 5            Ms. Cornish, would you please rise and raise your
 6   right hand to be sworn?
 7        (Alternate juror sworn.)
 8            THE COURT:  Thank you.  Please be seated.
 9   Mr. Berry, if you would step forward, please.  We have a
10   letter for you and if you want to go ahead and give us your
11   badge and button, we will take care of that for you.  And
12   I'm going to ask you to go back into the suite and I will be
13   with you in a moment.
14            Ladies and gentlemen of the jury, it's now time
15   for you to enter upon your deliberations.  If you'll please
16   rise.
17            Ms. Leavitt, if you'll remain seated we're going
18   to escort you into our conference room.  The Court will be
19   in recess until a verdict is returned.
20        (Thereupon, the jury retired to deliberate at 3:20 p.m.
21         during which time, Court's Exhibit 4 was received, a
22         note from the jury, after which, the jury returned in a
23         body, accompanied by the bailiff, at 4:55 p.m. into
24         open court and the following was had.)
25            THE COURT:  Thank you please be seated.  Ladies
```

1     and gentlemen of the jury, have you reached a verdict?

2                     JURORS COLLECTIVELY:  Yes.

3                     THE COURT:  Will the foreman please hand the

4     verdict forms to the bailiff.

5                     At this time I will ask the bailiff to please

6     publish the jury's verdict.

7                     THE BAILIFF:  State of Oklahoma versus Howard

8     Purifor Morris, III, CF-04-1212.  Verdict.

9                     "We, the jury, empaneled and sworn in the

10    above-entitled cause do upon our oaths finds as follows:

11    Guilty of the crime of Murder In The First Degree and fix

12    his punishment at life without the possibility of parole in

13    the Oklahoma State Penitentiary.  Darrel Gilbert, Foreman."

14                    THE COURT:  Ladies and gentlemen of the jury, is

15    this your verdict?

16                    JURORS COLLECTIVELY:  Yes.

17                    THE COURT:  All right.  Do you wish the jury to be

18    polled?

19                    MR. BOX:  Absolutely, Your Honor.

20                    THE COURT:  All right.  Mr. Lee, is this your

21    verdict?

22                    JUROR LEE:  Yes.

23                    THE COURT:  Ms. Carrender, is this your verdict?

24                    JUROR CARRENDER:  Yes.

25                    THE COURT:  Ms. Townsend, is this your verdict?

```
1              JUROR TOWNSEND:  Yes.

2              THE COURT:  Ms. Alexander, is this your verdict?

3              JUROR ALEXANDER:  Yes.

4              THE COURT:  Mr. Ryan, is this your verdict?

5              JUROR RYAN:  Yes.

6              THE COURT:  Mr. Gilbert, is this your verdict?

7              JUROR GILBERT:  Yes.

8              THE COURT:  Ms. Marriott, is this your verdict?

9              JUROR MARRIOTT:  Yes.

10             THE COURT:  Mr. Peters, is this your verdict?

11             JUROR PETERS:  Yes.

12             THE COURT:  Mr. Myers, is this your verdict?

13             JUROR MYERS:  Yes.

14             THE COURT:  Ms, Demers, is this your verdict?

15             JUROR DEMERS:  Yes.

16             THE COURT:  Mr. Cotey, is this your verdict?

17             JUROR COTEY:  Yes.

18             THE COURT:  Ms. Cornish, is this your verdict?

19             JUROR CORNISH:  Yes.

20             THE COURT:  All right.  My understanding is that

21   the Defendant wishes to put off sentencing and so I will set

22   sentencing for April the 14th at 9:00.  I'm entering an

23   order requiring the State to withdraw its exhibits and to

24   provide copies on or before the sentencing date.

25             MS. HIGH:  Yes, ma'am.
```

172

1       THE COURT:  Is there anything else that we need to

2  do on the record before this matter is concluded today?

3       MS. HIGH:  Not from the State.

4       MR. BOX:  No, Your Honor.

5       THE COURT:  All right.  Then ladies and gentlemen

6  of the jury, you've now discharged your duties as jurors in

7  this case.  You are free to discuss this with anyone or not

8  discuss it with anyone and if anyone does persist, you can

9  feel free to refer them to me and I will be happy to visit

10  with them.

11       I'm going to ask the bailiff to go with you now

12  back into the jury deliberation room.  I think we have some

13  letters for you.  We're going to take your buttons and your

14  badges and I will be in to visit with you in a few moments.

15       Mr. Morris, please stand.  Based on the jury's

16  verdict of guilty, you are remanded into the custody of the

17  deputy to await sentencing.

18       MR. BOX:  Did you say at 9:00, Your Honor?

19       THE COURT:  Yes, sir.

20       (Thereupon, court was adjourned.  On April 17, 2006,

21       with all counsel and the Defendant present, the

22       following Formal Sentencing was had.)

23       THE COURT:  In the matter of the State of Oklahoma

24  versus Howard Purifor Morris, III, in case number

25  CF-2004-1212.  This is sentencing after jury trial.  The

173

1   State appears by way of Ms. Pattye High and Mr. Graham Guhl.

2   The Defendant appears personally in custody and with

3   counsel, Mr. Chris Box.

4            Mr. Morris, the jury found you guilty and assessed

5   punishment as life without the possibility of parole.

6   You've completed some paperwork today with your attorney

7   that we title Sentencing After Jury Trial Summary of Facts.

8   You reviewed this with counsel?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  Do you have any questions about the

11  paperwork that you've gone over?

12           THE DEFENDANT:  No, ma'am.

13           THE COURT:  All right then, sir, in accordance

14  with the jury's verdict, I sentence you to confinement under

15  the supervision of the Department of Corrections for a term

16  of years that we title life without the possibility of

17  parole.

18           I'm assessing victim's compensation in the amount

19  of $45, the actual court costs as determined by the Oklahoma

20  County Court Clerk.  There's a DA fee of $25, the DNA fee of

21  150, and a jail fee of 38.45.

22           You have also presented me paperwork to appeal

23  from your Judgment and Sentence and that's been executed.

24           Is there anything further that I need to put on

25  the record for the State of Oklahoma?

1          MS. HIGH:  No, Judge.

2          THE COURT:  For the Defendant?

3          MR. BOX:  No, Your Honor.

4          THE COURT:  All right.  Mr. Morris, the jury

5    having found you guilty of Murder in the First Degree, you

6    are sentenced in accordance with the jury's verdict and

7    remanded into the custody of the deputy to serve your term

8    of incarceration.  You're excused.

9          (End of proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

175

```
 1            IN THE DISTRICT COURT OF OKLAHOMA COUNTY

 2                      STATE OF OKLAHOMA

 3

 4   THE STATE OF OKLAHOMA,        )
                                   )
 5                Plaintiff,       )
                                   )
 6   VS.                           )   CASE NO. CF-04-1212
                                   )
 7   HOWARD PURIFOR MORRIS, III,   )
                                   )
 8                Defendant.       )

 9

10            CERTIFICATE OF THE COURT REPORTER

11            I, Theresa L. Reel, Certified Shorthand Reporter

12   and Official Court Reporter for Oklahoma County, do hereby

13   certify that the foregoing transcript in the above-styled

14   case is a true, correct, and complete transcript of my

15   stenographic notes of the hearing in said cause.

16

17            Dated this  28th  day of   April      , 2006.

18

19

20                                  Theresa L. Reel

21                                    Theresa Reel
                                Oklahoma Certified Shorthand Reporter
22                                    Certificate No. 0344
                                   Exp. Date: December 31, 2006

23

24

25
```

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HOWARD P. MORRIS, III,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-09-81-R** |
| | ) | |
| **RANDY WORKMAN, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Petitioner, a state prisoner appearing through counsel, brings this action pursuant to 28 U.S.C. § 2254, seeking habeas relief from his state court conviction. United States District Judge David L. Russell referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). A response has been filed, and thus the matter is at issue. For the following reasons, it is recommended that the petition be denied.

By this action, Petitioner challenges his conviction following a jury trial on one count of first degree murder, for which he was sentenced to life without parole. Case No. CF-2004-1212, District Court of Oklahoma County; Petition, p. 1-2; Response Ex. 3, p. 1. On direct appeal, the Oklahoma Court of Criminal Appeals affirmed Petitioner's conviction. <u>Morris v. State</u>, No. F-2006-428 (Okla. Crim. App. Oct. 24, 2007) (attached to Response as Ex. 3); Petition, p. 2. Petitioner did not seek certiorari or state post-conviction relief. Petition, p. 3.

Petitioner raises six grounds for relief.[1]  In Ground One, he alleges that the trial court should have granted a motion for mistrial after the judge met privately with the jury to discuss security concerns voiced by a juror to a bailiff after Petitioner was observed taking notes during the voir dire examination.  Petition, p. 2; Memorandum in Support of Petition, p. 6-7.  In a related argument, Petitioner argues in Ground Two that his right to be present during all critical stages of the trial proceedings was violated during the judge's meeting with the jury regarding the security concerns. Petition, p. 2; Memorandum in Support of Petition, p. 9. In Ground Three, Petitioner claims that his counsel was ineffective for failing to move for a new trial on the basis of alleged juror misconduct – also related to the incident forming the basis of Grounds One and Two.  Petition, p. 2; Memorandum in Support of Petition, p. 11.  In Ground Four,  Petitioner seeks habeas relief on grounds of prosecutorial misconduct; specifically, he argues that the prosecutor shifted the burden of proof by statements made during closing argument.  Petition, p. 2; Memorandum in Support of Petition, p. 15.  Fifth, Petitioner claims that there was insufficient evidence to support his conviction.  Petition, p. 3; Memorandum in Support of Petition, p. 19.  Six, and finally, Petitioner claims that his right to a fair trial was violated by the cumulation of these alleged errors.  Petition, p. 3; Memorandum in Support of Petition, p. 24.

---

[1]Petitioner initially raised seven grounds in support of his petition, but one of the grounds was  eliminated when Petitioner filed his Memorandum in Support of Petition. Compare Petition, p. 2 (Ground Three - admission of hearsay statements violated federal and state constitutional rights) with Memorandum in Support of Petition, p. 2.

2

Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 690

## I. BACKGROUND

Shortly before midnight, on February 20, 2004, Oklahoma City police officers were dispatched to the Rockwell Villa Apartments regarding an assault. Trial Tr. Vol. 2, p. 75-77, 78-81. Upon arrival, officers discovered Rodney Perry laying deceased against a car in the parking lot of the apartment complex. Id. At trial,[2] three witnesses testified that Perry had been severely beaten by a group of men, one of whom was Petitioner.

The first witness, Demetria Tinner, stated that she had driven another woman to the Rockwell Villa Apartments on their way to visit a friend, and that upon entering the parking lot, she saw four men arguing with one man. Trial Tr. Vol. 2, p. 35-36, 40-41. Tinner testified all four of the men began beating the victim and stomping on him; she turned the car around in the circle drive behind the apartments and when she drove back by the victim was on the ground, shaking and making a gurgling noise. Id. at 42-43, 44-45. She then recognized the victim as someone she knew when she formerly lived at the Rockwell Villa. Id. at 37, 43-44. Tinner then called 911; a crowd had gathered, and one of the four men took off through the crowd. Id. at 44, 45. The other three got in a car and left. Id. at 45. At trial, she identified Petitioner as one of the men who had been beating and stomping Perry. Id. at 48-49.

Kurt Brazille testified that he was visiting his girlfriend at the Rockwell Villa, and

---

[2]One witness, Dewan Debose, was unavailable at trial, and so his preliminary hearing testimony was read into evidence. Trial Tr. Vol. 2, p. 114-117; Prelim. Hr'g Tr. p. 45-53 (Mar. 25, 2005).

3

while there, his nephew Dewan Debose had asked to use the phone. Trial Tr. Vol. 2, p. 130,
132, 133. Brazille would not allow him to use the phone in the apartment, and instead sent
him to use a pay phone at the front of the complex. Id. at 133. Three or four minutes later,
someone told Brazille that a fight had broken out around where the pay phone was located.
Id. at 134. Concerned about his nephew's welfare, Brazille quickly made his way toward the
front of the complex. Id. On the way, he met Debose and three other men walking toward
him. Id. at 136. At trial, one of the men was identified by Brazille as the Petitioner. Id.
Brazille's nephew told him that they "messed Rodney up," and asked Brazille if he wanted
to see. Trial Tr. Vol. 2, p. 144. At about that same time, Brazille saw Petitioner and the other
two men go back around to the other side of a car where the victim was; he could not see, but
heard stomping and "skin slapping." Id. at 145-47. He then saw the three men that had been
with his nephew get in a car. Id at 148-49. At that time, Brazille began to walk back to his
girlfriend's apartment; he heard sirens and looked back toward the front of the complex and
saw police coming. Id. at 149. About four minutes later, Petitioner and one of the other men
involved in the assault tried to come into Brazille's girlfriend's apartment to use the phone.
Id. at 149-50. Brazille refused, but gave them his stepson's cell phone to use. Id. at 150.
Brazille overheard Petitioner asking the person on the other end of the line to meet him at a
nearby convenience store. Id. at 150-51.

Debose testified that when he was outside the apartment he saw three men standing
across from the victim; Perry said something to them as he exited one of the breeze ways in
the complex. Prelim. Hrn'g Tr. p. 46-47. An argument ensued, and the three men "jumped"

4

Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 692

Perry. Id. at 47-48. The victim was knocked down, and the three men began to beat and stomp him. Id. They left the victim for awhile, and then came back and resumed the attack, killing him. Id. at 49, 51-52. Debose identified Petitioner as one of three men who assaulted Perry. Id. at 50.

## II. STANDARD GOVERNING PETITIONS FOR A WRIT OF HABEAS CORPUS

For factual and legal issues that have been adjudicated in state court, a federal district court may only grant a writ of habeas corpus if the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A state court's determination is contrary to clearly established federal law if it applies a rule that contradicts the law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a Supreme Court decision, but arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). A state court's determination involves an unreasonable application of clearly established federal law if it identifies the correct governing legal principle from Supreme Court decisions, but unreasonably applies that principle to the facts of the petitioner's case. Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

5

If a state court resolves issues in a summary disposition with little or no legal reasoning, a federal habeas court still owes deference to the result. Paine v. Massie, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." Id. (quoting Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999)).

## III. DISCUSSION

### A. GROUNDS ONE AND TWO - DENIAL OF MISTRIAL AND VIOLATION OF RIGHT TO BE PRESENT AT CRITICAL STAGE OF THE PROCEEDINGS

Petitioner's first two grounds for relief both concern the trial court's handling of a jury communication in which some jurors expressed concern that Petitioner had made notes while their personal information was disclosed during voir dire. Petition, p. 4, 7; Memorandum in Support of Petition, p. 6. On the first day of testimony, during the break between the direct and cross examination of Mr. Brazille, the trial judge informed counsel that the bailiff had made her aware of the jury's concerns:

> THE COURT: During the very brief break the bailiff made me aware that the jurors had expressed to her a concern that your client was taking notes during jury selection and because this is gang stuff, they don't know what that means and they're concerned about their personal security.
>
> I went into the jury room during this break and said to them that I don't generally talk to the jurors during trial and that I had to be very limited in what I said but that in my history with the court, I am unaware of there ever being a time when jurors have been threatened or intimidated, and that I was confident that Mr. Morris' taking notes was so that he could communicate with you.

6

[DEFENSE COUNSEL]:  Absolutely.

THE COURT: And would not be taking anything from the courtroom.

[DEFENSE COUNSEL]:  No.

THE COURT: And so I wanted to put on the record their concern, also how I handled it.  If you have objections or something that you wish that I would do in addition to that, I will be happy to address that.

[DEFENSE COUNSEL]: At this point I don't have any.  Obviously the notes at the table weren't even to do with even the individual particulars of the prospective jurors, it was numbers only and he was just circling numbers that he didn't like or liked.  So that's all that it was.

THE COURT: Well, I think that I have adequately expressed to them that they have no concern and that the same instruction that we give at the end of the trial which is at the conclusion of the trial they may discuss or not discuss with anybody and if anybody persists, that we'll be happy to handle that for them.  So I just wanted you to know that.

[DEFENSE COUNSEL]: Sure.

THE COURT: Okay.  Thank you.  Would you bring the jury in please?

Trial Tr. Vol. 2, p. 153-54.

The following morning, Petitioner's counsel raised a concern regarding the events of

the previous day:

[DEFENSE COUNSEL]: Your Honor, for the record, the Court advised us after you took the bench after the afternoon break yesterday afternoon, around the 4:00 hour, that you had been inadvertently contacted by at least one of the jurors or maybe a couple of them.

THE COURT: What I advised you to was that the bailiff had told me that they had expressed to her a concern.

...

7

[DEFENSE COUNSEL]: All right.  And I'm not misstating, it caught me flatfooted yesterday.  You called us to the bench and advised us that there had been an issue.  After I've had time to think about this, Your Honor, I'm disturbed that the jury would have this concern and that they would have this contact with the Court because, Your Honor, it indicates to me that they have collectively or at least individually talked about my client.

And it had not gone to charge, it has not gone to the deciding stage and by the very nature of their concern that they expressed to the Court, they were concerned.  The gist I get and the Court can correct me, but the gist was that they were concerned that my client was taking notes in voir dire and because of the gang-related allegations in this case, they were concerned for their safety or any repercussions that could be made upon them as a result of this case.

It is my understanding and I'm going to go to the Court because I'm not going to misstate the Court, and it happened quick yesterday, but the gist of it was, my understanding, the Court had relayed to them that you had never seen anything like that happen in your experience.  But you can correct me.  I'm not putting words in your mouth.  I really don't remember.  It was a daze to me.

...

THE COURT: I told them that in my history with the court I am unaware of any instance where a juror has been harassed by witnesses or family or friends.

[DEFENSE COUNSEL]: Okay.

THE COURT: And that I knew that being in a trial was stressful but that we were all in the courtroom all the time and that at the conclusion of the trial we usually have the deputies escort them to their cars, and that I was pretty certain that any note taking that the Defendant was doing during voir dire would have been communication with you and not something that he was trying to memorialize to keep with him.

[DEFENSE COUNSEL]: Okay, Well, in light of that, Your Honor, still, I stand by my concerns because I believe that by them talking about my client before they even get the charge to deliberate, that that's a violation of their oath.

Number two, by the very nature of the concern they expressed, it shows

8

to me that I'm facing an unlevel playing field now because they have some sort of either imagined fear or real fear or whatever you want to call it from my client.

They're concerned about my client because they were concerned that somehow he would know who they are or where they live or that there was consequences.

THE COURT: What are you asking for?

[DEFENSE COUNSEL]: I'm asking for a mistrial. Or - - I'm asking for a mistrial because I believe we have an unlevel playing field now. I believe they've violated their oath as jurors because they've talked about my client and I'm moving for a mistrial. I don't think I can get a fair trial - - my client get a fair trial.

I'm concerned. I'm sincerely concerned after thinking about this last night. I haven't got anybody's counsel. I just - - it caught me flatfooted yesterday. We were at the end of the day and then after I thought about it more - - I didn't tell my client about it until this morning, quite frankly, because I didn't want to put fear into him but I thought about this and I just don't think the jury can be fair.

They've expressed a concern, a fear for my client, and I don't think that fear can be overcome. And I believe because of the way they've expressed it, they've talked about my client, obviously. And they're instructed not to talk about my client. They can't talk about my client until this case is submitted to them.

So they've already got a preconceived idea about my client even before he takes the witness stand, a preconceived idea before they even hear all the State's case.

Trial Tr. Vol. 3, p. 8-12. In addition to mistrial, defense counsel moved the trial court for

an individual voir dire of the jurors in order to determine what they discussed. Id. at 12, 13.

The trial court agreed and, after handling another unrelated matter, moved the proceedings

to chambers in order to speak to the jurors individually. Trial Tr. 13, 19. The trial court

9

asked defense counsel if he would waive his client's presence during the questioning, and

he agreed.  Id. at 19.  The trial court then examined the jurors individually in the presence

of counsel for both sides, and defense counsel also asked questions of each juror.  Id. at 19-

70.     Following the examination of jurors, defense counsel renewed his motion for mistrial.

Trial Tr. Vol. 3, p. 70-71.  In support, he argued that the voir dire had revealed that some of

the jurors had expressed a concern that friends of Petitioner might retaliate, and that

Petitioner might give their personal information to others.  Id. at 70-71:

> [DEFENSE COUNSEL]: I know what the jurors have said back in chambers but I just think there's the appearance of not a level playing field in them even having these conversations, puts some apprehension in my mind that they could honestly be fair and impartial.
>
> THE COURT: Well, apprehension is not the legal standard.
>
> [DEFENSE COUNSEL]: Sure, I understand.
>
> THE COURT: And the legal standard is manifest necessity.  Every single juror has told me that they have not formed an opinion as to your client's guilt or innocence.  Most of them have expressed that it wasn't really so much your client, but the overall circumstances, the people in and out of the courtroom, witnesses and witnesses' boyfriends and, frankly, the kinds of things that we all observe and are aware of and talk about among ourselves.
>
> When a juror tells me that they can be fair and impartial and that they have not formed an opinion as to your client's guilt or innocence, I'm under the law to assume their truthfulness.  I've had no other indicia of them being untruthful about that.
>
> Not a single juror has revealed to us that there was any discussion of the facts or that there was anything specific, it was more of the unsaid, what happens if this information gets out.

Trial Tr. Vol. 3, p. 71-72.

10

Petitioner moves for habeas relief on grounds that the trial court erred in not granting a mistrial, and that the trial court's handling of the matter denied his right to be present during the critical stages of his trial.

## 1. TRIAL COURT'S FAILURE TO GRANT A MISTRIAL

Petitioner claims that the trial court's failure to grant a mistrial denied his right to an impartial jury. Petition, p. 4-7; Memorandum in Support of Petition, p. 7.

Respondent contends that the factual findings made by the state courts are presumed correct unless Petitioner can demonstrate by clear and convincing evidence that they were erroneous. Response, p. 7. He further argues that Petitioner has not even alleged that the factual findings were incorrect, making the presumption of correctness applicable to his first ground for relief. Id.

In denying this claim of error on direct appeal, the Oklahoma Court of Criminal Appeals stated:

> We review a trial court's ruling on a motion for mistrial for an abuse of discretion. An abuse of discretion is a "clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application." Here, the judge's decision is amply supported by the record and it is [Petitioner's] position that is clearly against the logic and facts because his premise that the jury prematurely discussed the facts of the case is contradicted by the record.
>
> Specifically, the record shows that under questioning by the judge and defense counsel, the jurors unanimously agreed that none of them discussed any aspect of the case among themselves. Jurors did state, however, that some of their number voiced concern about disclosing personal and family member information in open court where [Petitioner] seemed to be writing it down and where there were many people coming and going throughout the courtroom. Some jurors stated that it appeared to them at the time that the case might be

11

gang-related, based on the appearance of some of the persons present in the courtroom, and that this caused them some degree of apprehension when their personal information was being discussed so openly.

Because each juror expressed willingness to fully and fairly listen to all of the evidence, and because each juror denied discussing the case, the trial court's denial of [Petitioner's] motion for mistrial was not clearly against the logic and effect of the facts presented. The trial court judge did not abuse her discretion in denying the motion for mistrial.

Response, Ex. 3, p. 3-4.

The right to an impartial jury is guaranteed by both the Sixth Amendment and

Fourteenth Amendment:

The Sixth Amendment as incorporated by the Fourteenth Amendment guarantees the right of a trial by jury in all state criminal cases. The Fourteenth Amendment's Due Process Clause independently requires the impartiality of any jury empaneled to hear a case in a state court. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process."

Goss v. Nelson, 439 F.3d 621, 627 (10th Cir. 2006) (citations omitted); see also Lucero v.

Kerby, 133 F.3d 1299, 1307 (10th Cir. 1998). Traditionally, a juror who has "formed an

opinion" is one who cannot be impartial.  Morgan v. Illinois, 504 U.S. 719, 727(1992)

(quoting Reynolds v. United States, 98 U.S. 145, 155(1879) and Irvin v. Dowd, 366 U. S.

717, 721-722(1961)).  However, due to the "broad deference traditionally accorded to trial

courts in determining jury selection procedures and conducting voir dire" a petitioner must

show that the trial court committed manifest error in finding that the jury as a whole was

impartial. Lucero, 133 F.3d at 1308 (quotations and citations omitted). To do this, a petitioner

must demonstrate either actual prejudice or that there was such a high probability of

12

prejudice that the trial must be deemed to be inherently lacking in due process. Id.  Also, as argued by Respondent, a state court's findings as to the impartiality of individual jurors is a finding of fact entitled to a presumption of correctness in this federal habeas proceeding.  See Patton v. Yount, 467 U.S. 1025, 1036-38 (1984). In addition, "[a]bsent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." Lucero, 133 F.3d at 1309 (quotation omitted).

The trial court's decision to deny a mistrial was reached after her individual examination of each juror, and was based on her finding that they had neither discussed the case nor formed an opinion as to Petitioner's guilt or innocence.  These findings and those of the Oklahoma Court of Criminal Appeals are not only presumed correct in this proceeding, but amply supported by the record.  Upon questioning by the court and defense counsel, each juror responded that the jury had not discussed the case, and each stated that he or she could be fair and impartial. Trial Tr. Vol. 3, p. 20, 24-25, 27, 30-31, 35-36, 39, 40, 42, 45, 47-48, 52-53, 56, 58, 62-63, 64-65, 68-69.

Petitioner claims that the responses of one juror in particular, Juror Myers, show that he believed Petitioner needed to be convicted "or he would be turned loose on the community." Memorandum in Support of Petition, p. 10.  However, the record of Juror Myers' examination, when considered in its entirety, does not support Petitioner's claim.  After Juror Myers told the trial court that the jury had not discussed the case, the following colloquy ensued:

THE COURT: Were you one of the people that expressed some concern about

13

security or some apprehension about anything?

JUROR MYERS: I don't think so. I agreed with it when I heard it but I didn't bring it up.

THE COURT: Okay. I think I stated clearly yesterday, but let me state again, most of the time when a [d]efendant is writing things in the courtroom they're communicating with their lawyer and these - - they don't have the opportunity to take all these notes and stuff out of the courtroom.

JUROR MYERS: Good.

THE COURT: Mr. Myers, at this point in the trial have you formed an opinion as to whether or not the Defendant is guilty or not guilty?

JUROR MYERS: No. He's still innocent.. I haven't heard the whole deal.

THE COURT: All right. Can you be a fair and impartial juror in this case?

JUROR MYERS: I think so.

THE COURT: Do you have any concern at all that we need to visit with you about?

JUROR MYERS: I haven't talked to anybody about this but I'm concerned. Number one, I want to tell you that my wife was a juror about 15 years ago and I think it was under the different rules that you were talking about that the [d]efendant was there and the individual jurors were asked questions about where they lived and the juror - - the [d]efendant was writing all this stuff down.

THE COURT: Okay.

JUROR MYERS: And it was like they were writing it all down. That's what the [d]efendant was writing down. And my wife thought that was a little odd that they know all about us but we don't know anything about them.

THE COURT: [Defense counsel], when I when back into the jury room yesterday I told them that once upon a time was a rule that jurors - -

JUROR MYERS: Yeah, that was 15 years.

14

THE COURT:  - - that jurors gave their addresses but that that was no longer the rule and partially because it made people uncomfortable and we don't want them to be uncomfortable about this.  As far as you know  - -

JUROR MYERS: One other concern.

THE COURT: As far as you know, did anything happen as a result of that information being given to that individual in the courtroom 15 years ago?

JUROR MYERS: No.  No, it was just a goosey feeling that my wife had.

THE COURT: Okay.  I just wanted to clarify.

JUROR MYERS: If we don't convict this guy, we're going to turn him loose and he's got my address.  Or if we do convict him, he's going to give it to his buddy and the buddy is going to come and get me.

THE COURT: The second concern that you had?

JUROR MYERS: Seems like this is a gang-related case.  Nobody has said that. It hasn't come up in the court but I'm worried if we don't convict the guy, we're going to turn him loose in the community.

And I know that I'm only supposed to be concerned about the evidence and I'm thinking about what I was.  And I know that I'm supposed to only think about the stuff that's presented in the case in the courtroom, evidence.

THE COURT: You're right.  You are.  And here is kind of what I would tell you. At the conclusion of this case, undoubtedly you're going to have questions and we'll do our best to answer them but all of the what ifs are not addressed in the law that I give you.

JUROR MYERS: I am supposed to ignore all that stuff.

THE COURT: That's right.  Can you do that?

JUROR MYERS: Yeah.  I won't like it but that's what my job is.

THE COURT: Okay.  Do you have any doubt in your mind that you can be fair and impartial in this case?

15

JUROR MYERS: No. That's what I'm going to do.

THE COURT: Okay. Great.

[DEFENSE COUNSEL]: I have a couple of questions. It's obviously became quite apparent that there was some discussion yesterday afternoon in the jury room about some sort of, for lack of a better word, apprehension that my client was taking notes at the table during voir dire, is that correct?

JUROR MYERS: Yes.

[DEFENSE COUNSEL]: And you said that you might have joined in, you didn't initiate that conversation, you may have joined in to the conversation, is that correct?

JUROR MYERS: One guy said he was going to go talk. I said, "Yeah, go find out about that."

[DEFENSE COUNSEL]: Was there some serious concern or fear raised by members of the jury that they had fear for my client?

JUROR MEYERS: No, I think it was just kind of a general - - a general, how come he's writing notes.

[DEFENSE COUNSEL]: Was there a fear that will he would do something or somebody he knew would do something, or if you know.

JUROR MYERS: We didn't know. It wasn't a big deal. It was a concern that was expressed by the fella with the shaved head and the beard and I don't know his name and I was sitting next to him. And I said, "Yeah, go find out about that. We need to find out."

THE COURT: You understand the admonishment that I give you guys every time you leave the courtroom?

JUROR MYERS: You bet.

Trial Tr. Vol. 3, p. 52-56. The undersigned finds that these answers reflect a juror who was

both candid and conscientious; furthermore, he stated that he had and would continue to

16

conform to his oath as a juror.  He also unequivocally stated that he had not made up his mind. Although he admitted that he had personally thought about some matters that were not in evidence, specifically the matter of gang activity, he also stated that he knew he was to disregard such thoughts in reaching his verdict.  Juror Myers expressed an understandable and natural concern for his safety in the context of such a criminal proceeding, and it is both unrealistic and constitutionally unnecessary to expect perfection of a juror.  As stated by the United States Supreme Court:

> The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Smith v. Phillips, 455 U.S. 209, 217 (1982); cf. United States v. Small, 423 F.3d 1164, 1180 (10th Cir. 2005) (affirming decision of trial court denying mistrial after venireperson expressed concern for personal safety because case involved drugs and seven defendants and ten marshals were present: "Any prejudice that may have resulted ....was adequately addressed by the district court's explanation of the presence of the marshals in the courtroom.").

The responses of Juror Myers show that he was both capable and willing to decide the case solely on the evidence.  Indeed, after admitting that he had personal safety concerns he – unprompted – acknowledged "that I'm supposed to only think about the stuff that's presented in the case in the courtroom, evidence."  Trial Tr. Vol. 3, p. 54.

Appellate Case: 09-6248    Document: 01018399442    Date Filed: 04/09/2010    Page: 705

Furthermore, Petitioner has shown nothing that would clearly and convincingly rebut the presumption of correctness of the court's findings. After every juror had been examined, even defense counsel could point to no fact revealed during that examination which supported a conclusion that the jury was not impartial. Indeed, in making his motion for mistrial following the individual voir dire, counsel could only point to his "apprehension" regarding the significance of the security concerns, and the "appearance" of "not a level playing field." See Trial Tr. Vol. 3, p. 70-71. The trial court correctly concluded that such was not sufficient to show the manifest necessity for a mistrial.

Accordingly, the undersigned finds that the Oklahoma Court of Criminal Appeals' decision neither resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2). It is therefore recommended that relief be denied on this ground.

## 2.  VIOLATION OF RIGHT OF CONFRONTATION

In the second ground related to the jury's expressed concern regarding Petitioner's note-taking during voir dire, he claims that the court's initial, private meeting with the jury violated his right to be present at all critical stages of the proceedings. Petition, p. 7; Memorandum in Support of Petition, p. 9. He claims that the statements of one juror in particular show that the jury's concern went to the "core of the merits of the case," and so his presence was necessary to defend himself against the charges. Memorandum in Support

of Petition, p. 9.  He claims that Juror Myers expressed his belief that the jury needed to convict Petitioner, or he would be turned loose on the community.  Id.

Respondent concedes that under clearly established federal law, a criminal defendant has the right to be present during all critical stages of his criminal proceedings.  Response, p. 15.  However, he argues the right to be present only extends to those stages of the proceeding where the defendant's presence would have a "reasonably substantial" relation to the "fulness of his opportunity to defend against the criminal charge."  Id. at 16 (quoting Bland v. Sirmons, 459 F.3d 999, 1020 (10th Cir. 2006).  He claims that the substance of the meeting between the judge and the jury had nothing whatsoever to do with the merits of the case against Petitioner.  Id. at 18.  Respondent contends that Petitioner's presence would have actually been counterproductive during the meeting, as it would have made the jury less forthcoming about its concerns.  Id.

On direct appeal, the Oklahoma Court of Criminal Appeals held:

> A defendant's constitutional and statutory rights to be present at trial are rooted in the Sixth Amendment's right to confront witnesses and the Fifth Amendment's due process right to present a defense.... [H]owever, a defendant's right to be present has limits.  Specifically, a defendant must be allowed to be present only when his presence is reasonably related to his opportunity to defend.  Because the record shows that this brief meeting between the judge and jury was on a subject unrelated to the merits of the case, the meeting and resulting communications between the judge and jury did not impact [Petitioner's] ability to defend against the charges; nor did it impinge in any way on his ability to confront witnesses.  There is no constitutional violation.

Response, Ex. 3, p. 5-6 (citations omitted).

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal

19

defendant to be present at trial to confront witnesses and the evidence against him. United States v. Gagnon, 470 U.S. 522, 526 (1985). Through the Due Process Clause of the Fifth and Fourteenth Amendments, this right to be present has been extended to other critical stages of trial beyond those related to the defendant's rights to confronting witnesses and evidence. See id. That is, a defendant "has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (internal quotation marks omitted). As explained by the Tenth Circuit Court of Appeals:

> Although a defendant has a due process right "to be present ... whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," this right does not require that a defendant be present at all proceedings. Instead, the constitutional right to be present exists "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." For example, a defendant need not be present during all communications between a judge and a juror. When the defendant's "presence would be useless, or the benefit but a shadow," due process does not require the defendant's presence at a trial proceeding. In determining whether exclusion of a defendant from a proceeding violated due process, we consider the proceedings "in light of the whole record."

Bland v. Sirmons, 459 F.3d 999, 1020 -1021 (10th Cir. 2006); United States v. Gagnon, 470 U.S. at 526 ("The mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror ...," quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983)). With this standard in mind, the undersigned finds that the decision of the Oklahoma Court of Criminal Appeals on this point was neither contrary to or an unreasonable application of clearly established Federal law as determined

20

by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the record.

As noted above, one juror sent an inquiry to the trial court through the bailiff asking about Petitioner making notes as they revealed their personal information during voir dire. The trial judge then met very briefly with the jury as a whole, assuring them that during her time with the court, she had never known a juror to be threatened or intimidated. She also explained that Petitioner was probably writing notes to communicate with his lawyer, and would not be taking anything from the courtroom. Trial Tr. Vol. 2, p. 152-53. After the break the trial judge informed counsel what had occurred and how she had handled it, and then asked for any objections or requests regarding the issue. Id. at 153.

In light of the record as a whole, the undersigned finds that this brief and limited interaction between the trial judge and the jury did not thwart Petitioner's right to a just and fair proceeding. Petitioner's presence would have been of little if any benefit; indeed, Petitioner's presence might have been counter-productive to the trial court's effort to assure the jury in the most general of terms. Finally, any remaining doubt as to the effect of the exchange on Petitioner's due process rights is removed upon reading the subsequent individual voir dire. That questioning corroborates the very limited interaction between the trial court and the jury, and that although Petitioner's note-taking might have been the catalyst for the concern, the concern itself was of a general nature and unrelated to the merits of the charge against him. It is therefore recommended that relief be denied on Ground Two.

## B.  GROUND THREE - INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his third ground for relief, Petitioner asserts that his trial counsel was constitutionally ineffective for (1) failing to move for a new trial based on juror misconduct; and (2) failing to object to comments made by the prosecutor in closing argument.  With regard to the motion for new trial, Petitioner contends that the trial court would have had more time to consider the incident involving the jury's concerns regarding his note-taking if faced with a motion for new trial.  Memorandum in Support of Petition, p. 12.  He also claims that trial counsel failed to object to comments made by the prosecutor that allegedly shifted the burden of proof to Petitioner.  Id. at 12-13.

Respondent counters that Petitioner cannot show that any of the alleged errors caused prejudice, a necessary showing under a claim of ineffective assistance of counsel.  Response, p. 23.  He contends that if trial counsel had moved for a new trial the result of the proceeding would have been the same.  Id.   In support, he notes the trial court's opinion in the context of the motion for mistrial that there was nothing wrong with the court addressing the jurors about their security concerns.  Id. at 24. With regard to the prosecutor's comments, Respondent argues that an objection would have only subjected the comments to a higher level of scrutiny on appeal, and that even under that more rigorous standard, the comments did not deny Petitioner a fundamentally fair trial.  Id. at 24-25.

In addressing this claim on direct appeal, the Oklahoma Court of Criminal Appeals reached the following decision:

> To prevail on his ineffective assistance claims, [Petitioner] must

demonstrate that counsel acted in a professionally unreasonable manner by failing to object to the ... prosecutor's comments, or that he acted unprofessionally by failing to move for a new trial. In addition, [Petitioner] must also demonstrate there is a reasonable possibility that a different outcome would have resulted if counsel had objected or moved for a new trial. As we have found no merit to [Petitioner's] substantive claims on each of these issues, it is clear that any objections or motions for new trial raised on these grounds would have been properly overruled and the ultimate outcome unchanged. Trial counsel therefore was not ineffective.

Response, Ex. 3, p. 15-16.

As correctly noted by the Oklahoma Court of Criminal Appeals, to establish that counsel was ineffective, a habeas petitioner must show (1) counsel's performance was constitutionally deficient and (2) counsel's deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984). Performance is deficient if counsel's "representation [falls] below an objective standard of reasonableness." Id. at 688. Errors are prejudicial if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Counsel's performance is evaluated from the attorney's perspective at the time the assistance is rendered and considered in light of all the circumstances prevailing at that time. Id. at 689. There is a strong presumption that counsel's actions fell within the "wide range of reasonable professional assistance." Id. Because both deficient performance and prejudice must be established to prove ineffective assistance, it is appropriate to consider whether prejudice is shown from an alleged error without determining whether counsel performed deficiently. Id. at 697. In light of this standard, the undersigned agrees with Respondent that Petitioner has failed to show prejudice from trial counsel's alleged ineffective assistance.

23

In Oklahoma, a "court in which a trial has been had upon an issue of fact has power to grant a new trial when a verdict has been rendered against a defendant by which his **substantial rights have been prejudiced**...."  22 Okla. Stat. tit. § 952 (emphasis added).

First, Petitioner claims that counsel was ineffective for failing to move for a new trial on grounds that the jury was not impartial and that Petitioner was denied his right to be present when the trial court met briefly with the jury. It is apparent from the record of proceedings – which includes individual voir dire of each juror and argument of counsel – that the trial court did not believe Petitioner's right to an impartial jury had been violated when some jurors questioned the security of their personal information. See Trial Tr. Vol. 3, p. 71-73.  Petitioner contends that "[h]ad trial counsel moved for a new trial, the trial court could have re-examined the issues of fact and taken more time to properly examine Juror Myers and the other jurors about what [Petitioner] submits was their fixed beliefs (prior to deliberation) of his guilt of the crime charged."  Memorandum in Support of Petition, p. 12. However, Petitioner does not argue that the trial court failed to apply the correct legal standard in considering defense counsel's motion for mistrial, or that something occurred *after* the trial court's individual voir dire that might have changed the court's finding of impartiality. Furthermore, as noted above, the trial court thoroughly examined Juror Myers and was well aware of his concerns.  There is no indication that the court needed additional information to determine that juror's impartiality.  Thus, the undersigned finds no reasonable probability that the outcome of a motion for new trial on this ground would have been any different than the outcome of the motion for mistrial.

24

Second, Petitioner claims that trial counsel was ineffective for failing to object to two comments made by the prosecutor during closing argument. Id. at 12. He claims that the comments in question improperly shifted the burden of proof to him. Id. 13-14. In Ground Four, Petitioner also raises a stand alone claim regarding these two comments and one other that was objected to by counsel. Memorandum in Support of Petition, p. 12, 15. For the reasons discussed below in connection with the stand alone claim, the undersigned finds Ground Four to lack merit; thus, the undersigned recommends that this claim also be denied on grounds that there is no reasonable probability that the outcome of the proceeding would have been different if an objection had been made.

### C.  GROUND FOUR - PROSECUTORIAL MISCONDUCT

In Ground Four, Petitioner claims that the prosecutor improperly shifted the burden of proof as a result of comments made during closing argument. Petitioner complains about three comments. The first was in the context of the prosecutor's argument that the testimony of the witnesses was consistent:

> [THE STATE]: Now do you think those witnesses are so sophisticated that they could get together and make that up to where it just happens to fit? Is that what you think this is? A conspiracy between Demetria Tinner, Kyle Laws, Kurt Brazille, is that what this is?

> This Defendant couldn't even give you a reason that these people would all get together and do this. You've heard no evidence that would indicate to you these people are not telling you what they saw.

Trial Tr. Vol. 3, p. 108. Second, Petitioner complains of a similar comment specific to Demetria Tinner:

25

> [THE STATE]:Who would want to be involved in this? Who would want to take the stand and point the finger at Howard Morris unless it were true? There is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but to tell the truth. No conspiracy shown, no bias. What can she gain by taking the stand and pointing the finger at Howard Morris? Nothing.

Trial Tr. Vol. 3, p. 146. Defense counsel did not object to either of these two comments, but the third comment did draw an objection:

> [THE STATE]: Second, the Defense never shows any reason to question eyewitness credibility. [Defense Counsel] never establishes a conspiracy among these individuals to lie. He has the right to present evidence of that and he didn't. What can they gain by doing so? And, secondly, wouldn't you expect a more complete thorough and unquestionable story if they did indeed conspire to lie?

> [DEFENSE COUNSEL]: Objection, Your Honor. May I approach?

> THE COURT: You may.
> (Thereupon, the following was had at the bench).

> [DEFENSE COUNSEL]: Your Honor, I take issue with this part of the closing argument. The Defendant has no obligation to recall any testimony. The burden is strictly on the State of Oklahoma and any comment that the Defense is lacking in putting on particular evidence I believe is improper.

> [THE STATE]: Judge - -

> THE COURT: I don't believe that what he said shifts the burden. He just said that you never established that.

Trial Tr. Vol. 3, p. 156-57.

Respondent argues that a claim of prosecutorial misconduct will only result in habeas relief if the comment so infected the trial with unfairness that the resulting conviction is a violation of due process. Response, p. 28. He also contends that a prosecutor pointing out

26

that a petitioner failed to substantiate claims made in his defense does not necessarily result in a fundamentally unfair trial.  Id.  He urges that the prosecutor was not making any comment on the presumption of innocence when he pointed out that Petitioner failed to explain why three independent eyewitnesses would implicate him in the crime if he were innocent.  Id. at 29.

On direct appeal, the Oklahoma Court of Criminal Appeals stated:

> Morris did not object to the first two comments.  Therefore their use is reviewed for plain error.  Morris objected to the third remark, but the objection was overruled by the trial court judge.  We review a trial court's overruling of a defendant's objection to a prosecutor's comments during closing argument for an abuse of discretion.  Regardless of which standard is applied, however, we find not merit in any of these claims of prosecutorial misconduct.

> The burden of proof is on the State to prove every element of the crime charged beyond a reasonable doubt.  The State may not attempt to shift the burden of proof to the defendant during closing argument.

> In this instance, Kurt Brazille and Demetria Tinner both testified that they saw Morris beating the victim Rodney Perry.  Dewan Debose's preliminary hearing testimony, which was read into the record because of his unavailability for trial, indicated that he also saw Morris beating the victim.  When Morris testified at trial, he claimed he was at home asleep when the beating occurred and denied knowing the victim, Kurt Brazille, Demetria Tinner, and Dewan Debose.  When asked why these three individuals would lie and say that they saw him beating the victim, Morris asserted that their testimony was the result of mistaken identity.  When the prosecutor told the jury in closing that "you've heard no evidence that would indicate to you these people are not telling you what they saw."; "[t]here is no evidence presented in this case whatsoever that Demetria Tinner took the stand to do anything but tell you the truth"; and that Morris "ha[d] the right to present evidence of that and he didn't," the prosecutor was doing nothing more than commenting on the state of the evidence supporting Morris's asserted defense of mistaken identity.  This was fair comment on the evidence on an issue raised by Morris when he testified.  The prosecutor's statements were not improper.

Response, Ex. 3, p. 12-14.

Ordinarily, "[h]abeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair." Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-648 (1974)). However, "[w]here prosecutorial misconduct directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." Torres v. Mullin, 317 F.3d 1145, 1158 (10th Cir. 2003); Hamilton v. Mullin, 436 F. 3d 1181, 1187 (10th Cir. 2006). This determination is made "only after considering all of the surrounding circumstances, including the strength of the state's case." Malicoat v. Mullin, 426 F.3d 1241, 1255 (10th Cir. 2005).

During cross-examination, Petitioner stated that he did not know any of the three eyewitnesses against him, and did not know of any relationship between the three eyewitnesses that would cause them to form a conspiracy against him. Trial Tr. Vol. 3, p. 82, 83, 88-89, 90. The only explanation Petitioner offered for Tinner, Brazille, and Debose's identification of him as one of Perry's attackers was mistaken identity. Id. at 83, 88, 90. When asked if he could think of any reason other than mistaken identity why they would all three identify him, he said "I don't know." Id. at 90. Thus, in the State's closing argument, the prosecutor was not shifting the burden of proof to Petitioner, but commenting on this evidence and theory of defense which Petitioner himself presented during cross-examination. Compare, Trial Tr. Vol. 3, p. 108 with Trial Tr. Vol. 3, p. 89-90. Not only were the three

28

remarks fair comment on Petitioner's own testimony, the prosecutor referred to the presumption of innocence and the State's burden of proof on several occasions during both parts of the closing argument.  Trial Tr. Vol. 3, p. 96, 124, 141, 159, 160, 161. For example, the prosecutor stated "[t]he Defense doesn't have to call witnesses, the Defense doesn't have to deliver opening or closing statements.  In fact, [Defense Counsel] and Mr. Morris can just sit there and do nothing.  It's our burden."  Trial Tr. Vol. 3, p. 160.

Here, in light of the proceedings as a whole, the undersigned finds that the remarks were not of such a character that the jury would naturally and necessarily shift the burden of proof to Petitioner. Cf. Compare Delgado v. Barreras, No. 97-2007, 1997 WL 785525 at *2 (10th Cir. Dec. 22, 1997) (no prosecutorial misconduct where prosecutor's remarks were not a direct statement on the presumption of innocence and remarks were in response to defense counsel's comments during closing argument).[3] The Oklahoma Court of Criminal Appeals' resolution of this issue is thus not contrary to or an unreasonable application of clearly established federal law and relief on Ground Four of the Petition should be denied.

### D.  GROUND FIVE - INSUFFICIENCY OF THE EVIDENCE

In Ground Five, Petitioner contends that the evidence was insufficient to support a conviction for first degree murder.  Petition, p. 11; Memorandum in Support of Petition, p. 19.  He claims that the "third element of murder in the first degree," that the death was

---

[3]This unpublished disposition is cited as persuasive authority pursuant to Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

caused by the Petitioner, "was not met except in the context of witness credibility." Memorandum in Support of Petition, p. 20.

Respondent contends that in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt.  Response, p. 31.  He claims that three witnesses independently identified Petitioner as one of the men who attacked Perry.  Id. at 33.

In reviewing this claim on direct appeal, the Oklahoma Court of Criminal Appeals found:

> Three witnesses identified Morris as one of Perry's attackers and described the severity of the savage beating.  Even without any physical or forensic evidence of Morris's participation, this eyewitness testimony was sufficient evidence from which the jury reasonably could conclude that Morris caused Perry's death.  Furthermore, the question of whether the witnesses' testimony was worthy of belief is not relevant here.  The witnesses were tested under cross-examination at trial.  Any question as to their credibility was resolved by the jury.  By rendering a verdict of guilty, the jury obviously found the eyewitness testimony credible, and we must honor that choice as it supports the verdict.

Response, Ex. 3, p. 15.

The Supreme Court set forth the standard of review for insufficiency of the evidence claims in Jackson v. Virginia, 443 U.S. 307 (1979).  In that case, the Court held that the relevant question in considering such a claim, "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319; see also Romero v. Tansy, 46 F.3d 1024, 1032 (10th Cir. 1995).  This standard gives the trier of fact full

responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. Thus, in applying this standard, this Circuit has held that the Court may not weigh conflicting evidence or consider the credibility of witnesses. Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993). Rather, the Court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Id.

As noted above, the analysis of a federal habeas challenge to the sufficiency of the evidence begins with consideration of the crime's essential elements. Okla. Stat. tit. 21 § 701.7(A) provides: "A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." Thus, the elements of first-degree malice murder are: (1) the unlawful, (2) death of a human, (3) caused by the defendant, (4) with malice aforethought. OUJI-CR 4-61 (Second). Sufficient evidence exists to support a conviction for first degree murder when the defendant has participated in a beating despite the medical examiner's inability to pinpoint the fatal blow. Spears v. State, 900 P.2d 431, 438-39 (Okla. Crim. App. 1995).

After viewing the evidence in the light most favorable to the prosecution, the undersigned finds that any rational trier of fact could have found all of the essential elements of the crime of murder in the first degree beyond a reasonable doubt. Three percipient witnesses identified Petitioner as one of the men involved in the beating of the victim. Trial

Tr. Vol. 2, p. 41-51, 54 (Demetria Tinner); Prelim. Hr'g Tr. 45-52 (Dewan Debose); Trial

Tr. Vol. 2, p. 136-39, 141-43, 146-47, 149-52 (Kurt Brazille).  Forensic pathologist Chai

Choi testified that the cause of death was a head injury, and that the injuries the victim

received were consistent with being punched, beaten, and stomped.  Trial Tr. Vol. 2, p. 113.

Although Petitioner argues that the eyewitnesses lacked credibility for various reasons, under

the Jackson standard the trier of fact has full responsibility "to resolve conflicts in the

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

ultimate facts."  Jackson, 443 U.S. at 319. Accordingly, it is recommended that relief be

denied on Ground Five.

### E.  GROUND SIX -- CUMULATIVE ERROR

Finally, in Ground Six, Petitioner alleges that the cumulative effect of the alleged

errors deprived him of a fundamentally fair trial.  Memorandum in Support of Petition, p.24.

Respondent argues that cumulative error analysis only applies to constitutional errors, and

that Petitioner has failed to show any error at all, much less errors of a constitutional

magnitude.  Response, p. 34-35.  He claims that the Oklahoma Court of Criminal Appeals

found no errors, harmless or otherwise, in its review on direct appeal.  Id. at 35.  Indeed, the

Court stated: "This Court has repeatedly held that a cumulative error argument has no merit

when we do not sustain any of the other errors raised.  Because we have examined each of

[Petitioner's] allegations in detail and found no error, relief is not warranted on this claim."

Response, Ex. 3, p. 17 (citations omitted).

"Cumulative error analysis is an extension of harmless error and conducts the same

32

inquiry as for individual error, focusing on the underlying fairness of the trial." <u>Darks v.</u>
<u>Mullin</u>, 327 F.3d 1001, 1018 (10th Cir. 2003) (citations and internal quotations omitted). The
cumulative effect of individually harmless errors has the potential to prejudice a defendant
to the same extent as a single reversible error. <u>Duckett v. Mullin</u>, 306 F.3d 982, 992 (10th
Cir. 2002). Here, the undersigned finds that Petitioner has failed to establish any error,
harmless or otherwise; therefore, there is no basis upon which to find cumulative error. <u>See,</u>
<u>e.g.</u>, <u>Gonzales v. Tafoya</u>, 515 F.3d 1097, 1126 (10th Cir. 2008) (denying petitioner's claim
that he was prejudiced by the cumulative effect of his counsel's errors where court concluded
counsel's performance was not constitutionally deficient and, therefore, there was no error
to cumulate), <u>cert. denied</u> 129 S. Ct. 211 (2008); <u>United States v. Caballero</u>, 277 F.3d 1235,
1250 (10th Cir.2002 ) ("Cumulative-error analysis should evaluate only the effect of matters
determined to be error, not the cumulative effect of non-errors.") Therefore, Petitioner's
claim of cumulative error is meritless, and it is recommended that relief be denied on Ground
Six.

## **RECOMMENDATION**

Based on the foregoing findings, it is recommended that the petition for a writ of
habeas corpus be denied. Petitioner is advised of his right to file an objection to this Report
and Recommendation with the Clerk of this Court on or before August 17, 2009, in
accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. Petitioner is further advised that
failure to file a timely objection to this Report and Recommendation waives his right to
appellate review of both factual and legal issues contained herein. <u>Moore v. United States,</u>

33

950 F.2d 656 (10th Cir. 1991).  This Report and Recommendation disposes of all the issues

referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 27th day of July, 2009**.

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE

34

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HOWARD P. MORRIS, III,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  CIV-09-81-R** |
| | ) | |
| **RANDY WORKMAN, WARDEN,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **THE ATTORNEY GENERAL OF** | ) | |
| **THE STATE OF OKLAHOMA.** | ) | |

## PETITIONER HOWARD P. MORRIS, III'S
## OBJECTION TO REPORT AND RECOMMENDATION

Petitioner, Howard P. Morris (hereinafter "Mr. Morris and/or Petitioner"), by and through his attorney of record, Bill Zuhdi, pursuant LCvR 72.1, hereby objects to the Report and Recommendation dated July 27, 2009, by the Honorable Judge Doyle W. Argo, United States Magistrate Judge.

Mr. Morris objects to the US Magistrate Judge's recommendation that the Petition for Writ of Habeas Corpus be denied.  Mr. Morris incorporates herein the arguments, authorities, attachments, exhibits and facts contained within his Petition and memorandum in support of his Petition for Writ of Habeas Corpus.

-1-

## OBJECTIONS

**Grounds One and Two**

As part of Mr. Morris's objections, he states that the U.S. Magistrate Judge committed clear error in finding that, with regard to Ground One, the record of Juror Myers' examination, when considered in its entirety, does not support Petitioner's claim that the trial court should have granted a motion for mistrial after the judge met privately with the jury to discuss security concerns voiced by a juror [Doc. 15 at pg. 13]. Petitioner asserts the record amply supports Petitioner's claim and he has adequately shown the trial court committed manifest error in finding the jury as a whole was impartial. *Lucero v. Kierby*, 133 F.3d 1299, 1307 (10th Cir. 1998).

Actual prejudice was shown by petitioner and he has also shown there was such a high probability or prejudice the trial must be deemed to be inherently lacing in due process. *Lucero* 133 F.3d at 1308. The juror repeatedly voiced concern over Mr. Morris and his belief that Mr. Morris needed to be convicted. Trial Tr. Vol. 3, p. 52-56. Yes, the answers by the juror reflect a juror "who was both candid and conscientious"[1] as acknowledged by the U.S. Magistrate Judge. However, the candidness also reflects a high probability or prejudice that the trial was lacking in due process because the juror was clearly not impartial – even though he claimed he was. By his own admission, the juror was concerned that if "...we don't convict this guy, we're going to turn him loose and he's got my address. Or if we do convict

---

[1] Doc. 15 at pg. 16.

him, he's going to give it to his buddy and the buddy is going to come and get me...but I'm worried if we don't convict the guy, we're going to turn him loose in the community." Trial Tr. Vol. 3, p. 55.  The juror's fear that Morris would be turned loose on the community evidences he had a preconceived notion that Mr. Morris was guilty of the charged offense and was dangerous. Though the juror told the court he could be impartial, his responses belie this assertion. Juror Myers had already affirmatively voiced his concern that Morris should not be turned loose on the community.  Perhaps Juror Myers decided to stay on the jury just for that purpose – to insure Mr. Morris would not be "turned loose."  Perhaps Juror Myers thought it his mission to ensure Mr. Morris would not be let go.  While it is true a juror cannot be shielded from every contact or influence which can affect their vote,[2] a defendant is entitled to an impartial jury and Juror Myers's comments indicate that he was not impartial and he already knew in his mind Morris was guilty before the trial began.

Contrary to the U.S. Magistrates' finding, Petitioner clearly rebutted the presumption of correctness of the court's findings[3] by providing the actual verbiage provided by the juror as referenced in his Petition and Memorandum in Support of Petition for Writ of Habeas Corpus. *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984); Petition, p. 4-7; Memorandum in Support of Petition, p. 7.  Accordingly, the magistrate's finding was incorrect and in error that the OCCA's decision was not contrary to or involved an unreasonable application of

---

[2]

*Smith v. Phillips*, 455 U.S. 209, 217 (1982).

[3]

Doc. 15 at pg. 18.

-3-

clearly established Federal law as determined by the Supreme Court and that the decision was

not based on an unreasonable determination of the facts in light of the evidence presented in

the State Court proceeding. [Doc. 15 at pg. 18].

Regarding Ground two, Petitioner has asserted the court's initial private meeting with

the jury violated his right to be present at all critical stages of the proceedings.  Petition, p.

7; Memorandum in Support of Petition, p. 9.   As noted by the U.S. Magistrate, the Sixth

Amendment guarantees the right of a criminal defendant to be present at trial to confront

witnesses and the evidence against him.  *United States v. Gagnon*, 470 U.S. 522, 526 (1985)

[Doc. 15 at pgs. 19, 20].   But the magistrate judge also quoted *Rushen v. Spain*, 464 U.S.

114, 125-26 (1983), which states that, "The defense has no constitutional right to be present

at every interaction between a judge and a juror..."  *Id*; [Doc. 15 at pg. 20] and referred to

that standard when finding the "...decision of the Oklahoma Court of Criminal Appeals on

this point was neither contrary to or an unreasonable application of clearly established

Federal law as determined by the Supreme Court, nor was it based on an unreasonable

determination of the facts in light of the record." [Doc. 15 at pgs. 20, 21].   Mr. Morris

submits this finding by the U.S. Magistrate Judge was incorrect and therefore objects.  In

light of the record as a whole, the interaction between the trial judge and the jury thwarted

Petitioner's right to a just and fair proceeding, contrary to the magistrate judge's holding.[4]

Any private communication with a juror during trial about the matter pending before the jury

---

[4]

Doc. 15 at pg. 21.

is deemed presumptively prejudicial. *Remmer v. U.S.*, 347 U.S. 227, 229 (1954). As was asserted by Mr. Morris in his Petition and Memorandum in support, Mr. Morris should have been present during the communications and meeting between the jurors and the judge. Mr. Morris needed to defend himself against the charges and against Juror Myer's voiced belief that Mr. Morris needed to be convicted of the crime with which he was charged or he would be turned loose on the community [Doc. 11 at pg. 9]. The juror's statements went to the core of the merits of the case and was thus a critical stage of the trial proceedings. Therefore, the U.S. Magistrate's findings were incorrect.

**Ground Four – Prosecutorial Misconduct**

Petitioner asserted in Ground Four of his Petition that the prosecutor improperly shifted the burden of proof and complained about three comments which were made in closing argument. The U.S. Magistrate Judge found that, in light of the proceedings as a whole, the remarks made by the prosecutor "...were not of such a character that the jury would naturally and necessarily shift the burden of proof to petitioner." [Doc. 15 at pg. 29] and therefore, the OCCA's resolution of the issue was "...not contrary to or an unreasonable application of clearly established federal law and relief on Ground Four of the Petition should be denied." [Doc. 15 at pg. 29]. Mr. Morris specifically objects to the U.S. Magistrate Judge's finding. The prosecutorial misconduct directly affected his specific constitutional right to remain silent. Mr. Morris was so prejudiced by the comments, it effectively amounted to a denial of his right to the presumption of innocence or privilege against self-incrimination. *Torres v. Mullin*, 317 F.3d 1145, 1158 (10th Cir. 2003). Mr. Morris believes

-5-

that the U.S. Magistrsate Judge at least in part relied on the prosecutor's statements that the defense did not have to call any witnesses, didn't have to deliver an opening or closing statement, that defense counsel and Mr. Morris could just sit there and do nothing and that it was the state's burden, in making the determination that the OCCA's resolution was not contrary to or an unreasonable application of clearly established federal law. [Doc. 15 at pg. 29]; (Trial Tr. Vol. 3, Tr. 160). Mr. Morris submits that the prosecutor's improper statements regarding his right to silence were not excused or overcome by the prosecutor's attempt to glaze over the improper comments with the comments that Mr. Morris did not have to present any evidence and could remain silent. The law is not what the prosecutor states to the jury to lessen the blow of his misconduct, but the statements that the prosecutor made themselves which were improper by impermissibly shifting the burden of proof to Mr. Morris. Therefore, the U.S. Magistrate Judge's recommendation in this instance was in error and the petition should be granted.

**Ground Three – Ineffective Assistance**

As is set forth in Ground Three, Mr. Morris asserted he received ineffective assistance of trial counsel for 1) failing to move for a new trial based on juror misconduct and 2) failing to object to comments made by the prosecutor in closing argument, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution [Doc. 11 at pg. 11]. In its Report and Recommendation, the U.S. Magistrate judge erroneously found that Petitioner failed to show prejudice from trial counsel's alleged ineffective assistance [Doc. 15 at pg. 23] and Mr. Morris objects to this finding. *See also* Objections to Grounds One,

-6-

Two and Four herein.  The U.S. Magistrate's finding that "...no reasonable probability that the outcome of a motion for new trial on this ground would have been any different than the outcome of he motion for mistrial"[5] is also erroneous and incorrect and objected to by Mr. Morris.  Mr. Morris submits that there was a presumption of prejudice regarding the juror's comments that the juror was concerned about the defendant "...writing all this stuff down.", that the juror only thought he could be fair and impartial, as well as the other statements made by juror Myers, that could have been addressed and found to be juror misconduct by the trial court that was not harmless if a motion for new trial had been requested by trial counsel (Trial Tr. Vol. 3, p. 52-56).  *See U.S. v. Morales,* 108 F.3d 1213, 1223 (10th Cir. 1997), where the court determined a presumption of prejudice had arisen in a codefendant's case from a juror's improper conduct in researching the dictionary definition of distribution. *Id*. at 1223.  Mr. Morris submits similarly a presumption of prejudice had arisen in his case from juror misconduct evidenced in the juror statements set forth above, and trial counsel was ineffective in failing to move for a new trial.

**Ground Five – Insufficiency of the Evidence**

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime in which Mr. Morris was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).  Therefore, Mr. Morris objects to the U.S. Magistrate Judge's finding to the contrary [Doc. 15 at pg. 31].

---

[5] [Doc. 15 at pg. 24].

-7-

At least one witness was incredible (Tinner) and the U.S. Magistrate Judge erred in the finding that *Jackson* foreclosed the possibility that an incredible witness could result in insufficient evidence.  Mr. Morris agrees with the U.S. Magistrate Judge that under *Jackson*, the "...trier of fact has full responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; [Doc. 15 at pg. 32].  But Mr. Morris submits the law allows that in addition to the jury's responsibility as finder of fact, the Court may disregard testimony on review if the Court finds the witness is inherently incredible. *Tapia v. Tansy*, 926 F.2d  1554 (10th Cir. 1991); *Wilcox v. Ford*, 813 F.2d 1140, 1146 (11th Cir.), cert. denied, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987). To be considered incredible, the testimony "must be unbelievable on its face, i.e., testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978); *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir.1985), cert. denied, 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986); *Wilcox v. Ford*, 813 F.2d at 1146. Examination of the record shows, Mr. Morris submits, that based on Tenth Circuit law set forth above and based on *Jackson,* the evidence was insufficient to sustain his conviction.

**Ground Six – Cumulative Error**

As Mr. Morris has set forth herein in his objections to the report and recommendation, there were numerous errors that occurred in his trial.  The cumulative effect of those errors deprived him of a fundamentally fair trial.  Memorandum in Support of Petition, p. 24.  The

-8-

U.S. Magistrate's finding that Petitioner has failed to establish any error was incorrect because there was basis upon which to find cumulative error. *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990).

Based on the above and foregoing, Petitioner respectfully objects to the Report and Recommendation by the U.S. Magistrate Judge dated July 27, 2009.

Respectfully submitted,

s/Bill Zuhdi
Bill Zuhdi, OBA #10013
Bill Zuhdi Attorney at Law, P.C.
P.O. Box 1077
Oklahoma City, OK 73101
(405)232-1400 (office)
(405)755-9686 (facsimile)
Zlawoffice@aol.com (e-mail)
ATTORNEY FOR PETITIONER

### Certificate of Service

I hereby certify that on September 16, 2009, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the Following ECF registrants:

Jared A. Looper
Attorney General's Office
FHC.Docket@oag.state.ok.us

s/ Bill Zuhdi
Bill Zuhdi

-9-

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HOWARD P. MORRIS, III, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. CIV-09-81-R |
| | ) |
| RANDY WORKMAN, Warden, | ) |
| | ) |
| Respondent. | ) |

## ORDER

Before the Court are the Report and Recommendation of United States Magistrate Judge Doyle W. Argo entered July 27, 2009 [Doc. No. 15] and Petitioner's Objection to the Report and Recommendation filed September 16, 2009 [Doc. No. 21]. In support of his Objection, Petitioner incorporates by reference the arguments, authorities, attachments, exhibits and facts contained in his Petition for Writ of Habeas Corpus and his Memorandum in Support. He also makes specific objections to the findings and conclusions of the Magistrate Judge with respect to each of grounds one through five in his petition. Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court reviews the Report and Recommendation *de novo* in light of Petitioner's objections.

In his first objection, directed to the Magistrate Judge's findings and conclusions as to grounds one and two, Petitioner asserts that the Magistrate Judge committed clear error in finding that the record of Juror Myers' examination does not support Petitioner's claim that the trial court should have granted a mistrial after the judge met privately with the jury to discuss a juror's voiced security concerns. Petitioner asserts that the record shows actual

prejudice by juror Myers and thus that the trial court committed manifest error in finding the jury as a whole impartial. Petitioner asserts that Juror Myers' comments indicated that he was not impartial and he already knew in his mind Morris was guilty before the trial began. Objection at p. 3.

Regarding ground two, Petitioner suggests that the trial court's meeting with the jury was presumptively prejudicial, citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed 389 (1954). He submits, therefore, that the Magistrate Judge's finding that the decision of the Oklahoma Court of Criminal Appeals (OCCA) was not contrary to nor an unreasonable application of clearly established federal law nor based on an unreasonable determination of facts was incorrect.

The Court agrees with the Magistrate Judge that Petitioner has not shown that his right to an impartial jury was violated; that the trial court committed manifest error in finding that the jurors had not discussed the case, had not formed an opinion as to Petitioner's guilt or innocence and that the jury as a whole was impartial; and/or that the OCCA's decision resulted in a decision contrary to or involving an unreasonable application of clearly established federal law as determined by the Supreme Court or that the OCCA's decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court disagrees with Petitioner's assertion that the colloquy between the trial court and Juror Myers reveals that Juror Myers was prejudiced against Petitioner. Juror Myers indicated that he had not formed an opinion as to whether the defendant was guilty or not guilty and that he had not discussed any security concerns with

2

the other jurors but had merely heard another juror express a concern to which he replied the juror should find out about that.  He stated that he had no doubt that he could be fair and impartial in the case and stated that "[t]hat's what I'm going to do."  Juror Myers acknowledged a general concern that the defendant was taking notes and related that his concern in this regard stemmed from two things.  First, Juror Myers' wife had served on a jury 15 years prior in which jurors were asked where they lived and the defendant was "writing all this stuff down," and secondly, that the case on which Juror Myers was sitting seemed like it might be a gang-related case.  It is obvious from the context in which Juror Myers expressed concern over turning the defendant loose in the community if the jury convicted him or if they did convict him that the defendant was going to give his buddy Juror Myers' address and his buddy was going to "come get" Juror Myers related to the two concerns Myers expressed – that the defendant might have his address and that the case may be gang-related, and not to any belief as to the guilt or innocence of the defendant.  Furthermore, Juror Myers expressed, without prompting, his willingness and ability to ignore any concern that the case might be gang-related and decide the case on the evidence presented.

Petitioner's claim that his constitutional right to be present at all critical stages of the proceedings, rooted primarily in the Fifth and Fourteenth Amendments, was violated when the trial judge initially met privately with the jury is very similar to the claim of respondents in *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), who complained of the trial judge's meeting with a juror who had complained that one of the

3

respondents had been sketching portraits of the jury. When informed by the bailiff of the juror's concern, the trial judge first ordered respondent Gagnon to cease sketching jurors' portraits and then met with the juror, in Gagnon's attorney's presence, in chambers. In chambers the judge assured the juror that respondent Gagnon was an artist, meant no harm, that the sketches had been confiscated and that Gagnon would sketch no more. The juror advised the judge that there had been no general discussion about the sketching by other jurors and stated that he was willing to continue as an impartial juror in response to the judge's inquiry. The United States Supreme Court held that the "respondents' rights under the Fifth Amendment Due Process Clause were not violated by the *in camera* discussion with the juror." *United States v. Gagnon*, 470 U.S. at 526, 105 S.Ct. at 526, 84 L.Ed.2d at 490. Observing that "the Fifth Amendment does not require that all the parties be present when the judge inquires into such a minor occurrence," 470 U.S. at 527, 105 S.Ct. 1482, 84 L.Ed.2d at 491, the Court concluded that the presence of the four respondents and their counsel was not required to ensure fundamental fairness or a "reasonably substantial . . . opportunity to defend the charge." *Gagnon*, 470 U.S. at 527, 205 S.Ct. 1482, 84 L.Ed.2d at 490 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed 674 (1934)). Consistent with the Supreme Court's holding in *Gagnon*, the Court agrees with the Magistrate Judge that no due process violation occurred and that the OCCA's decision to that effect was not contrary to or an unreasonable application of clearly established federal law determined by the Supreme Court nor was it based on an unreasonable determination of the facts in light of the record. *See Rushen v. Spain*, 464 U.S. 114, 125-36, 104 S.Ct. 453, 78 L.Ed.2d 267

4

(1983)(Stevens, J., concurring in judgment)(no constitutional right to be present at every interaction between a judge and a juror nor to have every such communication transcribed); *Bland v. Sirmons*, 459 F.3d 999, 1020-21 (10th Cir. 2006)(no constitutional right to be present during all communications between a judge and a juror; such right to be present exists only to the extent that a fair hearing would be thwarted by the defendant's absence). Although prejudice is presumed when there is a private communication with a juror during a criminal trial about a matter pending before the jury, *see Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed 654 (1954), and when there is an *improper ex parte* communication between a juror and a judge, *see Bodine v. Warden of Joseph Harp Correctional Center*, 217 Fed. Appx. 811, 816, 2007 WL 53444 (10th Cir., Feb. 22, 2007)(No. 06-6264); *Smallwood v. Gibson*, 191 F.3d 1257, 1279 (10th Cir. 1999), no improper *ex parte* communication between the judge and the jury occurred in Petitioner's case. However, even if the *ex parte* communication was improper and Petitioner's constitutional right to be present was violated, "the error was harmless, that is, it had no substantial and injurious effect or influence in determining the jury's verdict." *Ricafort v. Carey*, 2008 WL 1701732 at *6 (N.D. Cal. April 10, 2008)(No. C-05-3612-MHP)(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)(internal quotation omitted)); *Atwood v. Mapes*, 2004 WL 359466 at * 17 (N.D. Iowa Feb. 25, 2004)(No. C03-0034-MWB)(quoting *Penry v. Johnson*, 532 U.S. 782, 795, 121 S.Ct. 1910, 1919-20, 150 L.Ed.2d 9 (2001)(internal quotations omitted)).

Addressing the Magistrate Judge's findings and conclusions with respect to ground

5

four, prosecutorial misconduct in purportedly shifting the burden of proof to Defendant as a result of comments made during closing argument, Petitioner asserts that "the prosecutor's improper statements regarding . . . [Defendant's] right to silence were not excused or overcome by the prosecutor's attempt to glaze over the improper comments with the comments that Mr. Morris did not have to present any evidence and could remain silent." Objection at p. 6.   Irrespective of the prosecutor's references to the presumption of innocence, the privilege against self-incrimination, the State's burden of proof and the absence of any obligation on the part of the Defendant to present any evidence, the comments of the prosecutor about which Defendant complains, when considered in the context of the entire trial, were nothing more than fair comments on Defendant's own testimony and Defendant's failure to successfully impeach or undermine the credibility of eyewitnesses' testimony through cross-examination or otherwise.   The comments did not shift any burden of proof or production to the Defendant.   *A fortiori*, the comments did not so infect the trial with unfairness as to render the resulting conviction a denial of due process, *see Patton v. Mullin*, 425 F.3d 788, 811 (10th Cir. 2005) or so prejudice the Defendant's right to a presumption of innocence or privilege against self-incrimination to amount to a denial of either of those rights.   *See Hamilton v. Mullin*, 436 F.3d 1181, 1187 (10th Cir. 2006)(citing *Torres v. Mullin*, 317 F.3d 1145, 1158 (10th Cir. 2003).   Thus, the Court agrees with the Magistrate Judge that the OCCA's resolution of this claim was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court and was not based on an unreasonable determination of facts.

6

Petitioner objects to the findings and conclusions of the Magistrate Judge with respect to ground three, alleged ineffective assistance of counsel, arguing that the finding that there was no reasonable probability that the outcome of a new trial motion would have been different than the outcome of the motion for mistrial is incorrect and that a presumption of prejudice arose from Juror Myers' statements, citing *United States v. Morales*, 108 F.3d 1213, 1222 (10th Cir. 1997). However, no presumption of prejudice arose from the trial judge's initial private conversation with the jury because that communication was not improper and in any event harmless. *See* above. No presumption of prejudice arises from Juror Myers' conduct. He did not engage in juror misconduct. He and other jurors were questioned by the trial court and defense counsel only because the trial court informed counsel of her brief conversation with the jury about a juror's security concerns and defense counsel moved for a mistrial and individual voir dire of the jurors. Juror Myers' statements revealed no juror misconduct and no actual prejudice on his part. The Court agrees with the Magistrate Judge that there was no reasonable probability that the result of a new trial motion would have been different than that of the mistrial motion and hence that Petitioner has not shown that he was prejudiced by his counsel's failure to move for a new trial. Moreover, the failure of Petitioner's counsel to move for a new trial in light of Juror Myers' statements was not objectively unreasonable. With respect to trial counsel's failure to move for a new trial based upon the prosecutor's alleged improper comments, as indicated above, the comments were not improper and did not prejudice any rights of the Petitioner or render his trial fundamentally unfair. Hence, his trial counsel's failure to move for a new trial on the basis

7

of the alleged prosecutorial misconduct was not professionally unreasonable and there is no reasonable probability that the trial court would have found that the defendant's "substantial rights had been prejudiced. . . ." Okla. Stat. tit. § 952.

In his Objection directed to the Magistrate Judge's conclusion that the evidence was sufficient to support Petitioner's conviction for first degree murder under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), Petitioner suggests that the Magistrate Judge erred in failing to consider that a court may on review completely disregard the testimony of a witness that it finds is "inherently incredible," citing *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991). He suggests that the testimony of Demetria Tinner was inherently incredible. But the testimony of Ms. Tinner was not unbelievable on its face, that is testimony as to facts she could not possibly have observed or as to events that under the laws of nature could not have occurred.. *See Tapia v. Tansy*, 926 F.2d at 1562 (citations omitted). Viewing the evidence in the light most favorable to the prosecution, including the testimony of Ms. Tinner as well as that of Kurt Brazille and Dewan Debose, a rational jury could have found Defendant guilty of first degree murder beyond a reasonable doubt. Neither the Magistrate Judge nor the OCCA erred in failing to disregard Ms. Tinner's testimony.

Because the Court, like the Magistrate Judge, has found no errors, there can be no cumulative error and Petitioner's assertion of same is without merit.

In accordance with the foregoing, the Report and Recommendation of United States Magistrate Judge Doyle W. Argo [Doc. No. 15] is ADOPTED in its entirety and the petition

8

of Howard P. Morris, III for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is

DENIED.

    IT IS SO ORDERED this 8th day of October, 2009.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

9

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **HOWARD P. MORRIS, III,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Case No. CIV-09-81-R** |
| | ) |
| **RANDY WORKMAN, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

## JUDGMENT

In accordance with the Order entered this 8th day of October, 2009, it is ORDERED,

ADJUDGED and DECREED that Respondent have judgment on the 28 U.S.C. § 2254

petition herein.

IT IS SO ORDERED this 8th day of October, 2009.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

HOWARD P. MORRIS, III,   )
            )
    Petitioner,   )
            )
vs.         )  **Case No.  CIV-09-81-R**
            )
RANDY WORKMAN, WARDEN, )
            )
    Respondent,  )
            )
THE ATTORNEY GENERAL OF )
THE STATE OF OKLAHOMA.  )

## PETITIONER HOWARD P. MORRIS, III'S
## NOTICE OF APPEAL

   Now comes the Petitioner, Howard P. Morris, III, through his counsel Bill Zuhdi, and

respectfully gives notice of his claim of appeal to the United States Court of Appeals for the

10th Circuit from the Judgment entered in this proceeding on the 8th day of October, 2009.

       Respectfully submitted,


     s/ Bill Zuhdi
     Bill Zuhdi, OBA #10013
     Bill Zuhdi Attorney at Law, P.C.
     P.O. Box 1077
     Oklahoma City, OK 73101
     (405)232-1400 (office)
     (405)755-9686 (facsimile)
     Zlawoffice@aol.com (E-mail)


-1-

### *Certificate of Service*

I hereby certify that on November 6, 2009, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing.

Jared A. Looper
Attorney General's Office
FHC.Docket@oag.state.ok.us

s/ Bill Zuhdi
Bill Zuhdi

-2-